IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:23-cv-527

| | |
|---|---|
| TYLIYA J. NELSON )<br>    Plaintiff, )<br>                   )<br>    v.                 )<br>THREE POINTS CENTER, LLC; )<br>THREE POINTS CENTER NORTH )<br>CAROLINA, LLC; THREE POINTS )<br>PROPERTIES, LLC; THREE POINTS )<br>PROPERTIES NORTH CAROLINA, LLC; )<br>THREE POINTS ACADEMY, INC., & )<br>THANE PALMER )<br>    Defendants )  | **COMPLAINT**<br>**[JURY TRIAL DEMANDED]** |

## STATEMENT OF THE CASE

This is a retaliation action under Section 1981 and Title VII brought against a group of affiliated companies and their owner-managers known as "Three Points." Three Points is a business in the "troubled teen" industry that opened a facility in Chatham County in late 2021. Plaintiff, a 19-year-old black woman, was one of the initial hires and she was fired on April 6, 2022, the same day she engaged in "protected activity." Defendant Thane Palmer is the President of Three Points. On April 5, 2022, he said "NIGGER" during a staff meeting.



1

Ms. Nelson arrived at work the next morning and a group text message (that included upper management) was sent. She and another black co-worker were going to have a one-on-one meeting with their "boss" Craig "Butch" Butcher that same day.

During this April 6, 2022 meeting, Ms. Nelson identified recent "comments" made by "higher ups." Butcher explained Palmer was "not trying to be offensive" when he said "that word" and assured Ms. Nelson "there's no hate in his heart." Plaintiff also told Butcher about certain "jokes" that were "not cool" that put her in an "uncomfortable" situation. And at one point, after she complained about Palmer "sayin the nigga word," Butcher asked "is this where you want to be?"

The meeting ended around 11:30 a.m. and about seven hours later, two employees named Dan and Christina were instructed by senior management to fire Ms. Nelson in-person at the end of her shift. It was a humiliating and extremely devastating end to one of Plaintiff's first experiences as an adult in the workplace. She "said something" and got fired because of it—the same day.

Ms. Nelson brings this action under Title VII and Section 1981 to recover all relief which she is entitled to seek, including compensatory and punitive damages.

## VENUE, JURISDICTION, & ADMINISTRATIVE PROCEEDINGS

1. Plaintiff's claims of discrimination arise under Title VII of the Civil Rights of 1964 and 42 U.S.C. § 1981.

2. This Court has jurisdiction over this action under 28 U.S.C. § 1331.

3. This Court has jurisdiction over Plaintiff's Title VII claims because Plaintiff individually filed a timely Charge of Discrimination with the proper administrative agency against Three Points less than 180 days after she was terminated on April 6, 2022.

4. In January of 2023, Plaintiff obtained counsel and responded via counsel to Three Points Position Statement on or about February 13, 2023.

5. Prior to the conclusion of EEOC's investigation, Plaintiff requested and received a Right-to-Sue letter that was uploaded to the EEOC portal on April 27, 2023.

**[Exhibit A]**

6. Venue is proper in this Court because the employment practices alleged to be unlawful were committed within the Middle District of North Carolina.

7. The Court has personal jurisdiction over all Defendants. Defendants own or otherwise have an interest in real property located in this state, transact business with North Carolina residents, employ North Carolina residents, accept insurance and government benefits from North Carolina residents for "tuition" payments, and otherwise have sufficient minimum contacts with the state to be subject to personal jurisdiction.

## PARTIES

**"Three Points" is an "Integrated Enterprise" and "Single" Employer of Plaintiff**

8. Plaintiff is a black female resident of North Carolina who was employed as a "Youth Mentor" by Defendants between December 2021 and April 6, 2022.

9. Defendants collectively make up the integrated enterprise of "Three Points Center," a group of affiliated entities and persons that operate in the "troubled teen" industry (hereafter "Three Points").

3

Case 1:23-cv-00527-LCB-JLW   Document 1   Filed 06/29/23   Page 3 of 18

10. Under the "integrated enterprise" or "single employer" doctrine several companies may be found to be so interrelated that they constitute a single employer for purposes of liability under Title VII and relief may be obtained from any of the entities.

11. The Three Points Defendants admit in recently filed court documents that they are "affiliated entities." **[Exhibit B]**

12. Upon information and belief, all of the named Three Points entities, <u>except for Three Points Properties, LLC and Three Points Properties North Carolina, LLC</u>, recently filed articles of dissolution on the same day, June 5, 2023. **[Exhibit C]**

13. "Three Points" is still operating residential treatment and congregate care facilities in Utah and North Carolina and accepting new patients as of the date of this Complaint.

