IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 1:23-cv-527

TYLIYA J. NELSON,       )
                           )   D E P O S I T I O N
         Plaintiff, )
                           )        O F
     vs.               )
                           )     C R A I G
THREE POINTS CENTER, LLC;  )
THREE POINTS CENTER NORTH  )    B U T C H E R
CAROLINA, LLC; THREE POINTS )
PROPERTIES, LLC; THREE     )
POINTS PROPERTIES NORTH    )
CAROLINA, LLC; THREE POINTS )
ACADEMY, INC. & THANE      )
PALMER,               )
                           )
        Defendants.)
----------------------------

A P P E A R A N C E S:

For the Plaintiff:     Mr. Garrett L. Davis
                     Law Office of Garrett Davis, PLLC
                     555 S. Mangum Street, Suite 100
                     Durham, North Carolina 27701

For the Defendants:    Ms. D. Beth Langley
                     Mr. Jimmy C. Chang
                     Brooks, Pierce, McLendon, Humphrey &
                      Leonard, LLP
                     P.O. Box 26000
                     Greensboro, North Carolina 27420

In Attendance:        Ms. Heidi Palmer

In Greensboro, N.C.    Reported by:
February 9, 2024      Lisa S. Marion

2

E X A M I N A T I O N   I N D E X

| Examination | By Whom | Page No. |
|---|---|---|
| Direct | Mr. Davis | 6 |
| Cross | Ms. Langley | 269 |

E X H I B I T I N D E X

| Exhibit No. | Description | Page Marked |
|---|---|---|
| Plaintiff's 30 | Time Records for Three Points Center Employees | 132 |
| Plaintiff's 31 | Time Compilation for Tyliya Nelson | 135 |
| Plaintiff's 32 | Time Spreadsheet for Tyliya Nelson | 164 |
| Plaintiff's 33 | Employee Termination Report | 174 |
| Plaintiff's 34 | Text Messages | 180 |
| Plaintiff's 35 | Text Messages | 182 |
| Plaintiff's 36 | Text Messages | 211 |
| Plaintiff's 37 | Attendance Review/ Corrective Action | 215 |
| Plaintiff's 38 | Group Notes | 216 |
| Plaintiff's 39 | Employee Training Report for Avery McLaurin | 221 |
| Plaintiff's 40 | Audio Recording | 236 |
| Plaintiff's 41 | Employee Training Report for Marcus Maness | 245 |

*Plaintiff's Deposition Exhibits No. 38 and 40 were retained by Mr. Davis.

4

1          S T I P U L A T I O N S

2          It is hereby stipulated and agreed between the

3     parties to this action, through their respective counsel of

4     record:

5          (1)  That the deposition of CRAIG BUTCHER may be

6     taken on February 9, 2024, beginning at 10:30 A.M. in the

7     offices of HYATT PLACE GREENSBORO DOWNTOWN, located at 300 N.

8     Eugene Street, Greensboro, North Carolina 27401, before Lisa

9     S. Marion, a Notary Public.

10          (2)  That the deposition shall be taken and used as

11     permitted by the applicable Federal Rules of Civil Procedure.

12          (3)  That any objections of any party hereto as to

13     notice of the taking of said deposition or as to the time or

14     place thereof, or as to the competency of the person before

15     whom the same shall be taken, are deemed to have been met.

16          (4)  Objections to questions and motions to strike

17     answers need not be made during the taking of this

18     deposition, but may be made for the first time during the

19     progress of the trial of this case, or at any pretrial

20     hearing held before any judge of competent jurisdiction for

21     the purpose of ruling thereon, or at any other hearing of

22     said case at which said deposition might be used, except that

23     an objection as to the form of a question must be made

24     at the time such question is asked, or objection is waived

25     as to the form of the question.

1       (5)   That the witness reserves the right to read and

2   sign the deposition prior to filing.

3       (6)   That the sealed original transcript of this

4   deposition shall be mailed first-class postage or hand-

5   delivered.

6       (7)   That the witness was identified by a government-

7   issued photo ID.

8                       * * * * *

9   Whereupon,

10                  CRAIG BUTCHER,

11                  having been first duly sworn,

12                  was examined and testified

13                  as follows:

14

15

16

17

18

19

20

21

22

23

24

25

1    DIRECT EXAMINATION BY MR. DAVIS:

2        Q     All right.  I think I'll scoot down a little bit

3              more closer to you so we're across the same spot.

4                    Good morning, Mr. Butcher.

5        A     Yes.  Good morning.

6        Q     My name is Garrett Davis.  I am the attorney for

7              plaintiff Tyliya Nelson in this lawsuit.  Thank you

8              for being here today.

9        A     Sure.

10       Q     And before I go into this -- our first little

11             exchange, I'll also -- we may get warmed up and it

12             may feel like a conversation.  And when I said

13             "good morning" and told you those kind of -- why

14             we're here, which I believe you know, you shook

15             your head like this, which is probably what we

16             would do if we were talking in some other type of

17             context.

18       A     Yes.

19       Q     So the first ground rule -- which it's my job, and

20             not the court reporter's job to make sure we get

21             clear testimony -- is if there is an answer that

22             you wish to provide that is yes --

23       A     Yes.

24       Q     -- or no --

25       A     Sounds good.

1    Q    We'll work on it.  And so if I have to keep doing

2         that -- that's one of those things where I may

3         push, but that's just -- it's just the nature of

4         the job.  And I'm the same way.  And the court

5         reporter may remind us, too.

6              So your name is Craig Butcher?

7    A    It is.

8    Q    Yesterday during Dr. Thibault's deposition, I asked

9         him a question about whether -- where your current

10        place of employment was.  Do you still work at

11        Three Points Center?

12   A    Yeah.  My -- yes.

13   Q    Okay.  Please explain.

14   A    So my caseload ended -- actually ended last week.

15        But I'd say with this week's proceedings, it was

16        extended, obviously, until this timeframe -- like

17        this is over.  But I've had -- yeah.  So currently,

18        yes.  Will I be as of after this today?  No.

19   Q    Okay.  And we'll get -- we'll get to that.  I just

20        wanted to kind of confirm --

21   A    Yeah.

22   Q    -- at the beginning kind of -- there's then, and

23        there's now, and there is the moving forward.  And

24        I didn't really ask Dr. Thibault too much about

25        that.  So thank --

1    A    Yes.

2    Q    Thank you.  So -- but since -- well, did you hire

3         Ms. Nelson in 2021?

4    A    I did.

5    Q    Okay.

6    A    Yes.

7    Q    Between 2021 when you hired Ms. Nelson and the time

8         last week whenever you made the decision, which I'm

9         going to ask you questions about, were you employed

10        by the -- one or more of the defendants named in

11        this lawsuit?

12   A    I was hired by Three Points Center.

13   Q    You worked for Three Points Center?

14   A    I do.  Yes.  I worked for both Three Points Center

15        North Carolina and Three Points Center in Utah --

16        in Utah.  Yes.

17   Q    Okay.  Understood.  All right.  Mr. Butcher, this

18        is -- I think some people might not -- I talk a lot

19        for my job.  And maybe you do, too.  I have a

20        southern accent.

21   A    Okay.

22   Q    And I don't think I do.  I detect -- do I detect an

23        accent?

24   A    You would.  Yes.

25   Q    And where is that?  Where are you -- where were you

```
 1          born?
 2    A     I'm from -- I'm from Liverpool, England.
 3    Q     Okay.  When did you move to the United States?
 4    A     In 2009, I believe.
 5    Q     Why did you move here?
 6    A     To go to school.
 7    Q     To go to school?
 8    A     Yeah.
 9    Q     What school did you go to?  College, or prep
10          school, undergrad?  What was it?
11    A     It was college.  Yes.
12    Q     College?
13    A     Yeah.
14    Q     So we'll start there.  We won't go back across the
15          pond in terms of things.  But that's where you --
16          Liverpool?
17    A     Yeah.
18    Q     And when were you born?
19    A     I was born -- what year was I born?
20    Q     Uh-huh.
21    A     1987.
22    Q     1987.  And so -- and you moved to -- or did you
23          fully emigrate to the United States in 2009?
24              MS. LANGLEY:  Object to form.
25    A     (Nods head.)
```

1    Q    Was it a student visa?

2    A    It was.

3    Q    Did you intend to stay here permanently when you

4          came over on that student visa?

5    A    No.

6    Q    No.  Okay.  Let's -- there may be some questions I

7          ask you about that.  If you've thought about trial

8          or think, "Why is he asking me that," this is a

9          deposition, and we can go back a little bit.  All

10        right?

11             And I think what I asked is why did you come

12        here, and you testified that you came here to go to

13        school, correct?

14    A    Yes.

15    Q    And when you came on the student visa originally,

16        you did not intend to stay here permanently?

17    A    No.

18    Q    And that was in 2009?

19    A    Yes.

20    Q    It's 2024.  Do you intend to stay in the United

21        States permanently?

22    A    It's something I've never really thought about.

23    Q    Maybe it's -- let's just go back to that.  Tell me

24        about going to school in 2009.  What did you --

25        what did you study?

1    A    It was -- I believe I took my general -- my

2         associates, and it was just general studies.  It

3         was on a soccer scholarship.

4    Q    Okay.  And what was the name of that institution?

5    A    It was Iowa Western Community College.

6    Q    Iowa.  Okay.

7    A    Yes.

8    Q    So the first place that you lived at in the United

9         States was in Iowa?

10   A    Yes.

11   Q    When did you finish that school?  Or did you

12        graduate from there?

13   A    I did not.

14   Q    Okay.  You did not?

15   A    No.

16   Q    Okay.  What did you do after Iowa Community

17        College?

18   A    I transferred to a university.

19   Q    Which university?

20   A    Ashford University.

21   Q    Ashford.  Where is that located?

22   A    That's also in Iowa.

23   Q    That's also in Iowa.  What year did you transfer?

24   A    2011.

25   Q    For the -- for the fall or for the spring semester?

1    A    For the fall.

2    Q    The fall.  All right.  Did you play soccer there?

3    A    I did.  Yes.

4    Q    Okay.  Was that a four-year institution?

5    A    It was.  Yes.

6    Q    Okay.  Did you receive a degree from that

7        institution?

8    A    Yes.

9    Q    What year did you receive that degree?

10    A    2013.

11    Q    2013.  And I may do a lot of confirming in this one

12        just 'cause I feel like it's good for there [sic].

13        And if I confirm too much, you can expect them to

14        not let me confirm.  Okay?

15    A    Okay.

16    Q    But here as we do this, I'm just going to keep

17        repeating, 'cause I think it might help.

18             2013.  What was your degree in?

19    A    Sports and recreational management.

20    Q    Okay.  What was your first -- after graduating --

21        so you're in Iowa.  What was your first job after

22        graduating?

23    A    I worked at a loan office -- in a loan office --

24    Q    A loan office?

25    A    -- in St. George, Utah.

1    Q    In St. George, Utah?

2    A    Yeah.

3    Q    Why -- so you graduated in -- from a college in

4         Iowa.  Did you -- when you were graduating, did you

5         know you were going to move to St. George?  What

6         was the reason for moving to St. George?

7    A    I moved -- that's where my wife's family lives.

8    Q    Okay.  Tell me, who is your wife?

9    A    My wife -- her name is Chamea.

10    Q    Chamea?

11    A    Chamea Butcher.

12    Q    Chamea.  When did y'all meet?

13    A    It was in college.

14    Q    Did she go to the community college or the four-

15         year?

16    A    She went to both.

17    Q    She went to both?  Okay.

18    A    Yes.

19    Q    When were you two married?

20    A    Let's see.  It would be 2012.

21    Q    Okay.

22    A    Yeah.

23    Q    I'm not going to ask for an anniversary, because

24         I'm drawing a blank, too.  I forgot my -- I forgot

25         my ring.

1        2012.  You met -- you met in college.  And

2        what is her first name again?

3    A   Chamea.

4    Q   Chamea.  What is her connection to St. George,

5        Utah?

6    A   That's where she grew up.

7    Q   That's where she grew up?

8    A   Yes.

9    Q   What is her maiden name?

10   A   Palmer.

11   Q   Palmer?

12   A   Yes.

13   Q   Is she related to -- by -- is she related to Mr.

14       Thane Palmer?

15   A   Yes.

16   Q   And Mrs. Palmer?

17   A   Yes.

18   Q   Okay.  The loan -- the loan office, how did you get

19       that job?

20   A   I believe it was an internet search at the time.

21   Q   So how many -- how big is St. George?  I mean, I

22       say "how big."  What is -- is it a small town, big

23       town?

24   A   I would say it's a small town getting bigger.

25   Q   Is it the type of place where you feel like

1           everybody knows everybody, or is it bigger than

2           that?

3                MS. LANGLEY:  Object to form.

4   Q    You can answer.

5   A    I don't think -- I don't think everyone knows

6           everyone's business.  No.

7   Q    Did the Palmers help you get the job in any way,

8           either, you know, put in a good word, you know, "We

9           think -- we think our son-in-law is a great

10          leader," that type of stuff, to get the job at the

11          loan office?

12  A    No.

13  Q    Okay.  Why did you apply to a loan office with a

14          degree in sports?  What was your -- what was your

15          degree in?

16  A    Sports and recreational management.

17  Q    And recreational management.  You have -- I may not

18          have asked that.  You were -- you were married, and

19          Utah is a beautiful place, so that's the job you

20          applied for, correct?

21  A    Yes.

22  Q    How long did you work there?

23  A    I want to say two years.

24  Q    Two years.  So help me pin the timeline down again.

25          So did you get the loan office job the same year

1              that you -- that you graduated from the Iowa

2              College?

3    A     Yes.  I believe -- I believe so.

4    Q     Okay.

5    A     Yeah.

6    Q     And you worked there for about two years?

7    A     Yes.

8    Q     So that puts us in -- what was your next job after

9              the loan office?

10   A     It was employment at Three Points Center.

11   Q     Okay.  It's my understanding that Three Points

12            Center started in 2014.  Does that seem like the

13            date you started working there?

14   A     No.

15   Q     Let me rephrase that.  You were living in Utah with

16            your wife and family in 2013, correct?

17   A     Correct.

18   Q     Had Three Points started yet?

19   A     No.

20   Q     Where was Mr. Palmer, your father-in-law, working

21            at that time?

22   A     I don't know the name of the organization.

23   Q     Okay.

24   A     Yeah.

25   Q     When Three Points Center -- around this time, do

1        you remember discussing with your family members

2        about Three Points Center being opened?

3               MS. LANGLEY:  Object to form.

4   A    Yes.  I remember conversations.

5   Q    Okay.

6   A    Yeah.

7   Q    What were those conversations like?

8   A    That was -- that was a very long time ago.  I don't

9        -- I don't remember the content of those

10       conversations.  I do remember -- yeah.  I remember

11       Three Points Center and, like, openings and family

12       kind of being excited, but I don't remember

13       (inaudible) --

14  Q    Right.  And that's why it was a general question.

15  A    Yeah.

16  Q    Okay.

17  A    Sorry.

18  Q    No.  That's all right.

19  A    I don't remember.  Sorry.

20  Q    Do you remember if when you heard that it was --

21       that Three Points Center was going to be

22       established that you had a desire to work there

23       when it opened?

24              MS. LANGLEY:  Object to form.

25  A    No.  I don't think so.

1    Q    How did the -- but you did eventually become

2          employed at Three Points Center after it opened,

3          correct?

4    A    I did.  Yes.

5    Q    How did that opportunity present itself to you?

6    A    I believe -- yeah.  I was -- let's see.  I believe

7          I was offered a position by Mr. Palmer to come work

8          there.  Yeah.

9    Q    What was that?  What was your first position at

10         Three Points Center?

11    A    I would've been a supervisor.

12    Q    A supervisor?

13    A    Yes.

14    Q    So just so we can kind of develop a little bit of a

15         dictionary right now, you would've been a

16         supervisor there.  What was your final job title as

17         an employee for any of the defendants that you

18         worked for identified on the complaint?

19              MS. LANGLEY:  You mean as of --

20              MR. DAVIS:  As of before --

21              MS. LANGLEY:  -- recently --

22              MR. DAVIS:  Yeah.

23              MS. LANGLEY:  -- or as of --

24              MR. DAVIS:  As of last week.  Right.

25    A    So at TPC Utah, I finished as a clinician.

1    Q    All right.  Let me -- all right.  So we're going to

2         bounce a little bit.  All right.  So when you say

3         you finished at Utah, you're talking about last

4         week, so 2024.

5    A    Yes.

6    Q    I'm just going to put February 2024.

7    A    Yes.

8    Q    Is that -- all right.  2024.

9              MS. LANGLEY:  Are you making an exhibit?

10             MR. DAVIS:  No, I'm not.  I'm just doing --

11        I'm doing it here for my own purposes.

12   Q    Clinician.  Okay.  Now, it's my understanding that

13        at some point you were -- had a job title known as

14        the group living director.  Is that different than

15        clinician?

16             MS. LANGLEY:  Object to form.

17   Q    Well, let me -- were you ever -- did you ever have

18        a job position at Three Points where you or the

19        website held you out as group living director?

20             MS. LANGLEY:  Object to form.

21   A    So yes.  My position in TPC North Carolina was the

22        group living director.

23   Q    Okay.  So finished off as clinician.  Briefly, what

24        is -- what is the nature of that job?

25   A    I meet with students for weekly therapy.

1    Q    Okay.  Is it a therapist position?

2    A    Yes.

3    Q    And do you have a degree in counseling or therapy

4         now?

5    A    Yes.

6    Q    All right.  So we'll pin that.  All right.  So

7         therapy.

8              All right.  And the first position would

9         have been --

10   A    Supervisor.

11   Q    Supervisor at the Utah facility?

12   A    Yes.

13   Q    Tell me about what you did in that role.

14   A    Just oversight of staff, making sure the shift was

15        adequately staffed, groups with kids were

16        adequately staffed.  I would spend lots of time --

17        lots of time with the students, lots of time with

18        staff.  Just the daily cohesion of the shift and

19        safety of the students.

20   Q    Tell me -- when you said "oversight of staff,"

21        which -- what is the job title of the staff that

22        you provided oversight for when you were the

23        supervisor in Utah?

24   A    I was over the youth mentors.

25   Q    The youth mentor.  Okay.

1   A      Yes.

2   Q      How much were you paid per hour as a supervisor at

3          the Utah facility during this time?

4               MS. LANGLEY:  Which time are you referring

5          to?

6   Q      The time that we've just been -- your first job.

7   A      At the start?

8   Q      Uh-huh.

9   A      I believe it was sixteen-fifty (16.50), I believe.

10         Sorry.  That was a long time ago.

11  Q      Okay.  And do you remember how much the youth

12         mentors -- the young mentors were paid?

13  A      I don't.

14  Q      So when you say you applied at oversight of staff,

15         it was more of a field operations as opposed to a

16         payroll type of oversight?

17              MS. LANGLEY:  Object to form.

18  A      Yes.  I was -- I was more with the students.

19  Q      May I?

20  A      Sorry.

21  Q      As the supervisor, did you -- at this time in 2014

22         -- at any point in -- well, let's just pin down the

23         -- when did you -- how long were you the supervisor

24         for?

25              MS. LANGLEY:  I don't think we've pinned

1          down the start date.
2                    MR. DAVIS:  Let's just --
3                    MS. LANGLEY:  You said '14, and he said two
4          years after --
5                    MR. DAVIS:  Oh, it was two years?
6                    MS. LANGLEY:  He had the other job for two
7          years.
8    Q     No.  But you -- that was two years after 2012.
9          That's when you moved to St. George, correct?
10   A     Let's see.  Sorry.
11                   MS. LANGLEY:  I believe you said '13.
12   Q     Okay.
13   A     Yeah.  I graduated -- I believe I graduated in May
14         of 2013.
15   Q     Okay.
16   A     Yes.
17   Q     All right.  And three -- do you believe that Three
18         Points Center opened in around 2014?
19   A     Yes.  That's when it opened.
20   Q     And did you get the supervisor job, like, right
21         after it opened, or was it like a year later?
22   A     I believe it was around six to seven months later.
23   Q     Okay.  So instead of trying to say that there is a
24         specific date, right, I'm just going to say your --
25         I'm going to refer to your first job at Three

1          Points, and then whatever it is, it is.  Okay?

2     A    Okay.

3     Q    Your first -- I'm just going to call it first.  But

4          it was after 2014, fair?

5     A    Yes.  It was --

6     Q    All right.

7     A    -- mid-2015.

8     Q    Okay.  All right.  About how long did you stay in

9          the role of a supervisor at the -- at the facility

10         in Hurricane?

11    A    I believe I was in that position for a few years.

12         So I'd be guessing if I gave you exact dates.

13         Sorry.

14    Q    Okay.  Well, general timeframes are fine, sir.

15    A    Yeah.

16    Q    I mean, the dates are hard to remember.  I

17         understand.

18              But you -- when you came to -- let's do --

19         when did you move to North Carolina?

20    A    It would've been August of '21 --

21    Q    Okay.

22    A    -- I believe.

23    Q    And when you moved here and the facility became

24         operational, what was your job title?

25              MS. LANGLEY:  Object to form.

1    Q    When the Three Points North Carolina -- when the
2         facility in Chatham County that Ms. Nelson was --
3         worked at -- what was your job title there?
4    A    It was the group living director.
5    Q    Okay.  All right.  So between the time that you
6         were a supervisor of the facility in Utah and when
7         you moved to North Carolina and became the group
8         living director, were you employed by any other
9         business besides Three Points?
10                  MS. LANGLEY:  Object to form.
11   A    Yes.
12   Q    What is the name of that entity, or person,
13        employer?
14   A    It would've been a place called Ashcreek Academy.
15   Q    Okay.  When was that?
16   A    I do not know.
17   Q    One thing we can do -- do you maintain a résumé?
18   A    Yes.
19   Q    Okay.  Would --
20   A    Actually, sorry.  Do I maintain?  No.  I do have a
21        résumé.  Sorry.
22   Q    You do have?
23   A    Yeah.
24   Q    All right.  Okay.  Ashcreek.  Besides Ashcreek, any
25        other intervening employers?

1    A    No.  Not that I recall.

2    Q    Did you -- while -- before you -- so here's a --

3         before you moved -- I'm going to keep -- yesterday

4         I used this for North Carolina.

5    A    Yeah.

6    Q    And I guess -- yeah, I did.

7              Before you moved to North Carolina -- forget

8         about the other intervening -- Ashcreek, correct?

9    A    Yeah.

10   Q    Did you have any promotions at the facility in

11        Utah?

12   A    Yes.

13   Q    Roughly when was it and when was that promotion?

14   A    I would like to say 2016.  I remember being a

15        supervisor for a few years before getting that

16        promotion.

17   Q    And then what was the -- what job position were you

18        promoted to?

19   A    A group living director.

20   Q    Okay.  Excuse me.  As the group living director at

21        the Hurricane, Utah facility, were your core job

22        duties the same as those job duties that you

23        performed while you were living in North Carolina

24        working at the facility in Chatham County?

25   A    Yes.

1    Q    Yes?

2    A    Yeah.

3    Q    Tell me what your job duties were as a group living

4         director -- please tell me -- and I meant please

5         tell me what your job duties were as a group living

6         director in Utah.

7    A    Group living director in Utah?

8    Q    Uh-huh.

9    A    It would've been oversight of the supervisors.

10   Q    Okay.

11   A    Yes.  Communication between -- lots of running

12        parts of communication between departments, making

13        sure I knew most supervisors on the same page as

14        the clinicians, academics, things like that.

15   Q    Okay.  Now, when I asked you about your first role

16        at the Utah facility, you -- I believe you

17        testified that you had oversight of staff.  And

18        that would've been the youth mentor --

19   A    Yes.

20   Q    -- position, right?

21             I also wrote a note down that you said your

22        job was to ensure that the shifts were adequately

23        staffed.  Do you agree that that was part of your

24        job duties as the supervisor?

25   A    As the supervisor?

1    Q    Uh-huh.

2    A    Yes.

3    Q    What do you mean by ensuring that shifts were

4         adequately staffed?

5    A    To make sure the shifts had the right amount of

6         staff for ratios.

7    Q    I agree that's what you mean.  How did you go about

8         that?  That's a fine answer.  How did you go about

9         doing that?

10   A    I would see what staff were available, showed up to

11        work, and then allocate them to the group for the

12        day.

13   Q    So before you were a group living director in Utah,

14        as the supervisor, did you have scheduling duties?

15   A    Scheduling duties?  To a certain extent, yes.

16   Q    Okay.  Let's do an example.  Utah -- how were the

17        youth mentors scheduled in Utah?

18   A    So the scheduling actually exchanged hands

19        occasionally.  But it would've been -- originally I

20        would have received -- I would've known who was on

21        shift and then I would allocate them to the group.

22        It was -- usually you received your schedule when

23        you -- when you were enrolled or offered the

24        position, so you knew what days you'd be working

25        and I would know what staff I had available for my

```
 1              shift.
 2     Q    Okay.  So when a youth -- is it -- is it -- please
 3          tell me if you agree or disagree.  My
 4          understanding, based on the Utah supervisor
 5          explanation you gave me, is that as the supervisor,
 6          you knew when particular youth mentors were
 7          scheduled because when they were hired, they were
 8          given a schedule.
 9     A    Yes.  It would've been in the offer --
10     Q    Okay.
11     A    -- I believe.
12     Q    So I guess my -- there wasn't like a weekly
13          schedule put out each week by HR?
14     A    No.
15     Q    Okay.  How -- are there any differences in terms of
16          time -- and when I say "time," I mean duration.
17          And are there -- let's do this.
18               Are there any differences in the start and
19          end times of a shift at the Utah facility versus
20          the North Carolina facility?
21               MS. LANGLEY:  Object to form.
22     A    Yes.
23     Q    Please explain.
24     A    Shifts in Utah were from six to six, and in North
25          Carolina they were seven to seven.
```

```
1    Q    What is the -- if you know, what is the reason for
2         that difference?
3    A    I don't -- I don't recall the exact reason.  The
4         reason I believe would be it would give the day
5         staff more waking hours with the students to work
6         along with chores when they wake up at seven.  Day
7         staff -- they could see the majority of the day
8         'til seven o'clock.  So it's just having those
9         staff present with the students from the waking
10        time -- they're awake.
11   Q    At the Utah facility, please describe what a shift
12        -- typical shift change looks like between the
13        youth.  And the shift change I'm asking about is
14        between youth mentors.
15   A    Yeah.  I believe the staff would -- yeah -- show up
16        for work, they would get clocked in, they would
17        come onto the floor.  Say this was the mentors.
18        They would, I think, spend -- go into the group,
19        touch base with the staff from the previous shift,
20        and kind of switch those -- I say switch those
21        staff out, and then they would start to engage with
22        the kids.  And I say that's when the job
23        responsibilities of being a mentor would start.
24        That's kind of how the start of the shift went.
25   Q    Okay.  So when you say when one youth -- one youth
```

1          mentor that is taking over another youth mentor's

2          shift.  Is that what you're talking about?  One

3          mentor takes over another specific mentor's shift?

4     A    Yeah.  Not specifically.  Like, it wasn't like a

5          sign.  But there is two staff usually with a group

6          of eight kids on every shift, so they would switch

7          out those two staff.  Yes.

8     Q    Okay.  So it was -- so the staff that were taking

9          over shifts, they -- a youth mentor coming to the

10         Hurricane facility -- let's just call them Employee

11         A.

12    A    Yeah.

13    Q    Okay?  When they're coming to the facility to take

14         over for the day shift, they know that they have to

15         take over the shift of either Employee B or

16         Employee C?

17              MS. LANGLEY:  Object to form.

18    A    Yes.  The other staff, they would -- yeah -- get to

19         work, and -- yeah -- that's when -- that's when the

20         -- all the staff -- they would leave.  Yeah.  The

21         other staff would leave.  Yes.

22    Q    Okay.  And staying with that example, A is coming

23         to work.  So it's -- the shift in Utah starts at

24         six A.M.?

25    A    Yes.

1      Q      All right.  So it's five -- it's five A.M.  Are the

2             girls -- are the students still sleeping at five,

3             or are they up by then?

4      A      They typically would still be asleep by then.

5      Q      Okay.  There is a day shift in Utah.  Is that a

6             fair way to describe it?  The day?

7      A      Yes.

8      Q      That would be six A.M. to six P.M.?

9      A      Yes.

10     Q      And then the night shift would be before that?

11     A      Yes.

12     Q      Okay.  Which staff member at the Utah facility is

13            responsible for waking a student up if they don't

14            get up?

15     A      That would -- that would be the mentors.

16     Q      Okay.  But they get up in the morning.  Between the

17            morning and the -- and the night shift, which one

18            of those would be the one that actually does it?

19     A      The morning.

20     Q      The morning?

21     A      Yes.

22     Q      Okay.  Is there a time -- and I'm asking about,

23            like, the rules for your employer in Utah.  Are

24            there guidelines for when the students must be --

25            must be out of their bed?

1    A    Yes, there was.  Yeah.  Yes.

2    Q    Okay.  But it wasn't -- I guess it wasn't

3         immediately at six A.M.?

4    A    No.

5    Q    Okay.  It could have -- would have happened

6         sometime before -- I guess is breakfast and clean

7         -- and hygiene -- or is hygiene the first event on

8         the schedule?

9    A    Yes.

10   Q    And is that how -- is that how it's referred to

11        between employees and staff members?

12   A    Yes.  They would wake up and have hygiene and room

13        chores.  Yes.

14   Q    Okay.  Hygiene, room chores.  Then what is the next

15        activity for the students?

16   A    I believe it's breakfast.

17   Q    So those three -- let's call them "the get up

18        activities."  And this -- it's a deposition.

19   A    Yeah.

20   Q    We have to kind of be a little bit laborious.  My

21        apologies.  The morning shift youth mentor is

22        responsible for those get up activities -- or for

23        ensuring that the students do those?

24   A    Typically, yes.

25   Q    Okay.  Thank you.  I believe the other thing that

1          you testified about with regards to the shift

2          change was this exchange of information between an

3          employee that's on -- that was there on the night

4          shift with one of the employees that's coming to

5          relieve -- I guess to relieve them.  Is that a fair

6          way to put it?

7     A    Yeah.

8               MS. LANGLEY:  Object to form.

9     Q    Okay.

10    A    Yes.

11    Q    If the morning shift person -- there's the premise.

12         Morning shift person or mentor -- morning shift

13         mentor arrives at Three Points Utah facility.

14         Understand what I'm saying?

15    A    No.  Sorry.

16    Q    Okay.  Which -- I'm creating an example, 'cause I

17         want to understand this conversation between the --

18         a person on the night shift and a person on the

19         morning shift that happens around six A.M.

20    A    Okay.

21    Q    Okay?  The person on the morning shift arrives.  Do

22         they go to a dorm to relieve the night shift

23         person?

24    A    Yes.  Typically after clocking in, they would go to

25         the staff room, get clocked in, and then head to

1          the dorm.

2     Q    Okay.  So in Utah, is the -- is the clock-in --

3          when you -- when you were working there, is it in

4          the dorm?  Is the clock-in --

5     A    In Utah?

6     Q    Uh-huh.

7     A    No.

8     Q    Where is the clock-in in Utah in relation to the

9          dorm where the staff member ultimately goes first?

10    A    It was -- it was in a building we call the main

11         building twenty feet away from the dorm, maybe.

12    Q    Okay.  When they go to the -- after clocking in and

13         then go to the dorm to relieve the other -- to

14         relieve the night shift, is there always a

15         conversation between the two youth mentors?

16    A    No.  Not -- I wouldn't say always.

17    Q    Let me -- based on your understanding of your

18         employer's rules with relation -- with regards to

19         the population served -- so not the employment --

20         employee rules -- with regards to how the students'

21         behavior and schedule is managed, is it -- is it

22         required that there be a debriefing?

23    A    No.  Not necessarily.

24    Q    So is it fair to say that that -- that there could

25         be a debriefing -- is it fair to say there could be

1    a debriefing between morning and --

2  A   There could have been.  Yes.

3  Q   And is that in the discretion of the youth mentors

4    on whether debriefing is necessary?

5  A   Amongst the mentors.  Yes.

6  Q   Okay.  What are the circumstances where a

7    debriefing might happen, might -- or what are the

8    circumstances where you would expect that the night

9    youth mentor would debrief the morning shift

10    mentor?

11  A   I guess if they felt a student needed some extra

12    support the following day, to highlight any

13    behaviors where the student was struggling and they

14    thought they may take that into the next day, if

15    there was a problem between students that they

16    wanted the day staff to be aware of.  Things

17    usually involving, like, the students.

18  Q   Okay.

19  A   Yeah.

20  Q   When the night shift employee uses their discretion

21    to debrief the incoming day shift employee, have

22    they clocked out yet, or are they compensated for

23    that time?

24  A   In all the processes in my head, they would -- they

25    would still have been clocked in.

1    Q    Okay.

2    A    Yes.

3    Q    All right.  The clock-in -- where in Utah -- the

4          clock-in machine is in an admin building, fair?

5    A    In the main building, like a school building.  Yes.

6    Q    Okay.  After a debrief happens that necessarily

7          doesn't have to happen, does the night shift worker

8          -- the night shift go to that same building where

9          the clock-in happens to clock out?

10    A    Yes.

11    Q    What is -- what was the clock-in -- what was the --

12          was there a computer when -- we're still talking

13          about Utah.  Okay?  Was there a computer then to

14          clock in and out?  What was the system?  Or was it

15          something kind of old-fashioned like a piece of

16          paper?

17    A    There was -- there was a transition in the system.

18          It used to be a computer, and then it -- in Utah,

19          and then it switched to a fingerprint.

20    Q    When did it switch to fingerprint in Utah?

21    A    I couldn't give you an accurate time.  Sorry.  I

22          don't -- I don't remember the exact time it

23          transitioned.

24    Q    When you were a -- when you were a supervisor in

25          Utah for those first few years, did you have to

1           clock in?

2      A    Yes.

3      Q    Who was your supervisor at this time?  Or who did

4           you report to when you were a shift supervisor in

5           Utah?

6      A    I would have reported to the group living director.

7      Q    And what was that person's name at that time?

8      A    That changed.  That changed a couple of times.

9      Q    A couple of times?  Let's just do one, if you can

10          remember one.

11     A    It would have been a guy called Chet.

12     Q    Chet.  When you were -- when you were promoted to

13          group living director, were you promoted because

14          somebody quit or because somebody was fired?

15     A    Somebody had quit, moved on.

16     Q    Why did they quit?

17     A    Actually, apologies.  When I -- when I was made

18          group living director, the group living -- at the

19          time was a lady called Kimberlee Wilson.  She moved

20          to be a clinician, a therapist, so it opened up.

21     Q    It opened up?

22     A    Yes.

23     Q    Okay.  And then they promoted you?

24     A    Yes.

25     Q    Did you have to apply for that position?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Who else was in the running for it, if you can |
| 3 | | remember? |
| 4 | A | Yeah.  I don't.  I don't know who all put their |
| 5 | | names in the hat.  Sorry.  I don't know. |
| 6 | Q | Did you have to interview to be promoted? |
| 7 | A | Yes. |
| 8 | Q | You did?  Who did you interview with? |
| 9 | A | I interviewed -- at the time, it was -- I believe |
| 10 | | it was the directors, I believe.  It was probably |
| 11 | | four or five people, I remember. |
| 12 | Q | Was your father-in-law one of the directors at the |
| 13 | | time that you interviewed with? |
| 14 | A | Let's see.  He was not -- he was not present for |
| 15 | | the interview, I believe. |
| 16 | Q | What about your mother-in-Law? |
| 17 | A | No.  She was not present. |
| 18 | Q | So you said there were about four or five people |
| 19 | | present that were directors. |
| 20 | A | Yes. |
| 21 | Q | Who -- I met Dr. Thibault yesterday.  Who else were |
| 22 | | directors of the Three Points Utah facility at the |
| 23 | | time you got the promotion? |
| 24 | A | It would have been the HR director at the -- I |
| 25 | | think -- I believe a family -- a family liaison, it |

1           would've been the program director at the time,

2           academic director, I even believe the maintenance

3           director.

4      Q    You were the -- you were the group living director

5           in Utah and the North Carolina facility, correct,

6           Mr. Butcher?

7      A    Yes.

8      Q    But you finished with -- I want to -- give me a

9           second, 'cause I want to -- you finished your

10          employment with the defendants named in this

11          lawsuit --

12              MS. LANGLEY:  Object to form.

13     Q    -- with -- well, who -- when you got -- did you get

14          paychecks -- paystubs while you were -- while you

15          were working at these facilities?

16     A    I didn't receive -- they were available through an

17          HR platform.

18     Q    Okay.

19     A    I never --

20     Q    All right.  I apologize.  I'll move on in a second.

21          When you were a clinician -- you were a clinician

22          in Utah, correct?

23     A    Yes.

24     Q    So at some point you moved back from North Carolina

25          to Utah?

1     A    Yes.

2     Q    When did that happen?

3     A    That was August of 2022.

4     Q    Okay.  So after Ms. Nelson was terminated?

5     A    Yes.

6     Q    All right.  When you moved back to Utah, did you

7          move directly into the clinician role?

8     A    No.

9     Q    What role did you have when you moved back to Utah?

10    A    It was an assistant program director.

11    Q    Okay.  When you moved back to Utah, who was the

12         group living director at that time?

13    A    A group living director.  It was -- it was a guy

14         called Wyatt.

15    Q    Wyatt.  Okay.  So when you moved back to Utah,

16         Wyatt was the group living director?

17    A    Yes.

18    Q    Between when you moved back to Utah and Wyatt was

19         the group living director and when you resigned

20         last week before this deposition, has that -- has

21         that job changed?  Is Wyatt still the group living

22         director?

23    A    No.

24    Q    Who is the group -- so hold on one second.  Wyatt

25         when moved back.

