IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 1:23-CV-00527


TYLIYA J. NELSON,                      )
                                       )
            Plaintiff,                 )
                                       )     D E P O S I T I O N
         v.                            )
                                       )            O F
THREE POINTS CENTER, LLC;              )
THREE POINTS CENTER NORTH              )     DR. N O R M A N
CAROLINA, LLC; THREE POINTS            )
PROPERTIES, LLC; THREE POINTS          )     T H I B A U L T
PROPERTIES NORTH CAROLINA, LLC;        )
THREE POINTS ACADEMY, INC., AND        )
THANE PALMER,                          )
                                       )
            Defendants.                )
--------------------------------

A P P E A R A N C E S:

For the Plaintiff:      Mr. Garrett L. Davis
                        Law Office of Garrett Davis, PLLC
                        555 S. Mangum Street, Suite 100
                        Durham, North Carolina 27701

For the Defendants:     Mr. Jimmy C. Chang
                        Ms. D. Beth Langley
                        Brooks, Pierce, McLendon,
                           Humphrey & Leonard, L.L.P.
                        Post Office Box 26000
                        Greensboro, North Carolina 27420


In Greensboro, N.C.     Reported by:
February 8, 2024        Peter J. Wylie

2

E X A M I N A T I O N   I N D E X

| Examination | By Whom | Page No. |
|-------------|---------|----------|
| Direct      | Davis   | 8        |
| Cross       | Chang   | 264      |
| Redirect    | Davis   | 267      |

3

E X H I B I T   I N D E X

| Exhibit No. | Description | Page Marked |
|---|---|---|
| Plaintiff's 1 | Notice of Deposition | 32 |
| Plaintiff's 2 | Three Points Academy Bylaws First Page and Various IRS Documents | 34 |
| Plaintiff's 3 | Screenshot from Three Points Academy Website | 47 |
| Plaintiff's 4 | Ad from The Daily Spectrum | 55 |
| Plaintiff's 5 | News Article re: Butts County residential treatment center | 60 |
| Plaintiff's 6 | Pages from NATSAP Website | 81 |
| Plaintiff's 7 | Photos of Entrances to Different Three Points Center Facilities | 106 |
| Plaintiff's 8 | Certificate of Organization of Three Points Onboarding, L.L.C. | 107 |
| Plaintiff's 9 | Application for Certification of Withdrawal of LLC | 115 |
| Plaintiff's 10 | Salt Lake Tribune Article on Three Utah Teen Treatment Centers | 142 |
| Plaintiff's 11 | Attendance Review/Corrective Action Dated 2-22-22 | 162 |
| Plaintiff's 12 | Employee Promotion Authorization Request | 164 |
| Plaintiff's 13 | TPC Performance Assessment | 167 |

Dr. Thibault

E X H I B I T   I N D E X

| Exhibit No. | Description | Page Marked |
|---|---|---|
| Plaintiff's 14 | Attendance Review/Corrective Action Dated 4-6-22 | 180 |
| Plaintiff's 15 | Three Points Center Mission Statement | 194 |
| Plaintiff's 16 | Lease Agreement | 197 |
| Plaintiff's 17 | Excerpts of LLC Agreement of Three Points Center, LLC | 205 |
| Plaintiff's 18 | TPC NC Employee Transaction Form | 218,221 |
| Plaintiff's 19 | Employee Appraisal Form Signed by Craig Butcher | 221 |
| Plaintiff's 20 | Attendance Review/Corrective Action Form for Kameron Ellis | 222 |
| Plaintiff's 21 | TPC's Non-Discrimination Policy | 224 |
| Plaintiff's 22 | TPC Equine Therapy and Horsemanship Program Release | 228 |
| Plaintiff's 23 | Residential Treatment Inspection Checklist | 229 |
| Plaintiff's 24 | Web Page Aerial Photo of TPC Chatham County Property | 235 |
| Plaintiff's 25 | Aerial Map of TPC Property with Buildings and Lots Marked | 240 |
| Plaintiff's 26 | TPC NC New Hire Form | 245 |

5

E X H I B I T   I N D E X

Exhibit No.            Description                  Page Marked

Plaintiff's 27        TPC Employee Handbook – Excerpt        254

Plaintiff's 28        Caption Page of Lawsuit               263

                      Involving Glenn Thibault

Plaintiff's 29        Article on Spanking Written           275

                      by Norman Thibault

6

1               S T I P U L A T I O N S

2          It is hereby stipulated and agreed between the

3     parties to this action, through their respective counsel of

4     record:

5          (1)  That the deposition of DR. NORMAN THIBAULT may

6     be taken on February 8, 2024, beginning at 10:29 A.M. in

7     Meeting Room 3 at the Hyatt Place Greensboro Downtown, 300 N.

8     Eugene Street, Greensboro, North Carolina 27401, before Peter

9     J. Wylie, a Notary Public.

10          (2)  That the deposition shall be taken and used as

11     permitted by the applicable Federal Rules of Civil Procedure.

12          (3)  That any objections of any party hereto as to

13     notice of the taking of said deposition or as to the time or

14     place thereof, or as to the competency of the person before

15     whom the same shall be taken, are deemed to have been met.

16          (4)  Objections to questions and motions to strike

17     answers need not be made during the taking of this

18     deposition, but may be made for the first time during the

19     progress of the trial of this case, or at any pretrial

20     hearing held before any judge of competent jurisdiction for

21     the purpose of ruling thereon, or at any other hearing of

22     said case at which said deposition might be used, except that

23     an objection as to the form of a question must be made

24     at the time such question is asked, or objection is waived

25     as to the form of the question.

1          (5)  That the witness reserves the right to read and

2     sign the deposition prior to filing.

3          (6)  That the sealed original transcript of this

4     deposition shall be mailed first-class postage or hand-

5     delivered.

6          (7)  That the witness was identified by a government-

7     issued photo ID.

8                         *  *  *  *  *

9     Whereupon,

10                    DR. NORMAN THIBAULT,

11                    having been first duly sworn,

12                    was examined and testified

13                    as follows:

14

15

16

17

18

19

20

21

22

23

24

25

1   DIRECT EXAMINATION BY MR. DAVIS:

2      Q     Good morning, Mr. Thibault.

3      A     Dr. Thibault.

4      Q     Dr. Thibault.  I think that's a great segue into

5             -- this may end up feeling like a conversation.

6             And just based on my investigation in the case,

7             I'm assuming someone in your position has had

8             many -- conversations are part of your job.

9             Right?  And I want to know -- would you like me

10           to call you Dr. Thibault for the remainder of the

11           deposition, or anything else?

12     A     Dr. Thibault is great.  Thank you.

13     Q     Dr. Thibault.

14     A     Thank you.

15     Q     All right.  Dr. Thibault, thank you for coming to

16           this deposition and reaching across the table to

17           shake my hand before we get started today.  There

18           are, you know, a lot of ground rules that some

19           attorneys like to set out and I think it's

20           important to do them.

21               I may not do all of them.  I may infringe

22           on one of them and your counsel may remind me

23           that I should or should not do that.  But the

24           ones that I remember are it may feel like a

25           conversation, and if you don't understand my

9

1    question, you can ask me: "I don't understand

2    that question." But if you do understand it and

3    you answer it, if you can just say "yes" or "no"

4    or provide a response as opposed to that. I'm

5    not saying that's going to be a problem, but

6    that's kind of how these depositions get started.

7         Another common expectation-setting

8    statement is it's not an endurance test. It will

9    take some time. There's a limit on it. If you

10   need to take a break, we can do that. But if

11   we're in the middle of a question or a line of

12   questioning, I would ask that, if possible, that

13   we try to finish that one.

14   A    Sure. May I make a statement to that?

15   Q    Absolutely.

16   A    I totally agree with the question thing. I do

17   take frequent restroom breaks. Probably about

18   once an hour, just out of practice, being a

19   therapist. At least I've conditioned myself that

20   way. Just to be transparent.

21   Q    Oh, noted.

22   A    Thank you, Mr. Davis.

23   Q    Because -- yeah. And with that said, just to

24   confirm, you are the CEO of Three Points,

25   correct?

1    A    I am the CEO of Three Points Center, LLC, in

2         Utah.

3    Q    Okay.  Three Points Center, LLC, is one of the

4         entities named in this lawsuit.  So is Three

5         Points Center North Carolina, LLC.

6    A    Uh-huh.

7    Q    Who is the CEO of Three Points Center North

8         Carolina?

9    A    In name, I am.

10   Q    What do you mean by "in name"?

11   A    Thane Palmer is the president of Three Points

12        Center North Carolina, and he has the final say

13        in that facility.

14   Q    Okay.  So as we get situated -- and I will try

15        not to think out loud at the risk of being

16        properly chastised as testifying.  But sometimes

17        I like to clarify, like with a paraphrasing

18        statement --

19   A    Sure.

20   Q    -- because that's a piece of information that I

21        had for later in my outline, and sometimes it's

22        best to just come out right now.  So Mr. Palmer

23        is the president and -- you said of the Three

24        Points North Carolina facility.

25   A    Yes, sir.

1    Q      Okay.  And if you could repeat yourself -- I'm

2           sorry -- it's in term of the operations, the kind

3           of -- the buck stops with him for the North

4           Carolina decisions?

5                  MR. CHANG:  Objection.  Go on.  You can

6           go ahead and answer.

7                  MR. DAVIS:  Yes.

8    A      Mr. Palmer is in charge of the North Carolina

9           facility.

10   Q      Okay.  And we may get into more detail, but when

11          you say in charge, hiring decisions?  Would that

12          constitute in charge?

13                 MR. CHANG:  Objection to form.

14   Q      Does Mr. Palmer make or approve all hiring

15          decisions for workers whose primary location is

16          the Three Points facility in North Carolina?

17                 MR. CHANG:  Objection to form.

18   A      I don't know that he -- sorry.

19                 MR. CHANG:  I'm sorry.  Go ahead.

20   A      I don't know that he approves all hiring

21          decisions.

22   Q      Okay.  So it's possible there may be somebody

23          else that could approve a hiring decision that

24          results in somebody -- an employee being

25          onboarded formally with the organization?

```
 1     A      Yes.

 2     Q      Okay.  What Mr. Palmer does with respect to the

 3            North Carolina facility, do you do the same exact

 4            role at the Utah facility?

 5     A      No.

 6     Q      Okay.  Who does what Mr. Palmer does in North

 7            Carolina in Utah?

 8     A      Kim Wilson.

 9     Q      Kim Wilson.  Okay.  Mr. Palmer, my understanding

10            is that he -- you're Dr. Thibault.  Mr. Palmer,

11            he's a -- has a master's in what?  What is his

12            educational credentials?

13     A      Family.  A master's in family and human

14            development with an emphasis in marriage and

15            family therapy.

16     Q      Does Kim Wilson have the same educational

17            credentials?

18     A      Yes.

19     Q      Okay.

20     A      Actually, no.  No.  Let me correct that.  She has

21            a master's in marriage and family therapy.

22     Q      Okay.  Prior to, let's say, the inception of the

23            Three Points facility in North Carolina, in terms

24            of an employee being hired, is it fair to say

25            that that would be November 2021 to the best of
```

1           your recollection?

2                    MR. CHANG:  Objection to form.

3      A    I'm not sure I understand the question.

4      Q    Let me rephrase it.  That was slightly awkward.

5           But the property in North Carolina was acquired

6           at some point.

7      A    Uh-huh.

8      Q    Okay.

9      A    Yes.

10     Q    That was in August of 2021 based on my review,

11          but is that about the time that you would recall

12          buying that property?

13                   MR. CHANG:  Objection to form.

14     Q    Who bought the property in North Carolina?

15     A    Three Points Center North Carolina Properties.

16     Q    Okay.  Do you believe that Three Points Center

17          North Carolina Properties acquired it legally,

18          the deeds, in the fall, late summer of 2021?

19     A    Yes.

20     Q    And then after that, that would have been when an

21          employee would have been hired because there

22          would have been no place to work without the

23          property.

24                   MR. CHANG:  Objection to form.

25     Q    Were employees hired after the property was

```
 1           purchased?

 2      A    Yes.

 3      Q    Okay.  So before the property was purchased, what

 4           was Mr. Palmer doing in Utah?

 5      A    Training.

 6      Q    Training.  Please be more -- training who?

 7           Training what?

 8      A    Training employees in operating at Three Points

 9           Center.

10      Q    Which Three Points Center facility did you refer

11           -- are you referring to right there?

12      A    Three Points Center Utah.

13      Q    Okay.  Was Kim Wilson doing the same role that

14           she is now in the summer of 2021 in Utah?

15      A    No.

16      Q    Who was doing what Kim Wilson does now in Utah?

17      A    Mr. Palmer.

18      Q    Mr. Palmer.

19      A    Uh-huh.

20      Q    Okay.  So is it fair to say that Ms. -- that

21           after the business decision was made by the Three

22           Points board of directors that Mr. Palmer was

23           either volunteered or given the task assigned to

24           get the Three Points North Carolina facility up

25           and running?
```

```
 1                    MR. CHANG:  Objection to form.
 2        Q        You can answer it.
 3        A        Okay.  Yeah.
 4        Q        If you understand the question.
 5        A        Oh, yes.
 6        Q        To get -- does Mr. Palmer permanently reside in
 7                 the State of North Carolina?
 8        A        Yes.
 9        Q        Okay.  Does he still maintain a permanent
10                 residence in the state of Utah?
11        A        No.
12        Q        No.  When did you meet Mr. Palmer?
13        A        Summer of 1994.
14        Q        The summer?  You guys go back.
15        A        We do.
16        Q        Let me just make this note real fast.
17        A        I like to say unfortunately, we do.  Yeah.
18        Q        It's on the record.
19        A        He'd say the same.
20        Q        Okay.  Mr. Palmer is a Defendant in this action.
21                 Are you aware of that?
22        A        Yes.
23        Q        Okay.  You met in 1994.  Where did you meet?
24        A        Logan, Utah.
25        Q        Logan, Utah.  I'll try to keep it -- was it under
```

```
 1                business circumstances, or were you just friends
 2                first?
 3        A       Academics.
 4        Q       Academics.  Had you had your Ph.D. -- when did
 5                you get your -- you said academics.  When did you
 6                get your Ph.D.?
 7        A       My Ph.D. I received in 2006.
 8        Q       Okay.  So when you say academics, did you guys go
 9                to college together?
10        A       We did.
11        Q       Which college?
12        A       Utah State University.
13        Q       Okay.  And let's just do a couple of these.
14                Would that have been your bachelor's or master's?
15        A       Master's degree.
16        Q       Okay.  Master's in what year?
17        A       Received in 1998.  We started in 1994.
18        Q       Okay.  Did he get his master's the same year, if
19                you recall?
20        A       I don't recall.
21        Q       That's all right.  But in the '90s?
22        A       Yes.
23        Q       So you were there -- were you also working at the
24                same time that you were getting your master's?
25        A       I was.
```

1  Q    You were.  Where were you working?

2  A    Cache Valley Detention Center.

3  Q    Okay.  Is that a -- what is Cache Valley

4       Detention Center?

5  A    A juvenile detention center for juveniles.

6  Q    It's a public facility?

7  A    A State facility.

8  Q    State facility.  Okay.  Did -- after you met Mr.

9       Palmer and you graduated, did you guys -- or

10      excuse me -- did you gentlemen continue to stay

11      in touch after graduating?

12 A    Yes.

13 Q    Did you ever work at the same places of

14      employment between when you graduated and when

15      you founded Three Points Center?

16 A    Yes.

17 Q    Can you identify all the places of employment

18      that you remember working with Mr. Palmer before

19      Three Points?

20 A    Yes.

21 Q    Okay.  Go ahead.

22 A    Cross Creek Manor.

23 Q    Okay.

24 A    Mills Counseling.

25 Q    And that's it?

1    A    Yes.

2    Q    Okay.  During discovery in this case, a document

3         was produced.  And I'm not going to put in

4         everything as an exhibit.  I'll just represent

5         that I believe what is on there.  I may get

6         pushback on it if I'm wrong.  Mr. Palmer's resume

7         was produced.  There's a place of employment

8         listed on there that's not in the short list that

9         you just provided me.  The Liahona Academy.

10   A    Yes.

11   Q    What is that?

12   A    It's a residential treatment center for

13        adolescent males.

14   Q    Okay.  So when Mr. Palmer was working at Liahona

15        -- and we're not going to try to pin down the

16        exact dates, but just general places and times

17        pre-Three Points -- where were you working?

18   A    I had a private practice.

19   Q    Okay.  All right.  And then, Dr. Thibault, when

20        did you start your private practice?

21   A    2005.

22   Q    Okay.  And you had your Ph.D. by -- did you have

23        your Ph.D. by then?

24   A    No.

25   Q    It was the next year?

```
 1     A      Yes.

 2     Q      Okay.  What was the name of your practice?

 3     A      The Family Life Therapy Center.

 4     Q      And was it in St. George?

 5     A      It was.

 6     Q      Okay.  And is that where you currently reside

 7            still?  The same --

 8     A      No.

 9     Q      Oh.  Where do you live now?

10     A      Washington, Utah.

11     Q      Is that close to St. George?

12     A      Yes, sir.

13     Q      How far is -- well, your current place of

14            employment.  Utah's big.

15     A      Yes, sir.

16     Q      Is it -- and Hurricane is where Three Points is

17            located in Utah, right?

18     A      Yes.

19                 MR. CHANG:  Objection to form.

20     Q      Okay.  So Mr. Palmer is at the Liahona Academy,

21            which -- and this is where I might say forgive me

22            if I misstep.  Please correct me.  I know there

23            are differences in the models between different

24            live-in residential treatment facilities and that

25            there are words -- I believe that there are words
```

```
 1              that I might say that you might say, no, we --
 2              that's not what it is.  Okay?
 3    A         Uh-huh.
 4    Q         Are Liahona and Three Points Center -- except for
 5              the male/female distinction -- are they the same
 6              type of facility?
 7    A         They are licensed the same.
 8    Q         Okay.  And I appreciate you adding that
 9              clarification.  So in terms of -- I don't want to
10              go down the licensing thing, but yeah, I'm going
11              to note it.
12    A         In one respect.
13    Q         Okay.
14    A         Three Points Center Utah has more than one
15              license.  Three Points -- Liahona, to my
16              knowledge, has one license.
17    Q         Okay.  I'm just going to pin that and keep it
18              with you and Mr. Palmer and then -- because I do
19              have some stuff about licensing.  And it's your
20              -- feel free to answer however you want to.
21    A         Sure.
22    Q         As you were in private practice, did you maintain
23              friendly communications with Mr. Palmer during
24              that time when you weren't working together
25              anymore on a day-to-day basis?
```

```
 1    A      Yes.
 2    Q      Did your private practice have a relationship
 3           with Mr. Palmer's employer, the Liahona Academy?
 4    A      No.
 5                MR. CHANG:  Objection to form.
 6    Q      Not a formal relationship, but were there any
 7           type of -- who were your primary -- let's see.
 8                The practice that -- let's go back to
 9           your practice.  Was it a general therapy
10           practice, or was it kind of specific like your
11           new business is, the adolescent, adopted teens,
12           or things of that nature?
13                MR. CHANG:  Objection to form.
14    Q      You can -- what was your practice like?
15    A      Family practice.
16    Q      And you know, I don't -- I haven't used one --
17           not that there's anything wrong with it.  I just
18           don't know what that means.
19    A      Sure.  I saw a broad variety of clients, mainly
20           marriages.
21    Q      Mainly marriages.  So it wasn't a teen-focused
22           practice?
23    A      Correct.
24    Q      Okay.  When did you become professionally
25           interested in unique mental health challenges
```

1              facing teens, if you will?

2    A    1996.

3    Q    Okay.  So while you were in school?

4    A    Yes.

5    Q    So you've always been interested in it?

6    A    Yes.

7    Q    Oh, and I should have -- I think at Cross Creek

8              Manor, that's what -- do you remember the years

9              that you worked at Cross Creek?

10   A    1996 to 2005.

11   Q    Okay.  And then the next one was Mills -- what

12             was the next place that you worked at with Thane?

13   A    Mills Counseling.

14   Q    Mills Counseling.

15   A    That was concurrent with Cross Creek Manor.

16   Q    Okay.  So just to summarize, you and Mr. Palmer

17             were in graduate school together at Utah State.

18   A    Yes.

19   Q    During graduate school and then after graduate

20             school you worked at -- you each worked -- you

21             both worked -- you were coworkers.

22                  MR. CHANG:  Objection to form.

23   Q    During and after graduate school, you were

24             coworkers at Cross Creen Manor.

25   A    Yes.

```
1               MR. CHANG:  Objection to form.  You can
2          answer if you understand; if there's a question.
3     A     Yes.
4     Q     Were you coworkers at -- all right.  We have to
5          figure out how we're going to work together and
6          they're holding me to the question -- the
7          question thing.  And I thought I could have --
8          ask leading questions, but I've just never been
9          called out on it this much.  Just to kind of move
10         things along.
11              But I will try to phrase everything as a
12         question, kind of like answering in Jeopardy.
13         Let me recalibrate.  I'm going to get some water
14         after our next break, too.
15              How is Cross Creek Manor different than
16         the Liahona Academy?
17    A     Can you be more specific?
18    Q     Well, I believe the Liahona Academy, teenage boys
19         live there, and go to school there, and are
20         supervised on a 24-hour -- 24-7 basis.  Is Cross
21         Creek Manor the same in that regard?
22    A     It was.
23    Q     Okay.  What was your -- what were your duties at
24         Cross Creen Manor?
25    A     I was a marriage and family therapist.
```

24

```
 1    Q      The -- and was it teenagers that lived at Cross
 2           Creek Manor?
 3    A      Yes.
 4    Q      Okay.  So I understand that the license -- the
 5           marriage part, the population served does -- they
 6           don't have to be married in order for you to
 7           provide therapy.  So who's married at Cross Creek
 8           Manor?  That's what I don't understand.
 9                  MR. CHANG:  Objection to form.
10    Q      Were you counseling the parents, too?
11    A      Yes.
12    Q      Okay.  All right.  I want to get a context of
13           your business, Dr. Thibault.
14    A      Sure.
15    Q      Okay.  Why did you leave Cross Creek Manor?  To
16           start your own private practice?
17    A      To start my private practice.
18    Q      Did Cross Creek Manor shut down before you
19           started your private practice?
20    A      No.
21    Q      No.  Okay.  Is Cross Creek Manor still operating
22           to your knowledge?
23    A      No.
24    Q      No.  Do you know why?
25    A      No.
```

1    Q    Did you have a -- were you just an employee of

2          Cross Creek Manor, or did you have an ownership

3          interest in it?

4    A    An employee.

5    Q    An employee.  All right.  All right.  I think it

6          might be time just to readjust my outline a

7          little bit.  I appreciate that information.  Tell

8          me about the founding of Three Points Center.

9                 MR. CHANG:  Objection to form.

10    Q    Are you the founder of Three Points Center?

11    A    I'm a founding owner.

12    Q    Who is the other founding owner?

13    A    Glenn Thibault and Thane Palmer.

14    Q    Okay.  Tell me about your brother Glenn

15          Thibault's role in the formation and founding of

16          Three Points.

17                 MR. CHANG:  Objection to form.

18    Q    What role did your brother have in founding Three

19          Points Center?

20    A    He organized shareholders to fund the business

21          when it was started, and operated as CFO.

22    Q    All right.  Now, when you say operated as CFO,

23          are you saying he was the CFO?

24    A    Yes.

25    Q    Who was the CEO at this time?

1          MR. CHANG:  Objection to form.  What
2      company are we talking about?
3          MR. DAVIS:  The one that Dr. Thibault and
4      his brother, Glenn, founded.
5    A     My brother was CFO and operated as CEO at Three
6          Points Center Utah, LLC, when it was founded.
7    Q     Okay.
8          MR. DAVIS:  Can you read back that last
9      answer so I can --
10         THE COURT REPORTER:  That he just gave?
11         MR. DAVIS:  That he just said about the
12     brother operating as the CEO.
13         THE COURT REPORTER:  I think that's what
14     he said, but I can go back.
15         MR. DAVIS:  Thank you.
16     (THE COURT REPORTER READS BACK ANSWER)
17   Q     (By Mr. Davis)  So when you say that -- how would
18         you like to refer to me -- to Glenn?
19   A     "Your brother" or "Glenn" works.
20   Q     Okay.
21   A     Yeah.
22   Q     When you say your brother operated as CEO, what
23         does that mean?
24   A     He handled all the business decisions and
25         deferred all the clinical to myself and Mr.

1          Palmer.

2     Q    During the time that your brother was operating

3          as CEO of the company, did you ever hold yourself

4          out to the public as the CEO of Three Points,

5          also?

6               MR. CHANG:  Objection to form.

7     Q    You can answer.

8     A    Not for the first two or three years.

9     Q    Was there ever a time that Glenn was holding

10         himself out as the CEO of Three Points and you,

11         Dr. Thibault, were also holding yourself out as

12         the chief executive officer of the same company?

13    A    No.

14    Q    No.  When did you become the CEO of Three Points?

15    A    To my best recollection, it was about 2018.

16    Q    Okay.  Did it -- was it a board decision to make

17         you the full-time CEO in 2018?

18    A    Yes.

19    Q    Yes.  How does the -- who are the members of the

20         Three Points board of directors?

21               MR. CHANG:  Objection to form.  Which

22         Three Points?

23    Q    The company that we've just been discussing.

24    A    The board of directors of Three Points Center,

25         LCC in Utah are Dr. David Anderson, Todd

1          Houghton, Thane Palmer, myself.  My brother was

2          on the board of directors until that time.

3   Q    Okay.  And when you say that time, are you

4          talking about 2018 when you were appointed?

5   A    I believe it was about 2018.

6   Q    Okay.  Are the boards of directors for the

7          company that you just told me that -- identified

8          the members of the boards of directors, are those

9          the same people and entities that are the board

10         of directors for all the other Three Points

11         entities that have been sued?

12   A    No.

13   Q    Can you identify any differences that you know?

14   A    Three Points Academy has an entirely separate

15         board of directors.  I'm not a member of that

16         board of directors.

17   Q    Was Three Points Academy founded, or incorporated

18         -- is it Three Points Academy, Inc.?

19   A    Yes.

20   Q    Was it incorporated at the same time that the

21         original Three Points was formed?

22            MR. CHANG:  Objection to form.

23   Q    You can answer.

24   A    I don't recall if it was the exact same time.

25   Q    When was the first time that the Three Points

1           Utah facility had a resident?

2      A    November of 2014.

3      Q    Okay.  Was education always provided as part of

4           the Three Points program?

5      A    Yes.

6      Q    Does the -- in this industry, or in your

7           business, in order for education to be provided

8           to the teen residents -- can I say -- may I say

9           residential treatment facilities --

10     A    Sure.

11     Q    -- to refer?  Okay.

12     A    Yes.  Thank you.

13     Q    At permanent, live-in, residential treatment

14          facilities does there have to be a separate

15          company, non-profit, to provide the educational

16          services?

17              MR. CHANG:  Objection to form.

18     Q    When you worked at Cross Creek, to the best of

19          your knowledge -- knowing that you were an

20          employee, not the CEO -- did they provide

21          educational services, you know, in-house, if you

22          will?

23     A    Yes.

24     Q    Did they have a separate academy, or was it just

25          Cross Creek?

1     A     They had a separate academy.

2     Q     They had a separate academy.  Okay.

3     A     I --

4     Q     Please.

5     A     Three Points Academy -- Three Points Center

6           provided educational opportunities through an

7           online service initially until Three Points

8           Academy came into operation.

9     Q     Okay.  And just one more on Three Points Academy.

10          Who -- or who made the decision to form Three

11          Points Academy?

12    A     My brother.

13    Q     Your brother did.  Do you remember -- did you

14          have discussions with him about it?

15    A     Yes.

16    Q     What were the reasons for doing it?

17    A     To provide educational opportunities for our

18          students.

19    Q     Three Points Academy; is it a non-profit

20          organization?

21    A     It is.

22    Q     Which of the entities on the -- Three Points

23          entities on the caption.  I mean, we've got Three

24          Points -- or Three Points, LLC; Three Points

25          Properties, LLC; Three Points of North Carolina,

1    LLC; and Three Points Properties of North -- or

2    Three Points North Carolina Properties, LLC.  The

3    four Three Points, LLCs and then there's the

4    fifth, Three Points Academy.  Which of those

5    entities does the tuition go to?

6         MR. CHANG:  Objection to form.  You got a

7    caption?

8         MS. DAVIS:  We've got as part -- here we

9    go.  Thank you.

10        MR. CHANG:  Dr. Thibault, this is a

11   caption, the top part.

12        THE WITNESS:  Oh, okay.

13        MR. CHANG:  That's a caption.

14   A    This is a caption.

15   Q    I'm sorry.  We looked at that caption all day on

16        Monday, and I didn't have it out for me.  Take

17        your time.  And the question is which of those

18        entities that are named as the Defendants -- and

19        you know, you don't have to consider Mr. Palmer

20        -- does money go to from parents?

21        MR. CHANG:  Objection to form.

22   Q    You can answer.

23   A    Three Points Center, LLC.  Three Points Center

24        North Carolina, LLC.  Yeah.

25   Q    Okay.  Let's do that as Exhibit 1.  Can we do

1          that as Exhibit 1?

2          (PLAINTIFF'S DEPOSITION EXHIBIT NO. 1

3              MARKED FOR IDENTIFICATION)

4              MR. CHANG:  You got more copies?

5              MR. DAVIS:  No.  I -- it's just the

6     notice.

7              MR. CHANG:  Okay.  You've got copies of

8     other exhibits though?

9              MR. DAVIS:  I do.

10             MR. CHANG:  Okay.  So, Dr. Thibault --

11    Mr. Davis, do you mind if I explain to him what

12    an exhibit is?

13             MR. DAVIS:  Take your time.  I was

14    looking at the calendar to see if I wanted -- it

15    was time for --

16             MR. CHANG:  Okay, yeah.  This could be a

17    good time if you need a break.  But these are

18    exhibits, paper exhibits for your deposition.  So

19    the court reporter just marked this as Number 1.

20             THE WITNESS:  Okay.

21             MR. CHANG:  Okay.  This is -- this one's

22    going to go to the court reporter.  It'll be an

23    exception to the case.  But we will have copies

24    for you.

25             THE WITNESS:  Okay.

1          MR. CHANG:  And you will have your stack.

2      Mr. Davis will have his stack.  But with this

3      exhibit, we're just going to give it to the court

4      reporter today.

5          THE WITNESS:  Okay.

6          MR. DAVIS:  Hey, do you -- can we go off

7      the record just for a second?

8          THE COURT REPORTER:  Going off at 11:00.

9          (TEN-MINUTE RECESS)

10         THE COURT REPORTER:  Okay.  We're back on

11      the record at 11:10.

12  Q    (By Mr. Davis)  Okay.  Hello again, Dr. Thibault.

13      I think where we left off before that break was I

14      asked you which of the entities on the caption --

15      on Exhibit 1 do the parents pay tuition to.  And

16      I believe you testified -- please correct me if

17      I'm wrong -- it's Three Points Center, LLC, and

18      Three Points Center North Carolina, LLC.

19      Correct?

20  A    Yes.

21  Q    And just to confirm, is that -- the parents whose

22      children are at the Three Points facility in

23      Chatham County, they pay Three Points Center

24      North Carolina?

25         MR. CHANG:  Objection to form.

1    Q        I know it's -- sometimes what seems obvious, and

2             I would never ask you in a conversation, I want

3             to ask for this deposition.

4    A        Okay.

5    Q        So if Three Points Center North Carolina is

6             getting money from a parent whose child is one of

7             your students or residents, that premise -- do

8             you understand that premise?

9    A        Yes.

10   Q        If their child is at the facility in North

11            Carolina, their tuition dollars go to a bank

12            account for Three Points Center North Carolina?

13   A        Yes.

14   Q        Okay.  Now, I'm going to hand you Exhibit 2 and

15            pass one to my counterpart.

16            (PLAINTIFF'S DEPOSITION EXHIBIT NO. 2

17                 MARKED FOR IDENTIFICATION)

18   Q        The first page is just one of the documents

19            produced in discovery.  I'll represent that it is

20            the -- just the first page of Three Points

21            Academy's bylaws.  I have not included the rest

22            of them because I'm simply introducing it to

23            provide a framework for this discussion.

24   A        Okay.

25   Q        That's identified as Three Points Center -- let

1              me find mine actually in here real fast.  I'm

2              going to have my order a little bit off.  It's

3              Three Points Center 309 from their discovery.

4              Okay?  And then I'll represent that the next

5              pages -- if you can turn to them.

6                        I'll represent that the next pages are

7              documents that are available on the Internal

8              Revenue Service's website that can be downloaded

9              for entities that have non-profit status.  I've

10             highlighted some records for your -- to draw your

11             attention to it.  Do you see where it says

12             program service revenue, line item nine?  Well,

13             actually, let's start at the top.  Can you

14             identify the name of the organization on this

15             form?

16    A        Three Points Center Academy.

17    Q        And what is the year up in that right corner?

18    A        2017.

19    Q        Okay.  And that Three Points Center Academy,

20             that's the one we've just been talking about?

21    A        We -- I'm not sure I understand.

22    Q        Can you look back at the first page of this

23             exhibit for me?

24    A        Uh-huh.

25    Q        What is the name of the entity who's a non-profit

1          corporation that you're looking at?

2     A    Three Points Academy.

3     Q    Okay.  Can you now turn to the second page, the

4          first IRS form?  What does it say?