14. Defendant <u>Three Points Center, LLC</u> is a Colorado limited liability company that voluntarily dissolved on June 5, 2023.

15. Defendant <u>Three Points Center North Carolina, LLC</u> is a manager-managed Colorado limited liability company that voluntarily dissolved on June 5, 2023.

16. Defendant <u>Three Points Properties, LLC</u> is organized for the purpose of owning and managing Three Points properties and is a Utah limited liability company.

17. Defendant <u>Three Points Properties North Carolina, LLC</u> is a Colorado-based limited liability company organized for the purpose of owning and managing Three Points properties. Upon information and belief, it is the record owner of the real property in Chatham County where Ms. Nelson was fired on April 6, 2022.

18. Defendant <u>Three Points Academy, Inc.</u> is a non-profit corporation that was voluntarily dissolved on June 5, 2023.

19. Defendant Thane Palmer is the President of Three Points Center, and he maintains a residence in Chatham County, North Carolina.

20. Upon information and belief, Palmer authorized the decision to terminate Plaintiff. He may be held individually liable for Plaintiff's Section 1981 Claims.

21. One person or entity owns nearly 50% of all named Three Points entities.

22. The chief executives of Three Points, Norm Thibault and Defendant Thane Palmer, are the managing members of all named Three Points entities and they each own an equal percentage of all Three Points entities.

23. Upon information and belief, when Plaintiff was terminated, Defendants were controlled by a single manager who was responsible for all significant financial personnel, and employment policy decisions.

24. The boards of the Three Points entities are comprised of the same people.

25. All Three Points entities are closely held and unified by a single business model – providing live-in "residential treatment" and education to teenagers in exchange for tuition payments.

26. There is a pending lawsuit in the State of Colorado involving with all named Three Points entities where they commonly asserting a single claim for relief.[1]

---

[1] *Three Points Center, LLC v. Estate of Michael Thibault* (1:22-cv-03053) District Court, D. Colorado

27. The residents are moved back and forth between facilities. Shortly after Plaintiff was hired, Ms. Nelson flew to Utah to transport a group of teens living at Three Points Utah facility to the Three Points North Carolina Facility.

28. There is no material distinction in the branding that differentiates the Utah and North Carolina Three Points facilities, nor is there a specific website or web presence for the North Carolina Facility.

29. There is only a single website (www.threepointscenter.com) and employee email addresses have a single domain (@threepointscenter.com).

30. The "Three Points Properties" LLC's are holding companies with no distinct business purpose, other than to be a pass through entity for "rent."

31. At all relevant times, the "Three Points" Defendants have continuously done business in North Carolina and maintained at least fifteen (15) employees.

32. At all relevant times, Defendants were and are Plaintiff's "employer."

## FACTUAL ALLEGATIONS

33. Defendants collectively make up the integrated enterprise of "Three Points Center," a service provider in the "troubled teen" industry ("Three Points").

34. The "troubled teen" industry is a label applied to a category of businesses that operate private "residential treatment facilities" for teenagers.[2]

---

[2] "When problems arise with adopted adolescents that can no longer be dealt with at home, thousands of these adopted individuals and their families are treated with a "cookie cutter" approach at residential facilities[.]" https://www.threepointscenter.com/



**Plaintiff's Employment at Three Points Center Siler City**

35. Tyliya Nelson is a 19-year-old black woman that was hired by Three Points in late 2021 as a "Youth Mentor."

36. In this role, she was paid approximately $12.00 per hour to provide constant supervision of teenage girls with behavior and emotional problems.

37. The "girls" were under "lock and key."

38. As a secure, private residential facility, Three Points is obligated to prevent "runaways" and other forms of self-harm.

39. Ms. Nelson and her co-workers would sometimes be required to physically restrain and control the juvenile residents.

40. Ms. Nelson was extremely fit for this guardian role and despite its unique demands, enjoyed working with "the girls."

41. This was her first "real" full-time job after graduating high school.

42. Tragically however, at the end of her April 6, 2022 shift, her job ended as the result of an illegal retaliatory termination ordered by Defendants' senior management.