1                    And you moved back in August of 2022?

2        A    Yes.

3        Q    Okay.  Did Wyatt quit?  Was he fired?

4        A    Wyatt had -- Wyatt quit.  Yeah.  He had another

5             opportunity.

6        Q    Okay.  Where did he -- where did he go work?

7        A    Yeah.  I don't -- Wyatt was a fireman.  I don't

8             know exactly which city department he went to work

9             for.

10       Q    How -- when did you first meet Wyatt?

11       A    That would've been -- yeah.  It was at the

12            beginning time of my employment at TPC Utah, those

13            early years.  I don't know exactly.

14       Q    So, I mean, in terms of employment timeframes, he

15            had been at the Utah facility for several years?

16       A    Yes.

17       Q    And you -- did you work directly with him, like, on

18            the floor?

19       A    Yes.

20       Q    Are y'all friends?

21       A    I would say so.  Yeah.  It's difficult, right?  I

22            was also his boss.  But yes.  Wyatt was a friend.

23       Q    Do you ever see him in a social capacity, like go

24            out, watch football, get a beer?

25       A    Over the time of the -- my employment, yes.  Once

```
 1            or twice.
 2      Q     Once or twice?
 3      A     Once or twice.
 4      Q     But you don't know -- you don't know why he quit?
 5            Oh, you do know why he quit.  I apologize.
 6                 Do you know -- but you don't know where he
 7            is working now?  I'll finish --
 8      A     No.  Sorry.  I know what he does.  I say he's a
 9            fireman.  I don't know what city.  I don't --
10      Q     Okay.
11      A     -- know the exact -- I don't want to give --
12      Q     Understood.
13      A     -- the name of --
14      Q     Now he is a fireman.  That's what you mean.  He
15            took a fireman job?
16      A     Yes.
17      Q     All right.  So the group living director had to be
18            replaced at some time when you were back in Utah as
19            you were the assistant program director?
20      A     Yes.
21      Q     Who -- how long did it take to replace Wyatt?
22      A     A week.
23      Q     A week?
24      A     A week.  I think, if I remember right, it might
25            have been less than a week, 'cause I know we began
```

1      interviews -- the process of the week -- like, he

2      brought notice in, so we knew we were having to

3      replace him.  So it was within a week.

4   Q   And what is the -- who got the job?

5   A   A lady called Janzy.

6   Q   Can you spell it?

7   A   Yeah.  J-A-N-Z-Y.

8   Q   Okay.  Who did -- who interviewed Janzy before she

9      was hired?

10  A   That would've been myself, the HR director, and the

11     program director.

12  Q   And who is the program director?

13  A   A lady called Kimberlee Wilson.

14  Q   That's Kim Wilson.  All right.  All right.  Did you

15     review any documents before today's deposition?

16  A   Before?  Yes.

17  Q   Can you tell me what you -- what you remember that

18     you reviewed?

19  A   Sorry.  I don't remember the exact names of forms.

20     And I know lots of text messages.  I know that.

21  Q   Do you remember if at the bottom of those documents

22     there was a label that said "TPC 000" and then,

23     like, a page number?

24  A   I don't recall.  Sorry.

25  Q   Okay.  You said forms first, right?

1     A    Yes.

2     Q    What type of forms did you review?

3     A    I reviewed the policies, procedures, the employee

4           handbook.  Yes.  I'll say lots of text messages,

5           too.

6     Q    Okay.  Those forms that you reviewed, did you

7           review forms that had signatures on them or forms

8           that were filled out and had handwritten ink?

9     A    Both --

10    Q    Both?

11    A    -- I believe.  Yeah.

12    Q    Okay.  The text messages -- no.  We will look at

13          text messages.  I'm not going to do that type of

14          memory assault.

15    A    Of course.

16    Q    But the -- but the identity of the persons of text

17          messages, that's what I'm going to ask about.  So

18          did you review your text messages with other people

19          -- that you exchanged with other -- and I say

20          "people."  I mean employees, fellow coworkers.

21          Those text messages.

22    A    Yes.  For those -- for those involved with this,

23          yes.

24    Q    Did you provide any text messages while you were

25          still employed by a -- by a Three Points entity to

1          help respond to the discovery in this lawsuit?

2                    MS. LANGLEY:  I'm going to instruct him not

3          to answer with regard to communications with

4          counsel.  But other than that, you can answer.

5     A    I'm sorry.  I would like to follow my counsel, if

6          that's okay.

7     Q    Well, you can -- in terms of the communication --

8          and I will -- and I'm going to rephrase it.  I

9          believe -- and I will be corrected if I am wrong --

10         that you are able to tell me what you did and the

11         reasons why, even if it's related to this lawsuit,

12         but what you -- I am not asking for is for you to

13         tell me the specific communications and what they

14         said to you.  Okay?

15                   MS. LANGLEY:  He's talking about the

16         communications with lawyers.

17    Q    Right.

18    A    Okay.

19    Q    So let's -- a lawyer could say in an e-mail to you

20         while you were an employee -- said -- had a bunch

21         of different text and then you take an action.

22         Okay?

23                   So what I'm asking is did you provide

24         documents either directly to lawyers or to people

25         at your employer who are higher on the totem pole,

```
 1              just to move on here --
 2                   MS. LANGLEY:  Object to form.  That's
 3              offensive.
 4       Q      -- so higher in the organizational hierarchy, okay,
 5              in response to this lawsuit?
 6       A      I believe yes.  I believe I provided information.
 7       Q      And which information did you provide -- do you
 8              remember providing?
 9       A      Text messages.
10       Q      Okay.  All right.  So the text messages that you
11              reviewed before today, did those include the text
12              messages that you provided in discovery?
13       A      Yes.
14       Q      Okay.  Who were those text messages -- and they
15              were your text messages on your phone?
16       A      Yes.
17       Q      Okay.  Did you review text messages between you and
18              the plaintiff, Tyliya Nelson?
19       A      Yes.
20       Q      Okay.  Did you review text messages between you and
21              any other of the youth mentors at the Chatham
22              County facility?
23       A      No.
24       Q      Okay.  Did you review text messages between you and
25              any of the shift supervisors at the Chatham County
```

1       facility?

2   A   Yes.

3   Q   Okay.  Who?

4   A   It was Ms. Nelson's direct supervisor, Dan.

5   Q   Okay.  Anybody else?

6   A   No.

7   Q   Did you review any text messages between you and

8       Mr. Palmer before today's deposition?

9   A   No.  I don't -- I don't believe so.  I may have.

10      Yeah.  Sorry.  Yeah.  I don't believe so.  I may

11      have said -- but that's like if I didn't provide

12      them, then they weren't there, so --

13  Q   Do you -- do you -- how do you communicate with Mr.

14      Palmer?

15  A   Whilst at work or whilst at --

16          MS. LANGLEY:  Can you specify about what?

17  Q   When you -- when you were working at the Chatham

18      County facility.  Okay?  So that's the time I'm

19      asking about.  My understanding is that -- is that

20      Mr. Palmer was at the top of the -- of that

21      facility's organizational hierarchy.  Is that fair?

22  A   Yes.

23  Q   Did you -- as a group living director, did you

24      report directly to him while you were in Chatham

25      County?

1    A    Yes.

2    Q    Okay.  Did you send him -- how did you communicate

3         with him during that time?

4    A    There was several platforms.  With the radio, cell

5         -- like cell phone.

6    Q    Okay.  All right.  So you say radio.  There were

7         walkie-talkies used?

8    A    Yes.

9    Q    Okay.

10   A    Radios.

11   Q    When you say "cell phone," did you have --

12   A    Cell phone.

13   Q    -- did you have one -- do you have one cell phone

14        at this time or multiple cell phones?

15   A    I have one.  So I have one cell phone and then the

16        -- yes.

17   Q    Okay.  And what was the cell phone that you had at

18        this time?  Or what was the number of it?

19   A    It would be the same number now.

20   Q    What is it?

21   A    It's 435-632-3156.

22   Q    Okay.  And is that the only phone that you had

23        during this time?

24   A    Yes.

25   Q    Who is the provider?

1    A    Verizon.

2    Q    Who pays that phone bill?

3              MS. LANGLEY:  At what time?

4    Q    At the time while you were -- let's see -- working

5         at the Chatham County facility and reporting to Mr.

6         Palmer.

7    A    I received a stipend from TPC.

8    Q    Directly from TPC?

9    A    Yes.

10    Q    How did that stipend come to you?

11    A    It's had -- I've received it in the form of a

12         check.  It has also been deposited into my account,

13         also.

14    Q    Okay.  When you say you received a stipend, how

15         much was it?

16    A    It was seventy-five dollars.

17    Q    A month?

18    A    Yeah.

19    Q    Okay.  All right.  Did you review any other

20         information besides text messages or forms before

21         today's deposition?

22    A    No.  Not that I recall.

23    Q    Okay.  All right.  Just backing up, my

24         understanding is that you are now starting your own

25         private therapy practice.

1    A    No.  I'm not starting.  I'm going to work for

2         someone who has a private practice.

3    Q    Who is that?

4    A    It's a guy called Logan.

5    Q    What?  Logan?

6    A    Logan.  L -- Logan.

7    Q    Okay.

8    A    Yeah.

9    Q    All right.  And what is -- when you say you're

10        going to work for a guy named Logan, where is

11        Logan's -- what is Logan's full name?

12   A    Logan Bleazard.  Yes.

13   Q    We may spell that later.

14             All right.  What are -- is he Dr. Logan?

15   A    I don't believe he has his doctorate.  I'm not

16        sure.

17   Q    What are his educational credentials?

18   A    I don't know.  So I believe he's a -- he's a -- I

19        want to say LMSW, a licensed social worker, I

20        believe.

21   Q    Okay.  And where is Logan's existing practice?

22   A    That's in St. George.

23   Q    Okay.  And did you get a -- do you have a degree in

24        counseling?

25   A    I do.  Yes.

1    Q    Where did you get it from?

2    A    I studied at a place called Touro University.

3    Q    What is it?

4    A    Touro, T-O-U-R-O.

5    Q    And you -- so you don't have -- you've never

6         studied anyplace else?

7              MS. LANGLEY:  Object to form.  Studied what?

8    Q    Well, you don't have any degree -- not studied.

9         You said "studied."

10             But you don't have a degree from any other

11        place?

12             MS. LANGLEY:  Object to form.

13   Q    Do you have -- do you have multiple degrees in the

14        fields of counseling, or licensed social work, any

15        of those fields?

16   A    No.  My previous degree was my bachelor's from

17        Ashford.

18   Q    Okay.

19   A    Yeah.

20   Q    So B.S. and M.B.  The -- I'm just going to call it

21        the master's degree.

22             When you were working as assistant program

23        director -- well, actually, you moved back to Utah

24        in August of 2022 to become the assistant program

25        director, correct?

1    A    Yes.

2    Q    Why did you move back to become the assistant

3         program director?

4    A    Just the (unintelligible) become the assistant

5         program director was an opportunity, I felt, to

6         move up the company.

7    Q    Okay.  It was a promotion?  It was a promotion?

8    A    Yes.  On -- yes.  On paper for sure.

9    Q    How much -- what was your annual compensation as

10        the group living director while you were working at

11        the Chatham County facility?

12             MS. LANGLEY:  We're going to shut this down.

13        What he was paid has absolutely nothing to do with

14        this lawsuit and -- for the same reasons we

15        discussed yesterday.  So if you want to get into

16        personal financial information about any of the

17        individual witnesses or you're going to get into

18        financial information about any of the entity

19        defendants, then we can chat about that.  And if

20        you continue to pursue that, we will pursue a

21        protective order with the Court.

22             MR. DAVIS:  I will try to go about what I

23        think that I have -- oh, sorry -- what I think that

24        I have the right under the federal rules -- the

25        liberal rules of discovery --

1          MS. LANGLEY:  Which are limited to the

2     claims and defenses in this case.

3          MR. DAVIS:  And also --

4          MS. LANGLEY:  And what he was paid --

5          MR. DAVIS:  -- potential for witness bias.

6          MS. LANGLEY:  What he was paid has nothing

7     to do with this -- the claims or defenses in the

8     case.

9          MR. DAVIS:  If bias is not something that I

10     can explore --

11          MS. LANGLEY:  There is no evidence of bias

12     that has to do with what he was paid.  So I've

13     stated my objection.

14          MR. DAVIS:  Okay.

15          MS. LANGLEY:  If you go forward, we will

16     proceed as we just discussed.

17   Q    Do you -- well, we'll finish up this background

18        information.  What is your wife's name again?

19   A    Chamea.

20   Q    Chamea.  Is it -- she took your name?

21   A    Yes.

22   Q    What is -- do you and Mrs. Butcher have any

23        children?

24   A    Yes.

25   Q    How many children do you have?

1      A      We have five.

2      Q      Five.  You're -- and then you're leaving Three

3             Points to go work for Logan, correct?

4      A      Yes.

5      Q      Is it a higher -- is it a higher paying job than

6             what you were earning at Three Points as the

7             assistant program director?

8      A      Structure is -- potentially.  Structure is

9             different.

10     Q      Tell me -- tell me -- so how could you potentially

11            earn more?

12     A      It's an hourly paid position over salaried, so the

13            more people I see, the more I get paid.

14     Q      Okay.  The people that you can see, would those

15            people include the residents of the Three Points

16            Utah facility?

17     A      No.  Ethically that wouldn't be -- that wouldn't be

18            something I would do.

19     Q      Okay.  That's -- so the -- there -- I guess just to

20            finish it up, there is not an ability for Logan's

21            practice to be like a consulting therapist for

22            Three Points Center's unique needs?

23     A      No.

24     Q      So what is the population that you think that

25            you'll be working with moving forward?

1    A    An array of -- yeah -- different -- like maybe

2         still work with teenagers, couples, and clients

3         much, much older.  It's a wide range of clients and

4         what they present with, so --

5    Q    All right.  Who is Dr. -- well, who is Glenn

6         Thibault?

7    A    Glenn Thibault?  He was one of the founding owners,

8         I believe.

9    Q    Did you ever meet Glenn Thibault?

10   A    Yes.

11   Q    Okay.  When did you meet him?

12   A    I met him -- I've met him several times through my

13        employment at Three Points Center.

14   Q    At the Utah facility?

15   A    At the Utah facility and at the -- yeah -- North

16        Carolina facility.

17   Q    What was your -- you said he was the founding

18        owner?

19   A    I believe so.  I don't --

20             MS. LANGLEY:  I think he said "one of the."

21   Q    One of.  Yeah.  One.  He was a founding owner?

22   A    Yes.

23   Q    As far as you know, did he have any other role --

24        and I say "any other" -- at the facility -- where

25        you saw him at the facility -- managing type role

1              at Utah?

2      A     Did he have any other role?

3      Q     Operations?

4      A     Not that I'm aware.  I don't know all what his role

5              entailed.

6      Q     Okay.  When you met him, why did he come to the --

7              to the facility?

8              MS. LANGLEY:  Which one?

9      Q     The -- when you met him in Utah.

10     A     Utah.  I believe -- I believe the first time I met

11             him was -- it was possibly at -- I say that was a

12             long time ago.  But I think it was the Christmas

13             party, actually.

14     Q     Okay.

15     A     Yeah.

16     Q     Who is Dr. Norman Thibault?

17     A     Dr. Norm Thibault?  He is also one of the owners.

18     Q     What is his role, as far as you understand it?

19     A     What was that?  The owner.  The owner of the

20             company.  Yeah.

21     Q     What are some of the specific things when you were

22             in Utah that you remember seeing him do or know of?

23     A     See him do?  He would -- he would provide -- he

24             would be a support, he would offer counsel when

25             asked, he would -- yeah.

1    Q    Counsel to who?  Staff or employees?  Or not staff.

2         Excuse me.  Staff or the students?

3    A    To both.

4    Q    To both.  How often would you -- would you see him

5         during a typical day?  And we'll -- let me get more

6         specific.

7             When you were a -- when you were the group

8         living director --

9    A    Yeah.

10    Q    -- in Utah, how often would you see Dr. Thibault?

11    A    I would see him weekly.  I wouldn't say daily, but

12         weekly.

13    Q    When you were the group living director in Utah,

14         did you ever fire anybody?

15    A    Yes.

16    Q    All right.  I'm going to start looking for specific

17         information.

18    A    Okay.

19    Q    Can you identify the employees that you fired

20         either by first name, last name while you were the

21         group living director?

22             MS. LANGLEY:  At any time?

23             MR. DAVIS:  While he was group living

24         director in Utah.

25    A    No.  Not off the top of my head.

1    Q    How -- okay.  How -- you testified that you did

2          have -- you did fire somebody.

3    A    Yeah.  Yes.  I would've been involved in the

4          dismissal determination --

5    Q    Okay.

6    A    -- of people.  Yes.

7    Q    So when you say "involved in the decision," is it

8          -- is it fair to say, based on that testimony, that

9          you did have the unilateral authority as the group

10         living director to make a termination decision?

11    A    That would be right.  It would have been presented

12         to me from the supervisor, and let's say we would

13         discuss that as a -- as a team.

14    Q    And just to -- I mean, I just asked generally about

15         firing, and you said it would've been presented to

16         you by a supervisor.  So are you saying that you've

17         only fired youth mentors, or have you ever fired a

18         supervisor, as well?

19    A    There has been -- that's a good question.  I would

20         have -- I would have been involved in decisions to

21         terminate supervisors.  Yes.

22    Q    Okay.

23    A    Yeah.

24    Q    And in decisions to terminate youth mentors?

25    A    Yes.

1  Q   But would -- now the question is would anybody else

2      above you in the organizational hierarchy had to

3      have been involved in the decision to terminate

4      youth mentors in Utah?

5          MS. LANGLEY:  Object to form.

6  A   Above me?  Above me, no.  All directors such as the

7      HR director, yes.  However, like I would -- I would

8      often seek counsel from my -- like the program --

9      and ask for counsel and advice, so -- but they were

10     not necessarily involved in the decision.

11 Q   I believe when I started asking these questions

12     about had you fired somebody, you said others would

13     be involved in the -- in the discussion, correct?

14         MS. LANGLEY:  Object to form.

15 Q   Did you -- were others involved?  Can you identify

16     now even -- can you identify a specific person that

17     you actually said "You're fired" to while you were

18     in Utah?

19         MS. LANGLEY:  Object to form.

20 A   Yes.

21 Q   Please do.

22 A   Like the person's name of --

23 Q   Uh-huh.

24 A   It would have been an employee called -- are you --

25     sorry -- looking for a supervisor or a mentor?

1   Q    We'll do -- we'll do both.  Just the first one that

2        comes out of your head.

3   A    Yeah.  I remember -- yeah -- a guy called Ed.

4   Q    Okay.  Ed what?

5   A    I want to say Hager.

6   Q    We'll call him Ed H.

7   A    Yeah.

8   Q    What was his job title?

9   A    He was a supervisor.

10  Q    Okay.  All right.  So back to the previous

11       discussion, a supervisor wouldn't have brought

12       Ed's, you know, fireable conduct to your attention,

13       because he was a supervisor, correct?

14            MS. LANGLEY:  Object to form.

15  Q    Well, who brought -- did you observe -- well, and

16       excuse me.  Strike that.

17            Why was Ed fired?

18  A    I don't recall.  I believe his professionalism.  I

19       don't recall.  Sorry.  That was a long time ago.

20  Q    When you say professional -- when you say

21       "professionalism" -- well, is Ed -- does -- did Ed

22       have a college degree, as far as you understood it

23       -- recall?

24  A    I don't -- I don't know his education background.

25       I'm sorry.

1    Q    Does one -- at Three Points Center Utah during this

2         time, to be a shift supervisor, does one -- does an

3         employee have to have a bachelor's degree?

4    A    No.  Not necessarily.

5    Q    Okay.  When you say "professionalism" with regards

6         to Ed wasn't being professional, what do you mean

7         more specifically?

8    A    I think it's just Ed's ability to -- I believe to

9         follow a policy, procedures, things like that.

10   Q    Do you believe that there is a distinction between

11        being unprofessional, but then also just -- but not

12        complying with procedures?

13             MS. LANGLEY:  Object to form.

14   A    Sorry.  Could you clarify the question?  Sorry.

15   Q    Let me give an example.  Someone -- just picture a

16        job where the expectation is that the shirt remain

17        tucked in at all times, okay --

18   A    Yeah.

19   Q    -- but that job also requires the employee to

20        perform some sort of function.  Can you see a

21        situation where that employee was able to perform

22        the functions necessary to do the job, whether it

23        be physical or a white-collar job, but every day

24        they came into work that shirt was just hanging

25        out, and the employer informed them shirts must be

1            tucked in at all times?  They follow, you know, the

2            procedures and policies about the job, but they

3            don't tuck in their shirt.  So do you consider

4            profession -- not being professional to be the same

5            as not following Three Points Center's rules and

6            procedures?

7                  MS. LANGLEY:  Object to form.

8      A     I would make a connection.  Maybe not that one, but

9            I would --

10     Q     Okay.

11     A     -- make a connection.  Yes.

12     Q     Then professional -- it's -- I understand what

13            you're saying, right?  But what -- if you can

14            remember anything specific -- well, here we go.

15                  What was unprofessional about Ed H.?

16     A     I think -- I think possibly -- just possibly some

17            of the dialogue in which he spoke with his mentors.

18            Yeah.

19     Q     Okay.  Did the mentors complain about him, or did

20            you personally observe that inappropriate dialogue?

21     A     I believe both.

22     Q     Can you remember a statement that he made that you

23            thought was inappropriate?

24     A     No.  Not that I -- not that I witnessed.

25     Q     Can you remember the -- can you remember the nature

```
 1              of the statements?  And what I mean by that is were
 2              they sexist, racist statements?
 3                   MS. LANGLEY:  Object to form.
 4       A      Yah.  Neither.  I guess I would say inappropriate.
 5              Inappropriate.  I don't believe they would fall in
 6              the category of sexist or racist.
 7       Q      Were they sexual?  Were they sexual in nature?
 8                   MS. LANGLEY:  Object to form.
 9       A      Sorry.  "Sexual" is a very heavy word.
10       Q      Were they related -- okay.
11       A      Yeah.  Sorry.
12       Q      Were the inappropriate statements related -- were
13              they about the students?
14       A      No.
15       Q      This was just coworker talk?
16       A      Yes.
17       Q      Was it -- were they cuss words?
18       A      Sometimes.
19       Q      How -- in these youth mentor and supervisor roles
20              -- I'll represent that Dr. Thibault testified
21              yesterday these are tough jobs.  Do you agree with
22              that statement?
23       A      Very tough.
24       Q      Among themselves -- not in front of the students,
25              but when they're among themselves, do the young
```

1          people -- the supervisors, youth mentors -- do they

2          use cuss words?

3                    MS. LANGLEY:  Object to form.

4     A    I have not -- I have witnessed cuss words, but not

5          everybody dialogues that way.

6     Q    Would -- if you -- when you were the group living

7          director, if you had witnessed a youth mentor or

8          shift supervisor, you know, between themselves use

9          the "F" word or something like that, you know, in a

10         non-antagonistic way, would you have fired them?

11                   MS. LANGLEY:  Object to form.

12    A    No.

13    Q    Would you have written them up for using a cuss

14         word?  Again, the question is outside of the

15         presence of the students.

16    A    No.  No.  I don't believe so.

17    Q    So Ed H., his dialogue must have been something

18         more than cuss words?

19                   MS. LANGLEY:  Object to form.

20    Q    Do you believe it was more than just using cuss

21         words?

22    A    Yes.

23    Q    Okay.  But was -- but it wasn't targeted towards

24         the students; it was between employees, correct?

25    A    Yes.

1    Q    Okay.  So last -- if you can't remember, that's

2         fine and we'll move on.  But what -- you got cuss

3         words and then racists comments.  Where was it, Mr.

4         Butcher --

5              MS. LANGLEY:  He never said racist comments.

6              MR. DAVIS:  No.  He said --

7              MS. LANGLEY:  You did.

8              MR. DAVIS:  No.  He said they weren't.

9    Q    And I'm saying on this -- you've got cuss words.

10        And that's not something you would write somebody

11        up for, is it?

12   A    No.  Not typically.

13   Q    Okay.  So what was this dialogue that he was

14        engaging in that was unprofessional?

15   A    Well, I'm sorry.  I believe you used the word,

16        like, sexual, and I thought that was a heavy word.

17        I would say -- I would say -- possibly flirtatious

18        would be a word, but -- with some of his

19        supervisors.

20   Q    Okay.  And --

21   A    And this would -- sorry.  This would've been --

22        even alone, that was something I remember, if I'm

23        being honest.  It would've been probably at the

24        time an accumulation of different things.  I'd say

25        this is the one thing I remember.  So it wouldn't

1             have been, I believe, solely for this --

2     Q     Right.

3     A     -- but that was a part of his unprofessionalism.

4     Q     Right.  And I know you just -- we're just having a

5             conversation, but you said, "If I'm being honest."

6     A     Yeah.

7     Q     I expect you to be one hundred percent honest the

8             rest of this conversation.

9     A     Absolutely.  Yeah.

10    Q     So -- and -- but with that said, if I use a word

11            that's heavy, it is completely appropriate for you

12            to respond and clarify instead of, you know,

13            standing on it and taking your time --

14            MS. LANGLEY:  I believe he said -- he did

15            clarify.

16            MR. DAVIS:  I know.  And I'm saying we

17            didn't get to it --

18            MR. LANGLEY:  And so you're making a deal --

19            MR. DAVIS:  We didn't get to it for ten

20            minutes.

21            MS. LANGLEY:  To make a big deal about a

22            figure of speech which people use all the time, "to

23            be honest" --

24            MR. DAVIS:  I'm not making --

25            MS. LANGLEY:  -- "to be frank," whatever --

```
1              don't make a big deal about that, Mr. Davis.  Or do
2              if you want to.
3                   MR. DAVIS:  No, I'm not.
4                   MS. LANGLEY:  I'll just keep objecting.
5                   MR. DAVIS:  Like you have been the whole
6              time.
7      Q       All right.  The unwanted sexual advances, you
8              observed Ed doing that?
9                   MS. LANGLEY:  Object to form.
10     A       Sexual --
11     Q       Or unwanted flirtatious advances.
12     A       I would say he was flirtatious.  Yes.
13     Q       Okay.  Did you make -- who did you consult with to
14             make that termination decision?
15     A       I would've spoke to the program directors, the HR
16             director.
17     Q       Did you speak to Mr. Palmer about it?
18     A       I don't remember.
19     Q       Moving on, do you remember the name of a youth
20             mentor that you terminated?
21     A       I guess not.  No.
22     Q       Okay.  But do you remember if you did terminate a
23             youth mentor?
24     A       Yes.  I would've been involved a few times.  Yes.
25     Q       Do you think the number of people that you
```

1          terminated or recommended -- and I say number of

2          employees at the Utah facility -- that you could

3          count them up on both hands, or do you need more

4          than two hands?

5     A    That I was -- I was involved in?

6     Q    Uh-huh.

7     A    It involves -- so as far as being discussed with, I

8          was not present for every termination.  Often it

9          was a supervisor with the HR director or a

10         supervisor with another supervisor.  So I was

11         probably involved in the discussion, but not

12         necessarily present for every termination.

13    Q    So is it -- a supervisor supervises youth mentor?

14    A    Yes.

15    Q    A supervisor could observe a youth mentor's

16         violation of a Three Points policy, correct?  Do

17         you understand what I'm saying?

18    A    Yes.

19    Q    They could observe that.  They would go above you

20         to discuss terminating the youth mentor?

21              MS. LANGLEY:  That's not what he said.

22    Q    Well, that's what -- is there ever a situation

23         where -- I asked if you had ever been involved in

24         the termination of a youth mentor, correct, while

25         you were a group living director?

1    A    Yes.  You've asked me that.  Yes.

2    Q    Okay.  And you said you weren't involved in all of

3         them.  So what I'm trying to understand, is there

4         ever a situation, based on this organizational --

5              MS. LANGLEY:  Before you testify for him, we

6         can have the court reporter read back what he said.

7         But that's -- what you just said was not what he

8         testified to.

9              MR. DAVIS:  I'm fine with that.  But I just

10        don't know how long ago it was.

11             MS. LANGLEY:  You need to rephrase your

12        question.

13             MR. DAVIS:  I'll rephrase it instead of

14        doing that.

15   Q    To the best of your recollection, was there ever a

16        time at the Three Points Utah facility where a

17        youth mentor was terminated where the group living

18        director was not involved in the decision or

19        discussion to terminate that youth mentor?

20   A    Yeah.  I don't believe so.  That wouldn't have been

21        our practice.  No.

22   Q    Okay.  And while we're here, just let's -- I'd like

23        to pin down the organizational hierarchy, as far as

24        you understand it, in terms of termination

25        decisions.  Okay?  A youth mentor does not have the

1           ability to terminate anyone, do they?

2     A     No.

3     Q     Okay.  A supervisor, do they have the authority to

4           terminate a youth mentor without talking to anybody

5           else at the employer?

6     A     No.

7     Q     Okay.  Why is that, do you believe?

8     A     Yeah.  I believe it's for counsel, for

9           understanding, for someone to -- like, to inform --

10          ask what ways things can be managed.  It just

11          usually wasn't the practice for a supervisor to

12          just make a decision directly on the spot in the

13          moment and not seek counsel.  That usually wasn't

14          the practice.

15    Q     But when you say seek -- well, when you say "seek

16          counsel" --

17    A     Yeah.

18    Q     -- do you mean if the youth -- say a youth mentor

19          came to you to seek this counsel.  Would you be one

20          of the persons or employees that they could seek

21          counsel with?

22    A     Yes, sir.  Yes.

23    Q     And if you agreed with the supervisor's, I guess,

24          reason of why a particular youth mentor should be

25          terminated, would you just say, "Go ahead and do

1          it," or would there be another layer of approval

2          and documentation that would have to occur?

3     A    I would typically -- as far as practice for myself,

4          I would typically speak to the HR director and tell

5          them this was a decision we'd like, but that was

6          not -- I'll say not always.  But I guess I would

7          have -- I would have a say in that.

8     Q    So you -- so as a matter of practice, is it fair to

9          say that if a supervisor came to you with a

10         potential grounds for terminating a youth mentor

11         that you would go to the HR director next?

12    A    Typically, yes.  I would say not always.

13    Q    Okay.  And what type of decision would you not --

14         would you not take the matter to the HR director?

15    A    If, for example, the -- well, I guess the problem

16         was consecutive, I'd have discussions before the

17         plan of action or path was made.  Yes.

18    Q    Okay.  So for that category of termination, based

19         on your testimony, is it fair to say that even

20         though you may consult with the HR director or any

21         other employee above the group living director in

22         the hierarchy, as the group living director, you

23         had the authority to terminate employees below you

24         in the hierarchy?

25    A    I believe so.  Yes.

1    Q    Without approval from the HR director, or Mr.

2          Palmer, or Mr. Thibault -- or Dr. Thibault?

3    A    Sorry.  To -- without approval?  So yes.  I would

4          say so.

5    Q    Just take yourself back to the time where you were

6          a group living director.

7    A    Yeah.

8    Q    Would you feel comfortable terminating a youth

9          mentor without talking to anybody else at Three

10         Points Center about it?

11   A    No.  I wouldn't usually be comfortable.

12   Q    Okay.  Did you make the decision to fire Tyliya

13        Nelson on April 6th, 2022?

14   A    I was -- I was involved in the decision to

15        terminate Ms. Nelson.  Yes.

16   Q    When did those discussions occur that day?

17             MS. LANGLEY:  Object to form.

18   A    I don't -- I don't recall the exact time.  I

19        believe the afternoon of April 6th, I believe.

20             THE WITNESS:  Sorry.  Would it be possible

21        to have a bathroom break?  I apologize.  Sorry.

22             MR. DAVIS:  I did leave that one rule out.

23        But the rule would've been if you need a break,

24        this is not an endurance contest.  I would ask that

25        you please finish answering the question, and you

1    did, so --

2              THE WITNESS:  Thank you.

3              MR. DAVIS:  But can you please repeat back

4         the last couple lines of testimony before we do?

5         Because I'm going to take a note.

6              THE COURT REPORTER:  I'll need to go off the

7         record to do that.

8              MR. DAVIS:  Go off the record.  Yes.  All

9         right.  Thank you.  That's fine.  Absolutely.

10                   (FIVE-MINUTE RECESS)

11              (11:56 A.M. - 12:01 P.M.)

12   Q    All right.  Mr. Butcher, where we left off was I

13        was asking you about when the decision was made to

14        terminate Ms. Nelson on April 6th, and you

15        testified that you did not recall the exact time,

16        and that you believed it was the afternoon of April

17        6th.  Is that when you believe that the decision

18        was made?

19   A    Yes.

20   Q    Can you remember when we were talking about

21        termination decisions when you were the -- you

22        probably will remember.  It was recently.  When a

23        group -- when the supervisor would bring a

24        potential termination to you -- do you understand

25        what I'm saying?  Like bring it -- they would bring

1           it up to you for a youth mentor.

2    A      I remember --

3    Q      Okay.

4    A      -- those comments.  Yes.

5    Q      Did a supervisor bring Ms. Nelson's -- the idea of

6           terminating her to you on that day?

7    A      From what I recall, yes.

8    Q      You do?  Well, who brought it to your attention?

9    A      It would've been her direct supervisor, Dan.

10   Q      Dan?  When did he bring it to your attention?

11   A      I don't recall the exact time.  I believe the

12          afternoon of the 6th.

13   Q      So Dan --

14   A      Yeah.

15   Q      Dan -- if -- so is it your testimony that Dan

16          recommended terminating Ms. Nelson on April 6th?

17   A      Yes.  Dan was certainly someone behind that

18          decision.  Yes.

19   Q      What did he say to you?

20   A      I don't recall.  It was over two years ago.  I

21          don't recall the exact conversation.  Sorry.

22   Q      What types of issues had Dan brought to your

23          attention regarding Ms. Nelson before, if any?

24   A      Tardiness, difficult to work with, uncooperative,

25          unprofessional, creating an environment where the

```
 1              staff wanted to leave.  Lots.
 2       Q      Did you believe all of Dan's assessments of Ms.
 3              Nelson?
 4       A      I had witnessed a lot of it.  There was also -- my
 5              advice, especially for someone like Ms. Nelson, to
 6              try and be patient, and push my supervisors to try
 7              and be patient, too, and try and give people the
 8              benefit of the doubt and the opportunity to
 9              improve, right?  That's part of my -- part of my
10              standing on working with people.  Yeah.
11       Q      But Dan -- so Dan would -- do you know how to
12              pronounce his last name?
13       A      I would be guessing.
14       Q      I believe it starts with a "G."
15       A      Geschwind [phonetic] or something.
16       Q      Dan G.
17       A      Yeah.
18       Q      Was Dan G. responsible for Ms. Nelson's February
19              performance evaluation?
20       A      The performance evaluation?
21       Q      Uh-huh.
22       A      No.  That would've been -- he would've had some
23              input, but that would've been myself.
24       Q      He would've had some input?
25       A      I believe so.  Yes.
```

1    Q    How does -- I mean, how do you -- if you're relying

2         on the statements of supervisors --

3    A    Yeah.

4    Q    -- regarding a particular youth mentor, including

5         Ms. Nelson or any other ones, how do you verify

6         that the statements they are making to you about

7         their performance are accurate?

8    A    I would try and -- I would try and observe, and pay

9         attention, and try and witness it for myself.  I

10        think a lot of it goes into -- you know, a big part

11        of myself is -- making the decision to promote

12        someone is trust and things like that.  So I try

13        and trust my supervisors the best I can, too --

14   Q    Okay.

15   A    -- but I definitely try to witness things myself.

16   Q    Right.  Now, you said the decision to promote.  Why

17        did you mention that?  I didn't ask you about the

18        decision -- you said "promote."

19             MS. LANGLEY:  Object to form.

20   A    If I recall the conversation, it was pressed about,

21        like, why I would trust a supervisor.  So from

22        someone to go to a mentor to supervisor, I would --

23        they were things I would look for.

24   Q    What --

25   A    So what I'm saying is for someone to be in that

1          position, they've established a level of trust with

2          me.  Sorry.

3     Q    Okay.  All right.

4     A    Yeah.

5     Q    So that's part of it, that you've established it?

6     A    Yes.

7     Q    When was Dan hired?

8     A    It would've been either the November or December of

9          '21, I believe.

10    Q    Okay.

11    A    Yes.

12    Q    Is there ever a situation where a new hire is hired

13         directly into the supervisor role?

14    A    No.  I don't believe -- I don't believe there -- I

15         don't believe there is.  There's nothing, I don't

16         think, against that; it's just not a practice I did

17         often.  I don't recall ever doing that.

18    Q    So it's not a practice for the Three Points Center

19         in Utah or North Carolina to hire somebody directly

20         into the supervisor role?

21    A    Not necessarily.  I can't -- I said I don't want to

22         -- can't testify that it has never been done.

23    Q    Weren't you hired directly into the supervisor

24         role?

25    A    Yes.

1    Q    Why was that?  Did it --

2    A    I don't know the reasoning at the time with -- you

3         would have to speak with my direct supervisor at

4         the time.  I don't -- I don't know why.

5    Q    And who was your direct supervisor at the time that

6         hired you directly into the supervisor role?

7              MS. LANGLEY:  I believe he has testified

8         about who (inaudible) --

9              MR. DAVIS:  Okay.  If it's in there already,

10        all right.

11   Q    But typically, except for you, it's not standard

12        practice for a new hire to be hired directly into

13        the supervisor role?

14   A    No.  I mean, we have established positions, right?

15        It's not -- yeah.  So no.

16   Q    How many other, I guess, termination discussions

17        did Dan G. initiate with you while you were his

18        supervisor?

19   A    Yeah.  I don't recall the exact number.

20   Q    You know, more than one?  Less than one?

21   A    I would say more than one.

22   Q    More than one.  So is one of them Tyliya?

23   A    Yes.

24   Q    Okay.  And that conversation was initiated on the

25        afternoon of April 6th, 2022?