5     A    Three Points Center Academy.

6     Q    Are they -- is there another non-profit besides

7          Three Points Center, or could that just be a

8          typo?

9               MR. CHANG:  Objection to form.  Don't

10         speculate.

11    A    I do not know.

12    Q    Let's -- this may help on this one.  Can you go

13         down to the bottom where it says -- or towards

14         the bottom where it says, "Sign here," and it

15         says, "Glenn Thibault, President."

16    A    Yes.

17    Q    Was -- to the best of your knowledge, was he the

18         president of two non-profit organizations that

19         provided educational services to your residents,

20         or just one?

21    A    Just one.

22    Q    Okay.  All right.  Can you look at the line-item

23         nine where it says revenue, program service

24         revenue?

25    A    Yes.

1    Q    Do you see where I've highlighted in pink?  It

2         says 4,896,759 --

3    A    Yes.

4    Q    -- dollars.  How did money get into this

5         non-profit entity?

6              MR. CHANG:  Objection to form.

7    Q    If the parents didn't pay the educational

8         non-profit, why do -- what is the source of their

9         program service revenue?

10   A    Three Points Academy received revenue for

11        providing educational services for students of

12        Three Points Center, LLC.

13   Q    How did the money get to Three Points Academy's

14        bank account?

15             MR. CHANG:  Objection to form.

16   A    I don't know.

17   Q    How was the money transferred?  From which --

18        directly from the -- did the parents pay Three

19        Points Academy?

20   A    I don't believe so.  No.

21   Q    Okay.  And that's potentially a follow-up

22        question then for discovery.  All right.  I'm

23        going to turn a few pages over to where there's

24        2018.  You see at the top.  And I appreciate you

25        identifying the difference between page one of

1          this exhibit and these forms.  Do you see where

2          it says "Name of Organization"?

3    A     Yes.

4    Q     What is the address of Three Points Center

5          Academy?

6    A     On this form?

7    Q     Uh-huh.

8    A     1068 Cypress Way, Castle Rock, Colorado 80108.

9    Q     Is that -- was that your brother's personal

10         residence?

11   A     Yes.

12   Q     On program service revenue, I know your testimony

13         was that the parents did not pay Three Points

14         Academy or Three Points Center Academy, correct?

15   A     Yes.

16   Q     So in order for Three Points Academy to get

17         program service revenue, did that money -- was

18         that money passed through from one of the Three

19         Points entities that did receive the parent money

20         or the tuition money?

21              MR. CHANG:  Objection to form.

22   A     I'm not sure what you're asking.

23   Q     How did -- I think you can -- how did Three

24         Points Center Academy, at least according to this

25         form, generate $5.833 million of program service

1           revenue in tax year 2018?

2      A    Three Points Academy provided educational

3           services for students at Three Points Center,

4           LLC.

5      Q    But where did the money come from, Norm -- Dr.

6           Thibault?  My apologies.

7      A    From tuition that was received.

8      Q    By the other Three Points entities?

9                MR. CHANG:  Objection to form.

10     Q    By the Three Points entities that you just

11          identified when we did the caption exhibit?

12     A    Yes.

13     Q    All right.  Let me ask you this.  That's -- so

14          just to confirm, the parents -- let's do Utah.

15          So it's two -- 2018, there was no North Carolina

16          facility, correct?

17     A    Correct.

18     Q    So Three Points Center Academy would only be

19          providing educational services to residents of

20          the Hurricane, Utah facility, correct?

21     A    Correct.

22     Q    How many students, if you -- roughly were at

23          Three Point's Utah facility in 2018?

24     A    I don't recall the exact number.

25     Q    Has the capacity changed from 2018 to the

1          present?

2                    MR. CHANG:  Objection to form.

3      A   Yes.

4      Q   Okay.  What is the capacity of the Utah facility

5          now?

6      A   Eighty-eight.

7      Q   Okay.  So in 2018, is it fair to say that there

8          were fewer than 88 students whose parents paid

9          Three Points Utah tuition?

10     A   Yes.

11     Q   And then that tuition money came out of Three

12         Points Center Utah's bank account and then went

13         into Three Points Center Academy's bank account.

14                   MR. CHANG:  Objection to form.  If you

15         understand, go ahead.

16     A   Yes.

17     Q   Yes.

18     A   I believe so.

19     Q   Are you -- right now, are you the -- with your

20         brother's passing -- and I may have forgotten;

21         are you the CEO of Three Points Center Academy?

22     A   No.

23     Q   Who is?

24     A   There is no Three Points Center CEO.

25     Q   Okay.

1    A     Excuse me. There is no Three Points Center

2          Academy CEO.

3    Q     All right. What is the entity that exists now

4          that is an academy? What's the name? Is it the

5          one that was on the Exhibit 1? Was it identified

6          correctly?

7    A     There is Three Points Center -- excuse me. There

8          is Three Points Academy.

9    Q     Three Points Academy. Does Three Points Academy

10        have a bank account?

11    A     I believe so.

12    Q     Where?

13    A     Colorado.

14    Q     With what bank?

15    A     Guaranty Bank.

16    Q     Guaranty Bank. Okay. Can you turn to the --

17        turn a few pages over and look? When you see

18        2021 at the top, "Open to Public Inspection,"

19        stop there.

20    A     Uh-huh.

21    Q     Okay. What is the name of the organization on

22        this form?

23    A     Three Points Academy.

24    Q     Okay. And what – can you see it? Go down to

25        "Sign Here."

1    A    Uh-huh.

2    Q    What is the signature date on this tax form?

3         It's over to the right.

4    A    09-24-22.

5    Q    When did your brother pass?

6    A    October of 2021.

7    Q    Did you e-sign or provide your accountant the

8         authority to submit this form to the IRS?

9    A    No.

10   Q    Did you -- you did not?  Is that your name in the

11        "Sign Here" box?

12   A    Yes.

13   Q    If you didn't sign or provide the authority, then

14        how did your name get on this form?

15   A    That was a mistake.

16   Q    Tell me how -- tell me about how it was a

17        mistake.

18   A    I was not a member of the board of Three Points

19        Academy at that time.  We had switched

20        accountants.  She was filling in for a previous

21        accountant who had also passed away when my

22        brother passed, and was taking care of the

23        documents for us.

24   Q    If that was a mistake, who should have signed

25        this form?

1    A    LuAnne Forrest.

2    Q    LuAnne Forrest.

3    A    Uh-huh.

4    Q    And what is her title?

5    A    She's the director of Three Points Academy.

6    Q    Okay.  Who pays LuAnne Forrest's salary?

7    A    Three Points Academy.

8    Q    Three Points Academy.  Can you turn over to the

9         next page?  Do you see where it says number two,

10        LuAnne Forrest?

11   A    Yes.

12   Q    It says member.  You're a member.  Who is Bruce

13        Kellogg?

14   A    He is a member of the board of directors.

15   Q    Okay.  Do you see where it says reportable

16        compensation from the organization, W-2, 1099?

17   A    Uh-huh.

18   Q    Column D.

19   A    Uh-huh.

20   Q    I believe your testimony was that Ms. Forrest was

21        paid by Three Points Academy, wasn't it?

22   A    Yes.

23   Q    What is the number in the row with Ms. Forrest's

24        name for her compensation from Three Points

25        Academy?

1      A      Zero.

2      Q      So is that a mistake, too?

3      A      I believe so.

4      Q      Okay.  Do you see the next column, column E?

5      A      Yes.

6      Q      It says, "Reportable compensation from related

7             organizations."

8      A      Yes.

9      Q      What organizations are related to Three Points

10            Academy?

11                 MR. CHANG:  Objection to form.

12     A      Define "related."

13     Q      Do you know what related means?

14     A      I'm asking.

15     Q      Do you -- I'm asking.  I know you're asking me,

16            but --

17                 MR. CHANG:  Objection to form.  If

18            they're related on a -- the tax form --

19                 MR. DAVIS:  Okay.

20                 MR. CHANG:  -- what does related mean

21            when you fill out this tax form?

22                 MR. DAVIS:  I want to go off the record

23            for this one.

24                 MR. CHANG:  Wait, wait, wait.  I don't

25            agree to go off the record.

1        MR. DAVIS:  I'm talking about a ground

2        rule that I -- I'm talking about the -- you asked

3        the question.  I don't want to do that.  So I'm

4        not going to -- we're not going to ask about any

5        of this stuff.

6   Q    (By Mr. Davis)  You're ask -- remember that part

7        in the ground rules, it feels like a

8        conversation?

9   A    Uh-huh.

10  Q    And you're asking me questions.  Sometimes I've

11       seen -- and at the end of the deposition, what I

12       do is, like, I ask the questions here.  But it is

13       kind of one of the rules.  Okay?  So if you --

14       MR. LANGLEY:  You said if he didn't

15       understand the question, he could tell you.  So

16       he didn't understand your question.

17       MR. DAVIS:  I know.  But then I --

18       MS. LANGLEY:  He can do that.

19       MR. DAVIS:  I know.  But then I said do

20       you not know what the word related means?  So at

21       some point --

22       MS. LANGLEY:  You are asking on a tax

23       form --

24       MR. CHANG:  Yeah.  What are related

25       organizations.

1                    MS. LANGLEY:  --which has IRS-specific --

2                    MR. DAVIS:  I will --

3                    MS. LANGLEY:  -- regulations.  So of

4        course he can ask you that, Garrett.

5                    MR. DAVIS:  All right.  That's fine.  And

6        I won't take us off the record again without

7        connecting.

8    Q     (By Mr. Davis)  Okay.  Dr. Thibault, I was -- you

9        asked me after I asked you a question about what

10       "related" is.  We were looking at calling me on

11       this tax form.  You ask me what "related" meant.

12       Are there any organizations that are affiliated

13       with Three Points Academy?

14                  MR. CHANG:  Objection to form.

15    A     I don't understand the legal definition of

16       affiliated.

17    Q     I'm not asking for a legal definition of

18       affiliated.  I'm just asking for the plain

19       meaning of the term.  What does affiliated mean

20       to you?

21    A     Again, I -- that can be such a nebulous term.

22       McDonald's and Wendy's are affiliated by the type

23       of food they offer.  I don't know.

24    Q     Let's keep them together.  I'll just label them,

25       too.  I'm going to put little page numbers on

1          this one because there's like four, but I want to

2          skip to number three.  I'm going to hand you

3          Exhibit 3.

4          (PLAINTIFF'S DEPOSITION EXHIBIT NO. 3

5              MARKED FOR IDENTIFICATION)

6     Q    Can you turn to page three of Exhibit 3 --

7     A    Yes.

8     Q    -- that I just marked?

9     A    Yeah.

10    Q    I'll represent that this is a screenshot of the

11         Three Points Academy website taken prior to this

12         deposition.

13              MR. CHANG:  Objection to form.

14    Q    Does this image of a website appear to be what

15         the website looks like for Three Points Academy?

16              MR. CHANG:  Objection to form.  This says

17         Three Points Center on it.

18              MR. DAVIS:  No.  Go to the third page,

19         Jimmy.

20              MR. CHANG:  Oh, the third page.  I'm

21         sorry.

22              MR. DAVIS:  Yeah.  No problem.  That's

23         why I labeled them for Dr. Thibault.

24    Q    Are you on the third page?

25    A    Yes, sir.

1    Q    Do you see where it says at the top Three Points

2         Academy?

3    A    Yes, sir.

4    Q    And do you see it in the URL?  It says

5         threepointsacademy.com.

6    A    Yes, sir.

7    Q    All right.  Now, it's difficult to read here, but

8         I've done a zoom in on page four.  Do you see the

9         -- there's a phone number box?  It says, "Learn

10        about enrollment," and then there's, like, a

11        little banner hanging down.  Can you read the

12        words on that banner for me?

13   A    "Affiliated with Three Points Center."

14   Q    So is it fair to say based on your company's

15        website that Three Points Academy is affiliated

16        with Three Points Center?

17   A    Yes.

18   Q    Now can you -- we're back on the tax form.  At

19        that column D, column E, 2021.  Now you said that

20        the fact that LuAnne Forrest didn't have any

21        reported compensation for the entity was a

22        mistake, correct?

23   A    I believe it is.

24   Q    You believe it is.  Who are you compensated by in

25        terms of -- well, do you receive wages, or do you

1          only receive profit distributions?

2     A    I'm an employee of Three Points Center, LLC,

3          Utah, and receive wages.

4     Q    You receive wages.  Okay.  All right.  Do you

5          receive any wages from Three Points Academy?

6     A    How are you defining wages?

7     Q    The way that you just -- remember when you

8          answered my question that you received wages from

9          Three Points Center, the Utah one?

10    A    Yes.

11    Q    Whatever understanding of wages that you had when

12         you answered that question, that's what I want to

13         know.

14    A    No, I do not.

15    Q    You do not.  If you look at the column E for your

16         name under reportable compensation from, quote,

17         "Related Organizations" -- I'm not going back

18         there, Dr. Thibault -- what is the number next to

19         it for your name?

20    A    Zero.

21    Q    But you do receive compensation from an

22         affiliated organization, correct?

23    A    Which organization are you referring to?

24    Q    The one that we looked at in Exhibit 3 on page

25         three.

50

```
 1    A       I'm not trying to be obtuse.  I'm a little
 2            confused at your question.
 3    Q       Can you turn back to page three --
 4    A       Yes.
 5    Q       -- of that exhibit?  Actually, turn to page four.
 6    A       Yes.
 7    Q       Do you see the words under the logo where it says
 8            Three Points Center?
 9    A       Yes.
10    Q       Is that where -- is that the entity that pays you
11            the wages that we just identified, or you just
12            identified?
13    A       Yes.
14    Q       Okay.  All right.  Okay.  You are aware that this
15            is a case that revolves around employment
16            generally, just to kind of switch gears for us.
17    A       Yes.
18    Q       When was the first time that you were an
19            employer?
20                    MR. CHANG:  Objection to form.
21    Q       When was the first time that you had a
22            supervisory role over an employee, but you were
23            still an employee?
24    A       At which company?
25    Q       Let's -- we won't go back further than Cross
```

1          Creek.  During your time at Cross Creek between

2          1996 and 2005, were you ever an -- did you ever

3          have a supervisor role?

4     A    No.

5     Q    No.  So the therapy that you provided, you were

6          like a staff clinician?  Almost like -- I mean

7          like a staff doctor or a staff nurse?

8     A    Yes.

9               MR. CHANG:  Objection.

10    Q    Is that a fair way to characterize your place at

11         -- who did you report to at Cross Creek then?

12    A    The program director.

13    Q    The program director.  All right.  When you were

14         at Cross Creek Manor, did you ever hire anybody?

15    A    No.

16    Q    Okay.  Did you ever fire anybody at Cross Creek

17         Manor?

18    A    No.

19    Q    Did you ever recommend that somebody be fired

20         from Cross Creek Manor?

21    A    I don't recall.

22    Q    At Cross Creek Manor, can you remember any

23         situations generally where you thought an

24         employee of that residential treatment facility

25         should be fired for what they did?

1  A    Not specifically, no.

2  Q    When you started your private practice -- what

3       was the name of it again?

4  A    The Family Life Therapy Center, PC.

5  Q    Did it start with just you, or did you bring an

6       employee with you?

7  A    Just myself.

8  Q    Did you -- was it always just you, or did you

9       ever hire employees?

10 A    Just myself.

11 Q    Just yourself.  So between the -- 2005-'06 and

12      the founding of Three Points in 2014, you just

13      worked for yourself.

14 A    I also worked for a young adult treatment

15      program.

16 Q    Which one was that?

17 A    At the Crossroads.

18 Q    Okay.  When did you start work there?

19 A    2008, I believe it was.

20 Q    Okay.  Did Mr. Palmer work there with you?

21 A    No.

22 Q    Okay.  Is it a live-in residential treatment

23      facility?

24 A    Yes.

25 Q    Is it a fair statement to say that there's a

1          relatively higher concentration of these

2          residential treatment facilities in Utah than in

3          other states?

4               MR. CHANG:  Objection to form.

5     Q    You can answer if you understand the question.

6               MR. CHANG:  Yeah.

7     A    Yes, I believe so.

8     Q    Based on your experience in this industry, why is

9          that?

10    A    As I understand it, the laws in Utah are very

11         friendly to parents and parental rights.

12    Q    And one follow-up question on that.  What do you

13         mean by that?  And please add another level of

14         detail.  And if I need another one, I'll ask.

15    A    In many other states, the laws of consent for

16         treatment are much younger for children.

17         Therefore they can walk out of treatment on their

18         own volition.  Whereas in Utah, parents can have

19         their children be in treatment.  Parental

20         consent.

21    Q    Okay.  So is it an age-based -- I'd like to do a

22         -- would you mind doing an example for me, or

23         else I'll -- they might make me pull one out.

24         Like, can you just provide an example of

25         practically what that looks like?

1    A    In Oregon, the age of consent is 13.  Meaning a

2         13-year-old can make medical decisions for

3         themselves and decide that they don't want

4         treatment, and can walk out, and their parents

5         have no recourse.

6    Q    Okay.  And then in Utah, same thing.  What's the

7         age?

8    A    Eighteen.

9    Q    Eighteen.  Okay.

10   A    As in North Carolina.

11   Q    And does that -- because of those difference in

12        the laws does that mean that parents who have

13        troubled teens in other states with, let's say,

14        Oregon, for example --

15   A    And --

16   Q    -- can bring their -- can send their kids to Utah

17        and not have to face those same laws?

18             MR. CHANG:  Objection to form.

19   A    I really take offense to "troubled teens."  These

20        are young people who have been traumatized; who

21        have been abused; who have been adopted; who come

22        from quite deleterious situations.  And so I do

23        -- that was once a popular term for the field I

24        work in, but thankfully we have become more

25        sensitive to language.

1    Q    Do you remember the part at the beginning when I

2         said I might step -- right?  So just want you to

3         know it came from a place.  Okay?  So I like to

4         -- let's see.  Get this one in here.  Yeah.

5              I'm going to hand you Exhibit 4, which is

6         -- and, Jimmy, if you turn to the next page,

7         that's kind of like a chain-of-custody-type thing

8         where this clipping came from.

9    (PLAINTIFF'S DEPOSITION EXHIBIT NO. 4

10        MARKED FOR IDENTIFICATION)

11   Q    It's a clipping from a newspaper article from --

12   A    From a newspaper.

13   Q    -- The Daily Spectrum from Sunday, August 21st,

14        2016.  Do you see on the first page though, where

15        it says therapist?  It says, "Must also have

16        experience working with troubled teen males."

17        Did this language shift?  You said you find

18        offense.

19   A    Uh-huh.

20   Q    Would you have found offense in 2016 at the term

21        troubled teen?  And understanding that this isn't

22        your business that posted this.

23   A    Right.

24   Q    Right.  But that -- I used the word because I've

25        seen it out there.

1    A       Yes, because of the population I work with.

2    Q       And while we're -- tell me specifically about the

3            population that you work with.

4    A       I work with adopted adolescents.

5    Q       Just males or females -- is there a difference

6            between males and females?  My understanding is

7            at Three Points facility, that the residents are

8            all females.

9    A       Which program are -- which company are you

10           referring to?

11   Q       What is the gender make up at the Utah facility

12           currently?

13                   MR. CHANG:  Objection to form.

14   Q       Are there males at the Utah facility?

15   A       Yes.

16   Q       There are.  Okay.  Are there any males at the

17           North Carolina facility?

18   A       No.

19   Q       No.  What is the clinical reason, business reason

20           for that decision?

21                   MR. CHANG:  Objection to form.

22   Q       Why --

23                   MR. CHANG:  If you understand, go ahead

24           and answer.

25   Q       Yeah.

1    A      I'm not sure I do understand.

2    Q      Why does one facility have -- oh, does Utah have

3            females?

4    A      Yes.

5    Q      So it's a coed facility.

6                   MR. CHANG:  Objection to form.

7    Q      Are there males and females at the Utah facility?

8    A      Yes.

9    Q      Okay.  And I mean students, not the employees.

10          There are male -- are there male and female

11          students at the Utah facility?

12    A      Yes.

13    Q      There -- are there any males at the North

14          Carolina facility?

15    A      No.

16    Q      Why did you make the decision to not have males

17          at the North Carolina facility?

18                   MR. CHANG:  Objection to form.

19    A      I didn't make the decision.

20    Q      Who did make that decision?

21    A      My brother.

22    Q      Your brother.  Did you have any discussions with

23          him about why to only serve the female

24          population?

25    A      Yes.

1     Q     Tell me about those discussions.

2     A     The thinking was we received more referrals in

3            Utah, at the Utah campus, for females than males.

4     Q     Okay.  So you receive more referrals at the Utah

5            facility for females.  Is that correct?  What you

6            just testified to?

7     A     Yes.

8     Q     Okay.  Where do these referrals come from?

9                  MR. CHANG:  Objection to the form as to

10          which company.

11    Q     The referrals that you just mentioned at the time

12          before North -- well, the discussion you had with

13          your brother about only serving the female

14          population in North Carolina.  Is it fair to

15          assume that that conversation happened before you

16          purchased the North Carolina property?

17    A     Yes.

18    Q     Okay.  So those referrals that prompted that

19          conversation about expanding Three Points into

20          North Carolina, what --

21                 MR. CHANG:  Objection to form.  That's

22          not what he testified to.

23    Q     Did you have a conversation with Glenn about

24          creating a new Three Points facility just to

25          serve females?

1    A    Yes.

2    Q    Okay.  And the reason you had that -- had to do

3         with identifying, I guess, metrics, if you will,

4         referral metrics to the Utah facility --

5              MR. CHANG:  Objection to form.

6    Q    Tell me what a referral is, please.

7    A    Request for service.

8    Q    Who do they come from?

9    A    Educational consultants, adoption experts, mental

10        health hospitals, school districts, and parents.

11   Q    Okay.  And so because there were proportionately

12        more referrals for females, when the decision was

13        made to expand Three Points, your brother decided

14        to only serve females at the North Carolina

15        facility?

16             MR. CHANG:  Objection to form.

17   Q    What was your brother's ownership interest before

18        he passed away in these -- in Three Points?

19   A    In which?  Three Points Center Utah?

20   Q    Well, the one that existed before Three Points

21        Center North Carolina was formed.

22   A    Three Points Center, LLC, in Utah.  His ownership

23        interest was 48 percent, 48-point-something.

24   Q    Did you want to grow the business in North

25        Carolina or did only Glenn want to?

1                    MR. CHANG:  Objection to form.

2        A        We all participated in those discussions and were

3                 proponents of creating a facility for residents

4                 east of the Mississippi.

5        Q        And so was that the -- east of the Mississippi,

6                 was that -- is it fair to say that's the kind of

7                 high-level geographic decision that was made

8                 early on?

9        A        Yes.

10       Q        I'm handing you Exhibit 5, which is a newspaper

11                article.

12                (PLAINTIFF'S DEPOSITION EXHIBIT NO. 5

13                    MARKED FOR IDENTIFICATION)

14       A        Okay.

15       Q        Can you read the headline, please?

16       A        Asking me?

17       Q        Uh-huh.

18       A        "Three Points Center establishing residential

19                treatment center for adopted youth in" -- I

20                forget how to pronounce that -- "Butts County."

21       Q        The B word.

22       A        Yeah.

23       Q        Did Three Points Center establish a facility in

24                Butts County?

25       A        No.

1    Q    Why not?

2    A    This was during COVID.  Trying to get licensing

3         through the State of Georgia and understanding

4         licensing requirements became extremely arduous

5         for us.

6    Q    Okay.  So when you say licensing requirements,

7         knowing that there can be very detailed answers,

8         are there any states where the type of facilities

9         that Three Points are, the -- what they provide,

10        are not regulated by the state?

11   A    I don't know.

12   Q    When did these facilities become regulated in

13        Utah?

14   A    I don't know.

15   Q    The licensing, I guess, issues with Butts County

16        in Georgia, what were those licensing issues?

17   A    We could not get anyone to call us back.  People

18        were working from home.

19   Q    Oh.  You -- when you say we, do you mean

20        government workers at the licensing entity --

21        agencies?

22   A    Correct.

23   Q    Okay.  What are the regulations that apply in

24        Georgia?

25   A    I don't know.

62

| | | |
|---|---|---|
| 1 | Q | Okay. In North Carolina, are there any |
| 2 | | regulations that apply specifically to the Three |
| 3 | | Points facility in Chatham County? |
| 4 | A | Yes. |
| 5 | Q | What are they? |
| 6 | A | We are a therapeutic boarding school, i.e. a |
| 7 | | non-public, private school. We have stricter |
| 8 | | regulations in Utah that we apply in North |
| 9 | | Carolina, so our own policies and procedures are |
| 10 | | more stringent than those that apply to North |
| 11 | | Carolina regulations. And we follow the Utah |
| 12 | | regulations in North Carolina. |
| 13 | Q | Okay. Are there any facility inspections that |
| 14 | | occur in North Carolina? |
| 15 | A | Yes. |
| 16 | Q | What agency conducts those? |
| 17 | A | The Joint Commission. |
| 18 | Q | Okay. In Utah, what is the agency called that |
| 19 | | conducts the inspections of the Three Points |
| 20 | | facility there? |
| 21 | A | The Joint Commission. |
| 22 | Q | Okay. |
| 23 | A | The Utah Department of Health -- |
| 24 | Q | All right. |
| 25 | A | -- and Human Services Office of Licensing. |

1    Q    So Three Points -- and you said non-public

2         boarding school.  Did I hear that correctly, that

3         term, "non-public boarding school"?

4    A    Yes.

5    Q    Okay.

6    A    Well, therapeutic boarding school.

7    Q    All right.

8    A    Let me correct that.

9    Q    Okay.  Therapeutic boarding school.

10   A    Yes.

11   Q    And my understanding, just to identify exhibits,

12        use exhibits -- on Exhibit 3, the therapeutic

13        boarding school that provides services to Three

14        Points is called Three Points Academy?

15   A    Yes.

16   Q    Does Three Points Academy provide educational

17        services to the students in Utah?

18   A    To the students at Three Points Center, LLC in

19        Utah?

20   Q    In Utah.  Well, I'm saying just -- well, I

21        understand there's an issue in this case.  When

22        you talk to employees in Utah and you talk about

23        Three Points, do you routinely always add LLC

24        after every time you talk about Three Points, or

25        are you just doing it right now?

1    A    It varies.  Sometimes I do, sometimes I don't.

2    Q    Let's -- for example, when was the last time you

3         led a staff meeting in Utah?

4    A    Last week.

5    Q    Last week.  What was it about?

6    A    It was training employees to -- in working with

7         attachment and trauma.

8    Q    Did you do a PowerPoint or anything like that for

9         it?

10   A    Yes.

11   Q    Okay.  On that PowerPoint that you provided the

12        employees in Utah, to the best of your knowledge,

13        did you use the phrase Three Points Center, LLC,

14        at all in that PowerPoint?

15   A    I don't remember.  I may have.  There are times

16        when I do.  Times -- yeah.

17   Q    Okay.  But I mean, when I say you, not speaking

18        -- but I mean, do you prepare your own slides?

19   A    I do.

20   Q    Okay.  And do you still have that PowerPoint?

21   A    Yes.

22   Q    Okay.  The three -- on Exhibit 3, page three and

23        four, Three Points Academy, that's the

24        educational services non-profit, correct?

25   A    To?

1    Q    Oh, to the facility in North Carolina, also,

2         right?  Let me ask a more -- LuAnne Forrest.

3    A    Yes.

4    Q    What was her title again?

5    A    Director.

6    Q    Director.  Does she develop the curriculum or

7         approve it, make high-level decisions?

8              MR. CHANG:  Objection to form.  Go ahead

9         if you understand.

10   A    Yes.

11   Q    I'm getting --

12   A    She's in charge of the academy.

13   Q    She's in charge of the academy.  Does she set the

14        curriculum for both the Utah and North Carolina

15        facilities?

16   A    According to each individual guideline.  In other

17        words, North Carolina has separate state regs,

18        Utah has separate state regs.  So she follows

19        those state regulations for each state.

20   Q    Understood.  But she makes those executive

21        decisions about how to comply with different --

22        each state's rules.

23   A    Yes.

24   Q    Okay.  Under one non-profit entity called Three

25        Points Academy?

1    A      Yes.

2    Q      That she's paid by?

3    A      Yes.

4    Q      Her salary.  How much does she make?

5    A      I do not know.

6            MR. DAVIS:  Is that our running time, Mr.

7       Reporter?

8            THE COURT REPORTER:  Yes, sir.

9            MR. DAVIS:  Okay.

10           THE COURT REPORTER:  The total running

11      time includes 21 minutes.

12           MR. DAVIS:  Okay.

13           THE COURT REPORTER:  So an hour and 11.

14           MR. DAVIS:  Thank you.

15   Q      (By Mr. Davis)  When you, your brother -- and I

16      believe Mr. Palmer's identified as a founding

17      owner, too.  Why is the distinction -- why is the

18      distinction made that Glenn is not a found -- was

19      not a founding owner?

20           MR. CHANG:  Objection to form.  What are

21      you referring to?

22   Q      On your website, there -- the staff and -- of the

23      Three Points is listed on threepointscenter.com.

24      That's your company's website, correct?

25   A      Three Points Center Utah.

1    Q    In Utah.  Well, is there a North Carolina website

2         yet?

3    A    No.

4    Q    Why not?

5    A    It hasn't been a priority as far I understand.

6         Thane and Heidi have been very busy.

7    Q    Who has what?

8    A    Thane and Heidi have --

9    Q    They've been very busy.

10   A    Yeah.

11   Q    Okay.  How did the -- is Three Points Center in

12        North Carolina -- or the facility in Chatham

13        County, is it currently at capacity?

14   A    No.

15   Q    No.  What is the capacity for that facility?

16   A    I believe 48.

17   Q    About how many students are there now?  About?

18             MR. CHANG:  Objection.  I'm going to

19        instruct the client not to answer this question.

20        Don't give away details about any of the

21        students.  How many kids there are, their living

22        arrangements.

23             MR. DAVIS:  That is -- the number is in

24        the -- it's in one of the lease documents, Jimmy.

25             MR. CHANG:  Can you ask it a different

```
 1              way?

 2      Q       How many beds are there at the Three Points

 3              facility in Chatham County?

 4      A       Total beds?

 5      Q       Uh-huh.

 6      A       I believe 48.

 7      Q       Does your business -- do you believe that more

 8              than half of them are slept in currently, or less

 9              than half?

10      A       Less than half.

11      Q       What is the -- let's see.  Each of those -- less

12              than half.  Those students have parents who are

13              interested in your companies' services, correct?

14                      MR. CHANG:  Objection to form.  But if

15              you understand --

16      A       Yeah.  I'm not sure --

17      Q       Let me tie it back to the website.  The website

18              has a phone number that says, "Contact us about

19              enrollment."  How many of your companies' leads

20              come from your website, threepointscenter.com?

21                      MR. CHANG:  Okay.  Objection to form.

22              Which company?  I think you've got to -- like

23              which company?

24                      MR. DAVIS:  How many --

25                      MR. CHANG:  You're talking about a
```

1                    website with a phone number and then you're

2                    talking about leads.  To which company?

3          Q        I think what we can do is just pin this right now

4                    just because I want to see where we got -- and is

5                    it your position that the website,

6                    threepointscenter.com, does not provide any

7                    information relevant to the services that are

8                    provided at the facility in Chatham County where

9                    Tyliya Nelson worked?

10         A        Again, I'm not sure what you're -- Mr. Davis,

11                   help me.

12         Q        If people call that number that's on -- do you

13                   see the number on Exhibit 3?  The phone number

14                   where it says, "We can help your family"?

15         A        Yes.

16         Q        If somebody with a -- somebody who had an adopted

17                   -- it's exclusively adopted children, right?

18         A        Yes.

19         Q        Okay.  And the Chatham County facility is

20                   exclusively female.

21         A        Yes.

22         Q        If a parent with an adopted female child with a

23                   condition that you believe that your company

24                   could help with called this number and they lived

25                   in North Carolina, would they be told that they

1          could get a bed at the Chatham County facility?

2                    MR. CHANG:  Objection, if it calls for

3          speculation.

4     A    They would be referred to the marketer handling

5          North Carolina, not Utah.

6     Q    Okay.  Who is the marketer handling North

7          Carolina?

8     A    Sheila Tart-Zelvin.

9     Q    When was she hired?

10    A    Gosh.  2018.  My best guess.

11    Q    So does she handle exclusively North Carolina?

12    A    Primarily North Carolina.

13    Q    Primarily North Carolina.  What is her job title?

14    A    Marketer.

15    Q    Just marketer.  Does she have a counterpart?

16    A    Yes.

17    Q    What's her -- well, his or her name?  That

18         employee's name.

19    A    Millie Anderson.

20    Q    Okay.  Where do -- Millie, and then the first one

21         was Sheila?

22    A    Yes.

23    Q    Okay.  Where do Millie and Sheila live?

24    A    Millie lives in Utah.  Sheila lives in New

25         Mexico.

71

1    Q    Sheila lives in New Mexico.  Okay.  So if a

2         parent with a teenaged female called

3         435-635-0636, the number on

4         threepointscenter.com, and they lived in North

5         Carolina, you said they would be referred to

6         Sheila in New Mexico?

7    A    Correct.

8    Q    Does Sheila not pick up the phone?  Who picks up

9         the phone?  If we called 435-635-0636 right now,

10        is it, like, an automated service, or is it a

11        Three Points Center employee?

12   A    A phone tree receptionist in Utah will answer the

13        phone.