**Tuesday April 5, 2022**

43. On April 5, 2022, Defendant Palmer said "NIGGER" at a staff meeting.

44. The situation at Three Points became highly charged and volatile.

45. Upon information and belief, one of the teenage residents leapt up and rushed towards Palmer in a fit of rage.

46. After the teen was restrained, Palmer did not quickly apologize for using a racial slur in front of everybody.

47. Rather, there was an attempt to minimize the force and effect of "that word" and downplay the gravity of a white executive saying it out loud at work.

48. After that meeting ended, Ms. Nelson worked the rest of her shift.

**Wednesday April 6, 2022**

49. The next morning of April 6, 2022, a group text message was exchanged between Ms. Nelson, two of her co-workers, and a manager Craig "Butch" Butcher.

50. Butcher's duties at Three Points were akin to those of a Vice-Principal (i.e., discipline, resolving staff disagreements, making or recommending personnel decisions).

51. Defendant Palmer's role was more akin to a Headmaster or Warden.

52. Butcher set up a meeting with Ms. Nelson and two other employees to discuss the events of April 5, 2022.

53. Butcher explained this meeting would "be as [her] boss" and he "would like to hear it for sure."

54. Ms. Nelson and Butcher met around 11 a.m. in the "admin building."

**April 6, 2022, 11:00 a.m – Ms. Nelson's meeting with Butcher**

55. During the meeting, among other issues and topics of discussion, Ms. Nelson identified certain racial "comments" and "jokes" she heard during her relatively brief employment tenure at Three Points.

56. She expressed that Palmer's use of a racial slur the day before had caused reflections amongst employees about "what's right and what's wrong" in the workplace.

57. She also expressed her view that employees should directly address situations where they perceive "unfair" treatment, like when Defendant Palmer said "the nigga word."

> *Ms. Nelson: "if you feel like something was done unfairly, even to yourself, then say it, like the whole Thane sayin the nigga word."*

58. Butcher then explained that Palmer was not "trying to be offensive" and "did not have any hate in his heart" when he said "that word."

> *Butcher: "…There's no hate in his heart behind it…He wasn't trying to be offensive to you or anyone else…although you're right, you shouldn't say that word, that's for sure."*

59. Butcher later expressed an opinion that Ms. Nelson had "potential," but he saw "attitude" and "resistance to some things."

60. Butcher also asked Ms. Nelson …."is this where you want to be?"

61. Three Points management knew Ms. Nelson was willing to say "something" about workplace issues.

62. Butcher's "is this where you want to be" question was a thinly veiled attempt to assess whether Plaintiff was going to toe the company line the day after Defendant Palmer said the "N-word."

63. Ms. Nelson then explained to Butcher that "people need a job."

> <u>Ms. Nelson</u>: "And you say oh "you wanna be here' and all this and all that….well… people need a job…you know what I'm sayin…and its like… we leave this job what is it, fast food restaurant?"

64. During the April 6, 2022 meeting, Ms. Nelson also identified "comments" made by other white employees after Palmer said the "N-word."

65. As a black hourly employee, Plaintiff was reasonably concerned that a senior white executive's unrepentant use of the "N-word" could foster a workplace culture where employees felt licensed to indulge in unwelcome, offensive racial tropes and caricatures with impunity.

66. The potential for things to get out of hand and snowball into a racially hostile work environment is amplified by the fact that Three Points is a geographically isolated, restricted access, 24-7 facility.  **[Exhibit D]**

67. Ms. Nelson reminded Butcher about a "conversation" she had with a white co-worker who made a black "joke" that was "not cool."

> <u>Ms. Nelson</u>: "Had a whole conversation with [employee] … and he's acting like he's black …talkin bout some… 'if I step into the dark you wouldn't see me'…it's not cool"

68. She also identified a previous discipline action Butcher took against her, expressing her opinion that it did not seem fair, especially when compared to discipline other employees received.

69. Specifically, on the weekend of January 29, 2022, Ms. Nelson and a black co-worker made breakfast for Three Points residents. "Buck" the cook was absent.

70. Apparently, Ms. Nelson was not supposed to make sausage and waffles. Butcher informed her the following Monday morning those items were not "approved" and must be replaced.



71. Three Points' tuition paying residents ate the "unapproved" items, but Ms. Nelson was still required to pay out-of-pocket to "replace them."

72. Upon information and belief, Three Points does not have a written policy putting non-kitchen, hourly employees on notice that making unapproved food could subject the employee to a *de-facto* wage reduction.