Case 1:23-cv-00527-WO-JGM   Document 39-1   Filed 07/23/24   Page 78 of 296

1    A    I believe so.

2    Q    Okay.  Who else did -- was Dan the supervisor of

3         that he wanted to terminate?

4    A    I don't -- I don't recall.  I don't remember.

5         Sorry.

6    Q    Now, I asked you -- well, Dan came to you on April

7         6th in the afternoon, correct?

8    A    Yes.

9    Q    So were -- like personally, or did he call you, or

10        was it on the walkie-talkie?

11   A    I believe in the -- I believe personally.  I'd say

12        we work closely.  We're on campus, right?  We're

13        around each other.  The exact format of

14        conversation I don't remember, but I would've spoke

15        to him personally throughout the day.

16   Q    Okay.  So at this time, so before Dan came to you

17        and initiated, you know -- your testimony is --

18   A    Yeah.

19   Q    -- that Dan did this.  So in the morning up until

20        that point that you alleged that conversation

21        happened, how many youth mentors were on the

22        Chatham County facility -- or at the Chatham County

23        facility?

24   A    During that shift?

25   Q    Uh-huh.

1   A    I'd say between two to four.

2   Q    Between two to four.  So it would've been Ms.

3        Nelson, correct?

4   A    Yes.

5   Q    Would it have been somebody named Sharika?

6   A    Yes.

7   Q    Would it have been somebody named Avery?

8   A    Avery?  Yes.

9   Q    Okay.  How many students are -- were at the

10       facility at this time?

11  A    I don't recall the exact number.  I know we had --

12       I believe at the time it was one group, possibly

13       two groups.  So with one group, we would've had --

14       that allows up to eight students in one group.

15  Q    I'm not asking what you would've had.  I'm asking

16       who was there, if you can remember.

17  A    Yeah.  I don't remember.

18            MS. LANGLEY:  Object to form.

19  Q    You don't remember.  Okay.  Would those three that

20       we do -- that we can remember the names of -- was

21       Dan their supervisor -- the shift supervisor that

22       day for Tyliya, Sharika, and Avery?

23  A    That day?  Yes.  I believe so.

24  Q    Okay.  So -- well, what -- so it's the day --

25       lunchtime?

81

1    A    Yeah.

2    Q    There's a cafeteria, right?

3    A    Yes.

4    Q    Okay.  So Tyliya, Sharika, and Avery, and then the

5          unknown other person that would've been there, did

6          they go to the cafeteria with the students?

7    A    Yes.  They would stay with the group.  Yes.

8    Q    And do they stay with them in the cafeteria while

9          they -- while they eat?

10   A    Usually, yes.

11   Q    Yes.  Does Dan have to stay there, too?  Or does

12         the supervisor, and then specifically Dan -- is he

13         required to stay there?

14   A    It required -- it was asked of the supervisors to

15         be present during meal times.  Yes.

16   Q    Okay.  And where would you have been at this time?

17   A    Usually present in the cafeteria, too.  I could

18         have been speaking, I could have been in academics

19         or the dorms.  I was floating all over.

20   Q    Okay.  So you have a floating role.  There is a

21         floating aspect of the group living director job?

22   A    Yes.  I was able to move around.  Yes.

23   Q    Okay.  What about the shift -- the shift

24         supervisor?  Are they allowed -- are they able to

25         float, also?

1    A    They are able to float.

2    Q    Besides supervise, I guess what I want to know is

3         what is the nature of their -- of their supervision

4         of the youth mentors?

5    A    Similar in which I discussed, like oversights of

6         the shift, staffing the shift, safety of the

7         students.  They would -- they would help assist

8         with the students, keep according to the schedule

9         of the day.

10   Q    So when -- then a situation where Dan could float

11        some, fair?

12   A    Yes.

13   Q    But he could not float as much as you, fair?

14   A    Fair.

15   Q    Okay.

16   A    He had to focus.  Yes.

17   Q    All right.  So when he was not floating, that means

18        that he was actually in the same -- he was in the

19        presence of the -- of that students that Tyliya,

20        Sharika, and Avery were mentoring, if you will?

21             MS. LANGLEY:  Object to the form.

22   Q    Is that -- he could see -- could he -- was he -- if

23        he's not floating, is he supposed to be looking at

24        either supervisors or the students?

25   A    Yes.  His job, as I say, if he was doing other

1          things, he could have been meeting with -- the job

2          varied in that sense.  He could have been not

3          always directly, as I say, over or present there.

4          He could have been speaking with myself, could have

5          been speaking to academics, speaking to the

6          clinicians for communication.

7    Q    Do you remember roughly how old Dan was?

8    A    No.  He looks -- I think he looks older than he is.

9          But no, I don't know Dan's exact age.  Sorry.

10   Q    Did you hire Dan?

11   A    Yes.

12   Q    Did you do the job interview with Dan?

13   A    Yes.

14   Q    Okay.

15   A    Actually, I don't believe I did the job offer.  I

16        don't believe I did Dan's.  I don't believe I was

17        responsible for the interview with Dan.

18   Q    Okay.  But at some point after Dan became an

19        employee, that is when he established trust with

20        you to be promoted, correct?

21   A    Yes.

22   Q    How did he establish that trust with you?

23   A    Obviously over the period of his hire date -- so

24        when we made the decision -- we had an interview --

25        we had an interview process.  We -- I may have

1       brought -- had people do the supervisor role, and I

2       would speak to -- I would speak to some staff to --

3       for input.  But just usually work performance,

4       work-related, and just observing how he has

5       conducted himself over the last -- over the last

6       little bit before we made that decision.

7               MR. DAVIS:  Y'all have them all except for

8       the ones --

9               MS. LANGLEY:  Which set are you --

10              MR. DAVIS:  The ones from -- the 1 through

11      -- I might pull some out --

12              MS. LANGLEY:  From yesterday?

13              MR. DAVIS:  Uh-huh.

14              MS. LANGLEY:  Okay.  All right.

15              MR. DAVIS:  And then what did you say your

16      lunch time was?

17              MS. LANGLEY:  We're going to head out

18      twelve-thirty-ish.

19              MR. DAVIS:  What are we at now?

20              THE COURT REPORTER:  It's twelve-sixteen.

21              MR. DAVIS:  Twelve-sixteen.

22   Q  All right.  I'm going to hand you Exhibit 13.  We

23      may refer back to that some more.  This -- what I'm

24      handing you is Plaintiff's Exhibit 13 from the Dr.

25      Thibault -- and we will do that spelling later if

1           you don't have it -- Thibault deposition.  Okay?

2           Take a moment to look at that, and then I'm going

3           to ask a few questions after I find it in my

4           binder.  That's one -- is that one of the forms

5           that you reviewed before today?

6      A    I've reviewed this before.  Yes.

7      Q    You reviewed it before.  But in terms of preparing

8           -- the question is in terms of preparing for this

9           deposition.

10     A    I've looked over this.

11     Q    Okay.  Here we go.  All right.  Is that your

12          handwriting on this form?

13     A    There is a few different handwritings on this form.

14          But the one -- the one in blue is myself.  Yes.

15     Q    Okay.  What is the date on this evaluation?

16     A    The 21st of February 2022.

17     Q    What is this document that you're looking at?

18     A    It's a performance assessment.

19     Q    Who is it -- which employee is it for?

20     A    Ms. Nelson.

21     Q    Why was it provided to her on February 21st, 2022?

22     A    I believe we do -- it was her ninety-day

23          evaluation.  Yes.

24     Q    The handwriting -- you testified the handwriting in

25          blue is yours, correct?

1    A    Yes.

2    Q    Okay.  The first -- there's Part 1, and then I'm at

3         the part where it says, "Job knowledge.  Employee's

4         understanding of the job requirements, as well as

5         related functions and the need to keep skills

6         current."  What did you check for Ms. Nelson's

7         performance?

8    A    Satisfactory.

9    Q    And in the comments, you have "TBRI."  What does

10        that stand for?

11   A    It's an acronym for trust-based relationship

12        intervention.

13   Q    Okay.

14   A    It's a form of intervention.

15   Q    And you have a question mark with it.  What does

16        the -- what does that question mark indicate?

17   A    So in -- for job knowledge, I would kind of ask

18        employees on the spot over these things just to --

19        I would say, "Hey, so tell me about what you've

20        learned about TBRI so far."  Positive peer culture,

21        these are all things that we use.  So I would ask

22        -- I would usually ask the person under the

23        assessment to kind of discuss those with me.

24   Q    Okay.  So during the -- so during the assessment is

25        when you kind of give them the pop quiz, if you

```
1              will?
2      A       Yes.  We would have a discussion.  Yeah.
3      Q       So those comments, you put a question behind it.
4              Did she -- are you indicating that she didn't
5              understand that TBRI, or that you just asked the
6              question and you thought her understanding was
7              satisfactory?
8      A       These were wrote -- these were wrote down for me to
9              prompt discussion about that.  These are not to
10             clarify an understanding.
11     Q       Okay.  So there is no -- one way or another -- so
12             overall, at this time when you filled out this
13             form, you did believe that Ms. Nelson's job
14             knowledge generally was satisfactory?
15     A       Yes.
16     Q       Okay.  But these other comments, you asked her
17             about those things, and after she answered your
18             questions, then you checked the box "satisfactory"?
19     A       Yeah.  I don't recall the order of how I did that.
20             Sorry.
21     Q       Well, is it -- what does "positive peer culture"
22             mean?
23     A       Positive peer -- that's a -- it's kind of a culture
24             in which we communicate with the kids.
25     Q       So the peer -- who are the peers being referred to?
```

1   A    They would be the students.

2   Q    Okay.  So to create a positive peer culture, an

3        employee facilitates it.  But the students are not

4        their peers.  That's what -- who are the -- the

5        peers are the students.  But how did the youth

6        mentors affect positive peer culture?

7   A    So it's -- the positive peer culture was a, as I

8        say, culture of how to operate.  So they would be

9        somebody who would be expected to be aware of that

10       so they could promote it in every -- in every

11       dealing with the students.

12  Q    Ms. Nelson was good with -- you did believe that

13       Ms. Nelson was good with the girls, didn't you?

14            MS. LANGLEY:  Object to form.

15  Q    Did you believe that Ms. Nelson was good with the

16       girls -- the students?

17  A    Ms. Nelson was good with the students.  Yes.

18  Q    So if you asked her about positive peer culture and

19       checked "satisfactory," do you believe that she was

20       facilitating a positive peer culture at this time?

21  A    I believe -- I believe she was still learning and

22       shaping her understanding of positive peer culture.

23       I do not think she -- I wouldn't say proficient in

24       positive peer culture.  We were ninety days in and

25       she was still learning.

1    Q    At this -- at this time at Three Points' facility

2         -- at the Chatham County facility, Ms. Nelson

3         wasn't a -- I would say -- is it fair to say an

4         initial hire?  Is that fair?

5    A    She was one of the first.

6    Q    One of the first ones (inaudible) --

7    A    Yes.  I believe so.

8    Q    -- the youth mentors?

9              Did -- and when she was hired, were other

10        youth mentors hired around that same time, early

11        December and November 2021?

12   A    Yes.

13   Q    Well, who were some of the other youth mentors

14        hired at that time?

15   A    Dan would have been one -- a mentor.  We had

16        Krista, I remember.  Yes.

17   Q    Dan and Krista?

18   A    Yeah.

19   Q    Did you also perform performance about -- their

20        ninety-day performance evaluations for Dan and

21        Krista at this time?

22   A    At this exact date, I don't remember.  But ninety

23        days usually I would have done.  Yes.  But I don't

24        remember if it was this exact date when I performed

25        those.

1    Q    Would you have waited a hundred and twenty days to

2         do them?

3    A    I would've tried not to.  No.

4    Q    Would you -- would you have done them before ninety

5         days?

6    A    Not necessarily.  No.

7    Q    So if you did -- if you did do them, it would -- it

8         would -- you would call it a ninety-day eval, I

9         understand.

10   A    Yeah.

11   Q    I mean, it's an employment -- but it wouldn't have

12        happened six -- Dan's ninety-day eval wouldn't have

13        happened after Ms. Nelson was terminated, would it?

14   A    I don't -- yeah.  I don't believe so.  I don't

15        recall.  No.  I don't believe so.

16   Q    And then who else made it ninety days after being

17        hired?

18   A    There's a mentor that I remember, Krista.

19   Q    How was -- how was her performance?

20   A    I don't -- I'll say I have not reviewed Krista's,

21        but I remember her also being very, very good with

22        the students, I remember.  Yes.

23   Q    Okay.  You've got "TPC mission statement."  Now,

24        that mission statement, Dr. Thibault told me that

25        changed recently to something much, much shorter

1          than what it was when Ms. Nelson was working there.

2          Did you ask her to recite the mission statement, or

3          is it just to understand the nature of the --

4     A    Yeah.

5     Q    -- services?

6     A    I believe so.  To give me her interpretation of

7          what she felt like our mission was.

8     Q    Okay.  And you felt that she understood?

9     A    Yeah.  I believe -- I believe she understood how

10         important the work with the kids was.  Yes.

11    Q    Turn to the next page, please --

12    A    Yeah.

13    Q    -- of her evaluation.  What is the -- see where the

14         -- below the logo where it says, "Three Points

15         Center"?

16    A    Yeah.

17    Q    It says, "Quantity:  Typical volume of work

18         employee produces under normal circumstances."  I'm

19         not going to mince words, but just to clarify,

20         there is not an actual production element of their

21         job, is there?

22    A    No.  There is not like a -- yeah.

23    Q    Okay.

24    A    There is no measurement as far as --

25    Q    There is not a physical output?

1    A    Yes.

2    Q    All right.  Where is the transcript?  All right.

3         Very -- you checked "very good."  "Comments:  No

4         problems.  Always with students and stays engaged."

5    A    Engaged.  Yeah.

6    Q    Very good.  Now, earlier you said -- I asked if you

7         thought -- I think I asked how you thought Ms.

8         Nelson was with the students, and you testified

9         that you thought that she was good with the

10        students.  Here you checked "very good."

11            MS. LANGLEY:  Object to form.

12   A    There is no "good" on this form.

13   Q    Is very good better than satisfactory?

14   A    Yes.

15   Q    Is satisfactory -- well, in terms of this spectrum

16        between excellent, very good, satisfactory, fair,

17        and unsatisfactory, which one -- in your mind,

18        which one of these boxes is good enough?

19            MS. LANGLEY:  Object to form.

20   A    Good enough would have been -- yeah.  That's a good

21        question.  Fair, satisfactory.

22   Q    Somewhere between --

23   A    Satisfactory.  Yeah.

24   Q    So satisfactory is good enough?

25   A    Yeah.

1    Q    If there was an employee whose form had all fairs,

2         would that employee be given, like, a warning or,

3         like, initial discipline, something along those

4         lines?

5    A    I don't -- I don't believe so.  That's not how I

6         did things.  I would reflect on maybe I needed to

7         spend more time in training and give people

8         opportunity to get better.

9    Q    So if somebody had satisfactory -- let's just say

10        cooperation --

11   A    Yeah.

12   Q    -- is there -- to your understanding, is there

13        something in the either employee handbook or just

14        do you believe that -- would you believe that

15        employer has an expectation that their employees

16        cooperate with each other without a handbook?

17   A    Sorry.  Could you ask that question --

18   Q    I mentioned a handbook.  But I mean cooperation.

19        It's -- you know what an employee handbook is?

20   A    I do.

21   Q    Okay.  Just picture a situation.  I'm not -- this

22        is a hypothetical.  There is an employer that

23        doesn't have an employee handbook, but they still

24        do ninety-day performance evaluations.  You

25        understand what I'm saying?  Just like this.

1          Cooperation.

2     A    People -- yeah.

3     Q    Ms. Nelson, she is cooperating with other

4          employees, based on your evaluation?

5               MS. LANGLEY:  Object to form.

6     A    If she was -- yes.  It was satisfactory.  I marked,

7          and I stand by that.  Yes.

8     Q    Now -- and you -- the comment was "Use the right

9          channels for concern."  Is that a -- did you mean

10         use, or is that a comment that she uses the right

11         channels for concerns?

12    A    That would -- I believe in this context it was

13         feedback for me to -- the feedback I gave Ms.

14         Nelson was to ask her to use the right channels of

15         -- for concerns.

16    Q    Okay.  So -- but your feedback on this -- on this

17         form, it's not a complete sentence.  It's

18         ambiguous, isn't it?

19              MS. LANGLEY:  Object to form.

20    A    Yeah.  I would say it's not a complete sentence.

21         It says, "Use the right channels for concerns."

22    Q    What are -- which concerns are you talking about?

23    A    I don't recall every concern.  I just know during

24         that time we had obviously introduced the

25         supervisor role.  I think there was maybe a way of

1          mentors coming to myself, and it was trying to

2          establish the process of go to your direct

3          supervisor, come to, like -- just to establish the

4          right chains of command there.  Yeah.

5    Q    Did you fire Ms. Nelson because she didn't use the

6          right channels for concerns?

7              MS. LANGLEY:  Object to form.

8    A    Did I fire Ms. Nelson 'cause she didn't use the

9          right -- no.

10   Q    Was Ms. Nelson fired for not using the right

11         channels to express these concerns?

12   A    I don't -- I don't believe so.

13   Q    After this performance evaluation, did Ms. Nelson

14         appropriately express her concerns through the

15         right channels?

16   A    Not always.

17   Q    Not always?

18   A    Yeah.

19   Q    Was she ever written up for that?

20   A    No.  I don't believe so.

21   Q    Initiative, the how -- it states, "How well does

22         the employee generate ideas and follow through with

23         them?"  Which box did you check?

24   A    Very good.

25   Q    Okay.  And the comment was, "No problems.  Keep

1          bringing your ideas."

2      A   Yes.

3      Q   How would someone achieve excellent in this

4          criteria?

5      A   I think it's someone who would be -- I don't know

6          -- consistently creative with ideas, keeping the --

7          keeping the students occupied, engaged.

8      Q   What type of -- what type of ideas do you remember

9          Ms. Nelson coming up with that you thought were

10         very good?

11     A   She was creative at times.  She would bring board

12         games.  She typically had a plan for her group to

13         keep them engaged and have fun, have a good time

14         with the kids, and she would structure their day to

15         kind of keep the kids -- keep the kids active.  Say

16         if we had a discussion about possibly off-campus

17         things, I could lean on her knowledge of the area,

18         and she could say, "Hey, like, this -- the

19         trampoline parks or the movies," or something.  She

20         had ideas like that.  So yeah.

21     Q   Keeping it -- keeping it fun for the students?

22     A   Yes.

23     Q   'Cause it's a tough -- it's a tough environment

24         sometimes for everybody there, right?

25     A   It can be a tough environment.

1    Q    Did Ms. Nelson make it better?

2    A    For the students, yes.  Not for staff.

3    Q    But there is somewhere in your handbook that says

4         the students are what matters the most.

5    A    Students absolutely matter.  Yeah.

6    Q    The most.  And the parents, right?

7    A    Parents matter.  Yes.

8              MS. LANGLEY:  So Garrett, we are at twelve-

9         thirty-four.  Is this a good time --

10             MR. DAVIS:  We can follow -- yeah.

11             MS. LANGLEY:  Is this a good breaking time?

12   Q    What was it?  The students matter the most, fair?

13   A    Yes.

14   Q    Yeah.

15   A    That's fair.

16             MR. DAVIS:  See you when you get back.

17             (LUNCH RECESS)

18             (12:34 P.M. - 1:21 P.M.)

19   Q    Good afternoon, Mr. Butcher.  Just to pick up where

20        we left off, you were looking at Plaintiff's

21        Exhibit 13 introduced in Dr. Thibault's deposition.

22        Will you turn to the second page?  I believe our

23        last conversation about Ms. Nelson's performance

24        evaluation were at the "Initiative" section.  Do

25        you remember that?  Do you see where I'm at?

1    A    Yes.

2    Q    And I believe you testified, but just to -- there

3         might be some overlap.  What did you mean by --

4         well, when you checked "very good," what were the

5         ideas that you remembered liking that she had?

6    A    She would keep her shift busy.  She had board games

7         and activities.  She would be able to -- she knew

8         the area.  She'd be able to recommend off-campus

9         activities and things like that.

10   Q    That's right.  So is -- and I believe you said that

11        she was good at planning -- thinking about the day

12        for the girls, which might include those activities

13        or games that she brought.  My question is was Dan

14        -- did Dan have any responsibility -- kind of

15        programmatic responsibility like that?

16   A    Yes.  It would've been in conjunction with his

17        team.  Like, if Dan had an idea or an activity

18        planned, he would ask his staff if they wanted to

19        do that.  They could say "yes" or "no."  He could

20        -- yeah.  It was --

21   Q    So what is the -- "curriculum" is not the right

22        word, because a school -- but the activities -- is

23        it your testimony that the youth mentors are

24        responsible for developing the activity schedules

25        for the students?

1    A    Yes.  They were involved in that.  Yes.

2    Q    Okay.  What were some -- what was -- during this

3         time as you -- as the Three Points facility in

4         North Carolina got up and running, what were some

5         of the ideas that you remember having about

6         activities for the students?

7    A    Water balloon fights, marshmallow fights.  We go

8         off campus, we do hikes.  Yes.  We bring in

9         possibly movies, right, video games, those types of

10        things.

11   Q    To make it fun stuff like you do -- I mean, it's a

12        difficult -- like you do at home?

13   A    Yes.

14   Q    Like home.  Okay.  Thank you.  So those type of

15        activities, Tyliya was good at generating ideas for

16        those?

17   A    Yes.  She was good at creating ideas of activities

18        for the kids.

19   Q    Okay.  Do you see the next metric?  The

20        dependability/reliability?

21   A    Yes.

22   Q    This is for an employee's willingness to accept

23        responsibility and meet deadlines.  Now, in the

24        blue ink, it's checked "satisfactory."  Now,

25        knowing that this form is dated coming up on two

1      years ago, I just want to confirm.  Is the blue ink

2      your handwriting?

3  A   The blue ink would be my handwriting.  Yes.

4  Q   May I say that your handwriting is almost a model

5      for a font, Mr. Butcher?  It is.

6  A   Thank you.

7  Q   It's very -- it's very clean and clear.

8          And did you fill out all the other

9      performance evaluations for the other employees for

10     the ninety days?  Remember the initial hires?

11 A   During this time, I imagine so.  Yes.

12 Q   Okay.

13 A   Not over the course of -- as the supervisors were

14     introduced, it would have been their responsibility

15     moving forward.

16 Q   Thank you for adding that clarification.  So did --

17     we'll stay on that for a minute.  Did Dan

18     ultimately take over the ninety-day evals?

19 A   He would've done.  Yes.

20 Q   He would've done.  But did he?

21 A   Yes.

22 Q   He did.  When did you give him the go-ahead to

23     start doing that?

24 A   That would have been -- I don't know the exact

25     date.  But that would've been a transition of where

```
 1              he would've had sufficient time with his employees
 2              to make -- to do an assessment.  For example, with
 3              T, I was -- I had oversight for the majority of
 4              that ninety days, so it would make no sense for Dan
 5              to do that.
 6     Q        Understood.  Did Dan -- you know, after Ms. Nelson
 7              was terminated, did Dan fire -- hire anybody?
 8     A        No.  I don't -- I don't believe he did.  Could he
 9              possibly have been in the interview process?  Yes.
10     Q        Okay.  So in terms of thinking about a hiring
11              decision and the evaluation forms, is it fair to
12              say that somebody without hiring authority is
13              responsible for doing the ninety-day performance
14              evaluation?
15                   MS. LANGLEY:  Object to form.
16     A        Yes.  Sorry.  I believe there's lots of gray with
17              that question.  Sorry.
18     Q        What is -- what's gray about it?
19     Q        'Cause that wasn't how it would often -- like for
20              -- so sometimes, as I say, when we did interviews,
21              Dan would be involved in the interview process and
22              give his -- give his inputs, his thoughts, ask
23              questions to an interviewee, right?  So when he
24              would often say, "Hey, like, I think that person
25              would be great or good," yeah, I would obviously
```

1          take that on.  We would have a discussion, so --

2     A    I understand.  Is it fair to say that the

3          supervisor is kind of like your right-hand man or

4          Girl Friday, just to be as neutral as possible?

5               MS. LANGLEY:  Object to form.

6     A    Yes.  They would be someone I would lean on in

7          these types of things.  Yes.

8     Q    You would lean on?

9     A    Yes.

10    Q    But what I'm asking is in terms of a -- of a pure

11         HR authority calculus, you testified that Dan fills

12         out these ninety-day performance evaluations,

13         correct?

14              MS. LANGLEY:  At what time period?

15    Q    At some point after Ms. Nelson was fired, you

16         testified that ultimately translated -- the

17         transition to him filling out these forms.

18    A    That would've been a responsibility of his.  Yes.

19    Q    But Dan never had the authority to himself hire or

20         fire any youth mentor?

21    A    Not by himself.

22    Q    Okay.  On -- I may have started here.  I apologize.

23         Dependability and reliability.  I know I read that.

24         What did you check for Ms. Nelson?  So we're back

25         on the performance eval exhibit.

1    A    Yes.  I checked "satisfactory."

2    Q    Okay.  In terms of dependability, could you depend

3         on Ms. Nelson to work extra shifts when you texted

4         her and asked her to?

5    A    Depend?

6    Q    At this time.  Let me --

7    A    Sure.

8    Q    At this time, could you depend on her?

9    A    Depend, no.  So I put in an offer to Ms. Nelson.  I

10        would not know if she would say yes or no.  I

11        believe she had -- she would say yes at times and

12        no other times.  I wouldn't say I could depend on

13        her to absolutely pick up a shift.

14   Q    But is it -- would it be -- is it reasonable for

15        you to depend on somebody that has already worked

16        fifty hours in one workweek to agree to pick up

17        another shift?

18             MS. LANGLEY:  Object to form.

19   A    No.  I don't think I would.  I would offer.  I

20        don't know if I would depend.

21   Q    Right.  Well, I guess is it reasonable for you to

22        depend on it is what I'm saying.  If you knew that

23        an employee had already worked the number of days

24        and hours for their regular shift schedule -- that

25        premise, right?

1  A  Yes.  I would still include them in my offer to --

2  Q  No.  I understand you would include.  What I'm

3     asking -- and typically if someone had worked four

4     twelve-hour-plus shifts, how many hours is that?

5  A  That would be forty-eight hours.

6  Q  When I say "overtime," do you know what I mean?

7  A  Yes.

8  Q  What is your understanding of overtime?

9  A  It is usually anything over forty hours, I believe.

10 Q  Okay.  And what -- but what happens because of

11    overtime, from an employer's perspective?  What is

12    an employer obligated to do when an hourly employee

13    works -- an hourly non-exempt employee works more

14    than forty hours in a workweek?

15 A  I don't -- yeah.  I don't -- I don't know.

16          MS. LANGLEY:  I don't think he ever said he

17    had a responsibility for payroll.  So you're asking

18    --

19          MR. DAVIS:  He said he had responsibility

20    for scheduling and --

21          MS. LANGLEY:  But you're asking for

22    something --

23          MR. DAVIS:  First of all, you need -- if you

24    want to object, say -- just say "objection."  But

25    he has testified he had responsibility for

1       scheduling and that he couldn't depend on Ms.

2       Nelson to pick up extra shifts, correct?  And I'm

3       asking is it reasonable for --

4               MS. LANGLEY:  No.  That wasn't your

5       question.  I object to --

6               MR. DAVIS:  Okay.

7               MS. LANGLEY:  You asked if someone worked

8       forty-eight-plus hours, what is your understanding

9       of what the employer is supposed to do?

10  Q    Okay.  And I won't go any further on that, because

11      your answer is you don't know?

12  A    No.  I don't know.

13  Q    Okay.  All right.  Do you -- do you believe, based

14      on your understanding of -- general understanding

15      of American labor law, that forty hours is a

16      standard workweek?

17  A    It's a full-time workweek.  Yes.

18  Q    Okay.  So my final question on this, Mr. Butcher,

19      would it be reasonable for you to depend on an

20      employee who has already worked over forty hours or

21      over forty-eight hours to come in and pick up extra

22      shifts?

23  A    Yes.  That would be something -- sorry.  I'm trying

24      to just get the question in my head.  Yes.  I would

25      ask employees who had worked their regular shifts

1    forty-eight hours a week, and then if there was

2    additional shifts available, I would -- yes, I

3    would ask them to work.

4    Q    I know you would ask them.  But I'm saying is it --

5         from your perspective, is it reasonable to do that?

6    A    To offer?  I believe so.  Yes.

7    Q    To offer.  But to expect them to say yes

8         dependably?

9    A    No.  I would never expect.  I don't believe I did

10        expect.

11   Q    Okay.

12   A    So yeah.

13   Q    So when you say -- the part where -- when we were

14        -- when I asked you about whether or not she was

15        dependable and I asked if she picked up extra days

16        and shifts and you said you couldn't depend on her

17        to pick up extra days and shifts, that's not a

18        negative to Ms. Nelson; it's just you wouldn't

19        depend on it because it wouldn't be reasonable to

20        depend on that?

21   A    Because she -- I believe so.  Yes.

22   Q    Okay.

23   A    She had the option.  Yes.

24   Q    So that -- so that dependability thing is not about

25        her not picking up extra shifts.  So what was the

1              -- what dependability made you check "satisfactory"

2              as opposed to the box "very good"?  That appears to

3              be written in, but is not in blue ink.

4     A     Someone would ask to -- I guess me.  I would ask

5              them to do a task.  So it would be follow through

6              of what's being asked of them, I believe.

7     Q     For example -- can you think of an example of

8              something Ms. Nelson didn't follow through on?  A

9              task.

10    A     Yes.  To say, "Hey, a parent is coming to visit.

11             Can you -- would you be able to get that student to

12             the main building?"  I don't know.  So I just --

13             something like that where I -- she was kind of

14             dependable in that sense of like I know Ms. Nelson

15             would be able to get a student to the main

16             building.

17    Q     So that's it?  One you can think of -- when did

18             that -- like, I know it's been a while, but I

19             thought she was good with the girls.

20                   MS. LANGLEY:  Object to form.

21    A     Ms. Nelson was good with the girls.

22    Q     Okay.  So -- but getting them to the main building

23             -- how often did the parents -- you said before the

24             parents came.  Was that the example?

25    A     It was the -- yeah.  One example.  Yes.

Case 1:23-cv-00527-WO-JGM   Document 39-1   Filed 07/23/24   Page 107 of 296

1    Q    How often do the parents come -- or are they

2         allowed to come to Three Points?

3    A    Allowed is as much as they want.

4    Q    How often do parents typically come?

5    A    So that's also a great -- we had students with

6         zero, we had students with weekly at that time, so

7         --

8    Q    Last one.  Parents weekend -- is there a scheduled

9         parents' weekend?

10   A    Yes.

11   Q    So when Ms. Nelson didn't get one of the students

12        to the main building on time, was that -- do you

13        remember if that was for a parents' weekend or for

14        just one of these kind of random visits?

15   A    I don't recall.  And I don't know if she ever did

16        not get a student there on time.  I don't --

17   Q    Well, is that what you -- I thought that's what you

18        testified, though, is that -- in terms of not being

19        able to rely on her.

20   A    So you asked for an example of how I could rely on

21        her, and that was the thing that came to my mind.

22   Q    Oh, you could -- she did do that well.  Is that

23        what you're saying?

24   A    She was dependable in that area.  I know --

25   Q    Okay.

1   A       -- she would follow through.  Yes.

2   Q       Thank you for -- what I'm asking is -- all right.

3           Do you see how the initiative -- you checked

4           "very good," and then for dependability and

5           reliability, you checked "satisfactory"?

6   A       Yes.

7   Q       So I'm just -- the final one here.  Just why did

8           Ms. Nelson not get very good on dependability and

9           reliability?

10  A       'Cause I believe those occasions were possibly a

11          little difficult and uncooperative, as I say, a

12          struggle.  I had to be very strategic in which I

13          would apply my feedback so she wouldn't sulk or get

14          frustrated or shut down, so --

15  Q       But, Mr. Butcher, there is a -- there is an area of

16          the performance evaluation for cooperation already.

17  A       Yes.

18  Q       Can you read the comment that you have for the

19          dependability/reliability comment?

20  A       Yes.  It says, "Struggles with constructive

21          feedback."  And then underneath, it says, "Could be

22          my delivery."

23  Q       Is it -- looking at this now, would it have been, I

24          guess, conceptually cleaner to put that comment

25          into the cooperation comments, or do you consider

1            an employee that doesn't respond to your feedback

2            to be unreliable?

3     A     So yeah.  Looking at it now, yes.  It could be -- I

4            think it could be in both.

5     Q     You have another sub-note next to the asterisk,

6            "Could be my delivery."

7     A     Yes.

8     Q     What do you -- looking back at it at this time,

9            what did you mean by -- what do you believe you

10           meant by that?

11    A     I believe at the time I wrote that is -- sorry.  I

12           believe -- I know my feedback was right.  The way I

13           -- the way I approach my feedback was right to

14           relate to Ms. Nelson.  I put that in there

15           strategically, 'cause Ms. Nelson is someone who --

16           I did this as a way to try and keep her motivated,

17           engaged, to say there's things I can look at within

18           myself to elevate your performance.

19    Q     So is that --

20    A     That's what -- that's why --

21    Q     Is that note for her?  Is that what you're saying?

22           The "Could be my delivery" note, is that for Ms.

23           Nelson?

24                MS. LANGLEY:  Object to form.

25    A     Yes.  Sorry.  Yes.  It would be a conversation to

```
 1              ask, "Hey, is, like, the way I'm asking this of you
 2              a problem?  Like, do you understand?  Like, how can
 3              I better communicate with you to" --
 4       Q      Did you present -- after you filled out this form,
 5              did you present it to Ms. Nelson?
 6       A      Yes.  I believe -- I believe this would've been
 7              done some before and as -- in the presence of Ms.
 8              Nelson as we were having a discussion about it.
 9       Q      The ninety-day eval, is it -- is it a time where
10              you have a meeting with the employee and you give
11              them this form, or do you have a meeting with the
12              employee and then you go fill out the form later?
13       A      Yeah.  So I would -- my practice would have been
14              Ms. Nelson would have received this form before
15              that meeting.  I would've asked her where she
16              believes she is at, as you can see where she has
17              marked it and wrote on it.
18       Q      Okay.
19       A      And then that's where I would come back -- I'd take
20              off -- I'd say thank you, then I would go over my
21              points, and then we would talk about where we
22              differ and things like that.
23       Q      Well, that's helpful.  So is it your testimony that
24              you give this form blank to an employee and they
25              can make notes on it?
```

1    A    Yes.

2    Q    And that's before you fill it out?

3    A    Typically, yes.

4    Q    All right.  Thank you for that.  All right.  They

5         give it back to you, then you fill it out.  Then

6         what happens physically at the campus?

7    A    Yeah.  I would -- I would meet to go over the

8         evaluation, talk about possible differences that we

9         had, possible things we could improve on, possibly

10        things we enjoyed, like, we liked.  Yeah.

11   Q    How would you set up that meeting with employees

12        like Ms. Nelson?

13   A    Either text message, call, in communication as we

14        were walking past each other.

15   Q    And just while we're on that, was your primary

16        means of communicating with Ms. Nelson text message

17        and phone calls?

18   A    No.  I would probably say most of the interaction

19        would be like this, face to face.

20   Q    Okay.  Right.

21   A    Yeah.

22   Q    Aside from -- let me be more specific.  Aside from

23        face-to-face interactions on the campus, did you

24        ever e-mail her about job-related things?

25   A    That wouldn't have been -- I can't say I never

1       e-mailed her, but that wouldn't have been my

2       primary, like you asked.

3   Q   Okay.  Thank you.  And then at this meeting where

4       you present this document that you filled out after

5       she has made notes, do you ask her to sign -- did

6       you ask her to sign it?

7   A   Yeah.  I don't recall.

8   Q   Okay.  Do you recall whether or not the other

9       performance evaluations that you did around this

10      time -- that the employees signed them?

11  A   Yes.  That was usually the practice.  I would ask

12      -- yeah.

13  Q   Is that -- as Dan transitioned to becoming

14      responsible for doing ninety-day performance

15      evaluations, did you advise him that the youth

16      mentor who he is apprising be required to sign the

17      form as a condition of the evaluation?

18  A   I don't remember that conversation.  It would have

19      been an instruction I'm sure I would've gave as he

20      would have gone through the training for this.

21      Yeah.

22  Q   Okay.  Can you turn to the second -- the second --

23      let's see.  No.  The fourth page.  It's Three

24      Points 052.

25  A   Yeah.

1    Q    Is this -- is this your signature, Mr. Butcher?

2    A    Yes.

3    Q    And what is the date?

4    A    It is 2-21.  So the 21st of February '22.

5    Q    Do you see the signature line above it?

6    A    Yes.

7    Q    What is that signature line for?

8    A    That would be for Ms. Nelson's signature.

9    Q    Is there a signature on that line?

10   A    There is not.  No.

11   Q    Here -- standing here today -- did you have a

12        verbal conversation around this time with Ms.

13        Nelson about her performance?

14   A    I believe I did.  Yes.

15   Q    But looking at this document, can you be sure that

16        this document was actually ever provided to her?

17   A    Besides my own knowledge of giving it to her and

18        receiving it back filled out?

19   Q    No.  I mean -- I mean giving it to her.  Excuse me.

20        Thank you.

21             It was given to her after you checked the

22        boxes and wrote the comments?

23   A    Yeah.  Yes.  I believe so.

24   Q    How can you be sure?

25   A    Just some of the terminology within it I believe is

1         written down in discussion with someone, if I

2         remember right, so --

3   Q   Does that mean that -- when you say "be sure," on

4         your memory that you gave it to her with the blue

5         ink on it?