14   Q    Okay.  Who is -- who are they employed by?

15   A    Three Points Center Utah.

16   Q    Three Points Center in Utah.  So a person -- a

17        parent interested in Three Points Center, or

18        resident -- actually, a parent interested in

19        residential treatment for their child, they could

20        google that term and would Three Points Center

21        come up, do you believe?

22             MR. CHANG:  Objection.  Calls for

23        speculation.

24   Q    Does your company pay for Google ad placement?

25   A    No.

1    Q       No.  Do you have any sense of the proportion of

2            how many students find your -- find Three Points

3            based on a website or referrals, like we

4            discussed earlier?

5    A       I don't.

6    Q       You don't.

7    A       No.

8    Q       Is that a metric that you think that your company

9            keeps up with?

10   A       It's possible that Sheila does.

11   Q       It's possible that Sheila does.  What is the

12           tuition, average tuition right now for the North

13           Carolina facility?

14                   MR. CHANG:  Objection.  We are going to

15           instruct the client not to answer anything

16           relating to the financial condition of these

17           companies.  Three Points Academy, you found that

18           document online.  All the other entities, we're

19           going to move for a protective order if we go

20           down that line of questioning, on the specific

21           grounds that the financial condition or financial

22           information of these Defendants are not

23           discoverable until Plaintiff's have proven a

24           prima facie case, that she's entitled to punitive

25           damages.

1          Because that goes to the award of

2     punitive damages should she get that far.  So I

3     am going to instruct Mr.-- or, sorry -- Dr. T --

4     sorry about that -- Dr. Thibault, we're not going

5     to get into the finances of these other

6     Defendants, and we will move for a protective

7     order on the record if we need to.

8               MR. DAVIS:  I have a lot of respect for

9     this process, and I understand what he's saying.

10    And I have been able to kind of piece together, I

11    think, enough for now for us to not have that.

12    But I'd like to take just a quick break because,

13    you know, it's a shift, if you will.  Thank you,

14    Jimmy.

15              MR. CHANG:  Yeah.  Okay.  And if we're

16    going to deliberate --

17              MR. DAVIS:  Yeah.

18              MR. CHANG:  If you're just taking a

19    break, that's cool.  If we're going to deliberate

20    about a protective order or anything, I would

21    like that on the record.

22              MR. DAVIS:  No, no.  No.  I just --

23              MR. CHANG:  Okay.  Thank you, Mr. Davis.

24              MR. DAVIS:  Yes, yes, yes.  That's not --

25              MR. CHANG:  I wasn't saying you were

```
1              going to do otherwise, but --

2                   MR. DAVIS:  No, no, no, no.

3                   THE COURT REPORTER:  We're off the record

4              at 12:00 noon.

5                     (SIX-MINUTE RECESS)

6                   THE COURT REPORTER:  We're back on the

7              record at 12:06.

8     Q    (By Mr. Davis)  All right.  Before we took that

9              break, your Counsel --

10                  MS. LANGLEY:  You go ahead.  I'll be

11             back.

12    Q    -- stated the objection on the record to what it

13             was, the financial records, about specific

14             information.  I won't stay too much more on this,

15             about specific numbers.  But does -- in terms of

16             -- let's start from the top.

17                  Do you refer to it as tuition?  Whatever

18             payment is made, is it considered tuition?

19                  MR. CHANG:  Objection to form.

20    Q    What do you -- when you think about a parent

21             paying either the -- for services in Utah or in

22             North Carolina, right now, if you had to describe

23             what they pay -- not the number, but what it's

24             called -- what do you call it?

25    A    Tuition.
```

1    Q    Tuition.  Is it monthly?

2    A    Not always.

3    Q    Not always.  Depending upon the circumstances,

4         could the tuition vary between different parents

5         -- or different kids, or is it the same?

6    A    Which facility are you referring to?

7    Q    Let's go -- I'm going to use my hands.  Because

8         here's west, right?  Utah.

9    A    Yeah, yeah.  Which -- okay.

10   Q    Okay.  Is it all uniform across the board?

11   A    No.

12   Q    Okay.  So it's not like a -- like a college, for

13        example.  You go there.  This is the tuition,

14        room and board.  You know what I'm refer --

15        right?  You can picture that.

16   A    Yeah.

17   Q    Three Points Center doesn't have a table like

18        that.

19   A    Correct.

20   Q    Okay.  North Carolina, similar to what we just

21        identified with Utah, or is it fixed tuition?

22   A    It's fixed.

23   Q    It's fixed.  Why is it fixed?

24   A    Because it's a standard tuition for North

25        Carolina students.

1    Q        Okay.  Why -- but why was it -- what's behind the

2             decision -- the decision to standardize tuition

3             at one facility, and not standardize it in Utah?

4    A        The referral sources.

5    Q        The referral sources.  Okay.  Who is the referral

6             -- who are the referral sources for the students

7             in North Carolina, or some of them?

8    A        Educational consultants, adoption agencies,

9             private parents.

10   Q        When you say educational consultant, can you

11            identify an entity or a business name for me

12            that's providing a referral?

13   A        Off the top of my head, I can't think of one

14            right now.

15   Q        After you said educational consultants -- I can

16            ask him to read it back, but I -- sorry.  What

17            was the other referral source?

18   A        Adoption professionals.

19   Q        Are you referring -- what is an adoption

20            professional?

21   A        An adoption professional could be a clinician or

22            an adoption agency or someone who works in

23            adoption, who could become aware of Three Points

24            Center North Carolina's treatment and then refer

25            to the program.

```
 1        Q      Have you received any referrals from adoption
 2               professionals that are located in North Carolina?
 3        A      I don't think so.
 4        Q      After you said adoption professionals -- I think
 5               there were three.  What was the other referral
 6               source?
 7        A      Hospitals.
 8        Q      Hospitals.  What type of hospitals?
 9        A      Psychiatric hospitals.
10        Q      Okay.  Has -- to the best of your knowledge, have
11               there been any referrals to Three Points from a
12               psychiatric hospital in North Carolina?
13        A      Which Three Points?
14        Q      For either one.
15        A      No.
16        Q      There's the -- we're not talking about numbers.
17               Does insurance cover any of the services -- does
18               insurance cover any of the tuition that we just
19               discussed?
20        A      At which facility?
21        Q      We'll start with Utah.
22        A      Some.
23        Q      Please explain.
24        A      Depends on the policy.  Depends on the carrier.
25               Depends on a number of variables, whether they
```

1          will cover clinical work or residential

2          treatment.  So it really depends on a number of

3          factors whether it will be covered or not.

4     Q    But is it common or uncommon in Utah for

5          insurance to provide some amount of a student's

6          tuition?

7     A    Depends on the student and their policy.

8     Q    But I asked a different question, Dr. Thibault.

9          I said common or uncommon.  And it's just -- and

10         I'm asking you because you're the CEO, right?

11    A    Uh-huh.

12    Q    Do you -- and as the CEO, is it fair to say that

13         you're responsible with knowing where money comes

14         from for your company?

15    A    Yes.

16    Q    Okay.

17    A    I'd say it's uncommon.

18    Q    Uncommon.

19    A    Yeah.

20    Q    So in terms of just language -- we may not even

21         need to use it -- insurance can pay for a

22         service.  But if the insurance doesn't pay, how

23         do you refer to it?  Private pay?  Out-of-pocket?

24    A    Private pay.

25    Q    Private pay.  So in Utah, it's mostly private

1           pay.  Is that a fair statement?

2   A       No.

3   Q       No?  Well, if it's not -- but you said it was

4           uncommon for there to be insurance.  What other

5           source of money is there for tuition?

6   A       Students in Utah are oftentimes covered by

7           California post-adoption assistance.

8   Q       And these would be students whose -- let me

9           think.  It's not birth home -- what's the right

10          -- can you help?  They're from California, right?

11          Is that why they get the assistance?

12  A       They don't necessarily have to live in

13          California, no.

14  Q       So California -- so is there a student -- and I'm

15          not asking which one it is, but is there a

16          student in the abstract who didn't -- whose

17          parents don't live in California, but that Three

18          Points Utah receives money from the State of

19          California?

20  A       Yes.

21  Q       How much money is that?

22  A       It varies by county.

23  Q       Varies by county.  What is the name of that

24          program that you just referred to?

25  A       Post-adoption assistance.

1    Q    And it's administered through just the State of
2         California?
3    A    Through counties of California.
4    Q    Okay.  What percentage of the Utah facility's
5         revenue comes from this post-adoption assistance
6         pot?
7    A    It varies.
8    Q    Last year.  Or fiscal year 2023.
9    A    I'm going to guess about 65 percent.
10   Q    All right.  And were you the CEO for all of 2023?
11   A    Yes.
12   Q    All right.  And then 2022, were you the CEO all
13        through the 2022 fiscal year?
14             MR. CHANG:  Objection to form just as to
15        which company.
16   A    Yeah.  Which --
17   Q    The same company that got 65 percent of its
18        revenue from the State of California.
19   A    Which is?
20   Q    The facility in Utah.
21   A    Utah.  Yes.
22   Q    All right.  Did that number -- would you say it's
23        the same, more, less in 2022, percentage number?
24   A    Less.
25   Q    Less.  All right.

1              THE COURT REPORTER:  Didn't we mark five,

2         Garrett?

3              MR. DAVIS:  I believe I --

4              MR. CHANG:  I only go up to five.  Oh,

5         wait, no.  I've got five.

6              MS. LANGLEY:  Five.  Right here.

7              MR. DAVIS:  You've got five?  Yeah.

8         What's -- there we go.  Let's get you stacked up,

9         too.  Here comes six.

10             MR CHANG:  Butts County.

11    Q    (By Mr. Davis)  Okay.  Dr. Thibault, I'm handing

12         you this web print-off which -- I will introduce

13         it as being not what it looks like on the

14         website.  You can see it looks like computer

15         programming.  Okay?  But I wanted to have -- for

16         Counsel to know that I just printed this PDF.

17         All right.  And let me highlight it for you.

18         It's going to make it easier.  Give me one

19         second.

20    (PLAINTIFF'S DEPOSITION EXHIBIT NO. 6

21         MARKED FOR IDENTIFICATION)

22             MR. CHANG:  I'm just going to object

23         lightly as to authentication, but I know you have

24         some questions lined up.

25             MR. DAVIS:  Right.  And we can always

```
 1              look at a website later.  But let me just do the

 2              questions, and then move on.

 3     Q        I'm going to just highlight the text that I

 4              believe was actually on this website.  Okay.

 5              Okay.  All right.  I'm on the first page.  This

 6              PDF print of a website came from a website called

 7              the National Association of Therapeutic Schools

 8              and Programs.  Do you know what that is?

 9     A        Yes.

10     Q        What is it?

11     A        It's an association of therapeutic schools and

12              programs.

13     Q        I understand.  I know.  We're not -- if we were

14              in a bar, I'd be like this guy.  This guy with

15              the questions.  Are you -- are you and/or the

16              companies that you are a CEO of active in this

17              association?

18     A        Yes.

19     Q        Is there an annual conference?

20     A        Yes.

21     Q        Okay.  Do you see where it says Three Points

22              Center, LLC --

23     A        Yes.

24     Q        -- at the top?

25     A        Yes.
```

1    Q        And you see where it says last updated June 3rd

2             -- or January 1st -- or January 3rd, 2024?

3    A        Yes.

4    Q        And it says, "Full Program Member."

5    A        Yes.

6    Q        Is Three Points Center, LLC -- I'm sorry -- a

7             full program member of this association?

8    A        Yes.

9    Q        Is Three Points Center North Carolina, LLC, a

10            full program member of this organization?

11   A        No.

12   Q        Why not?

13   A        The tuition was very high to be a part of it.

14   Q        Which tuition?

15   A        To be a member of NATSAP.

16   Q        Oh, okay.  So the tuition -- so we used tuition

17            before.  You mean the membership fees?

18   A        The membership dues.

19   Q        Let's say membership dues.

20   A        Yeah.

21   Q        So the membership dues for the National

22            Association of Therapeutic Schools and Programs

23            -- your testimony is the reason that there isn't

24            an entry on this website for Three Points Center

25            North Carolina, LLC, is because the membership

1           dues are too high?

2      A    Yes.

3      Q    So if they weren't too high, or if they were

4           free, they would be?  You would create another

5           entry and say you're the CEO of Three Points

6           Center North Carolina, LLC?

7                     MR. CHANG:  Objection to form.

8      A    Well, you're asking -- I've got questions.

9      Q    I'm saying if -- what are the membership dues to

10          be part of this association?

11     A    I don't recall.  They're exorbitant.

12     Q    How do you -- what is exorbitant?

13     A    As I -- they're about $10,000 a year.

14     Q    Ten thousand a year.

15     A    Yeah.

16     Q    So $10,000 -- well, what are the benefits of

17          being a member of this association?

18     A    It has a wonderful annual conference.  It raises

19          the standards of programs in the country who

20          treat adolescents.  They have a code of ethics.

21          They collaborate to raise treatment and provide

22          research value for families.

23     Q    Okay.  So there are some benefits you think

24          industry-wide that your 10,000 -- that Three

25          Points Center, LLC's $10,000 annual payment goes

1        to?

2    A    Yes.

3    Q    And so -- but you previously testified that

4        $10,000 was exorbitant.

5    A    Yes.

6    Q    So exorbitant that it's not worth making Three

7        Points Center North Carolina a member, too, to

8        promote those higher standards that you just

9        identified?

10          MR. CHANG:  Objection to form.  That's

11        not what he said.  Go ahead if you understand the

12        question.

13    A    It's not in the budget yet.

14    Q    Whose budget?

15    A    For Three Points Center North Carolina.  As I

16        understand it, it can't be afforded.

17    Q    Who develops that budget?

18    A    Colby Dalley.

19    Q    Colby Dalley.  Who is Colby Dalley?

20    A    Our CFO.  The CFO for Three Points Center.  And

21        by CFO, bookkeeper.

22    Q    Okay.  So Colby Dalley is the CFO/bookkeeper for

23        Three Points Center.  Is that what you just said?

24        Can you read that back please?

25        (THE COURT REPORTER READS BACK ANSWER)

1  Q      Okay.  So Colby Dalley is a Three Points -- is

2         the CFO for Three Points Center, and he develops

3         the budget that we were referring to that just

4         doesn't have the capacity to pay $10,000 to

5         become a member of this association on Exhibit 6,

6         correct?

7  A      Yes.

8  Q      Okay.  When was he hired?

9  A      2022.

10 Q      Was he hired because of -- after your brother's

11        passing?

12 A      Yes.

13 Q      Because your brother was handling CFO duties?

14 A      Yes.

15 Q      Was there ever a time that Three Points -- that

16        there was enough in the budget for Three Points

17        Center North Carolina to pay $10,000 to this

18        association?

19              MR. CHANG:  Objection.  Form.

20 A      I don't know that there was.  I --

21 Q      Okay.

22 A      -- I don't know.

23 Q      Where does Mr. -- is Mr. Dalley an employee of

24        Three Points Center?

25 A      Mr. Dalley is an employee of Three Points Center

1              Utah.

2     Q      Okay.  And he does the budget for Three Points

3              Center North Carolina?

4     A      Yes.

5     Q      Okay.  All right.  We're sticking on Exhibit 6.

6              This we passed -- see where it says chief

7              executive officer's name?

8     A      Yes.

9     Q      Do you remember earlier on when I asked you if

10             there was any time where there was an overlap

11             between your brother Glenn holding himself out as

12             the CEO officer of Three Points Center, and you?

13             And I believe your testimony was no, there

14             wasn't.  When your brother was the CEO of Three

15             Points Center, LLC, was Three Points Center, LLC,

16             a member of the National Association of

17             Therapeutic Schools?

18    A      Yes.

19    Q      They were?

20    A      Yeah.

21    Q      Okay.  And so when you took over the CEO duties,

22             is that when you went into the website, or the --

23             or updated the contact information for Three

24             Points, LLC and switched it from Glenn Thibault

25             to Dr. Norman Thibault?

1    A    I don't recall.

2    Q    Okay.  Let's see.  Okay.  I'm going to turn to

3         the second page of Exhibit 6.  Let's see.  There

4         is a -- do you see where it says, "We have a

5         proprietary Wild-Mustang program"?

6              A couple questions about -- tell me, what

7         is equine therapy as it's conducted at either of

8         the facilities?

9    A    It's conducted differently at the facilities.

10   Q    I'd like to know how.  How is it conducted in

11        Utah?

12   A    In Utah, the students are -- work with horses in

13        what we call groundwork, and learn about

14        themselves in the process in working with the

15        horse.  The students have to apply to be able to

16        work with a mustang, as demonstrated by their

17        previous history with a horse on our campus.  So

18        they have to go through an approval process to be

19        able to work with a wild mustang.

20             In North Carolina, they're assigned a

21        wild mustang upon enrollment and begin

22        immediately working with them.

23   Q    I've seen the pictures on the website and just

24        thinking about -- they're beautiful.  All right.

25        I just want to know, why horses?  What is the

1      relationship with -- is that common in

2      residential treatment, or is that a unique thing

3      for Three Points to have equine therapy?

4              MR. CHANG:  Objection to form, but go

5      ahead and answer if you understand.

6   A   Yeah.  It's common for some programs to have

7      equine therapy.  When you're dealing with wild

8      mustangs and you're dealing with the children

9      that we work with, there are some neurological

10     similarities in the way that they behave and

11     respond to what they perceive are threats,

12     because the children we work with, many of whom

13     have been terribly abused, and they don't like to

14     be close to people.  They don't want to be

15     touched.  They're afraid and they run from trust,

16     because trust equals vulnerability.  Mustangs are

17     very much the same way.  The mustangs that we

18     use, we have an agreement with the BLM, the

19     Bureau of Land Management, to be able to receive

20     these mustangs off the range.  And so they don't

21     have human contact.  They don't trust humans

22     either.  The parallels are really beautiful.

23  Q   They truly are.  So the horses in Utah truly are

24     wild in that they've never been on a farm before?

25     Is that what you're saying?

1    A        Yes.

2    Q        Okay.  What is Mustang Alley?

3    A        It's what we call our mustang program.

4    Q        Okay.  So is it a separate company or non-profit,

5             or is it just what you call the program?

6    A        It's what we call the program.

7    Q        All right.  What entity owns the horses in North

8             Carolina?

9    A        Three Points Center North Carolina.

10   Q        Does a horse have to have papers?  Like how does

11            that --

12   A        Yes.

13   Q        Well, where do the horses -- thank you for

14            answering that quickly.  Where do the horses in

15            North Carolina come from?  From North Carolina,

16            or from out west?

17   A        The BLM provided them to us.

18   Q        Who -- how did they get from Bureau of Land

19            Management land, where I assume that they were --

20            were they like rounded up?  It's like a round-up?

21   A        I believe so.

22   Q        Okay.  How did they get from west, across the

23            Mississippi, over to Chatham County?

24   A        In a truck that the BLM brought them in.

25   Q        The BLM brought -- drove all the way from --

1    A        Yes.

2    Q        How about that.

3    A        Yes.

4    Q        Does Three Points -- so we don't have -- are any

5             of the companies that you are the CEO of, that

6             provide residential treatment services and

7             mustang therapy, do they own trucks that can

8             transport horses?

9    A        Yes.

10   Q        Okay.  Where are the trucks right now?

11   A        There is a truck in Utah and a truck in North

12            Carolina.

13   Q        Okay.  What type of truck is in North Carolina?

14   A        A Ford F-350.

15   Q        Okay.  Who bought that truck?

16   A        Three Points -- well, actually, I don't know.  I

17            don't know.

18   Q        Okay.  Does it have a North Carolina license

19            plate or a Utah license plate?

20   A        Which truck are you referring to?

21   Q        The one that's in Chatham County right now.

22   A        Oh.  I don't know.

23   Q        Okay.

24   A        Yeah.

25   Q        Just to recap, there are two -- there's a Chatham

1            County facility that we've been discussing, and a
2            Utah facility in Hurricane, Utah.  There are wild
3            mustangs at each of those facilities.
4       A    (Nods head.)
5       Q    Say yes or no, please.
6       A    Yes.
7       Q    Okay.  There are also trucks that can haul,
8            transport, if they had to go the vet, the horses.
9            Correct?
10      A    Yes.
11      Q    Okay.  What about trailers?  Is there a trailer
12           in Chatham County that can hold horses?
13      A    Yes.
14      Q    Okay.  Who bought that?
15      A    I don't know.
16      Q    Okay.  And who would have bought the truck and
17           trailer for the Utah facility?
18      A    Three Points Center Utah.
19      Q    Okay.  Is there a specific -- at the companies
20           which you are the CEO of, that are identified on
21           the caption in Exhibit 1 --
22                MS. LANGLEY:  I'm going to object to
23           form.
24                MR. CHANG:  Object to form.
25      Q    Can you please look at Exhibit 1 again, Dr.

1          Thibault?  Just briefly.  This will be our last

2          one.  Are you the CEO of Three Points Center,

3          LLC?

4     A    Yes.

5     Q    Are you the CEO of Three Points Center North

6          Carolina -- or are you the CEO of Three Points

7          Properties, LLC?

8     A    No.

9     Q    Is there a CEO for Three Points Properties?

10    A    No.

11    Q    All right.  Are you the CEO of Three Points

12         Center North Carolina, LLC?

13    A    Yes.

14    Q    Okay.  Is there a CEO for Three Points Center --

15         Three Points Center North Carolina Properties,

16         LLC?

17              MR. CHANG:  Objection to form, just

18         because you read the caption wrong.

19              MR. DAVIS:  I did?  I can't keep all

20         these Three Points together.  Can I see that,

21         please?

22    Q    Three Points Properties North Carolina, LLC.  Is

23         there a CEO for that entity?

24    A    No.

25    Q    Okay.  All right.  So my question -- I'm going to

1      start asking -- for the LLCs identified on

2      Exhibit 1 that you are the CEO of, is there an

3      employee or -- a single employee responsible for

4      the mustang program?

5    A    No.

6    Q    How many employees are responsible for the

7      mustang program?

8    A    I don't have an exact number.

9    Q    Is there like a lead, like, mustang program

10      employee?

11         MR. CHANG:  Objection to form, but go

12      ahead if you understand it.

13   A    There is a lead in Utah and a lead in North

14      Carolina for each mustang program.

15   Q    The person that you referred to in Utah, what's

16      his or her name?

17   A    Harley Bjelland, and to pronounce it is just

18      really hard for me.  We'll get a spelling.

19   Q    Thibault was until I heard it.  My whole world

20      changed today.

21   A    Yeah.

22   Q    That's a little bit of embellishment.  I'm sorry

23      about that.

24   A    You're fine.

25   Q    I've seen the name Rodney.  Is that an employee

1           that deals with horses?

2      A    Was.

3      Q    Was.  So is Rodney no longer with Three Points?

4      A    He is.

5      Q    Okay.  Who is the lead for the mustangs in North

6           Carolina?

7      A    Reggie Madsen.

8      Q    Reggie.  Okay.  Harley, Reggie.  Does -- back to

9           the last thing on Exhibit 6 where it says, "We

10          have a propriety Wild-Mustang program."

11     A    Yes.

12     Q    Assume that things were not as tight, and Three

13          Points Center North Carolina was able to become a

14          full-program member.  Would that entity be able

15          to use the proprietary wild mustang program for

16          the students in North Carolina?

17               MR. CHANG:  Object to form.

18     Q    Do you understand what -- it says proprietary.

19     A    Uh-huh.

20     Q    What is your understanding of the term

21          "proprietary"?

22     A    No one else in the country does -- uses wild

23          mustangs.

24     Q    Is that -- so is that -- that's why I wanted the

25          -- so that is it.  That's what makes it

1          proprietary, the wild mustang part.  Is there

2          anything else besides the wild mustang part that

3          is proprietary?

4     A    The -- in Utah, it's different because of the

5          application process.  In North Carolina, there is

6          no application process.  It's a separate entity.

7     Q    I don't -- I think I got it.  When you say

8          application process, are you referring to how the

9          students are able to kind of be with the horses?

10         There was something earlier on that he won't be

11         able to repeat.  Can you please repeat yourself

12         about this process?

13    A    Yes.

14    Q    Okay.

15    A    In Utah, the students have to earn trust through

16         work with horses prior to being able to be

17         eligible to work with mustangs.  And then they

18         have to get parental permission and get their

19         therapists' permission in order to apply to work

20         with a mustang.

21    Q    Okay.  So one thing that is -- is it fair to say

22         that one thing in common between the North

23         Carolina facility and the -- or the Utah facility

24         and the North Carolina facility's equine therapy

25         program is that they both use wild mustangs?

1    A    Yes.

2    Q    Whose idea was it to use wild mustangs?

3    A    Rod Mayes.

4    Q    When did he come up with that idea?

5    A    I don't remember exactly.

6    Q    Was Rod Mayes -- we'll use Exhibit 6 to help.  It

7         says here that Three Points Center, LLC was

8         founded in 2014.  Were there horses at Three

9         Points Center's Utah facility in 2014?

10   A    Yes.

11   Q    Was Rod Mayes there?

12   A    No.

13   Q    No.  What were the horses then?

14   A    They were two domestic horses that we purchased

15        to use.

16   Q    Okay.  When Rod was hired, why did you hire him?

17   A    As a licensed marriage and family therapist.

18   Q    So he's not a pure horse person?  He's -- he's

19        therapist first, not horse person first?

20             MR. CHANG:  Objection to form.  Go ahead

21        if --

22   Q    I apologize.  The picture of him on the website,

23        he looks kind of like a cowboy.  I assumed he

24        wasn't a therapist.  I'm sorry.  All right.  It's

25        just kind of -- so he was a therapist first --

```
 1                    MS. LANGLEY:  I'm sorry.  I wouldn't want
 2            you to see me on the weekends either.
 3    A       There's actually a funny story about Rod being a
 4            cowboy, but that's a story for another day.
 5    Q       So he came on as a therapist.
 6    A       Yes.
 7    Q       And did he identify this adoption program from
 8            the Bureau of Land Management as a potential way
 9            to get free horses?
10                    MR. CHANG:  Objection to form, only
11            because I don't think --
12    Q       Well, I mean, are -- okay.  In terms of the --
13            because it's from the BLM, there are resources
14            that Three Points has to expend to take care of
15            and get these horses set up.  Correct?
16    A       Yes.
17    Q       Barns, tack, those types of things.
18    A       Significant resources.
19    Q       But you're not spending $10,000 to buy the horse?
20    A       To purchase, no.
21    Q       That's what I meant by free.
22    A       Yeah, yeah.  We do pay for those mustangs.
23    Q       How so?
24    A       We have to pay to receive them --
25    Q       How --
```

```
 1      A       -- and then we're reimbursed to feed and house

 2              them.

 3      Q       Well, okay.  So the BLM reimburses Three Points

 4              Center?

 5      A       Actually, it may have been the Mustang Heritage

 6              Foundation.

 7      Q       I think all we need to know is that money also

 8              comes -- in addition to coming in from parents,

 9              money comes in related to the horses.

10      A       We lose money on the mustangs.

11      Q       Okay.

12      A       It's a very expensive program.

13      Q       Rod -- is it fair to say that the decision to go

14              develop this proprietary wild mustang program and

15              pursue it was a significant decision for the

16              business?

17                      MR. CHANG:  Objection to form.

18      A       Can you rephrase it, Mr. Davis?

19      Q       When was the first time that you remember a wild

20              mustang being on the Three Points Utah property?

21      A       2017 or '18.

22      Q       Okay.  Because of Rod?

23      A       Yes.

24      Q       Did Rod work with Glenn to develop this mustang

25              program, or did Rod work with you, or some other
```

1       combination?

2   A   Rod proposed it to my brother and Thane,

3       primarily.

4   Q   Okay.  And then when -- before your brother's

5       passing, when the idea for Three Points Center,

6       the facility in Chatham County came, was there an

7       understanding that you would just export this

8       wild mustang program for use in North Carolina?

9   A   Yes.

10  Q   Let's just tie it together.  There is some amount

11      of reimbursement, even though there's a loss as

12      you testified, for caring for these mustangs that

13      goes to Three Points Center's Utah facility.

14      Does it also go to Three Points Center's North

15      Carolina facility for taking care of them?

16              MR. CHANG:  Objection to form.

17  Q   The Bureau of Land Management drove across the

18      country and dropped off the horses in Chatham

19      County?

20  A   Yes.

21  Q   Are those horses that are there and living now,

22      are they connected to wherever the money comes

23      from, whether Bureau of Land Management or

24      whatever you said?  There's like an ID number?

25  A   I need to explain, Mr. Davis.  The Mustang

1           Heritage Foundation and the BLM are currently

2           fighting a divorce.  They're intertwined and

3           that's where the money went though.  So I'm not

4           clear what's going on with that.

5    Q      Right.

6    A      So I don't want to be disingenuous or misleading.

7    Q      That's all right.  I think we -- I think that's

8           enough with -- on the mustang.  Right now there's

9           also -- is it fair to say some -- kind of a messy

10          lawsuit related to your brother's passing and

11          what your sister-in-law did with the assets of

12          Three Points, correct?

13   A      Yes.

14               MR. CHANG:  Objection to form.

15   Q      Tell me about the lawsuit pending in Colorado

16          District Court that asserts RICO claims against

17          your brother's estate and Nicole Thibault.

18               MR. CHANG:  Objection to form.

19   A      It's financial mismanagement.

20   Q      Did you initiate that lawsuit?

21   A      I, personally?

22   Q      Were you requested by the Three Points Center

23          board of directors to initiate a lawsuit related

24          to this financial mismanagement?

25   A      No.

1    Q    What led -- before the lawsuit was filed, how did

2         this financial mismanagement become apparent to

3         you and the board of directors?

4    A    Upon my brother's passing, as I took over

5         financial responsibility to the board, in digging

6         in, I realized that there was financial

7         mismanagement going on.  That was reported to the

8         shareholders of Three Points Center and the

9         board.

10   Q    What is the general nature of the relief sought

11        by the plaintiffs in that case?

12   A    Two-fold.  Damages that were paid to my brother

13        that were unknown to the board, and a life

14        insurance policy that we believe was a key-man

15        policy that should have been -- Three Points

16        Center, LLC Utah should have received as

17        beneficiary, but was changed to my sister-in-law.

18   Q    Back to the -- you identified two components.

19        But I believe what you said is damages, which in

20        the legal context has its own thing.

21   A    Uh-huh.

22   Q    So are you saying that you want to recover

23        damages based on the insurance policy alone, or

24        is there something else that the damages are

25        related to?

1    A    Something else.

2    Q    What is that something else?

3    A    Monies that my brother was paid to him himself

4         that were not approved or were unknown by the

5         board.

6    Q    Okay.  When you say monies that were paid to

7         himself, somebody had to push a button or approve

8         that payment, correct?

9    A    Yes.

10   Q    Who pushed that button to make that unauthorized

11        payment?

12   A    He did.

13   Q    So the former CEO of Three Points -- the lawsuit

14        pending in Colorado, were all the same entities

15        identified on Exhibit 1, are also entities.  It

16        was initiated because the former CEO, your

17        deceased brother, misappropriated the company's

18        money?

19   A    Yes.  Can I ask a question though?

20   Q    Yes, if you don't understand.

21   A    Define misappropriated, because again, I just

22        want to make sure I legally understand this.

23             MR. CHANG:  I'm just going to --

24             MR. DAVIS:  He said misappropriate at the

25        beginning, so --

1            MR. CHANG:  No, no, no.  I'm not

2       objecting to that.  I'm telling him -- his

3       questions are fine right now, but just -- I would

4       just caution you that this is a pending lawsuit,

5       which I'm not involved in.

6            THE WITNESS:  Right.

7            MR. CHANG:  And then so, he's not going

8       to go there, but do not -- I'm going to caution

9       you not to give any legal theory or strategy like

10      -- or angles.

11           THE WITNESS:  Okay.

12           MR. CHANG:  And also, if there are any

13      facts that you and your attorneys have not been

14      required to or purposely haven't disclosed yet to

15      the other side in that other lawsuit.

16           THE WITNESS:  I see.  Okay.

17           MR. CHANG:  Okay.  Go ahead.

18  Q    On Exhibit 1, all of the Three Points entities

19      that are named as defendants in Ms. Nelson's

20      suit, my client, are those all the -- are those

21      the same entities that are plaintiffs in the suit

22      that your attorney has instructed you about?

23  A    Yes.

24  Q    Do any of the entities that are plaintiffs in the

25      Colorado lawsuit -- well, are the claims for

```
 1              damages all based on the same misappropriation by

 2              your brother, and insurance policy?

 3                   MR. CHANG:  Objection.  Objection to

 4              form.

 5    A    That's a -- that's hard.

 6    Q    It's fine.  We can move -- I agree.  We'll --

 7              just give me a second to tie this one up.  All

 8              right.

 9                   MR. DAVIS:  What's our run time?

10                   THE COURT REPORTER:  About 40 minutes

11              since we last broke.

12                   MR. DAVIS:  Okay.  Let's keep on for --

13              we can go for 15.  You know what?  It's not that

14              I don't want to -- I want to break earlier.  It's

15              just like logical to break now.

16                   MR. CHANG:  Yeah, okay.  I get it.

17                   MR. DAVIS:  You know what I mean?

18                   MR. CHANG:  Yeah.

19                   MR. DAVIS:  So that's just -- I think

20              that was a productive -- we got some stuff in.  I

21              think a lot of questions were answered.  I

22              understand where y'all are, so.

23                   THE COURT REPORTER:  Do you want to go

24              off?

25                   MR. DAVIS:  Yeah.
```

Case 1:23-cv-00527-WO-JGM   Document 39-2   Filed 07/23/24   Page 105 of 279

1          THE COURT REPORTER:  Okay.  We're off at

2          12:47.