73. Upon information and belief, the swift, punitive, "tough love" nature of the various "behavior modification" techniques Three Points managers use with teen residents (which may include immediate punishment for talking out of turn and a

complex system of "demerits" and "levels") has migrated into the company's employment practices.

74. Ms. Nelson and Butcher's meeting ended around 11:30 a.m.

**April 6, 2022 - Ms. Nelson was unlawfully terminated the same day she engaged in "protected activity" because she engaged in "protected activity"**

75. During the April 6 meeting with Butcher, Ms. Nelson engaged in "protected activity" under Title VII and its implementing regulations and guidance.

76. And approximately 7 hours later, Three Points management instructed two low-level supervisors named Dan and Christina to fire her in-person.

77. No written reason was provided at the time.

78. There was no plan to terminate Plaintiff before her morning meeting with Butcher on April 6, 2022.

79. Butcher could have terminated Ms. Nelson before or during the meeting.

80. He was her "boss."

81. But Butcher told Ms. Nelson he wanted to "hear it."



82. And after he heard about "it" for about 30 minutes, Three Points worked Ms. Nelson the rest of her 12-hour shift before they fired her.

83. Her end-of-shift, in-person termination was humiliating and devastating.

84. It was also an illegal retaliatory termination.

85. It is specifically alleged that during the April 6, 2022 meeting, amid a longer statement about employees "speaking up" about "what's wrong," Ms. Nelson said:

*"like the whole Thane saying the nigga word"*

86. And after she said this, Butcher asked her:

*"is this where you want to be?"*

87. Three Points knew Ms. Nelson (aka "T") was the type of employee willing to say "something."

88. And so did her co-workers. They were grateful for it.



89. Under these circumstances, it is not just merely possible that the termination of Ms. Nelson would "deter" other "reasonable" members of Defendants' workforce from engaging in protected activity.

90. Rather, when an employer terminates a black woman making $12.00 per hour seven hours after she respectfully communicates to HR that a white executive's use of the "N-word" puts black employees in an "uncomfortable" situation, that employer knowingly creates a substantial risk that employees will forego opposing racial discrimination out of fear for losing their job.

91. Defendants did this and it is outrageous.

13

92. Three Points' retaliatory termination was done with malice or with reckless indifference to Ms. Nelson's civil rights, and she brings this action to recover all damages and relief allowed, including back pay, damages for emotional distress and punitive damages to punish Defendants and deter others from similar future conduct.

## COUNT I
**(42 U.S.C. § 1981) (Intentional Retaliatory Termination)**
*Against All Three Points Entity Defendants & Defendant Thane Palmer*

93. The preceding paragraphs are incorporated by reference herein.

94. Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens."

95. Section 1981 applies to employment discrimination on the basis of race and "encompasses retaliation claims." *Cbocs West, Inc. v. Humphries*, 553 U.S. 442 (2008)

96. Plaintiff is a black employee that engaged in activity protected by Section 1981, including during the April 6, 2022 meeting with Butcher, a Three Points manager with discipline authority who also performed other human resource roles.

97. Specifically, Plaintiff made several statements to her "boss" Butcher about unfair treatment, discrimination, and "uncomfortable" work conditions for black employees, including herself.

98. Plaintiff's "opposition" to racial discrimination and a racially hostile work environment include, but are not limited to, the following statements:

   a. "if you feel like something was done unfairly, even to yourself, then say it, like the whole Thane saying the nigga word."
   b. "he's acting like he's black … it's not cool"

      c. "the higher ups…for example, him saying the N-word."
      d. "comments that have been made and people brush it off like it's funny"
      e. "it puts you in an environment where you can't progress"
      f. "you put us in an uncomfortable position"
      g. "is it because of my skin color?"

99. Plaintiff's statements constituted a specific complaint to her employer opposing workplace conduct and conditions that were or could become racially hostile.

100. Plaintiff's opposition statements were based on a good-faith belief that the environment at Three Points could become racially toxic and discriminatory.

101. It is specifically alleged that when a senior manager says "NI**ER" in front of black employees, the potential for a racially hostile work environment is significant and imminent, if not immediate and automatic.[3]

102. Near the beginning of the April 6 meeting, Butcher acknowledged that Palmer said "that word" after Ms. Nelson identified "it."

103. And near the end of the meeting, Butcher told Plaintiff that he "definitely sees" some "resistance to some things."

104. Butcher knew Plaintiff was conveying opposition or resistance to actual or potential race based EEO violations and Defendants were aware of her protected activity.