6   A   Yes.

7   Q   Okay.  All right.  Okay.  Turn back to the ones

8         with the check boxes.  It's the second page, Three

9         Points 0050.  One says, "Attendance/punctuality.

10        How conscientious is the employee when it comes to

11        attendance, punctuality, and lunch periods?"

12        Almost all lunch periods -- Ms. Nelson was on the

13        day shift at the Chatham County facility, correct?

14   A   Correct.

15   Q   Is the lunch period contemporaneous with the girls'

16        lunch -- or the students' lunch period, or do the

17        staff get a break?

18   A   So both.  Staff would be entitled to breaks, and at

19        lunchtime, they would eat with the students.

20   Q   Okay.  So in terms of attendance and punctuality

21        for lunch periods, what is the attendance and

22        punctuality expectation with regards to lunch

23        periods for youth mentors?

24   A   The expectation is for them to be present with the

25        -- with the students, eat lunch with the students.

1              Lunch is provided by TPC.  So they would be

2              expected to be with their group and eat lunch.

3      Q      So given that lunch period is, I guess, called out

4              in this particular form, in your experience, is

5              there a -- is it common -- well, I won't say

6              "common."

7                      Is that -- is that a -- is that a problem

8              with the youth mentor position that they won't be

9              in the cafeteria with the students?

10     A      Is that a problem?  If not communicated

11             effectively, yes.  If --

12     Q      So how many students would eat lunch in the

13             cafeteria at one time?

14     A      All of them.

15     Q      All.  Well, when Ms. Nelson was there, about how

16             many students were there?

17     A      It would've been eight to sixteen, I believe.

18     Q      Eight to sixteen.  So let's just say eight.

19     A      Yeah.

20     Q      If one of the youth mentors wasn't at the lunch

21             period, wouldn't that destroy the ratios that Three

22             Points Center attempts to maintain?

23     A      As I say, if it was -- the two mentors were to get

24             up and leave without communication, that would

25             affect the ratios.  Yes.

1    Q    But is that a -- if a -- what I'm asking is the

2         ratios are important to Three Points Chatham

3         County's facility, correct?

4    A    Ratios are important.  Yes.

5    Q    Is it your -- Dr. Thibault testified yesterday that

6         the ratios are regulation in the State of Utah.  Is

7         that your understanding, also?

8              MS. LANGLEY:  Object to form.

9    A    Yes.  I want to clarify ratios are important.  Yes.

10   Q    Okay.  But then in North -- in North Carolina --

11        which was the facility that Ms. Nelson was working

12        at, correct?

13   A    Yes.

14   Q    That there are no state-required ratios.

15   A    I don't know.

16   Q    You don't know?

17   A    No.

18   Q    You know that the ratios are important in Utah and

19        North Carolina?

20   A    Yes.

21   Q    That's -- you know that they are important to your

22        -- to the people you report to --

23   A    Yes.

24   Q    -- for their own reasons?

25             Okay.  If you observe as a group living

1          director one of the youth mentors not being present

2          in the cafeteria, would that make you think about

3          those ratios?

4     A    I would like to think I have that awareness.  Yes.

5     Q    Would you fire a youth mentor for not being present

6          at lunch the entire period?

7     A    No.  My initial thought process would be to step in

8          and engage with the students to make sure we were

9          in ratio.

10    Q    The -- you checked "satisfactory."  Back to lunch

11         periods, do you ever remember a time that Ms.

12         Nelson was written up for not being present with

13         the students during lunch?

14    A    During lunch?

15    Q    Uh-huh.

16    A    No.  Not for lunch.  No.

17    Q    Okay.  The comments here, it says, "Has five

18         documented violations."  Are those -- so those

19         violations -- she was with them during lunch,

20         correct?

21    A    During lunch, I believe so.

22    Q    Are there any other -- during the workday, so after

23         a shift begins and before a shift ends, are there

24         any other time-related deadline -- any other things

25         where you would think about attendance -- the words

1           "attendance" and "punctuality" besides lunch?

2      A    Yes.  First thing in the morning, come and go onto

3           shift, staying for your entire shift.  If a staff

4           communicated, "Hey, I just have a quick errand" and

5           needed to leave for a fifteen-minute break and

6           would take an hour, yes.  So there are other times

7           where they would be looked at.  Yes.

8      Q    The fifteen-minute and staff would leave for an

9           hour, who did -- who did that at Three Points'

10          North Carolina facility?

11     A    Yeah.  I don't recall.  Sorry.

12     Q    Did you just make that example up?

13     A    No.

14     Q    Okay.  Can you think of anybody under your -- under

15          -- in the group living department -- that's your

16          department, right, Mr. Butcher?

17     A    Yes.

18     Q    Can you think of any employee that you're

19          responsible for supervising -- so supervisors or

20          youth mentors -- that left campus during the day,

21          told you they would be back by a certain time, and

22          then did not get back by that certain time?

23     A    No.  Not that I recall.

24     Q    Okay.  So are you thinking about an example from

25          Utah when you gave me that example?

1    A    That is possible.  I've been -- I've been doing --

2          was in the position for a lot of years.  So yeah.

3          I don't -- I don't recall --

4    Q    Is it possible -- is it possible that you gave me

5          that example because staff leaving and then not

6          getting back when they said they would is so common

7          that you just can't identify a particular incident?

8               MS. LANGLEY:  Object to form.

9    A    No.  I don't believe it's -- I don't believe it's

10        so common.

11    Q    Did Ms. Nelson ever tell you she had to leave

12        campus and then not get back at an acceptable time

13        for you?

14    A    No.  Not that I recall.

15    Q    So the violations where it says, "Has five

16        documented violations," it's not a lunch period

17        violation and it's not a -- is it fair to call it a

18        workday errand violation?

19    A    I think that would be fair.

20    Q    Okay.  What are the five documented violations that

21        you were referring to?

22    A    They would've been, I believe, tardiness coming in

23        in the morning, not coming in at all, no shows,

24        possibly -- if I recall, possibly leaving early

25        without -- yeah.

1    Q    You said "possibly."  But --

2    A    Yes.

3    Q    -- the comment below is, "Consistently clocking in

4         five to fifteen minutes late."

5    A    Yes.

6    Q    So the five documented violations -- what

7         information source did you rely upon to support

8         this comment that there were five documented

9         violations?

10   A    It would've been, I believe, the platform that we

11        use.

12   Q    What is the name of the -- when you say "the

13        platform" -- well, first of all, when you say "we,"

14        who are you talking about?

15   A    We as in TPC --

16   Q    Okay.

17   A    -- North Carolina.

18   Q    Well, you said TPC.  And then what did you say?

19   A    North Carolina.

20   Q    Okay.  The platform that TPC and then -- North

21        Carolina relies on, what is the name of it?

22   A    I believe it was called RMI.

23   Q    RMI?

24   A    Yes.

25   Q    So Ms. Nelson -- you gave back -- just turn to the

1          front page of the performance evaluation.  It's

2          your testimony that you handed this form blank to

3          Ms. Nelson to fill out her own evaluation, and she

4          checked in some of the boxes, correct?

5     A    Yes.  That's what I believe.  Yes.

6     Q    Is that standard practice at your employer?

7               MS. LANGLEY:  Object to form.

8     A    That was a standard practice of myself.  That's

9          something I would do often.

10    Q    Okay.  And then you filled out -- we went through

11         the comments again.  And then back to the source of

12         information for the five documented violations --

13    A    Yeah.

14    Q    -- what did you -- how did -- what look -- did you

15         look at to determine there were five violations?

16    A    I would've looked at our RMI time portal.  Yeah.

17    Q    Okay.  Where do you look at the RMI?  Is it on your

18         phone?  Do you have to log into a desktop computer

19         or laptop?

20    A    I would have logged into a laptop or a desktop.

21    Q    Okay.  So it doesn't -- they don't have a -- they

22         didn't have a mobile app?

23    A    They may have.  It's not something I used.

24    Q    You used -- did it -- is there -- did -- was it an

25         admin building?  Is there like a computer -- a

1          shared computer, or you just did it at home?  Like,

2          where did you log in?

3     A    It would have been -- I tried not to take work home

4          with me.  But it probably would've been in the main

5          building or in my office in the dorm -- in the dorm

6          room area where my office was.  I don't know.  I'm

7          sorry.

8     Q    So you would have logged in.  And what is -- what

9          is a violation for -- under Three Points' policies

10         and procedures for clocking in -- clocking in late?

11    A    Sorry.  What is the violation?

12    Q    Uh-huh.  When does -- when does -- in terms of

13         clocking in -- so it's not lunch period --

14    A    Yeah.

15    Q    -- attendance violations --

16    A    Yeah.

17    Q    -- it's not the errand -- coming back to -- you

18         know, that took too long.

19    A    Yeah.

20    Q    It's the clocking in late violation.  What is a

21         violation -- what constitutes a violation at your

22         place of employment?

23    A    Anything that is after the start of the shift.  I

24         believe we have a five-minute leniency.  But

25         anything after that --

1    Q    Okay.

2    A    -- would be a violation.  Yeah.

3    Q    Let's see here.  Okay.  And just what is the date

4         on the -- your signature on that one?

5    A    My signature is on this the 21st of February '22.

6    Q    I'm going to hand what was Dr. Thibault's

7         Plaintiff's Exhibit 11.  Take a moment to look at

8         that, please, while I turn to find my copy.  Okay.

9         What does it say at the top of this form?

10   A    It says, "Attendance review correction action."

11   Q    Okay.  What is the date?

12   A    The date on this is the 22nd of February 2022.

13   Q    Okay.  What is the employee name?

14   A    It's Tyliya Nelson.

15   Q    So this is a documented write-up for something,

16        correct?

17   A    Correct.

18   Q    And what is it a documented write-up for?

19   A    It appears her tardiness.

20   Q    How many write-ups -- or how many documented lates

21        are there?

22   A    On here, there are three.  It looks like three

23        documented.

24   Q    Can you look at the third one?  It says -- what

25        does it say?

1    A    It said, "Tyliya Nelson left twenty-one minutes

2         early with no approval from supervisor."

3    Q    Okay.  Now, I understand that that --

4    A    Yeah.

5    Q    -- could be -- you know, something like that could

6         be a violation.  But is that being -- is that late?

7    A    No.  That would not be a late.

8    Q    So how many documented late violations are on this

9         form?

10   A    From what I see, there's the two.

11   Q    There's two.  Did you write this form?

12   A    No.  I don't believe I did.

13   Q    Who made the decision to issue an attendance -- a

14        corrective action to Ms. Nelson the day after your

15        performance evaluation of her?

16   A    I believe that would have been her direct

17        supervisor.

18   Q    Did you have any input or oversight of this

19        write-up?

20   A    I'm sure it was brought to my attention.  Yes.

21   Q    So is that a yes or a no?  So yes?

22   A    Yes.

23   Q    Okay.  You did say yes.  I apologize.

24            Why -- so when you -- when you did the

25        ninety-day performance evaluation the day before,

1          based on what you wrote and your review of the RMI

2          time portal, your testimony was that you observed,

3          based on the time records, that Ms. Nelson was late

4          five documented times, correct?

5     A    Yes.

6     Q    So why did Dan have to bring two lates to your

7          attention?

8               MS. LANGLEY:  Object to form.

9     A    Why did he have to?

10    Q    Well, I'm saying wasn't it already brought to --

11         didn't you already bring the late clock-ins to your

12         attention yourself when you prepared her

13         evaluation?

14    A    Yes.  Ms. -- I was -- I was well aware of Ms.

15         Nelson's tardiness, as she was aware that I was

16         well aware.

17    Q    But you -- but did you just get Dan to do the

18         discipline so you didn't have to?  Is that what

19         we're looking at here, Mr. Butcher?

20    A    No.  I don't believe so.  No.

21    Q    When did Dan become the supervisor?

22    A    I believe it was -- I couldn't give you an exact

23         date.  I do believe it was in that window of end of

24         January, beginning of February.

25    Q    The beginning of February.  Does Dan have the

1     ability to go in and change an employee's time

2     records in that clock system we were talking about?

3  A  To change?

4  Q  Or observe.

5  A  Observe, yes.

6  Q  Okay.  Do you have the ability to change the start

7     and end times of when an employee is shown as being

8     clocked in or clocked out?

9  A  The ability to change the time?

10  Q  Uh-huh.

11  A  I would have done.  Yes.

12  Q  Okay.  So --

13  A  I'm not -- I don't know.  I know I was given

14     administrative duties, and I imagine that would

15     have been possible for me.

16  Q  Okay.  And when you say "administrative duties," in

17     terms of computers, you mean administrative

18     privileges?

19  A  Yes.

20  Q  And those administrative privileges include the

21     ability to alter the clocked in time for an

22     employee?

23  A  I'm making an -- I don't want to make an

24     assumption, but I imagine I would have been able to

25     do that.

128

1    Q    Okay.  Did Dan -- did you -- let me -- I'll be

2         direct.

3              Did you want to document -- did you want to

4         discipline -- issue Ms. Nelson an attendance review

5         at the same time that you gave her the performance

6         evaluation?

7    A    I think -- I think -- sorry.  Let me think about

8         this.  It's not something I would have or enjoyed

9         doing or wanted to, I think.  So I think that's

10        clear as you look at Ms. Nelson's timeclock -- the

11        leniency which I had shown up until this point.  So

12        no.  It's definitely not something I liked to do or

13        wanted to do.

14   Q    Why would you not like to do it for Ms. Nelson?

15   A    I don't like -- not just Ms. Nelson.  I don't like

16        to do it for anybody.  It's something I did, yes,

17        but I don't -- I try to develop my employees.  Not

18        something like I like getting after them and

19        telling them -- like, telling them, like, "This is

20        one of the problems.  Hey, get to work on time."

21        It wasn't just something I enjoyed.

22   Q    This is not -- so as management, it was one of the

23        duties that you didn't like as much?

24   A    I would say so.

25   Q    Which duties about management did you like?

1    A    I like -- I like development, I like -- I like

2         growth, I like teaching people.  Yeah.

3    Q    So because -- I mean, yeah.  You relied on your

4         assistant, so Dan gave her the memo, more or less.

5         Is that what we're looking at here with Exhibit 11?

6              MS. LANGLEY:  Object to form.

7    A    Yes.  And so to clarify, obviously Dan introduced

8         [sic] to the supervisor while I was able to provide

9         adequate oversight of exact times, and probably

10        more awareness than possibly I had.  It was a focus

11        of his to make sure that people were on time.  Yes.

12   Q    So let's look at the -- do you see the date?  It

13        says, "February 8th, 2022."  It says, "Eighteen

14        minutes."

15   A    Yes.  I see that.

16   Q    Okay.  The eighteen minutes -- so just based on --

17        assume it's seven o'clock shift start time.

18   A    Yeah.

19   Q    If it's eighteen minutes late, what would the

20        clock-in time have to be?

21   A    I believe seven-eighteen.

22   Q    Seven -- all right.  Seven-eighteen.  Did Dan have

23        -- Dan didn't have the ability to look at the RMI

24        system, though, did he?

25             MS. LANGLEY:  Object to form.

1    A    I believe he did.

2    Q    He did?

3    A    I believe so.

4    Q    You don't know if the supervisors have access to

5         the timeclocks?

6              MS. LANGLEY:  I believe he has answered your

7         question.

8    Q    Okay.  So did Dan gather this information about

9         eighteen minutes?

10   A    Yes.  I believe so.

11   Q    Okay.  Did you instruct him to go look at the

12        timeclock and then figure out what the exact times

13        were before he wrote this?

14   A    I don't -- I don't recall giving that instruction.

15        I don't remember.

16             MR. DAVIS:  Okay.  All right.  I think we

17        just have to get them in.  Okay?  So you know those

18        -- they're part of the discovery.  It's the ones

19        that look like this.  You know which one I'm

20        talking about, Jimmy?

21             MR. CHANG:  Uh-huh.

22             MR. DAVIS:  Okay.  I want to get them in.

23        And I need to -- I'm going to think out loud,

24        because I've had to -- I couldn't get my stapler

25        all the way through them.  And also just noting

1          before we get these in, some of the reports have --
2          and this is what I asked for in discovery, so I'm
3          not objecting to anything -- are for January 1st,
4          2022 to April 30th 2022, and then some of them are
5          by themselves for '22 [sic] to April 8th, 2022.
6          I'm not making an issue about that.  But Tyliya's
7          -- and I noticed this when I pulled it out, and
8          that is why hers is not in blue.  Her big chunk --
9          all right?  The big chunk, that goes to March, so
10         the end date on this one is separate from her final
11         three days.  Okay?
12                MR. CHANG:  Right.
13                MR. DAVIS:  All right?  So that's what these
14         are.  It's these time things and then Tyliya's --
15         so Tyliya's final time period is in here somewhere.
16         And I'll know what the Bates side [sic] is in a
17         little bit.  All right?  So that's what these are.
18         I'm not going to ask him to wade through all of
19         them.  I'm putting Tyliya's on top.  All right?
20         The main times.  Okay?
21    Q    But I am going to ask you to look through them for
22         a little bit, because I have a compilation
23         afterwards.  Okay?  So that would be --
24                MS. LANGLEY:  And you're going to give us
25         copies?

1      MR. DAVIS:  I am, because I've got mine in

2          here.

3          Sticker, please?  Would you put this on the

4          front of that?  And then what we'll do at some

5          point -- we're just going to go like this.  Okay?

6          All right.

7       (PLAINTIFF'S DEPOSITION EXHIBIT NO. 30

8          MARKED FOR IDENTIFICATION)

9          MS. LANGLEY:  And what is that exhibit

10         number?

11         MR. DAVIS:  We're at Plaintiff's Exhibit --

12         did I put -- yeah -- 30.

13   Q    Okay.  So, Mr. Butcher, remember when I was asking

14        about the records -- the time records that you

15        looked at before you put the comments in Ms.

16        Nelson's performance evaluation?

17   A    Yes.  I remember when you asked that question.

18   Q    Okay.  I'll represent that the first page of the

19        Exhibit 30 that you're looking at -- and I don't --

20        where the heck did mine go -- is Tyliya Nelson's

21        time records.

22         Actually, real fast for you, you're looking

23        at Three Points 607, correct?

24   A    Yes.

25   Q    What is the name of the employee that you're

1          looking at?

2     A    It says Tyliya Nelson.

3     Q    Tyliya Nelson.  Okay.  Success.  Okay.  All right.

4          Give me one second, 'cause I forgot my copy on that

5          one.  My apologies.  My computer is slightly

6          uncooperative.  But I will move on.  Here we go.

7               Please continue to just look at -- I'm going

8          to ask you questions about arrival times, so I

9          don't think there's anything wrong with you

10         continuing to look at that exhibit.

11              Okay.  Acknowledging that you may have

12         looked at those dates on a computer screen before

13         you filled out her performance evaluation on

14         February 21st, right --

15    A    Yes.

16    Q    -- is this generally what you remember the time

17         records looking like on that computer screen?  We

18         have a date, correct?

19    A    Yes.

20    Q    Do you see where it says, "Action"?

21    A    I do.  Yes.

22    Q    Do you see where it says, "Shift," and then there

23         is two different times?

24    A    Yes.

25    Q    And then there is "Hours"?

1    A    Yes.

2    Q    And then there's other fields?

3    A    Yes.

4    Q    Does that look like a fair reflection of the RMI

5         information that you reviewed before Ms. Nelson's

6         performance evaluation?

7    A    Yes.  A slightly different format, but yes.

8              MR. DAVIS:  I don't want to hand him the

9         whole thing.  All right.  My apologies everybody.

10        Can we go off the record for a second?

11                  (TWO-MINUTE RECESS)

12                  (2:09 P.M. - 2:11 P.M.)

13   Q    Okay.  Thank you, Mr. Butcher, for that brief delay

14        while I got organized.

15             I have handed you Exhibit 30, which includes

16        those time records we were discussing from RMI.

17        And on -- can you read the Bates number -- the

18        bottom number of the first page you're looking at?

19   A    Would that be these numbers --

20   Q    Yeah.

21   A    -- in the corner?

22   Q    Yeah.

23   A    0000607.

24   Q    And can you read the Bates numbers of the other

25        page that I'm pointing at now?

1     A      Yes.  0000742.

2     Q      Does this one also have time records for Ms.

3            Nelson, the 742?

4     A      It appears so.  Yes.

5     Q      And what are the dates?  How many time records are

6            there for her on 742?

7     A      How many time records?

8     Q      Uh-huh.

9     A      It appears to be four.

10    Q      Okay.  Do you have any reason to believe that these

11           are not your former employer's time records of Ms.

12           Nelson?

13    A      No.  I have no reason to believe that.  No.

14                 MR. DAVIS:  All right.  Sticker, please?

15           Just keep them over here.

16            (PLAINTIFF'S DEPOSITION EXHIBIT NO. 31

17                 MARKED FOR IDENTIFICATION)

18    Q      Now I'm going to hand you a copy of Exhibit 3

19           [sic], which I'll represent to you --

20                 MS. LANGLEY:  This is exhibit what?

21                 MR. DAVIS:  31.  Excuse me.  31.

22    Q      Take a moment to look -- take a moment to look at

23           that Exhibit 31, those dates, with Exhibit 30, just

24           comparing the start and stop times just to --

25                 MS. LANGLEY:  Are you comparing every single

1      time entry?

2             MR. DAVIS:  I don't want to -- I don't want

3      to go through it.  I just want to see --

4             MS. LANGLEY:  I just want to know what your

5      instruction to him is.

6  Q   My instruction to him is do you believe that the

7      Exhibit 31 that I've offered you, the first page

8      which shows the dates between January 3rd and

9      January -- or February 6th, reflect the same

10     clock-in times shown on Exhibit 30?

11 A   It looks that way.  So I haven't had a chance to go

12     all the way through it, but it looks that way.

13 Q   It looks that way?

14 A   Yes.

15 Q   And I'll just represent that I took your former

16     employer's discovery and converted it to text and

17     put it in a spreadsheet.

18 A   Yes.

19 Q   Okay.

20            MS. LANGLEY:  So we're not going to

21     stipulate it's authentic, but for illustrative

22     purposes --

23            MR. DAVIS:  And for illustrative purposes,

24     is that --

25            MS. LANGLEY:  -- you want to ask him

1        questions?

2             MR. DAVIS:  Is that -- assuming that the

3        numbers in Exhibit 31 are the same numbers on

4        Exhibit 30, I'd like to ask some questions about

5        clock-in times and Ms. Nelson's work.  Okay?

6             MS. LANGLEY:  Okay.

7             MR. DAVIS:  All right.  I appreciate it.

8   Q   All right.  So the first week of work in 2022 --

9        actually, that's -- what happened in -- what was it

10       like in December?  Actually, let's start back

11       there.

12           The students weren't at the facility by

13       December, were they?

14   A   No.

15   Q   Tell me about when you hired Ms. Nelson.

16   A   Sorry.  What would you like to know, sir?

17   Q   Did you interview her?

18   A   I believe I interviewed Ms. Nelson.  Yes.

19   Q   What did you like about her from the interview?

20   A   I liked -- I liked her, I guess -- I guess

21       confidence in her ability to manage teenagers and

22       teenagers who could be difficult.

23   Q   Is managing difficult teenagers the most important

24       part of the youth mentor job?

25   A   It is -- it is one of the most important.  Yes.

1    Q    What would be the -- if there is another one that

2         is equally important, what is it?

3    A    I believe being -- showing up to work and being

4         consistent to be able to do that would be up there.

5    Q    Okay.

6    A    Yes.

7    Q    All right.  Now let's look in January.

8              MS. LANGLEY:  Which document are you --

9    Q    We're back on Exhibit -- first page of Exhibit 31.

10   A    Okay.

11   Q    Okay?

12   A    Yes.

13   Q    The --

14             MS. LANGLEY:  I guess the only objection I'm

15        going to have -- there is an entry of "Rest."

16        There is no such entry, and I don't know we can

17        stipulate she was resting or doing something else.

18             MR. DAVIS:  Well, that --

19             MS. LANGLEY:  You could say "off work."

20             MR. DAVIS:  We can say off work.

21             MS. LANGLEY:  All right.

22             MR. DAVIS:  The reason I didn't want to put

23        "day off" is because I thought that it might imply

24        that they were -- asked for a day off.

25             MS. LANGLEY:  I see.

1          MR. DAVIS:  Okay?  So we -- I'm fine with

2      that.  But --

3          MS. LANGLEY:  Or not working.  But yeah.

4          MR. DAVIS:  But I don't like "not working."

5          MS. LANGLEY:  Well --

6          MR. DAVIS:  We don't know.  We don't know if

7      she wasn't working.

8          MS. LANGLEY:  We don't know.

9          MR. DAVIS:  We don't know.

10         MS. LANGLEY:  We don't know.  But we don't

11     know she was resting.

12         MR. DAVIS:  I'm fine -- I'm fine with

13     saying, "Not paid by Three Points Center for any

14     hours."

15         MS. LANGLEY:  Well, we wouldn't like any

16     implication that you're saying she was there and

17     worked and wasn't paid for her time, because this

18     is --

19         MR. DAVIS:  Well, let's find -- let's find

20     out.  Let's word this -- are you fine with just --

21     the reason I've done the separation is to -- is to

22     see the on/off part from a visual perspective,

23     because you cannot see it as well, you know, on

24     that, so that's why I've done that.  As long as we

25     can just keep the dates on there, we can scratch

1          the word "rest" off.

2                    MS. LANGLEY:  You can leave them on there,

3          as far as I'm concerned.  I just wanted to voice

4          our --

5                    MR. DAVIS:  Voice the objection.  That's

6          fine.  I don't think -- it is what it is.

7     Q    All right.  The first -- so in orange, Mr. Butcher,

8          the action "work" is what it says on your company's

9          records, correct?  Your former company's records.

10         Doesn't it say "work"?

11    A    Yes.

12    Q    Okay.  All right.  So the orange blocks, those are

13         the time periods or the days that Ms. Nelson worked

14         consecutively at the Chatham County facility,

15         correct?

16    A    It appears that way.  Yes.

17    Q    And during this first -- this first block of work,

18         you were her direct supervisor, correct?

19    A    For this initial first block here?

20    Q    Uh-huh.

21    A    I believe so.  Yes.

22    Q    Okay.  And for the shift start times that are in

23         this block, those dates, are any of those dates on

24         the documented write-ups that Dan provided Ms.

25         Nelson in February?

1    A    Am I allowed to --

2    Q    Uh-huh.  Yeah.  Refer to Exhibit 11.

3    A    For this original -- this first block?

4    Q    Which -- was she written up?  Well, was -- did you

5         think that she was late for any of these shifts?

6              MS. LANGLEY:  Which shifts are you referring

7         to?

8              MR. DAVIS:  The first block between January

9         3rd and January 6th.

10   A    Let's see.  The times I'd say on there -- actually,

11        I believe -- sorry.  So we wouldn't have had, I

12        don't believe, students at the facility.  So I

13        don't believe there is -- the seven A.M. to seven

14        P.M. shift had possibly started then.

15   Q    Thank you for that.  Before we get -- before the

16        students got to the facility, didn't you take Ms.

17        Nelson to Utah?

18   A    I did.  Yes.

19   Q    Okay.  Before we go through -- tell me about --

20        well, when was the Utah transport?

21   A    I believe that first week of January, if my memory

22        serves me right.

23   Q    Okay.  If it was the first week of January, if Ms.

24        Nelson was in Utah, how did she clock in for work?

25   A    She would have reported her hours to either myself

1          or HR, I imagine.

2     Q    On the Utah trip, was -- I'm picturing that it was

3          a twenty-four/seven kind of job.  But did they have

4          time off during the Utah trip?  I mean, when I say

5          "they," the youth mentors that you brought with

6          you.

7     A    Did they have time off?

8     Q    Uh-huh.

9     A    To be able to -- yes.

10    Q    I mean, so they weren't constantly supervising the

11         students being transported?

12    A    No.

13    Q    Okay.  All right.  So without -- the Utah trip more

14         than likely occurred in January of 2020?  The first

15         week of January?

16    A    I believe so.  Yes.

17    Q    When did you decide which employees that you would

18         like to come with you for the transport?

19    A    I believe the week prior.  Just it would've been on

20         my mind that this was coming up, and I would've

21         started to plan for it.

22    Q    Okay.  And was that -- that was -- was that

23         transport -- that was a sign -- that was not your

24         thing that week, right?  Was there any other -- was

25         there anybody above you in the hierarchy that came

1    with you?

2  A    No.  I was the lead of the transport.

3  Q    Okay.  And how many students were being transported

4       from Utah to North Carolina?

5  A    I believe four.

6  Q    Four?

7  A    Yes.

8  Q    How many employees did you take with you?

9  A    I took myself and two others.

10 Q    Okay.  Besides Ms. Nelson, who else did you take?

11 A    I took a mentor called Chris -- Christina.

12 Q    Christina?

13 A    Yes.

14 Q    Okay.  Is Christina -- when did -- was Christina

15      still working when Ms. Nelson was terminated?  Do

16      you remember?

17 A    Yes.  I believe so.

18 Q    Okay.  Why did you choose to take Christina to

19      Utah?

20 A    I believe she was the one who was available to go,

21      and I'd say -- believed that she would be capable

22      of managing the kids on a transport.

23 Q    So how many shifts -- how many youth mentors were

24      at the facility at that time that you -- that you

25      could have taken?  Now, I say "could have taken."

1          There was just a pool of potential youth mentors?

2     A    Yes.  I don't recall the exact number of staff at

3          the time.

4     Q    But it was more than two?

5     A    Yes.

6     Q    Okay.  So you testified -- I believe that the

7          reason you chose Christina is 'cause you thought

8          she would have the ability to -- what was it again?

9          Why did you bring Christina?  To manage --

10    A    Yeah.  I thought she would be able to manage the

11         kids on a transport.  Yes.

12    Q    Which of the other employees that you can recall at

13         this time did you not think had the ability to

14         manage the kids on a difficult trip like this?

15    A    That I recall?

16    Q    Uh-huh.

17    A    I don't remember.  I don't remember.  I think --

18         yeah.  I could have -- sorry.  I don't know.  I

19         could have taken -- I could have taken a few staff.

20         I guess I don't fully understand the question.

21         Sorry.

22    Q    But you had -- you chose Christina, correct?

23    A    Yes.

24    Q    And you chose Ms. Nelson?

25    A    Yes.

1    Q    And there could have been other employees that you

2         chose, correct?

3    A    There could have been.  Yes.

4    Q    This trip presents a lot of potential liability and

5         risk for your employer, didn't it?

6              MS. LANGLEY:  Object to form.

7    A    In what sense?  Sorry.

8    Q    Why not just throw a dart at the wall and just pick

9         whoever wants to take a trip to Utah?  Why did you

10        have to think about it?

11             MS. LANGLEY:  Object to form.

12   Q    Why did you have to consider for a week which two

13        employees that you would take to transport four

14        emotionally troubled teenagers across the country

15        through a public airport to hotels?

16             MS. LANGLEY:  Object to the form once again.

17   A    I thought they would have been the staff that would

18        have helped me do that the safest way possible.

19   Q    Why did you think that about them?

20   A    I think just through interactions since their hire.

21        I said I didn't really have the opportunity to see

22        them interact with students, 'cause we didn't have

23        any at that time.  But just -- I think just the way

24        they interacted with me, their desire to want to

25        come and do that.  Yes.

Case 1:23-cv-00527-WO-JGM    Document 39-1    Filed 07/23/24    Page 145 of 296

1    Q    You got a sports background, right?

2    A    Yeah.

3    Q    Played soccer, right?

4    A    I tried my best.  Yes.

5    Q    Well, were you a starter?

6    A    Yes.

7    Q    Were you on the -- were you on the A team or the

8          practice team?

9    A    There was both at times.

10    Q    Both?

11    A    Yes.

12    Q    When did you get bumped up to the A team?

13               MS. LANGLEY:  At what point?

14    Q    When he was -- when you were on the soccer team at

15          the community college or the other one.

16    A    During college, I was always on the A team.

17    Q    Did you bring your A team to Utah?

18    A    I would like to think so.  Yes.  Staff I thought I

19          could trust.  Yes.

20    Q    Tyliya was on the A team, wasn't she?

21    A    She was a staff I trusted to do this trip with.

22          Yes.

23    Q    All right.  I'm back on Exhibit 31.

24    A    Okay.

25    Q    So the -- at some point between January 3rd and

1            January 6th, Tyliya and Christina took that trip to

2            Utah, and so none of those start times or end times

3            are really comparable to the start times and end

4            times which are being used to justify Ms. Nelson's

5            termination?

6    A    I don't believe so.  No.

7    Q    Okay.  Assuming -- do you believe that January 9th

8            was a workday at the Chatham County facility?

9    A    I do believe it was.

10    Q    Okay.  I'm going to -- how many hours did Ms.

11            Nelson work on January 9th, 2022?

12    A    On this document, it says twelve-point-six-three

13            (12.63).

14    Q    How many hours are shown on Exhibit 31 for the next

15            date --

16    A    Would've been --

17    Q    -- for January 10th?

18    A    Would've been nine-point-nine (9.9).

19    Q    The next date?

20    A    Twelve-point-zero-seven (12.07).

21    Q    The next date?

22    A    Twelve-point-six-five (12.65).

23    Q    The next date after that?

24    A    Was four-point-five-eight (4.58).

25    Q    Now, is January 13th -- what is the start time for

1          Ms. Nelson on this shift?

2     A    The start time is one -- twenty-five past one.

3          One-twenty-five.

4     Q    There might be a few of these.  Can you look back

5          at the Exhibit 11, the documented write-ups?

6     A    Yes.

7     Q    Is that date shown as being late to work?

8     A    No.  Not on the document.

9     Q    Do you believe that Ms. Nelson was late, or that

10         you just gave her a half shift on that date?

11    A    Yeah.  I don't recall the reason for that date --

12         the clock-in to be late on that day.

13    Q    Is it -- is there a situation where a youth mentor

14         -- whose regular shift is for twelve hours, correct

15         --

16    A    Typically, yes.

17    Q    -- give or take?

18              That they might come in for something less

19         than that, but it's not necessarily the fact that

20         they were late for a shift?  Like a medium -- like

21         a pickup -- like a half shift or anything like

22         that?  Do you understand what I'm asking?

23    A    That is possible.  Yes.

24    Q    Okay.  And then on January 14th, 2022, how many

25         hours did she work?

1    A    Eleven.

2    Q    Is the date January 14th, 2022 -- is that on the

3         documented write-ups on Exhibit 11?

4    A    It's not.  No.

5    Q    Okay.  Based on Exhibit 30 and combined with

6         Exhibit 31, recognizing opposing counsel's

7         objection to the term "rest," does it appear to you

8         that Ms. Nelson did not work on January 15th and

9         January 16th, 2022?

10   A    That's what it looks like.  Yes.

11   Q    Okay.  How many days in a row did she work for

12        twelve hours the following week?

13   A    Looks like three.

14   Q    Three.  And then how many days of not work are

15        there?

16   A    On this, it appears to be four.

17   Q    For a youth mentor, a comparable employee to Ms.

18        Nelson, three-four -- is that how Three Points

19        refers to shifts for youth mentors?

20   A    Yes.  That's how the shifts were typically

21        allocated.  Yes.

22   Q    Tell me -- 'cause I guess when you look at this,

23        you know, with the facility just getting started,

24        there are some fives and there are some ones and

25        things of that, but just take that out of it.  Tell

1      me what three-four means practically over the

2      course of two workweeks for a youth mentor.

3  A   Okay.  So one week they would work four days, then

4      given that they would work the alternative Sunday,

5      they would be off for three.  The following week

6      they would be off for four, because they would have

7      the alternative Sunday off.

8  Q   So this block of days between January 17th and

9      January 23rd for Ms. Nelson -- we're looking at

10     Exhibit 31 still -- that's three days of work and

11     four days of non-work for Three Points, correct?

12 A   That's what it looks like.  Yes.

13 Q   Okay.  Can you look at the next -- the next block

14     of active work time, 1-24 through 1-26-2022?

15 A   Yes.

16 Q   Can you read the number of hours worked for January

17     24th, 2022?

18 A   Eleven-point-nine-three (11.93).

19 Q   How many hours did Ms. Nelson work the next day for

20     Three Points?

21 A   It says fourteen-point-nine-seven (14.97).

22 Q   How many hours did Ms. Nelson work the next day?

23 A   Fifteen-point-three-three (15.33).

24 Q   Fifteen -- that's almost sixteen hours.  Well, it's

25     between fifteen -- it's more than fifteen, less

```
 1              than sixteen hours, correct, Mr. Butcher?
 2      A       That would be correct.  Yes.
 3      Q       Did Ms. Nelson -- did she have to commute to work,
 4              or did she have like a bunk at Three Points that
 5              day?
 6      A       That day, I don't know how she got to work that
 7              day.  Sorry.
 8      Q       But did she -- but on days like this where an
 9              employee works, you know, more than their shift,
10              are they -- do they get like -- it's like a
11              trucker.  Do they get a break, or can they just
12              work sixteen hours straight?
13      A       I would imagine a break was offered.  I don't know
14              if she had a break that day.
15      Q       No.  I mean -- I should be more specific.  You say
16              "offered."
17      A       Yeah.
18      Q       When I -- you know, the trucker example -- by
19              regulation, truck drivers are not permitted to
20              drive more than ten hours a day for safety reasons.
21              I'm asking is there a policy at Three Points that
22              restricts the amount of consecutive hours that a
23              youth mentor or supervisor can work due to the
24              grueling nature of the work and what is at stake?
25                      MS. LANGLEY:  Object to form.
```

1    A    Without the handbook in front of me, I'm not aware
2         of a policy of sorts.
3    Q    Is a fifteen-point-three-three (15.33) hour workday
4         something that you expect from youth mentors?
5    A    Expect?  No.  Not necessarily.
6    Q    Is it something that you're happy to get, though,
7         when you -- when you need somebody to fill in when
8         somebody else doesn't show up?
9    A    That would -- of course.  Yeah.  That would --
10   Q    Is that what --
11   A    I always appreciate the help.  Yes.
12   Q    Is that what Ms. Nelson did there?
13   A    It appears that way.  Yes.  That she offered --
14        well, she helped out to stay late.  Yes.  That's
15        what it looks like.
16   Q    The next -- there is a kind of one on/one off.  The
17        next block of four consecutive days begins on
18        January 30th, 2022.  Do you see that?
19   A    I see that.
20   Q    Do you see where it says, "Start seven" -- or let's
21        just go back.  Let's keep it formulaic.
22             Do you see the date January 30th on
23        Plaintiff's Exhibit 11?
24   A    No.
25   Q    Okay.  So was she not written up for that -- for

Case 1:23-cv-00527-WO-JGM    Document 39-1    Filed 07/23/24    Page 152 of 296

1          being late if she was late at seven-forty-three?