3               (ONE-HOUR RECESS)

4          THE COURT REPORTER:  We are on at 1:47.

5     Q    Good afternoon again, Dr. Thibault.  Continuing

6          with a couple questions about Three Points

7          Center's different facilities.  I'm handing you

8          Exhibit 7.

9          (PLAINTIFF'S DEPOSITION EXHIBIT NO. 7

10              MARKED FOR IDENTIFICATION)

11    Q    There are four pages.  I'll just quickly

12         represent that they are images obtained from the

13         web.  The first one is from a Google screenshot

14         of a street-view image.  Do you see the picture

15         I'm talking about on the first page?

16    A    Yes, sir.

17    Q    What is the address up in the left corner?

18         What's the street name?

19    A    Glovers Grove Church Road.

20    Q    Is that where the Three Points Siler City,

21         Chatham County facility we've been discussing is

22         located?

23    A    Yes, sir.

24    Q    Is that the entrance to the facility?

25    A    Yes, sir.

1    Q    And just -- is there a sign that says Three

2         Points Center?

3    A    Yes, sir.

4    Q    Can you turn to the next page?  Is this the -- an

5         entrance or the entrance to the facility in Utah?

6    A    It is the entrance to Three Points Center Utah.

7    Q    Why does the -- back on the first page, why does

8         the sign that says Three Points Center in North

9         Carolina not say Three Points Center North

10        Carolina?

11   A    I don't know.  You'd have to ask Thane that.

12   Q    Was there a -- when the facility in Chatham

13        County was -- during the conceptualization phase,

14        was there ever a discussion that it would have

15        different branding than the Utah facility?

16   A    Not that I recall.

17   Q    I'm going to hand you Exhibit 8.

18        (PLAINTIFF'S DEPOSITION EXHIBIT NO. 8

19             MARKED FOR IDENTIFICATION)

20   Q    What I've handed you for Exhibit 8 is a document.

21        You'll have to hang for a second.  I need to find

22        it in my binder real fast.  Would you please mind

23        taking a look at it for one second while I find

24        it in my binder?

25                  Okay.  Dr. Thibault, I see at the top of

Case 1:23-cv-00527-WO-JGM    Document 39-2    Filed 07/23/24    Page 107 of 279

1          this document, Exhibit 8, it says, "Certificate

2          of Organization of Three Points Onboarding, LLC."

3          Under Article 3 below, it says that the

4          registered agent is Three Points Center, LLC and

5          there's two pages.  Are there two pages in your

6          document?  I just want to double check.

7     A    There's two total pages.

8     Q    Yeah.  You see where it says Article IV on the

9          second page?

10    A    Yes.

11    Q    You see where it says that the member is Three

12         Points Center, LLC?

13    A    Uh-huh.

14    Q    What is Three Points Onboarding, LLC?

15    A    It is -- Three Points Onboarding, LLC is -- was

16         organized to train our employees prior to their

17         going on the floor in Utah with students.

18    Q    When you say floor, which -- are you referring to

19         inside, outside?  Is there a specific -- what do

20         mean by "floor"?

21    A    Interacting with students.

22    Q    Okay.  All right.  It was formed.  Does it do

23         anything right now?

24    A    Yes.

25    Q    Okay.  It is an LLC.  What is your understanding

1                of what LLC stands for?

2        A      Limited liability corporation.

3        Q      Is this a for-profit business?

4        A      I don't know how it was registered.

5        Q      Okay.  Does it -- does Three Points Onboarding,

6                LLC, employ anybody?

7        A      Yes.

8        Q      Do they -- so they employ.  Do they -- who do

9                they employ?

10       A      New employees who then -- I need to explain it to

11               you.  Because we comply in Utah with California

12               code, because we receive students from

13               California, California requires that all

14               employees have background checks completed before

15               they're allowed to interact with students.

16       Q      Okay.

17       A      In Utah, that can take up to two weeks.  So when

18               you employ somebody and then you get to tell

19               them, "Well, now we have to wait for your

20               background check, but we can't pay you, we can't

21               employ you," then they'll just go get a job

22               somewhere else.  So we created Three Points

23               Onboarding as a separate company where we can

24               train and pay our employees, and then they become

25               employees of Three Points Center, LLC, in Utah.

```
 1    Q     The employees that you've identified generally,
 2          where there's a risk of losing them if there's
 3          not this kind of immediate turnaround and get
 4          paid --
 5    A     Yes.
 6    Q     -- right; what are their job descriptions?  What
 7          are the job descriptions that -- where somebody
 8          might not take a job just because they wouldn't
 9          get paid for two weeks?
10    A     Youth mentor.
11    Q     Okay.  Is the youth mentor position one of the
12          ones with the highest amount of turnover in the
13          two businesses that you're -- you say you're the
14          CEO of?
15    A     Yes.
16    Q     Why is that?
17    A     It's a very challenging job.
18    Q     Do the activities, or do the -- I believe your
19          summary of what this organization does -- that's
20          per the deposition.  I'm not going to try to
21          repeat it.  But whatever they do, Three Points --
22          whatever Three Points Onboarding, LLC does, what
23          -- do they have to do that for any North Carolina
24          employees?
25    A     No.
```

1    Q        So this is purely related to Utah, California,

2             background-check compliance?

3    A        Yes.

4                     MR. CHANG:  Objection to form.  You can

5             go ahead.

6    Q        Okay.  All right.  During my client's deposition

7             on Monday, there were several documents entered

8             into exhibits.  I may refer to some of them

9             generally, and if we need to put them in front of

10            you to kind of pull things out, I do have my

11            copies.  But an organization called RMI was

12            mentioned.  Do you know who -- what RMI is, or

13            Resource Management, Incorporated is?

14   A        I have an idea.  I don't know the technical term,

15            but an HR organization.

16   Q        Okay.  How did RMI become involved in Three

17            Points?

18                    MR. CHANG:  Objection to form.

19   Q        How did RMI become involved in the two businesses

20            in the caption on the Complaint that you are the

21            CEO of now?

22   A        I'm sorry?

23   Q        We've got our particular way that we have to do

24            things.  So there -- remember, before lunch it

25            was -- we looked at Exhibit 1.

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And we went through it. |
| 3 | A | Yeah. |
| 4 | Q | Two of them you're the CEO of, correct? |
| 5 | A | Correct. |
| 6 | Q | The other ones don't have a CEO, the property |
| 7 | | ones. |
| 8 | A | Yeah. |
| 9 | Q | The two that you're the CEO of, how did RMI |
| 10 | | become involved with those two businesses? |
| 11 | A | My brother hired them. |
| 12 | Q | Okay. And who deals -- who is the point of |
| 13 | | contact right now for RMI in your organization? |
| 14 | A | No one. |
| 15 | Q | No one. Or are they no longer affiliated or -- |
| 16 | A | No. |
| 17 | Q | They're not. Have they been replaced by another |
| 18 | | HR organization? |
| 19 | A | Yes. |
| 20 | Q | Who is that? |
| 21 | A | isolved. |
| 22 | Q | isolved. When did isolved become -- replace RMI, |
| 23 | | if you will? |
| 24 | A | I don't remember exactly the time, but it was -- |
| 25 | | I think early last year. |

1    Q    So last year was 2000 --

2    A    In '22.

3    Q    -- '23.

4    A    I mean '23.  Thank you.

5    Q    Okay.

6    A    Yeah.

7    Q    Why did you get rid of RMI?

8    A    Basically, it was a budgetary decision.

9    Q    Did RMI -- it might be best just to have that.

10              Did RMI when -- before they were let go,

11         or the -- was there a contract with RMI?

12   A    Yes.

13   Q    Okay.  Before that contract was terminated, they

14        -- my understanding is they handled payroll.

15              MR. CHANG:  Objection to form.

16   Q    Is that correct?

17   A    Yeah.

18   Q    Did they ever lend or front any money to meet

19        your payroll needs, or were they just processing

20        the checks and connecting to Three Points's bank

21        accounts?

22              MR. CHANG:  Objection to form, but go.

23   Q    Let me just be -- I don't want to be obtuse about

24        it.

25   A    Yeah.

1    Q    So I didn't know about them till recently, so I'm

2         wrapping --

3    A    Yeah.

4    Q    -- my head around it.  I have a client -- I have

5         another client who makes payroll, but they're

6         provided money by like a -- it's called a

7         factoring organization.  They help them meet

8         their needs because they have accounts

9         receivable, I assume, right?

10   A    Yeah.

11   Q    So the money -- did RMI handle the payroll before

12        they were terminated?

13   A    Yes.

14   Q    In terms of making direct deposit to employees

15        such as a youth mentor?

16   A    Yes.

17   Q    Okay.  The money that RMI got into the employees'

18        bank accounts, did that come from RMI's bank

19        account and then you pay -- and then Three Points

20        paid RMI back, or was it a Three Points bank

21        account?

22   A    Three Points Center paid RMI, who then

23        distributed it to employees.  Three Points Center

24        never received loans or fronted money from RMI.

25   Q    Understood.  There was a blip somewhere that said

1    employee leasing.  Okay?

2    A    Uh-huh.

3    Q    So thank you for clarifying that.  I'll hand you

4    Exhibit 9.

5    (PLAINTIFF'S DEPOSITION EXHIBIT NO. 9

6         MARKED FOR IDENTIFICATION)

7    Q    Okay.  In Exhibit 9 can you -- you see at the

8    top, it looks like a computer-generated

9    timestamp?

10   A    Yes.

11   Q    We're not going to read the whole thing.  Can you

12   read the date filed?

13   A    November 30th, 2023.

14   Q    I'll pick up a little bit of the next load.  This

15   is a file -- tell me if you disagree.  This is a

16   filing with the State of North Carolina

17   Department of the Secretary of State.

18   A    Are you asking me?

19   Q    Yeah.  And I should have said, "Is this?"  Yes.

20   A    Yes.

21   Q    Is this a filing?  Okay.  Is it a filing that was

22   filed on behalf of Three Points Center, LLC?

23   A    Yes.

24   Q    What is the purpose of this filing?

25   A    To withdraw the LLC from the State of Colorado,

1         as I understood it.

2    Q    Okay.  Let's see here.  It's a little bit blurry,

3         but -- I'm going to read number four.  Okay?  I'm

4         going to read it slowly.  It says, "The limited

5         liability company revokes the authority of its

6         registered agent to accept service of process and

7         consents that service of process in any action or

8         proceeding based upon any cause of action arising

9         in the State of North Carolina."

10   A    North Carolina.  Yeah, I misread that.

11   Q    It's tiny.  It's all right.

12   A    Yeah.

13   Q    What is your understanding of the purpose of this

14        document now?

15   A    I would have to have you ask Colby Dalley.  There

16        was a -- there's an issue that I don't understand

17        between the Secretary of State and the Department

18        of Revenue in North Carolina.

19   Q    Okay.  And Colby Dalley is the -- he's the CFO?

20   A    Correct.

21   Q    But let's just look at the title of this.

22        "Application for Certificate of Withdrawal of

23        Limited Liability Company."

24   A    Yeah.

25   Q    So if Three Points Center, LLC, had to withdraw

1            from North Carolina via filing, at what point did

2            Three Points Center, LLC, get into this state?

3                 MR. CHANG:  Objection to form.  Answer if

4            you understood.

5       A    I -- can you rephrase the question, please?

6       Q    I'll represent that this filing is one of several

7            filings associated with Three Points Center, LLC.

8       A    Uh-huh.

9       Q    Do you have any reason to disagree with me?

10           Because I didn't want to print off all of these

11           documents because they're filings.  Do you have

12           any reason to disagree with me that there are

13           filings before this one by Three Points Center,

14           LLC?

15      A    I don't know.

16      Q    Did Three Points Center, LLC, ever register, to

17           your knowledge, with the North Carolina Secretary

18           of State to transact business in this state?

19                MR. CHANG:  Objection to form.  Answer if

20           you understand.

21      A    If -- one more time, please.

22      Q    Why would a company have to withdraw from the

23           state if it hadn't already appeared in the state?

24                MR. CHANG:  Objection to form.  I think

25           the previous question was better.  I'm sorry.

1    Q      You are the CEO of --

2    A      Yes.

3    Q      -- two businesses, correct --

4    A      Yes, yes.

5    Q      -- Dr. Thibault?

6    A      Yes.

7    Q      And I've already been instructed not to ask about

8           specifics.  Do you remember the IRS forms that we

9           looked at and the numbers for the revenue?

10   A      I do.

11   Q      Is it fair to say that the companies that you are

12          CEO of make millions of -- or generate millions

13          of dollars a year?

14   A      Define generate, please.  What is the legal

15          definition of generate?

16   Q      The total sum of the money received from parent

17          tuition, California county programs, and the wild

18          mustang reimbursement program.  If you add all

19          those up generally, does it exceed millions of

20          dollars?

21                 MR. CHANG:  I'm going to object if you're

22          talking about Three Points Center, LLC, or Three

23          Points Center North Carolina.  Are you just

24          talking about Three Points Academy?

25   Q      Let's do this.  You can -- we have a standing

1          objection.  Moving forward, whenever I ask the

2          question about Three Points and the businesses

3          that you're in charge of, we can say that what

4          I'm asking is are the businesses that you are the

5          CEO of that you identified on Exhibit 1 --

6     A    Yes.

7     Q    -- okay?  The total revenue for those businesses

8          that you're the CEO of, it's millions -- it's

9          over a million dollars a year.

10              MR. CHANG:  Then I'm going to go back to

11         my objection about finances being -- we're going

12         to move for protective order.  I don't want --

13         we're not going to disclose financial

14         information, magnitudes of millions.

15    Q    Okay.  As the CEO -- how do you see your role as

16         a CEO for the next five years?

17              MR. CHANG:  Objection to form.  Go ahead.

18    A    Consulting with the leaders of Three Points

19         Center, guiding policy, training.

20    Q    Do you see yourself having any type of active

21         role in understanding the numbers behind these

22         two businesses?

23    A    Active?  Define active.

24    Q    Knowing how much money your companies make and

25         where it comes from.

1    A    I'll have an idea of that.

2    Q    And you do have -- you have a general

3         understanding of what the purpose of these

4         different corporations are that are named on the

5         lawsuit that you initiated in Colorado.  Correct?

6    A    Yes.

7    Q    Just trying to get it right.  Why would an LLC,

8         which you're the CEO of, have to withdraw from

9         the state if they've never been in the state?

10                   MR. CHANG:  Objection.

11   A    My brother registered Three Points Center in

12        North Carolina when he was alive.  He made the

13        mistake of not registering it as Three Points

14        Center North Carolina in North Carolina.

15   Q    But he knew that Three Points North Carolina

16        existed, didn't he?

17   A    Yes.

18   Q    Isn't your brother a very sophisticated

19        businessman -- or wasn't he?

20   A    No.

21   Q    He was not?

22   A    No.

23   Q    Does the current version of the employee handbook

24        talk about Glenn Thibault's business acumen?

25   A    I don't recall.

```
 1      Q       Did he have business acumen?

 2                      MR. CHANG:  Objection to form.

 3      A       We're in a lawsuit against my brother's estate

 4              because of his business acumen.  That's very

 5              painful.

 6      Q       I understand that, and we will -- let's go back

 7              before the pain.

 8      A       Yeah.

 9      Q       2014, Three Points Center did not exist, did it?

10      A       No.

11      Q       Would it have existed without Glenn Thibault?

12      A       Eventually.

13      Q       What did Glenn Thibault bring to the table to

14              make Three Points Center exist?

15      A       Seven friends who had money.

16      Q       And that's it?

17      A       Yeah.

18      Q       Do you recall what his percentage of ownership

19              was from --

20      A       Forty-eight percent.

21      Q       So did he have the most money of the seven

22              friends?  Are you including him in the seven

23              friends?

24      A       Yes.

25      Q       Okay.  Why was his percentage the highest among
```

1          all of the members of the LLC?

2     A    He put in the most money.

3     Q    How did he get that money?

4     A    Business interests, I believe.  Actually, I

5          shouldn't say.  I don't know.

6     Q    Was he successful in business before he passed?

7     A    I believe so.

8     Q    So it's your testimony that your brother, who had

9          the most money of all the seven friends to start

10         Three Points, when he filed something with the

11         North Carolina Secretary of State, that he should

12         have put the word North Carolina on that filing?

13    A    My brother had the worst ADD you have ever seen.

14         Yes.

15    Q    Okay.  I believe - remember when I -- the

16         turnover for the youth mentor position.  Remember

17         that question?  It wasn't too long ago.

18    A    Yeah.

19    Q    I asked if it was a tough job.  Do you remember

20         that?

21    A    I don't remember you asking that.  I remember I

22         said that.

23    Q    Okay.

24    A    Yeah.

25    Q    I'm going to ask it.  Is it a tough job?

1    A    Yes.

2    Q    Why?

3    A    We work with the hardest children to work with in

4         residential treatment.

5    Q    To your knowledge -- and I'm not asking about

6         your facility, just the residential treatment

7         industry.  I'm not using "troubled teens."  Has

8         any student ever killed a counselor or staff

9         member of a facility?

10   A    Yes.

11   Q    Has a significant -- are significant injuries

12        inflicted by the population served?  Is that a

13        risk that has to be considered on a day-to-day

14        basis?

15   A    It's possible.

16   Q    Does the risk that -- do you believe -- well, let

17        me ask a specific question.

18             Three Points Center Utah.  What is the

19        worst injury that's been inflicted on a staff

20        member by a student?  Not asking for dates,

21        student names, or anything.

22   A    To my knowledge, a broken nose.  Yeah.  That's

23        what I would say right now.

24   Q    I guess, I mean, considering what could happen,

25        would you consider you and your company fortunate

```
 1                    then for that to be the worst one?
 2        A          We take quite a few precautions to ensure the
 3                   safety of our employees.  So I don't want to
 4                   speculate on what could happen.
 5        Q          Okay.
 6        A          Yeah.
 7        Q          Have there ever been any lawsuits filed against
 8                   either of the businesses that you're the CEO of
 9                   on the complaint by a parent?
10        A          Yes.
11        Q          Without identifying anything -- specific names,
12                   whatever -- please generally describe the nature
13                   of that lawsuit.
14        A          A mentor was playing with one of our students,
15                   wrestling, rough housing.  The student's ankle
16                   was injured.  The student was given appropriate
17                   and immediate medical care by our nurse, which
18                   was reviewed by our consulting physician.  The
19                   parent came to visit.  Took the student in for an
20                   X-ray.  The ankle apparently was broken.  And the
21                   parent felt like the X-ray should have been done
22                   sooner, and alleged that it was abusive treatment
23                   and neglect of treatment at the time.
24        Q          Did your -- was it at the Utah facility?
25        A          Yes.
```

1    Q    Did Three Points Center conduct an internal

2         investigation into it?

3    A    Yes.

4    Q    How did that investigation -- well, who is

5         responsible for the internal investigations at

6         Three Points?

7    A    I don't recall who exactly did the investigation

8         itself.  We reported it to Child Protective

9         Services.  We reported it to the Office of

10        Licensing.  And they both investigated it, as

11        well.

12   Q    Have there been any -- so the one in Utah.  Have

13        there been any -- short of a demand up to a

14        lawsuit related to the operations in North

15        Carolina?

16   A    No, not that I'm aware.

17   Q    No.  Does Three Points Center carry a liability

18        policy to account for those types of potential

19        claims by parents or students, former students?

20   A    Which program?

21   Q    For either of the businesses that you are the CEO

22        of identified on the Complaint.

23   A    Yes.

24   Q    Okay.  What are the limits on that policy?

25   A    I want to say 3 million or 5 million, but I don't

1              remember off the top of my head.

2      Q      What is the -- the CEO hat.  What is the biggest

3              liability risk facing the businesses that you are

4              the CEO of?

5      A      I'm not sure I understand what you mean by

6              liability risk.

7      Q      If you had to do a training, develop a training

8              right now for a new youth mentor position that

9              had to get done in an hour, hit the high points.

10             What are you telling them to be thinking about in

11             order to perform their job safely?

12     A      Don't be alone with a student.

13     Q      That's number one.  Is there anything else?

14     A      I would explain to them why the students respond

15             the way they do.  The attachment and trauma

16             training I'd do quickly.

17     Q      Okay.  All right.

18     A      I would make sure that they knew to talk to their

19             supervisors to make sure that they were aware of

20             any concerns, to be aware of any concerns.

21     Q      Okay.

22     A      Yeah.

23     Q      Anything else?

24     A      I mean, I could go on and on.

25     Q      Right.  No.  And remember when I asked what was

1          the biggest liability risk?  Let me be a little

2          more direct.  It's my understanding that some --

3          that there's something called a restraint that

4          may have to happen depending upon the

5          circumstances, and based on the student's

6          behavior at a certain point in time.  Is the word

7          "restraint" one that you use?

8     A    We like safety holds.

9     Q    Safety holds.

10    A    Yeah.

11    Q    Tell me about safety holds.

12    A    When a student is of significant danger to

13         themselves or another party, we may have to use

14         safety holds to keep them safe.

15    Q    Are new employees -- knowing that the last

16         question about what would you train an employee

17         in an hour, but in terms of the components, would

18         safety -- would the issues related to a safety

19         hold be something that you would focus a lot on

20         in terms of defining the expectations of

21         employees?

22    A    At the outset, no.  I've done this for 30 years

23         and I've been in two safety holds.

24    Q    You would say you've been in two that you've had

25         to do?

1    A    Yeah.

2    Q    Are the safety -- more of a general industry

3         question.

4    A    Sure.

5    Q    You know, as a member of the National Association

6         of Therapeutic Schools, they have conferences --

7    A    Yeah.

8    Q    -- right?  Can you think of -- or when was the

9         last conference that you went to?

10   A    It was in Orlando two weeks ago.

11   Q    Two weeks ago.

12   A    Yeah.

13   Q    What were some of the topics that they discussed?

14   A    Polyvagal theory, trauma, responding to trauma.

15        Supporting employees in a time of financial

16        challenges.  Yeah.  Generally, industry-type

17        things.

18   Q    When you say supporting employees, what do you

19        mean by that?  And you said in times of financial

20        challenges.

21   A    Yeah.

22   Q    For the business or for the employee?

23   A    Both.

24   Q    Okay.

25   A    Yeah.

1    Q        What's going on right now?

2    A        With inflation, you know, people are having a

3             hard time making ends meet.  And so some

4             companies make arrangements with, for example,

5             grocers to get discounts.  We have an arrangement

6             because we're in a rural ranch in Utah, that if

7             people get flat tires coming to our ranch, a

8             local tire company will fix their flats for them

9             for free.  Things like that.

10   Q        Is it -- since you've become a leader in

11            companies that are employers, is it hard to find

12            good people to fill these jobs right now?

13   A        It can be.

14   Q        Why is that?

15   A        There are a number of programs in a small area in

16            southern Utah, and there's not a lot of

17            population to fill those jobs.  It's labor

18            intensive.

19   Q        What about -- are there differences in the labor

20            markets -- and I'm going to -- for the youth

21            mentor supervisor roles in Utah than in North

22            Carolina?

23   A        Rephrase that for me, please.

24   Q        Do you believe that North -- that staffing the

25            North Carolina facility with youth mentors has

1              similar challenges to Utah?

2      A     I don't know.

3      Q     You don't know?

4      A     No.

5      Q     Mr. Palmer?

6      A     Yeah.

7      Q     And I'm going to be up front, that I'm looking at

8            things to help me here that I don't necessarily

9            think need to be admitted as exhibits.

10     A     Okay.

11     Q     Okay?

12     A     Yeah.

13     Q     Have -- in your experiences as a -- in the

14           industry, have police -- have criminal charges

15           ever been filed against a worker in a residential

16           treatment facility?

17     A     In any treatment facility?

18     Q     Right.  I'm just probing your -- I mean, you're

19           -- you've been in the industry for how long now?

20     A     Three decades.

21     Q     Three decades.

22     A     Yeah.  Yes.

23     Q     Yes.

24     A     Yeah.

25     Q     How -- is it physical abuse -- and there may be

1          an overlap -- or sexual abuse that the employees

2          do more with the students?

3     A    I have no idea.

4     Q    Does Three Points -- well.  Have any facilities

5          that you know of in Utah ever been closed down

6          due to violations/issues related to employees

7          harming students?

8     A    A facility did not have its license renewed

9          because of the way they handled a student.

10    Q    I'm going to ask, because remember we talked --

11         so in Utah, what is the license called for Three

12         Points Center's facility in Utah?

13    A    Residential treatment center, therapeutic

14         boarding school, outpatient treatment, day

15         treatment.

16    Q    Four separate licenses?

17    A    Yes.

18    Q    All right.  North Carolina.  Are there any

19         licenses specifically with the facility in

20         Chatham County?

21    A    Licensed by the Department of Education.

22    Q    Department of Education.  What is the reason that

23         there are more licensing requirements --

24         actually, before I ask that.

25              What are the key differences between --

1          besides male/female.  Besides male/female, what

2          are the key differences between the Utah facility

3          and North Carolina?  If there are any.  I thought

4          there was something else besides male/female.

5     A    The way they operate.  The North Carolina

6          facility operates, for example, the mustang

7          program differently.

8     Q    Okay.  I can fix this one.  If the program as it

9          is right now in Chatham County, the program --

10         not number of students, but just what they have

11         -- was in Utah.  And we're not calling it Three

12         Points.  Just whatever's happening here in terms

13         of the services provided, would it have to have

14         the same four licenses that you identified for

15         Three Points Utah?

16    A    No.

17    Q    No?

18    A    No.

19    Q    Which ones?  What makes --

20    A    It would meet the requirements for a residential

21         treatment center in Utah.

22    Q    Okay.  And what was the -- the therapeutic

23         boarding.  It would not meet the therapeutic

24         boarding school one?

25    A    It would, but it wouldn't need them.

1    Q    Why is that?

2    A    Because the staffing requirements are different.

3    Q    Please explain.

4    A    In a residential treatment center, you need more

5         intensive staffing requirements than in a

6         therapeutic boarding school.

7    Q    So that's -- so the one in Siler City -- or in

8         Chatham County has less intensive staffing

9         requirements than Utah because it's not a -- it's

10        a therapeutic boarding school?

11   A    North -- no.  By choice, it has the same ratio.

12   Q    Okay.  All right.  What are those ratios?

13   A    Four to one.

14   Q    Four to one what?

15   A    So four students for every staff member.  Every

16        mentor.

17   Q    Every mentor.

18   A    Correct.

19   Q    All right.  So I think it's a good time -- you

20        said four to one?

21   A    Uh-huh.

22   Q    How many -- is there a dorm that just has 12 beds

23        in it?  I'm trying --

24   A    I don't know.

25   Q    You don't know?

```
 1      A      I don't know.

 2      Q      All right.  So when you say four to one, it

 3             doesn't matter if it's in a dorm.  It's out in

 4             the field.  It's anywhere.  Is that what you

 5             mean?

 6      A      Yes.  Except for nighttime sleeping hours when

 7             the ratios can be reduced.

 8      Q      Okay.  So let's go daytime.

 9      A      Yeah.

10      Q      All right.

11      A      Daytime, it's four to one.

12      Q      Walk me through a day in the life of one of the

13             girls -- and I say girls because I have a client,

14             and they refer to them as that, and I think in an

15             endearing manner.

16      A      Sure.

17      Q      So if I do, that's why.

18      A      Okay.

19      Q      Students and residents.

20      A      Yeah.

21      Q      Walk me through a day in the life of one of the

22             students and residents at Three Points in Chatham

23             County.

24                    MR. CHANG:  Object to form.

25      A      I can't tell you exactly.
```

1    Q    And I think that's too -- because it's not

2         sensitive enough to a day in the life.  I mean in

3         terms of their program activities.  Right?

4         Something about -- like summer camp.  Like when I

5         -- you know --

6    A    Right.

7    Q    -- you wake up.  You go get breakfast.  The

8         counselor makes you do stuff.

9    A    Yeah.

10   Q    You've got this and that.  That type of stuff.

11   A    Yeah.

12              MR. CHANG:  Object to form.

13   Q    But you can -- please answer --

14              MR. CHANG:  You can answer.

15   Q    -- if you've got an idea of what I'm asking

16        about.

17   A    Yeah.  I can't be exact, Mr. Davis, because I'm

18        really not familiar with the exact schedule

19        throughout the day there.  I can tell you some of

20        the proponents of -- some of the components of

21        it.

22   Q    I know you're not familiar, but -- and I know

23        you've worked with Mr. Palmer for a long time.

24   A    Yeah.

25   Q    Let's take him out of the picture for now, just

1          for this.  And somebody else took over Mr.

2          Palmer's role, okay?

3     A    Yeah.

4     Q    And then you came for a site visit, and you were

5          like, "This is not how it's supposed to be.  It

6          needs to be like this."  What's Dr. Thibault's

7          recommendation on how these girls' day should be

8          structured?

9               MR. CHANG:  Object to form.  But if you

10         understand the hypothetical.

11    A    I can tell you what I think the day looks like.

12         I'm not sure I understand what I would say would

13         be different, because I don't know exactly what

14         is different.

15    Q    Let me tell you what I'm asking about.  There's a

16         close -- I believe -- and tell me if you agree

17         with this.  I believe that there is a close

18         relationship between the youth mentor position

19         and the majority of the waking day for these girl

20         -- for the students.  They're with them more time

21         than, say, the horse supervisor.  Okay?  Who

22         wakes the girls up?

23    A    Typically, the mentors.

24    Q    The mentors.  What do the girls -- what do the

25         mentors do after the girls wake up?  Well, do --

1                   let's do Utah.

2        A         Yeah.

3        Q         You're familiar with it.

4        A         They instruct them to get cleaned up, do basic

5                   hygiene.  They walk them over where they feed and

6                   water horses.  Then they come back and have

7                   breakfast.

8        Q         Okay.

9        A         And they're with them those times.  And then they

10                  would take them to school and that's when they're

11                  in their academics.  And so the mentors may shift

12                  groups, may switch around, but the kids are in

13                  school throughout most of the day.

14       Q         Okay.  So -- and do not forget why we're here.

15                  We're talking about the ratios.

16       A         Yeah.

17       Q         So when you say they're at school, is there like

18                  a schoolhouse in Utah?

19       A         Yes.

20       Q         Okay.  And there's a teacher in there?

21       A         Yes.

22       Q         If the students are not in the schoolhouse and

23                  they're walking around, it's four to one, right?

24       A         Right.

25       Q         Okay.  If you go into the schoolhouse, there's --

1              I'm assuming there's a teacher in there.

2     A     Uh-huh.

3     Q     Could one of the youth mentors then take a

4           breather?  Does that count as one?  The teacher,

5           too?

6     A     Typically one of the youth mentors will be in the

7           classroom with the teacher, and another one will

8           be outside in the hallway.

9     Q     In terms of maintaining the ratios and -- let me

10          just think for a second.

11               If there was an inspection in Utah --

12          because that's the regulation that you have to

13          comply with in Utah and that you say you

14          voluntarily comply with in North Carolina, the

15          ratio?

16    A     Yes.  Yes, sir.

17    Q     If an inspector showed up at your facility --

18          let's do another one so we don't have to make it

19          like Three Points is doing this, right?

20    A     Yeah.

21    Q     Let's say they showed up at a facility and there

22          are four girls walking from the dorm to school.

23          They're not in there yet.

24    A     Yeah.

25    Q     There would have to be one staff member with

1          them, correct?

2    A     This is in Three Points Center?  Because we don't

3          allow --

4    Q     Well, let's just say the regulation.  The

5          regulations.

6    A     Okay.

7    Q     I want to just focus on that.  I think that's

8          good.

9    A     Yeah.

10   Q     So four students, one youth mentor.

11   A     Yes.

12   Q     Okay.  Eight students, there would have to be two

13         youth mentors.

14   A     Yes, sir.

15   Q     But if there wasn't a youth mentor, could any

16         other staff member fill in to achieve that

17         regulatory ratio?

18   A     If they were trained appropriately in the variety

19         of verbal de-escalation and other behavior

20         management techniques.

21   Q     Tell me about that training.

22   A     Like I said, it's verbal de-escalation.  It's

23         learning how to talk to students and to manage

24         their dysregulation.  It's seeking backup when

25         needed from other staff members to help

1          de-escalate situations.  We call it verbal judo.

2     Q    Okay.  Remember we were talking about Three

3          Points Onboarding?

4     A    Yeah.

5     Q    The purpose behind that was to -- you know, it's

6          hard to find staff members, the youth mentor,

7          correct?

8     A    Correct.

9     Q    And so having Three Points Onboarding, that gets

10         the youth mentors paid, you know, the first week.

11    A    Yeah.

12    Q    And so the question is if a new staff member is

13         an employee of Three Points Onboarding, their

14         first day of work, would they be able to provide

15         that supervision for the ratios that we've been

16         discussing?

17    A    Not in Utah.

18    Q    How much training do they need before they can be

19         an employee that provides the necessary ratio?

20    A    In which campus?

21    Q    We're still in Utah.

22    A    It primarily depends on their background check.

23    Q    Okay.  Let's -- so the background check.  If

24         there is a new hire, I assume that they come to

25         -- we're staying in Utah.  They come to the

1          facility for an interview.  Do they start work

2          that day, on the same day as the interview?

3    A    In Chatham County?

4    Q    No, in Utah.

5    A    In Utah.  No.

6    Q    No.  What's their first day at the facility like?

7    A    Filling out paperwork.

8    Q    When does the training that you identified as

9          being necessary occur?

10   A    It depends on how many employees we have in the

11        line-up to go into the onboarding class, because

12        we kind of group them together.