105. Plaintiff's manner of opposition was also reasonable. During a meeting with her supervisor the day after a racial slur was used, she promptly identified the slur and the person who said it, Defendant Thane Palmer.

---

[3] *Reid v. DeJoy*, 1:22-cv-01285-JRR, at *22-23 (D. Md. May 10, 2023) ("It is axiomatic that "[f]ar more than a 'mere offensive utterance,' the word 'nigger' is pure anathema to African-Americans.") (citing *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001).

106. After Butcher's meeting with Plaintiff ended, he communicated with his supervisor, Defendant Thane Palmer.

107. Palmer ultimately authorized and made the decision to fire Ms. Nelson that day.

108. Three Points' swift termination of Plaintiff <u>the same day she engaged in protected activity</u> was a "materially adverse" employment action.

109. Defendants' retaliatory motive was the "but-for" cause of her termination.

   a. Plaintiff met with Butcher, a Three Points manager that had the authority to fire her on April 6.
   b. He did not fire her during the meeting.
   c. Nor did he tell her she was going to be fired at the end of the day for any specific reason.
   d. After the meeting, Plaintiff worked the rest of her shift and did not do anything that would justify her termination during those seven hours.

110. Defendants' termination of Ms. Nelson was carried out in retaliation because she engaged in protected activity.

111. Plaintiff is entitled to back pay and pre-judgment interest, compensatory damages, and other non-economic damages, including damages for the significant emotional distress proximately caused by this retaliatory termination.

112. Defendants' retaliation was done "with malice or with reckless indifference to the federally protected rights" of Ms. Nelson, entitling her to an award of punitive damages.

## COUNT II
**(Title VII) (Retaliatory Termination)**
*Against All Three Points Entity Defendants*

113. The preceding paragraphs are realleged and incorporated by reference.

114. Defendants are Plaintiff's "employer" and they engaged in unlawful employment practices in violation of Section 704 of Title VII, 42 U.S.C. § 2000e-3(a) by retaliating against Ms. Nelson for engaging in protected activity.

115. As alleged, including within Paragraphs 98-107, Plaintiff engaged in "protected activity" as a Three Points employee by making several "opposition" statements to her employer.

116. Defendants, aware that Plaintiff had engaged in protected activity, subsequently took a materially adverse employment action against Plaintiff by terminating her the same day she engaged in protected activity.

117. Defendants' actions would dissuade a reasonable worker from making or supporting a charge of racial discrimination or opposing conduct in the workplace that could violate the EEO laws.

118. Defendants' retaliatory motive was a "but-for" cause of the termination.

119. The unlawful practices complained of were willful and intentional.

120. The unlawful practices complained of were committed with malice or with reckless indifference to Plaintiff's federally protected rights.

121. As a direct and proximate result of Defendant's violations of Title VII, Plaintiff suffered actual damages including but not limited to back pay, front pay, losses in compensation and benefits, humiliation, emotional distress, and loss of enjoyment.

122. Defendants' retaliation was done "with malice or with reckless indifference to the federally protected rights" of Ms. Nelson, entitling her to punitive damages.

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and the following relief against Defendants:

A. For COUNT I, enter an order declaring that the named Defendants violated 42 U.S.C. § 1981 by retaliating against Ms. Nelson for engaging in protected activity.

B. For COUNT II, enter an order declaring that the named Defendants violated Section 704 of Title VII, 42 U.S.C. § 2000e-3(a) by retaliating against Ms. Nelson for engaging in protected activity.

D. Order Defendants to make Plaintiff whole by providing compensation for past pecuniary losses including, but not limited to front pay, back pay, and consequential damages in amounts to be determined at trial;

E. Order Defendants to make Plaintiff whole by providing compensation for past and future non-pecuniary losses including, but not limited to, emotional distress and humiliation in amounts to be determined at trial;

F. Order Defendants to pay Plaintiff punitive damages to for their willful, and reckless conduct in an amount to be determined at trial;

H. Award Plaintiff costs and reasonable attorney's fees in this action.

I. A jury trial on all questions of fact raised by this Complaint.

J. Grant such further relief as the Court deems necessary and proper.

This the 29th day of June 2023.

                                          */s/ Garrett L. Davis*
                                          **Garrett L. Davis**
                                          The Law Office of Garrett Davis
                                          N.C. Bar # 52605
                                          555 S. Mangum St. Ste. 100
                                          Durham, NC 27701
                                          gd@garrettdavislaw.com
                                          919-321-1203
                                          *Attorney for Plaintiff*