2      A   I don't believe so.  Another example of my leniency

3          there.

4      Q   Could it also not be an example of her having

5          permission to arrive at that time?

6      A   Seven-forty-three is a really specific time to be

7          approved to have come in, but --

8      Q   Well, I understand, Mr. Butcher.  But you might say

9          that somebody could be there by seven-forty-five or

10         seven-forty, but when they get there, they aren't

11         -- they don't -- they're not automatically clocked

12         in when their car crosses the property boundary,

13         are they?

14     A   No, they wouldn't be.

15     Q   Okay.  So would you ever -- in a situation where

16         you gave leniency in advance, if you will, you

17         would never use a specific time like that because

18         it's unachievable, correct?

19             MS. LANGLEY:  Object to form.

20     A   So yeah.  No, I would not.  If I had approved a

21         time, then no, I would not then later go back and

22         use that against them.

23     Q   Right.  And really in terms of -- can you turn to

24         the second page of Exhibit 13, please?

25     A   Yes.

1    Q    You see where it says, "Clock in consistently five

2         to ten minutes late"?

3    A    Yes.

4    Q    What is the range of time between five and fifteen?

5    A    Ten.

6    Q    Ten minutes.  Is that generally how you think about

7         time at Three Points, as being five to fifteen

8         minutes late?

9              MS. LANGLEY:  Object to form.

10   A    No.  Not necessarily.  I don't think so.

11   Q    But if you were -- let's just say you're going to

12        meet somebody to go out to eat.  And I know this is

13        a job.  That's different.  But I mean just in terms

14        of planning for time to arrive at a place, you

15        could predict that you'll be there at a restaurant.

16        Do you give people the exact time or do you give

17        them a range?

18   A    I typically would say, "Hey, seven o'clock dinner

19        or seven o'clock -- twelve o'clock lunch."  So I

20        believe I would give an exact time.

21   Q    You would?  You would never say seven-ish?

22   A    Yes.  I've used "seven-ish" before.

23   Q    You've used "seven-ish"?

24   A    Yes.

25   Q    How the -- back on January 30th, 2022, when did Ms.

1          Nelson leave Three Points -- or clock out of Three

2          Points, at least?

3   A    It says seven-thirty-two.

4   Q    So who took over Ms. Nelson's shift at this time?

5          Which -- what would be the names of the employees

6          that would have relieved her from duty?

7   A    Sorry.  I don't recall the names of the staff.  It

8          was someone on the night shift.

9   Q    How would we figure out who?  I guess the time

10        records for that date?  The RMI time records?

11  A    I imagine so.  It would be something on the RMI

12        platform to see who worked that day.  But I don't

13        recall.  Sorry.

14  Q    So Ms. Nelson couldn't clock out until seven-

15        thirty-two P.M., based on these time records,

16        correct?

17  A    That's correct.

18  Q    Who was late that day to take over for her?

19  A    I don't recall.  I don't recall if anybody was late

20        that day.

21  Q    Did you -- well, turn to the second page, please.

22        Do you see the block of active work time that

23        begins on February 8th, 2022 on the second page?

24  A    Yes.

25  Q    What is -- what is -- now can you look back at

1          Exhibit 11 over there?

2      A   Yes.

3      Q   Is that the first documented late arrival on

4          Exhibit 11?

5      A   It looks like.  Yes.

6      Q   Okay.  And what is -- two-twenty.  Okay.  And the

7          next day, there is seven-eleven for the -- for

8          February 9th.  See that?

9      A   Yes.  I see that.

10     Q   Is that a documented arrival on Exhibit 11?

11     A   It doesn't appear so.  No.

12     Q   The next block of time begins on Valentine's Day.

13         How many hours of work are there for Ms. Nelson on

14         that -- on February 14th, 2022?

15     A   Twelve-point-one (12.1).

16     Q   Okay.  And how many hours the next day?

17     A   Eleven-point-eight-five (11.85).

18     Q   And then how many hours the next day?

19     A   It's fourteen-point-one-seven (14.17).

20     Q   So in terms of a three-day work shift, assuming the

21         typical shift of twelve hours, how many hours of

22         work does Three Points Center expect of its youth

23         mentors?

24     A   So scheduled one week is three twelves, which is

25         thirty-six.  The following week is four twelves at

1          forty-eight.

2     Q    Without getting a calculator out, do you believe

3          that she worked over thirty-six hours that week?

4     A    Yes.  It looks like, if my math is right, it would

5          be thirty-seven hours.  I don't know.  But yes.  It

6          looks like it was over thirty-six.  Yes.

7     Q    Do you see the -- what are the dates of the seven-

8          oh-nine arrival in that block?

9     A    2-15.

10    Q    Okay.  What is the date on Exhibit 11?

11    A    It's 2 --

12    Q    No.  What is the date that Dan signed it, that that

13         was given to her?

14    A    The 22nd of February.

15    Q    So she wasn't written up for -- was she written up

16         for that seven-oh-nine period?

17    A    It doesn't look like it.

18    Q    Okay.  The next block of active work time begins on

19         February 20th, 2022.  Just to confirm, that date

20         she was written up, correct, Mr. Butcher?

21    A    Yes.

22    Q    Okay.  The next date is February 21st, 2022.  That

23         was -- she wasn't written up for being late.  What

24         does it say on Exhibit 11?

25    A    Which one are you referencing?

1    Q    February -- isn't it something where she left

2         early?  What is it?  Please read that.  So February

3         --

4    A    Let's see.  It says, "Tyliya Nelson left twenty-one

5         minutes early with no approval from supervisor."

6    Q    Who is Tyliya Nelson's supervisor?

7    A    It is -- his name is Dan.

8    Q    But at this time, could you have approved Ms.

9         Nelson to leave early, or does -- can only Dan

10        approve her to leave early?

11   A    I believe that would be something I think I could

12        have approved.  That wouldn't have been for me not

13        to include or inform the supervisor that would've

14        been done.  But it's not usually the practice.

15   Q    So ultimately, in a group -- in a group living

16        setting, decisions related to people leaving early,

17        leniency, it all comes back up to you, right, Mr.

18        Butcher?

19             MS. LANGLEY:  Object to form.

20   A    No.  Not necessarily.  I would disagree.  Sorry.

21   Q    If you would've approved Ms. Nelson to leave early,

22        and Dan didn't want her to leave early, Dan

23        wouldn't be able to say anything, would he?

24   A    No.  In order of operations, no.  I just know I

25        wouldn't do that.

1    Q    Okay.  So the supervisor referred to in Exhibit 11

2         -- did she not get approval from you, her boss, or

3         did she not get approval from Dan, the youth mentor

4         that just got promoted a few days earlier?

5              MS. LANGLEY:  I object to the extent you're

6         assuming he did approve anything.  So you can go

7         right ahead.

8    Q    Who was being referred -- which supervisor -- which

9         supervisor does that form refer to?  You or Dan?

10   A    I believe it would've been Dan at the time.

11   Q    It would've been Dan.  Okay.

12   A    I believe so.

13   Q    Okay.  So what -- and what is the date on Exhibit

14        11 that Dan gave it to her?

15   A    The 22nd of February, it looks like.

16   Q    So the following workweek after Ms. Nelson received

17        the attendance review/corrective action for

18        punctuality, what time did she get to work on

19        February 28th?

20   A    February 28th at six-fifty-two.

21   Q    And then when did she stay 'til?

22   A    Seven-thirty-eight.

23   Q    Eight minutes early, thirty minutes after shift.

24        That's a full day, isn't it?

25   A    Yes.  That's what it looks like.  Yes.

1      Q     What about the next day?

2      A     Six-forty-three to seven-oh-three.

3      Q     How many minutes early is that?

4      A     That would have been seventeen minutes.

5      Q     The next, March 2nd?

6      A     Is six-forty to seven-eighteen.

7      Q     Seven-eighteen.  What were some of the things -- I

8            recall seeing something in the handbook -- and we

9            may have to introduce it if necessary -- but that a

10           youth mentor could be assigned a chore before they

11           leave.  Does that ring a bell?

12     A     It doesn't.  Sorry.

13     Q     Okay.  In terms of -- I'm thinking about when I was

14           in a restaurant and my friends that worked in a

15           restaurant, one of the duties when we're done is

16           to, like, fold the napkins before everybody leaves.

17           You know what I'm talking about?  Something like

18           that.  Like, the main work is done, but there is

19           one little thing they've got to do.

20     A     Yeah.  I understand what you're talking about.

21           Yes.

22     Q     Besides -- so the primary duty is supervising the

23           girls, correct?

24     A     Yes.

25     Q     That's the most important one, right?

1    A    Supervision.  Yes.

2    Q    Were there any of those little, like, kind of

3         finishing duties that she would've had to do, like,

4         during that time between seven and seven-thirty-

5         eight, for example, on February 28th?

6    A    Finishing duties?

7    Q    Yeah.  Meds?

8    A    Yeah.

9    Q    Is administering meds a thing?

10   A    Medication?  Yes.

11   Q    Tell me about meds -- med administration.

12   A    Med administration was when the students would take

13        the medication.  There was usually three time --

14        three time slots of medication.  Yes.

15   Q    When is -- when is bedtime?

16   A    Typically between -- sorry.  Bedtime is -- starts

17        to wind down around nine o'clock.  It's lights out

18        by ten.

19   Q    Okay.  So there is still -- so when the night shift

20        comes over, it's not a bed at seven.  It's not that

21        type of thing.  All right.  Understood.

22             All right.  And then just if you would just

23        look at the final page of this -- of this diagram,

24        and just please compare it to the other information

25        just to confirm that subject to -- if there was a

1        copy and paste there.  It looks to be similar.

2    A    It looks similar.  Yes.

3    Q    All right.  Thank you, Mr. Butcher, for that.

4             I'm going to hand you Exhibit 32, which is

5        another, I guess, compilation based on the data

6        that we just reviewed.  So between the time period

7        that we have clock-in data for Ms. Nelson -- so

8        I'll represent that there is no clock-in data for

9        the month of December.

10   A    Okay.

11   Q    Okay.  That's ninety-three days.

12            MS. LANGLEY:  I'm not sure he's testifying

13       that's ninety-three days or he has any way to

14       verify that's ninety-three days.

15            MR. DAVIS:  Here's what I think we're going

16       to do on this.  This is me arguing.  Take that --

17       let's scratch this one.  Because I'm glad we got

18       that in.  And this is -- let's -- we don't need to

19       do this one.

20            MS. LANGLEY:  So are we taking it out?

21            MR. DAVIS:  Yeah, 'cause it's --

22            MS. LANGLEY:  Okay.

23            MR. DAVIS:  Well, because I don't want --

24       here's why.

25            MS. LANGLEY:  Well, he can testify about it,

1          but --
2                    MR. DAVIS:  I know.  But this --
3                    MS. LANGLEY:  I believe he can.
4                    MR. DAVIS:  Because -- no.  Exactly.  That's
5          right.  'Cause it's like it shows what it shows,
6          and I can ask my questions about it based on the
7          other one.  Okay?  If you don't -- you see what I'm
8          saying?  I can -- I'll be quickly [sic], and I'll
9          move on.  Because it does -- I had to add, and it's
10         just -- I didn't think about the context of the
11         exchange.  Okay?  And --
12                    MR. CHANG:  So what are we deciding on?
13         Because --
14                    MR. DAVIS:  I mean, you can keep it and say,
15         "Here is Garrett's exhibit that he pulled back
16         because he thinks it's proper," and it would just
17         --
18                    MR. CHANG:  So he's got to rip off the
19         sticker, then?
20                    MR. DAVIS:  I'll rip it off.
21                    THE WITNESS:  Yeah.
22                    MR. DAVIS:  I just -- 'cause I looked at the
23         other one.  I mean, I'm trying to -- I represent
24         Tyliya Nelson.
25                    MS. LANGLEY:  I know.

Case 1:23-cv-00527-WO-JGM   Document 39-1   Filed 07/23/24   Page 163 of 296

1        MR. DAVIS:  Okay?  So that's part of where

2    it came from.  But, Mr. Butcher, I appreciate that.

3        And we'll save Exhibit 32 for -- actually,

4    we'll save 32 for this.  This one I do think is

5    proper to put in.  All right.  Let me find a place

6    to put the sticker, though, that doesn't take it

7    up.  Okay.  All right.  Yeah.

8     (PLAINTIFF'S DEPOSITION EXHIBIT NO. 32

9        MARKED FOR IDENTIFICATION)

10        MS. LANGLEY:  So this is going to be --

11        MR. DAVIS:  This is -- this is 32.

12        MS. LANGLEY:  Okay.

13        MR. DAVIS:  This is a better -- this is a

14    better summary.

15   Q    Mr. Butcher, I've handed you Exhibit 32, which is a

16    compilation that I've prepared for your deposition

17    based on the information that we've just been

18    discussing:  Ms. Nelson's write-ups --

19   A    Yes.

20   Q    -- and her time sheets.

21        So based on what we've looked at, including

22    Exhibit 11, is it fair to say that -- to your

23    knowledge, that Ms. Nelson was not written up for

24    attendance or punctuality in January of 2022?

25   A    That's what it looks like.  Yes.

1    Q    Do -- well, did you give Ms. Nelson a raise?

2              MS. LANGLEY:  Does 32 have the January time

3         on it?

4              MR. DAVIS:  Does 32 what?

5              MS. LANGLEY:  Have the January time on it?

6              MR. DAVIS:  No, because I wanted to get it

7         all on one page.

8              MS. LANGLEY:  Okay.  Just wanted to be clear

9         --

10             MR. DAVIS:  Right.

11             MS. LANGLEY:  -- that this isn't -- this

12        doesn't include January.

13             MR. DAVIS:  Exactly.  And I'll say the

14        reason that I identified February --

15             MS. LANGLEY:  That's fine.

16             MR. DAVIS:  -- is because that's where the

17        write-ups are.

18   Q    All right.  Do you remember giving Ms. Nelson a

19        raise?

20   A    I believe so.  Yes.

21   Q    Why did you give her a raise?

22   A    It was usually -- it usually came in correlation

23        with the ninety-day eval performance, kind of a

24        sticking around and doing what they do.  So I

25        believe a majority, if not all, received a raise in

1          ninety days.

2     Q    For sticking around?

3     A    I believe so.

4     Q    You know, have you ever heard the expression, you

5          know, sometimes what counts is showing up?  Right?

6          Like in sports -- you like sports analogies, right?

7     A    Sure.

8     Q    You've got to show up.

9     A    It's important.

10    Q    You can't win if you don't show up.

11    A    Yeah.

12    Q    You testified that -- just now that it's typical

13         that if an employee sticks around for ninety days

14         that they get a raise.

15    A    Yeah.  Yes.  Along with other things.  Yes.

16    Q    Notwithstanding some punctuality issues?

17    A    Sorry.  What was that question?

18    Q    They get the raise as long as they stick around.

19         And I said -- and the question is they get the

20         raise notwithstanding some of the punctuality

21         issues that are identified on the February 22nd

22         write-up?

23    A    Yes.  I would say so.

24    Q    So the punctuality issues identified on that -- on

25         that write-up, they're less important than -- to

1           your employer than merely sticking around?

2               MS. LANGLEY:  Object to form.

3      A    Yeah.  Showing up is very important.  Being on time

4           is very important.  I don't know if less important

5           is correct.  Sorry.

6               MS. LANGLEY:  Garrett, before you start

7           another one, I don't know if you want to go -- stay

8           on the record or on [sic] the record.

9               MR. DAVIS:  I'm fine with staying on.

10              MS. LANGLEY:  But if -- you've noticed Ms.

11          Palmer's deposition for two o'clock today and we

12          have her here for that, so can you give us -- let

13          us know -- we've -- these folks planned their

14          schedule based on your notices.

15              MR. DAVIS:  I know.

16              MR. CHANG:  Sorry.  I forgot to mention it

17          was already past two.  I'm sorry.

18              MR. DAVIS:  I know.

19              MR. CHANG:  I honestly (inaudible) --

20              MR. DAVIS:  Give me five.  I know there is a

21          big thing that I want to deal with, and I think

22          two-thirty -- you know, and here's the other thing.

23          I did notice it for two-thirty.

24              MS. LANGLEY:  Oh, it's two-thirty.  Okay.

25          I'm sorry.  My bad.

Case 1:23-cv-00527-WO-JGM   Document 39-1   Filed 07/23/24   Page 167 of 296

1          MR. DAVIS:  No.  But also remember we bumped

2     this to ten-thirty, so really --

3          MS. LANGLEY:  But you didn't change the

4     other.  So I'm just --

5          MR. DAVIS:  I know, but --

6          MS. LANGLEY:  -- saying that was your

7     notice.

8          MR. DAVIS:  I know it was my notice.

9          MS. LANGLEY:  I'm just saying -- I'm

10    bringing this to your attention, 'cause we want to

11    be able to plan.

12         MR. DAVIS:  It's good --

13         MR. LANGLEY:  We have two witnesses here.

14         MR. DAVIS:  It's good, because y'all --

15    right.  Exactly.  Give me five so I can kind of

16    think where I'm at and what would be most useful to

17    then move on.

18         MS. LANGLEY:  Do you need more than five?  I

19    mean --

20         MR. DAVIS:  Yeah.

21         MS. LANGLEY:  Do you want to take -- you

22    want to take a ten-minute break?

23         MR. DAVIS:  Let's do a ten-minute one.

24         MS. LANGLEY:  We'll come back -- or nine-

25    minute, and we come back at three o'clock?

1          MR. DAVIS:  Yes.  Yes.

2          MS. LANGLEY:  Okay.  All right.

3          MR. DAVIS:  Thank y'all.

4          (NINETEEN-MINUTE RECESS)

5          (2:51 P.M. - 3:10 P.M.)

6     Q    All right.  Thank you, Mr. Butcher, for being here

7          again.

8               Just to tie back to where we left off, do

9          you remember me asking you about Tyliya's raise?

10         So we're looking at Exhibit 32.

11    A    Yeah.

12    Q    And I will hand you exhibit -- Norm's Exhibit 12

13         just so you can confirm the dates.

14    A    Yeah.

15    Q    Okay.  So the raise that Ms. Nelson received on or

16         around February 22nd, 2022, I believe you said that

17         was typical when the employee -- for sticking

18         around.  Is that fair?

19    A    Yeah.  Amongst other things.  Yes.

20    Q    And then in Exhibit 32 -- this is a little more of

21         housekeeping.  I'm going to ask you a question if

22         it reflects your memory of things.

23              But I'm going to hand you one more document.

24         This is just the termination notice.  Okay?  So on

25         Exhibit 32, I've got a yellow kind of bottom part

1           that's got a Bates stamp.  Do you see the Bates

2           stamp on that document that I just handed you?

3                   MS. LANGLEY:  Exhibit 14?

4      Q    Uh-huh.  From Exhibit 14.

5      A    Yes.  This --

6      Q    What is the -- just read the final three digits.

7      A    130.

8      Q    And then if you look back at Exhibit 32, was Ms.

9           Nelson terminated at the end of her April 6th, 2022

10          shift?

11     A    Could you say that date again?  Sorry.

12     Q    Was Ms. Nelson terminated at the end of her April

13          6th, 2022 shift?

14     A    I don't -- I don't believe it was the end of the

15          shift.

16     Q    Okay.  Would you look back at Exhibit 14?

17     A    Yes.

18     Q    When was Exhibit 14?  What does Exhibit 14 say?

19     A    It's "Attendance review/Corrective action."

20     Q    Can you read the corrective action that is -- that

21          is written there?  It's below the dates.

22     A    Yes.  It says, "Employee Tyliya Nelson's employment

23          is being terminated."

24     Q    Okay.  When was Ms. Nelson terminated?

25     A    I believe on that day of 4-6.

1    Q     On 4-6?

2    A     Yes.

3    Q     Okay.  And was she terminated at the end of the

4          day?

5    A     I believe it was the end of the day.  I believe it

6          was around five o'clock.

7    Q     Around five o'clock?

8    A     I believe so.  Yes.

9    Q     Let me -- if you don't mind, this might be faster

10         than me finding mine.  Do you see this is part of

11         -- I wish -- what was our blue time sheets exhibit

12         number called?  Where is the sticker on this thing?

13         Did we not put a sticker on this one?

14              MS. LANGLEY:  Are you talking about Exhibit

15         30?

16   Q     Here we go.  Yeah.

17   A     This was --

18   Q     What is it?  Uh-huh.  There we go.  All right.  As

19         part of Exhibit 30, Mr. Butcher, I'm going to show

20         you one of the included documents, which is Three

21         Points 742.  Okay?  Now, I've got -- those are

22         yours.  Okay?  Can you read the clock -- time

23         clocked out entry for Ms. Nelson?

24   A     Yes.  It's seven-oh-five P.M.

25   Q     Would she have been fired before she clocked out or

 1                after she clocked out?

 2        A     Before, I believe.

 3        Q     Okay.  Before.  All right.  So how does an -- how

 4                does an employee clock out for -- at this time as

 5                of April 6th, how would she have clocked out?

 6        A     It would have been a fingerprint on the time

 7                machine.

 8        Q     On the time machine.  And what building is that --

 9                was that in at that time?

10        A     That would have been in the -- in the dorm -- in

11                the main building in the dorm.

12        Q     So when I asked you when was she terminated, let me

13                break this -- break it -- when was the decision

14                made to terminate Ms. Nelson?

15        A     I believe the afternoon of April 6th.

16        Q     And then what is the name of the employee -- the

17                employer's signature on Exhibit 14?  Is that your

18                name or is that somebody else's?

19        A     That's somebody else's.

20        Q     When do you believe that this document was drafted?

21        A     I believe four -- on the date that's documented.

22        Q     I say "what time."  There we go.  What time on

23                April 6th do you believe this document was drafted?

24        A     Yeah.  I don't know a specific time.  Possibly the

25                afternoon.

1    Q    Would it -- would that document have been drafted

2          after the decision to fire Ms. Nelson been made or

3          before?

4    A    I wouldn't know.

5    Q    Okay.  All right.  Looking back at Exhibit 32 --

6    A    Yeah.

7    Q    -- were those other records in front of you -- is

8          that a fair and accurate summation of the

9          information that we've been discussing in these

10         different Exhibits?

11            MS. LANGLEY:  On 32?

12            MR. DAVIS:  Uh-huh.

13            MS. LANGLEY:  We'll object to them for --

14         that they are not the actual time records --

15            MR. DAVIS:  That's fine.

16            MS. LANGLEY:  -- and that they're your

17         compilation.

18    Q    Does it help you understand the timeline of Ms.

19          Nelson's employment in 2022 at Three Points'

20          Chatham County facility?

21            MS. LANGLEY:  Object to form.

22    A    Yes.

23    Q    Okay.  Before we took that break, the -- you used

24          the phrase "sticking around" as being an important

25          attribute of a youth mentor, fair?

1    A     Yes.

2          (PLAINTIFF'S DEPOSITION EXHIBIT NO. 33

3              MARKED FOR IDENTIFICATION)

4    Q     I'm going to hand you 33, a document produced in

5          the discovery -- in discovery in this case.  I

6          believe that this is a list of employees of the --

7              MS. LANGLEY:  This is 33.

8    Q     -- of employees that worked at the Chatham County

9          facility -- let me find it in mine -- while you

10         were the group living director.  Can you take a

11         moment and look at the names and what the list

12         says?

13             MS. LANGLEY:  I'll object in that the

14         characterization is employees terminated while he

15         was group living director.  I believe this

16         specified the request was for employees terminated

17         during her employment -- during Plaintiff's

18         employment.

19             MR. DAVIS:  Right.  And I also -- I also

20         believe that even though this table has "List

21         termination reason," I think -- I believe Mr.

22         Butcher -- this is one of the questions I'm going

23         to ask -- is that some of these employees -- they

24         weren't terminated; they quit.  Okay?

25    Q     Like, for example, there is one that says, "Unhappy

```
 1              with job."
 2      A     I see where it says, "Unhappy with job."  Yes.
 3      Q     Okay.  So let's start at the bottom.  Do you see
 4              where it says, "Avery McLaurin"?
 5                    MS. LANGLEY:  The bottom?
 6                    MR. DAVIS:  Yeah.  So yeah.  Work from the
 7              bottom.  You go up three to --
 8                    MS. LANGLEY:  Okay.  Up three, not three at
 9              the bottom?
10                    MR. DAVIS:  Yeah.  Up.  Exactly.  Yeah.
11                    MS. LANGLEY:  All right.
12                    MR. DAVIS:  Just because that's the one I
13              alluded to.
14      A     Yeah.  I see Avery's name.
15      Q     Was Avery a youth mentor on Tyliya's shift?
16      A     Yes.
17      Q     Do you recall what about the job she was unhappy
18              with?
19      A     I don't.
20      Q     Okay.  The point about sticking around -- if there
21              is job abandonment, is -- let me find one that says
22              -- actually, I'll highlight one.  Do you mind?
23              I'll highlight one for you.  It'll be easier to
24              read.
25                    MS. LANGLEY:  Actually, we would object to
```

1          the record being highlighted.

2                MR. DAVIS:  Okay.

3                MS. LANGLEY:  If you want to point to

4          something --

5                MR. DAVIS:  All right.  It's just there is

6          not, like, an easy way.  But I'll point to it.

7          Okay?

8     Q    All right.  I'm going to point for you.  Okay?  And

9          I'll try not to mark it.  Do you see that "Job

10         abandonment and inappropriate conduct"?

11    A    I see that.

12    Q    I'm going to focus on those employees.  Okay?  Job

13         abandonment.  Which employee abandoned their job on

14         that day?

15    A    Job abandonment.  It looks like a -- according to

16         this document, a staff called Natalia.

17    Q    Was Natalia a youth mentor or a supervisor?  What

18         was her job?

19    A    I don't recall.  I believe -- I believe a mentor.

20    Q    If a youth mentor abandons their job, what does

21         that mean?

22    A    It means they don't show up to work or don't show

23         up to even start after --

24    Q    I guess --

25    A    -- they get hired.

| | | |
|---|---|---|
| 1 | Q | -- what I'm saying, if somebody -- if an employee |
| 2 | | is noted as terminated for job abandonment, are |
| 3 | | they given a notice, or you just take them out of |
| 4 | | the system and note that they abandoned their job? |
| 5 | A | I don't know the process of how HR would -- |
| 6 | Q | So who would know that process? |
| 7 | A | That would be HR.  Yes. |
| 8 | Q | Who is HR? |
| 9 | A | HR at the time would have been Heidi. |
| 10 | Q | Ms. Palmer? |
| 11 | A | Yes. |
| 12 | Q | Who is in this room with us right now? |
| 13 | A | Yes. |
| 14 | Q | Okay.  We won't -- we won't go through all of them. |
| 15 | | But what is the first date on this list of |
| 16 | | employees who were either terminated or quit or |
| 17 | | abandoned their jobs? |
| 18 | | MS. LANGLEY:  Which column are you asking |
| 19 | | the date for? |
| 20 | Q | The -- let's start -- let's do the termination |
| 21 | | date. |
| 22 | A | Okay.  So what are the dates? |
| 23 | Q | Yeah.  What is the date?  What is the range of |
| 24 | | dates on this list? |
| 25 | A | From the 6th of January to the 28th of April. |

1    Q    Okay.  One, two, three, four, five, six, seven,

2         eight, nine, ten, eleven, twelve, thirteen,

3         fourteen, fifteen, sixteen, seventeen, eighteen --

4         twenty-four, twenty-five, twenty-six, twenty-seven,

5         twenty-eight.  I counted twenty-eight employees

6         that were either terminated or quit or abandoned

7         their jobs during that timeframe.  Does -- do you

8         have any reason to disagree with that?

9              MS. LANGLEY:  You can count it if you want.

10   Q    Yeah.

11   A    So I would take your word that that's roughly

12        around twenty-eight employees.  Yes.

13   Q    And how many weeks, roughly, are there between

14        January 1st and the end of April?  What is that?

15        Four months?  So around sixteen, right, give or

16        take?  Sixteen, seventeen weeks?

17   A    Give or take, yes.

18   Q    So is it fair to say that the turnover in the youth

19        mentor position is one to two employees per week at

20        this facility?

21              MS. LANGLEY:  Object to form.

22   A    Turnover rate is high.  I don't believe everyone on

23        this form was a mentor.  Turnover rate is high.

24   Q    Which ones on here do you believe were not mentors?

25   A    I don't recall.  There's lots of names I don't --

```
1              lots of names I don't remember (inaudible) --
2       Q      Okay.  All right.  Was the -- for the different job
3              titles, was turnover rate the highest in the mentor
4              position, relatively speaking?
5       A      I believe so.
6       Q      Let's see here.  Where is she?  Okay.  Do you --
7              starting at the top where -- under "Employee
8              names," do you see the fourth name down, Maya
9              Thompson?
10      A      I see that.
11      Q      Okay.  She left for personal reasons.  If you
12             remember the personal reasons, please tell me.
13      A      I don't.
14      Q      You don't?
15      A      Sorry.
16      Q      But if it says, "Personal reasons," would that mean
17             that she quit?
18      A      I believe so.
19      Q      Would she have told -- when an employee quits as
20             opposed to abandoning their job for personal
21             reasons, how does Three Points Center know that
22             it's personal reasons versus abandoning their job?
23             How is that distinction made?
24                  MS. LANGLEY:  Object to form.
25      A      I believe a conversation would have been had.
```

1   Q    Okay.

2   A    Yeah.

3   Q    So a text message, or you asked, "Hey, why are you

4        leaving," something like that?

5   A    I believe so.  Yes.

6   Q    And after -- when a youth mentor quits or abandons

7        their job for personal reasons or anything, is

8        there typically a need to fill in that shift to

9        account for the fact that they're leaving?

10  A    Yes.  We need to make sure all shifts are staffed

11       correctly.

12       (PLAINTIFF'S DEPOSITION EXHIBIT NO. 34

13            MARKED FOR IDENTIFICATION)

14  Q    I'm going to hand you Exhibit 34.  Mr. Butcher,

15       I'll represent this is one of the text messages

16       produced in discovery.  I believe that this is a

17       text message between you and Tyliya.  Please look

18       at it for a minute while I find it in my binder.

19       Does this appear to be a text message exchange

20       between you and Tyliya Nelson?

21  A    Yes, it does.

22  Q    Is that -- are you the messenger in blue -- with a

23       blue background?  Do you believe -- well, can you

24       read the words in the blue background starting at

25       "We had"?

1    A    It says, "We had Maya call out, so do you want more

2         hours until ten P.M.?  Then let me know."  Smiley

3         face.

4    Q    Is that -- is that you?  So you're in blue?

5    A    I can't see my name on this.  I would imagine so.

6    Q    Okay.  It would not have been Tyliya, because she

7         doesn't deal with scheduling shifts when employees

8         quit.

9    A    That's correct.

10   Q    Well, when you said Maya called out -- Maya quit,

11        didn't she?

12             MS. LANGLEY:  Object to form.

13   A    So yeah.  So on this document, it looks like Maya

14        quit.  I don't recall the exact reason Maya quit,

15        so --

16   Q    That's fine.  I'll move -- but the point is Maya

17        wasn't showing up for work -- for her shift -- for

18        calling out or for quitting?

19   A    Yes.  The termination date is 1-17.

20             MS. LANGLEY:  Object to form.  This just

21        says there is one day she didn't --

22   Q    What is the date that -- what is the date of Maya's

23        termination, if you don't mind?

24   A    The 17th of January.

25   Q    The 17th.  Okay.  So Maya may have called out,

| | | |
|---|---|---|
| 1 | | maybe.  But regardless, are you asking Ms. Nelson |
| 2 | | to fill in for Maya's shift because she called out? |
| 3 | A | Yes.  It looks like on January 12th, Maya had to |
| 4 | | call out.  Yes. |
| 5 | Q | And what did Ms. Nelson say in response? |
| 6 | A | She said, "Okay.  I will stay 'til ten." |
| 7 | Q | Why did you ask Ms. Nelson and not somebody else? |
| 8 | A | I believe I would have asked others.  That would've |
| 9 | | been my general practice to send several messages |
| 10 | | to staff on shift. |
| 11 | Q | Okay. |
| 12 | A | Yeah.  Was usually the way I did things. |
| 13 | | (PLAINTIFF'S DEPOSITION EXHIBIT NO. 35 |
| 14 | | MARKED FOR IDENTIFICATION) |
| 15 | Q | All right.  I'm handing over a large exhibit.  I'm |
| 16 | | not going to -- we're not going to go through all |
| 17 | | of them -- everyone here at the table.  But there |
| 18 | | is a -- I'd like you to look at these text messages |
| 19 | | and tell me if these are your text messages with |
| 20 | | Ms. Nelson.  And I may ask questions about some of |
| 21 | | them, and I'll refer to the bottom numbers to help |
| 22 | | navigate us.  This is Exhibit -- what did I put on |
| 23 | | there? |
| 24 | A | 35. |
| 25 | Q | 35.  Just take a moment and scan through them. |

1            MS. LANGLEY:  Just by way of clarification,

2       I think you've represented these were text

3       messages, and you put documents in the back.

4            MR. DAVIS:  Are there documents in the back?

5            MS. LANGLEY:  There are some stuck --

6            MR. DAVIS:  Oh, goodness.

7            MS. LANGLEY:  -- in between.  There's a

8       calendar, there's --

9            MR. DAVIS:  Let's take --

10           MS. LANGLEY:  -- looks like a payroll.

11           MR. DAVIS:  I know.  Can we -- let's --

12      'cause they're not in mine.  Are they in yours?

13      They might just be attached to --

14           THE WITNESS:  There's a few of those.

15           MR. DAVIS:  Let me -- my -- I'm hustling.

16      But let's take all that stuff off.  That just --

17      that was an inadvertent staple.  Okay?  I'm not

18      trying to ask any questions about that.

19           MS. LANGLEY:  So what do you want us to take

20      out?

21           MR. DAVIS:  Anything that's not a text

22      message.

23           MS. LANGLEY:  Well, let's just make sure we

24      got the exhibit right.  So we want -- it starts

25      with Plaintiff Exhibit 35, the defendant's Bates

184

1        Nos. 751, 754 --

2                MR. DAVIS:  Yeah.

3                MS. LANGLEY:  -- 755, 758, 757, 763, 795,

4        796 --

5                MR. DAVIS:  Yeah.

6                MS. LANGLEY:  -- 799 --

7                MR. DAVIS:  Yeah.

8                MS. LANGLEY:  -- 801 --

9                MR. DAVIS:  Keep going.  Yeah.

10               MS. LANGLEY:  -- 802 --

11               MR. DAVIS:  Yeah.

12               MS. LANGLEY:  -- 804 --

13               MR. DAVIS:  That's right.

14               MS. LANGLEY:  -- 805, 807 --

15               MR. DAVIS:  Okay.

16               MS. LANGLEY:  -- 809 --

17               MR. DAVIS:  Okay.

18               MS. LANGLEY:  -- 814 --

19               MR. DAVIS:  Yes.

20               MS. LANGLEY:  -- 816 --

21               MR. DAVIS:  Yes.

22               MS. LANGLEY:  -- 817 --

23               MR. DAVIS:  Yes.

24               MS. LANGLEY:  -- 825 --

25               MR. DAVIS:  Yeah.

1          MS. LANGLEY:  -- unnumbered.

2          MR. DAVIS:  No.  Is that the -- what do you

3      got?  Which one are you looking at?  It says,

4      "Small."

5          MS. LANGLEY:  Gotcha.

6          MR. DAVIS:  That's Nelson --

7          MS. LANGLEY:  Nelson 55 --

8          MR. DAVIS:  Yeah.

9          MS. LANGLEY:  -- Nelson 82 --

10         MR. DAVIS:  Yeah.

11         MS. LANGLEY:  -- Nelson 59.

12         MR. DAVIS:  Yeah.  Do you have the --

13         THE WITNESS:  I don't -- sorry.  Did you say

14     Nelson 52?

15         MS. LANGLEY:  Uh-huh.

16         THE WITNESS:  I don't -- I have a Nelson 55

17     again.

18         MS. LANGLEY:  So there was -- oh, excuse me.

19     I read that wrong.  It was Nelson 82.  So let me go

20     back.  Nelson 55, Nelson 82.

21         THE WITNESS:  I don't believe I have an 82.

22         MS. LANGLEY:  You don't have an 82?

23         THE WITNESS:  Don't believe so.

24         MR. DAVIS:  Let me see what that one is.  I

25     even want to -- oh, that's a text with Dr.

1           Thibault, isn't it?  Look at the top.

2                   MS. LANGLEY:  I understand.  Is that

3           supposed to be in here?

4                   MR. DAVIS:  No, it's not.

5                   MS. LANGLEY:  Okay.

6                   MR. DAVIS:  That's why I said staple --

7           remove it.  Take that out.

8                   MS. LANGLEY:  (Inaudible.)  Okay.  Then

9           Nelson 59 is after Nelson 55.

10                  MR. DAVIS:  Yeah.

11                  MS. LANGLEY:  All right.  Then I have a not

12          numbered.