13   Q    Okay.  Thank you.  And so these ratios that are a

14        regulatory requirement in Utah, if that inspector

15        that comes out to a facility so regulated and

16        sees eight girls walking, but only one mentor,

17        what happens?

18   A    They would be cited for a violation in Utah.

19   Q    Has your facility in Utah ever been cited for a

20        violation of any of the applicable regulations?

21   A    Yes.

22   Q    When?

23   A    Gosh.  I don't have a list of them.

24   Q    Do you keep a list of them?

25   A    The State reminds us.

```
1     Q      What -- is that Exhibit 10?

2     A      Ten, yeah.

3     Q      I'm sorry.

4     A      Yeah.

5            (PLAINTIFF'S DEPOSITION EXHIBIT NO. 10

6                 MARKED FOR IDENTIFICATION)

7     Q      Okay.  I've handed you Exhibit 10.  It is a

8            print-off, a PDF print-off of a newspaper

9            article.  It appears to be from the Salt Lake

10           Tribune.  It says three Utah -- the headline is

11           "Three Utah Treatment Centers Disciplined for

12           Assaults, Unnecessary Inclusion of Painful

13           Restraints."  And I'm not going to read through

14           this, but if you turn to the fourth page of it,

15           it says 4 of 7 at the bottom.  What is the

16           facility identified on this page?

17    A      Three Points Center.

18    Q      What happened, Dr. Thibault?

19    A      With what?

20    Q      Which led to this discipline that this article is

21           referring to.

22    A      We're going to be here a long time.

23    Q      I'm all right with a brief summary.

24    A      The Senate passed State Bill 127 in Utah, which

25           had rewritten the rules and laws for residential
```

1          treatment centers in Utah.  Okay?  So as a

2          result, the Department of Licensing had to hire a

3          bunch of new investigators and licensers for

4          programs in Utah.  And I know this because I'm on

5          the NATSAP executive committee to the

6          legislature.  Okay?  New licensers came in and

7          spoke with kids and basically misrepresented what

8          the rule said.  So we had situations where kids

9          were being given permission, implying permission

10         to go AWOL -- we say run off campus -- by the

11         licensers.

12                 And it became very, very challenging for

13         us to work with the kids and keep them contained,

14         when state officials were coming in and telling

15         them unless you're a danger of harm to yourself

16         or others, they can't stop you from leaving.

17    Q    Okay.

18    A    My campus in Utah has mesas.  Okay.  It's in the

19         southwest desert and literally between my campus

20         in Utah and the Grand Canyon is nothing but the

21         Nevada -- I mean -- excuse me -- the Arizona

22         Strip.  Hundreds of thousands of acres of wild

23         desert.  I cannot risk these children's lives by

24         allowing them to run out in the middle of the

25         night in the wrong direction.  And so I had some

1          intense conversations with the Department of

2          Licensing about what was happening.  Ultimately,

3          where the -- finally, the director of licensing

4          emailed me and said you have permission now to

5          stop these kids from leaving your campus.  But

6          prior to that, they would cite us for stopping

7          kids from doing this, to try to save their lives

8          and protect them because we had kids running out

9          into the wild.

10    Q    So the issue is not so much the regulation, but

11         the agency inspectors' interpretation of the

12         regulation.

13    A    Yes.

14    Q    And so you're on the NATSAP executive committee?

15    A    The Utah NATSAP executive committee.

16    Q    Okay.  The Utah NATSAP.

17    A    It's a committee of four persons who speak with

18         the legislatures.  Next week I have a meeting

19         with Governor Cox and the lieutenant governor and

20         some others about legislation for these programs.

21    Q    And so that NATSAP, the Utah one, is that the one

22         that the dues are $10,000?

23    A    We're a state chapter of the larger organization.

24    Q    Okay.  And so you're one of four in the State of

25         Utah.

1    A      Correct.

2    Q      You're one of the four leaders.

3    A      Yes.

4    Q      Like is it fair to say that you're the face --

5           you are one of the big faces of this -- excuse me

6           -- that you are a prominent leader in this

7           industry?

8    A      I wouldn't say in the entire industry.  I would

9           say I am on the Utah executive committee, one of

10          four members.

11   Q      Are there any other residential treatment centers

12          that have the type of corporate dis-separation

13          that we've been having a lot -- I've been asking

14          a lot of questions about?

15               MR. CHANG:  Objection to form.

16   Q      Do you know any -- of the people that you know in

17          your industry -- what's the name of another

18          facility?

19   A      You want just the name of another treatment

20          center?

21   Q      Uh-huh.

22   A      Now I'm drawing a blank.  Give me a second.

23          Discovery Ranch for Girls.

24   Q      What is the name of a treatment center that has

25          two locations?

1                    MR. CHANG:  Objection to form.

2        A    I don't know of a treatment center that has

3             multiple locations off the top of my head.

4        Q    So is Three Points Center unique in that regard?

5                    MR. CHANG:  Objection to form.

6        A    Meaning?

7        Q    Well, are -- at these conferences, you meet with

8             people like you.

9        A    Sure.

10       Q    The CEOs of other treatment centers.

11       A    Yes, sir.

12       Q    To the best of your recollection, is Three Points

13            Center unique in that there's two locations on

14            two different sides of the country?

15                   MR. CHANG:  Objection to form.

16       Q    All right.  Are there any residential treatment

17            programs that have the same CEO that you know of

18            that have -- that that CEO is the CEO of two

19            different facilities in two different locations?

20       A    Not that I'm aware of.

21       Q    You are unique then among your counterparts in

22            that you are the CEO of two treatment centers on

23            two different sides of the country.  Is that a

24            fair statement?

25                   MR. CHANG:  Objection to form.

Dr. Thibault

| | | |
|---|---|---|
1    A    I don't know.  I can't speak to others.  I'm not
2         aware of others like --
3    Q    Okay.  That's -- some of these, you're just not
4         aware.
5    A    Yeah.
6    Q    How did you get on the NATSAP executive
7         committee?
8    A    I was nominated and voted on.
9    Q    How many members are there in the Utah NATSAP
10        executive committee?
11   A    Four.
12   Q    Oh, there's only four members total?
13   A    On the executive committee.
14   Q    Okay.  I mean how many members are there -- how
15        many therapeutic schools?  You know, ballpark.
16   A    I could find out for you pretty easily, but off
17        the top of my head, 20, 30.
18   Q    How many are there in North Carolina now?
19   A    Quite a few.  Twenty, 30, I would say, maybe.
20   Q    Has North Carolina formed its own chapter?
21   A    No.
22   Q    No.
23   A    No.
24   Q    Should it?
25   A    I don't know.

```
 1    Q       The regulations that -- I believe when we talked
 2            about NATSAP national, I think your testimony was
 3            -- and please correct me -- is that it was better
 4            for the industry to have it.
 5    A       Yes.
 6    Q       Is the industry in Utah better for -- by having
 7            the regulations?
 8    A       Yes.
 9    Q       They are?
10    A       Yes.
11    Q       So do you invite the regulation?
12    A       Yes.
13    Q       Do you think North Carolina should be similarly
14            regulated?
15    A       I don't know that they aren't.  I don't know.
16    Q       Has Three Points Center in Utah ever been cited
17            for a ratio violation?
18    A       Not to my knowledge.
19    Q       Do you see on Exhibit 10 where the author of this
20            headline wrote, "Three Utah teen treatment
21            centers disciplined"?
22    A       Uh-huh.
23    Q       Did the -- well, what is discipline?
24            MR. CHANG:  Objection to form.
25    A       Are you asking what the state considers
```

```
 1              discipline?
 2    Q        No.  I think I'm more just pointing it out
 3             because I've -- when a state takes an official
 4             action like that, I would consider it to be a
 5             violation.  I just think it's --
 6    A        Yeah.
 7    Q        I'm transitioning into another part of the
 8             deposition, so I'm asking what is discipline,
 9             generally.
10                 MR. CHANG:  Objection to form.
11    A        That seems real nebulous to me.  Help me.  What
12             does discipline mean?  In what context?
13    Q        Fair, fair.  Your family -- we'll start -- the
14             background in family and marital counseling.
15             What is discipline in terms of the parent-child
16             relationship?
17    A        Correction.
18    Q        Okay.  All right.  Now, I would say that's kind
19             of nebulous.  Correction of what?
20    A        It depends on the context.
21    Q        But what's being corrected?
22    A        That depends on the context.
23    Q        I think -- you mean behavior is being corrected?
24             Like what --
25                 MR. CHANG:  Objection to form.
```

1    A    It depends on the context.  It could be thoughts,

2         feelings, urges, motives, behaviors.

3    Q    Are you saying so --

4    A    I mean, if you're speaking on discipline,

5         discipline can come in any -- come in factors,

6         any kind of --

7    Q    Discipline can come in any number of factors.

8         But what is the purpose of discipline?

9    A    Correction.

10            MR. CHANG:  Objection to form.

11            MR. DAVIS:  I don't understand that

12         objection, Jimmy.  I'm going to ask -- I just --

13            MR. CHANG:  What are you talking about?

14         You're just ask -- are we going to -- I think

15         you're not really respecting how complicated this

16         field of work is.  And so you're just spit

17         balling and just -- but go ahead.  I said

18         objection to form.  He apparently understood the

19         question.  He answered.  What's your problem?

20    Q    What is -- can you give me an example, one

21         example of discipline between a parent and child?

22    A    Sure.  A child runs out into the street and a

23         parent brings the child back, and sternly tells

24         them that what they did was dangerous and they

25         should never do that.

1      Q      Okay.  So that could be the first incident of

2             discipline, the stern warning.

3      A      Uh-huh.

4      Q      And is running -- is it fair to say, just to

5             develop our dialogue, that running out into the

6             street is the behavior sought to be deterred?

7      A      Yes.

8      Q      And in that context, the reason the behavior was

9             disciplined is because it's eventually dangerous

10            for the child.

11     A      Yes.

12     Q      Do Three Point -- does Three Points, either one

13            of the facilities, do they discipline the

14            students when they put themselves at risk for

15            harm in a similar way, if they ran away from

16            campus, that type of thing?

17     A      Depends on the context.

18     Q      Okay.  Give me an example of the type of

19            discipline that is administered when a student

20            puts themselves in harm's way, like the child

21            running out into the street.

22     A      If a student, for example, went and ran off

23            campus, they may not have their shoes for a day

24            or two.  They may have socks.  They may have

25            sandals, what have you.  But they can't have

1          tennis shoes for a day or two, just to make sure

2          that they don't try to run away for the next day

3          or two.

4     Q    Is that the -- for that particular situation, is

5          that the first discipline for that -- for a

6          runaway, or is there something before?

7     A    We don't have a set -- that doesn't work for the

8          kids we work with.  It's important to understand

9          that the children we work with, behavioral means

10         do not work.  And you have to be quite literal

11         with them because cognitively and emotionally

12         they're typically delayed three, four, or more

13         years behind their peer groups.  And so while

14         they look like we're dealing with adolescents, in

15         fact what we're dealing with cognitively are much

16         younger children.

17    Q    You said behavioral means.  What do you mean by

18         that?

19    A    Any kind of discipline that is behavioral in

20         nature, such as rewards like stickers and charts,

21         and punishments, we don't do that at Three Points

22         Center.

23    Q    Okay.  So taking the shoes away, that's not

24         considered a punishment.  What is it considered?

25    A    A safety measure.

1    Q      That's a safety measure.

2    A      Yeah.

3    Q      Okay.

4    A      Yeah.  What might be considered discipline?  A

5           student gets upset and punches a wall, breaks a

6           wall, they have to help the person repair the

7           wall.

8    Q      Okay.  When a student -- we've got two examples

9           now.

10   A      Yeah.

11   Q      When a student runs away, when they're returned

12          safely, when are their shoes taken from them?

13   A      Typically, as soon as they're back on campus.

14   Q      What is the value in disciplining a student

15          immediately for behaviors that are potentially

16          harmful to them or others?  Psychologically

17          speaking.

18   A      Our goal is not to punish them, but to maintain

19          safety.  So whatever we do is about maintaining

20          safety for the student.  Our number-one task is

21          their safety.

22   Q      Understood.  But in order to maintain safety,

23          which is the goal, is it fair to say that certain

24          conduct has to be deterred?

25   A      Discouraged.

1    Q    Discouraged, deterred.  Is there a difference --

2    A    Uh-huh.

3    Q    -- for you?  What is it?

4    A    Yeah.  Because we don't -- we're not seeking

5         compliance from our students.  Compliance doesn't

6         work for these kids because they've already been

7         abused or have been in foster care and

8         orphanages, so compliance does not impact them

9         and it's in -- actually is contra-indicated.  So

10        the goal to try to make them behave doesn't work.

11        Our goal is to get them to make choices to align

12        with us, to have enough influence where they

13        trust us --

14   Q    Okay.

15   A    -- and feel safe with us so that we can guide

16        them towards healthier decisions for their lives.

17   Q    Okay.  Second example, punching the wall.

18   A    Yeah.

19   Q    And you gave the example of the discipline.  Now,

20        I believe you testified that there's some

21        flexibility with what -- what discipline is and

22        when it occurs, correct?

23   A    It's contextual.

24   Q    It's contextual.

25   A    Yeah.

1    Q    So the punching the wall example and they have to

2         fix the wall, what are just a couple other

3         possible disciplinary actions that could be taken

4         that you believe would help?  What was it?  That

5         it's not for compliance, it's what?

6    A    Yeah.  It's not about compliance.  It's allowing

7         them the freedom to make choices.  It's about

8         safety.

9    Q    Okay.  What would be another thing besides fixing

10        the wall?

11   A    Having to explain to their parents what they did.

12   Q    Okay.

13   A    You know, or having to explain to their group why

14        they have to spend time now fixing this wall as

15        opposed to going on an activity or something.

16   Q    Can they be deprived of any other rights or not

17        -- excuse me, not rights -- any other privileges

18        that other students might have had they not, you

19        know, done that?

20   A    Typically not.  The only time students are not

21        allowed certain privileges is if it's a safety

22        risk.  Otherwise, no, we never deny them

23        activities and privileges simply based on

24        behavior, because that's not what we're about.

25   Q    When you said privileges, you did put an air

```
 1               quote up.

 2      A        Yeah.

 3      Q        What do you consider to be privileges?

 4      A        Well, going off campus.  Going -- you know, for

 5               example, they've gone kayaking, and they do

 6               different things off campus.  And we never

 7               leverage visits with parents or contact with

 8               parents as a means to gain compliance.  So that's

 9               never on the table.

10      Q        So the calculus, the disciplinary calculus for

11               your students, your population, is different than

12               the disciplinary calculus for a child that hasn't

13               experienced the type of trauma that they have.

14               Is that fair to say?  You said you weren't trying

15               to encourage compliance, right?  Remember the

16               deterrence part?

17      A        Yes.  Yeah.

18      Q        Okay.  Now, disciplining employees.  How is that

19               different than -- how do you view disciplining

20               employees versus disciplining the students?

21      A        It goes back to organization and safety.  We have

22               to have employees who are there for the students

23               because of safety, because of ratios, because of

24               numbers.  And so we have to be very clear about

25               what those are, what those expectations are, to
```

1             keep the kids safe and other employees safe.

2      Q      Do you remember back to the first example with

3             the kid and the first warning could be a stern

4             warning, "Don't do that again."  That would be

5             considered discipline.  And then there could be

6             something else if they did it again.  Would that

7             discipline in order to be effective the second

8             time, would it need to be more intense than the

9             stern warning for it be effective?

10     A      It depends on the child.

11     Q      Do you have any children?

12     A      I do.

13     Q      Did you ever have to discipline them?

14     A      Yes.

15     Q      With one of your children, without naming -- not

16            naming a name, thinking back to a time that you

17            may have had to discipline them or do something

18            twice to get them to modify their behavior.  They

19            did it the first time, gave them the warning.

20            The second time, you're not just giving them a

21            cookie, are you?

22                 MR. CHANG:  Objection to form.  Go ahead.

23                 MS. LANGLEY:  Objection.

24     A      I'm not -- what do you mean, give them a cookie?

25     Q      I'm saying if you warn the child with a stern

1          warning --

2    A      Yeah.

3    Q      -- let's call it behavior A.

4    A      Right.

5    Q      All right.  You've seen your child engage in

6          behavior A.  Behavior A is unacceptable.  There's

7          that premise.  You provide the stern warning.

8          Behavior A, "No!"  Your child engages in behavior

9          A again, a second time.  Would it have – do you

10         believe -- what would you advise -- maybe not

11         your child, but what would you advise a parent in

12         that situation?  How should they discipline them

13         the second time around to deter behavior A?

14    A      I would probably ask them, which I have done,

15         "Are you clear on what your expectation is?"

16         Because having had that happen with my own child,

17         he didn't know what the street was.  So it was

18         going back to I was at fault, because I did not

19         make sure he knew what the street was when I

20         said, "Don't run in the street."

21             So when it happened the second time, I

22         did a check and realized, "Oh, my gosh, he didn't

23         know what the street was."  So there's a clarity

24         thing on that part, as well.

25    Q      So setting expectations, that's -- some people

1                say miscommunication, but if the person to be

2                disciplined doesn't know what the disciplinary

3                authority wants, how can they can properly change

4                their behavior?  Correct?  Is that what you're --

5                is that a fair way to --

6    A       Clarity.

7    Q       Clarity.

8    A       Yeah.

9    Q       So you would advise the parents by saying, "Make

10              sure they know that behavior A is wrong --

11   A       Yes.

12   Q       -- and that you have clearly communicated that to

13              them."

14   A       Yes.

15   Q       And if they did provide a stern warning, "Never

16              do that again," is that the type of clarity that

17              you would advise them to do?

18   A       There's so much context to that, Mr. Davis.  I

19              mean, I -- again, I -- forgive me, but I'm -- in

20              the domain, I can't think that -- there's so much

21              nuance to how you to respond to people.

22   Q       Well, let's take the nuance out of it.  A parent

23              comes to you and said, "Johnny, he just keeps

24              putting his hand in the cookie jar.  Every time I

25              come home, he's just in there, taking it in and

1          out."

2     A    Yeah.

3     Q    First discipline.  "No, Johnny."

4     A    Yeah.

5     Q    "Don't do the cookies."  He keeps doing it again.

6          What would you do next?

7     A    I'd move the cookie jar.

8               MS. LANGLEY:  Sorry.

9               THE WITNESS:  I would move the cookie --

10         is that what you said?

11              MS. LANGLEY:  I'm a parent, and that's

12         something I would do.

13              THE WITNESS:  I would move the cookie

14         jar.  I'd put it out of reach.

15    Q    Would you give them more cookies at the same time

16         that you move the cookie jar?

17    A    You want me to respond typically, in

18         generalities?  No.

19    Q    No.

20              THE WITNESS:  I'm glad we're on the same

21         wavelength as far as the cookie jar.  Did you

22         just say that?

23              MS. LANGLEY:  I did.  That's what I'd do.

24              MR. CHANG:  I mean, I thought you were

25         going to say something, like, very very profound.

 1                    THE WITNESS:  Well --

 2                    MS. LANGLEY:  Having had a son who loves

 3           cookies, you have to move the jar.

 4                    THE WITNESS:  I was working with Dr. John

 5           Gottman, and Dr. Gottman is a Nobel -- I mean,

 6           he's written a number of books and journal

 7           articles.  He's one of the most respected

 8           psychologists in the world.  And he was talking

 9           about how he handled a couple who fight over

10           whether the toothpaste should be squeezed from

11           the bottom or the top.  Right?  And I'm just the

12           whole time going, give them two --

13                    MS. LANGLEY:  Give them two toothpastes.

14      Q    So tell me a little -- I've heard that name

15           Gottman.  When you say you spoke with him, have

16           you studied extensively under him?

17      A    Yes.

18      Q    How so?

19      A    I would go to Seattle and study under him and his

20           wife, Dr. Julie Gottman.  In other words, he

21           would instruct us.  And then he -- when I was

22           president of the Utah Association for Marriage

23           and Family Therapy, I brought him to Utah where I

24           spent the weekend with him where he trained

25           therapists in Utah.

1    Q    Okay.  The first visits, you know, you said you

2         studied.  I asked how you studied extensively

3         under him, and then you answered "I studied

4         extensively under him."  How?  Did you see him in

5         person?

6    A    Yes, absolutely.  Yeah.

7    Q    Okay.  Where'd you see him?

8    A    In Seattle at the place -- the conference center

9         he rented where we met and --

10    Q    At a conference center he rented.  So he was

11         hosting a conference?

12    A    It was a particular training.

13    Q    Was it just for you, or was it for anybody that

14         wanted to show up?

15    A    There were a limited number of people who were

16         there.  Yeah.

17    Q    Okay.  So that's what you consider to be "studied

18         extensively"?

19    A    Yeah.  And I did it on and off for about 12

20         years.

21    Q    Back to the cookie jar.  And this one -- where

22         are we at?  We're at Exhibit 11.

23         (PLAINTIFF'S DEPOSITION EXHIBIT NO. 11

24             MARKED FOR IDENTIFICATION)

25    Q    I'm handing you Exhibit 11.  It's marked Three

1          Points 129.  Can you read the top, just the top

2          line?

3     A    "Attendance review/Corrective action."

4     Q    I'll just represent for the record that this is

5          Ms. Nelson's first and only attendance -- you

6          know, written attendance review before she was

7          terminated.

8               MR. CHANG:  Objection to form.

9     Q    Is this discipline?

10              MR. CHANG:  Objection to form.

11    Q    Is this a disciplinary action?

12    A    I don't know.  I wasn't there.  I'm not involved

13         in this.

14    Q    Do you -- all right.  Do you believe that --

15         we'll take Ms. Nelson out of it.  Do you believe

16         that writing up employees for, you know, I guess,

17         alleged violations of Three Points's policies and

18         procedures, that that could result in one of

19         these types of forms?

20    A    Yes.

21    Q    What do you think -- what is the purpose of this

22         form?  Take your time to look at it, too.  You

23         can be specific with Ms. Nelson.

24    A    This particular form, or this form in general?

25    Q    Let's do in general, and then we'll get specific

1           here.

2    A     It appears that it's a notation to document

3           tardiness, and a warning.

4    Q     And a warning.  So is a warning -- that is

5           discipline, correct?

6    A     It can be.

7    Q     The form -- do you consider this, as a CEO, to be

8           a disciplinary action by the company that you're

9           the CEO of?

10   A     Yes.

11   Q     What is the date on here?

12   A     February 22nd, 2022.

13   Q     February -- you said February 22nd, correct?

14   A     Yes.

15   Q     Okay.  Now I'm handing you Exhibit 12.

16          (PLAINTIFF'S DEPOSITION EXHIBIT NO. 12

17              MARKED FOR IDENTIFICATION)

18   Q     What is that form?

19   A     It says, "Employee Promotion Authorization

20           Request."

21   Q     What is the name of the employee?

22   A     T. Nelson.

23   Q     Is T. Nelson the same employee that was just on

24           the last -- on Exhibit 11, do you believe?

25   A     I believe.

```
 1    Q        Okay.  What is the date that Ms. Nelson was given
 2             a raise?
 3                       MR. CHANG:  Objection to form.
 4    Q        What is the date at the top of the form on this
 5             promotion?  Well, let's go through the form.  Do
 6             you see how -- it's a promotion.  Do you see that
 7             there's a raise that's been given?
 8    A        A raise request.
 9    Q        Has it been signed by Craig Butcher?
10    A        I don't know.  Is that his signature?  I don't
11             know if that's his signature or not.
12    Q        Do you have any reason to disbelieve me that Ms.
13             Nelson was provided a raise at this time?
14    A        No.
15    Q        So if you please look at Exhibit 11 and 12
16             together.  Remember when I asked you if Exhibit
17             11 was employee discipline?
18    A        Uh-huh.
19    Q        And do you remember our previous conversation
20             about discipline and setting expectations?  About
21             that being an important part?
22                       MR. CHANG:  Objection to form.
23    Q        Do you remember when we were talking in the
24             abstract?
25    A        Uh-huh.
```

Case 1:23-cv-00527-WO-JGM   Document 39-2   Filed 07/23/24   Page 165 of 279

1     Q     Do you remember when we were -- there was the

2           parents.

3     A     Yeah.

4     Q     You were telling them, "Make sure they know what

5           your expectations are."

6     A     Yes.

7     Q     Okay.  What is the date on Exhibit 11?

8     A     02-22-22.

9     Q     And what is the date that Ms. Nelson was approved

10          for a 16 percent raise?

11    A     It was requested on 02-21-22.

12    Q     By her supervisor.  Assuming she got the raise

13          the same day, is Exhibit 11 really discipline

14          then?

15    A     Excuse me?

16    Q     Does Exhibit 11, taken in the context, which --

17          you've said that context matters, right, for

18          discipline?

19    A     Sure.

20    Q     Isn't your staff telling Ms. Nelson that she

21          shouldn't be late, and then giving her a raise

22          the same day?

23             MR. CHANG:  Objection to form.

24    A     I think -- again, I'm not sure what you're asking

25          me.

1    Q    Why are you not -- tell me why you're not sure.

2         How is this different than the situation with the

3         cookie jar?  How is that not different than

4         saying, "Don't take cookies.  Here's a cookie"?

5    A    What it appears to me is this was requested on

6         the 21st.  On the 22nd, she was cited for being

7         late a few different times.  She was not

8         terminated.  And so what this appears to me is,

9         "Look, you've got another opportunity here.  We

10        appreciate you.  Don't screw it up."

11   Q    And here's some more money while we're at it.

12   A    Which is an appreciation.

13   Q    Is it communicating, though, in a way that --

14        well, here, let's do the other one.  We'll do 13.

15        (PLAINTIFF'S DEPOSITION EXHIBIT NO. 13

16             MARKED FOR IDENTIFICATION)

17   Q    Exhibit 13.  It starts at Three Points 0049.  Do

18        you see the -- is this a performance evaluation?

19   A    Yes.

20   Q    Did you come up with this form?

21   A    No.

22   Q    Who is responsible for HR at Three Points?

23   A    Which center?

24   Q    All right.  Let's use the form.  What is the --

25        what are the words at the top of Ms. Nelson's

1           performance evaluation?

2    A     "Performance Assessment (Non-Exempt Employees)."

3    Q     No.  There's a logo and there's words below it.

4           What does that say?

5    A     "Three Points Center."

6    Q     I'm asking who's responsible for HR at that

7           place?

8    A     At North Carolina or Utah?

9    Q     Well, wherever, whoever -- who did this form that

10          says "Three Points Center" on the top?

11   A     That would be North Carolina then.

12   Q     Okay.

13   A     That would be -- it would have been probably

14         Heidi.

15   Q     Okay.

16   A     But she did not create the form.

17   Q     Who do you think would have created the form?

18   A     My brother.

19   Q     Okay.  So Three Points Center North Carolina uses

20         the same employee forms as Three Points Center

21         Utah?

22   A     I don't know that they do all of them.

23   Q     Okay.  First page.  Let's see.  That's actually

24         second page.  Turn to the second page.  Do you

25         see where it says, "Attendance/Punctuality"?

1    A        Uh-huh.

2    Q        "How conscientious is the employee when it comes

3             to attendance, punctuality, lunch periods?"  What

4             is the check-box checked?

5    A        Satisfactory.

6    Q        Okay.  So now take that page and then look back

7             at 11 and 12 for me please.

8    A        Uh-huh.

9    Q        And the question, is form 11 intended to be

10            employee discipline, based on what you know about

11            that form and what it says?

12   A        Well, as I said, in context, if you look at what

13            was written underneath it.  It has five

14            documented violations, but does have "Picks up

15            extra days and helps when short."  So both of

16            them make absolute sense when you look at the

17            context.

18                    On one hand, it looks to me like Ms.

19            Nelson helped out at times, which was very

20            appreciated and rewarded.  And other times, it

21            looks like she was late consistently, and that

22            needed to be addressed.

23   Q        Right.  No, but do you see how number two -- or

24            Exhibit 13 says, "5 documented violations"?

25   A        Yes.

1    Q    Please look back at Exhibit 11.  How many

2         violations are documented on that form?

3    A    One, two, three that I can see.  Yeah.

4    Q    Are all those forms consistent with each other?

5    A    No.

6    Q    They're not.

7    A    Well, I can't speak for this one, the

8         authorization request, because I don't know who

9         -- you know, I'm not sure what Dan was thinking

10        behind that and he -- I'm sure he had valid

11        reasons.  Maybe because she picked up extra days.

12        But this says three days late.  This says five

13        documented violations.

14   Q    On Exhibit 11, do you see where it says, "The

15        next occurrence will result in a final written

16        warning"?

17   A    Uh-huh.

18   Q    Back to just general discipline.  How -- when a

19        discipline authority, if you will, tells the

20        subject to be disciplined about what they're

21        going to do the next time, is it important for

22        the discipline authority to be consistent and do

23        that?

24   A    Depending on the context.

25   Q    Tell me -- give me an example.  Why -- give me an

1          example where it would be helpful, given the

2          purpose of discipline, to tell somebody one thing

3          is going to happen and then do something

4          completely opposite.

5     A    If I told somebody that they're going to be

6          terminated the next time they're late for a

7          meeting, and then the next time I find out

8          they're late for a meeting, but yet they stopped

9          because they helped somebody on the side of the

10         road, that would rather be --

11    Q    That's not late, though.  I mean, that's just --

12         I understand it's late, but there's an excuse,

13         right?  That's not really where I'm going.

14         That's not --

15    A    But that's -- I mean, if we're talking in, you

16         know, a literal sense, the next occurrence will

17         result in a final written warning.  That's what

18         you asked, isn't it?

19    Q    I'm saying the next un-excusable occurrence.  So

20         if there's something that's excused, it's no

21         longer an occurrence, is it?

22    A    Well, but then that's subjective about what's

23         excusable and what's not excusable.

24    Q    Subjective.  Who makes that subjective

25         determination at your business?

1    A     Depends on who, I would guess, the supervisor is

2          at the time, in conjunction with Thane and Heidi.

3    Q     How do they make that determination, that

4          subjective determination about what's a

5          terminable offense?

6    A     You'll have to ask them.

7    Q     I'll have to ask them?

8    A     Yeah.

9    Q     Do you not want -- have you just disregarded all

10         duties as a CEO to have any impact –

11               MS. LANGLEY:  Oh, jeez.

12   Q     -- influence over your company's HR policies?

13               MR. CHANG:  Objection to form.

14   A     I'm not sure what you're asking.

15   Q     It took me a while to get it out, and she knew

16         it.

17   A     Yeah.

18   Q     What I'm asking is that -- you're the CEO.

19   A     Yes.

20   Q     Do you believe that you should have a hand in

21         your company's HR policies?

22   A     In policy, yes.  In implementation, I defer to

23         Thane and Heidi.  They're boots on the ground.

24   Q     Given the choice between enforcing a policy

25         consistently or inconsistently, which one would

1          you recommend?

2     A    Consistently.

3     Q    Consistently.

4     A    Sure, understanding context.

5     Q    Have you ever personally fired anybody since

6          you've been -- since Three Points started?

7     A    Yes.

8     Q    Who?

9     A    You want the name of the employee?

10    Q    You can tell me who -- yeah, actually, I do.

11         Yes, I do.

12    A    The name was -- I don't remember his last name.

13         His name was Steve.

14    Q    Steve.  Anybody else besides Steve?

15    A    Yes.

16    Q    Who?

17    A    Chelsea.

18    Q    Chelsea.

19    A    Uh-huh.

20    Q    Anybody else?

21    A    Victoria.

22    Q    I mean, you've been in -- I mean, the fact that

23         there's a bunch, I'm not trying to make anything

24         --

25    A    No, actually --

1   Q      Let's do -- if you can do five, then I --

2   A      I don't think there would be five.

3   Q      So it's three.  All right.  Steve.  Utah facility

4          or the North Carolina facility?

5   A      Utah.

6   Q      Okay.  Year?

7   A      2023.  It had to be '23.  It had to be last year,

8          I guess.

9   Q      Was that your first termination?

10  A      No.

11  Q      Okay.  Who was -- so was it Chelsea or Victoria

12         first?

13  A      Chelsea was.

14  Q      Okay.  When was Chelsea?

15  A      2021.

16  Q      All right.  And Victoria?

17  A      2023.

18  Q      Okay.  So let's start with Chelsea.  What was her

19         job at Three Points?

20  A      Marketing.

21  Q      Marketing.

22  A      Yeah.

23  Q      Why did you terminate her?

24  A      She wasn't fulfilling her job duties.  And there

25         were boundary issues with her.

1    Q       Okay.  And without getting into that, was she

2            issued a warning?

3    A       Yes.

4    Q       Was she given a raise at the same time she was

5            issued a warning?

6    A       I don't think so, but I don't remember, honestly.

7    Q       Okay.  But it was 2021?

8    A       Yeah.

9    Q       So we'll be able to figure that out.  How many

10           written warnings did she get?

11   A       I don't remember.

12   Q       Okay.

13   A       Actually, she resigned.  Sorry.  She resigned.

14           Chelsea resigned.  Forgive me.

15   Q       Okay.  Let's -- Chelsea may have resigned.  Okay.

16           Here we go.

17   A       Yeah.

18   Q       All right.  Who was next?  Victoria or Steve?

19   A       Steve was next.

20   Q       All right.  What was Steve's job?

21   A       He was a mentor.

22   Q       He was a mentor.  And when you say mentor, in --

23           he was in Utah?