13                  MR. DAVIS:  Is that the breakfast one?

14                  MS. LANGLEY:  Yes.

15                  MR. DAVIS:  I don't know how that -- we did

16          label it, but --

17                  MS. LANGLEY:  Do you want it in here?

18                  MR. DAVIS:  Yeah.

19                  MS. LANGLEY:  All right.  795.

20                  MR. DAVIS:  I'm done.  795, I'm out.  That's

21          it.

22                  MS. LANGLEY:  Okay.

23                  MR. DAVIS:  Take all that stuff out.

24                  MS. LANGLEY:  Everything else is not -- not

25          817?

Case 1:23-cv-00527-WO-JGM   Document 39-1   Filed 07/23/24   Page 186 of 296

Craig Butcher 2-9-24

1          MR. DAVIS:  That's right, Ms. Langley.  Yes.

2          MS. LANGLEY:  Okay.  All right.  Thank you.

3          MR. DAVIS:  Pull those out, Mr. Butcher.  I

4     do see --

5          MS. LANGLEY:  Do you have a stapler?

6     Because that just now broke my -- or have a clip?

7          MR. DAVIS:  I do have a stapler.

8          MS. LANGLEY:  Thank you.

9          MR. DAVIS:  All right.

10         MS. LANGLEY:  Thanks so much.

11         MR. DAVIS:  And those pages are out.

12    Perfect.  Okay.  Great.  All right.  Thank you

13    everybody for that.

14    Q    Now that we've made this exhibit -- what is going

15         to be Exhibit 35, I believe you testified that most

16         of your exchanges with Ms. Nelson and other youth

17         mentors would either be in person or via text

18         message?

19    A    Yes.

20    Q    And I'll represent that these are not all the text

21         messages from discovery.  But after having looked

22         through them, do these appear to be your text

23         messages with Tyliya Nelson while she was employed?

24    A    They do appear to be.  Yes.

25    Q    Do you see the -- at the top it says "T" for the

1          contact?

2     A    Yes.  I see that.

3     Q    And then below it, it says, "Tyliya NCTPC"?

4     A    Yes.

5     Q    What does the "NC" stand for?

6     A    North Carolina.

7     Q    Are there any other Tyliyas at the Utah facility?

8     A    Not that I know -- aware.  Not that I remember.

9     Q    Do you know any other Tyliyas?

10    A    Yeah, I do.

11    Q    You do?

12    A    Uh-huh.

13    Q    Are they in your contacts?  Excuse me.

14    A    No.

15    Q    No.  When you -- I assume you got Ms. Nelson's

16         phone number at some point when she applied.

17    A    Yes.

18    Q    So -- and it's difficult to see all the -- all the

19         dates on these text messages, but that was sometime

20         in November, correct, when you -- when you got her

21         phone number?

22    A    Yes.  I believe so.

23    Q    When you got her phone number, did you type in

24         "NCTPC" at that time, or have you typed "NCTPC" in

25         later?

1   A   I believe it would have been at the time.

2   Q   At the time?

3   A   Yes.  I believe so.

4   Q   Why did you type in "NCTPC"?

5   A   It's a distinguished location.  I did it with most

6       of the employees.

7   Q   But you weren't employed at this -- when Ms. Nelson

8       was hired, I thought you -- I didn't think you were

9       working at the Utah facility anymore.

10          MS. LANGLEY:  Object to form.

11  A   No, I wasn't.  But I didn't -- I didn't go through

12      my phone to delete every contact I had established

13      over that time either.

14  Q   Okay.  I'm going to look through a few, and then

15      I'm going to ask a few questions.  Can you turn to

16      755?  I think it would be the third page in.  You

17      see at the top where Ms. Nelson is saying, "Hey,

18      Butch, can you send me the BestNotes site ID?"

19      What is BestNotes?

20  A   BestNotes is a platform used to record, like, some

21      notes and things like that about the students' day.

22  Q   Okay.  Is BestNotes what you call it, or is that

23      the business provider that sells the software?

24          MS. LANGLEY:  Object to form.

25  Q   Well, let me ask -- when you say they give notes,

1          you go to a website.  Is it called BestNotes?

2     A    It is.  Yeah.

3     Q    Okay.  It's a website called BestNotes.  All right.

4          Thank you.

5               757 at the bottom.  Turn a few pages.  Ms.

6          Nelson writes, "Took shoes.  She is still trying to

7          run."  What is -- what is that situation that she

8          is referring to?

9     A    I believe Ms. Nelson would be referencing a student

10         trying to leave the facility.

11    Q    And did Ms. Nelson prevent this student from

12         leaving the facility, to the best of your

13         knowledge?

14    A    Yeah.  I don't recall the staff involved.  It seems

15         like Ms. T was involved in, as it said, taking her

16         shoes from the dorm room.  I don't know if she was

17         involved in keeping her on campus.  I don't know.

18    Q    You responded, "Put her in protection.  You have

19         the staff if needed, dude."  When you say "put her

20         in protection," what does that mean?

21    A    Protection is -- it's a room away from other

22         students usually -- typically to allow students to

23         calm down.

24    Q    So in order for -- in order for Ms. Nelson to get a

25         student -- not saying that this student -- I'm not

1          asking for names on any of this stuff.

2     A    Yeah.

3     Q    In order for Ms. Nelson to put one of the students

4          in protection, would she have to restrain that

5          student?

6               MS. LANGLEY:  Object to form.

7     A    Not necessarily.

8     Q    Not necessarily.  Okay.  When you say, "You have

9          the staff if needed" --

10    A    Yes.

11    Q    Ms. Nelson -- she was a youth mentor, correct?

12    A    That's correct.

13    Q    When you say she has the staff, she wasn't

14         supervising any, though, right?

15    A    I believe so.  Yes.

16    Q    I mean, knowing that, you know, there is a

17         situation and you may not be there, you may be

18         floating, did she have the ability to direct staff?

19    A    If I would have asked of her, yeah, she would have

20         been able to do that.

21    Q    And was she the type of, I guess, youth mentor

22         where other youth mentors would still listen to her

23         even though she wasn't technically their superior?

24    A    At times, I believe so.

25    Q    If you turn to the next page, it says 763.

1    A    Yeah.

2    Q    Do you see at the top where you're asking Ms.

3         Nelson if she wants to work any extra shifts this

4         week?

5    A    Yes.

6    Q    Do you remember when I asked you about -- earlier

7         in the deposition about what the job

8         responsibilities were for the supervisor --

9    A    Yeah.

10   Q    -- position?

11             Based on this text message, I believe that

12        the supervisor position did not have any role in

13        juggling shifts and employees.  Do you -- do you

14        agree with that, based on what you wrote to Ms.

15        Nelson?

16   A    To say no role at all I would disagree with.

17   Q    So when you say -- when you say, "I have Friday,

18        Saturday, and Sunday," would Dan -- would it have

19        been typical or not typical for Dan to send a

20        message like this to a youth mentor?

21   A    Not to plan ahead of schedule.  No.

22   Q    So as the group living director, part of your --

23        even though Dan may have some sort of scheduling --

24        ensuring things about the schedule, the group

25        living director had his foresight responsibilities?

1     A     At this time, I was still in charge of the

2            schedule.

3     Q     Okay.

4     A     Yes.

5     Q     Sounds good.  Can you turn to the next one, Page

6            795?

7     A     Yes.

8     Q     There is a -- in the middle, it says, "You take the

9            lead today.  Same schedule today as Wednesday."

10           Smiley face.  And Ms. Nelson wrote, "Okay.  No

11           problem."  January 28th, what was the -- I guess

12           why are you telling a youth mentor that it's the

13           same schedule?  I thought the schedule was set.

14     A     Let's see.  So the kids -- the kids have a

15           schedule, also.  I believe I am referencing the

16           layout of the morning, the kids going to school,

17           breakfast times, et cetera.

18     Q     Thank you.

19     A     And that looks like that's what I was referencing.

20     Q     Okay.  Then you look at the next one where you

21           write to Ms. Nelson, "Confirming you are working

22           this Sunday."  And what does Ms. Nelson reply?

23     A     She does a -- it's three emojis.

24     Q     What do those -- what do you take those emojis to

25           mean in this context?

1    A    As if to say kind of, "Hold up.  Like, wait.

2         What?"  But I can't -- as I say, I can't testify to

3         what Ms. Nelson meant.

4    Q    Right.

5    A    That's how I perceived it.

6    Q    But what -- tell -- just describe the emojis just

7         briefly.

8    A    It's kind of a blank -- like blushed serious face,

9         eyes wide open.  So --

10    Q    So are you confirming that she is working on a day

11         that she is not scheduled to work?

12    A    I wouldn't know if that was her Sunday or not.

13    Q    Okay.  How would we know if it was her Sunday or

14         not?

15    A    Well, how I would find out would be comparable to

16         people I know to be on her shift.  Like I could

17         look at Dan's schedule.

18    Q    Okay.  I'll represent that I've reviewed these

19         messages also before today's deposition, Mr.

20         Butcher.  There does seem to be a lot of back and

21         forth between you and Ms. Nelson.  And I

22         understand, you know, there's a floor.  And did

23         y'all have walkie-talkies, also?

24    A    We had radios.  Yes.  Yeah.

25    Q    So was there regular communication between you and

1          Ms. Nelson while she was at Three Points?

2     A    Yes.  I like to think I had a relationship with all

3          my staff.  Yes.

4     Q    Did you communicate with any other staff during

5          this time the way that you did with Ms. Nelson?

6     A    I'm sure I did.  There would've been other staff.

7          Yes.

8     Q    In terms of the frequency, and the check-ins, and

9          things of that nature?

10    A    I believe so.  Yes.

11    Q    Chris -- who is the -- Christina?

12    A    Christina.

13    Q    You took her to Utah, also, right?

14    A    I did.

15    Q    Did -- was she on Ms. Nelson's shift, or was she on

16         a different shift?

17    A    I believe she was on a different -- on a different

18         shift.

19    Q    Did you communicate with Christina in the same

20         manner that you communicated with Ms. Nelson?

21    A    I'd have had lots of dialogue with Christina.  Yes.

22    Q    Can you turn to 799?

23    A    Yeah.

24    Q    It says, "Hey, Butch, did you put in my hours?"

25         What is Ms. Nelson -- and then I'll read -- I'll

1       finish reading it.  So Ms. Nelson writes, "Hey,

2       Butch, did you put in my hours?  Because HR texted

3       and don't know my hours and said I clocked in on

4       the 13th and didn't clock out.  That's the day the

5       machine got moved."  And you wrote, "Yes," smiley

6       face.

7              Do you remember when I asked if you had the

8       authority to go into the timekeeping system and

9       change an employee's time?

10  A   Yes.

11             MS. LANGLEY:  Object to form.

12  Q   But you did -- I mean, Ms. Nelson is asking you to

13      go in and change her hours, isn't she?

14  A   Sorry.  I guess I viewed that differently.  Change,

15      no.  She's asking -- there was no time there to

16      change.

17  Q   Not time to change.  Edit or input.  How about

18      input?  Input.

19  A   I was able to input hours.  Yes.

20  Q   You could -- and when you went in to input hours,

21      that's effectively an override for the fingerprint

22      clock-in, correct?

23             MS. LANGLEY:  Object to form.

24  A   It's an alternative way of recording the time.

25  Q   All right.  So the employee could clock in,

1          correct?

2     A    Yes.

3     Q    Fair?  And then -- and then somebody with

4          administrative privileges could log into the system

5          and then input a time, also?

6     A    Yes.

7     Q    Can you turn to 802?

8     A    Yes.

9     Q    Do you see the text message where it says, "Thane

10         is offering to pick you up if that changes anything

11         for you"?  Why would Mr. Palmer be offering to pick

12         Ms. Nelson up for work that day?

13              MS. LANGLEY:  He needs to read the whole

14         chain.

15    Q    That's why I'm -- all right.  Yes.  Please read the

16         text message.

17    A    Sorry.  Yes.  So can you ask me the question again?

18         Sorry.

19    Q    After having a moment to look through this -- and

20         you can take your time again.

21    A    Yeah.

22    Q    You wrote to Ms. Nelson on January 15th.  I may

23         have to zoom in later.  But it does appear to be

24         January.  That, "Thane is offering to pick you up

25         if that changes anything for you."  What was the

1          request that you made to Ms. Nelson?

2     A    I don't believe I requested anything.  Sorry.

3     Q    Well, what do you mean by if it changes?  Like,

4          what was -- what was Thane picking her up --

5               MS. LANGLEY:  Just for the record, it does

6          not appear that the entire string of this

7          communication is included, so I'm not sure -- maybe

8          you've got something else you can show him.

9     Q    What does the top line say?  Well, let me write --

10         let me -- I will read for Ms. Nelson.  She writes

11         to you, "Depending upon the roads, I may not be

12         there.  I know I won't be there at seven, 'cause I

13         have to drive an hour and it'll be dark.  And I'll

14         let you know."  And you wrote back to her, "Work is

15         not optional, dude."  And she said, "Okay."  And

16         then you wrote, "I might be able to get you a

17         ride."

18    A    Yes.

19    Q    Showing up is the most important thing for the

20         girls, isn't it?

21    A    It's up there.  Yes.

22    Q    So even if you got her a ride and that ride didn't

23         get back to the facility until seven-ten in the

24         morning, seven-fifteen, everything still would've

25         been okay, wouldn't it have been, Mr. Butcher?

Case 1:23-cv-00527-WO-JGM   Document 39-1   Filed 07/23/24   Page 198 of 296

1  A  I believe this text message was sent the day before

2  in this top one, "Depending on the roads."  So I

3  believe I had plenty of time to possibly speak with

4  Thane and arrange a time for her to be picked up

5  adequately to get on shift on time.

6  Q  How often does management pick up their employees?

7  A  How often?

8  Q  Yeah.  Is this an -- is this an isolated occurrence

9  where this offer was made, or is it common for

10  management to reach out and offer to give -- drive

11  an employee two hours?

12  A  It's not -- it's not common.  Thane has a truck --

13  has a vehicle that can tolerate weather.

14  Q  What weather was at issue around this time?

15  A  I believe -- I don't know the weather at the time.

16  Sorry.

17  Q  Well, why did you say -- why did you -- what does

18  it matter if Thane has a truck or if he has a

19  moped?

20  A  'Cause he wouldn't -- he wouldn't moped to

21  somebody's house in rain or snow.

22  Q  Okay.  So the snow.  That's what I'm trying -- I

23  mean (unintelligible) say moped.

24  A  Yeah.

25  Q  Let's just say a passenger -- a passenger vehicle

Case 1:23-cv-00527-WO-JGM   Document 39-1   Filed 07/23/24   Page 199 of 296

| | | |
|---|---|---|
| 1 | | that's not equipped for snow. |
| 2 | A | Yes. |
| 3 | Q | Okay.  So what type of vehicle does Mr. Palmer |
| 4 | | have? |
| 5 | A | He has -- he has a truck. |
| 6 | Q | What is the make and model and year? |
| 7 | A | I don't know the year.  I believe it's a Ford |
| 8 | | F-350, I want to say. |
| 9 | Q | Okay. |
| 10 | A | It's a Ford truck.  Yes. |
| 11 | Q | Is that the truck that's used to pull the horse |
| 12 | | trailers? |
| 13 | A | It was used at times.  That's not the only truck. |
| 14 | | It was used at times to pull horse trailers. |
| 15 | Q | The -- there is an equine therapy program at Three |
| 16 | | Points, correct? |
| 17 | A | Yes.  I believe so.  Yeah. |
| 18 | Q | The truck that pulls the trailers, is it left on |
| 19 | | campus during the day, or does it go home somewhere |
| 20 | | after the day? |
| 21 | A | It would be Thane's truck, so he would drive it to |
| 22 | | and from where it would go. |
| 23 | Q | So Thane's F-350 is the horse truck? |
| 24 | A | He would use it for the horses. |
| 25 | Q | Okay. |

Case 1:23-cv-00527-WO-JGM    Document 39-1    Filed 07/23/24    Page 200 of 296

1    A    Yes.

2    Q    Turn to the next one, 804.

3    A    Yeah.

4    Q    I believe these text messages that we've been

5         looking at are still from the -- from the month of

6         January, which is still early in the employment.

7    A    Yes.

8    Q    I just want to note that.

9              MS. LANGLEY:  Object to the form.

10   Q    You write to her, "You are great, just not office

11        great.  Hahaha."  What do you mean by that?

12   A    Ms. -- I believe Ms. Nelson would often make

13        comments like, "Hey, when am I getting -- when am I

14        getting my office?"  I believe she would make

15        comments of wanting an office.

16   Q    She was motivated, wasn't she?

17   A    At times, yes; other times, no.

18   Q    Right.  And so she would make that comment, and so

19        that's where -- that's what prompted this response?

20             MS. LANGLEY:  Object to form.

21   Q    Do you see at the top where it says, "What do you

22        need an office for?"  Ms. Nelson writes --

23             MS. LANGLEY:  I'll just note that it appears

24        that there -- that's a question in response to a

25        message that hasn't been produced in this stack --

1          in this exhibit.

2                    MR. DAVIS:  I know.  We'll note it.  And not

3          an objection back, but I still believe that I'm

4          allowed to present this case without --

5                    MS. LANGLEY:  That's fine.

6                    MR. DAVIS:  -- including everything.

7                    MS. LANGLEY:  But you are taking one

8          statement --

9                    MR. DAVIS:  Every -- the rule -- no, no, no,

10          no, no.  I think that you --

11                    MS. LANGLEY:  -- and you are not including

12          --

13                    MR. DAVIS:  Let's go -- let's get through

14          this one.

15                    MS. LANGLEY:  -- what the prior question

16          was.

17                    MR. DAVIS:  I understand that.

18                    MS. LANGLEY:  And so that's not fair to --

19                    MR. DAVIS:  And my --

20                    MS. LANGLEY:  -- the witness, and I can

21          absolutely note that.

22                    MR. DAVIS:  You can note that.  And I

23          disagree for moving forward that the rule of

24          completeness is so broad and necessary as you -- as

25          you described.

```
1              MS. LANGLEY:  There is a rule of being fair

2         to the witness.  And so to be fair to the witness,

3         you are asking him a question and then inserting

4         what you believe something said prior without

5         actually showing him the dialogue.  So that's my

6         objection --

7              MR. DAVIS:  Okay.

8              MS. LANGLEY:  -- Mr. Davis.

9              MR. DAVIS:  Okay.  Strike -- the plaintiff

10        will not make an issue about any question asked to

11        Mr. Butcher that appears where I inserted what I

12        believe.  I'm asking Mr. Butcher what he believes

13        now by the sentence that he typed in his phone,

14        "You are great, just not office great."

15   Q    What do you think you meant by it?  And whatever

16        the answer is, we'll move on.

17   A    Sorry.  What was your question?

18   Q    What did you mean by you're -- what does "office

19        great" mean?

20   A    That was, I believe -- there is actually no

21        criteria to be office great.  I believe that was a

22        comment back and forth, possibly banter, as you can

23        see by her smiley faces and tears that she's

24        laughing at that.  Just a banter between the two of

25        us, I believe.  But there is no criteria of what is
```

1           office great and what is not office great.

2      Q    Did the -- did the supervisor -- did Dan -- do

3           supervisors get an office after they're promoted?

4           Or did Dan get an office?

5      A    No.

6      Q    Okay.  That's really -- it's -- to the promotion

7           that was kind of at issue that Ms. Nelson indicated

8           her interest in, right -- that Dan also -- it

9           wasn't for an office?

10     A    No.

11     Q    Okay.  If you turn to the next one, 805, you wrote

12          to Ms. Nelson, "You might want to bring a night bag

13          to work in the morning, dude, just in case the

14          weather is so bad."  Acknowledging this -- that

15          there is a continuous thread of text messages

16          between you and Ms. Nelson which begins at the

17          inception of employment and ends months later that

18          I haven't included in here, when might an employee

19          need to bring a night bag or -- need to bring a

20          night bag?

21     A    If weather permitting, their circumstance of an

22          appropriate vehicle not to drive, and location of

23          which they drive, we made available to staff that

24          that would be an option for them.

25     Q    When you -- when you worked as the group living

1      director at the Chatham County facility, did you

2      have your own quarters onsite?

3   A  My own office?

4   Q  No.  Living quarters.  Did you have a bed, a place

5      that you could crash?

6   A  There was apartments in one of the buildings.  Yes.

7   Q  Okay.  But was that your permanent residence while

8      you were employed there?

9   A  No.

10  Q  Okay.  How far away did you live from this

11     location?

12  A  About forty-five minutes.

13  Q  Forty-five minutes?

14  A  Yes, sir.

15  Q  It's kind of out there, isn't it?

16         MS. LANGLEY:  Object to form.

17  A  It's a little ways away.

18  Q  In terms of thinking about the Utah facility and

19     where it's located, is the North Carolina facility

20     located -- well, which is kind of -- which is more

21     remote?  The Utah facility or the North Carolina

22     facility?

23  A  To myself or to --

24  Q  Generally.  I mean, look at a map.  You know, in

25     Utah, it's apples and oranges a little bit.  But in

Case 1:23-cv-00527-WO-JGM    Document 39-1    Filed 07/23/24    Page 205 of 296

1          terms of -- in terms of distance from towns where

2          your employees work.

3     A    Actually, I would say very similar.

4     Q    Similar?

5     A    I believe so.

6     Q    So what would a typical commute be for any -- for

7          most of the employees at the North Carolina

8          facility?

9     A    Fifteen to twenty minutes.

10    Q    Fifteen to twenty minutes?

11    A    I know there was lots of staff that -- thirty to

12         forty-five minutes.

13    Q    And you were on the forty-five -- where did you --

14         where did you live at this time?

15    A    I lived in Apex.

16    Q    In Apex.  Okay.  This will help.  Can you turn to

17         814?  Do you see at the bottom I believe the date

18         is December 30th, 2021?  And you write to Ms.

19         Nelson, "You still on for the transport?"

20    A    That's what I wrote there.  Yes.

21    Q    Are you referring to the Utah transport?

22    A    I believe I would've been.  Yes.

23    Q    So if you asked her, then the transport would have

24         happened after December 30th?

25    A    Yes.

1    Q    Okay.  Then 816 towards the bottom, I see a date of

2         December 27th, 2021.  Ms. Nelson writes to you,

3         "You have an interview today at four-thirty."  And

4         you reply, "Sounds good."  Did Ms. Nelson schedule

5         job interviews for you?

6    A    No.

7    Q    Would it -- was she keeping up with your schedule?

8    A    I believe, if I remember correctly, Ms. Nelson

9         referred a few people -- of her friends to come and

10        try and be employed.  So I think -- I think if I

11        would've spoke to be -- "Hey, if your friend is

12        interested, get them up here."  And I think that's

13        her way of letting me know that she had a friend

14        coming to interview.  Like, she had arranged a time

15        -- well, she would have arranged any of the

16        interviews, I imagine.  I believe that's what it's

17        referencing.

18   Q    Did you -- did you ask her to try to find new

19        potential staff members to fill out the roster at

20        Three Points?

21   A    No.  I don't believe -- making that request from

22        Ms. Nelson.

23   Q    So she -- so if you didn't make the request, she

24        took it upon her own initiative to find more youth

25        mentors or other people that could work at Three

1       Points?

2   A   I believe so. As I say, this one was -- I don't

3       know if she went out looking or a friend. I know

4       -- I know she referred friends. I don't know if

5       she -- this was someone she didn't know that she

6       went out actively looking for.

7   Q   Okay. I'm looking at 825. This is a text message

8       between you and Ms. Nelson. I believe the date at

9       the top says November 24th, 2021. Is that -- is

10      that -- can you see that?

11  A   November 24th. Yes.

12  Q   Okay. And then -- so this is around the hire date?

13  A   I believe so.

14  Q   Okay. Do you see where you say, "Training starts

15      next week, Monday through Friday"?

16  A   I see that. Yes.

17  Q   What training is that?

18  A   That would have been training for mentors, for

19      everyone we had hired up to this point.

20  Q   Was -- is this how you informed Ms. Nelson that she

21      had the job?

22  A   Not from this exact message. If you read up the

23      page where it says, "So I moved things around, and

24      we can have you do Shift A days."

25  Q   But this is before her first day of employment, so

```
 1              --
 2     A     Yes.  This was texting back and forth.  This was
 3           the communication.  Yeah.
 4     Q     When you say "Shift A days," is that -- is that --
 5           is "A" an indication for morning or for the days?
 6     A     Shift A would have been the Monday, Tuesday,
 7           Wednesday.  So it was an assignment of the days.
 8     Q     And she was hired for the morning shift, correct?
 9     A     Yes.  And then Shift A nights would have been
10           nights.
11     Q     Okay.  The training that started next week -- I may
12           have asked this, and I apologize if I did.  What
13           was the training that occurred the next week?
14     A     That would have been for everybody hired up until
15           that point to kind of give them, I believe, the
16           rundown the best we can of the training we felt
17           like they would have all needed.
18     Q     Okay.  And when you say "we," you mean you?
19     A     We, my team, my staff, my mentors.  Yes.
20     Q     Okay.  So training just -- but in terms of the
21           identities of the employees providing the training,
22           it's you and people under you.  That's the training
23           you're referring to?
24                 MS. LANGLEY:  Object to form.
25     A     Yeah.  So the mentors coming on.  This is the
```

1          training for the mentors.

2     Q    By you?

3     A    By myself and other people.  Yes.

4     Q    Okay.  Which other people?

5     A    Heidi would have been involved in that.  Thane.

6          Yeah.

7     Q    All right.  I mean, what was it?  Like, was -- did

8          -- was there like a classroom that everybody met

9          in?  Like --

10    A    There was an activity building in which we did the

11         training in.

12    Q    Okay.  Which -- when are youth mentors trained in

13         the restraint process?

14    A    When are they at this timeframe?

15    Q    Uh-huh.

16    A    It would've been during that week, I believe.

17    Q    Okay.

18    A    Yeah.

19    Q    All right.  And I think the last two -- well, I'm

20         not going to ask you about them, 'cause they're

21         from a different general time period, Nelson 055

22         and Nelson 059.  Okay?  I may refer back to those,

23         but --

24    A    I see.

25    Q    -- Ms. Nelson produced these.

```
1              MS. LANGLEY:  Okay.  We're having a
2         technical issue.
3              MR. DAVIS:  I can't complain about those.
4              MS. LANGLEY:  Is it charging now?
5              MR. CHANG:  Yeah.
6              MS. LANGLEY:  Okay.  All right.  The power
7         strip wasn't plugged in.
8              MR. CHANG:  I just didn't want it to die
9         when we needed it.
10         (PLAINTIFF'S DEPOSITION EXHIBIT NO. 36
11              MARKED FOR IDENTIFICATION)
12    Q    Okay.  I'm going to hand you one more text message
13         marked as Exhibit 36.
14              MR. DAVIS:  Actually, I don't want to put my
15         handwriting -- you can do it in your own
16         handwriting.
17    Q    Can you read -- actually, let me -- I need to find
18         it in my binder real fast.  Mr. Butcher, I'll just
19         -- I'll just -- I've read several of the text
20         message exchanges between you and Ms. Nelson, and I
21         know that you've -- there's a lot of young people
22         that you have to manage.  I will say that.  I
23         noticed that you regularly call Ms. Nelson "Dude."
24         Is there a reason that you've called Ms. Nelson
25         "Dude"?
```

1    A    No.  No reason at all.  No.

2    Q    Towards the bottom, it says, "Emojis are for

3         weirdos, bro."

4    A    Yes.

5    Q    Now, that one, that's a different one.  What is a

6         bro?

7    A    A bro?  I would categorize dude and bro the same

8         for myself.  Someone I would relate to when being

9         -- when making jokes or being friendly, I would use

10        "bro."

11   Q    You would -- would you -- if you met a -- in a

12        friendly -- well, was Ms. Nelson your employee?

13   A    She was my employee.

14   Q    Okay.  But in a friendly setting, if you met a

15        black adult woman, would you call her "Bro"?

16   A    Without a relationship with them?

17   Q    Uh-huh.

18   A    I don't know.  I don't think so.

19   Q    Why wouldn't you call a black woman "Bro"?

20   A    The same reason I wouldn't call anyone "Bro" that I

21        didn't know.

22   Q    As of -- as of February 23rd, 2023, what was your

23        relationship with Ms. Nelson?

24   A    I was her boss.

25   Q    You were her boss?

```
 1     A     Yes.

 2     Q     And she was a black female employee, correct?

 3     A     Correct.

 4     Q     Do you call other black female employees names like

 5           "Bro" and "Dude," or was it just Ms. Nelson?

 6     A     I don't recall my messages.  But in my dialogue,

 7           I'm sure I possibly would have.

 8     Q     What other informal terms such as "Dude" and "Bro"

 9           did you use to call or identify your subordinates

10           at Three Points Center in Chatham County?

11               MS. LANGLEY:  Object to form.

12     A     I don't -- I think they're usually my go-tos.

13     Q     At your new therapy practice, if a black teenager

14           with a history of emotional distress was in your

15           office, would you -- would you call them "Bro" or

16           "Dude"?

17     A     Yes.  I would use those words, I think.  Like,

18           "Dude, it's going to be okay.  You got this."

19     Q     Okay.

20     A     Yeah.

21     Q     All right.  No.  But what about "Bro"?  Last one on

22           "Bro."  You would?

23     A     I believe in that context, yes.  Like, "Bro, you

24           got this."  Yeah.

25               MS. LANGLEY:  So are you planning to depose
```

1     Ms. Palmer today?  'Cause it's four-oh-six.
2           MR. DAVIS:  The best laid plan sometimes --
3     you know, you try to predict to be efficient.
4           MS. LANGLEY:  I understand.
5           MR. DAVIS:  I am, but I think we're getting
6     --
7           MS. LANGLEY:  I'm trying to be respectful to
8     the witness --
9           MR. DAVIS:  I am.
10          MS. LANGLEY:  -- who has been here an hour
11    and a half.
12          MR. DAVIS:  I am.  And I know -- I
13    understand that I noticed them for a day.  And so
14    we got to stick with it, but --
15          MS. LANGLEY:  I mean, you understand she
16    took off work to be here because you noticed her
17    deposition.
18          MR. DAVIS:  I know.  And I'm almost done.
19          MS. LANGLEY:  So my question is are you
20    going to depose Ms. Palmer today?  Because we're
21    not going to stay until late in the evening --
22          MR. DAVIS:  Tell me --
23          MS. LANGLEY:  -- and it is four-oh-six right
24    now.
25          MR. DAVIS:  Well, then you tell me your --

Case 1:23-cv-00527-WO-JGM   Document 39-1   Filed 07/23/24   Page 214 of 296

1          you tell me your drop dead, and I won't go more

2          than five minutes above it.

3                    MS. LANGLEY:  On a Friday evening?  Five-

4          thirty.

5                    MR. DAVIS:  What time is it now?

6                    MS. LANGLEY:  Four-oh-seven.

7                    MR. DAVIS:  Make it six.

8                    MS. LANGLEY:  I mean --

9                    MR. DAVIS:  Make it six.

10                    MS. LANGLEY:  We can go off the record on

11          this.

12                    MR. DAVIS:  Oh, yeah.

13                       (ELEVEN-MINUTE RECESS)

14                       (4:06 P.M. - 4:17 P.M.)

15           (PLAINTIFF'S DEPOSITION EXHIBIT NO. 37

16                    MARKED FOR IDENTIFICATION)

17     Q    Okay.  Going to put a few more -- 37.  These are --

18          I'll represent that these are the only two other

19          write-ups that look similar to the write-ups for

20          Ms. Nelson that were Plaintiff's Exhibits 11 and

21          14.  Who is the employee on the name of the --

22                    MS. LANGLEY:  Just object to the form on the

23          representation (inaudible) --

24     Q    I'm sorry.  What is the title of this document?

25     A    It's "Attendance review/Corrective action."

1    Q    Who is the employee?

2    A    It says a Dymond Baldwin.

3    Q    Did you -- did you write Mr. Baldwin up?  Is this

4         your write-up for him?

5    A    Yes.  It has got --

6    Q    Okay.

7    A    -- my signature on this.

8    Q    Right.  And then look -- just turn to the next one.

9         Who is the employee shown there?

10   A    An employee named Kameron Ellis.

11   Q    Did you write Mr. Ellis up around this time?

12   A    I believe so, although this document doesn't have

13        my signature on it.

14   Q    Okay.  Thank you.

15        (PLAINTIFF'S DEPOSITION EXHIBIT NO. 38

16             MARKED FOR IDENTIFICATION)

17   Q    All right.  Going to do 38.  This is an EEO

18        document, these -- the group notes.  Mr. Butcher,

19        take a second to look at that.

20             MS. LANGLEY:  Let's hold one second on this.

21             MR. DAVIS:  Yeah.

22             MS. LANGLEY:  We've got an issue with Mr.

23        Butcher seeing these notes.  This should not be an

24        exhibit.

25             MR. DAVIS:  Why can't Mr. Butcher see them?

1           'Cause he's not an employee anymore?

2                   MS. LANGLEY:  This is for attorneys' eyes

3           only, and he is not an attorney.

4                   MR. DAVIS:  Understood.  But my

5           understanding of the protective order is that we

6           are allowed to use them in the context of

7           litigation.  So how can we -- how can we use them

8           to figure out what they are if we can't show them

9           to somebody else?

10                  MS. LANGLEY:  Are you going to go through

11          with him exactly what his confidentiality

12          obligations are?

13                  MR. DAVIS:  How about this?  Let me -- if I

14          can look at it, I can ask questions to understand

15          what I want, and then you can keep --

16                  MS. LANGLEY:  I think that would be

17          preferable.

18                  MR. DAVIS:  Okay.

19                  MS. LANGLEY:  Okay.

20                  MR. DAVIS:  And I was expecting this

21          conversation here to happen, but I just did it

22          'cause I'm hustling.  All right.

23                  MS. LANGLEY:  Okay.

24     Q    Mr. Butcher, do you remember some of those text

25          messages about notes being entered into a system at

1          Three Points?  Or just notes -- what are notes?

2    A     Notes would be like kind of a documentation of how

3          students' day went.  That would be the reference to

4          notes.

5    Q     Of the employees at Three Points that could enter

6          notes, a youth mentor could enter notes, correct?

7    A     Correct.

8    Q     Okay.  And then the document that is attorneys'

9          eyes only marked as Exhibit 38 -- a provider could

10         enter notes, correct?

11   A     Could you define "provider"?  Who do you mean by

12         "provider"?

13   Q     Were there therapists at Three Points Center?

14   A     Yes.

15   Q     Who were the therapists that you remember there

16         when Ms. Nelson worked?

17   A     I remember a therapist called Karen.

18   Q     What was her name?

19   A     Karen.

20   Q     Karen?

21   A     Yeah.

22   Q     Okay.  Did the therapist provide group therapy

23         sessions for the students?

24   A     They did.  Yes.

25   Q     Were they one-on-one?  Well, this was the group.

1        But did they have one-on-one sessions, also?

2    A   Individual sessions.  Yes.

3    Q   Okay.  How was most therapy provided to the

4        students at Three Points?  One-on-one or through

5        group?

6    A   Most of it would be -- I would say probably through

7        group.  They had one hour of individual a week, one

8        hour of family, but they would have four to five

9        groups per week.

10   Q   Okay.  Tell me what you remember about the day of

11       April 5th, 2022 at Three Points.

12   A   I wouldn't have recollection of that day.  That was

13       a long time ago.

14   Q   You don't have any memory of April 5th, 2022?  This

15       is to confirm.

16   A   I don't remember.  I don't remember much, if

17       anything, that day.  So it doesn't stand out to me

18       at all.

19   Q   Was there a meeting -- a staff -- where staff were

20       present?

21   A   A staff meeting?  I don't -- I don't -- I don't

22       recall.

23   Q   Was there a meeting that Mr. -- that Mr. Palmer

24       spoke at?

25   A   A staff meeting?

1   Q   I just said was there a meeting -- was there -- was

2       there any type of meeting where staff and/or

3       students may have been present where Mr. Palmer

4       spoke?

5   A   I believe so.

6   Q   Okay.  What was that meeting about?

7   A   I don't recall.

8   Q   You don't recall?

9   A   Yes.

10  Q   What types of things would -- Mr. Palmer was the

11      head of the Chatham County facility, correct?

12  A   Yes.

13  Q   The leader?

14  A   Yes.

15  Q   What types of things would there be meetings about

16      with Mr. Palmer?

17  A   They would range -- a broad spectrum of his

18      involvement in meetings.  So meetings -- there were

19      different kinds.  So are we talking a meeting with

20      the students, meeting with the staff?  It could be

21      staff, it could be a training.  If it was in a

22      group session, it could be therapy intended, right?

23      I don't know the setting.  Sorry.

24  Q   So during the typical day, my understanding is that

25      the students always had to be supervised by a

1          combination of either a youth mentor, a supervisor,

2          teacher, right?

3     A    Correct.

4     Q    So if there was -- if there were eight students in

5          a room, how many staff members would always have to

6          be there?

7     A    There would be two.  Two staff.

8     Q    Two.  And so in a group meeting where Mr. Palmer is

9          talking to the students, necessarily would the --

10         would other employees have to be there to maintain

11         the ratios?

12    A    That would be our practice, I know.  As a

13         therapist, I don't know if that would be completely

14         necessary.

15    Q    Okay.

16    A    Like, he would be able to meet with students

17         individually.

18    Q    He would be able to meet individually.  But in a

19         group context --

20    A    He would also be able to do that.

21    Q    He would also be able to do that.  Okay.  Without

22         staff being present?

23    A    I believe as a therapist, he would've been allowed

24         to do that.

25              (PLAINTIFF'S DEPOSITION EXHIBIT NO. 39

1            MARKED FOR IDENTIFICATION)

2     Q     Okay.  I'm going to hand you 39.  Let's see.  Find

3           it in my thing.  All right.  This is a document --

4           who is in this -- this is Three Points 579.  Do you

5           see where it says, "Three Points Training Center

6           Employee Training Report.  Supervisor:  Hannah

7           Locke.  Employee:  Avery McLaurin.  Date of

8           training/date of report:  April 5th, 2022."  So is

9           the supervisor position being referred to here the

10          same one that Dan had?