24   A       Correct.

25   Q       Is that - I understand there's program

| | | |
|---|---|---|
| 1 | | differences, but the same supervisor role that |
| 2 | | Tyliya Nelson had in North Carolina? |
| 3 | | MR. CHANG:  Objection to form. |
| 4 | | MS. LANGLEY:  Objection. |
| 5 | Q | Mentor. |
| 6 | A | No. |
| 7 | Q | Was there any material difference -- I mean, if |
| 8 | | Tyliya was in Utah, would she have been a direct |
| 9 | | coworker of Steve? |
| 10 | A | I don't know. |
| 11 | Q | Okay.  Do you have -- how much did Steve make per |
| 12 | | hour? |
| 13 | A | I don't know. |
| 14 | Q | Was it hourly? |
| 15 | A | Yes. |
| 16 | Q | So he was a mentor.  Twelve-hour shifts in Utah? |
| 17 | A | Yes. |
| 18 | Q | That's -- all right.  Just wanted to know if |
| 19 | | there were comparables.  What did Steve do? |
| 20 | | MR. CHANG:  Objection to form. |
| 21 | Q | What was his term -- why was he terminated? |
| 22 | A | Oh.  Steve was terminated because he was actually |
| 23 | | crossing boundaries, making offensive jokes, and |
| 24 | | wasn't fulfilling his job duties. |
| 25 | Q | Okay.  How long -- how did you become aware that |

1          Steve was doing that?

2     A    The HR person in Utah made me aware of it, and

3          I'd been informed by a supervisor.

4     Q    Okay.  So to the best of your -- it's 2023.  How

5          recent of a termination was this?

6     A    It was either late 2022 or early 2023.

7     Q    Okay.  When you -- when I asked you had you

8          terminated them -- did you personally deliver the

9          message, or did you make the decision and

10         somebody else terminated him?  Carried it out, if

11         you will.

12    A    In the -- in both of these, I discussed them with

13         HR and made it with HR.

14    Q    Made it with HR.

15    A    Yes.

16    Q    So you delivered the message?

17    A    Yes.

18    Q    Okay.  Do you feel it's important for the leader

19         of the facility to deliver that message?

20    A    In certain circumstances.

21    Q    Why did you feel it was important to deliver the

22         message to Steve?

23    A    He was so very well known, and we care about him.

24         Yeah.  I love that man.  And I wanted him to know

25         that he was loved and we cared about him, but we

1              just couldn't continue to have that on our

2              campus.

3         Q    How many warnings did Steve have?

4         A    I don't remember exactly, but I know there were

5              at least two or three.

6         Q    Okay.

7         A    Yeah.

8         Q    Victoria.  Was she after Steve or before Steve?

9         A    She was after Steve.

10        Q    What was her job?

11        A    She was HR.

12        Q    She was HR.

13        A    Yeah.

14        Q    So not exactly comparable.  What was she

15             terminated for, though?

16        A    She needed to -- she didn't have an HR education.

17             She did a good job in trying to fill in for us,

18             but she knew that she was going to have to be

19             replaced by an HR manager, which we did.  And so

20             we -- I met with her and told her that we'd have

21             to let her go.  She knew eventually it was

22             coming, so we gave her some severance and just

23             cared about her quite a bit.  She did a good job

24             for us.

25        Q    What do you mean she knew it was coming?

1    A    She knew she didn't have the quality -- or

2         qualifications to run the Utah office.

3    Q    No, I understand that.  But in terms of the

4         termination, I mean -- how do you know when

5         somebody new was coming?

6    A    When we found the right person.

7    Q    So you found another person and then let her go?

8    A    Yes.

9    Q    Okay.  So she knew that once you found another

10        employee that she was going to get fired?

11   A    Correct.

12   Q    Okay.

13   A    Yeah.  And we could offer -- we offered her, you

14        know, another position, but we didn't have one in

15        HR, so that --

16   Q    I think -- yeah.  That was like --

17   A    Yeah.

18   Q    This was not for -- this was for not being able

19        to do the job and --

20   A    It's not -- yeah.  It's not for cause.

21   Q    -- not being able to -- not wanting to do a lower

22        job.

23   A    Correct.

24   Q    It wasn't a terminable offense, whereas with

25        Steve -- so of the people that you've terminated

1          that you can remember, Steve was the one that was

2          terminated based on violations of your company's

3          policies?

4     A    Yes, sir.

5     Q    And he got three warnings?

6     A    I want to say three.  I'm guessing.  I don't

7          remember exactly.

8     Q    Is Steve white?

9     A    Yes.

10    Q    What are we on?  All right.  We're on 14.

11         (PLAINTIFF'S DEPOSITION EXHIBIT NO. 14

12              MARKED FOR IDENTIFICATION)

13    Q    I'm handing you Exhibit 14.

14         (MUSIC COMES OVER SPEAKER IN ROOM)

15    A    Did you guy's pipe in some mind-altering music or

16         something?

17    Q    Yeah.  I'm going to go stop it after we get done

18         with this one.  I don't want -- I'm working.  I

19         can't have my mind altered if I have Dr. Thibault

20         on the other side.  All right.

21    A    Well, you're like my brother that way.  ADD.  He

22         always had to have background noise.

23    Q    Oh, now you've turned it up.  We're going to take

24         a break after this one.

25    A    Yeah.

1  Q    All right.  I'll ask you, maybe spread out 11

2       through 14 together, please.

3  A    Okay.

4  Q    All right.  I've handed you Exhibit 14.  Can you

5       read the top line?

6  A    "Attendance review/Corrective action."

7  Q    And who's the employee named?

8  A    Ty Nelson.

9  Q    The date?

10 A    04-06-22.

11 Q    Okay.  What is this form based on your review of

12      it?  What does this signify?

13 A    That Ms. Nelson failed to take corrective action;

14      was late -- one, two, three, four, five, six --

15      well, late five times, called out one time; and

16      that the employment was being terminated.

17 Q    Just to confirm, you -- this decision, did you

18      have any role in making this decision?

19 A    No, sir.

20 Q    Who had the authority to make this decision to

21      terminate Ms. Nelson?

22 A    There were a few different people who had that.

23 Q    Please identify them.

24 A    Butch, Heidi, Thane.

25 Q    Okay.  Is that it?

1    A    To my knowledge.

2    Q    Okay.  And since we're here, and this is a

3         transcript, can you identify Butch's full name?

4    A    Craig Butcher.

5    Q    What is his job title?

6    A    He was group living director.

7    Q    Who does he get paid by?

8    A    Three Points Center North Carolina.

9    Q    Okay.  Has he ever worked at the Utah facility?

10   A    He has.

11   Q    When did -- does he live in North Carolina now?

12   A    No.

13   Q    Who's performing -- does he still perform the

14        same role that he did during the time that Tyliya

15        was employed?

16   A    No.

17   Q    What's he do now?

18   A    He is a therapist.

19   Q    Did -- at the Utah facility?

20   A    No.

21   Q    At the North Carolina?

22   A    No.

23   Q    Where is he?  Oh, he's no longer --

24   A    Yeah.

25   Q    Okay.  When did that happen?

1     A     Today.

2     Q     Who made that decision?

3     A     He did.

4     Q     How about that.

5     A     He decided to go into private practice for a

6            while.

7     Q     Mr. Butcher.  Okay.  Heidi.  Can you please

8            identify her full name?

9     A     I don't know her middle name, but Heidi Palmer.

10    Q     First and last name.  Heidi Palmer.

11    A     Yeah.

12    Q     What is -- what was her role at Three Points

13           Center on April 6th -- as of April 6th, 2022?

14    A     Quality assurance.

15    Q     Quality assurance.  Who did she get paid by?

16    A     Three Points Center North Carolina.

17    Q     Okay.  And you said she would've had the

18            authority to terminate Ms. Nelson?

19    A     I believe so.

20    Q     Okay.  And then Mr. Palmer.  We've already

21            identified him.  Thank you.  Okay.

22                 Can you look at Exhibit 11 and 14

23            together?  Eleven says, "Employee Tyliya Nelson

24            has received a written warning.  The next

25            occurrence will result in a final written

1           warning.  Any occurrence after that will result

2           in termination."  I'll represent to you that

3           there were no written warnings in between

4           February 22nd and the date that Ms. Nelson was

5           terminated.

6                     MR. CHANG:  And I'll object to form.

7      Q    Do you have any reason -- knowing that you're not

8           involved in the HR decisions that affected Three

9           Points Center's North Carolina facility at this

10          time, do you have any reason to not believe me

11          that there are no -- there have been no documents

12          produced by the -- by the companies that you're a

13          CEO of that have a warning -- an additional

14          warning between the dates of February 22nd, 2022,

15          and the date of termination, April 6th, 2022?

16     A    I do not know or do -- I do not know.

17     Q    Okay.  Are you willing to assume with me just for

18          the sake of this question that there aren't?

19     A    Okay.

20     Q    Okay.  So Exhibit 11 says that Ms. Nelson would

21          receive a final written warning.  And we've

22          assumed for here that no additional written

23          warning was provided before she was terminated.

24          What type of context would suggest that that is

25          the way to do things?

1          MR. CHANG:  Objection to form.

2     Q    You say context matters.

3     A    I do.

4     Q    How many minutes late was Tyliya on April 5th?

5          MR. CHANG:  I'll object to form.  You're

6          saying context matters, and he's looking at four

7          separate forms for the first time ever in his

8          deposition.

9     Q    All right.  I'm sorry.  I apologize.  On Exhibit

10         14, please.  Thank you, Jimmy.  That's really

11         appropriate.  Can you look at the dates for the

12         minutes late that --

13    A    On April 5th, you said?

14    Q    Uh-huh.

15    A    Six minutes late.

16    Q    Six minutes late.

17    A    Yeah.

18    Q    You supervise youth mentors at the Utah facility?

19    A    Not directly.

20    Q    Not directly.  Who does?

21    A    Their group living director.

22    Q    Their group living director?

23    A    Yeah.

24    Q    Can you think of any employee, youth mentor at

25         the Utah facility who was terminated the day

```
 1                      after they were six minutes late for a shift?
 2        A      I don't know of any.  I would not say that it
 3               wouldn't be possible if they were continually
 4               late.  It's important.
 5        Q      What do you mean by continually late?
 6        A      Repeatedly.  More than one or two occasions.
 7        Q      Do you remember the ratios that we talked about?
 8        A      Yes.
 9        Q      If an employee is six minutes late, they're still
10               there, aren't they?
11        A      Not at the time they're supposed to start.
12        Q      But given how the youth mentor shift change
13               happens, the shift member that is on duty before
14               the other employee gets there six minutes after
15               the start time, they're still there, aren't they?
16               They don't just leave.
17        A      They'd like to, but they are still there.
18        Q      So this -- the shift change, it's not like at a
19               factory, just like a whistle, it blows, and it's
20               like, "I'm out of here."  And then there's no one
21               on the line to fumble with the widgets, right?
22               It's a handoff situation.  Correct?
23                      MR. CHANG:  Object to form.
24        Q      The shift is a shift change, where two -- the two
25               mentors meet each other, discuss things, and then
```

1          one leaves.  Correct?

2    A    Not always, no.

3    Q    How does it work at the Utah facility?

4    A    Depending on -- again, depending on the

5         situation, if someone has to leave, a supervisor

6         -- because we have floaters -- a supervisor may

7         have to come in and step in for someone who has

8         to leave because they have to pick a child up,

9         they've got something they're planning on doing.

10        So it really does create an imposition on the

11        people who are left there.

12   Q    For six minutes?

13   A    Uh-huh.

14   Q    Six minutes is an imposition?

15   A    Repeatedly, yeah.  Do something once, it's a

16        mistake.  Do it more than once, it becomes a

17        habit.

18   Q    Looking back, comparing Exhibit 11 and Exhibit

19        14, and then looking at the dates on Exhibit 14,

20        what is the first date listed on this April 6th

21        form?

22   A    March 15th.

23   Q    Twelve minutes.  How many minutes late?

24   A    Twelve.

25   Q    Does it say?

1    A    Twelve.

2    Q    And what does it say for the minutes late on the

3         -- what are the next two dates?

4    A    March 28th, 2022.

5    Q    What are the minutes late there?

6    A    Six.

7    Q    And what about the next day?

8    A    March 29th, 2022.

9    Q    I think you mentioned -- you said repeatedly

10        late.

11   A    Yeah.

12   Q    What would you consider repeatedly late?

13   A    On more than one occasion.

14   Q    Twice is repeatedly?

15   A    I would say so.

16   Q    Do you know whether or not the businesses that

17        you're the CEO of have attendance guidelines in

18        the employee handbook?

19   A    Yes, they do.

20   Q    Do you think that those should be followed?

21   A    Yes.

22   Q    And if they're not followed, would you ask why

23        they weren't followed?

24   A    Ask who?

25   Q    Are you the super -- are you Heidi's -- well.

1          MR. CHANG:  Objection to form as to who's

2     following the guidelines.

3          MR. DAVIS:  That's why -- just give me a

4     minute, Jimmy.

5    Q    Are you personally made aware of all terminations

6     that happen at the companies that you're the CEO

7     of?

8    A    No.

9    Q    No.  Why do you think that is?  I'm not saying

10     it's good or bad.  Why?

11   A    I don't think I need to know.

12   Q    You're the CEO.  I mean, I -- yeah.  You're in

13     charge, right?  There's a lot of employees.  How

14     many employees does your organization have now?

15   A    Which organization are you talking about?

16   Q    The organization on Tyliya's performance

17     evaluation.

18   A    So Three Points Center North Carolina?

19   Q    The one --

20   A    Three Points Center North Carolina.

21   Q    I'm asking the organization that is represented

22     by --

23          MR. CHANG:  And he's saying it's Three

24     Points Center North Carolina.

25          MR. DAVIS:  Yeah.  He can -- you can

1          answer however you want.

2                    MR. CHANG:  He is and you're not

3          accepting it.

4                    MR. DAVIS:  He -- no.  I'm not accepting

5          it.  I'm saying that, and then we answer and we

6          move on.

7     A    Three Points Center North Carolina has

8          approximately 80 employees.

9     Q    How many employees does the facility in Utah

10         have?

11    A    Three Points Center Utah has approximately 130,

12         140.

13    Q    As the -- since you've become CEO, you don't --

14         just to recap.  You don't know about every

15         termination, but do you ever have senior staff

16         meetings with somebody that does know about every

17         termination that's happened?

18    A    I'm not sure I understand, and only because

19         that's not a topic that we talk about in every

20         staff meeting.

21    Q    Terminating -- when an employee is terminated,

22         it's -- does it happen so frequently that it's

23         just not something that rises to the level of --

24    A    That's --

25                    MR. CHANG:  Objection to form.

1    Q    Do you have a sense of how frequently employees

2         are terminated at the companies that you're a CEO

3         of?

4    A    No.

5    Q    Besides the employees in Utah that you

6         terminated, how many terminations do you think

7         have happened in Utah in the past year?

8    A    I have no idea.

9    Q    Who would know?

10   A    Our HR person.

11   Q    Do you believe that the HR person in Utah keeps a

12        documented list of the employees' names and the

13        files like we just looked at?

14   A    Yes.

15   Q    Would those types of -- as a CEO, if you had to

16        evaluate your company's termination decisions,

17        would documents similar to these help you

18        understand whether or not your company's policies

19        are being applied fairly and consistently?

20   A    Yes.

21   Q    They would?

22   A    Yeah.

23   Q    It would be useful information to see those

24        documents to evaluate terminations?

25   A    Yeah.  I -- we have department heads.  We teach

1          them things and they govern themselves.

2     Q    Tell me, when you say "we," who is "we"?

3     A    The company leaders.  Thane teaches North

4          Carolina.  I teach Utah.

5     Q    So what do you teach them about terminations?

6     A    I don't teach them about terminations.  We have

7          HR people who do that.

8     Q    Dr. Thibault, you said "we."  And are you not

9          part -- when you say "we," you mean the people

10         you're in charge of?

11    A    Yes.

12    Q    Okay.  How did they get the information to teach

13         the teachings that they need to teach?

14    A    They --

15    Q    Sorry.

16    A    Oh, you're -- they get educated.  We have an HR

17         professional who studies HR and gets educated in

18         HR and works with isolved to understand HR

19         things.  We have a clinical director who goes to

20         conferences.  Three Points Academy has Dr.

21         Forrest, who goes to conferences to become

22         educated.  They handle their areas.

23    Q    Okay.  Who is the HR person that is the one that

24         learns everything and then disseminates the

25         information to your employees?

1    A    Where?

2    Q    Utah.

3    A    That would be Tina Felder.

4    Q    Tina Felder.

5    A    Yeah.

6    Q    North Carolina?

7    A    It'd be a combination of Heidi and Brittany

8         Ortiz.

9    Q    Brittany.

10   A    Yeah.

11   Q    Ortiz?

12   A    Yeah.

13   Q    Okay.

14            MR. DAVIS:  Mr. Court Reporter, how long

15       have we been going since our last break?  Since

16       we came back?

17            THE COURT REPORTER:  An hour and 43

18       minutes.

19            MR. DAVIS:  I think that's a good

20       stretch.

21            THE WINTESS:  That's as long as I've gone

22       without a bathroom break, and I'm actually proud

23       of myself.

24            THE COURT REPORTER:  We're off the record

25       at 3:30.

```
 1                    (FIFTEEN-MINUTE RECESS)
 2                    THE COURT REPORTER:  We are on the record
 3              at 3:45.
 4    Q        I'm going to try to get a couple docs in quickly.
 5              All right.  Here we go.  Exhibit 15.
 6       (PLAINTIFF'S DEPOSITION EXHIBIT NO. 15
 7              MARKED FOR IDENTIFICATION)
 8    A        Thank you.
 9    Q        What is the document that I just handed you?
10    A        "Three Points Center Mission Statement."
11    Q        Okay.  Which of your facilities is that mission
12              statement applicable to?
13    A        None.
14    Q        None?
15    A        None.  That's not our new mission statement.
16    Q        Okay.  We'll go back there.  Has this -- has the
17              document that I've presented you, which is marked
18              as Three Points -- what is the number on the
19              bottom?  Let me find it on mine here.  I think I
20              tore it out.
21                    MR. CHANG:  518.
22    A        518.
23    Q        518.
24    A        Yes, sir.
25    Q        Is that like a draft mission statement?  Has that
```

```
 1                 ever been applicable?

 2      A          It was applicable.

 3      Q          Okay.  When it was applicable, which facility did

 4                 it apply to?

 5      A          Utah.

 6      Q          Utah.

 7      A          Yeah.

 8      Q          Okay.  And what is the date at the -- can you

 9                 read the date at the bottom?  It's a little

10                 fuzzy.

11      A          I don't see a date at the bottom.

12      Q          I know.

13      A          Forgive me.

14      Q          And I don't have my computer.  Jimmy, can you

15                 help him, if you can see it?

16                      MR. CHANG:  There is nothing.

17                      MS. LANGLEY:  There is none.

18                      MR. DAVIS:  There's not a date on that?

19                      MR. CHANG:  Not that I see.

20                      MR. DAVIS:  Yeah.  I might have given you

21                 my copy.

22      Q          Well, whatever the date is, I think -- we can

23                 clean it up tomorrow.  But it was part of your

24                 company's discovery.

25      A          Okay.
```

1   Q   Okay.  It's no longer applicable.  What's the new
2       mission statement?
3   A   "We heal adoptive families."
4   Q   And that's it?
5   A   That's it.
6   Q   Just --
7   A   "Three Points Center heals adoptive families."
8   Q   Okay.  The -- and as a mission statement -- so
9       the statement exists independent of having a
10      graphic over it.
11  A   Uh-huh.
12  Q   Right?  What's the mission statement for Three
13      Points Properties, LLC?
14  A   There is no mission statement.
15  Q   There's not?
16  A   No.
17  Q   What's the mission statement for Three Points
18      Properties North Carolina, LLC?
19  A   There is no mission statement.
20  Q   What are the purposes of those two companies?
21  A   They own real estate.
22  Q   They're a real estate holding company?
23  A   Yeah.
24  Q   Are -- they own it.  Does money -- do they have
25      their own bank accounts?

1    A    Yes.

2    Q    Okay.  So are they the landlord or the tenant?

3         So they're the landlord?

4    A    Uh-huh.

5    Q    Okay.  Who's the tenant?

6    A    On which company?

7    Q    So Three Points Property -- Three Points

8         Properties owns the Utah ranch or -- in

9         Hurricane, that property.  Correct?

10   A    Correct.

11   Q    Is there a similar lease agreement to the one

12        that your company produced that you entered with

13        Mr. Palmer for North Carolina, for Utah?

14             MR. CHANG: And I'll object --

15             MR. DAVIS:  Let me just get that one out.

16        I apologize.

17             MR. CHANG:  Okay.

18   Q    Here we go.  Okay.  And we're going to Exhibit

19        16.

20        (PLAINTIFF'S DEPOSITION EXHIBIT NO. 16

21             MARKED FOR IDENTIFICATION)

22   Q    So strike the Utah question.

23             And let's just focus on Exhibit 16, which

24        is a lease agreement.  This was obtained from the

25        Chatham County Register of Deeds.  Let me quickly

1          identify it in my binder real fast, Mr. -- Dr.

2          Thibault.  Here we go.  After you take a moment

3          to review it, I'll start asking questions.  Okay.

4          You see on the first page where it says, "Lease

5          Agreement"?

6     A    Yes, sir.

7     Q    Is this document a lease agreement between Three

8          Points Center North Carolina, LLC, and Three

9          Points Properties North Carolina, LLC?

10    A    It appears to be so.  Yes.

11    Q    What is the business reason for having a separate

12         corporation own the property where the Three

13         Points school is located and facilities?

14              MR. CHANG:  Objection to form.

15    A    I don't know.  My brother did it.

16    Q    Can you turn to the final page?

17    A    Uh-huh.

18    Q    Is that Exhibit 14?

19    A    Yes.

20    Q    Your brother's name is not on here.

21    A    Correct.

22    Q    You did it.

23    A    Yes.

24    Q    So did you sign this document not knowing what

25         the purpose was?

| | | |
|---|---|---|
| 1 | A | I signed the document understanding this was a |
| 2 | | lease. |
| 3 | Q | What is the purpose of a lease, generally?  Your |
| 4 | | understanding. |
| 5 | A | To make available properties for payment. |
| 6 | Q | So if Three Points Properties is the landlord and |
| 7 | | Three Points Center North Carolina is the tenant, |
| 8 | | does Three Points Center North Carolina pay Three |
| 9 | | Points Properties North Carolina? |
| 10 | A | On page two, I believe there is a lease amount. |
| 11 | | Yes. |
| 12 | Q | Okay.  What happens if Three Points Center North |
| 13 | | Carolina is late on rent? |
| 14 | A | I don't know.  I'd have to look at the form. |
| 15 | Q | Who executed the lease on behalf of the landlord? |
| 16 | A | On behalf of the landlord? |
| 17 | Q | Uh-huh. |
| 18 | A | That would have been Thane. |
| 19 | Q | And then who executed the lease on behalf of the |
| 20 | | tenant? |
| 21 | A | That would have been me. |
| 22 | Q | So if you were late on rent, the -- and what is |
| 23 | | the rent identified in this lease?  What page was |
| 24 | | it on? |
| 25 | A | It's page two. |

```
 1      Q      Part of it.

 2      A      Subsection B.  Yeah.

 3      Q      $13,500 per month plus three percent.

 4      A      Uh-huh.

 5      Q      If Three Points Center North Carolina missed a --

 6             was late on rent, would Mr. Palmer evict your

 7             company?

 8      A      I don't know.

 9      Q      You don't know if he would evict you?

10      A      Yeah.  I don't know.

11      Q      Well, does he have -- does Three Points

12             Properties have the right to evict its tenant if

13             rent is late?

14      A      Let's see what it says.  Insurance.

15      Q      Where's the --

16      A      Breach by tenant.

17      Q      Yeah.  Where's that?  Let's see.  Sometimes it

18             says landlord's rights and remedies.

19      A      It looks like he has a few different options he

20             could execute.

21      Q      And then if Three Points Center North Carolina

22             didn't pay the rent on this lease, well, who

23             would come in and take over the lease?

24                    MR. CHANG:  Objection to form.

25      A      What do you mean?
```

1    Q       Well, let's say -- oh, here we go.  It's on page

2            10.  It says, "Tenant's failure to pay rent or

3            other amounts payable in full within five days

4            are due" is a breach of the lease.  What happens

5            when a tenant -- your understanding.  If a tenant

6            breaches a lease, commercial or residential, does

7            the landlord have the right to evict the tenant?

8    A       Typically, I --

9                    MR. CHANG:  Objection to form.

10   A       I'm assuming, typically, yes.

11   Q       Would Mr. Palmer ever evict you -- your company,

12           if you were late on rent?

13   A       Would he?

14   Q       Yeah.

15   A       I would doubt it, but --

16   Q       And it's because --

17   A       -- could he?  Yeah.

18   Q       And it's because both companies are owned by the

19           same exact people, isn't it, Dr. Thibault?

20                   MR. CHANG:  Objection to form.

21   A       What are you asking?

22   Q       This lease is just a formality.  I mean, does

23           your -- is rent actually paid to Three Points

24           Properties?  Is there a transfer of $13,500 every

25           month before the fifth day of the month?

```
1    A    Yes.

2    Q    There is?

3    A    Yes.

4    Q    What banks?

5    A    Guaranty Bank.

6    Q    Guaranty Bank.  How does the money get into the

7         bank account of Three Points Center North

8         Carolina?

9    A    I imagine there's a transfer, but we'd have to

10        ask our CFO about that.

11   Q    Back to the -- remember our discussions about the

12        different revenue sources, tuition, the horses?

13             MR. CHANG:  Objection.

14   Q    In North Carolina, it's just tuition -- because

15        California is not on the table in North Carolina,

16        correct?

17   A    Correct.

18   Q    The California county reimbursement.  All right.

19        Does the majority of North Carolina's revenue

20        come from the tuition payments?

21   A    From parents?

22   Q    Yes.

23   A    Yes.

24   Q    Okay.  All right.  So when a parent -- how does a

25        parent pay tuition?  What are the options that
```

1          they have?

2     A    Credit card.

3     Q    Okay.

4     A    ACH, check.

5     Q    Check.  And we're not going to -- I'm not asking

6          how much it could be, but it could be for the --

7          a semester, or the whole year, or month to month?

8     A    No.

9     Q    No?  Is it all at once, one year?

10    A    No.

11    Q    Which one is it?

12    A    They can pay monthly, or they can pay three

13         months in advance.

14    Q    Okay.

15    A    Yeah.  So if there were cash flow issues for

16         Three Points Center North Carolina, the rights

17         and remedies that are in this boilerplate lease

18         that I introduced --

19              MR. CHANG:  Objection to form.

20              MS. LANGLEY:  Object to form.

21    Q    You're not an attorney are you, Dr. Thibault?

22    A    I am not an attorney.

23    Q    Is this a legal document?

24    A    I assume so.

25    Q    Were you -- and I'm not asking you to advise, but

Case 1:23-cv-00527-WO-JGM    Document 39-2    Filed 07/23/24    Page 203 of 279

1          did you have any role in the drafting of this
2          document?
3     A    No.
4     Q    And you signed it.
5     A    Yes.
6     Q    But you are aware that this is an agreement
7          between two corporations?
8     A    Yes.
9     Q    And one corporation, if the other corporation
10         breaches their duties under this agreement, has
11         certain rights, correct?
12    A    Yes.
13    Q    And what I'm asking is if Three Points Center
14         North Carolina had cash flow issues, would Three
15         Points Properties North Carolina ever evict Three
16         Points Center North Carolina?
17              MR. CHANG:  Objection.  Calls for
18         speculation.  Go ahead.
19    A    I don't know, and I'm happy to explain why.
20    Q    I would -- right.  I mean, is that something --
21    A    If the shareholders had a problem with -- that
22         would impact paying the mortgage for the Three
23         Points Properties North Carolina, then I think
24         they have a right to take remedies.
25    Q    And when you say shareholders, are those the

1           seven people with money that your brother knew?

2      A    Yes.

3      Q    Okay.

4      A    Yes.

5      Q    All right.  Dr. Thibault, I'm going to hand you

6           Exhibit 17.  I may not have too many specific

7           questions about these, but there's a work aspect

8           of these depositions.  Can you just take a look

9           through them for a second while I locate them

10          here in my binder?

11          (PLAINTIFF'S DEPOSITION EXHIBIT NO. 17

12              MARKED FOR IDENTIFICATION)

13     A    Sure.

14     Q    I'll just keep an eye out and see when you get to

15          the final page.  Okay.  And I'll represent for

16          you and your counsel, the majority of these, if

17          not all of them, were taken from your company's

18          recent discovery production.  And for the limited

19          purposes which I'm introducing them, I have

20          purposely truncated or extracted -- removed some

21          of the other pages so we -- so our court reporter

22          doesn't have to scan all of them.  Okay?

23     A    Uh-huh.

24     Q    So they're not complete in that sense.  Do you

25          see the first page?

1    A      I do.

2    Q      What is that?  Will you please just read the

3           first three lines?

4    A      "Amended and Restated Limited Liability Company

5           Agreement of Three Points Center, LLC."

6    Q      Okay.  And it has an effective date of August

7           12th, 2021.

8    A      Correct.

9    Q      I noticed in the documents and the -- and if you

10          turn to the -- a few pages to the next one, that

11          Three Points Center North Carolina also has an

12          LLC effective as of a date of August 12th, 2021.

13   A      Yes.

14   Q      That was a big day for the Three Points entity,

15          wasn't it?

16               MR. CHANG:  Objection to form.

17   Q      Tell me what you remember about this time period

18          and these documents.

19   A      Nothing.

20   Q      Nothing?

21   A      No.

22   Q      Do you believe that this was around the same time

23          that Three Points Center North Carolina's

24          property was purchased?

25   A      Could have been.

 1    Q      Okay.

 2    A      I candidly don't remember.

 3    Q      If it was, there would be a legal record of when

 4           that happened.

 5    A      Yes.

 6    Q      Do you remember -- aside from that possible

 7           reason, do you remember why the operating

 8           agreement for Three Points Center, LLC, had to be

 9           amended around this time?

10    A      No, I don't remember exactly.

11    Q      And I'll just -- I'll represent, just because --

12           your brother may have still been -- was he still

13           handling --

14    A      Yes.

15    Q      -- the corporate business stuff at this time?

16    A      He was.

17    Q      When did -- what was his cause of death?

18    A      COVID.

19    Q      He died of COVID?

20    A      Yes.

21    Q      So it was immediate?  Was it -- it kind of just

22           came on?

23    A      He actually contracted COVID in October of 2021

24           and passed away the following month.

25    Q      So when these documents were executed, there

```
1                wasn't -- just to be clear -- you thought he was
2                just going to keep running things at this time?
3      A         Absolutely.
4      Q         Okay.
5      A         Yes.
6      Q         And so at this time were you the CEO, or was he
7                still the CEO?
8      A         I was the CEO in name.
9      Q         In name.  Okay.  Just turning to the -- let's do
10               the final page of -- 0268 at the bottom.
11     A         268?
12     Q         Yeah.  It's like five pages in from the first
13               staple.
14     A         Okay.
15     Q         It's the list of --
16     A         Got it.  Yeah.
17     Q         -- the list of members.
18     A         Yes.
19     Q         Okay.  I believe after this lawsuit was filed, or
20               sometime around it, that these -- the Three
21               Points entities were dissolved and then
22               reorganized.  Does that ring a bell?
23     A         Yes.
24     Q         Why did that happen?
25     A         Convenience.
```

1    Q    Can you be more specific?

2    A    They were organized in Colorado because that's

3         where my brother lived, and where the majority of

4         these gentlemen lived who were investors.  And

5         because our bookkeeping and accounting offices

6         were moved to Utah, then we just felt it would be

7         easier to do it there.  When we moved them to

8         Utah --

9    Q    Okay.

10   A    -- Guaranty Bank let us know, who's in Colorado,

11        that that was -- that didn't work for them.  And

12        so they asked us to reinstate them in Colorado,

13        which we did.

14   Q    Okay.  All right.  Now, the lawsuit is pending

15        with your brother.  But technically, does his

16        estate still own a controlling share of the Three

17        Points entities?

18             MR. CHANG:  I would object only to the

19        not giving any legal theory or strategy, if

20        that's an issue.  If that's an issue in the case.

21   Q    And I'll be more specific to help --

22   A    Yeah.

23   Q    -- help avoid it.

24   A    Please, Mr. Davis.

25   Q    Before the lawsuit was filed -- Nicole, correct?

```
 1    A      Uh-huh.
 2    Q      After he died, immediately afterwards, did you
 3           have any idea about the mismanagement that became
 4           discovered later?
 5    A      No.
 6    Q      Okay.  But when he died, he -- and then you said
 7           he had a will.  I'm not asking about it.  But did
 8           Nicole become effectively the owner of 1,437
 9           units of this company?
10    A      I believe so.
11    Q      Okay.  Her estate.
12    A      Correct.
13    Q      Did she start participating in the management of
14           the company at all?
15    A      Yes.
16    Q      She did.  Okay.  How are board decisions made now
17           for critical operations issues -- safety, buying
18           trucks, you know, food, replacing things to keep
19           the business running, given that Nicole and/or
20           the estate is adverse to the -- to everybody else
21           in the -- is there a board of directors still
22           making decisions?
23               MR. CHANG:  Objection to form.
24    Q      How are big decisions -- I mean, actually, that's
25           not a great question.
```

```
 1                  What types of decisions before the
 2          mismanagement and when you brother was still
 3          alive -- and let's do before Three Points Center
 4          North Carolina, too.  What types of decisions did
 5          the board of directors have to approve?
 6     A    Typically not many decisions at all.
 7     Q    Okay.
 8     A    They were made aware of financial circumstances,
 9          gave counsel on managing Three Points Center Utah
10          from a financial perspective.  But the decisions
11          were made by program directors.
12     Q    What about financial -- I mean financial
13          expenditures?  Was there a -- I'm picturing
14          there's a level that maybe a group living
15          director might have had to, you know, allocate
16          funds for a movie night.  And then a nurse could
17          make other things.  But was there some sort of
18          tier where once the money being spent, it had to
19          be run by everybody?
20     A    No.
21     Q    No?
22     A    No.
23     Q    And I guess when you add up your ownership shares
24          and your brother and your partner, Mr. Palmer,
25          the cofounder, you were the controlling
```

1          shareholders.