11    A     Yes.  Hannah and Dan were both supervisors.

12    Q     They were both supervisors.  Is -- do employees --

13          what Hannah did, is this a -- is this a write-up or

14          is this evidence of training?

15    A     This looks like an employee training, so this will

16          be a training report.

17    Q     Okay.  Do you see where it says, "Description of

18          training"?

19    A     Description.  Yes.

20    Q     Read the description of training.

21    A     It says, "Not letting students mess with laptop and

22          involving self with the students more."

23    Q     Do you see the top where it says, "Description of

24          work-related issue"?  What does that say?

25    A     It says, "Not involving self with students while

Case 1:23-cv-00527-WO-JGM    Document 39-1    Filed 07/23/24    Page 222 of 296

1         talking to other staff and letting students mess
2         with laptop."
3    Q    Now, those sentence fragments are similar, but they
4         are different, correct?
5    A    They're different.
6    Q    Is not letting -- how is this training?  I just
7         want to -- I mean, is that training, Mr. Butcher?
8    A    Sorry.  I can't speak to the dialogue used for that
9         training.  I wasn't there.  Sorry.
10   Q    What type of -- in this situation -- 'cause these
11        are write-ups from a supervisor to a youth mentor,
12        correct?
13   A    That's what it looks like.  Yes.
14   Q    It's a write-up?
15   A    A write-up.  Sorry.  This -- it says, "Employee
16        training report."
17   Q    It says, "Employee training report"?
18   A    Yes.
19   Q    Can you go back to -- do you remember the text --
20        the exhibit with all the text messages with you and
21        Tyliya, and we kind of stopped, and then there were
22        those final pages on the end?
23   A    Yes.  I believe so.
24   Q    And then keep the write-up one in front of you.
25   A    Yes.

1    Q    I'm at Nelson 555.  So it's the final -- it should

2         be the final two pages of that -- of Exhibit 35.

3    A    Yes.

4    Q    Okay.

5              MS. LANGLEY:  Nelson which number?

6              MR. DAVIS:  0555.  It's the final two pages

7         of the big text message exhibit.

8    Q    I'll wait until your attorney --

9              MR. CHANG:  Nelson, not Three Points.

10             MS. LANGLEY:  I'm just not seeing it in this

11        file.  Hold on a second.  I'm crammed up in here.

12        Okay.  555.  Gotcha.  Thanks.

13   Q    This appears to be a group text message with you on

14        it and several other employees at the Chatham

15        County facility.  Do you agree with that?

16   A    Yes.  That's what it looks like.

17   Q    Okay.  You wrote, "I will assume this message is

18        for me, as I'm the only one who provides supervise"

19        -- "oversight of the supervisors.  I would enjoy

20        discussing this further.  T, let's meet at eleven

21        A.M. in the admin building.  Avery, let's meet at

22        eleven-thirty."  Who is the name of the employee on

23        the -- on the write-up on Exhibit 34 that was

24        written up?  This one right here.  39.  Excuse me.

25        My apologies.

1    A    Hannah Locke.

2    Q    Okay.  But who was the employee that was written

3         up?

4    A    Avery.

5    Q    Avery.  Is this -- is that the same Avery that

6         you're setting a meeting for eleven-thirty in this

7         text message?

8    A    I believe so.

9    Q    Okay.  And T, are you referring to Ms. Nelson, the

10        plaintiff?

11   A    Yes.

12   Q    Was she also written up by Hannah on April 5th,

13        2022?

14   A    I don't recall.

15   Q    You don't recall.  Why would you be setting up a

16        meeting with Ms. Nelson at eleven and then with

17        Avery, the employee that was written up the day

18        before by Hannah?

19             MS. LANGLEY:  Mr. Davis, you know very well

20        that there was a text message from your client in

21        this series of discussion that precipitated this

22        that you have not included as an exhibit.  I mean,

23        you asked why he was meeting with Avery.

24             MR. DAVIS:  If he doesn't remember -- yeah.

25   Q    If you don't remember why -- why would you meet

1       with two supervisors consecutively the day after

2       one of them was written up?

3    A  Why would I meet with two --

4          MS. LANGLEY:  Two supervisors?

5    A  I don't --

6          MR. DAVIS:  Excuse me.  Well, he says -- he

7       says he provides oversight to supervisors.  But two

8       youth mentors.  Thank you.

9    A  I believe not pictured here there was a message

10      from T included into this group that I felt needed

11      -- we talked -- we talked further about it.

12   Q  Okay.  All right.  Turn to the second page.  This

13      one is -- it is a -- it shows a continuation from

14      that thread.

15         Was Sharika also written up by Hannah?

16   A  I don't recall.

17   Q  Okay.  And you write, "And of course this will be

18      as your boss and not" -- "and not your friend."

19      Why did you identify that distinction in this text

20      message to these girls -- or these employees?

21   A  I believe the previous message that is not pictured

22      here by Ms. Nelson indicated that she wasn't

23      friends with many people, I believe, if I remember

24      right.  'Cause like this, "Remember, we're not

25      friends" -- I'm going -- without seeing that in

1          front of me, I believe -- I believe -- so it was me

2          acknowledging what I felt Ms. Nelson was

3          referencing.

4     Q    So did you review these text messages before

5          today's deposition?

6     A    These ones?

7     Q    Uh-huh.

8     A    I believe -- I believe these were included in the

9          messages that I provided, also, so I have seen them

10         before.  Yes.

11    Q    Okay.  But you testified that you -- before we

12         started looking at these, you testified that you

13         don't remember if there was anything unique that

14         happened on April 5th, 2022.

15    A    Yes.  No, I don't.  I don't.  Yeah.  That would be

16         accurate.

17    Q    But your review of the text messages reminded you

18         of the spat between Hannah and Sharika and Tyliya?

19              MS. LANGLEY:  Object to form.

20    A    Yes.  I would say reading this, it obviously brings

21         some things that I can recall.

22    Q    What was the -- what was the nature of this, you

23         know, internal strife, if you will, between --

24    A    My interpretation of it?

25    Q    Uh-huh.

1    A    Would be I believe Ms. Nelson had a frustration at

2         Hannah's position, and she would often be very

3         uncooperative and unprofessional with Ms. Locke,

4         really hard to work with for Hannah.  And so I

5         believe it was referencing her -- there was a lot

6         of frustration on both sides, I believe.

7    Q    Was Ms. Nelson terminated because she didn't

8         cooperate or get along with supervisors?

9    A    I believe that -- I believe that was possibly a

10        part of it.  That's not -- I'll say Ms. Nelson was

11        terminated because of her tardiness and

12        continuously excessive being late, right?

13        Continuous -- I'd say she was also at the same time

14        creating an environment where people didn't enjoy

15        working, so I'm sure that was taken into

16        consideration and talked about.

17   Q    But we looked at Plaintiff's Exhibit 14, Ms.

18        Nelson's termination notice, earlier, didn't we?

19   A    Yes.  We looked at that.  Yes.

20   Q    Does it -- does it say anything about the shifting

21        explanation that you just provided for Ms. Nelson's

22        termination?

23             MS. LANGLEY:  Object to form.

24   A    On this attendance review, it doesn't -- it doesn't

25        mention those things.  No.

1    Q    What you mention now about Ms. Nelson -- not the

2         tardiness rationale, but the -- what was it?  Not

3         getting along with Hannah?

4    A    I think she had frustration for Hannah's position

5         as her supervisor.  Yes.

6    Q    Okay.  Did you think that that frustration was

7         unprofessional?

8    A    At times, yes.  I believe it made its way out so

9         the students could even witness the frustration.

10        Yes.

11   Q    Do you remember when I asked you who you terminated

12        at the Utah facility?  Do you remember that part of

13        the deposition?

14   A    Yes.  I believe I remember that.

15   Q    It was -- Ed H. was one of them, right?

16   A    Yes.

17   Q    Why did you terminate him?

18   A    For his own professionalism.

19   Q    And when you terminated him, did you tell him the

20        real reason that he was terminated, or did you make

21        up another one?

22             MS. LANGLEY:  Object to form.

23   A    I believe I would have told him the reason he was

24        fired.  Yes.

25   Q    So if Ms. Nelson was fired for being

1      unprofessional, why wasn't she told that?

2   A  I believe maybe not -- I believe many conversations

3      were had about professionalism with Ms. Nelson over

4      the course of her employment.

5   Q  Did you have any conversations with Ms. Nelson the

6      day she was terminated about being late for work?

7   A  Not that I recall.

8   Q  What would refresh your recollection about

9      conversations you had with Ms. Nelson the day she

10     was terminated?

11  A  What would recall?

12  Q  Yeah.

13  A  I guess text messages that I could view and see

14     that I was involved in, or looking at the clock-

15     in/clock-out stuff if I'm trying to reference

16     times.

17  Q  Did -- well, let's go back to the Nelson 059.  It

18     says -- you're at the right one.  Flip to the next

19     page.

20  A  Yeah.

21  Q  Not -- I'm sorry.  Not that one.  It's right there.

22     I think it's the one where it's -- here we go.

23         The -- what time did you set up the meeting

24     with Ms. Nelson?  See at the top you said, "T,

25     let's meet at eleven and" --

1     A     "Let's meet at eleven."  Yes.

2     Q     Okay.  And then you see at the bottom what -- where

3           Ms. Nelson wrote, "Butch, I'm here"?

4     A     I see that.  Yes.

5     Q     What time was she there?

6     A     It says ten-fifty-six A.M.

7     Q     So she wasn't late for this meeting, was she?

8     A     No, she was not.

9     Q     Did you have a thirty-minute-long meeting with Ms.

10          Nelson to discuss issues that day?

11    A     I did have a meeting.  I don't know the length of

12          time.

13    Q     You don't know the length of time?

14    A     Yes.

15    Q     Have you been -- and not asking for specific

16          communications between you and any of the attorneys

17          in this room.  Have you been made aware that Ms.

18          Nelson on her phone recorded that conversation she

19          had with you?

20    A     I believe --

21              MS. LANGLEY:  She had with who?

22              MR. DAVIS:  Mr. Butcher.

23              MS. LANGLEY:  Okay.  I didn't hear your last

24          word.

25              MR. DAVIS:  Yeah.

Case 1:23-cv-00527-WO-JGM    Document 39-1    Filed 07/23/24    Page 231 of 296

1          MS. LANGLEY:  I thought you said "him."

2     A    Yes.  I'm aware of her recording.

3     Q    You're aware of it?

4     A    Yes.

5     Q    If you listened to that recording, would that

6          refresh your memory of whether or not you informed

7          her that she had punctuality issues that day that

8          would lead to her termination at the end of the

9          shift?

10    A    If I heard it and that's what I said, yes, that

11         would certainly remind me of it.

12    Q    But if you didn't say anything in that recording

13         about Ms. Nelson's punctuality, then the answer

14         would be, "I didn't say anything about it," right?

15    A    On that specific day in that meeting, no.

16         MS. LANGLEY:  Do you mean the part she

17         recorded?

18    Q    I mean how -- when did -- the part she recorded --

19         when did you schedule the meeting for Ms. Nelson?

20         It's right there at the top.  When did you meet?

21         Or when did you -- when did you schedule to meet

22         with Avery?

23    A    Avery was eleven-thirty.

24    Q    Okay.  So would you -- based on your practice as a

25         manager, if you had another employee scheduled to

1           meet at eleven-thirty, would you have tried to
2           start around that time?
3      A    I would've tried to.  My best.  Yes.
4      Q    Your best.  Do you remember anything else that Ms.
5           Nelson told you or said to you during that --
6           during that meeting?
7      A    Yes.  I believe I do.
8      Q    What do you remember?
9      A    I remember lots of frustrations with supervisors.
10          Yeah.  I remember addressing concerns like that.
11          Yeah.
12               MR. DAVIS:  Now, Beth, we can do this on the
13          record.  You know we listened to it on Monday.
14          Okay?  Now, when I introduced it for my client, I
15          asked, "Is this your voice," and she said, you
16          know, her thing.  We can listen to it.  'Cause I
17          don't need to ask any questions about it.  But for
18          authentication purposes, if he listened to a little
19          and said, "Yes, this is my voice on this recording"
20          --
21               MS. LANGLEY:  I don't know your purpose.
22          But if you're going to ask him about -- if you're
23          going to play a portion of it and then ask him
24          about it, then he can -- he should be able to
25          listen to the entire thing if you're going to ask

Case 1:23-cv-00527-WO-JGM    Document 39-1    Filed 07/23/24    Page 233 of 296

1    him questions.

2           MR. DAVIS:  Well, then we got -- then we

3    have to do it.  I mean, then we have to listen to

4    it again.

5           MS. LANGLEY:  All right.  But we're still

6    ending at the same time.

7           MR. DAVIS:  Thirty minutes.  I think we'll

8    be all right.

9           MS. LANGLEY:  Up to you.  Before we do that,

10   I'm really going to have to go to the restroom,

11   'cause that's going to be --

12          MR. DAVIS:  Yeah.

13          MS. LANGLEY:  -- thirty minutes.

14              (THREE-MINUTE RECESS)

15              (4:41 P.M. - 4:44 P.M.)

16   Q    Mr. Butcher, before we took that break, I mentioned

17        -- I asked if you were aware that Ms. Nelson had

18        recorded that conversation on April 6th before she

19        was terminated.  Do you remember that question?

20   A    Yes.  I remember that question.

21   Q    Did you listen to that recording before today's

22        deposition?

23   A    I've heard it before.

24   Q    You've heard it?

25   A    Yeah.

1    Q    How much have you heard?

2    A    I don't -- I don't want to calculate.  That's -- I

3         listened to it, moved forward, and listened to

4         bits.

5    Q    Is it you in the audio tape?

6    A    In the one that was presented to me, I do believe

7         that was my voice in that -- in that recording.

8         Yes.

9    Q    So -- and you are aware that the attorneys -- our

10        job is to kind of manage this process and to be

11        respectful of people's time that have come here.

12        But before we left, there was a position taken that

13        we need to listen to the whole thing if I intended

14        to ask you questions about it.  Do you remember

15        that?

16    A    I remember that.  Yeah.

17    Q    But if I didn't ask you any questions about it, if

18        you listened to just a little bit of this exhibit,

19        would you be able to confirm whether or not it is

20        your voice in this meeting that we're looking at?

21    A    I believe I know -- I would be able to recognize my

22        voice.  I would also like to lean on my counsel and

23        make sure I hear everything.

24    Q    Okay.

25    A    Yes.

1          MS. LANGLEY:  If all you want to do is

2     verify that's his voice, that's it, but if you're

3     going to ask him questions about the substance of

4     the conversation, he is entitled to hear the whole

5     thing.  So that's up to you.

6          MR. DAVIS:  Right.

7          MS. LANGLEY:  It's no different than a

8     document.  And he has the right to see the

9     document.

10          MR. DAVIS:  He has the right to see it.

11     What is your ballpark for your cross?

12          MS. LANGLEY:  I've got a page full of

13     questions.  I'm going to reserve a half hour.  I

14     may not need it.

15          MR. DAVIS:  I know.  That will put us at

16     six-forty-five [sic].  That's only fifteen for

17     Heidi.  We're not going off the record, but I'm

18     just going to think for one second.  Yeah.  We have

19     to listen to it.

20  Q   Okay.  Mr. Butcher, I'm going to play this tape,

21     and I won't have too many questions.

22          MR. DAVIS:  I'll play this audio recording,

23     which we'll mark as Exhibit 40.

24      (PLAINTIFF'S DEPOSITION EXHIBIT NO. 40

25          MARKED FOR IDENTIFICATION)

Case 1:23-cv-00527-WO-JGM   Document 39-1   Filed 07/23/24   Page 236 of 296

```
 1                 (Playing audio recording.)
 2     Q     I'm calling an audible.  I'm not going to ask you
 3           any questions about this recording.
 4                 I just want -- we've listened to the first
 5           minute and twenty-four seconds.  Is that the
 6           beginning minute and twenty-four seconds of the
 7           meeting, I guess, identified in Nelson 059?
 8     A     I believe so.
 9     Q     Okay.  And I'll represent that this recording is
10           thirty-four minutes long.  And if there was an
11           audio recording where Ms. Nelson wasn't talking to
12           you, then -- well, it is what it is.
13                 Okay.  So that is you?
14     A     I believe so.
15     Q     Okay.  After this meeting, did you meet with Avery?
16     A     Yes.  I believe I did.
17     Q     Where is -- do you have the exhibit -- it's the one
18           -- the list of the employees that quit.  Do you
19           remember that one?  There it is.  What date -- what
20           is the official date of Avery's quitting?  It's one
21           of the -- it'll be one towards the bottom.  And
22           this is -- he's looking at Exhibit 33.
23                 MS. LANGLEY:  33.
24     A     The 7th of April.
25     Q     Did Avery also express concerns at that meeting
```

1           about things that were going on at Three Points?

2               MS. LANGLEY:  Object to form.

3       A   That's what the meeting was set up for.  What she

4           discussed in it I don't recall.

5       Q   You don't recall what you and Avery discussed?

6       A   I don't.

7       Q   Okay.  During -- well, if you look at Exhibit 14,

8           please -- it's right in -- right in front of you.

9           Do you -- do you see the final violation date on

10          there before -- it has the sentence, "Employee:

11          Tyliya Nelson.  Employment terminated for" -- what

12          is the -- what was she terminated for?

13      A   Employment has been terminated.  So the tardiness.

14      Q   Tardiness.  What is the last date that she was

15          identified as being tardy?

16      A   It was the 5th of April.

17      Q   And what is the number of minutes late that was --

18      A   It says --

19      Q   -- identified?

20      A   It says six minutes late.

21      Q   Okay.  And what was the date of the meeting that

22          you had with Tyliya, Avery, and Sharika that we

23          listened to the beginning of the recording of?

24      A   I believe that was on the 6th, the following day.

25      Q   So is it fair to say when you had this meeting

1           that's Plaintiff's Exhibit 40 -- I'm asking

2           questions about what is on there.  But at that time

3           that you had this meeting, that you would've had

4           access to the information that Three Points relied

5           upon to identify the fact that Ms. Nelson was tardy

6           six minutes the day before?

7    A     Yes.  I don't know why I would have looked it up or

8           referenced a timeclock for that meeting, but it was

9           available to me if I thought to check it.  Yes.

10   Q     So after the meeting with Ms. Nelson, is that when

11          you went back to look to see if she was late so you

12          could terminate her?

13           MS. LANGLEY:  Object to form.

14   A     I don't believe I did.  I don't believe I did look

15          or check.

16   Q     Do you remember at the beginning -- towards the

17          beginning of the deposition I asked you when the

18          decision was made to terminate Ms. Nelson?  Your

19          testimony was the decision was made in the

20          afternoon.  Do you remember that?

21   A     I remember that.

22   Q     Okay.  Is the afternoon after the -- after the

23          meeting that you had with Ms. Nelson at eleven-

24          thirty?

25   A     Yes, it would've been.  Yes.

1    Q    Tell me -- tell me what you remember about work the

2         rest of the day after your meeting with Sharika.

3    A    I imagine -- I imagine lunch, spending time --

4         spending time with the kids, with the groups,

5         spending time with the staff, checking in on staff,

6         checking on supervisors.  Just -- yes.

7    Q    When did -- when were the discussions had to decide

8         whether or not to terminate Ms. Nelson?

9    A    The exact timeframe I'm unaware of.  As I said, I

10        don't recall the time that Dan would have done an

11        attendance review.

12   Q    Dan -- why did Dan -- why would Dan do an

13        attendance review that day at that time?

14             MS. LANGLEY:  Object to form.

15   A    I believe probably 'cause of the -- she had two

16        within three days.  I'm sure that could have

17        prompted it.  I don't know why Dan would have done

18        that.  But she had two within the three days.  I'm

19        sure that was on his mind and prompted the check.

20   Q    That was on his mind?

21   A    I'm sure -- I'm sure it was.  I can't testify to

22        what was on his mind.

23   Q    Now, the discussions that were had the afternoon

24        after the meeting -- the April 6th meeting, who was

25        part of those discussions?

```
1    A    I believe myself and Dan.  Yeah.  Her direct

2         supervisor.

3    Q    Was Ms. Palmer at those discussions?

4    A    I don't believe so.

5    Q    You don't believe so?

6    A    No.

7    Q    So who authorized the termination of Tyliya Nelson?

8    A    Who said, "Okay, let's do that"?

9    Q    Uh-huh.

10   A    That would have been myself.

11   Q    You did?

12   A    Yes.

13   Q    You decided to terminate Ms. Nelson the day after

14        you met with her to discuss issues for being six

15        minutes late the day before?

16             MS. LANGLEY:  Object to form.

17   A    So that wasn't the only -- the only one on there,

18        right?  It was an accumulation of lates that was

19        brought to my attention that was the concern of a

20        supervisor.

21   Q    I will try to -- because I've taken a position and

22        I'm sticking -- I am not going to ask you anything

23        that would have been in those thirty minutes of

24        tape that you've said that you've reviewed before

25        this deposition.  Okay?
```

```
1    A    Okay.

2    Q    I'm going to pose it as a hypothetical.

3    A    Okay.

4    Q    If you terminated Ms. Nelson for -- well, was April

5         5th really the straw that broke the camel's back,

6         then, based on what your write-up says?

7              MS. LANGLEY:  Object to form.

8    A    I mean, April 5th was the last -- I guess the last

9         -- one of the last days she had the opportunity to

10        continuously be late.  Yes.

11   Q    But she came to work the next day.

12   A    On 4-6?

13   Q    Yeah.

14   A    You're right.  Correct.

15   Q    Okay.  So just to confirm, you didn't know that Ms.

16        Nelson was one minute late until after the meeting

17        that you had with her where she discussed whatever

18        was discussed on the audio?

19             MS. LANGLEY:  Object to form.

20   A    Yes.  I wouldn't have stood by the timeclock in the

21        mornings and witnessed times of people's ins and

22        outs.  No.  That's not something I would have been

23        aware of at the time.

24   Q    So let's -- April 5th, 2022, if that's -- if you

25        went to the timeclock and saw five minutes instead
```

1          of six minutes, would you have instructed Dan to

2          terminate Ms. Nelson at the end of her shift that

3          day?

4     A    Just based off that one --

5     Q    I'm saying you have six.  I'm saying so if on the

6          5th you went in there and it said seven-oh-five

7          A.M. --

8              MS. LANGLEY:  When you say "six," are you

9          talking about the six occurrences on the write-up?

10             MR. DAVIS:  No.  We're doing the write-up.

11         I'm saying April 6th.  On April --

12             MS. LANGLEY:  You're focusing solely on

13         April 6th instead of what is on the exhibit?

14    Q    I'm not focusing solo what's on the -- I'm saying

15         that the last date on Exhibit 14 where Ms. Nelson

16         is documented as being late was the day before she

17         was terminated, correct?

18    A    Yes.  That would've been the day before the 6th.

19         Yes.

20    Q    But you testified that you didn't go in and look at

21         the time records until the afternoon after your

22         meeting on the 6th.

23             MS. LANGLEY:  He said he didn't go look at

24         the time records.  He just testified that Dan did.

25             MR. DAVIS:  That Dan --

Case 1:23-cv-00527-WO-JGM   Document 39-1   Filed 07/23/24   Page 243 of 296

1             MS. LANGLEY:  And he said that several times

2       --

3             MR. DAVIS:  Okay.

4             MS. LANGLEY:  -- throughout the day.

5    Q    So let's do this, then.  If Dan came -- if Dan came

6       to you and said, "Hey, boss, she was only five --

7       it was only seven-oh-five on April 5th," would you

8       still have made the decision to terminate Ms.

9       Nelson?

10   A    I don't know what my decision would have been at

11      the time if --

12   Q    What would you --

13           MS. LANGLEY:  Would you let him answer?

14      He's answering.

15           MR. DAVIS:  Yes.

16   A    I was presented with multiple.  So I probably would

17      have heard the conversation and came to the same

18      conclusion with or without the time entry on the

19      5th.

20   Q    With or without the 5th.  So the six minutes on the

21      5th, that's not material to you?

22           MS. LANGLEY:  Object to form.

23   A    Sorry.  It is.  But as you can see, there's many

24      other examples of the tardiness in there that would

25      have to be considered.

1    Q    So at the time that you had this meeting at eleven

2         o'clock with Ms. Nelson, is it your testimony that

3         you had no awareness that she was -- what is the

4         first -- excuse me.

5              What is the first date documented on Exhibit

6         14?

7    A    The 15th of March.

8    Q    Okay.  Is it your testimony that as of April 6th

9         between eleven and whenever the meeting was over

10        that you had no awareness that Ms. Nelson was late

11        on the 15th of March?

12   A    Yeah.  I can't -- I don't know my knowledge at the

13        time.  Sorry.

14   Q    Did -- were supervisors -- do you remember the

15        Hannah write-up that we looked at a little bit?

16   A    The employee training?

17   Q    Yeah.

18   A    So I remember the employee training report.  Yes.

19   Q    Did supervisors have the ability to write up youth

20        mentors for being late?

21   A    Yes.

22        (PLAINTIFF'S DEPOSITION EXHIBIT NO. 41

23             MARKED FOR IDENTIFICATION)

24   Q    To your knowledge, Exhibit 41 -- were there any --

25        did you ever see any reports like this filed

1    contemporaneously by a shift supervisor documenting

2    Ms. Nelson's attendance?

3  A  No.  This is the first time I've seen --

4  Q  Take a look at 41.  What is Exhibit 41?

5  A  Just an employee training report.

6  Q  And what is -- please read it for me.

7  A  It says, "Supervisor:  Hannah Locke.  Employee:

8    Marcus Maness."  It says, "Individuals present."

9    It says initials H.L. and M.M.  The date of

10   training was 4-2-22.  Date of report was 4-2-22.

11 Q  So Exhibit 41, is it fair to say that this is a

12   write-up by Hannah, a supervisor, of a youth

13   mentor?  Let me break it into pieces.

14        Is this a Hannah -- a write-up by a

15   supervisor for a youth mentor?

16 A  This looks -- sorry.  It would be counsel with that

17   staff and, like, an employee training report.  I

18   don't know if this was -- required the accumulation

19   of a write-up.

20 Q  Okay.

21 A  It sounds like she has talked to him about his

22   being late.

23 Q  Hannah and Dan were both supervisors, correct?

24 A  They were.

25 Q  So if Hannah believed that Marcus was -- based on

1          this document, Hannah believed that Marcus -- how

2          do you -- Maness?

3      A   Maness, I believe.

4      Q   That he got to work so late that it necessitated

5          her filling out one of these employee training

6          reports?

7              MS. LANGLEY:  Object to form.

8      A   That's what it looks like.  Yes.

9      Q   That description of training, I mean, you know,

10         "Will arrive to work on time," you know, that's

11         just what Hannah put in there.  It's not really

12         training, is it, though, Mr. Butcher?

13             MS. LANGLEY:  Object to form.

14     A   Yeah.  I can't testify to Hannah's style of

15         training.  That's what has been documented here.

16     Q   That text message where the group text is set up

17         for the meeting between -- or the group text where

18         you set up the meeting with Tyliya, Avery, and

19         Sharika, do you remember that part of the text

20         message that said you were the only one who

21         provides oversight of the supervisors?

22     A   Of the supervisors, yes.

23     Q   So when one of your supervisors fills out one of

24         these forms like the -- like the Exhibit 41 where

25         Hannah has written up Marcus for being late, is

1          there some sort of, like, automatic notification

2          for you in the system to supervise what's going on?

3     A    No.

4     Q    No?  So when an employee is late, how -- is this

5          what the supervisors are supposed to do -- is to

6          write them up?

7     A    I'd say this is not an employee training report,

8          right?  So this is not a write-up.  So excessive

9          late shows, I'm sure he would have been written up.

10    Q    So do you believe that Marcus was late -- based on

11         the dates on here, do you believe that Marcus was

12         late on April 2nd, 2022?

13    A    I believe he was late previous to this date.  I

14         don't know if it was the 2nd.

15              MR. DAVIS:  All right.  The -- remember the

16         big time sheet exhibit?  Jimmy, it's Three Points

17         0597.

18    A    What exhibit number?  Sorry.

19    Q    It's probably going to be easier for me to help you

20         locate it at this point.

21              MS. LANGLEY:  It's No. 30.

22    Q    Yeah.  And it may be in this first bundle.  Keep

23         them separate so we don't lose them.  Okay?

24    A    Okay.

25    Q    All right.  You keep those there, and then we'll

1          deal with it later.  All right?

2     A     Yeah.

3     Q     All right.  Look for -- look for at the bottom, it

4          says 597.  It may be in the first bundle that I've

5          stapled.

6     A     Okay.

7     Q     Are you -- are you looking at Three Points 597?

8          Yeah.  And what you need to do to understand, turn

9          back one page to 596, please, so you can see whose

10         time it is.

11    A     Yes.

12    Q     All right.  Whose time entries are you looking at?

13    A     It appears to be Marcus's.

14    Q     Okay.  And so does it say "Marcus Maness" on 596 at

15         the -- do you see what I'm saying?

16    A     Yes.  Yes.  Yes.

17    Q     All right.  Turn to the next page, please, of that

18         exhibit.  Do you see it says, "Three Points 597" at

19         the bottom?

20    A     Yes.

21    Q     What is the date range that you see on the left-

22         hand column?  April 1st to what?

23    A     April 30th.

24    Q     Okay.  Do you remember we were looking at Hannah

25         Locke's employee training report for Marcus,

1          Exhibit 41?

2     A    Yes.

3     Q    What is the date of that training -- or that

4          report?  Excuse me.

5     A    4-2.

6     Q    Okay.  And what is the description of the work-

7          related issue?

8     A    Arriving to work late.

9     Q    Okay.  Turn back to Marcus's time sheet for April

10         2nd, 2022, please.  Or you've actually -- you got

11         it in front of you.  What time did Marcus clock in

12         to work that day?

13    A    On the 2nd was seven-thirty-eight.

14    Q    Now, that's late, isn't it?

15    A    That appears to be late.  Yes.

16    Q    That's pretty late.  Did he get fired for that?

17    A    I don't believe so.  No.

18    Q    But from Hannah's perspective, she didn't write

19         somebody up until they were thirty-eight minutes

20         late?

21              MS. LANGLEY:  Object to form.

22    A    So what is your question?  Sorry.

23    Q    I'm just saying from Hannah's perspective, right,

24         is it fair to say that Hannah believes that thirty-

25         eight minutes late is late?

1    A    I would think Hannah would think thirty-eight

2         minutes past the start of a shift is late.  Yes.

3    Q    Have you ever seen a supervisor -- an employee

4         training report where a supervisor wrote up a youth

5         mentor for being six minutes late?

6    A    I don't recall seeing one.  No.

7    Q    Can you -- now that we've looked at time sheets and

8         talked about -- you said excessive tardiness?

9    A    Yeah.

10   Q    Are there any other employees that you've

11        terminated for being excessively tardy, that you

12        can recall?

13   A    Not that I can recall.  I can't recall names and

14        things like that.  I'm sure I have over my time.

15        Yes.  But I don't recall.

16   Q    After an employee -- after you make the decision to

17        terminate an employee, do you have to report that

18        decision up to Ms. Palmer or Mr. Palmer?

19   A    Do I have to?

20   Q    Yes.  Yeah.  I mean, is it -- is it part of your --

21        of your former employer's policies and procedures

22        for you to inform executive management that there

23        has been a termination?

24   A    No.  I would've informed HR.

25   Q    You would've informed --

1    A    HR.

2    Q    And who is HR?  It's your mother-in-Law, correct?

3    A    Ms. Palmer.  Yes.

4    Q    Mr. Butcher, do you remember when I asked you

5         questions about -- when we had that discussion

6         about how many hours Ms. Nelson worked in a week

7         and overtime, and I asked whether you thought that

8         meant, right, it had a legal implication?  Do you

9         remember those questions?

10   A    I remember your questions about her time.  Yes.

11   Q    What is the source of -- to your understanding,

12        where does the -- where do the laws come from that

13        regulate employers who have the ability to fire

14        people?

15            MS. LANGLEY:  Object to form.  I'm going to

16        instruct him not to make a legal --

17            MR. DAVIS:  Okay.

18            MS. LANGLEY:  -- conclusion.

19   Q    Do you believe that overtime is required by law?

20   A    Required by law?

21   Q    Uh-huh.

22   A    I don't believe so.  No.

23   Q    You don't.  Do you believe that there are laws and

24        regulations which regulate how employers can make

25        decisions?

1          MS. LANGLEY:  Object to form.  Decisions

2      about what?

3  Q    Do you believe that employment is regulated?

4          MS. LANGLEY:  Object to form.

5  Q    Are the facilities in Utah regulated by the state?

6  A    In Utah?

7  Q    Uh-huh.

8  A    Yes.  I believe so.

9  Q    Are there -- are you aware that there are laws

10      called employment discrimination laws that prohibit

11      an employer from retaliating against an employee?

12  A    No, I was not.

13  Q    You're not?

14  A    Uh-uh.

15  Q    Do you have any understanding of what the word

16      "protected activity" means?

17  A    In the legal sense, no.

18  Q    When you -- when did you become group living

19      director at the Utah facility?

20  A    I want to say possibly halfway through -- sorry.  I

21      don't know.  I would be guessing.

22  Q    Okay.  But it was --

23  A    It would be a guess.

24  Q    I think -- I believe it was around 2018.

25  A    That's --

1    Q    It wasn't the first -- 2014, but -- it wasn't

2         immediately, but it was in the teens, fair?

3    A    I believe so.

4    Q    So prior to Ms. Nelson's termination in 2022, there

5         were three to four years where you, Craig Butcher,

6         were the supervisor of supervisors, correct?

7    A    I was supervisor of supervisors.  Yes.

8    Q    At the time when you left the Utah position, how

9         many youth mentors and supervisors on both shifts

10        were there at that facility?

11   A    At what facility?

12   Q    The one in Utah.

13   A    When I left, how many employees were there?

14   Q    No.  I'm not asking for employees.  I want people

15        under you.  I want to keep it away from legal

16        stuff.  I just want a number of people that you

17        believed you had the ability to help coach, right

18        --

19   A    Yes.

20   Q    -- the ability to -- or the duty to make sure that

21        there were enough of them for the girls, right, and

22        the -- that you had the authority to fire them.

23        How many -- how many of those types of employees

24        were beneath you at the Utah facility?

25   A    To my calculation right now off the top of my head,

```
 1              seventy to ninety.
 2      Q       Seventy to ninety?
 3      A       Yes.
 4      Q       Okay.  And when North Carolina opened up -- or at
 5              the time -- or let's do when Ms. Nelson was
 6              employed.  Roughly how many employees were under
 7              your direct supervision that you had the ability to
 8              fire?
 9      A       My direct supervision?
10      Q       Supervisors and youth mentors, right?  That was it.
11              Is there anybody else that you could have fired?
12                    MS. LANGLEY:  Object to form.
13      Q       Could you have fired the cook?
14      A       I don't -- I don't believe so.
15      Q       Okay.  Approximately how many employees, night --
16              you know, night shift, day shift, floaters in
17              between?  How many?
18      A       As of the date 4-6?
19      Q       Uh-huh.
20      A       Approximately twelve to fifteen.
21      Q       And at any point between when you were promoted by
22              your family members --
23                    MS. LANGLEY:  Object to form.
24      Q       Who made the decision to promote you in Utah?
25      A       My interview consisted of a few directors.
```

1    Q    Okay.

2    A    I imagine it was a group decision.  Yeah.

3    Q    Before you were promoted in Utah -- or at the time

4         after you were promoted in Utah where you at one

5         point were supervising between ninety -- seventy to

6         ninety employees, right -- so there is the

7         beginning time -- to the point that you decided to

8         terminate Ms. Nelson after you met with her on

9         April 6, okay, that time period, all right, did

10        your -- did the directors -- the people above you

11        in the hierarchy at Three Points -- did they ever

12        tell you that there was something called employment

13        discrimination?

14   A    I don't recall being told that or having those

15        conversations.

16   Q    No one -- so did you ever have to go to any type of

17        training unrelated to the services -- when I say

18        "training," I don't mean the type of training that

19        Dr. Thibault and your father-in-law would be

20        responsible for leading.  I mean training just

21        about employment.

22   A    I don't recall the actual content of those, but I

23        remember meetings with HR to discuss HR stuff.

24   Q    When you say "HR," who are you talking about?

25   A    Well, if -- are we referencing my time in North

1          Carolina?

2     Q    We're going to do both.

3     A    Yeah.

4     Q    Do Utah first, 'cause that's where you were first,

5          please.

6     A    That would've been our HR director, a guy called

7          Selwyn.

8     Q    Selwyn.  Did -- at no point --

9     A    And Victoria.  I believe that changed.

10    Q    Okay.  And you don't remember at any point in time

11         while you had the authority to fire between seventy

12         and ninety -- you wouldn't do it all at once.  I

13         want to be clear, right?

14              While seventy to ninety employees were below

15         you in the hierarchy that you could terminate,

16         discipline any one of them, you -- don't you have a

17         master's degree?

18    A    I do.  Yes.

19    Q    How did you do in school when you were at the

20         soccer college in Iowa?

21    A    I did -- I did okay.

22    Q    What was -- what was your degree again?

23    A    In Iowa?

24    Q    Uh-huh.

25    A    It was sports and recreational management.

1    Q    Sports and recreational management.  Do you ever

2         remember taking any classes like -- not law -- like

3         law school classes, but, you know, just kind of

4         like about how government works or anything like

5         that?

6    A    I remember a few classes.

7    Q    How did you do?  What was your GPA in undergrad?

8    A    I believe I finished with a three-point-five (3.5),

9         I believe.

10   Q    With a three-point-five (3.5)?

11   A    Around there.  Yes.

12   Q    And then you went -- where did you go to master's?

13   A    I went to a place called Touro University.

14   Q    And I'm not going to enter a website at this point,

15        but I recall reading your profile on the

16        threepointscenter.com, the website.  Do you know

17        which website I'm talking about?