2                    MR. CHANG:  Objection to form.

3      Q     If you add up the -- there's percentages on here

4            somewhere.

5      A     Right.

6      Q     But if you --

7      A     It's on the last page.

8      Q     It's on the last page.  Yeah.  Percent, right, to

9            -- so, your brother's ownership percentage was

10           47.9.  You had 15.8.  And Mr. Palmer had 7.5.

11           So, twenty-two.

12     A     Yeah.

13     Q     I mean, that's like 70 percent just between you

14           three gentlemen.

15                   MR. CHANG:  What is Exhibit A2?  Oh,

16           sorry.

17                   MR. DAVIS:  Well -- yeah, yeah.

18                   MR. CHANG:  It's the --

19                   MR. DAVIS:  You get --

20                   MR. CHANG:  No, no, no.  The Bates number

21           is not -- so what is -- so I'm looking at -- you

22           guys are looking at the last page as 228?

23                   THE WITNESS:  228 is the one I'm looking

24           at here.

25                   MR. CHANG:  Okay.  Then it says Exhibit A

1              on top.  So my -- I don't know if it's an
2              objection, but --
3                        MR. DAVIS:  Well --
4                        MR. CHANG:  -- is it Exhibit A to what?
5              Because in the page before it, it's 156.
6                        MR. DAVIS:  Oh, okay.  The way that I've
7              produced these and in good faith, and if I made
8              an extraction, Adobe boo-boo -- I have pulled out
9              the full operating agreement for Three Points
10             Center and then got rid of all of the stuff that
11             really doesn't matter for this deposition.  And
12             then did the same thing for Three Points Center
13             North Carolina, which -- that's the one that
14             happens to show a percentage of the units as
15             opposed to like a --
16                       MR. CHANG:  Okay.
17                       MR. DAVIS:  -- number of shares.  So that
18             was what I was --
19                       MR. CHANG:  So the last page is Exhibit A
20             to the Three Points Center North Carolina, LLC?
21                       MR. DAVIS:  Yeah.  And while we're here,
22             what is the number that we gave this one on the
23             front?  What's the sticker say?  This guy.  We've
24             got --
25                       THE WITNESS:  17.

Case 1:23-cv-00527-WO-JGM   Document 39-2   Filed 07/23/24   Page 213 of 279

1          MR. DAVIS:  All right.  We're looking at

2     17 still.

3          MS. LANGLEY:  And the last page doesn't

4     belong to 17?

5          MR. CHANG:  No.  The last page belongs to

6     -- no, it is part of 17.  Yes.  Exhibit 17.

7     Sorry.  Yes.

8          MR. DAVIS:  That's all right.

9          MS. LANGLEY:  You were asking about

10    percentage ownership.

11    Q    (By Mr. Davis)  Right.  So the board of directors

12         -- but if something big needed to be done, and

13         you and Glenn and Thane said this needs to be

14         done, it's 70 percent.  Who cares what the other

15         people say?  You can decide.  Not that you

16         wouldn't care, but in terms of corporate --

17    A    Yeah.

18    Q    -- for the corporate decision-making --

19    A    It's a board-managed corporation.

20    Q    Yeah.  And you're the CEO now and your brother

21         was.  All right.  Understood.  All right.

22         MR. CHANG:  Objection to form, just

23         because I don't know what the question was and I

24         don't know what you were answering, but --

25    A    Yeah.

```
1     Q      Let's see.  All right, so -- and just to get this
2            in, we've looked at pages of an operating
3            agreement for Three Points Center, LLC, correct,
4            Dr. Thibault?
5     A      Correct.
6     Q      We've looked at pages of an operating agreement
7            for Three Points Center North Carolina, LLC,
8            effective the same date.  Correct?
9     A      Correct.
10    Q      The non-profit educational part of the
11           organization is called Three Points Academy, Inc.
12           Do you see that?
13                  MR. CHANG:  Objection to form.
14    Q      Is that -- because I just have the front page,
15           just to confirm, this is the -- Three Points
16           Academy, Inc., is the one that currently exists
17           right now and provides educational services.
18    A      Correct.
19    Q      Not Three Points Center Academy, the one that's
20           on the IRS records.
21    A      Correct.
22    Q      Okay.  And then the next page, just there is an
23           entity called Three Points Properties, LLC.  That
24           is the entity that is the record owner of the
25           Hurricane, Utah facility.  Correct?
```

1    A       Correct.

2                        MS. LANGLEY:  And just for the record and

3               we can make this clear, you've combined operating

4               agreements from what appears to be several

5               different organizations into one exhibit.

6                        MR. DAVIS:  I have.

7                        MS. LANGLEY:  So we're not agreeing that

8               this is all one document.  We just want to make

9               it very clear that you've made a compilation.

10                       MR. DAVIS:  And I -- and the compilation

11              was made for efficiency reasons because that way

12              we keep our sticker count down.  And you know,

13              some of the stuff in the middle, it's, like,

14              boilerplate.  Okay.

15                       MS. LANGLEY:  Except they're all

16              different entities.  But anyway, go ahead.

17                       MR. DAVIS:  Except -- yeah, right.

18              Except they're -- and that's a very --

19   Q       And just to put a ribbon on this, all the

20              entities except for Three Points Center Academy,

21              Inc., the LLCs, right?  Three Points Property.

22              I'm asking a question now.  Three Points

23              Properties, LLC; Three Points North Carolina

24              Properties, LLC; Three Points Center, LLC; and

25              Three Points Center North Carolina, LLC, the

1          percentage ownership shares are exactly the same

2          between you and all of these other -- and these

3          other entities and people.  Correct?

4     A    No.  The way you phrased that, the percentages

5          are the -- are different between each of us.

6     Q    Yes.  They are different between each of you, but

7          in terms of how much you -- let's do you.  How

8          much -- what is your percentage ownership

9          interest in Three Points Properties North

10         Carolina, LLC?

11    A    About 15 percent.

12    Q    Fifteen percent.  And what is your percentage

13         ownership interest in Three Points North

14         Carolina, LLC?

15    A    About 15 percent.

16    Q    And it's the same for the two Utah ones, too.

17         Correct?

18    A    Correct.

19    Q    And it's the -- everybody else is the same, also?

20    A    Not 15, but --

21    Q    But --

22    A    -- yeah.

23    Q    -- equal across.  Understood.  All right.  Okay.

24         I have to think about it, and I may come back to

25         some of those.  Let's see.  I'm handing you

```
 1              Exhibit 18.  A collection of documents from
 2              discovery.
 3         (PLAINTIFF'S DEPOSITION EXHIBIT NO. 18
 4              MARKED FOR IDENTIFICATION)
 5    A    Sorry.
 6    Q    Let me find it real fast.  Going to ask you about
 7         it.  Okay.  Do you see the first page that I'm --
 8         it says Three Points 004?
 9    A    Yes.
10    Q    Okay.  Do you see where there's blanks for
11         employee signature, supervisor signature, and
12         executive director signature?
13    A    Yes.
14    Q    Are there any signatures on this document?
15    A    I don't believe so.  On the cover page?
16    Q    Yeah.  And I -- this is similar to some of the
17         last ones, Beth, where I've pulled out different
18         documents from discovery and for my own purposes.
19         But they're not all part of the same document.
20         Okay?
21    A    So these are separate documents stapled together.
22    Q    These are -- the next page is a separate
23         document, but from your company's discovery.
24    A    Okay.
25    Q    So will you turn to the second page, please?
```

1     A     Uh-huh.

2     Q     Do you see where it says department head

3           signature?

4     A     Yes.

5              MR. CHANG:  Before you get rolling, I'm

6           just going to object to this, the second page of

7           Exhibit 18, for incompleteness.  Go ahead.

8              MR. DAVIS:  Okay.  And I'll represent so

9           we can remember it.  Jimmy, I believe that this

10          is the final page of the February 21st

11          performance evaluation that I asked -- or asked

12          Dr. Thibault about.

13             MS. LANGLEY:  So if you're going to ask

14          him -- I would just say if you're going to ask

15          him about a document, we would request to get the

16          whole document.

17             MR. DAVIS:  I understand that.  And the

18          reason that this choice has been made is because

19          of printing cost and the fact that we are all in

20          front of our computers and I believe that I can

21          hopefully sufficiently guide the witness for the

22          purposes of testimony I'm eliciting.  And I would

23          hope that we can stipulate that instead of having

24          something hanging out there like a completeness

25          objection, that we could just say, all right,

1       here's the full thing and maybe send it to our

2       court reporter.

3                   MR. CHANG:  I understand.  But as a --

4       just for this one.  I was cool with the, you

5       know, operating agreements.  But this one, can we

6       rip off the first page, make that 18, and then

7       can we do --

8                   MR. DAVIS:  Let's make them all different

9       exhibits.  I'm fine with that.

10                   MR. CHANG:  Maybe just for this packet.

11      Thank you.

12                   MR. DAVIS:  Yeah, that's fine.

13                   MR. CHANG:  Okay.

14                   MR. DAVIS:  Let's do that.  All right.

15      Let me get --

16                   MR. CHANG:  Because I don't know what

17      your line of questioning is, but just for me, at

18      face value --

19                   MR. DAVIS:  That's -- no.  And also, I

20      think you're flipping through stapled things.

21                   MR. CHANG:  Yeah.

22                   MR. DAVIS:  There's a -- yeah.

23                   THE WITNESS:  May I run to the restroom

24      real quick?

25                   MR. DAVIS:  Let's take a break.

1        THE COURT REPORTER:  Off the record at

2        4:15.

3             (FIVE-MINUTE RECESS)

4        THE COURT REPORTER:  Back on the record

5        at 4:20.

6    Q    (By Mr. Davis)  Okay.  Dr. Thibault, I'm handing

7        you modified Exhibit 18 after our attorney

8        conversation about how to handle these next few

9        documents.

10       (PLAINTIFF'S DEPOSITION EXHIBIT NO. 18

11            MARKED FOR IDENTIFICATION)

12            MR. CHANG:  Thank you.

13   Q    Could you just repeat what's at the top of this

14       form?

15   A    "Three Points Center North Carolina Employee

16       Transaction Form."

17   Q    And then at the bottom, are there lines for

18       employee, supervisor, and executive director

19       signatures?

20   A    There are.

21   Q    Are those signature lines blank?

22   A    They are.

23   Q    Let me hand you number 19.

24       (PLAINTIFF'S DEPOSITION EXHIBIT NO. 19

25            MARKED FOR IDENTIFICATION)

1    Q    This is the final page of a document Bates

2         stamped Three Points 052.  Do you see where it

3         says department head signature?

4    A    I do.

5    Q    Do you believe that's Craig Butcher's signature?

6    A    I do.

7    Q    Do you see where there's a line for employee

8         signature?

9    A    I do.

10   Q    Is it signed?

11   A    No.

12   Q    Going to hand you Exhibit 20.

13        (PLAINTIFF'S DEPOSITION EXHIBIT NO. 20

14             MARKED FOR IDENTIFICATION)

15   Q    This is a document also produced by your

16        companies in discovery.  Can you just read the

17        top line for me?

18   A    "Attendance review/Corrective Action."

19   Q    Is this -- does this form look similar in terms

20        of its formatting and its -- in terms of its

21        formatting to the ones that we looked at that had

22        Ms. Nelson's name on it?

23             MR. CHANG:  Objection.  Only if we could

24        refer to that exhibit on the record.

25   Q    I believe it's Exhibit 11 and 14.

```
 1      A      May I?

 2      Q      Uh-huh.

 3      A      It looks somewhat different.

 4      Q      If the differences are - it would be names,

 5             obviously.  There's some differences in

 6             formatting.  Correct?

 7      A      There is differences in formatting, and there's a

 8             statement in 14 that's different than what's in

 9             20, as far as the form itself.

10      Q      What is the title of the document --

11      A      Attendance review --

12      Q      -- on both of them?

13      A      -- corrective action.

14      Q      And is that -- the title of Exhibit 20 is the

15             same as Exhibit 14?

16      A      Yes.

17      Q      So this is a -- is Exhibit 20 a written warning

18             to Mr. Ellis about whatever the document says?

19      A      Let me read.  It appears to be a warning.  Yes.

20      Q      Okay.  And is it -- I'll be more specific because

21             I caught myself.  Is this a warning to Mr. Ellis

22             that he was late on the following dates in excess

23             of five minutes?  January 22nd, 2022, January

24             23rd, 2022, and January, 30th, 2022?

25      A      Yes.
```

1     Q     Are there any signatures on this document?

2     A     No, sir.

3     Q     Hand you Exhibit 21.

4     (PLAINTIFF'S DEPOSITION EXHIBIT NO. 21

5     MARKED FOR IDENTIFICATION)

6     Q     This is a document Bates stamped Three Points

7     00102.  Are there any signatures on this

8     document?

9     A     No, sir.

10     Q     What is the title of this document?

11     A     "Section, Workplace; Department, All; Subject,

12     Non-Discrimination."

13     Q     All right.  And then what is -- and actually,

14     what does it say above those words that you just

15     read?

16     A     "Three Points Center, LLC."

17     Q     And then what is the -- over on the right side at

18     the top line, what does that say?

19     A     "Policy and Procedure Manual."

20     Q     Why are there signature lines on your company's

21     policies and procedures, but there's no

22     signature?

23     MR. CHANG:  Objection to form.  Just the

24     context of this form.

25     Q     Who do you think -- who wrote these?  Who

1                developed these forms -- or what is the updated

2                date on this document to the right -- top

3                right-hand corner?

4        A       March 28th, 2022.

5        Q       Do you remember being part of any meetings,

6                conversations, or emails related to this updated

7                policy that we're looking at?

8        A       I remember -- yes.

9        Q       Okay.  Do you see where it says Three Points

10               Center, LLC?

11       A       Yes.

12       Q       Is the non-discrimination policy different for

13               Three Points Center North Carolina, LLC, than it

14               is for Three Points Center, LLC?

15       A       I don't believe it's different.

16       Q       You don't believe it's different.  Okay.  And

17               just to -- there's no signatures on this document

18               either.

19       A       No.

20                    MR. CHANG:  I'm going to only object

21               -- this is going to be the only speaking

22               objection.  I'm sorry, Garrett, in advance.  In

23               discovery, we were asked to produce policies in

24               place, and therefore we produced policies in

25               place.  And you're asking my -- I think you were

1              trying to get my client to say whether or not Ms.

2              Nelson should have signed this, or somebody

3              should have signed this.  But in discovery, we

4              were just asked to produce policies in place, and

5              that's all.

6      Q      You just came up with my argument for me.

7      A      Well, I don't --

8      Q      I --

9      A      I don't know where it came from.

10     Q      The context matters, and I don't either,

11             actually, except that it came in an email last

12             week.  Okay.

13                  MS. LANGLEY:  In response to your

14             discovery request.

15                  MR. DAVIS:  In response to my discovery

16             request.  And I'm laughing.  In response, but not

17             organized by specific questions, like, may or may

18             not be required.  I've had people say it is.

19             I've had people say it -- I try to bundle mine up

20             more.  I've got 800 pages, and they may have been

21             organized by request.  I just didn't see it.

22             Okay.  So if that argument can be made, that's

23             not for a deposition.

24                  MR. CHANG:  Mr. Davis, I'm not arguing

25             with you.  We just went the route of putting in

1          Bates numbers to the written responses instead of

2          putting slip sheets like you did because we would

3          have multiple documents that would be -- for

4          example, we'd have one document that would be

5          responsive to multiple requests.  So that

6          wouldn't work with the slip-sheet method because

7          then you would have to do the document multiple

8          times.  So we did Bates stamps in our written

9          responses.

10                    MR. DAVIS:  And I'll just say if there is

11          moving forward that I prefer that, and I think

12          that this actually is more efficient in terms of

13          lawyer time than the alternative.

14                    MR. CHANG:  Okay.

15                    MR. DAVIS:  So I just -- bear with me.

16                    THE WITNESS:  I have no idea what you

17          guys are talking about.

18     Q    (By Mr. Davis)  But let's -- I do want to button

19          this up.  Let's go back to Exhibit -- the one

20          that's got Craig Butcher's signature on it.

21     A    19?

22     Q    Uh-huh.  So that is a document that has a

23          signature on it of the supervisor, but does not

24          have the signature of the employee.

25     A    Is that a question?

228

1    Q    It's more – it's a leading question, just to

2         confirm there is a signature.  As opposed to

3         Exhibit -- the one that led to this.  As opposed

4         to the non-discrimination page.  That one has no

5         signatures.  What number is that?  21?

6    A    Uh-huh.

7    Q    Whereas the one with Mr. Butcher's signature does

8         have a signature.

9    A    Question.  This one that's blank, is the

10        inference that there should be a signature here?

11        Is this somebody's document, or is this just out

12        of the manual?

13   Q    That's one where I'm going to have to just coldly

14        reply that I can't answer any questions on that.

15   A    Okay.

16   Q    But thank you for asking about inferences.  All

17        right.  Number 22.  Last one.

18             (PLAINTIFF'S DEPOSITION EXHIBIT NO. 22

19                  MARKED FOR IDENTIFICATION)

20   A    Uh-huh.

21   Q    And this is Three Points 000554.  Below the line,

22        the blank signature lines, can you read the fuzzy

23        -- it's slightly fuzzy.  Do you see what it says?

24        It's Three Points Center -- like the bottom

25        footer thing.

1    A    "Three Points Center Policy and Procedures

2         Manual."

3    Q    And then there's a page number, but I'm not going

4         to -- okay.  Is there something unique about the

5         horse program that led to the creation of this

6         form that is -- that employees may or may not

7         have signed?

8    A    I don't know.  That would be a question for Rod

9         Mayes, who created it.

10   Q    Thank you.  Okay.  23.

11        (PLAINTIFF'S DEPOSITION EXHIBIT NO. 23

12             MARKED FOR IDENTIFICATION)

13   Q    Dr. Thibault and Jimmy, I've handed Exhibit 23

14        across, and let me just briefly introduce it in

15        terms of -- this exhibit does contain every

16        single page from a document I found online called

17        "Residential Treatment Inspection Checklist."

18             But do you see how there's big pages and

19        then it gets -- turn about five pages in.  And

20        then it transitions to smaller pages.  And Jimmy,

21        we'll maybe have to work through this.  I wanted

22        to produce the entire thing, Dr. Thibault, but I

23        didn't want to ask about every single check-box

24        that this inspector did.

25   A    Uh-huh.

1    Q      Okay.  So I want to give you time to look through

2           it, but the question -- the pages I'm going to

3           ask questions about are really just the first few

4           --

5    A      Okay.

6    Q      -- that are legible.  Okay?

7    A      Uh-huh.

8                  MR. CHANG:  Okay.  So just for the

9           record, the title pages represent the entire

10          document, and then the front full-size pages

11          represent the pages that Mr. Davis wants to draw

12          attention to.

13   Q      Yeah.

14                 MS. LANGLEY:  So I'm going to object to

15          this, but just -- this has to do with an

16          inspection in Utah in May of 2023, more than a

17          year after the Plaintiff was employed.  So this

18          has no purpose whatsoever to this lawsuit.

19                 MR. DAVIS:  I get to -- we'll tidy it up

20          pretty quickly.  And then if it doesn't have any

21          pertinence or I want to throw it away -- it's a

22          deposition.

23                 MS. LANGLEY:  And also, I have that she

24          was not employed by Three Points Center, LLC in

25          Utah.

1    Q    Dr. Thibault, are you the CEO of both the
2         facilities that your attorney has just
3         identified?  The one in North Carolina and the
4         one in Utah?
5    A    I am.
6    Q    Okay.  And didn't you previously testify that
7         even though North -- the North Carolina facility
8         is not subject to the regulations that are, I
9         guess -- that this inspector in Utah would know
10        about, that your facility in North Carolina, that
11        you had -- you voluntary complied with those
12        regulations.
13             MR. CHANG:  Object to form.  But answer
14        if you understand it.
15   A    I'm not sure --
16   Q    Do you remember you -- so, in Utah, this
17        inspector is coming to the facility to determine
18        whether or not Three Points Center's Hurricane,
19        Utah facility is complying with the ratios and
20        those regulations that we discussed previously in
21        the deposition.  Correct?
22   A    Correct.
23   Q    And I believe you testified that those
24        regulations, specifically the ratio requirements,
25        do not apply from a regulatory perspective in

1     North Carolina, but that you, the CEO, had made

2     the decision with others to comply with the same

3     regulations that are at issue in this inspection.

4  A  We are complying with our policies and procedures

5     in Utah.

6  Q  Okay.  Your policies and procedures.  Okay.  Are

7     the policies and procedures any different in Utah

8     than they are in North Carolina?

9        MS. LANGLEY:  Are you talking about

10     ratios?

11        MR. DAVIS:  Well, he says policies and

12     procedures.  I'm talking about policies and

13     procedures, because those are different than

14     regulations.  That's --

15        MS. LANGLEY:  Your question was about

16     ratios, so --

17        MR. DAVIS:  I used that as an example

18     because that's the only one I can remember.

19  A  No, not materially.  They aren't.

20  Q  Okay.  All right.  Can you turn to the third page

21     of Exhibit 22 -- or 23?  Let me mark it for

22     myself.  There's a note from the inspector.  It

23     says, "Initial treatment signed outside of 30

24     days."  What does that mean?

25  A  The treatment plan -- what it appears to be is

233

```
 1                   that a treatment plan was signed by a client
 2                   after 30 days of enrollment.
 3        Q          So is it fair to say that the inspector in Utah
 4                   identified a document that was signed after the
 5                   fact?
 6        A          What do you mean, "after the fact"?
 7                        MR. CHANG:  Objection to form.
 8        Q          Well, signed after the time that it was supposed
 9                   to be signed.
10        A          Treatment plans have to be signed within 30 days
11                   of admission.
12        Q          Of admission.  What is the point of signing a
13                   document nearby the time when you're supposed to
14                   sign it?  I know that was -- sorry.
15                        What's the reason for that regulation?
16        A          I don't know, because I disagree with it.
17        Q          Why do you disagree with that regulation?
18        A          Because there's no way a mental health
19                   practitioner can create a full and complete
20                   treatment plan in 30 days.  You just don't get
21                   enough data on a client.
22        Q          Fair.  All right.  Turn two more -- two pages.  I
23                   might have had a duplicate in here.  Yeah.  Do
24                   you see the comment?  I'm on -- we're on the same
25                   page.
```

1    A        Okay.

2    Q        Do you see where the inspector's note says,

3             "Don't have permission to use video"?

4    A        Yes.

5    Q        What is that about?

6    A        I don't know.

7    Q        Do -- are there video cameras in the Three Points

8             Center North Carolina facility?

9    A        Yes.

10   Q        Where?

11   A        In the dorm hallways.

12   Q        The hallways?

13   A        Yes.

14   Q        I may -- this one may be helpful just to go ahead

15            and do this one, too, while we're here.

16   A        And --

17   Q        Go ahead.

18   A        And in other places.  I don't know exactly where

19            they are, but I know they have them in the

20            hallways.

21   Q        One second.

22                  MR. CHANG:  And Garrett, you stated that

23            there's a duplicate in here, right?

24                  MR. DAVIS:  I think there's a duplicate

25            in there.

1              MR. CHANG:  Okay.  I just want to state
2         that for the record.  So that there is not two
3         violations listed.
4              MR. DAVIS:  Yeah.  No, no, no.
5    Q    Show you what I'm going to do instead of fumbling
6         -- I know what the map looks like I'll introduce.
7         I think y'all can share it.  It's just -- I've
8         got copies for y'all, and y'all should be able to
9         see it okay.  I hope that will work.  Okay.  So
10        please keep that inspection thing out.  But as we
11        talk about where things are --
12   A    Sure.
13   Q    -- that's actually a little bit of a -- so I'm
14        going to mark this as 24.  And I brought my
15        stapler so we can staple them later if we want
16        to.  That way you can kind of look at them
17        together without having to flip back and forth.
18        (PLAINTIFF'S DEPOSITION EXHIBIT NO. 24
19             MARKED FOR IDENTIFICATION)
20   Q    I'll represent that the first page of the
21        document is a, you know, web GIS map from Chatham
22        County property records.  Take a moment to look
23        at it, and let me know if you -- well, look at
24        the first page.  Do you see where the arrow's
25        pointing?

1    A    Which is the first page?

2    Q    The one that has the yellow sticker on it.

3    A    24?

4    Q    Uh-huh.

5    A    Okay.

6    Q    Is that arrow pointing to the Three Points

7         Chatham County property?

8    A    Yes.

9    Q    Okay.  I'll represent that the second page is a

10        map that I have created -- I used to be a planner

11        -- to help me understand where stuff is, because

12        that one's difficult to draw on.  All right?

13   A    Yeah.

14   Q    So back to the inspection.  You said that there

15        were cameras in, what, the dorms?

16   A    There are cameras -- I believe there are cameras

17        in the dorms.

18   Q    Not to put us in s coloring class, but if you

19        know what these buildings are, I'd like to have

20        an understanding.  Can you use numbers on the map

21        that I have made and put on the buildings where

22        the dorm is that you just referred to?  Or just

23        use a D.  How about a D?

24            MR. CHANG:  I'm asking for clarification,

25        not objection, but when we're talking about the

1           cameras, that was Three Points Center, LLC, and

2           what is this a map of?

3                    THE WITNESS:  That's Utah.  This is North

4           Carolina.

5                    MR. DAVIS:  North Carolina.

6                    MR. CHANG:  Okay.  So you're asking him

7           to mark the --

8                    MR. DAVIS:  For North Carolina.

9                    MR. CHANG:  North Carolina.

10    Q     I want to -- because you said that North Carolina

11          has cameras, too.

12    A     North Carolina does have cameras.

13    Q     Okay.  And that's -- and then you put a D there.

14          That's next to the tennis court.  So while we're

15          here, what is that -- and is that a tennis court

16          that I colored like a tennis court?

17    A     This?

18    Q     Yeah.

19    A     Yeah.  It's kind of a sport court.

20    Q     Okay.  What is that other building that looks --

21          that I've symbolized as having a connecting

22          little trail to it?  Is that building --

23    A     Are you referring to this building?

24    Q     Yeah.

25    A     That is an -- well, it's kind of a multipurpose

1              building.

2        Q    Okay.  Put in a D, please.  Okay.  Now, where the

3              stables are, I couldn't tell if it was a barn or

4              like a heated building.  Is it -- what is the

5              building near the stables?

6        A    That's a barn.

7        Q    That is a barn.  I believe there's another

8              building towards the main -- closer to the main

9              entrance.  What is that?

10       A    That's an

11             administration/cafeteria/academic/office

12             building.

13       Q    I need you to put admin/school/caf.  Admin/school

14             caf.  Yeah.  That'll work.

15       A    Okay.

16       Q    Okay.  Have -- does that map generally, right,

17             identify the parking areas with those little gray

18             squares and the road network?  Generally?

19       A    Generally.

20       Q    Okay.  So I need you to just put a P.

21       A    There are some areas that your missing --

22       Q    Okay.

23       A    -- behind the dorm and to the side area.

24       Q    All right.  Just put a -- just scribble a P as

25             quick as you want to, and we'll be able to move

239

1          on.

2     A    Okay.

3     Q    Okay.

4              MR. CHANG:  Can you draw your parking

5          lot?

6     A    Yeah.

7              MR. CHANG:  I'm going to hand my -- the

8          witness my pen to see if it works better.

9              It does not.

10    Q    It's kind of slippery.  All right.  So there's

11         cameras in the dorm.

12    A    I believe so.  Yes.

13    Q    Are there cameras in other any building?

14    A    I don't know.

15    Q    Okay.  What is the purpose of having cameras in

16         these buildings?

17    A    Supervision.

18    Q    Okay.  If you know -- and if you don't, please

19         tell me -- is it like a gas station where they

20         delete the photo -- delete it all the time, or do

21         you still have, you know, video going back years?

22    A    I'm not sure if it cycles through and records

23         over or not.

24    Q    Who is in charge of the surveillance system at

25         Three Points?

1    A    Heidi.

2    Q    Heidi.

3    A    Yes.

4    Q    Okay.  And we were on -- all right.  Thank you

5         for that.  All right.  That was exhibit – let me

6         check.  Hand you what's -- actually, let's do --

7         instead of staple them, let's call the map that

8         you identified -- that way it keeps it

9         separate --

10   A    Okay.

11   Q    -- as 25.

12        (PLAINTIFF'S DEPOSITION EXHIBIT NO. 25

13             MARKED FOR IDENTIFICATION)

14   A    25.

15   Q    Okay.  Great.

16   A    Are we done with these?

17   Q    For now.

18   A    Okay.

19   Q    Oh, not the inspection one.

20   A    Oh, okay.

21   Q    Yeah.  And you can clip those together, too, if

22        you want.  All right.  So, the inspections.

23             MR. CHANG:  So is Exhibit 25 the second

24        page of that --

25             MR. DAVIS:  Yeah.  That keeps it cleaner,

1               because the other one's just a pure export from

2               Chatham.  No confusion of the authorship.

3     Q         (By Mr. Davis)  All right.  So in North -- back

4               to the permission to use video.  For the cameras

5               that are in the dorms for the North Carolina

6               students, did you obtain permission from the

7               parents in North Carolina to videotape or to

8               surveille the premises?

9     A         There is a -- yes.

10    Q         Okay.  What would the -- how did the inspector

11              determine that Three Points Center in Utah didn't

12              have permission to use video?

13    A         I do not know.

14    Q         Do you have permission to use video now there?

15    A         Yes.

16    Q         What did you have to do to get it?

17    A         We -- it's part of our enrollment agreement.

18    Q         Did somebody -- did one of the parents have to

19              sign a piece of paper to give Three Points

20              permission to surveille?

21    A         Yeah.

22    Q         So is a -- is it fair to say that a signature is

23              evidence that's useful to help people know what

24              happened?

25    A         I have no idea what --

1          MR. CHANG:  Objection to form.

2     A    -- what you mean by that, Mr. Davis.

3     Q    Why would a government agency that has a

4          regulation which requires a residential treatment

5          facility to have permission from parents to

6          record the population -- what is it about a

7          signature that allows them to make the conclusion

8          that the facility does have permission?

9          MR. CHANG:  Object to form.

10    Q    What -- why do we sign documents, Dr. Thibault?

11         When I say we, I mean businesspeople, lawyers,

12         parents who enroll.  What is the purpose of a

13         signature?

14    A    To attest we've read it.

15    Q    Well, what is the purpose of a signature -- let's

16         keep it more specific.  What is the purpose of

17         that signature that they said was missing?

18    A    I don't think they said that we -- it was

19         missing.

20    Q    Well, okay.

21    A    I don't know why they said "don't have

22         permission," but I don't think that means that --

23    Q    Maybe, but how -- assuming that they were wrong

24         to do that, how do you get permission to

25         surveille the students?

1    A    It's part of our enrollment agreement.

2    Q    And what -- and you said agreement, correct?

3    A    Correct.

4    Q    And why do people sign agreements?

5    A    To concur.

6    Q    That they agree with the statements in the paper?

7    A    Sure.

8    Q    Okay.

9    A    Yeah.

10   Q    Do you remember the documents that we looked at

11        of Exhibits 19 through 20?  The one that started

12        with "Employee Transaction Form."  Maybe it

13        started at 19.

14   A    19, okay.  That one.  Yeah.

15   Q    Do you see the one that says, "Employee

16        Transaction Form"?

17   A    I see.  Yeah.

18   Q    Do you see how there are no signatures there?

19   A    Uh-huh.

20   Q    Is this evidence of a transaction?

21            MR. CHANG:  Objection to form.

22   A    I can't speak to what happened with this.

23   Q    Why not?

24   A    Because I wasn't present when it was transacted.

25   Q    But if there was a signature, would you believe

---

1          that it was more likely than not that something

2          did happen, reflected on the form?

3     A   Yes.

4     Q   I'm asking if you saw a signature on a document

5          versus a document that was unsigned, which

6          document do you trust?  The signed one or the

7          unsigned one?

8               MS. LANGLEY:  Garrett, I'm going to

9          object to this.  There's tons of documents that

10         don't have signatures and they're authentic, so

11         if you can just move on.  He already told you he

12         doesn't know anything about it.

13    A   I just don't know.

14    Q   Okay.

15    A   Again, I don't know what transpired with that

16         document.

17    Q   Well, I won't introduce things twice.

18              MR. CHANG:  Respectfully, I object,

19         because his opinion about what he thinks about a

20         signed -- the power of a signature is just a

21         waste of time.

22              MR. DAVIS:  No.  I don't believe it is.

23    Q   Do you believe that -- when Three Points Property

24         was purchased, do you remember that time?

25    A   Which property?

1    Q      The one in North Carolina.

2    A      Yeah.

3                  MS. LANGLEY:  Garrett, it's a real estate

4           document that requires signatures.  This is

5           apples and oranges, so --

6                  MR. DAVIS:  We can argue about whether or

7           not an employee document that has a line for

8           signatures that doesn't have a signature is as

9           bona fide as one that does have a signature.  I

10          know that it's not a real estate document.  I'm

11          just asking Dr. Thibault --

12                 MS. LANGLEY:  Well, why don't you save

13          that argument for a judge, and not Dr. Thibault?