18   A    I'm aware of the Three Points website.  Yes.

19   Q    And there is a picture and everyone has got -- it's

20        like a circle picture and a bio description.

21   A    Yes.

22   Q    Is my recollection correct or incorrect that you or

23        your employer represented that you were pursuing a

24        therapy degree at North Carolina Central

25        University?

1    A    North Carolina Central?  That would be inaccurate.

2    Q    That's inaccurate?

3    A    Yes.

4    Q    North Central University.

5    A    North Central.  Yes.  That's a school out of -- an

6         online school out of Arizona, I believe.

7    Q    Okay.  I just want to confirm this, 'cause I added

8         a word in my head.  That's why I asked it in here.

9         All right.  So I'm looking at your former

10        employer's website, and it says, "Craig Butcher."

11   A    Yes.

12   Q    And then it says that you're currently pursuing

13        your master's degree in marriage and family therapy

14        at North Central University.  Is that where you got

15        your master's from?

16   A    No.

17   Q    Okay.  Where did you get your master's from again?

18   A    From Touro University.

19   Q    From Touro?

20   A    Yes.

21   Q    Okay.  So that's inaccurate?

22   A    Yes.  I started the process at that school.

23   Q    Okay.  So it just didn't update?

24   A    It's just not updated.  Yeah.

25   Q    And what happened here -- and I'll just -- I'll

Case 1:23-cv-00527-WO-JGM    Document 39-1    Filed 07/23/24    Page 259 of 296

1              just -- I thought 'cause you were in North

2              Carolina, you kind of took advantage of our school

3              system, and I just -- all right.  Thank you.

4                   All right.  So you have your master's

5              degree.  How did you do in that?

6         A    I did okay.  I believe I finished with a similar

7              GPA.

8         Q    What other -- I asked you if you had any training

9              about the regulations that are at issue in this

10             lawsuit.  What other trainings did you receive

11             while you were a group living director at either of

12             the facilities?

13                  MS. LANGLEY:  Can you be specific about what

14             you're looking for?

15                  MR. DAVIS:  Excuse me?

16                  MS. LANGLEY:  At any time whatsoever?

17                  MR. DAVIS:  No.  After -- once between --

18             any time -- 'cause he was only group living

19             director, and then up to program manager.

20        Q    What was the final one?

21        A    The assistant program director.  My final position

22             was therapist.

23        Q    Okay.  Let's go -- let's now go to assistant

24             program director.  How many people did you

25             supervise as assistant program director -- or

1           employees did you supervise?

2       A   Probably around the same.

3       Q   Okay.  When you got that promotion, you still had

4           no awareness that there were -- that there was

5           something called the Civil Rights -- Civil Rights

6           Act, which prohibits retaliating against an

7           employee for --

8               MS. LANGLEY:  Object to form.

9       Q   -- engaging in protected activity?

10      A   No.  I would lean on the expertise of my HR

11          director for things like that.

12      Q   Okay.  So just to -- you would lean on them for

13          that expertise, fair?  That's what you just

14          testified to?

15              MS. LANGLEY:  I believe you just asked him

16          if he knew of a specific statute.

17      Q   Well, I'm going to -- you testified that for those

18          types of matters -- which you don't know about and

19          didn't -- weren't trained in and didn't know about,

20          right?

21      A   What's your question?  Sorry.

22      Q   You testified that you would lean on HR, right?

23          Were you advised --

24      A   Yes.

25      Q   -- to come to HR to ensure that the employment

1          decisions you made did not violate state and

2          federal law?

3      A   Very often, yes.

4      Q   You would?  When you terminated Ms. Nelson, why did

5          you make the decision to not lean on anybody else

6          at that time?

7      A   I believe it was a situation that had been

8          discussed often, and so I felt -- I felt like me

9          letting HR know would have been kind of okay.

10         Like, they were aware of the accumulation of what

11         had gone on.  So it wasn't something I felt like I

12         had to check.  I was being fed in, I guess.

13     Q   And when you say "the discussion," are you

14         referring to a discussion between you and Ms.

15         Nelson or a discussion between you and HR?

16     A   I would -- when I say "discussion" in that context,

17         I was referencing myself and HR.

18     Q   Do you remember we looked at the summation?

19         Remember that one?  Can you go back to the time

20         sheets that have the color on them that I did?

21     A   Okay.

22     Q   Apologies for not remembering the exhibit.  The

23         ones you -- it's like 30 -- yeah.  31.  And then

24         pull 32 out, also, please.  These -- the

25         discussions that you had -- which type -- which

```
1              problems with Ms. Nelson are you referring to in
2              these discussions?  Punctuality or professionalism?
3       A      I think -- I think both.
4       Q      So you had already had the go-ahead to terminate
5              Ms. Nelson by which -- by which date during the
6              tenure of her employment?
7       A      I don't know.  I wouldn't say the go-ahead would be
8              the right -- the right use of language.
9       Q      What would be the right use of language?
10             Pre-authorization?
11      A      I'd say --
12                   MS. LANGLEY:  Object to form.
13      A      -- the understanding, possibly --
14      Q      The understanding that --
15      A      -- would be a good word.
16      Q      The understanding that you would terminate her
17             based on being one minute late?
18                   MS. LANGLEY:  Object to form.
19      A      I don't -- I don't think anyone was ever terminated
20             for one minute late.
21      Q      Can you look back at 32?
22      A      Yeah.
23      Q      I'll represent that we've gone through this.  But
24             just to remind you, the yellow highlights from
25             March 15th forward, okay --
```

```
 1     A     Yes.

 2     Q     -- those are the dates identified on Ms. Nelson's

 3           termination notice.  Do you have any reason to

 4           disagree with that right now?

 5                 MS. LANGLEY:  I would disagree with it,

 6           because it doesn't include the no-show date.

 7     Q     Okay.  With your attorney -- and you can -- when is

 8           the no-show date that --

 9                 MS. LANGLEY:  Looking at the 14 -- Exhibit

10           14, it was March 30.  Employee called out.

11                 MR. DAVIS:  Okay.  All right.  We can make a

12           note if you want to.  We can put that on there, but

13           I think it's in the record.

14     Q     The employee called out.  What does that mean to

15           call out?

16     A     To call out would be (unintelligible) to say they

17           can't come to work.

18     Q     Okay.  All right.  Those discussions that you had

19           with HR, when did -- when did they happen?  The

20           ones that you -- you said that the decision was

21           made after the April 6th meeting, correct?

22     A     Correct.

23     Q     You testified -- but are you testifying now that

24           you had discussions with HR about terminating Ms.

25           Nelson before the April 6th meeting?
```

1          MS. LANGLEY:  Object to form.

2     A    Sorry.  I don't believe that was your question.

3          Ms. Nelson's tardiness was brought up often.  It

4          was -- I mean, if you look at the times, it was a

5          constant reminder, right?  She was late often, and

6          that was a conversation that we had.  Yes.

7     Q    Okay.  So the thing that you're focusing on -- I

8          know your attorney said, you know, the callout.

9          But you keep focusing on she was late, she was

10         constantly reminded about being late, late.  Late

11         is different than a callout, correct?

12    A    Yes.

13    Q    Okay.  So March 15th, how many minutes late does

14         this -- does your company's time record show that

15         she was late?

16    A    Twelve.

17    Q    Twelve?

18    A    Yes.

19    Q    And then what are -- how many minutes beyond the --

20         was it like a five-minute kind of like grace

21         period?  What would you call it?  Safe zone?

22    A    I would say a grace period.

23    Q    Okay.  How many minutes after the grace period on

24         March 28th was Ms. Nelson late?

25    A    Past the five-minute grace period, it would have

1          been one additional minute.

2     Q   And I'm not going to do this in a deposition.  I

3          don't know if I could anymore.  Don't you think you

4          could hold your breath for one minute if you had

5          to?

6     A   For one -- I think I did hold my breath probably

7          about fifty times, right?  If you reviewed the

8          times, I held my breath a lot.

9     Q   You held your breath a lot.  But on that day,

10         literally one could probably have held their breath

11         for the amount of time that she was allegedly late?

12              MS. LANGLEY:  Object to form.

13    A   Yeah.  I don't know how long people can hold their

14         breath.  Sorry.

15    Q   And the 29th, what time did you get to work?

16    A   I don't recall.

17    Q   Did you have to clock in?

18    A   No.

19    Q   If you weren't there at seven-oh-six and if -- who

20         was her supervisor at this time?

21    A   It would have been Dan, I believe.

22    Q   I mean, I want to say if a tree falls in the forest

23         and no one is around, no one hears, right?

24              MS. LANGLEY:  Is that a question?

25    Q   How do -- yeah.  How do you even know that -- how

Craig Butcher 2-9-24

267

1          do you know that one minute past the grace period
2          really affected a single thing at the business?
3     A    I guess I wouldn't know.  I wouldn't know if it
4          affected it on that day or not.  I don't know.
5     Q    You've got two -- what was -- you got two
6          employees.  You got an employee.
7     A    Yes.
8     Q    One is great with the girls, one is not so good
9          with the girls.  One gets there at seven-oh-four
10         and one gets there at seven-oh-six.  Which employee
11         -- which employee is better for the girls?
12    A    Based off one time?
13    Q    I'm just making -- I mean, you were a manager,
14         right?  I mean, just thinking about policies, what
15         do you think matters more?
16             MR. CHANG:  Wait.  Objection to form.  He
17         asked a very specific clarification question, and
18         you just dodged it.
19             MR. DAVIS:  Okay.
20             MR. CHANG:  He said, "Just this one time?"
21    Q    Well, that's -- we will have our ability to deal --
22         but I mean in terms of right now, do you remember
23         earlier that the girls were the most important
24         thing?
25    A    So --

Pace Reporting Service, Inc.  919-859-0000      www.pacereporting.com

Case 1:23-cv-00527-WO-JGM   Document 39-1   Filed 07/23/24   Page 267 of 296

1     MS. LANGLEY: And I believe he said that

2   attendance was important for the girls, as well.

3   So might as well, like --

4  A  To answer --

5     MS. LANGLEY: -- accurately reflect his

6   testimony.

7     MR. DAVIS: Well, the record will reflect

8   what it is, and we can --

9  A  So to answer your question --

10    MR. CHANG: Wait. I just want to make sure

11   the witness -- do you believe you understand the

12   question?

13  A  I don't -- I don't feel like I understand the

14   question fully. Sorry.

15  Q  You don't? If there was a situation where you were

16   -- said, "We need to make some layoff decisions

17   because of finances" -- okay?

18  A  Yeah.

19  Q  All right. Reduction in force. No other types of

20   factors at play here that are, you know, race. I'm

21   not doing that. It's a pure example. It's just

22   that we just don't have enough money to pay another

23   youth mentor, and you've got to make that hard

24   decision. And you look at the performance

25   evaluations, and you've got -- it's down to -- it's

1          down to two.  There is one employee that was at

2          seven-oh-six -- seven-oh-six the past -- a few

3          days, you know, recently, and there is another

4          employee that are there there clocking in, but once

5          they're there, they're kind of clocked out, if you

6          know what I'm saying.  They're not really engaged

7          with the girls, they're not bringing you ideas,

8          they don't have any -- they don't connect with the

9          girls.  Would you recommend firing the employee

10         that's great with the girls or the one that got

11         there two minutes before?

12              MS. LANGLEY:  Object to your hypothetical.

13    A    In a situation in comparison of two staff, I would

14         keep a staff that is consistent, showing up to

15         work, being consistent, being there for the girls,

16         being on time, and being reliable.  I believe that

17         would trump a person who was possibly good with the

18         girls as of when she decided to come to work and

19         come on time.  Yes.

20              MR. DAVIS:  Okay.  I'm done.

21    CROSS-EXAMINATION BY MS. LANGLEY:

22    Q    Okay.  Mr. Butcher, did you know that Ms. Nelson

23         was black or African American when you hired her?

24    A    I knew that.  Yes.

25    Q    You hired her anyway?

270

```
 1    A    I did.  Yes.
 2    Q    You selected her to go to Utah for this transport
 3         of students back to North Carolina, correct -- one-
 4         time transport?
 5    A    Yes.
 6    Q    How many of the other youth mentors were wanting to
 7         go on that trip?
 8    A    There was a few.  I don't know the exact number.
 9         Sorry.  But a few mentors wanted to be
10         (unintelligible).
11    Q    More than the two you selected?
12    A    Yes.
13    Q    So you testified earlier that you thought that Ms.
14         -- well, Ms. Nelson and -- I believe it was
15         Christina who you selected?
16    A    Yes.
17    Q    That you had a good team.  Is that what you said?
18    A    Yes.
19    Q    Something like that.  All right.  What were your
20         criteria that you were looking for when you were
21         selecting the two youth mentors who would travel
22         with you?
23    A    Well, as a male staff transporting female students,
24         I needed female mentors.
25    Q    You needed female mentors?
```

1    A    I did.  Yes.

2    Q    Did Ms. Nelson's race have any factor in why you

3         selected her?

4    A    Her race?

5    Q    Yeah.  That she was black.

6    A    No.

7    Q    What were the races of the students who you were --

8         who were being transported -- transferred from Utah

9         to North Carolina?

10   A    I believe African American, Asian American, and

11        Hispanic.

12   Q    It was a mix of those three races?

13   A    I believe so.

14   Q    And I believe you said that there were four

15        students.  Is that right?

16   A    Yes.

17   Q    And I'm going to start at the top of my list and go

18        all the way through, so this may not all be in

19        order.

20             At any time have you ever been employed by

21        Three Points Center North Carolina, LLC and Three

22        Points Center in Utah at the same time?

23   A    At the -- no.

24   Q    All right.  There were some questions from Mr.

25        Davis to you about the process of how a youth

1          mentor would clock in.  And I want to focus your

2          attention right now on Three Points Center North

3          Carolina during the time that Ms. Nelson was

4          employed.  Okay?

5     A    Okay.

6     Q    All right.  So you mentioned that pretty early on,

7          a timeclock with a fingerprint mechanism was

8          installed.  Do you remember that?

9     A    Yes.  I remember.

10    Q    Where was the first timeclock located?

11    A    The first was located in the -- in the library.

12    Q    So when an employee pulls into the parking lot,

13         they are not working for you, are they?

14    A    No.

15    Q    And if they're walking down the sidewalk to the

16         library, they're not working, are they?

17    A    No.

18    Q    Okay.  So what is the first thing -- let's just

19         focus on when the timeclock was in the library.

20         What is the first thing that a youth mentor would

21         do to start working?

22    A    They would go to clock in.

23    Q    And is this something that you know that youth

24         mentors were trained on?

25    A    Yes.  I believe so.

1    Q    Did you personally observe that that was the

2         practice and instruction to youth mentors -- was to

3         sign in the timeclock first thing?

4    A    Yes.

5    Q    Did there come a time when the timeclock moved --

6         was moved physically?

7    A    Yes.  Yes.

8    Q    And where was it placed?

9    A    It was placed into the staff room located in the

10        dorms.

11   Q    In the dorms.  Okay.  So if you come into the

12        entryway of the door, is it locked or unlocked?

13   A    It would have been locked.

14   Q    All right.  And how would a youth mentor get into

15        the door?

16   A    They would've had a key.

17   Q    All right.  And once they open the door, from the

18        door, where was the timeclock?

19   A    From the door you were going in, it would be on the

20        right side of the door.

21   Q    How far away from the door?

22   A    From the front door, you had the dorm room door

23        fifteen feet, and the clock in the staff room was

24        ten, fifteen feet away from that.  So it was close.

25   Q    Now, where the students were, were they down near

```
 1            where the timeclock was?
 2     A      Yes.
 3     Q      They would be down there?
 4     A      Yes.
 5     Q      So would a youth mentor -- when they came in, was
 6            there anything else in that place where the
 7            timeclock was?
 8     A      No.
 9     Q      Nothing?
10     A      I don't believe so.  No.
11     Q      No lockers?  No anything?
12     A      No.
13     Q      From where that -- let me just ask from your
14            observation.  Would youth mentors go check in with
15            the prior shift youth mentors before they would
16            clock in?
17     A      Before clock-in?
18     Q      Correct.
19     A      No.
20     Q      They would not.  And why is that?
21     A      They're all trying to get paid, right?
22     Q      They wanted to get paid?
23     A      People would run to the clock-ins.  Yes.
24     Q      So they make a dart to the -- to the timeclock?
25     A      Yeah.  If people walk through the door at the same
```

 1              time, they would race to the timeclock to get

 2              clocked in first so they don't have to wait for

 3              each other.  Yes.

 4     Q     Let me invite your attention to -- one second.  Let

 5              me move on to something else for the sake of time.

 6              Yes, I do have that.

 7                     Let me invite your attention to -- in this

 8              stack -- this was marked as Plaintiff's Exhibit 13.

 9     A     Okay.  I have it.

10     Q     All right.  Now, I'm going to ask you a general

11              question about this form.  Was this form only used

12              by Three Points Center North Carolina for youth

13              mentors, or was it used for other positions, as

14              well?

15     A     I believe it was used for other positions, as well.

16     Q     Your focus were youth mentors and supervisors of

17              youth mentors.  Is that right?

18     A     That's right.

19     Q     As you look at this exhibit -- which it's labeled,

20              "Performance Assessment Non-exempt Employee."  And

21              you testified a bit about this, but I want to

22              clarify.  Do you remember meeting with the

23              plaintiff, Tyliya Nelson, on April 21 and

24              discussing this form, Exhibit 13?

25     A     On February 21?

1    Q    Shoot.  February 21.  I'm sorry.

2    A    I remember from today.

3    Q    Correct.  Do you remember meeting with her?

4    A    Yes.

5    Q    Now, you may not have emblazoned February 21 on

6         your brain, but do you remember meeting with her

7         and discussing her ninety-day evaluation?

8    A    Yes.  I believe I remember that conversation.

9    Q    Do you remember discussing with Ms. Nelson her

10        self-evaluation and comparing that to your

11        assessment?

12   A    Yes.  That would be something I like to do.

13   Q    And just for clarification -- so, for instance, if

14        we go to the first category, "Job knowledge," and

15        there is a checkmark by you "satisfactory," and

16        there is a grayed-in area, "very good."  What was

17        that grayed-in block?  Who put that there?

18   A    That was Ms. Nelson.

19   Q    And was that true throughout this ninety-day

20        evaluation form that for each of those sections,

21        Ms. Nelson with some sort of gray writing utensil

22        filled in a block and you put in a checkmark?

23   A    Yeah.  I utilized the checkmark.  Ms. Nelson is the

24        gray in the boxes.

25   Q    Do you see under "Dependability/reliability" --

```
1    A    Yes.

2    Q    You see that handwriting "Kind of both"?

3    A    Yes.

4    Q    Is that your handwriting?

5    A    No.  I don't believe so.

6    Q    Do you remember if that was Ms. Nelson's

7         handwriting?

8    A    I believe that's Ms. Nelson's handwriting.

9    Q    Under the "Attendance punctuality," do you see

10        where Ms. Nelson thought that she had very good

11        attendance and punctuality?

12   A    I see that.  Yes.

13   Q    And you wrote, "Satisfactory."  Do you see that?

14   A    Yes.

15   Q    You were starting to -- and I'm not sure if you

16        fully -- I just want to clear this up -- fully

17        testified why you -- why you assessed her as that

18        -- as satisfactory -- why you check marked

19        "satisfactory."

20   A    Right.  Let's see.  With Ms. Nelson, you had to be

21        -- to maximize her potential in everything, you had

22        to be very strategic in which you applied feedback

23        to Ms. Nelson.  And I believe the satisfactory is

24        -- as I said, she in numerous ways writes in how

25        much she would pick up shifts, which was helpful
```

         1              occasionally, too.  So it was more I didn't want to
         2              lose the help when she would provide it by coming
         3              in and saying "fail, unsatisfactory," 'cause she
         4              would -- if it was that direct, she would sulk,
         5              right?  She would sulk about things like that.  So
         6              I had to be very strategic in how I approached my
         7              feedback.
         8      Q       So you're saying she had a tendency to sulk
         9              whenever you or a supervisor gave her feedback?
        10      A       Yes.  It was -- yes.
        11      Q       Is that what you meant in the category above where
        12              it says, "Struggles with constructive feedback"?
        13      A       Yes, it would be.  Yes.
        14      Q       Do you -- let me ask you this.  You've testified
        15              about a lot of text messages between you and Ms.
        16              Nelson.  Do you remember text messages that --
        17              between the two of you where she would text and
        18              say, "I'm going to be late, Butch," or, "I can't
        19              come in today, Butch"?  Do you remember those?
        20      A       Yes.  There's a few of those -- a few of those.
        21      Q       Now, in those exchanges, if you remember, were you
        22              telling her it's okay to be late or it's okay not
        23              to come to work on time or as scheduled?
        24      A       No, ma'am.  I don't believe I ever told her it's
        25              okay to be late for work.

1    Q    There's one more thing I want to ask you about.

2           Let me just move it to -- it's easier with Exhibit

3           -- if you compare Exhibits 11 -- Plaintiff's

4           Exhibits 11 and Plaintiff's Exhibit 14, if you'll

5           take a look at those.

6    A    Okay.

7    Q    All right.  When you look at Plaintiff's Exhibit 11

8           -- and this was prepared by Dan, the supervisor.

9           Is that right?

10    A    Yes.  Sorry.

11    Q    Do you see after Ms. Nelson's name and the date

12           that it says, "Employee was late the following

13           dates in excess of fifteen minutes"?

14    A    Is this on No. 11?

15    Q    Yeah.  This is No. 11.

16    A    Yes.

17    Q    Now, you've referred to it as a grace period, the

18           -- you didn't consider someone actually late -- you

19           kind of gave them a grace period of five minutes to

20           get there, right?

21    A    Yes.

22    Q    All right.  Why do you know that Mr. -- I don't

23           remember his last name -- Geschwind -- Dan, the

24           supervisor, had fifteen minutes on Plaintiff's

25           Exhibit 11?

1   A      Well, I believe it was possibly my instruction to

2          Dan and possibly aimed to protect Ms. Nelson.

3   Q      You were trying to protect Ms. Nelson?

4   A      Well, yes.  I know if that wasn't my instruction,

5          Dan would have pulled up everything and that there

6          would've been a lot more than just three.  That's

7          for sure.

8   Q      Were there a lot more than three if this write-up

9          had covered every absence in excess of five

10         minutes?

11  A      Yes.  There would have been a lot more.  Yes.

12  Q      Why were you trying to protect Ms. Nelson?

13  A      I saw -- it's what I did some to develop my staff

14         that showed potential.  I care about my -- I care

15         about my staff.

16  Q      You care about your staff?

17  A      I do.

18  Q      So when you referenced in Exhibit 13 on page -- the

19         second page has 00050 on it.  Where it says, "Has

20         five documented violations clocking in five to

21         fifteen minutes late," that was a larger subset

22         that went to if she would have been five minutes or

23         more late.  Is that right?

24  A      Yes.  I believe so.

25  Q      Let me ask you something else about this.  On the

1           ninety-day evaluation, did you go back to the

2           absolute beginning of her employment for these five

3           documented violations, or were you looking at a

4           particular timeframe?

5      A    I don't recall the specific timeframe.  I don't

6           believe I went all the way back to the beginning of

7           her employment.

8      Q    I want to make sure that we are clear.  What was

9           the reason that Ms. Nelson's employment ended?

10     A    It would have been her tardiness.

11     Q    When you say "tardiness," do you mean just when she

12          was late, or did you factor in her absences --

13               MR. DAVIS:  Objection.

14     Q    If I can ask a question, did you factor in absences

15          or solely tardiness?

16               MR. DAVIS:  Objection.

17     A    Absences and no shows.

18     Q    All right.  Did -- if you were -- Mr. Davis asked

19          you some other questions about Ms. Nelson's overall

20          performance.  How would you -- were there other

21          issues that you as the group living director were

22          observing with Ms. Nelson's performance as of April

23          6th?

24     A    As of April 6th?  Yes.

25     Q    And what were those?

1    A    So upon the hiring of -- promotion of supervisors,
2         right, there is -- I definitely had no cooperation
3         to the supervisors.  Disrespectful, rude.  She
4         didn't get to know them and follow through with
5         what was asked of her.  And she did this
6         occasionally openly in front of students.  And
7         sometimes I had conversations with staff, you know,
8         threatening to leave because of the environment in
9         which she created.  So up until -- especially those
10        few weeks leading to that -- the months even --
11        very -- just created an environment that was not a
12        good workplace.  So really disrespectful.
13   Q    So let me ask this:  Did all of that factor into
14        why you terminated her, or was she terminated for
15        attendance?
16   A    It would have been a factor in the conversation.
17   Q    Did it factor in how much longer you wanted to put
18        up with someone who consistently was late --
19             MR. DAVIS:  Objection.
20   Q    -- or didn't work a schedule?
21   A    Yes.  It was -- as I said, I believe in the
22        conversation, it gets to the point where people
23        can't -- supervisors kind of -- like, "What are you
24        doing," right?  Like, I can't ignore
25        (unintelligible) --

283

```
 1      Q      Do you remember that group text that Mr. Davis
 2             showed you that was part of Plaintiff's Exhibit 35?
 3             It was toward the back --
 4                         (Crosstalk.)
 5      Q      Bottom numbers here.  So Exhibit 35, if we go
 6             toward the end of the document, at the bottom it
 7             says, "Nelson 00059."
 8      A      Yes.  I have it.
 9      Q      You were testifying a bit about this series of
10             texts on this page were -- began with a group text
11             from Ms. Nelson.  Do you remember that?
12      A      Yes.
13      Q      All right.  What do you remember about the initial
14             text that Ms. Nelson sent to the group?
15      A      I remember it being -- as you see in the message
16             there, there was -- I think included in that was
17             supervisors in that group.  I believe it was an
18             intent to indirectly call out some supervisors, if
19             I remember right.
20      Q      So she was calling out supervisors?
21      A      That's what I got from it when I read it.
22             Indirectly, yes.
23      Q      And is that why you responded the way you did that
24             "I'll assume this message is for me, as I'm the
25             only one who provides oversight of the
```

1          supervisors"?

2     A    Yes.

3     Q    On the next page of this exhibit that has 00059 --

4     A    Sorry.  Go ahead.  Yes.

5     Q    Do you see where you said, "T, let's meet at

6          eleven"?

7     A    I see that.

8     Q    You see that?  "Avery, let's meet at eleven-thirty.

9          Sharika, let's meet at noon."  Do you see that?

10    A    I see that.

11    Q    Do you remember what race Avery was?

12    A    I believe Avery was white.  Avery was white.

13    Q    When you said, "And of course this will be as your

14         boss and not your friend" -- do you see that?

15    A    Yes.  I see that.

16    Q    All right.  I believe you told Mr. Davis why you

17         selected that language, but I want it to be really

18         clear why you said, "I will be here as your boss

19         and not your friend."

20    A    That was in response to -- relation to how Ms.

21         Nelson had worded the previous message.

22    Q    And she said something to the effect, "You're my

23         boss and not my friend"?

24    A    She said -- yes.  I would say in that context.

25                   MR. DAVIS:  Are you reading -- objection.

1          That's not my recollection of the text.  Whose text

2          message says the friend?  That's not her.

3                    MS. LANGLEY:  I asked -- I asked him why he

4          used that phrase.

5                    MR. DAVIS:  Oh, because she said in the

6          previous message?

7                    MS. LANGLEY:  She said it in the previous

8          message --

9                    MR. DAVIS:  Sure.

10                    MS. LANGLEY:  -- that's not in this exhibit.

11                    MR. DAVIS:  My apologies.

12     Q    All right.  Do you ever call anyone other than Ms.

13          Nelson "Dude"?

14     A    Yes.

15     Q    Is it a phrase you use frequently?

16     A    Yes.

17     Q    What about "Bro"?

18     A    Bro is up there.  Yes.

19     Q    Is that kind of a linguistic style you have?

20     A    I think so.  Probably an annoying habit more than

21          anything, too.

22     Q    Did Ms. Nelson ever tell you not to call her "Dude"

23          or not to call you -- not to call her "Bro"?

24     A    Never.  No.

25     Q    Did -- in your employment with either Three Points

1        Center Utah or Three Points Center North Carolina,

2        were you familiar with a policy that said, "We

3        don't discriminate on the basis of race, sex,

4        gender, national origin, age," those sorts of

5        things?

6    A   I'm aware of the policy.  I could not -- I could

7        not --

8    Q   You couldn't --

9                    (Crosstalk.)

10   Q   As with an awareness of that policy, what did that

11       mean to you?  What did the policy mean to you?

12   A   Just to try and, I guess, uphold fairness, make

13       sure -- make sure job performance was a focus of

14       mine regardless of all those things.  Yes.

15   Q   When you say "all those things," you mean what

16       legally we refer to as protected categories?  But

17       race, gender --

18               MR. DAVIS:  Objection.  Objection.

19   Q   What were "all those things"?

20   A   Yeah.  So race, age, gender, those type of things.

21       Yeah.

22   Q   And you remember talking with the HR directors at

23       Utah and North Carolina to make sure you complied

24       with those -- that policy?

25               MR. DAVIS:  Objection.

1    A    That would be a practice of mine.  Yes.

2    Q    Let's take a look at Plaintiff's Exhibit 30.  And

3         I'm going to -- do I have the page folded?  No.

4         I've got to find it.  Here it is.  It's, I would

5         say, three-quarters of the way back, and it's Three

6         Points 000742.

7    A    Exhibit what?  Sorry.

8              MR. DAVIS:  30.

9    Q    Exhibit 30.  It looks like this has all the time

10        records.

11   A    742?

12   Q    742.

13   A    Go ahead.

14   Q    Okay.  I want you to look -- it's about a third of

15        the way down.  And do you see the entry for

16        "Nelson, Tyliya"?

17   A    Yes.

18   Q    All right.  And I want you to focus on the April

19        6th date.  Do you see that?

20   A    I do.

21   Q    Okay.  I believe you testified earlier that the

22        termination meeting with Ms. Nelson was around five

23        o'clock.

24   A    I believe so.  Yes.

25   Q    Do you see that she clocked out at seven-oh-five?

1    A    I see that.

2    Q    Do you know if she left after her termination

3         meeting?  Did she leave the premises?

4    A    The premises?  I believe she did not leave.

5    Q    She did not leave?

6    A    I don't believe so.  No.

7    Q    And how do you know that?

8    A    I believe I was made aware that she was, I believe,

9         sitting in the parking lot, I believe.  Sorry.

10        That's -- I know she was still onsite.  I made the

11        assumption of the parking lot.  But I know she was

12        still there.  I believe her supervisor Dan told me,

13        I believe.

14   Q    Just check my notes here.  Did Ms. Nelson ever --

15        did you ever make her stay after seven o'clock P.M.

16        on a regular shift?

17   A    Make her stay?

18   Q    Correct.

19   A    No.

20   Q    Did she have to stay late after seven o'clock P.M.?

21   A    No.  She did not have to.  No.

22   Q    How does that work, then?  If -- let's say someone

23        on the -- on the night shift has not arrived yet.

24        What were Ms. Nelson's options if she -- if she had

25        to leave right at seven or wanted to leave right at

1          seven P.M.?

2     A    She could -- she would utilize folks on staff.  She

3          could speak with a supervisor to step in, she could

4          communicate with someone to come and be with the

5          group so she could get off work.

6     Q    So she could have done that -- those things you

7          just --

8     A    Yes.

9     Q    -- you just stated?

10              Do you remember the -- let's go back to this

11         ninety-day evaluation meeting she had.  I believe

12         that was Exhibit 14.  And I want to compare that to

13         Exhibit 11.  Actually, that's the wrong one.

14         Exhibit 13.

15              MR. DAVIS:  And I'm going to help out to

16         help facilitate time.

17              MS. LANGLEY:  Thank you.  Exhibit 13

18         compared to Exhibit 11.

19              MR. DAVIS:  All right.

20              THE WITNESS:  Thank you for showing that --

21              MR. DAVIS:  It's all right.  We want to --

22         'cause I'm looking at the clock, and I'm just

23         getting -- starting to get a little -- I know

24         you're not running the clock out on me, but I'm

25         picturing --

1           THE WITNESS:  There we go.

2           MR. DAVIS:  -- this thing happening.

3     Q     So at two -- you met with Ms. Nelson -- this date

4           is February 21, 2022.  Do you see that?

5     A     Yes.

6     Q     And then if we compare this to Exhibit 11, you see

7           there are three entries that are noted where she

8           was -- this says late, but in excess of fifteen

9           minutes.  Do you see that?

10    A     Yes.

11    Q     All right.  The last entry, do you see that says

12          2022-02-21?  Do you know what date that would be in

13          that format?

14    A     In that format, I would understand it.  Yes.

15    Q     So what do you understand that date to be?

16    A     The 21st of February.

17    Q     So that was the same day that you have the ninety-

18          day evaluation?

19    A     Yes.

20    Q     All right.  And you see it says here, "Tyliya

21          Nelson left twenty-one minutes early with no

22          approval from supervisor"?  Do you see that?

23    A     Yes.  I see that.

24    Q     Did you approve Ms. Nelson to leave twenty-one

25          minutes late on the 21st of February 2022?  I mean

1          -- excuse me -- early.  I got to get this right.

2          Twenty-one minutes early with -- did you approve

3          her early departure?

4     A    No.  Not that I recall.  No.

5     Q    If you had approved it, would that time entry have

6          been on this corrective action form?

7     A    I don't believe so.  No.

8               MS. LANGLEY:  Those are my questions.  Thank

9          you.

10              MR. DAVIS:  All right.  I can -- I know we

11         said six.  I think it's -- if you said you're going

12         to leave and walk out at six, then I'll just have

13         to fall on my sword and be like, "Uh."  But I feel

14         like fifteen -- I can see fifteen.

15              MS. LANGLEY:  I'm just not going to agree to

16         have a witness have a -- for fifteen minutes.  I'm

17         just not going to agree to that.

18              MR. DAVIS:  Then what do we -- then what --

19         well, this is a different deposition, so it's off

20         -- we can go off now.

21              MS. LANGLEY:  I mean, do you want fifteen

22         minutes with him?

23              MR. DAVIS:  No, no, no.  I mean, no.  I'm

24         done.  I'm good.

25              MS. LANGLEY:  Okay.

1             MR. DAVIS:  Yeah.  No.

2             THE COURT REPORTER:  Before we go off the

3        record with his, if I can --

4             MR. DAVIS:  Yeah.  He's --

5             THE COURT REPORTER:  -- get your copy

6        orders.  Mr. Davis, what would you like?

7             MR. DAVIS:  Ask her first.  It's like --

8        'cause I'm thinking about something else.

9             MS. LANGLEY:  I'm going to have whatever I

10       ordered prior to this week.

11            THE COURT REPORTER:  We can do that.

12            MS. LANGLEY:  All right.

13            MR. DAVIS:  Can you --

14            MS. LANGLEY:  And he will read and sign.

15            THE COURT REPORTER:  Okay.

16            MS. LANGLEY:  All right.

17            MR. DAVIS:  What are the price differences

18       when you get something printed off and when you

19       don't get it printed off?  Or they always get

20       printed off?

21            THE COURT REPORTER:  So the regular and the

22       E-Trans are kind of one price.  If you wanted a

23       condensed paper copy, the four-to-a-page, that one

24       is extra.

25            MS. LANGLEY:  Let's go to the --

293

1          MR. DAVIS:  That's more, so I don't want

2     condensed.

3          THE COURT REPORTER:  Okay.  You just want a

4     regular and E-Trans?

5          MR. DAVIS:  Yeah.  Like, I need just like

6     the -- give me the standard.

7          THE COURT REPORTER:  We can do that.  All

8     right.  Thank you so much.

9     (Whereupon, the deposition was concluded at 6:00 P.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  STATE OF NORTH CAROLINA

2  COUNTY OF NEW HANOVER

3      I, Lisa S. Marion, a Notary Public in and for the State

4  of North Carolina, duly commissioned and authorized to

5  administer oaths and to take and certify depositions, do

6  hereby certify that on February 9, 2024, CRAIG BUTCHER, being

7  by me duly sworn to tell the truth, thereupon testified as

8  above set forth as found in the preceding 293 pages, his

9  examination being reported by me verbatim and then reduced to

10  typewritten form under my direct supervision; that the

11  foregoing is a true and correct transcript of said

12  proceedings to the best of my ability and understanding; that

13  I am not related to any of the parties to this action; that I

14  am not interested in the outcome of this case; that I am not

15  of counsel nor in the employ of any of the parties to this

16  action, and that signature of the witness was not waived.

17      IN WITNESS WHEREOF, I have hereto set my hand, this the

18  26th day of February, 2024.

19

20  _____

21  Notary Public

22  Certificate No. 200630000110

23

24

25

295

1                    CERTIFICATE  OF  WITNESS

2          I, _____, a witness in the above-entitled

3     action, do hereby certify that I have reviewed the foregoing

4     transcription of my deposition and have made corrections, if

5     any were deemed necessary, on the enclosed addendum.

6          Signed this the _____ day of _____, 2024.

7

8                                   _____

9                                   Craig Butcher

10    STATE OF _____

11    COUNTY OF _____

12    Sworn to and subscribed before me, this the

13    _____ day of _____, _____.

14    _____

15    Notary Public

16

17    My Commission Expires:

18

19

20

21

22

23

24

25

296

         E R R A T A   S H E E T

CASE NAME:  TYLIYA J. NELSON VS. THREE POINTS CENTER,

         LLC, ET AL.

CASE NO.   1:23-cv-527

DEPOSITION OF:  CRAIG BUTCHER

         Upon reading and examining my testimony as

    herein transcribed, I make the following

    corrections with the accompanying reason for same:

PAGE     LINE               REASON FOR CORRECTION
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

    Signed this the      day of          , 2024.


                    _____

                    Craig Butcher

lsm:  (2-9-2024)