14                 MR. DAVIS:  I will get the documents in.

15          I know what the answer's going to be.  I like to

16          get them in.

17   Q      (By Mr. Davis)  But you're the CEO.  Would you --

18          if there's a document with your company's name on

19          it that says signature line and that document

20          means something, do you accept that -- do you

21          understand that premise?

22   A      I'm not sure.  Do I understand what premise?

23   Q      Here.  I'm going to show you Exhibit 26.

24          (PLAINTIFF'S DEPOSITION EXHIBIT NO. 26

25                 MARKED FOR IDENTIFICATION)

1    A    Okay.

2    Q    This is a document that your attorney introduced

3         during Ms. Nelson's deposition.  I believe it

4         was.  What does it say on it?  What is at the

5         top?

6    A    "Three Points Center North Carolina New Hire

7         Form."

8    Q    And what does the document show?  What does it

9         say?

10   A    It shows an employee's name, date of hire,

11        starting pay, start date, job title.

12   Q    All right.  And I'm going to -- okay.  Do you see

13        how it says, "New Hire Form"?

14   A    Yes.

15   Q    Do you see -- it's a table form.  Do you see

16        where it says, "New Hire Training"?

17   A    Yes.

18   Q    Is that -- remember, we talked about training as

19        being like an important thing that has to happen

20        before an employee can do the job?

21   A    In Utah, it's required to do it before the

22        employee can do the job.

23   Q    Okay.  What is the employee's name on this form?

24   A    Ty Nelson.

25   Q    For the new hire training, does this form -- to

1          you, as the CEO of your company, does it appear

2          to indicate that new hire training occurred for

3          all of those items listed between mission

4          statement, progressive discipline policy,

5          provider code of conduct, all the way down to

6          criminal background policy -- does it appear to

7          indicate that training occurred on December 6th,

8          2021?

9                    MR. CHANG:  Objection.  You're completely

10         mischaracterizing this form and he has already

11         said he does not handle this stuff; he doesn't

12         know the context; he does not do the new hires.

13                    MR. DAVIS:  I'm not mischaracterizing

14         this form.  I asked him what --

15                    MR. CHANG:  All right.  We're going to

16         present some documents --

17                    MR. DAVIS:  What do you --

18                    MR. CHANG:  -- that waste an hour on

19         questioning.

20    Q    (By Ms. Davis)  What do you think this form --

21         what is the purpose of this form?

22    A    It's a new hire form.

23    Q    What is the purpose of training an employee?

24    A    To educate them in working at Three Points Center

25         North Carolina.

1    Q       Is it to educate them about the employer's
2            expectations of them?
3    A       I would imagine, yes.
4    Q       Can you turn to the final pages?  Well, actually,
5            it's on this.  It's on that first page right
6            there.  Is this document signed by anybody?
7    A       Not that I can see.  No.
8    Q       How do you know that any of this training
9            actually occurred?
10   A       I don't handle filling out the forms, so I don't
11           know that I can attest or didn't attest to it.
12   Q       So if I wanted to ask more, that could be for Ms.
13           Palmer?  A question for Ms. Palmer?
14   A       Uh-huh.
15   Q       But you as the CEO, looking at this, do you think
16           that this -- that having unsigned documents that
17           just say training happened on a certain date is a
18           good policy?
19               MR. CHANG:  Objection to form.  That --
20           you're totally mischaracterizing what's going on
21           in these forms.  And that your client is the one
22           -- all right, you know what?  You're going to
23           find out soon enough.  You're completely
24           mischaracterizing this form, so go ahead.
25   Q       I mean -- I'm just ask -- I'm asking what this

1   form is, and you don't know.  That's ask -- it's

2   ask Heidi.

3            MR. CHANG:  You're still asking him about

4   the form.  Just stop asking him about it.  And

5   you're saying -- and you're putting all these

6   assumptions into this form.  You're saying, "Oh,

7   how can someone do training all in one day."  Ask

8   your client who acknowledges that she did that.

9            MR. DAVIS:  Is this -- does this get to

10  be a speaking objection?

11           MR. CHANG:  Okay.  Then he already said

12  he doesn't know this form, and you acknowledged

13  that.  And he said, "Ask Heidi," and you said,

14  "Okay, he doesn't know anything."  And you still

15  keep asking him about it.

16  A   I have not seen this form before this very

17  moment.

18  Q   All right.  Which one was that?  What's the

19  exhibit?

20  A   26.

21  Q   Before today, when was the last time you were in

22  North Carolina for anything related to Three

23  Points?

24  A   I believe it was November 2023.

25  Q   What did you come here for?

```
 1     A      Attachment and trauma training, and a parent
 2            weekend.
 3     Q      A parent weekend?
 4     A      Yeah.
 5     Q      When was the last time you spoke with Mr. Palmer?
 6     A      This morning.
 7     Q      This morning?
 8     A      Yeah.
 9     Q      Did you speak about this case?
10     A      No.
11     Q      No.  What did you guys talk about?
12     A      We had an inspection yesterday at the Utah
13            facility from school districts.  And so I gave
14            him an update on how that went.
15     Q      When was the last time you spoke with Ms. Palmer?
16     A      When we were coming back from lunch.
17     Q      Oh, you -- she's here.  Okay.
18     A      She and I had a phone call when we were walking
19            back here.
20                   MR. CHANG:  And I would just caution the
21            witness.  You can't share legal advice that was
22            given to both of you.  The discussion of legal
23            advice.
24                   THE WITNESS:  Okay.
25     Q      When -- I believe that either in December of 2021
```

1          or early January of 2022, there were a few

2          students from the Utah facility that were moved

3          to the North Carolina facility.  Does that ring a

4          bell?  Do you believe that happened?

5     A    Yes.

6     Q    Okay.  Can you tell me about what that -- why

7          that happened and what it was?

8     A    Why it happened, or what it was?

9     Q    Just a -- yeah.  Who was moved?  Why were they

10         moved?  No names -- I'm not asking for names.

11    A    Yeah.

12    Q    Just --

13              MS. LANGLEY:  Object to form.

14    A    There were a few students -- and I don't remember

15         how many -- whose families lived closer to this

16         facility.  And upon learning that we were opening

17         here, the North Carolina -- Three Points Center

18         North Carolina, they were talked to and talked to

19         us.  I don't remember the exact exchange, but

20         they felt it would be more beneficial for their

21         families.  It'd be easier for them to visit their

22         children if they were over here.

23    Q    Okay.  Since then have any other students moved

24         between facilities?

25    A    No.

1    Q    Is the current population at the facility in

2         Chatham County, in terms of the states and

3         communities where those girls came from, is it

4         catering to an East Coast market, or are there

5         people from California that come to North

6         Carolina?

7              MR. CHANG:  Objection to form.

8    Q    Do you understand what I'm asking -- you know,

9         like do you have -- Utah.  You identify

10        California as being a place.  I mean, people from

11        Utah, Oregon.  Do you know the states where the

12        parents of the students that are in North

13        Carolina are from, generally speaking?

14   A    Yes, generally.

15   Q    Okay.  Is it the East Coast, Southeast,

16        Northeast?

17   A    Northeast, primarily.

18   Q    It's the Northeast.

19   A    Yeah.

20   Q    Would those parents -- well, are there any

21        students from the Northeast at the Utah facility?

22   A    Yes.

23   Q    There are?

24   A    Yes.

25   Q    Why do some go to North Carolina, and some go to

Case 1:23-cv-00527-WO-JGM    Document 39-2    Filed 07/23/24    Page 252 of 279

1          Utah?

2     A    A variety of reasons.  For example, if a student

3          lived in New England and was being funded by

4          California post-adoption assistance, they would

5          go to Utah.

6     Q    Okay.  And why is that?

7     A    Because Utah works with California post-adoption

8          assistance.

9     Q    Okay.  I see.

10    A    Yeah.

11    Q    So California, they say this money can go out of

12         the state, but only to these states, correct?

13    A    I'm not sure how California --

14    Q    All right.  But --

15    A    -- makes those decisions.

16    Q    Well, however they do it.  But they don't -- but

17         if there was a student from -- so someone from

18         the Northeast could have the California

19         post-adoption assistance?

20    A    Yes.

21    Q    Okay.  But if they said I want to go to Three

22         Points North Carolina, California, the county

23         would say, "No, you can't."

24    A    Correct.

25    Q    Okay.  Understood.

1    A    Yeah.

2    Q    27.  27.

3         (PLAINTIFF'S DEPOSITION EXHIBIT NO. 27

4              MARKED FOR IDENTIFICATION)

5    Q    Okay.  Dr. Thibault, I handed you Exhibit 27,

6         which is Bates stamped Three Points 064.  It was

7         produced in your client's discovery.  Let me see.

8         I think this is the handbook.  Do you see the

9         third paragraph?  It says, "This Employee

10        Handbook will provide you with a description of

11        the company."

12   A    I do.

13   Q    Okay.

14   A    Yeah.

15   Q    Is there an employee handbook for the North

16        Carolina facility?

17   A    Yes.

18   Q    There is?  Is this the employee handbook for the

19        North Carolina facility?

20   A    I do not know.

21             MR. CHANG:  Objection.  There's a lot of

22        pages missing that might help answer that

23        question.

24             MR. DAVIS:  This is the only page that

25        looks like this in your client's discovery.

1          So --

2                    MR. CHANG:  Didn't you rip it off of

3          there?

4                    MR. DAVIS:  No.  But I didn't want to run

5          afoul of the -- combining different numbers.

6                    MR. CHANG:  Do you want me to pull up the

7          full document or -- I don't get what you're

8          saying.

9                    MR. DAVIS:  Yeah, exactly.

10                   MR. CHANG:  I didn't produce a -- did I

11         produce a single page, like a standalone page

12         like this?

13                   MR. DAVIS:  No.  I just -- and she did

14         the same thing.

15                   MR. CHANG:  I know, but you're asking is

16         this --

17                   MR. DAVIS:  She did it all the time.

18                   MR. CHANG:  You're asking what this whole

19         document is, and then --

20                   MR. DAVIS:  I know I'm asking -- I'm

21         asking -- and yeah, I acknowledge --

22                   MR. CHANG:  Whereas she said, like, "This

23         is the blank from this document."  Whereas your

24         asking him, like, "Here's a page, what is it.

25         What is this document?"

1        MR. DAVIS:  Right.  And I acknowledge

2   that that question might be more properly --

3        MR. CHANG:  And then I asked you where --

4        MR. DAVIS:  -- answered by Ms. Palmer.

5        MR. CHANG:  -- did this come from, and

6   you said this is how I got it.  And I was, like,

7   "Really, did I give it to you like this?"  So now

8   I've got to check based on that answer.

9        MR. DAVIS:  And it's --

10       MR. CHANG:  Okay.  So it is part of a

11  larger document?

12       MR. DAVIS:  Yeah.  It's part of a larger

13  document.  It's the cover page --

14       MR. CHANG:  And it would -- I'm telling

15  you right now, I'm looking at the rest of the

16  document.  That would have --

17       MR. DAVIS:  It's the cover page of the

18  employee handbook, isn't it?

19       MR. CHANG:  Okay.  And you asked him.

20  You said, "Is there a handbook?"  And you took

21  away the rest of the document that would have

22  told him, "Oh, yeah, this is the handbook."

23       MR. DAVIS:  No, no, no.  I didn't --

24  Jimmy, what I'm saying is for y'all -- that's not

25  the employee handbook.  This is some PowerPoint

1          that my previous outline, I wanted to ask -- I

2          wasn't trying to take it away.  Look at the

3          bottom.  You see what I'm saying?  I didn't --

4          this is --

5                    MR. CHANG:  All right.  I think --

6                    MR. DAVIS:  Yeah, yeah.

7                    MR. CHANG:  -- as far as your question, I

8          think we're on --

9                    MR. DAVIS:  Yeah, yeah.  Don't --

10                   MR. CHANG:  I just -- I feel like --

11                   MR. DAVIS:  I'm not going to ask you

12         about the whole handbook.  And I had this, and

13         this is for Craig.

14                   THE WITNESS:  May I go to the restroom?

15         Is this --

16                   MR. DAVIS:  Yeah, yeah.  Absolutely.

17                   THE COURT REPORTER:  Okay.  We're off at

18         5:01.

19                   (FOUR-MINUTE RECESS)

20                   THE COURT REPORTER:  Back on the record

21         at 5:05.

22    Q     (By Mr. Davis)  I've handed you an extract from

23         the larger document that your attorneys produced

24         in discovery in response to my discovery request

25         for policies and procedures and handbooks that

1           were in effect when my client, Tyliya Nelson, was

2           employed.

3     A     Okay.

4     Q     Do you remember -- just because it's more helpful

5           for you to answer questions -- was Tyliya Nelson

6           employed -- she was one of the first employees at

7           Three Points.  Is that --

8     A     At Three Points Center North Carolina.

9     Q     North Carolina, yeah.  She worked at the North

10          Carolina facility?

11    A     Yes.

12    Q     And so this document, which was produced, was

13          policies that were in effect when she was

14          employed, that's what we're looking at.  This is

15          the cover page of the employee handbook in effect

16          at the time she was employed.  Who is the name

17          that signed this on the signature line?

18    A     Glenn M. Thibault.

19    Q     Ms. Nelson worked at Three Points between 2021

20          and April 6th of 2022, correct?

21                MR. CHANG:  Objection to form.

22    A     I believe so.  I don't know exactly.

23    Q     I believe you previously testified that you

24          became the CEO of Three Points Center in 2018.

25    A     Uh-huh.

| | | |
|---|---|---|
| 1 | Q | Why is your brother still holding himself out as |
| 2 | | the president and CEO to all the employees? |
| 3 | A | I think this was -- needed to be corrected after |
| 4 | | the change was made, and wasn't made in the |
| 5 | | handbook at the time. |
| 6 | Q | Just a couple follow-ups where -- switching gears |
| 7 | | a little bit.  Do you remember when I was asking |
| 8 | | questions about who owned trucks and horses |
| 9 | | earlier? |
| 10 | A | Yes. |
| 11 | Q | What other property that's not real property do |
| 12 | | the businesses that you are the CEO of own |
| 13 | | related to Three Points? |
| 14 | | MR. CHANG:  Objection to form. |
| 15 | | MS. LANGLEY:  I'm going to object just in |
| 16 | | general.  That's, like, come on now. |
| 17 | Q | Let's start with -- all right.  Let me -- let's |
| 18 | | go with Utah.  I'm going to try to picture the |
| 19 | | facility.  It's -- the buildings are real |
| 20 | | property that's owned by Three Points Properties |
| 21 | | Utah -- or Three Points Properties, LLC. |
| 22 | | Correct? |
| 23 | A | Yes. |
| 24 | Q | Okay.  And remember when I asked about the trucks |
| 25 | | that transported the horses? |

Case 1:23-cv-00527-WO-JGM    Document 39-2    Filed 07/23/24    Page 259 of 279

1    A      Uh-huh.

2    Q      Your testimony, it was what it was.  So I'm

3           thinking about personal property.  What other

4           big-ticket pieces of property -- just tell me

5           what the facility looks like.

6                    MS. LANGLEY:  Object to form.

7    Q      What else is there besides dorms, trucks, and

8           people?

9    A      A water tower.

10   Q      Okay.

11   A      Dorms, trucks, people.  Oh, we have an indoor

12          arena there.  I mean, buildings.

13   Q      The build -- okay.  Buildings.

14   A      Yeah, buildings.

15   Q      The cameras.

16   A      Well --

17                   MS. LANGLEY:  Are you wanting an

18          itemization of all personal property?  Because

19          we're going to object to that.

20                   MR. DAVIS:  I'm not asking -- that's why

21          --

22                   MS. LANGLEY:  -- has nothing to do

23          with --

24                   MR. DAVIS:  I said big ticket.  I said --

25          I basically -- I think it's vehicles.  I told --

1              this is the last one.  I'm just cleaning up.

2        Q    Besides trucks, is there anything else?

3        A    There are vans.

4        Q    Okay, vans.

5        A    Yeah, yeah.

6        Q    All right.

7        A    There are some vans and a small Ford Explorer.

8              And like I said, the trucks.  A tractor.

9        Q    Okay.

10       A    A small Kubota tractor.  That's really --

11       Q    Just stuff to maintain the property.  And

12             those -- and similar things in North Carolina?

13             So trucks, vans, and is there like a Gator or

14             something?

15       A    There's one van.  There's one truck.  There's a

16             horse trailer.  A Bobcat.

17       Q    Okay.  Is -- at the Utah facility, is there a

18             specific employee whose duties include fleet

19             management?

20       A    Not a specific employee, no.

21       Q    Who hand -- when I say fleet management, do you

22             have a sense of what I'm talking about?

23       A    Tell me.

24       Q    Is there some -- if there was a -- how many vans

25             are there at the -- that are used by the Three

1        Points Utah facility to provide the services?

2   A    Three.

3   Q    Three.  If one of the vans needed to be serviced,

4        is there a go-to person that keeps up with the

5        service record, will go take it to be serviced?

6        Things like that.

7   A    Yes.

8   Q    Who is that person?

9   A    Sam Lytle.

10  Q    Sam Lytle.

11  A    Yeah.

12  Q    Okay.  Is there a kind of person like that in

13       North Carolina, too?

14  A    I don't believe so.

15  Q    Okay.  So if the van -- how many vans are in

16       North Carolina?

17  A    One.

18  Q    One.  And one truck?

19  A    Correct.

20  Q    Okay.

21  A    And a Toyota RAV4.

22  Q    Okay.  To your knowledge, have any other

23       complaints or lawsuits been filed by employees of

24       the two businesses that you're the CEO of related

25       to Title VII of the Civil Rights Act?

1    A       No.

2    Q       By employees?

3    A       No.

4    Q       Is this the first employment discrimination

5            lawsuit against either of the Three Point

6            entities that you're the CEO of?

7    A       Yes.

8    Q       Okay.  And actually, this one.  I don't have any

9            other questions, but exhibit -- I'm going to do

10           Exhibit 28 just to housekeep.

11           (PLAINTIFF'S DEPOSITION EXHIBIT NO. 28

12                MARKED FOR IDENTIFICATION)

13   Q       Do you remember when I asked a couple questions

14           about the lawsuit related to your brother and

15           financial mismanagement?

16   A       Yes, sir.

17   Q       And we used the captions of different lawsuits to

18           talk about the different Three Point entities.

19   A       Oh, yes.

20   Q       Does this look like a -- in 28, does that look

21           like the front page of that lawsuit against your

22           brother and his estate and Nicole Thibault?

23                MR. CHANG:  Just object to form for a

24           clarification.  Is that a caption for that case?

25                MR. DAVIS:  Uh-huh.

264

1                      MR. CHANG:  Okay.

2       Q       And take off the bottom page.  I don't have any

3               questions about that, but it doesn't need to get

4               stuck in there.  I was going to ask about Glenn,

5               but I know now.

6       A       I believe it is.

7                      MR. DAVIS:  Okay.  Sounds good.  Thank

8               you.

9                      THE WITNESS:  Yeah.

10                     MR. CHANG:  We're going to need a break.

11                     MR. DAVIS:  That's fine.

12                     MR. CHANG:  And then a few questions.

13                     THE COURT REPORTER:  We're going off the

14              record at 5:15.

15                     (FIVE-MINUTE RECESS)

16                     THE COURT REPORTER:  We're on the record

17              at 5:20.

18      CROSS-EXAMINATION BY MR. CHANG:

19      Q       Okay.  Dr. Thibault, can you please take out

20              Exhibit 2?

21      A       Okay.

22      Q       Okay.  Please turn the page to the first Form

23              990, please.

24      A       Okay.

25      Q       Okay.  Do you know how to fill out a Form 990?

1    A      No, sir.

2    Q      Okay.  Does Three Points Center Academy or Three

3           Points Academy hire a CPA or accountant to fill

4           these out for them?

5    A      Yes, sir.

6    Q      Okay.  Still on the second page.  Turn -- oh,

7           wait.  There are page numbers at the top right.

8           Do you see that?

9    A      Yes.

10   Q      Okay.  Let's go to page -- my apologies.  Go back

11          to the first page of the Form 990.  No.  Do page

12          -- do turn to page seven, please.

13   A      Seven, okay.

14   Q      All right.  Do you see column D?

15   A      Yes.

16   Q      Do you know for sure what "Reportable

17          compensation from the organization" means in a

18          Form 990?

19   A      No.

20   Q      Do you know for certain what "Reportable

21          compensation from related organizations" means in

22          a Form 990?

23   A      No.

24   Q      And just to be thorough, column F, do you know

25          what it means -- what "Estimated amount of other

1    compensation from the organization or related

2    organizations" means in a Form 990?

3  A    No, sir.

4  Q    Okay.  Can you take out exhibit -- actually,

5    strike that.

6         Dr. Thibault, do you remember that

7    hypothetical that you and Mr. Davis went through

8    about discipline and cookies?

9  A    Yes.

10  Q    Did you believe that that hypothetical was in

11    regards to children?

12  A    Yes.

13  Q    Okay.  Now, can you turn to Exhibits 11, 12, 13,

14    14 --

15  A    Let's see.  11.

16  Q    -- and 26.

17  A    12, 13, 14, and - oh, thank you.  26.  Okay.

18  Q    Can you please take another look at them, because

19    I see that you have them piled on top of each

20    other?

21  A    Yes, sir.

22  Q    Okay.  Did you get a chance to look at each of

23    these five exhibits one more time?

24  A    Yes.

25  Q    Okay.  Before this deposition, have you ever

1           looked at these documents?

2    A      No.

3    Q      Okay.  Do you have any firsthand knowledge about

4           the facts and circumstances surrounding these

5           documents?

6    A      No.

7                   MR. CHANG:  That's all the questions I

8           have.

9    REDIRECT EXAMINATION BY MR. DAVIS:

10   Q      Your Counsel asked the -- clarification about my

11          discipline and cookies example.  He said, "Was it

12          about children?"  Dr. Thibault, I acknowledge

13          that the -- a child's brain and an adult brain

14          can be different.  But do we really change that

15          much in terms of how we respond to pain and

16          pleasure?

17   A      As we grow to understand the brain and the

18          science of epigenetics and the way the brain

19          evolves, I would say yes, we do.  So much is

20          dependent upon context, especially with the

21          latest neuroscience studies that we use.  And we

22          understand, yeah, actually.  In other words, why

23          is it that we know that an addiction can be

24          terribly, terribly painful, but yet we return to

25          it.  So there's so much nuance and so much to the

1        brain that we didn't know even 10 years ago.  So

2        I would say, yeah, there's quite a bit of

3        variability.

4              For example, you know, when I was in

5        graduate school, we thought that the attachment

6        window was three weeks prior to birth to about

7        age five.  Now we know it's five weeks post

8        conception to about 20 months.  Things change as

9        we learn.  And so, yeah, I would say that

10        thankfully we're learning a lot more about how

11        the brains are different between adults,

12        children, and how they adapt and their lifetime

13        experience.

14   Q    So I'm reading something from an article I may

15        introduce.  The -- because I'm looking at

16        something.  I want you to know I'm looking at

17        something.

18   A    Uh-huh.

19   Q    These are my notes.  The hedonistic principle,

20        commonly called the pleasure principle.  Is that

21        still part of the current thinking on how the

22        brain, adult or child, responds to discipline,

23        pain, pleasure?

24   A    It's considered a very primitive principle.  It's

25        not very sophisticated.  There's some tenets of

1          it that could be applicable.  But there's just

2          far more to the neuroscience behind the

3          animalistic.  You know, we gravitate towards

4          pleasure, and we run from things that cause pain.

5     Q    And when you say, "We," you're referring to

6          humankind, adults?

7     A    In general.

8     Q    We run from pain.  Is that what you just said?

9     A    Yeah.

10    Q    And understanding that it would be somewhat

11         ridiculous to picture an adult being punished by

12         depriving them of cookies, but an adult in prison

13         could be disciplined by -- I'm not saying – just

14         to make sure -- this is a hypothetical.

15    A    Okay.

16    Q    We're talking about prison and adults.

17         Deprivation of food would -- could punish an

18         adult, couldn't it?

19    A    Well, absolutely.

20    Q    And in the context of a business with employees,

21         if an employee saw another employee get fired for

22         engaging in certain conduct, don't you think that

23         would send a message to that other employee to

24         not engage in that conduct?

25              MR. CHANG:  Objection to form.

1    A    Again, I --

2    Q    Do you remember when we were looking at the

3         "Attendance review/Corrective actions"?  Three

4         Points discipline forms?

5    A    Uh-huh.

6    Q    Do you remember our discussion about employee

7         discipline?

8    A    Yes.

9    Q    And I stand by the cookie analogy.  But

10        employment provides benefits and pleasure for

11        employees, correct?

12   A    Correct.

13   Q    Financial.

14   A    Yes.

15   Q    And so if one employee saw another employee be

16        disciplined, and they understood the type of

17        behavior that that employee was engaged in, don't

18        you think that other employee would have a

19        reasonable basis to conclude that they shouldn't

20        engage in that behavior?

21   A    I would -- well, I hate making generalizations,

22        Mr. Davis.

23   Q    Why?  Isn't that what -- I mean, you're in --

24        academics make generalizations all the time,

25        don't they?

1    A    Well, we try --

2              MR. CHANG:  Objection to form.

3    A    -- we try to avoid them, actually, because they

4         can be so dangerous.

5    Q    Tell me if you believe that this statement is a

6         generalization.  This is an article about -- the

7         title of this article is, "Is spanking" -- and

8         I'll just go ahead and say this is an article

9         that you wrote, but I didn't print off three to

10        help me prepare for this deposition.

11   A    Do you remember -- do you have the date of that

12        article?

13   Q    I do.  It's from 1997, so pre-Ph.D.

14   A    Yes.

15   Q    Subject to correction.

16             MR. CHANG:  Mr. Davis, do you have a copy

17        for him just to --

18             MR. DAVIS:  I did.  I wasn't planning on

19        it, but -- and we may not have to put it in.  I

20        just want to ask questions.

21   Q    Have you changed your attitude?  If not -- you

22        know, and I'll --

23   A    Is there a problem with my attitude?  I'm sorry.

24   Q    Yeah, no, it's not.  I'm just -- I'm asking --

25        you said you don't like to speak in generalities

1              and so here --

2     A       I don't.

3     Q       -- the statement is, "Because spanking is

4             obviously a negative, we will quickly learn to

5             modify our behavior so as to avoid physical

6             pain."  Is that a generality?

7     A       Repeat it again for me if you would.

8                   MR. CHANG:  Can you just give it to him

9             so --

10                  MR. DAVIS:  Yeah.  I know.  But --

11                  MR. CHANG:  Yeah.

12    Q       Yeah.  Let me highlight it.

13    A       Yeah, please.

14    Q       I'm going to highlight the section that --

15    A       And I was younger then.

16    Q       That's right.  And I think -- that's the part

17            where -- and it ends with "deterrent to

18            behaviors."

19    A       Okay.  Because spanking is obviously a --

20    Q       Can you read it louder so the court reporter can

21            hear?

22    A       Sure.

23                  MS. LANGLEY:  He can read it to himself.

24                  MR. DAVIS:  Okay.

25                  MR. CHANG:  Yeah.

1            MR. DAVIS:  We can put it in.  I'm sorry.

2       A    Okay.  Let's see.  I'm just trying -- I'm not

3            trying to read the whole -- I don't even remember

4            -- I mean, I did write it, but I don't remember

5            writing it.

6       Q    Well, what is the title of the article?

7            MR. CHANG:  Dr. Thibault, you can read

8            the whole thing.

9       Q    Yes.

10           MR. CHANG:  Yes.  Take your time.

11      A    Let me -- I'm going to read it.

12      Q    I --

13      A    Okay.  What was your question?

14      Q    First, because you wrote it a while ago --

15           anything in there that you say that is just not

16           consistent with how Dr. Thibault views discipline

17           today?

18      A    Yeah.  I don't agree with what I wrote at that

19           point based on what I know now about

20           neurobiology.

21      Q    Which part do you not agree with?

22      A    Spanking is a quick and effective deterrent to

23           inappropriate behaviors.

24      Q    And I believe and maybe -- I believe that the way

25           that you wrote that -- and this is -- is that you

Case 1:23-cv-00527-WO-JGM    Document 39-2    Filed 07/23/24    Page 273 of 279

1              actually identified both sides of the argument.

2              So you may not have actually been writing it, and

3              made that conclusion.

4                        MS. LANGLEY:  Do you have a question for

5              him?

6     Q        I do.  I just -- the highlighted part.  Do you

7              agree with that statement?

8     A        No.  No, I don't.  Because it says, "Because

9              spanking is obviously a negative, we will quickly

10             learn to modify our behavior so as to avoid the

11             physical pain.  Thus, spanking advocates would

12             say that spanking is a quick and effective

13             deterrent to inappropriate behaviors."

14                       I would disagree with that today because,

15             as I understand it, what'll happen is -- and we

16             learned this because of the way we operate the

17             program -- rather than deterring behavior,

18             children learn to be resourceful and go

19             underground.  There's other ways to demonstrate

20             -- to get what they want.

21                       The children we work with, they've been

22             spanked.  And if spanking and behavioral and

23             other things worked, we wouldn't be open for

24             business.  They've all gotten disciplined.

25    Q        Right.  And I'm not trying to make this about

1    spanking.  Could you pass it back to me so I can

2    --

3   A    Sure.  Yeah.

4   Q    -- finish this up?  Thank you.

5   A    Yeah.

6   Q    You wrote, "because spanking is a negative."  So

7        let's take spanking out of it.  Okay.  Is it --

8        from an employee's perspective, is being

9        terminated a negative?

10  A    Yes.

11  Q    And so if one employee saw another employee be

12       terminated with -- based on certain behavior,

13       would it be reasonable for that employee to

14       conclude or to not engage in that behavior to

15       avoid a termination?

16  A    I would assume so if they wanted to keep their

17       job.

18            MR. DAVIS:  Thank you.

19       (PLAINTIFF'S DEPOSITION EXHIBIT NO. 29

20            MARKED FOR IDENTIFICATION)

21            THE COURT REPORTER:  And that's Exhibit

22       29?

23            MR. DAVIS:  29.

24            THE WITNESS:  That's amazing.  I don't

25       even know where you found that.  That's a long

1          time ago.

2                    MR. CHANG:  That's still on the record.

3                    THE WITNESS:  What's that?

4                    MR. CHANG:  I think we're still on the

5          record.

6                    MR. DAVIS:  You can strike it if you

7          want.  But, actually, no, I like it.

8                    THE COURT REPORTER:  Any more questions?

9                    MR. DAVIS:  I don't have any more

10         questions.

11                    THE COURT REPORTER:  Any more questions,

12         Jimmy?  Real quick, the same transcript order as

13         the other day?

14                    MR. CHANG:  Yes.

15                    MR. DAVIS:  Yes.  Whatever we're supposed

16         to do.

17                    THE COURT REPORTER:  Okay.  And as far as

18         read and sign?

19                    MR. CHANG:  Read and sign.  Yes.

20                    MS. LANGLEY:  Yes.

21                    THE COURT REPORTER:  Okay.  We'll send

22         that to you.

23                    MR. CHANG:  Thank you.

24                    THE COURT REPORTER:  We're off at 5:34.

25      (Whereupon, the deposition was concluded at 5:34 P.M.)

277

1    STATE OF NORTH CAROLINA

2    COUNTY OF CHATHAM

3        I, Peter J. Wylie, a Notary Public in and for the State

4    of North Carolina, duly commissioned and authorized to

5    administer oaths and to take and certify depositions, do

6    hereby certify that on February 8, 2023, DR. NORMAN THIBAULT,

7    being by me duly sworn to tell the truth, thereupon testified

8    as above set forth as found in the preceding 276 pages, his

9    examination being reported by me verbatim and then reduced to

10   typewritten form under my direct supervision; that the

11   foregoing is a true and correct transcript of said

12   proceedings to the best of my ability and understanding; that

13   I am not related to any of the parties to this action; that I

14   am not interested in the outcome of this case; that I am not

15   of counsel nor in the employ of any of the parties to this

16   action, and that signature of the witness was not waived.

17       IN WITNESS WHEREOF, I have hereto set my hand, this the

18   3rd day of March, 2024.

19

20   _____

21   Notary Public

22   Certificate No. 202221000213

23

24

25

CERTIFICATE OF WITNESS

I, _____, a witness in the above-entitled action, do hereby certify that I have reviewed the foregoing transcription of my deposition and have made corrections, if any were deemed necessary, on the enclosed addendum.

Signed this the _____ day of _____, 2024.

_____
Dr. Norman Thibault

STATE OF _____

COUNTY OF _____

Sworn to and subscribed before me, this the

_____ day of _____, _____.

_____
Notary Public

My Commission Expires:

E R R A T A   S H E E T

CASE NAME: NELSON vs. THREE POINTS CENTER, LLC, et al

CASE NO.  US DISTRICT COURT FOR MIDDLE DISTRICT OF NORTH

CAROLINA CIVIL ACTION NO. 1:23-CV-00527

DEPOSITION OF:  DR. NORMAN THIBAULT

      Upon reading and examining my testimony as

   herein transcribed, I make the following

   corrections with the accompanying reason for same:

PAGE    LINE          REASON FOR CORRECTION

_____

_____

_____

_____

_____

_____

_____

_____

   Signed this the    day of     , 20__.

               _____

               Dr. Norman Thibault

pjw: 12738