IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 1:23-CV-00527

TYLIYA J. NELSON,                    )
                                     ) 30(b)(6) DEPOSITION OF
            Plaintiff,               )
                                     )    THREE POINTS CENTER
        v.                           )
                                     )    NORTH CAROLINA, LLC,
THREE POINTS CENTER, LLC;            )
THREE POINTS CENTER NORTH            )     THROUGH ITS AGENT,
CAROLINA, LLC; THREE POINTS          )
PROPERTIES, LLC; THREE POINTS        )        T H A N E
PROPERTIES NORTH CAROLINA, LLC;      )
THREE POINTS ACADEMY, INC., and      )      P A L M E R
THANE PALMER,                        )
                                     )
            Defendants.              )
---------------------------------

A P P E A R A N C E S:

For the Plaintiff:      Mr. Garrett L. Davis
                        The Law Office of Garrett Davis, PLLC
                        555 S. Mangum Street, Suite 100
                        Durham, North Carolina 27701

For the Defendants:     Mr. Jimmy C. Chang
                        Brooks, Pierce, McLendon,
                          Humphrey & Leonard, L.L.P.
                        Post Office Box 26000
                        Greensboro, North Carolina 27420

In Attendance:          Heidi Palmer

In Greensboro, N.C.     Reported by:
April 18, 2024          Peter J. Wylie

2

E X A M I N A T I O N   I N D E X

| Examination | By Whom | Page No. |
|---|---|---|
| Direct | Davis | 6 |
| Cross | Chang | 189 |
| Redirect | Davis | 190 |

Thane Palmer

3

E X H I B I T   I N D E X

Exhibit No.            Description                 Page Marked

Plaintiff's 42         TPC Web Page with TPC                60
                       Phone Number

Plaintiff's 43         Web Page Aerial Photo of TPC         73
                       North Carolina Property

Plaintiff's 44         EEOC Employment Law Posters          75

Plaintiff's 45         Breakfast Incident Text             101
                       Messages

Plaintiff's 46         Employees Who Left the Employ       116
                       of TPC North Carolina

Plaintiff's 47         TPCNC Group Note 4-5-22             129
                       Authored by Dr. White

Plaintiff's 48         TPCNC Group Note of 4-5-22          140
                       Authored by Karen Storm

Plaintiff's 49         Lease Agreement                     171

Plaintiff's 50         Page from TPC Employee Handbook     177

Plaintiff's 51         4-6-22 Text Message from Shareka    201
                       to Tyliya Nelson

4

1                  S T I P U L A T I O N S

2          It is hereby stipulated and agreed between the

3   parties to this action, through their respective counsel of

4   record:

5          (1)  That the deposition of THANE PALMER may be taken

6   on April 18, 2024, beginning at 10:04 A.M. at the Greensboro

7   Marriott, located at 304 N. Greene Street, Greensboro, North

8   Carolina 27401, before Peter J. Wylie, a Notary Public.

9          (2)  That the deposition shall be taken and used as

10  permitted by the applicable Federal Rules of Civil Procedure.

11         (3)  That any objections of any party hereto as to

12  notice of the taking of said deposition or as to the time or

13  place thereof, or as to the competency of the person before

14  whom the same shall be taken, are deemed to have been met.

15         (4)  Objections to questions and motions to strike

16  answers need not be made during the taking of this

17  deposition, but may be made for the first time during the

18  progress of the trial of this case, or at any pretrial

19  hearing held before any judge of competent jurisdiction for

20  the purpose of ruling thereon, or at any other hearing of

21  said case at which said deposition might be used, except that

22  an objection as to the form of a question must be made

23  at the time such question is asked, or objection is waived

24  as to the form of the question.

25         (5)  That the witness waives the right to read and

1   sign the deposition prior to filing.

2           (6)   That the sealed original transcript of this

3   deposition shall be mailed first-class postage or hand-

4   delivered.

5           (7)   That the witness was identified by a government-

6   issued photo ID.

7                           *  *  *  *  *

8   Whereupon,

9                   THANE PALMER,

10                  having been first duly sworn,

11                  was examined and testified

12                  as follows:

13

14

15

16

17

18

19

20

21

22

23

24

25

1   DIRECT EXAMINATION BY MR. DAVIS:

2        Q       Good morning, Mr. Palmer.

3        A       Good morning.

4        Q       My name is Garrett.  I present the plaintiff in

5                this action.  I believe before we started I heard

6                -- you said that you had taken -- had your

7                deposition taken before?

8        A       Yes.

9        Q       When was that?

10       A       I don't remember.

11       Q       Was it within the past ten years?

12       A       No.

13       Q       Okay.  Was it related to the line of work that

14               you are in now?

15       A       Yes.

16       Q       Okay.  If you don't remember what it -- the

17               timing, can you tell me about what that case was?

18       A       It was -- I was speaking for a student that I was

19               a therapist for, and the parents asked me if I

20               would give a deposition as to specific statements

21               that a student had made to me.

22       Q       You -- were you a party in the action?

23       A       No.

24       Q       That's -- thank you.  So besides that deposition

25               -- well, have you been deposed in the -- any

```
 1              matters with the case that's pending in Colorado?
 2      A       No.
 3      Q       Okay.  You are the -- are you aware that I took
 4              Dr. Thibault's deposition about two months ago?
 5      A       Yes.
 6      Q       I'm not going to go over a bunch of ground rules
 7              in the interest of time, but to describe some
 8              context for how my questions may come across, I
 9              may reference some of the things that he said
10              either directly, or represent that that's what he
11              said.  But I just want to point that out.  And
12              are you aware that I also -- that Craig Butcher
13              was deposed around the same time?
14      A       Yes.
15      Q       Okay.  You -- it's my understanding that you are
16              the president of Three Points Center North
17              Carolina.
18      A       I'm the program director at the Three Points
19              Center North Carolina facility.
20      Q       Why don't we just start with an open-ended one to
21              get warmed up.  What is your role right -- well,
22              Dr. Thibault said you were the president.  Do you
23              still not have that role, or is that just not
24              what you consider yourself?
25                   MR. CHANG:  Objection to form.  Go ahead
```

```
 1              and answer.

 2     A        I am the president --

 3     Q        Okay.

 4     A        -- of Three Points Center North Carolina.  My

 5              active role is the program director at Three

 6              Points Center North Carolina.

 7     Q        Okay.  So the program director is the umbrella

 8              for what you actually do on a day-to-day basis at

 9              the --

10     A        Yes.

11     Q        -- at the Three Points Center -- I'm going to say

12              Siler City facility, and maybe North Carolina.

13              Fair?

14     A        Three Points Center North Carolina.

15     Q        Okay.  Tell me what a typical day looks like as a

16              program director for you.

17     A        You're going to have to be more specific --

18     Q        Okay.

19     A        -- on that because my days are different.

20     Q        Fair.  It's my understanding that when the Three

21              Points Center facility in Chatham -- the Chatham

22              County facility opened, that you relocated to

23              North Carolina permanently.

24              MR. CHANG:  Objection to form.

25     Q        Is that -- do you permanently reside in the State
```

1           of North Carolina now?

2     A     Yes.

3     Q     Do you have any dwellings that you maintain in

4           the State of Utah?

5     A     No.

6     Q     Okay.  Let's see.  You testified that each day

7           can be different.  Correct?

8     A     Yes.

9     Q     Fair?  On Monday, was there anything that you did

10          in your duties as the program director that you

11          would say is generally consistent from week to

12          week?

13    A     Every -- well, okay.  Most Mondays at 11:00 A.M.

14          we have an administration meeting where I meet

15          with all of the directors and managers of the --

16          in the program.

17    Q     Okay.  So a staff meeting.  Is that fair?  You

18          said --

19    A     No.

20    Q     Okay.

21    A     It's not a staff meeting.

22    Q     What is it?  What did you -- say it again.  I'm

23          sorry.

24    A     I said it's our administration meeting where I

25          meet with all of the directors and the --

1    Q    Okay.

2    A    -- managers of departments.

3    Q    More of a senior meeting.  Fair?

4    A    Yes.

5    Q    No youth mentors at that meeting?

6    A    No.

7    Q    What is the job -- and I know that Ms. Palmer's

8         been designated generally for job titles and

9         things of that nature, but with regards to Ms.

10        Nelson, what is the name of the job directly

11        above the youth mentor?

12   A    A shift supervisor.

13   Q    Shift supervisor.  Are shift supervisors at the

14        administration meeting?

15   A    No.

16   Q    Who is the -- my understanding is that above

17        shift --

18             MR. DAVIS:  I may do more leading

19        questions to move it along, Jimmy, based on my

20        understanding.

21             MR. CHANG:  I'm going to object.

22             MR. DAVIS:  Okay.  I know you are.

23   Q    My understanding is that directly above shift

24        supervisor was the role that your son-in-law,

25        Craig Butcher, used to hold.  Correct?

```
 1                    MR. CHANG:  Objection to form.
 2      A      I don't understand what you mean by that.
 3      Q      What was Mr. Butcher's job title at Three Points
 4             Center Siler City?
 5      A      Three -- in Three Points Center North Carolina,
 6             he was the program director.
 7      Q      He was a program director?
 8      A      No, I'm sorry.  He was the group living director.
 9      Q      Because you're the program director?
10      A      Yes.
11      Q      Okay.  Who currently has -- Mr. Butcher's no
12             longer employed by the company, correct?
13      A      That's correct.
14      Q      Who is in his current title job right now?
15      A      Heidi Palmer.
16      Q      Okay.  All right.  And -- okay.  So at this
17             administration meeting, the group living director
18             is there.  You're there.  I don't need names or
19             anything, but what are the other administrative
20             jobs at the Three Points Center Siler City
21             facility?
22      A      The academic director is there.  The clinical
23             director is there.  The nurse manager is there.
24      Q      Okay.  All right.  Who is the academic director?
25             No?
```

12

1    A    You just said you weren't going to ask for names.

2    Q    Oh, my apologies.  Is it Luanne Forrest?

3    A    No.

4    Q    Okay.  She does have a -- does Luanne Forrest's

5         role -- does Luanne Forrest live in Utah?

6    A    Are we talking about Three Points Center North

7         Carolina?  I mean, what -- because I'm under the

8         understanding that we're here -- I was brought

9         here today to talk about Three Points Center

10        North Carolina.

11   Q    I understand that and that is -- and I'll -- some

12        of this may feel like a conversation, and I feel

13        like this might be an appropriate time to have it

14        on the record.  I'm not going to ask you what

15        your attorneys have told you about this case.  If

16        you volunteer it such as you know, you're

17        understanding is probably based on what your

18        attorneys told you.  And that is a --

19             MR. CHANG:  Objection to form.

20   Q    Okay.  Well.  It's my understanding that Luanne

21        Forrest, even though she may not be employed by

22        -- or paid by Three Points Center North Carolina,

23        that she had some role in the development or --

24        she has a role in terms of oversight of

25        educational activities at the North Carolina

1       facility.

2              MR. CHANG:  Objection to form.

3    Q    Does Luanne Forrest have a role in overseeing any

4         educational activities that occur at the Siler

5         City facility?

6    A    No.

7    Q    No?  Has she ever?

8    A    Yes.

9    Q    When did she -- when she did have a role in North

10        Carolina educational activities, what did she do?

11   A    I don't know exactly.  I don't do a lot with that

12        aspect of the program besides the student part of

13        it.

14   Q    Okay.  Would you consider Luanne in terms of --

15        would you consider Luanne Forrest to be your

16        subordinate, or a co-equal person?

17   A    I don't understand what you mean by that.

18   Q    Can you fire Luanne Forrest?

19   A    No.

20   Q    Okay.  Who -- at what point did Luanne Forrest,

21        and when I say point -- I mean, date, month --

22        did she stop having a role in the education

23        activities that occurred at the Siler City

24        facility?

25   A    I don't understand what you mean by role.  That's

1         very, very broad.

2    Q    Do you remember at the beginning of -- when I

3         asked you about your role as program director and

4         you said that it changed?  That's what I mean by

5         role, so, like, what she does.  Do you -- so is

6         it your testimony that you don't know what Luanne

7         Forrest does?

8    A    No.

9    Q    You don't?  Oh, you said --

10    A    No.  I said that that's not my testimony.

11    Q    Okay.  So what does Luanne -- what did Luanne

12         Forrest do before she stopped doing it?

13    A    I'm -- I was told --

14             MR. CHANG:  Objection to form just

15         because I'm not sure where we're at right now.

16         But go ahead.

17    A    I was told that I was brought here to testify

18         specific to Three Points Center North Carolina,

19         and I came prepared to do that.

20    Q    Okay.  But the reason I'm asking is because one

21         of the other topics in here is the founding and

22         formation -- at the beginning of this facility in

23         November of 2021.

24    A    Yeah.

25    Q    Right?

15

1    A    The beginning of Three Points Center North

2          Carolina.

3    Q    And that is when Plaintiff was -- Plaintiff was

4          one of the initial youth mentor hires at that

5          time?

6    A    Yes.

7    Q    Okay.  That's why I'm asking about Luanne

8          Forrest's role in that facility because without

9          her, there would be no school, correct?

10            MR. CHANG:  Objection to form.

11    A    That would not be correct.

12    Q    So that's why I'm asking what she did, because I

13          want to see why that wouldn't be correct.  What

14          did she do --

15    A    But you're asking questions that are so

16          incredibly broad to -- that, first of all, I

17          don't -- I wouldn't understand what question

18          you're asking.  And second of all, it would --

19          it'd take up your whole seven hours that you

20          have.

21    Q    Right.  I appreciate you looking out for me.

22    A    Yeah.

23    Q    When -- have you ever had a conversation with

24          Luanne Forrest?

25    A    Yes.

16

```
 1    Q    When was the last time you spoke with her?

 2    A    I don't remember.

 3    Q    Was it in 2023?

 4    A    I've had conversations with Dr. Forrest in 2023.

 5    Q    Not only in 2023 -- is it -- have you had

 6         conversations with her this year?

 7    A    Yes.

 8    Q    What did you talk about?

 9    A    We talked about academic issues.

10    Q    At Three Points Center North Carolina?

11    A    Yes.

12    Q    Why did you talk with her about academic issues

13         at Three Points Center North Carolina, and not

14         the new academic director there?

15    A    Because she is the one that did the work for the

16         -- our academic accreditation through Cognia.

17    Q    So is it fair to say that academic accreditation

18         of Three Points Academy, Inc., is something that

19         Luanne Forrest is charged -- that is her role at

20         the organization?

21              MR. CHANG:  Objection to form.

22    A    I'm here to talk about Three Points Center North

23         Carolina.

24    Q    How does Three Points -- what is the relationship

25         between Three Points Center North Carolina and
```

1           Three Points Academy?

2                    MR. CHANG:  Objection to form, but go

3           ahead.

4      A    Can you be more specific than that?

5      Q    Uh-huh.  I'll try, but -- if Three Points

6           Academy, Inc. didn't exist, how would that affect

7           Three Points Center North Carolina, LLC's

8           operations?

9      A    We would use an accredited curriculum from some

10          different other entity.

11     Q    Okay.  All right.  The next -- at this

12          administrative meeting that you have, the

13          academic director is there, who is no longer

14          Luanne Forrest.  Who is the clinical --

15     A    Luanne Forrest was never the academic director at

16          Three Points Center North Carolina.

17     Q    Thank you.  Who was the first academic director

18          at Three Points Center North Carolina?

19     A    Her first name was Sarah.  I honestly don't

20          remember her last name.

21     Q    Okay.  Clinical director.  What role does the

22          clinical director play at Three Points Center

23          North Carolina?

24     A    The clinical director supervises all of the

25          therapists and supervises the clinical program at

1              Three Points Center North Carolina.

2     Q      Okay.  Knowing and appreciating you thinking

3            about the time, and also for yourself, can you

4            summarize what it means -- what clinical work

5            means in your -- at this facility?  What is

6            clinical?

7                   MR. CHANG:  Objection to form.

8     A      Well --

9                   MR. CHANG:  But go ahead.

10    A      -- once again, Garrett, I'm going to -- that is a

11           really broad question.

12    Q      We will get warmed up, Mr. Palmer.  And I'm going

13           to -- and I'm representing to you, I will try,

14           and I learned a lot from Dr. Thibault.

15    A      Yeah.

16    Q      And it is -- and he had some points like that,

17           and we were able to get to it.  So I'm here to

18           work --

19    A      And I'm --

20                  MR. CHANG:  Objection to form.

21    A      I -- I want to be very respectful to you.

22    Q      I appreciate that.

23    A      And I want to make sure that I am precisely

24           answering the exact question that you're asking.

25           And so I want to ask -- I want to understand the

```
 1              question you're asking.
 2      Q       And I can't -- and the best way for me to do it
 3              is to give hypothetical examples.  So --
 4                   MR. CHANG:  Objection to form.
 5      A       Well, but --
 6                   MR. CHANG:  We don't need to take --
 7      A       -- oftentimes, your questions and your
 8              hypotheticals are very, very broad.
 9      Q       Okay.  There at -- there are students at Three
10              Points Center North Carolina, correct?
11      A       That is correct.
12      Q       At what -- what would -- what type of event would
13              -- when would the clinical director engage in
14              work focused on a particular student?
15      A       I apologize, again, Garrett.  That is so
16              incredibly broad and can be so many different
17              situations.
18      Q       Let me go down a little.  You testified that the
19              clinical director supervises the therapists.
20              Correct?
21      A       Yes.
22      Q       Can you give me an example of therapy?
23      A       A therapist would conduct individual therapy.
24              They would conduct family therapy.  And they
25              would conduct group therapy.
```

20

| | | |
|---|---|---|
| 1 | Q | Okay. So we've got individual therapy, family |
| 2 | | therapy, and group therapy? |
| 3 | A | Yes. |
| 4 | Q | Are those -- is that an exhaustive list of the |
| 5 | | categories of therapy that occur at Three Points |
| 6 | | Center North Carolina? |
| 7 | A | No. |
| 8 | Q | What other categories of therapy occur at the |
| 9 | | facility? |
| 10 | A | We do a form of group therapy that you can call |
| 11 | | equine therapy. Our equine therapy is conducted |
| 12 | | by a licensed therapist, so we -- legally, it's |
| 13 | | group therapy. |
| 14 | Q | Are the therapists at the administrative meeting? |
| 15 | A | No. |
| 16 | Q | What are the minimum educational credentials to |
| 17 | | be a therapist at Three Points Center North |
| 18 | | Carolina's facility? |
| 19 | A | You have to have a master's degree in an |
| 20 | | associated profession. |
| 21 | Q | Okay. So all the therapists have master's |
| 22 | | degrees. A clinical director, and I -- I thought |
| 23 | | there was another third type of director that was |
| 24 | | at your administrative meeting. Academic, |
| 25 | | clinical. Is there another one? Group living. |

```
 1    A      We have --
 2                  MR. CHANG:  Objection to form.
 3    Q      Apologies.  Go ahead.
 4    A      Group living what?
 5    Q      Would group -- Ms. Palmer is fulfilling that role
 6           now, but if Mr. Butcher was still there, he would
 7           have been at that meeting?
 8                  MR. CHANG:  Oh, objection to form.
 9           You're still asking who -- or who is at the
10           administrative meetings, right?  Okay.
11                  MR. DAVIS:  That's what I want to know.
12           Thank you.  Thank you, Jimmy.
13    A      The group living director attends the
14           administration meetings.
15    Q      Is there -- well, I've seen the job title quality
16           assurance manager next to Ms. Palmer's name
17           before.  Is that still a job title at the Three
18           Points Center North Carolina facility?
19    A      Yes.
20    Q      Okay.  So is it fair to say that Ms. Palmer
21           fulfills multiple roles at the facility?
22    A      I don't know what you mean by that.
23    Q      There could -- is it fair to say that there could
24           be a group living director, and then Ms. Palmer
25           would no longer have those day-to-day
```

```
1              responsibilities?
2      A       Once again --
3                      MR. CHANG:  Objection to form.
4      A       -- you ask very broad questions, and so I'm not
5              sure which one of those to answer.
6      Q       Okay.  Let's just -- we'll wrap this one up.  How
7              many different -- how many employees besides --
8              not counting yourself, are at the -- were at the
9              administrative meeting this past Monday?
10     A       I wasn't at the administration meeting this past
11             Monday.
12     Q       What about last week?  Were you there?
13     A       I wasn't there that past Monday, either.
14     Q       The last time that you remember being there, how
15             many -- how many other employees were there?
16     A       The people that I have outlined for you.
17     Q       Now, we -- thank you.
18     A       Yeah.
19     Q       When did you and Dr. Thibault decide to form
20             Three Points Center North Carolina?
21                     MR. CHANG:  Objection to form.  Go ahead.
22     A       I don't remember exactly.
23     Q       Can you -- well, you and Dr. Thibault, prior to
24             the beginning of Three Points Center, it's my
25             understanding that you were friends and
```

```
1              colleagues.

2      A       Yes.

3      Q       I asked when, so I'm going to strike the "when,"

4              but can you remember the substance of your

5              conversations about this new business venture?

6      A       I sincerely apologize, Garrett.  Once again, your

7              questions are so broad, I --

8      Q       Whose idea was it to start Three Points Center

9              North Carolina?  Yours or Dr. Thibault's?

10     A       Dr. Thibault.

11     Q       Did Dr. Thibault reach out to you after he'd

12             already talked to his brother Glenn about

13             securing funding?

14                  MR. CHANG:  Objection to form.

15     A       I don't know.

16     Q       Mr. Palmer, how long -- well, when did you move

17             to North Carolina permanently?

18     A       In the early fall, I believe, of 2021.

19     Q       Prior to moving here, where else had -- what

20             other states had you lived in in your life?

21     A       I've lived in Utah.  I've lived in Oregon.  And

22             I've lived in Washington State.

23     Q       So is it fair to say that moving to the other

24             side of the country for you was a significant

25             life change?
```

```
 1                    MR. CHANG:  Objection to form.
 2        A     I have no idea what you mean by life change.
 3        Q     You don't know what I mean?  You don't believe
 4              that it's a significant life change to move
 5              across --
 6        A     Well --
 7        Q     -- the country and start a new business --
 8        A     I -- no.
 9        Q     -- Mr. Palmer?
10        A     No, that's not what I said.  I said I don't know
11              what you mean by life change.
12        Q     What do you think life change -- what does life
13              change mean to you?
14        A     It -- does that matter right now, or I'm -- you
15              asked the question.  I'm trying to understand
16              what you mean by life change.  Are we talking
17              about the mileage between Utah and North
18              Carolina?  Are we talking -- I mean, there's a
19              whole bunch of things --
20        Q     Mr. Palmer, I find it hard -- I know you're
21              asking me a question.  I find it hard to believe
22              that you don't remember the substance of any
23              conversations about the founding information of
24              Three Points Center North Carolina, topic number
25              nine, when part of the founding information of it
```

1          required you to move your entire family across

2          the country.

3                    MR. CHANG:  Objection to form.  You --

4          your question was "What was the substance of the

5          conversation?"

6                    MR. DAVIS:  And --

7                    MR. CHANG:  Like as if there was the one

8          conversation that put this all into motion.

9          You're asking him to remember that one.  It was

10         all singular, Garrett, so don't rephrase your

11         question as if Mr. Palmer is --

12                   MR. DAVIS:  Okay.  I -- all right.

13    Q    When Dr. Thibault --

14    A    And --

15    Q    -- approached you --

16    A    -- just -- I want to state something here.

17    Q    Uh-huh.

18    A    I do not appreciate the inference that you just

19         made.  I think that is not acceptable.

20    Q    Well, there are a lot of inferences that --

21    A    Well, you -- you're making an inference of my

22         age, and that I'd have a bad memory, and I don't

23         think that's very respectful.

24    Q    Dr. Thibault -- I believe one piece of testimony

25         we got out, that Dr. Thibault approached you,

```
 1                 correct, about Three Points Center North

 2                 Carolina?

 3                         MR. CHANG:  Objection to form, but go

 4                 ahead and answer.

 5      A          No.  Your original question was did Dr. Thibault

 6                 approach me about starting Three Points Center?

 7      Q          Uh-huh.  Well, you were an original partner in

 8                 Three Points Center Utah.

 9      A          Yeah.

10      Q          Right.

11      A          And I answered to you, "Dr. Thibault approached

12                 me about forming Three Points Center."  When you

13                 asked that question, it was Three Points Center.

14                 That's different than Three Points Center North

15                 Carolina.

16      Q          Well, so why are they different?

17                         MR. CHANG:  Objection to form.

18      A          Well, once again, Garrett --

19      Q          I can ask --

20      A          Okay.

21      Q          So you can answer --

22      A          Okay.  I'll tell you how -- one is called Three

23                 Points Center.  One is called Three Points Center

24                 North Carolina.  The difference is two words:

25                 North Carolina.  So that's one of the
```

1               differences.  So --

2        Q     That -- is that --

3        A     -- you asked what's the difference, and I said

4               that's one of the differences.

5        Q     Thank you.  That's one of the differences, is

6               just the name and the incorporated entity.

7        A     That -- that's why I said, "What do you mean by

8               that?"  Because there's a lot of things that that

9               can mean.

10       Q     Besides the name, besides the words North and

11              Carolina, between Points and LLC, what else is

12              different?

13       A     They are separate businesses.

14       Q     What does that mean to you?

15       A     They run separately.  They have separate

16              accounting.  They have separate management,

17              separate employees.

18       Q     Okay.  All right.  I'll represent that Dr.

19              Thibault testified that he was the CEO of Three

20              Points Center North Carolina.  Do you -- do you

21              have any reason to disagree with that?

22       A     I don't disagree with that.

23       Q     Does the CEO of a company have a managerial role?

24       A     He has a director-level role.

25       Q     What is the difference between director and

```
 1              manager as you -- based on your understanding,

 2              Mr. Palmer?

 3      A       Norm Thibault does not have any supervisory role

 4              directly on the campus of Three Points Center

 5              North Carolina.

 6      Q       What role does Dr. Thibault have with respect to

 7              Three Points Center North Carolina?

 8      A       He has a director-level role.

 9      Q       What does it mean to have a director-level role

10              at Three Points Center?

11      A       That he doesn't have any responsibility on the

12              day-to-day operation of things.  I supervise all

13              of that.  I, on occasion, would consult with Norm

14              on issues related to Three Points Center North

15              Carolina.

16      Q       When was the last time you consulted with Norm on

17              issues related to Three Points Center North

18              Carolina?

19      A       I don't remember an exact date.

20      Q       Okay.  A follow-up.  What was it about?  What did

21              you ask -- why did you seek his consult?

22      A       Norm is a highly experienced, very qualified,

23              licensed therapist.  And so I would consult him

24              specifically about kids, students.

25      Q       Okay.  Would it be fair to characterize that
```

1          consult as like a clinical-type consult?  A
2          clinical conversation between you and Dr.
3          Thibault?
4     A    Yes.
5     Q    What non-clinical oversight does Dr. Thibault
6          still have with respect to Three Points Center
7          North Carolina?
8     A    I actually can't remember, other than clinical
9          conversations where we've discussed things,
10         because I have full direct responsibility of all
11         the operation on Three Points Center North
12         Carolina campus.
13    Q    What was the last -- when I say capital
14         improvement, do you understand -- do you have --
15         do you understand what I mean by capital
16         improvement?
17    A    I do understand that.
18    Q    Thank you.  What was the last capital improvement
19         at Three Points Center's Siler City facility that
20         you can remember?
21    A    The construction of a barn.
22    Q    Construction of a barn.  When did that occur?
23    A    It -- the construction occurred in April of 2022.
24    Q    Okay.  How much did that barn cost?
25    A    I don't remember.

1    Q        Well, did -- let's say that you had -- what if

2             there was a need for a new barn?  I'm not saying

3             there is, but say that you determined that there

4             was a need for a new barn.  Are we okay with that

5             premise?

6                       Because I'm trying to not be -- I am

7             trying, Mr. Palmer.  Okay?  If there's a new

8             barn, more horses, okay?  And that was a -- that

9             was your judgment, would you have to run building

10            a new barn by Dr. Thibault, or could you do it on

11            your own?

12   A        No.  I would talk to Dr. Norm Thibault about

13            that.

14   Q        Is that because you're friends, or is that

15            because the operating agreement that you're all

16            members of requires you to do that?

17                      MR. CHANG:  Objection to form.  Go ahead.

18   A        That would be because of his position as CEO of

19            Three Points Center North Carolina.

20   Q        Okay.  So is it fair to say that while you have

21            almost full day-to-day authority at Three Points

22            Center North Carolina, that capital improvements

23            are something that has -- have to be run by Dr.

24            Thibault?

25   A        Well, you said something in your questions that's

1           not accurate.

2      Q    Okay.

3      A    So can you rephrase the question?

4      Q    Well, it's not -- that was a bad -- it's

5           compound.  Capital -- do capital improvements at

6           Three Points Center North Carolina have to be

7           approved by Dr. Thibault before they're built?

8      A    Dr. Thibault would be one of those decision

9           makers.  Yes.

10     Q    Back to the barn example.  Would the other

11          members of the Three Points Center board of

12          directors have to approve that decision, also?

13     A    No.

14     Q    Okay.  Is there a threshold amount of money which

15          triggers a board of directors' decision?

16     A    Well, let's back up.  And I -- this is something

17          that I want to be very clear with you about,

18          Garrett.  I do not appreciate you asking

19          questions in a way to trip me up.  Because your

20          question said Three Points Center board of

21          directors.  I am here to talk about Three Points

22          Center North Carolina.  And so if you want to ask

23          me about Three Points Center North Carolina board

24          of directors, I can answer that question.

25     Q    I appreciate that, and I actually thought about

1          reaching out to him earlier because even -- and

2          I'm going to -- I'm going to show you something.

3          I'm going to show you -- I'm going to show you

4          something, if you don't mind -- and the reason

5          I'm showing this to you is because I've -- I

6          think what's come across here is three "I don't

7          appreciates" and I -- and the "tripping up," Mr.

8          Palmer.  We -- let me finish.

9                    I am not trying to do that at this point,

10         because you have extremely competent counsel and

11         this is a legal issue.  When I said Three Points

12         Center, it -- I'm not trying to do that, and I

13         want to show you why, and then we can have a

14         standing point that if I say Three Points Center,

15         you don't feel like I'm going to use this to trip

16         you up.  Okay?

17    A    Well, I will be very --

18    Q    I'm going to introduce --

19    A    Garrett, I will be very clear with you.

20              MR. CHANG:  Mr. Palmer -- Mr. Palmer, let

21         him --

22    Q    Let me finish and I think it will -- because I

23         can sense what's going on here and we have work

24         to do and there's a limit, but there's a lot

25         coming back here that I normally don't have to

33

```
 1              put up with.
 2    A      What do you sense is going on here?
 3                   MR. CHANG:  All right.  All right.
 4    A      I'd be curious to know what that is.
 5                   MR. CHANG:  Number three of what?  In --
 6                   MR. DAVIS:  Of the request for
 7           production, Jimmy.  The one that I told you about
 8           that I wasn't going to -- remember that one?
 9                   MR. CHANG:  Yes.
10    Q      All right.  I'm going to -- I will represent to
11           you, Mr. Palmer, that in advance of this
12           deposition --
13    A      What do you sense is going on here?
14    Q      I will represent to you, Mr. Palmer -- and then I
15           think we should take a break after this --
16    A      Sure.
17    Q      -- that in advance of this deposition, that I
18           sent your counsel, Jimmy Chang, an email about
19           this request for production, which is one of the
20           topics that you and/or Ms. Palmer have to be here
21           about, where your counsel, you know, consistently
22           has raised the Three Points Center North Carolina
23           -- they're the employer.
24                   And in here, Mr. Chang, I know he did it.
25           He made a typo.  See here where it says Three
```

1          Points Center North Carolina -- or it says Three

2          Points Center?  And then up here it says Three

3          Points Center North Carolina?  Mr. Chang wanted

4          Three Points Center North Carolina to be there.

5          I knew that.  And I reached out to him, and I

6          said, "I need to show this at some point."  It

7          wasn't supposed to be here because it was

8          supposed to be about this document, Three Points

9          0581.  And I said I'm not going to make a big

10         deal about that at this deposition.

11                  MR. CHANG:  Well, Mr. Davis,

12         respectfully, a big point in your case, a big

13         legal issues is trying to keep -- so Mr. Palmer

14         is just -- I'll -- we're going to take a break,

15         but -- and I'll tell Mr. Palmer.  If you ever you

16         think he's doing -- just ask him to clarify if

17         he's talking about TPCNC versus TPC, and that's

18         it.

19    Q    And the last thing -- and the reason I'm doing

20         this right now is -- I'm glad I spent time doing

21         ground rules on this -- may feel like a

22         conversation because it definitely has.  It's

23         this time here, Mr. Palmer.  It's the time that

24         we should get over this, because we're grownups.

25         Can we please go off the record?

1    A      Well --

2              MR. CHANG:  Okay.  Well, Garrett, to be

3           fair, you can't -- it is a -- he has to be on

4           alert if you're going to switch entities because

5           that's like a big part of the case.  Be fair.

6           This typo with attorneys is like, okay, like I

7           can tell you it's a mistake, but he -- he's

8           getting -- he's testifying.  And if he trips up,

9           you're going to go to trial and say, "Ah, he said

10          it," right?  But if it's just me and you, yeah,

11          that's fine.  I made a typo, and you respected

12          it.

13              MR. DAVIS:  That's right.  And that's --

14          and I --

15              MR. CHANG:  But you're not making typos

16          right now.  You know what I'm saying?  He doesn't

17          know that you're making a typo.

18              MR. DAVIS:  And that's why I brought it

19          up because I think -- can we go off?

20              MR. CHANG:  We are off.

21              MR. DAVIS:  We are?

22              THE COURT REPORTER:  No.

23              MR. CHANG:  Oh, we're not off.  Okay.

24              THE COURT REPORTER:  And I meant to ask

25          you if you want to go off --

1          MR. CHANG:  Yeah, sure.  Okay.

2          THE COURT REPORTER:  We're going off the

3     record at 10:40.

4              (SIX-MINUTE RECESS)

5          THE COURT REPORTER:  Back on at 10:46.

6   Q    (By Mr. Davis.)  Okay.  What documents did you

7        review, if any, before today's deposition?

8   A    I read Ms. Nelson's deposition.  I read Craig

9        Butcher's deposition.  I reviewed the -- Dr. Norm

10       Thibault's deposition.  And a number of other

11       legal documents that I don't understand all the

12       legal verbiage.

13  Q    You said verbiage?

14  A    Legal verbiage.

15  Q    Okay.

16  A    Yeah.

17  Q    Would the depositions -- you said you read Ms.

18       Nelson's, you read Mr. Butcher's, but you just

19       reviewed Dr. Thibault's.

20  A    Yes.

21  Q    Was there a reason for that distinction?

22  A    No.

23  Q    Okay.  So when you said read, front to back?

24  A    No.

25  Q    Okay.  What documents did you -- what legal

1       documents did you review which you did not

2       understand the legal verbiage of?

3                   MR. CHANG:  I would only caution, Mr.

4       Palmer, if you're referring to anything I sent

5       you in an email, an email is still a document,

6       don't talk about my emails.  Okay?  Or any of my

7       notes.  But go ahead.

8   A   I don't remember the names of any of those

9       documents.

10  Q   Did you review a doc -- the document that

11      initiated this lawsuit, the complaint?

12  A   I don't remember.

13  Q   Did -- at any point, have you reviewed your --

14      the answer to the complaint?

15  A   I don't remember.  Do you have the documents?

16      I'm more than happy to --

17  Q   Yeah.  So if you -- the first -- skip through the

18      -- normally I have tabs.  Then you have -- you

19      get past the 30(b)6) filing, I think the

20      complaint is next.  It looks -- starts like this.

21  A   What page was that?

22  Q   Just turn.  Keep turning till it looks like this.

23      That's what I'm going to do.

24                  MR. CHANG:  Sorry, Garrett.  If you can,

25      like, explain what the complaint is to him, I

```
 1              think it would help move this along.  I mean, to
 2              help recall.
 3        Q     The complaint is the document that I wrote on
 4              behalf of Ms. Nelson and is necessary to initiate
 5              the legal proceeding that has led to this
 6              deposition.  Did you -- have you ever seen this
 7              document?
 8        A     I have seen this document.
 9        Q     Okay.  Did you review it before today?  Well,
10              let's -- I'm going to start being more precise
11              because -- did you review it specifically for
12              today's deposition?
13        A     No.
14        Q     Okay.
15        A     I did not.
16        Q     Would you turn several more pages?  There's a
17              document called Defendant's Answer and Defenses
18              to Plaintiff's Complaint.  It's coming.  Did you
19              review that one specifically -- or first, have
20              you ever seen this document?
21        A     Yes, I have.
22        Q     Okay.  Did you review it specifically before
23              today?
24        A     I don't remember that.
25        Q     Okay.
```

1    A        I'm not sure.  I don't know.

2    Q        All right.  Before the break, do you remember

3             when I was asking you about what the differences

4             were between the Three Points Center Utah

5             facility and Three Points Center North Carolina?

6             Do you remember that question?

7    A        Yes.

8    Q        I believe one of the responses was the name.  The

9             fact that North Carolina's in there.  Fair?

10   A        Yes.

11   Q        And then there was the separateness of bank

12            accounts.  Was that one difference?

13   A        Yes.

14   Q        Where are those -- what bank account does Three

15            Points in -- Three Points Center North Carolina

16            use?

17   A        Independent Bank.

18   Q        Independent Bank.  Where is Independent Bank

19            located?

20   A        I don't know.

21   Q        If there was a check made out to Three Points

22            Center North Carolina and it arrived in the mail

23            at the Siler City facility, what employee would

24            take that check to the bank?

25   A        Typically, Brittany Ortiz.

1    Q       Okay.  Besides the name and the bank account,

2            what are the other -- what other differences

3            exist between Three Points Center, LLC, and Three

4            Points Center North Carolina, LLC?

5                    MR. CHANG:  Objection.  Asked and

6            answered.  Go ahead.

7    A       There is different accounting.  There are -- it

8            is a -- Three Points Center North Carolina has

9            separate accounting.

10   Q       Okay.  When you say separate accounting, can you

11           be more specific, please?

12   A       I'm not an accounting person.  I am a therapist,

13           and I would not -- I don't think I'm qualified to

14           talk about that, so --

15   Q       Okay.  All right.  I'm going to list the ones

16           that I think that we've named.  Bank account,

17           separate accounting.  Is there anything else

18           different?

19   A       Yes.

20   Q       Please tell me.

21   A       Separate employees.

22   Q       What makes the employees separate?

23   A       The Three Points Center North Carolina employees

24           work in North Carolina at our Siler City address.

25   Q       Okay.  After employees, is there anything else

1          that you believe makes them separate?

2     A    There's a -- there's more things.  Do you want me

3          to go into that?

4     Q    Uh-huh.  Please.  Uh-huh.

5     A    Well, the location --

6     Q    Okay.

7     A    -- obviously.  You know, Three Points Center

8          North Carolina exists in North Carolina.  And

9          there would be differences in policies that are

10         specific to the state laws of -- and state codes

11         of North Carolina that would be different.  And

12         that there would be procedures that are different

13         with Three Points Center North Carolina to

14         address very specific differences in campus, in

15         weather, and things like that.

16    Q    Okay.  I'm noticing you have a company shirt on,

17         and it says Three Points Center.

18    A    Uh-huh.

19    Q    When did you get that shirt?

20    A    After we moved to North Carolina.

21    Q    Why doesn't it say Three Points Center North

22         Carolina on it?

23    A    Because it doesn't.  There's no reason for that.

24    Q    So if the -- so the brand is not separate?  Is

25         that fair to say?

1    A       Yeah.  That -- the triangle with the heart there

2              is not separate.  That's the same.

3    Q       Was it a deliberate decision by the founders of

4              Three Points Center North Carolina to not change

5              the brand that was already existing for the Utah

6              facility?

7    A       I don't know what you mean by deliberate.

8    Q       You don't know what I -- you have a master's

9              degree, Mr. Palmer, correct?

10   A       In -- as a marriage and family therapist, not an

11            English major.

12   Q       So you -- is it your testimony that you don't

13            know what the word deliberate means from -- like

14            if you read it, you'd have to ask --

15   A       I --

16   Q       -- for help?

17            MR. CHANG:  Objection to form.

18   A       I know what the word means.  I don't know what

19            you mean -- what you're intending to mean by that

20            question.

21   Q       To the best of your recollection, when you and

22            Dr. Thibault were talking about forming -- or

23            starting the facility in North Carolina, do you

24            remember having a conversation about calling it a

25            different name?

Thane Palmer

43

```
1    A    No.

2    Q    Okay.  Why not?

3    A    There was no need to have that conversation.

4    Q    And is that because the decision to just do Three

5         Points Center in North Carolina was in -- you

6         didn't even have to talk about it, correct?

7    A    Well --

8              MR. CHANG:  Objection to form, but go

9         ahead.

10   A    -- I'll use an example, because you like using

11        examples.  You have McDonald's and then there are

12        people that own McDonald's.  They're private

13        owners of McDonald's locations.  They all use the

14        same golden arches.

15   Q    But isn't something that's different about your

16        example that you just gave is that the owners of

17        Three Points Center in Utah and Three Points

18        Center North Carolina are exactly the same?

19   A    They are the same.

20   Q    So is there a plan right now to franchise Three

21        Points Centers' residential treatment facility

22        model?

23   A    No.

24   Q    Why not?

25   A    Because it's not a plan.  We haven't discussed
```

1           it.

2    Q      Okay.  Would that be something that you and Dr.

3           Thibault would entertain, franchising --

4    A      I --

5    Q      -- residential treatment facilities?

6                  MR. CHANG:  Objection to form --

7    A      I have no idea --

8                  MR. CHANG:  -- on the word franchising,

9           but go ahead.

10   A      I couldn't speak for Dr. Thibault, and I have not

11          considered that myself.

12   Q      Okay.

13   A      But see, I -- one reason why I used an example

14          was to point out to you the problem with using

15          examples that makes it confusing.  And so that's

16          why I don't -- I'm going to always ask you what

17          you mean when you use your examples, because they

18          can have a lot of different meanings and so --

19   Q      Sure.

20   A      -- do you see what I'm saying?

21   Q      Sure.  And --

22   A      Yeah.

23   Q      And the reason I asked the -- and, well, just --

24          why did you provide me the example about

25          McDonald's?

1   A    Because I bought a breakfast sandwich from

2        McDonald's this morning.

3   Q    But I understand why McDonald's might be on your

4        brain.  But why did you provide it as an example

5        in the context of this conversation we're having

6        about the separateness of the two Three Points

7        entities?

8   A    Because I'm aware that there is the McDonald's

9        brand and most -- many -- I don't know the exact

10       number -- many McDonald's locations are

11       separately owned.

12  Q    Okay.  But the facility in Siler City, the land,

13       it is owned by Three Points Center North Carolina

14       Properties, correct?

15            MR. CHANG:  Objection to form.  Go ahead.

16  A    Three Points North Carolina Properties.  Yes.

17  Q    All right.  Okay.  Three Points.  Three -- Three

18       Points Properties North Carolina, LLC.  And so

19       just to -- the word center is not in the

20       incorporated name of the record owner of the land

21       in Chatham County.  Correct?  You've got -- you

22       had a --

23  A    I don't know.

24  Q    Help him out.

25  A    I'm not sure.  Yeah.

1               MR. CHANG:  He's just saying what's the

2          name of the -- you guys both screwed up the name.

3          Three Points.

4    A     Three Points Center North Carolina.

5               MR. CHANG:  No, no.  Three Point -- I'm

6          going to screw up the name now, too.  Three

7          Points Properties North Carolina, LLC, is that

8          one.

9    A     Yeah.  Yeah.

10   Q     Okay.  Are you a member of the LLC that owns --

11         are you a member of the Three Points Properties

12         North Carolina, LLC?

13   A     Yes.

14   Q     Are you a member of the Three Points Properties,

15         LLC?

16   A     Yes.

17   Q     What land does Three Points Properties, LLC own?

18             MR. CHANG:  Objection.  That's not a

19         topic of examination.

20             MR. DAVIS:  Well, he's kind of opened the

21         door, Jimmy, about -- with these --

22             MR. CHANG:  No.

23             MR. DAVIS:  -- with the franchising

24         example.

25             MR. CHANG:  No.  Nope.  It does not.

Thane Palmer

1          It's not a topic of examination.  But it was fair
2          for you to ask him about himself, but yeah.
3                    MR. DAVIS:  Well --
4                    MR. CHANG:  Three Points Properties, LLC
5          is not the 30(b)(6) witness today, and therefore
6          is also not a topic of examination.
7                    MR. DAVIS:  Okay.
8                    MR. CHANG:  And quite frankly, I should
9          have objected when you asked him about the
10         ownership of these entities, or Thane's
11         involvement in those entities.
12                   MR. DAVIS:  I mean -- I guess the
13         documents speak for themselves, and we don't need
14         to spend more time on it.
15    Q    All right.
16                   MR. CHANG:  Objection.  Testifying.
17         Totally not okay.
18    Q    Let's see.  Give me one second, please.  Going
19         back to the differences between the two
20         facilities.  You said there were different
21         policies in terms of how the two -- how the Utah
22         facility -- and in fact, I'm going to use --
23         Utah, left hand, and North Carolina.  What are
24         the differences in the policies?
25    A    I don't know.

1    Q        What regulatory differences in terms -- and when

2             I say regulatory, I mean for the students, that

3             type of regulation -- are different between

4             operating a residential treatment facility in

5             Utah and in North Carolina?

6                  MR. CHANG:  Objection.  That's not a

7             topic of examination, what regulations govern

8             Utah.

9                  MR. DAVIS:  Jimmy, you are being --

10                 MR. CHANG:  Say it on the record.  What

11            am I being?

12                 MR. DAVIS:  That is extremely, extremely

13            narrow.  That is extremely narrow because --

14                 MR. CHANG:  Narrow doesn't say he has to

15            tell you the law that affects Three Points Center

16            in Utah, and then the differences in law.

17                 MR. DAVIS:  He's -- it's a combination

18            because he is the deponent on the factual basis

19            for Defendant's contention that Defendants are

20            not integrated under a single employer.  And he

21            went through and identified these different

22            things.  And he said different policies and

23            regulations.  That's what I'm asking.

24                 MR. CHANG:  Did you say -- Mr. Palmer, do

25            you remember saying regulations, or did you say

1          policies?

2     A    No.

3     Q    Why would the policies --

4     A    I said --

5     Q    -- be different?

6     A    I said laws and codes, is what I said.

7     Q    Okay.  Laws and codes.  He said law.  That's what

8          I'm asking about.  So what laws apply to the --

9          well, what is -- if someone asked you what type

10         of facility existed at the Siler City facility,

11         what is the answer?

12    A    I -- I'm sorry, Garrett.  I don't know what you

13         mean by that.

14    Q    What is -- does residential treatment facility

15         have -- have legal significance in your industry?

16         The term residential treatment facility.

17    A    Yes.

18    Q    What does that mean?

19    A    Once again, Garrett, that is a very broad

20         question, because there is a lot of different

21         meanings of that phrase.  And I'm not trying to

22         be difficult.

23    Q    I'm going to use an example.  If you picked up

24         the phone for somebody interested in your

25         company's services, and they said, "What type of

1          facility exists in Siler City," what would you

2          tell them?

3      A   I would tell them we have a treatment center that

4          offers specific treatment for the adopted

5          adolescent population.

6      Q   What does the term therapeutic boarding school

7          mean?

8      A   It would mean a boarding school that offers

9          therapeutic services.

10     Q   Is the facility in Siler City a therapeutic

11         boarding school?

12     A   Yes.

13     Q   Okay.  Are there any North Carolina laws that

14         apply to therapeutic boarding schools?

15     A   That's a really, really broad question, Garrett.

16         Because fire code --

17     Q   Okay.

18     A   -- applies to therapeutic boarding schools.

19     Q   No, that's fair.

20     A   So I --

21     Q   Because --

22     A   I --

23     Q   -- the answer could be yes.

24     A   But --

25     Q   Yes, but...  Please, yes.

1     A     -- I'm -- once a -- I want to be very precise in
2           what I understand.
3     Q     Okay.
4     A     And I want to be very precise and honest in my
5           answer.  So I am not trying to be difficult for
6           you, Garrett.
7     Q     Besides the building code and things that apply
8           to all structures that exist in the State of
9           North Carolina, what laws apply to that facility
10          based on the fact that teenage girls are living
11          there permanently under lock and key?
12                    MR. CHANG:  Oh, objection to form.
13    Q     Under -- it is a secure -- it is a secure
14          facility, correct?
15    A     No.
16    Q     Are the girls permitted to leave on their own?
17    A     Yes.
18    Q     Any time they want?
19    A     They could, yes.
20    Q     What do you mean by they could?
21    A     We -- kids are not under lock and key.  That --
22          that's a false characterization of our program.
23    Q     If a student ran away from the Three Points
24          Center Siler City facility, what is the protocol
25          to go find them?

1     A     We would go find them to make sure that they're

2           safe.

3     Q     And what I meant by lock and -- is the reason

4           that they go there is because they need somebody

5           to take care of them.  Fair?

6     A     Once again, Garrett, that is a very broad

7           characterization of -- and simplification of what

8           we do.

9     Q     To your knowledge, does any government official

10          from the State of North Carolina, not including

11          building code or fire officials, from the State,

12          have the authority to show up at the Siler City

13          facility and conduct a random inspection?

14    A     Yes.

15    Q     When was the last time that happened?

16    A     Just a few days ago, we had a person from the

17          Division of Water Quality come and take a water

18          sample.

19    Q     Okay.  All right.  And is that because there's a

20          well?

21    A     Yes.  We have a well.

22    Q     Not including local development regulators and

23          state environmental regulators that regulate

24          wells regardless of the business, is there any

25          other government agency that can -- that conducts

1         random -- can conduct a random inspection of the
2         North Carolina facility?
3    A    Yes.
4    Q    Who?  Which agency?
5    A    I don't know the exact names.
6    Q    But you said yes.  Why did you say yes?
7    A    People from whatever department that oversees the
8         safety of children can --
9    Q    Okay.
10   A    -- come to our location whenever they would
11        choose.
12   Q    And as the president of the facility, what do you
13        do to make sure that in the event they -- those
14        regulators do come, that your facility is up --
15        you know, up to the standards that they're coming
16        there to inspect for?
17             MR. CHANG:  Objection to form, but go
18        ahead and answer.
19   A    Okay.  I'll give you an answer to that.  It's
20        going to be a lot longer than probably what you
21        wanted, but it requires it.  So we are accredited
22        through the Joint Commission, and so we have
23        broad accreditation standards that you can review
24        separately.  Our North Carolina campus has what's
25        called JCAHO, Joint Commission accreditation,

1          that has broad requirements specific to students,

2          specific to the property, specific to the policy

3          and procedures directly related to running a

4          safe, quality center.

5                    We have our own policy and procedures

6          around that, which most importantly starts with

7          the safety of our students.  I conduct thorough

8          checks of the property to make sure that there's

9          no problems with the property that could pose

10         safety dangers to students.

11                   I -- the next part is their emotional

12         safety.  I do broad checks to ensure that our

13         students are being cared for very carefully, in a

14         very safe way as far as their physical and

15         emotional safety.

16                   I do broad checks to ensure that the

17         clinical work that we promise parents, that our

18         students are receiving those.  And I also

19         supervise the Mustang Program that we do at the

20         facility.  And I ensure that that is done --

21         ensure that that's done in a safe way for the

22         kids, a safe way for the horses, and in a way

23         that's also therapeutic.

24                   There is a lot of other things, and I can

25         continue going on if you want to -- if you want

1       me to, or I can stop.

2   Q   So if I asked -- and if I was able to send a

3       written question to your attorney and say,

4       "Please provide me the documents that were

5       provided to you by the last government agency

6       inspector that came to the facility," would you

7       be able to produce documents that are responsive

8       to that question?

9   A   I would be able to find them.  Yes.

10  Q   Okay.  Why not just give Three Points a different

11      name in North Carolina?  Why -- I mean, if it's

12      different, why not give it a different name?

13  A   Is that a question or a rhetorical question?

14  Q   Okay.  If the facilities are -- if they're

15      different, why don't they have different names?

16  A   Once again, that's a pretty broad question.  I'm

17      going to --

18  Q   It's a why -- I mean, do you not understand it,

19      or are you -- you just think it's too broad to

20      answer today?

21  A   I think it's too broad to -- if you can narrow

22      that down, I'd be more than happy to answer it.

23  Q   What would be -- would there be a -- would it be

24      advantageous to the business that you're the

25      owner of, to call it Four Points instead of Three

1      Points?

2   A   I don't know.  I've never -- I don't -- I've

3       never considered that option.

4   Q   Would it be advantageous for the business to have

5       a different website?

6              MR. CHANG:  Objection to form.

7   A   I am not the marketing person for Three Points

8       Center North Carolina.  I am laser focused on

9       running a safe program and a beneficial program

10      for our students and parents.

11  Q   I understand that you're not the marketing

12      person, but you are the corporate designee for

13      the factual basis for Defendants' contention that

14      Defendants are not an integrated enterprise or

15      single employer, correct?

16  A   Yes.

17  Q   Marketing.  Can you identify a marketing expense

18      that's not the website, if there is one?

19  A   Yes.

20             MR. CHANG:  Objection to form.

21  Q   Please identify.

22  A   We have referral sources called educational

23      consultants.  And we would at times pay for their

24      plane ticket, hotel accommodations to come visit

25      our facility.

Thane Palmer

57

1      Q        Uh-huh.  When you say "we," who is "we"?

2      A        Three Points Center North Carolina.

3      Q        When was the last time that Three Points -- and

4               when you say -- and it is Three Points Center

5               North Carolina, but who contacted this referral

6               source that you're talking about?  Let me strike

7               that.

8                        When was the last time one of these

9               education consultants came to the Siler City

10              facility?

11     A        I don't remember.

12     Q        Have -- between November -- well, let's say

13              between December 2021 and today, has an

14              educational consultant visited the North Carolina

15              facility?

16     A        Yes.

17     Q        Okay.  Do you remember their name?

18     A        No, I don't.

19     Q        Can you -- how did that educational consultant

20              become aware of Three Points Center's North

21              Carolina facility?

22     A        I don't know the answer to that.

23     Q        Did -- when they came -- well, before they came,

24              who paid for their plane ticket?

25     A        Well, once again, that's a really broad question

1              because --

2       Q      Mr. Palmer, I'm -- it is who paid for their plane

3              ticket?  Who paid for their plane ticket?

4       A      Let me tell you why it's broad.  Okay?  We would

5              have many educational consultants that come that

6              we do not pay any of their expenses.  So --

7       Q      Okay.

8       A      -- it's different for different education

9              consultants.

10      Q      Is it -- does --

11      A      I'm -- I am not trying to be difficult with you.

12      Q      That's all right.  And I'm going to interrupt

13             because I -- when I start going like this --

14      A      Yeah.

15      Q      -- I hear what you're saying.

16      A      Yeah.

17      Q      And had -- of the education consultants that have

18             come to the Siler City facility, acknowledging

19             that not all of them are paid -- their plane

20             tickets are paid for, have there been any ones

21             where their plane tickets have been paid for?

22      A      Yes.

23      Q      Who -- what entity paid for those plane tickets?

24      A      Three Points Center North Carolina.

25      Q      Okay.  When was the last time that a -- we'll

Thane Palmer

1          call them a paid educational consultant visit.

2          Is that fair?

3     A    Yeah.  I don't know the answer to that.  I --

4     Q    You don't know the answer?

5     A    I don't know the answer.

6     Q    Who would know the answer to that?

7     A    Sheila Tart-Zelvin.

8     Q    Okay.  And where does she live?

9     A    She lives in New Mexico.

10    Q    Has she ever lived in North Carolina?

11    A    I don't know the answer to that.

12    Q    Has she ever -- when was the last time you saw

13         her at the Siler City facility?

14    A    I don't remember.

15    Q    Do you believe she's ever been to the Siler City

16         facility?

17    A    Yes.

18    Q    Okay.  Who pays her salary?

19    A    Three Points Center North -- as far as Three

20         Points Center North Carolina is concerned, Three

21         Points Center North Carolina pays her salary.

22    Q    Does she also get a salary from any other entity

23         listed on the complaint?

24    A    Yes.

25    Q    Okay.  Which entity?

```
1    A      Three Points Center.

2    Q      Three Points Center.

3    A      Uh-huh.

4    Q      Is it your testimony that -- well, that might be

5           an HR topic.  Payroll stuff.  All right.  There's

6           a phone number on the website.  Let's do an

7           exhibit.  Let's get one in.  This will be 42.

8           (PLAINTIFF'S DEPOSITION EXHIBIT NO. 42

9                MARKED FOR IDENTIFICATION)

10                    MR. DAVIS:  And Jimmy, this comes from

11           Thibault Exhibit 3.

12   Q      Do you see the phone number on that?  Can you

13           read it?

14   A      Where are we?

15   Q      Oh, at the -- I got you the black and white one

16           to save a little bit of money.  Do you see

17           there's a phone number up there where it says

18           "Call"?  I can read it better on mine, so --

19   A      I'm sorry.  I can't read it.

20   Q      You can't read it.  Let's get a new one.  Let's

21           go off the record for a minute.  I'm going to get

22           the --

23                    MR. CHANG: Okay.

24                    MR. DAVIS:  I'm going to get this.

25                    THE COURT REPORTER:  We're off at 11:20.
```

1           (NINE-MINUTE RECESS)

2           THE COURT REPORTER:  It is now 11:29.

3      We're on the record.

4    Q     All right.  Mr. Palmer, I handed you what was Dr.

5      Thibault's Exhibit 3, and it's Exhibit 42.

6      That's a copy of a copy over time.  I'll

7      represent that there is a phone number at the top

8      of the website.

9           Well, one, I'll represent first that this

10     is a screenshot from Threepointscenter.com, the

11     home page, and that there is -- at the top, there

12     is a phone icon.  It says we can help your

13     family.  The number is 435-635-0636.  Do you have

14     any reason to disagree with my description of

15     this exhibit?

16   A     No.

17   Q     If I called that number right now and -- and I

18     won't say I.  If a parent -- because I'm not

19     allowed to do that.  I'm not allowed to contact

20     you without Jimmy being present.  If a parent

21     called that number who did need -- who was

22     interested in the services your company provides,

23     who picks up the phone?

24   A     That would be possibly two people.  Millie

25     Anderson or Sheila Tart-Zelvin.

62

1    Q    Okay.  We asked about Sheila.  Where does Millie

2         live?

3    A    Millie lives in Loa, Utah.

4    Q    Okay.

5    A    Well, actually, I need to clarify.  Because if

6         I'm remembering correctly, that number actually

7         goes to a line that people can go to -- they

8         would have to do another number to go to

9         admissions --

10   Q    Okay.

11   A    -- to go to Millie and Sheila.

12   Q    So there's -- is it fair to say you've just

13        described, like, the initial intake process for a

14        new student?

15   A    Yes.

16   Q    At what point during the intake process do -- I'm

17        just going to say workers instead of employees.

18        Do the workers fielding these conversations talk

19        to -- tell the parent there's two facilities that

20        are options?

21             MR. CHANG:  I'm just going to object to

22        form about this being a website for a Three

23        Points Center North Carolina.

24             MR. DAVIS:  Well --

25   Q    How many students are at Three Points Center's

1          North Carolina facility right now?

2     A    Twenty-six.

3     Q    Twenty-six.  Is there a separate phone number

4          that those parents would have called to get

5          connected to the services and move to the Three

6          Points Center North Carolina facility?

7     A    No.

8     Q    Okay.  Why not?

9     A    Because we -- Three Points Center North Carolina

10         pays our portion of the salaries for Sheila

11         Tart-Zelvin and Millie Anderson.

12    Q    Who -- and I know that you're clinical.  That's

13         why I'm -- what employee would know who pays the

14         phone bill for the number 435-635-0636?

15    A    Well, Three -- Three Points Center North Carolina

16         would pay our portion of those bills.

17    Q    Okay.  And I under -- paying the portion of the

18         bill, is -- what I'm asking now is what employee

19         actually gets the money to the phone company?

20         Like pay -- logs into a portal, pays the bill.

21         Who would that be?

22    A    Our -- the bookkeeper for Three Points Center

23         North Carolina is LeAnne Hukill.

24    Q    Okay.  So is it your testimony that LeAnne Hukill

25         is the -- pays this recurring phone bill for

1          Three Points Center Utah and Three Points Center
2          North Carolina?
3     A    Yes.
4     Q    Okay.  Is she -- does she have any other
5          bookkeeping -- oh, where does LeAnne Hukill live?
6     A    She lives in Colorado.
7     Q    She lives in Colorado.  Is 435 an area code for
8          Utah?
9     A    Yes.
10    Q    It is.  Okay.  How much -- before he passed, how
11         much interaction did you have with Glenn
12         Thibault?
13    A    I would speak with him on the phone once or twice
14         a month, maybe.
15    Q    You've known Dr. Norm Thibault since college,
16         correct?
17    A    Graduate school.
18    Q    Graduate school.  Were you friends with Glenn
19         Thibault at any -- when I say friends -- well,
20         did you have any -- was Glenn Thibault's cell
21         phone number in your phone before Three Points
22         Center started?
23    A    No.
24    Q    Okay.  So is it fair to say that you only started
25         communicating with Norm's brother after the

1          founding and formation of Three Points Center

2          Utah?

3    A     Yes.

4    Q     Or around that time.

5    A     Yes.

6    Q     Okay.  Then -- because after -- for precision,

7          you may have talked to him before.  What was your

8          understanding of his role in -- before he passed,

9          did he have a role in Three Points Center North

10         Carolina?

11   A     Yes.  He was the CFO.

12   Q     He was the CFO.

13   A     Uh-huh.

14   Q     Besides the CFO executive operations duties, what

15         was his contribution to become a 47 percent

16         membership owner of the entities?

17   A     He --

18              MR. CHANG:  Objection to form.  But go

19         ahead.

20   A     He provided some of the original funding and

21         helped -- well, didn't help.  He's the one that

22         contacted different -- the different, you know,

23         minor investors that supplied investment money.

24   Q     Was it your understanding that he was -- did he

25         have any clinical background like you and Dr.

1              Thibault have?

2      A      No.

3      Q      Was it your understanding that he was a

4              businessman?

5      A      Yes.

6      Q      How much investment was necessary to start the

7              Three Points business?

8                    MR. CHANG:  Objection.  Topic of

9              examination.  Are you talking about TPCNC?

10                   MR. DAVIS:  Oh, my fault.  The founding

11             and formation of Three Points Center North

12             Carolina.

13                   MR. CHANG:  Okay.

14                   MR. DAVIS:  All right.  Number nine.

15     Q      So for context, Three Points Center Utah was the

16             first Three Points Center facility?

17                   MR. CHANG:  Objection to form.

18     Q      Okay.  What start-up costs did Dr. -- did Glenn

19             Thibault provide to start Three Points Center

20             North Carolina?

21     A      To my knowledge, Glenn Thibault did not provide

22             any money to start Three Points Center North

23             Carolina.

24     Q      Okay.  So when you previously testified about

25             him, the investors, and that, that was for the

1          first Three Points Center?

2     A    Yes.

3     Q    Okay.  In his role as the CFO of Three Points

4          Center North Carolina before his passing -- well,

5          actually, I think I'm getting dates -- he -- did

6          Dr. Thibault's brother pass away right around the

7          same time that Three Points Center North Carolina

8          became operational?

9     A    Yeah, he did.

10    Q    Okay.  So even though -- is it fair to say that

11         even though he was the CFO in name, due to the

12         timing of his passing at the beginning of the

13         business, he never really performed that function

14         for Three Points Center North Carolina?

15              MR. CHANG:  Objection to form, but answer

16         if you understand it.

17    A    Glenn operated -- performed CFO functions for

18         Three Points Center North Carolina until he

19         became so sick he was in the hospital, I believe

20         in October of 2021.

21    Q    And so those functions that -- I just want to

22         just kind of pin down dates.  Those functions

23         were the start-up functions prior to students

24         arriving at the facility.

25    A    Yes.

1    Q    Okay.  When I say the phrase workplace culture,
2         what does that mean to you?
3    A    That would be the -- well, are you saying as far
4         as students go, as far as staff go?  That's --
5    Q    That's fair.  But by saying work, when I use the
6         word "work," I'm talking about staff.
7    A    Talking about staff.
8    Q    Employees.  Uh-huh.
9    A    Yeah.  In my opinion, workplace culture would --
10        involved the general atmosphere that the
11        employees work under; whether or not they feel
12        valued; whether or not they feel like they're
13        doing a very important job; whether or not
14        they're important individually and collectively;
15        whether or not they feel like that they can make
16        a difference in -- with our students.
17   Q    This is a general question.  How long have you
18        worked in this industry?
19   A    Close to 30 years.
20   Q    Were you employed -- were you and Dr. Thibault
21        employed at Cross Creek Manor together?
22   A    Yes.
23   Q    And you were both employees there, not owners,
24        correct?
25   A    Correct.

Thane Palmer

```
1    Q    What was the workplace culture like there?
2    A    My opinion about it, or --
3    Q    Uh-huh.
4    A    It wasn't very good.
5    Q    And I'm -- and the reason I'm asking, this would
6         be under the topic -- it would be under
7         leadership.
8    A    Yeah.
9    Q    That now you're in a leadership role, is it fair
10        to say that your prior experiences as an employee
11        at different businesses influenced how you lead
12        Three Points Center North Carolina today?
13   A    Yeah.  At Three Points -- or at Cross Creek
14        Manor, I learned a lot of things that I made a
15        determination if I were ever to be in charge of a
16        center, that I would do it very different.
17   Q    Well, that's a powerful statement.  I might just
18        pause -- stay on that for a little bit.  Let's go
19        for top five, if it gets to five.  What were the
20        things in terms of workplace culture at Cross
21        Creek Manor that you remember that you wanted to
22        do differently?  All right.  I'm ready.
23   A    You want me to list those?
24   Q    Uh-huh.
25   A    That employees would be treated respectfully.
```

1    Q    Okay.

2    A    That employees would understand the specific

3         population that they're working with.  That

4         employees would receive the appropriate training

5         and education that they need to effectively work

6         with the population.  The employees would be

7         taught how to treat students with care and

8         respect, and how to keep them physically and

9         emotionally safe.  How many is that?

10   Q    We're at four.  And there's two -- you've got two

11        that are kind of overlapped on training.  But

12        this -- that was open ended, so keep going.

13   A    Yeah.  And then we -- I determined I wanted to

14        have a culture that made it very safe for our

15        employees to come to me or other people in

16        leadership and discuss how their work with the

17        students have -- you know, can affect them in a

18        very emotional way.

19   Q    Based on those, let's say, lessons learned from

20        Cross Creek, why -- the first one you listed was

21        employee respect.

22   A    Uh-huh.

23   Q    What was an example from Cross Creek where you

24        did not see employees being respected?

25   A    I viewed instances at Cross Creek Manor where the

1          program director would correct -- like directly

2          correct employees in front of other employees.

3    Q    Okay.  Number two was understand population.

4          Number three, appropriate training.  Number four

5          says taught.  And so two, three, and four, I

6          believe that -- well, let's just start with two.

7                How does an employee at Three Points

8          Center understand the population they're working

9          -- and let me just do the youth mentor.  At what

10         point does a youth -- is a youth mentor trained

11         in the population that you serve?

12              MR. CHANG:  Objection to form to the

13         extent you meant to say TPC North Carolina.

14              MR. DAVIS:  Always.  Sorry.

15    A    At Three Points Center North Carolina, the --

16          that training starts from -- starts with the

17         interview process, actually, where they are

18         informed that we work with the specific

19         population of adopted adolescents and their

20         families.  In that the adopted adolescent

21         population has some unique needs and some similar

22         needs compared to the general adolescent

23         population that's in treatment.

24              And from there, they -- myself and Heidi

25         and the clinical director may -- will perform

1              regular trainings that typically are conducted

2              Wednesday and Thursday at 6:00 P.M. where we do

3              trainings on a variety of issues.  Anywhere from

4              issues specific to the adopted population, things

5              specific to program policy and procedures, and

6              issues related to themselves, and the -- of how

7              they can bring themself in to work with kids in

8              ways that are appropriate.

9    Q        Number three.  I'm going to try to do two things

10             at one time.  It might take me a while to get it

11             out.  Number three.  I believe you said

12             appropriate employee training.  I will connect

13             the dots.  This is 43.  Is there a breakroom at

14             Three Points Center's North Carolina facility?

15   A        Yes.

16   Q        Something like where like a -- there's -- is

17             there an ad -- there's an admin building,

18             correct?

19   A        We have a building that a section of that is the

20             admin part of the building.  Yeah.

21   Q        Let me do this.  Let me get one in first before

22             we -- here, this will be better.

23   A        We would actually have two different locations

24             that -- that you could call a staff break area or

25             something like that.

1    Q    All right.  This is 43.  A black and white

2         version of Dr. Thibault 24.

3         (PLAINTIFF'S DEPOSITION EXHIBIT NO. 43

4              MARKED FOR IDENTIFICATION)

5              MR. DAVIS:  These are the maps, Jimmy.

6    Q    If you turn to the second -- well, on the first

7         page, I'll represent, since I'm putting it in

8         front of you, that this is an automatically

9         generated map that I put an arrow on from Chatham

10        County -- from their GS -- GIS website.  Do you

11        have any reason to disagree with that?

12   A    Oh, sorry.

13   Q    Mr. Palmer?

14   A    Oh, I thought you were asking --

15   Q    Oh, yeah, no.  I'm just -- because --

16   A    Yeah.

17   Q    -- if -- I'm not going to ask any questions about

18        it, but I put it in front of you and --

19   A    Yeah.  No, no.  I've --

20   Q    Okay.

21   A    I've seen --

22   Q    You might have seen it.

23   A    -- basically, this map, numerous times.

24   Q    Did you review Dr. -- when I asked when you

25        reviewed Dr. Thibault's deposition, you also

1          reviewed his exhibits that were attached to it?

2          Do you remember?

3     A    I would have done that really quick.

4     Q    Okay.

5     A    Yeah.

6     Q    Will you turn to the next one?

7     A    Yeah.

8     Q    Twenty-five.  And I'll show you the color one if

9          you can't see anything.

10    A    Oh, is that -- okay.  So, yeah --

11    Q    Yeah.  But this is more than I showed Dr.

12         Thibault.  So back to the question of where the

13         breakroom is for employees.  Which building is it

14         in?

15    A    Well, the two locations that I was referring to

16         in what would be labeled with the D in this

17         section of the building here, there would be a

18         breakroom area where there's a fridge and places

19         for staff to -- lockers.  A place for staff to

20         put their personal items.  A place for them to

21         have -- you know, bring their own food if they

22         have their own food that they want to bring and

23         so forth.

24              And then in the administration area of

25         this building, there's an area where we provide

1          coffee and tea, that the staff can come in during

2          breaks, you know, while they're down on this part

3          and get coffee or tea or something like that here

4          in the admin building right there.

5      Q   And I'll just represent that Mr. Palmer was

6          pointing at the building labeled admin/school/caf

7          on --

8      A   Yes.

9      Q   -- Thibault 25.

10     A   Yes.

11     Q   In -- I'm going to hand -- 44 is -- I need to

12         pull this thing off.  This was wasting my time.

13         Have you ever seen either of those -- I guess

14         they're posters that used to be big.

15         (PLAINTIFF'S DEPOSITION EXHIBIT NO. 44

16              MARKED FOR IDENTIFICATION)

17     A   Yeah, yeah.  I've seen -- yes, I have.

18     Q   Are they posted anywhere at your facility?

19     A   Yes.

20     Q   Where are they posted?

21     A   I don't know if I could say like 100 percent.  I

22         would say very confidently that they are posted

23         in the staff area in the dorm building.

24     Q   Okay.  So --

25     A   And I actually also know that they're posted in

1          the -- a breakroom area that is provided for the
2          academic people.
3     Q    All right.
4     A    It's posted in there, also.
5     Q    Okay.  And so just for the transcript, the first
6          page of Exhibit 44, I'm just going to read the
7          big top of the poster.  It says, "Equal
8          employment opportunity is the law."
9     A    Where are you reading from?
10    Q    I'm reading from the first page of Exhibit 44.
11    A    Oh, yeah.  Yeah.
12              MR. CHANG:  He's trying to get it onto
13         the record.
14    Q    Yeah.
15    A    Oh.
16    Q    And I'll represent that the second page is the
17         second part of that poster.  And then the next --
18         I'll represent that the third and fourth page are
19         the updated -- well, it says -- the third page,
20         it says U.S. Equal Employment Opportunity
21         Commission.  Know your rights.  Workplace
22         discrimination is illegal.  Do you see that --
23    A    Yes.
24    Q    -- poster?
25    A    Yes.

```
 1    Q      So is it your testimony that you've seen one --
 2           either the first poster that says that equal
 3           employment opportunity is the law, or the second
 4           poster?
 5    A      Yes.
 6    Q      Which one do you believe that you've seen, if the
 7           answer is both -- not both?
 8    A      I would say I believe that I've seen both.
 9    Q      And if we could teleport right now to the
10           facility shown on Thibault Exhibit 25, where
11           would these posters be displayed?
12    A      In the staff area in the dorm room and in the
13           staff area of the academic part of the
14           admin/school/caf building.
15    Q      Did your -- before he left the employment of
16           Three Points Center North Carolina, did your
17           son-in-law, Craig Butcher, have his own office --
18    A      Yes.
19    Q      -- at the facility?  Where was Craig Butcher's
20           office?
21    A      It was located in the dorm building in this
22           corner right there.
23    Q      Okay.  And so I was -- you were pointing to the
24           building that's listed as D on Dr. Thibault's
25           map?
```

1       A        Yeah.  And I don't know if that's north or south

2                or what, but it -- it's in that --

3       Q        That --

4       A        -- that corner of the building.

5       Q        And then --

6       A        In the downstairs portion of that, because this

7                is a two-story building.  It's in the downstairs

8                portion of the building right there.

9       Q        Okay.  And the -- you did say that one or both of

10               these posters has been -- is up in that dorm

11               building?

12      A        Yes.  In this -- if we divide this building,

13               there's an area right there and that staff would

14               be in.

15      Q        I'm going to give you the -- I'm going to switch

16               out and give you the color one since these are

17               going to have to get scanned.  Okay?  Let me do a

18               quick audible real fast, gentlemen.  Can I see

19               your maps and switch these out?  There you go.

20               That's good.  All right.  All right.  So I'm

21               handing you a color version now of the maps.  It

22               should be easier to label.  And since Dr.

23               Thibault's writing was in blue ink --

24      A        That's -- is that black or blue?

25      Q        I don't know.  I think it'll be -- I think we'll

1           -- here's what we do.  That little drawing that
2           you just did, I'm going to help do a -- I'll get
3           it started.  All right.  I'm going to put a
4           little legend here.  All right.  Put your office
5           and then -- EEOC posters.  All right.
6                   So, Mr. Palmer, I've premade a legend
7           with B and P as the symbols.  I'd like you to
8           point -- just put with the letters, put where B
9           is, where Mr. Butcher's office was.  And then you
10          put a P.  And are -- were Mr. Butcher's office
11          and the EEOC posters on the same floor?
12    A     Yes.
13    Q     How big is that building?  Like, because I don't
14          have a sense of scale based on that map.
15    A     It's very -- I mean, it's over 20,000 square feet
16          total.
17    Q     Okay.  But the posters and Mr. Butcher's office
18          are on the same floor and on the same side of the
19          building?
20    A     Yes.
21    Q     Did you -- and you testified that you reviewed
22          Mr. Butcher's transcript, correct?
23    A     Yes.
24    Q     He's your son-in-law.  Correct?
25    A     Yes.

1    Q    How long has he been your son-in-law?

2    A    You're going to get me in trouble here, Garrett.

3    Q    I know he changed jobs, but I don't want to -- I

4         don't want to hear anything about that -- but

5         actually, I do.

6    A    I can tell you by the age of my grandkids.

7    Q    Okay.

8    A    So their oldest son is ten years old, and I

9         believe they were married two years be -- so

10        about 12 years.

11   Q    So he's married to your daughter.

12   A    Yes.

13   Q    You think Mr. Butcher is an intelligent man?

14   A    Yes.

15   Q    I'll represent that on page 250 of his transcript

16        that Mr. Butcher testified that on April 6th, the

17        day that he says that he terminated Tyliya

18        Nelson, that he did not know that these laws

19        existed.

20             MR. CHANG:  Objection to form.  You're

21        misstating his testimony.  And we object like

22        crazy because that was a very misleading

23        question.  You've got to take into account

24        several differences.

25             MR. DAVIS:  Sarah says you can seal it

1          back it up.  Just for the record, Pete, we're not

2          going to enter the whole transcript in.  But I

3          spoke with Sarah.  She said that we could reseal

4          this.  And I do need to find the -- hold on a

5          second, gentlemen, because I do want to get -- I

6          need to find it.  Let's take a quick break

7          because I need to use the restroom, also.  If it

8          -- Jimmy, are you fine with that?  And that's why

9          I'm getting a little bit --

10                   MR. CHANG:  Okay.

11                   MR. DAVIS:  Thank you.

12                   THE COURT REPORTER:  We're off at 11:57.

13                   (TWELVE-MINUTE RECESS)

14                   THE COURT REPORTER:  We're back on at

15          12:09.

16     Q    (By Mr. Davis.)  Okay.  Hopefully, not too many

17          more of those breaks, Mr. Palmer.  Before that

18          break, I was asking you about the location of the

19          EEOC employment law posters that are Exhibit

20          44 --

21     A    Yes.

22     Q    -- in relation to where your son-in-law, former

23          group living director Craig Butcher's office was

24          at the North Carolina facility.

25     A    Yes.

```
1    Q    And those --

2              (KNOCK ON DOOR)

3              MR. DAVIS:  Just leave it out there.

4    Q    And those -- that poster in his office, they were

5         in the dorm, which is marked D on the map that

6         you've marked.  Correct?

7    A    In the dorm.  They're in the dorm building.

8    Q    The dorm building.

9    A    Not in the dorms.  Yeah.

10   Q    Because that -- the posters are in a place where

11        employees can go.  Is -- was the -- where the

12        posters are, do the students have access to that

13        area?

14   A    No.

15   Q    Okay.  All right.  And then --

16   A    We follow the state law in regards to making sure

17        these are posted in a staff area.

18   Q    Right.  And that -- and so your testimony is that

19        at the time Ms. Nelson was terminated in April

20        2022, to the best of your recollection, one or

21        both of those posters were posted in the dorm

22        building?

23   A    Well, I couldn't speak specific to that time.  I

24        could testify very clearly that these documents

25        were posted very clearly in a staff area, so
```

1                according to state law.  Yes.

2       Q       And that staff area where they were posted,

3               was -- there were refrigerators there?  Is it --

4               was it that area?

5       A       In the staff area, there is a fridge there.  Yes.

6       Q       Okay.  So is it an area that Mr. Butcher would

7               have had a reason to go to at some point during

8               his typical workdays?

9       A       Yes.

10      Q       Okay.  And then I -- before break, I asked -- I

11              pointed out that I had the wrong cite.  I said

12              page 250 of Mr. Butcher's transcript said

13              something and it didn't, but I'll just read from

14              page 253.  I asked Mr. Butcher, "Are you aware

15              that there are laws called employment

16              discrimination laws that prohibit an employer

17              from retaliating against an employee?"  Mr.

18              Butcher responded, "No, I was not."

19                      And your counsel, he objected to

20              something, and I believe I asked, "Do you believe

21              that?"  Do you believe that your son-in-law was

22              not aware that the laws -- that employment

23              discrimination laws that prohibit an employer

24              from retaliating against an employee, that are

25              identified on those posters, that he was not

1          aware of that?

2     A    I -- actually, I don't believe that he was not

3          aware of these laws.  And if he would have been

4          asked the question in a way that was clear to him

5          -- because I know that I've had conversations

6          with Craig Butcher in my interactions with him

7          specific to the laws in this document.

8               And so I'm -- and I know in conversations

9          that I've had with Craig Butcher that he very

10         clearly understands that we don't -- and not only

11         is it in the law, it's also in our company

12         policy, that we don't discriminate against

13         employees on the things enumerated in this law

14         that's described in this document.  And that we

15         don't in any way retaliate the employees --

16         retaliate against employees.

17              So I know that Butch -- or Craig Butcher,

18         understands the principles in this document.

19    Q    Okay.  So I'm going to just show for illustrative

20         -- we're not going to enter this as an exhibit.

21         This is page 253 of his transcript and the

22         question.  And I'm not saying this because I'm

23         making a slight.  I'm trying to be efficient.

24    A    Yeah.  Yeah.

25    Q    I believe you criticized the question I asked as

```
 1              not being clear.  So I'm pointing out lines --
 2              you see the Q?  I'm going to read it out.  Are --
 3              I asked him, "Are you aware that there are laws
 4              called employment discrimination laws that
 5              prohibit an employer from retaliating against an
 6              employee."  Mr. Butcher said, "No, I was not."
 7                   I'm not trying to get you to change what
 8              you just testified to.  The question.  What part
 9              of that question is ambiguous for somebody --
10              what part of this question is ambiguous?
11     A        Yeah.  What I meant by that is, from what I
12              understood you saying, is Butch may not have
13              known the name of the law.  I do, in my own
14              interaction with Craig Butcher, and because of
15              what our company policies align with the law,
16              that I know he's been trained on, and I know that
17              I've had personal discussions with him related to
18              the specifics in this law.  So --
19     Q        Okay.
20     A        -- what I was referring to is he may not have
21              known the exact name of it that you referred to
22              there.
23     Q        Understood.
24     A        Yeah.
25     Q        So a follow-up.  You said that Mr. -- you've had
```

1                  conversations with your son-in-law before he left

2                  Three Points about these laws in -- on the

3                  posters.

4      A         Well, I mean, the --

5      Q         The principles.

6      A         This is part of the principles that form from a

7                  company perspective how I expect all of our

8                  employees to be treated. I want our employees to

9                  be treated with respect and that there is -- the

10                 things that we look for as we evaluate employees

11                 are, can they do the job? You know, do they --

12                 can they show up to work on time? Things like

13                 that. And we don't discriminate for any reason.

14                 It's just are people qualified, and can they

15                 effectively do the job?

16                       And I know that in the years I've worked

17                 with Craig Butcher, I know that he very clearly

18                 understands those principles.

19      Q         I believe you testified that Mr. Butcher was also

20                 trained with regards to these laws.

21      A         With regards to the principles in the laws

22                 because they also -- our company policy and

23                 procedures are directly aligned with this.

24      Q         And when -- my understanding of Mr. Butcher's

25                 time at Three Points was he began as a shift

1           supervisor.  Does that sound accurate to you?

2      A    Began where as a shift supervisor?

3      Q    In Utah.

4      A    Okay.

5      Q    Okay.

6      A    Yes.  He began as a shift supervisor in Utah.

7      Q    At the -- he did not begin as a youth mentor?

8      A    No, he did not.

9      Q    Why didn't he -- why did he not begin as a youth

10          mentor?

11     A    The reason he did not begin as a youth mentor;

12          because we were a newer company and I didn't have

13          any mentors at the time that I felt, like, had

14          the experience and qualifications, and my own

15          knowledge of them, to know that they can handle

16          -- well, let me back up.

17               With our population, things can get very

18          unsafe very quickly for staff and for students.

19          And so I have to have a supervisor that is on

20          campus at all times that I know is going to

21          handle those situations, you know, correctly

22          according to how I've instructed them and can

23          keep everybody safe.

24               And so because of my knowledge of Butch,

25          you know, previous to Three Points Center, I have

1              personal experience that I knew Butch could

2              accomplish those things in spite of not being a

3              mentor for us.

4    Q     You mentioned train --

5    A     Craig, I mean to say.  I'm sorry.

6    Q     You mentioned training that Butch underwent.  Is

7              that training the type of training -- you're his

8              father-in-law -- kind of like father and son

9              training, or did Mr. Butcher have to sign various

10            HR forms indicating that he had been trained on

11            different things?

12   A     When Craig Butcher was working so-called on the

13            clock for Three Points Center or Three Points

14            Center North Carolina, he was treated as an

15            employee and would receive the same training,

16            have the same expectations as any employee would.

17   Q     Okay.  And I think that some of the training

18            stuff might be from specifics from Mrs. Palmer.

19   A     Yeah.

20   Q     Okay.

21                MR. DAVIS:  What time do you guys want to

22            do lunch?  12:30?

23                MR CHANG:  12:30 would be nice.

24                MR. DAVIS:  Let's do it now, because

25            that's -- I think that's a break.  That's a clear

1          break, and then get organized again.

2                    THE COURT REPORTER:  Okay.  We're off at

3          12:20.

4                    (FORTY-MINUTE RECESS)

5                    THE COURT REPORTER:  We're back on at

6          1:00.

7     Q    (By Mr. Davis.)  Good afternoon, Mr. Palmer.  I

8          believe where we left we were talking a little

9          bit about Mr. Butcher, who's no longer with the

10         company.  Was he terminated from Three Points?

11    A    No.

12    Q    Why did he leave Three Points?  Or, why did he --

13         well, when did he leave Three Points?

14    A    Three Points Center North Carolina?

15    Q    How about this.  What was the last facility

16         location where Mr. Butcher worked before he moved

17         on to his new role?

18    A    Yeah.  Three Points Center.

19    Q    In Utah?

20    A    Yeah.

21    Q    Okay.  Why did he leave?

22                   MR. CHANG:  I'm going to object just

23         because the employment of Craig Butcher at TPC

24         Utah is not a topic of examination.  But if you

25         know the answer to this question, go ahead.

```
1    A    He wanted to work in private practice.

2    Q    Okay.

3    A    And so he went to work for an existing private

4         practice in St. George, Utah.

5    Q    When he was the group living director at Three

6         Points Center in Siler City, who did he report

7         to?

8    A    In -- for Three Points Center North Carolina?

9    Q    Uh-huh.

10   A    Yeah.  He would directly report to me.

11   Q    Okay.  When he was the group living director at

12        Three Points North Carolina, did Craig Butcher

13        have the unilateral authority to hire new youth

14        mentors and supervisors?

15   A    Yes.

16   Q    Okay.  Let me use an Indeed posting as kind of

17        the backdrop.  Somebody applies.  They go through

18        the interview process.  Even if he had the

19        authority to hire, did he still -- did he run any

20        hiring decisions above to his superiors at Three

21        Points North Carolina?

22   A    I don't know if I could, you know, speak for him

23        on that.  But I know generally he wouldn't

24        consult with me on hiring different mentors.

25   Q    Okay.
```

1    A      He had the ability to make those decisions.

2    Q      That was around a little bit, but sticking with

3           Mr. Butcher, do you remember the questions about

4           the lessons learned at Cross Creek Manor,

5           employee respect?  Do you remember that part of

6           the testimony?

7    A      Yes.

8    Q      Based on your working with Mr. Butcher,

9           acknowledging he's your son-in-law, are there --

10          were there many time where you felt like he

11          wasn't adhering to those principles of respect

12          that you wanted to be upheld?

13   A      Craig Butcher was very respectful to the

14          employees and actually erred on the side of, you

15          know, not writing them up when he could have

16          according to company policy in his effort to, you

17          know, build a team in North Carolina.  So he

18          would err on the side of, you know, really being

19          patient and treating people great instead of

20          making specific written write-ups when he

21          probably should have.

22   Q      So when you say he probably should have, is your

23          assessment of his performance as group director

24          that he consistently applied Three Points Center

25          -- Three Point Center's policies at the facility,

1          or inconsistently?

2      A   Oh, no.  He --

3                  MR. CHANG:  Objection to form just

4          because you said Three Points Center.  Go ahead.

5      A   At Three Points Center North Carolina, Butch

6          understood very clearly what we were trying to

7          accomplish there, that we were building a team,

8          and very consistently created the culture that I

9          wanted on -- related to employee respect, and did

10         that very consistently.

11     Q   I asked what documents you reviewed previously.

12         Did you review any audio recordings that were

13         produced during discovery in this case?

14     A   Yes.

15     Q   What audio recordings did you review?

16     A   I reviewed the audio recording where the

17         Plaintiff recorded portions of a group therapy

18         session.  Along with portions of her conversation

19         with a student.  And then the same recording has

20         -- records portions or -- I don't know how much

21         of the conversation, but part of a conversation

22         with -- were -- that I'm pretty sure is Dr.

23         Laurine LeBlanc.

24     Q   Okay.  Did you review -- that group therapy

25         session that you're talking about, is that the

1          session from April 5th?  Do -- are you --

2     A    Yes.

3     Q    Do you have the dates down so we can kind of

4          progress?

5     A    Yeah, yeah.

6     Q    Did you review -- or did you listen to an audio

7          recording called Glovers Grove Church Road

8          April 6?

9     A    I have -- I've listened to portions of that.  I

10         have not listened to that from the beginning to

11         the end.

12    Q    Okay.  And so what I want to -- here and it may

13         be -- that recording is 32 minutes -- or 34

14         minutes long and it's been introduced into

15         evidence already and was completely listened to.

16    A    Yeah.

17    Q    And I would not have pulled it up, but for the

18         line of questioning related to respect and Mr.

19         Butcher.  So would you be -- or if you listened

20         to it, is that Mr. Butcher's voice speaking to

21         Tyliya Nelson on the April 6 recording?

22    A    Yeah.  I know that Craig Butcher's voice is on

23         that recording.

24    Q    If I played you a segment of that recording,

25         knowing that you could ask me to go back and

1          forth, would you feel comfortable with me asking

2          a question about that segment in the interest of

3          time, for you getting back to the facility today?

4     A    Yes.

5               MR. CHANG:  Oh, I'm going to object

6          because it's a continuous conversation.

7               THE WITNESS:  Oh, okay.

8               MR. DAVIS:  But --

9               MR. CHANG:  You've got to play the whole

10         thing.  We've been through this.

11              MR. DAVIS:  You -- Jimmy --

12              MR. CHANG:  You're asking right now --

13              MR. DAVIS:  -- this needs to be on the

14         record.  You can object.  I'm not playing the

15         whole thing because you have had -- the whole

16         time this rule of completeness is being used to

17         add time to this little clock.

18              MR. CHANG:  Okay.

19              MR. DAVIS:  That's what's happening, and

20         I'm not going to play the conver --

21              MR. CHANG:  Okay.

22              MR. DAVIS:  I'm going to play something

23         that's -- I want to play it.

24              MR. CHANG:  Okay.

25              MR. DAVIS:  And if you have an objection

Thane Palmer

1      to why we need to go back and forth -- but you
2      said you want to get back.
3   A  Well, with the counsel from my attorney, I'm
4      going to -- I would follow his guidance on that.
5   Q  I understand that.
6             MR. CHANG:  Well, the rule of
7      completeness, Mr. Davis, that you're threatening
8      me with, he says he reviewed it, but you can't
9      ask a question -- you can't ask a question about
10     a 30-minute -- a segment of a 30-minute audio and
11     expect my client to commit it to memory.
12            MR. DAVIS:  I'm not.  I know.  And I'm
13     going to play it, and then we'll ask questions.
14     You can say like you have before, "Garrett, I
15     don't understand that.  What's this about?"  But
16     there are --
17            MR. CHANG:  Especially because you said
18     "I'm going to ask a question about respect,"
19     which is a --
20            MR. DAVIS:  Well, it's -- let me -- let's
21     do it this way.
22   Q  Do you -- Mr. Palmer, do you believe that I have
23     listened to that recording several times by now?
24     Do you have any reason --
25   A  I'm -- I would make the assumption that you

Thane Palmer

1              wouldn't -- being a good attorney as you are,

2              that you wouldn't present something into evidence

3              that you haven't reviewed in completeness.

4      Q      If I -- if I said to you that during this

5              recording that I believe that Mr. Butcher did not

6              -- was not exhibiting the principles of respect

7              that you alluded to, in that he put down another

8              employee in front of Tyliya Nelson, would you

9              want to listen to that segment to have a chance

10             to react to that?

11     A      Well, the way you stated your question was would

12             I go on your point of view on how one of my

13             employees was treated.  So that wouldn't make

14             sense to me to answer that question.

15     Q      Let's start from -- we can at least get like five

16             minute -- let's start from the beginning because

17             that's -- that makes sense.  But we don't need --

18             I don't think we need to go to 30.

19                  MR. CHANG:  Okay.  Well, what you said,

20             Garrett, kind of goes to the point that the whole

21             context is necessary because you're taking one

22             sound bite.  It's like, "Hey, isn't Mr. Butcher

23             being disrespectful?"  It's, like, let's listen

24             to the whole conversation to understand why he

25             would, in this sound bite, seem like he was doing

1          that.  Maybe there's more to it than just this

2          five minutes.

3     Q    I don't -- I don't disagree.  But I may have to

4          start hustling, Mr. Palmer, if that -- or I --

5          going quickly.

6     A    Yes.  But --

7     Q    Do you see -- all right.  Well, let's go.

8     A    Yeah.  Let's play it.

9     Q    Here we go.

10              MR. CHANG:  Okay.  Let's play it.  Shhh.

11         Sorry.  I didn't mean to shoosh.

12              MR. DAVIS:  That's all right.

13              MR. CHANG:  Not you.  My client.  Yeah.

14         Both of you.  I'm sorry.

15                  (AUDIO PLAYS)

16    A    To be honest with you --

17    Q    I'm going to pause it.  Is it loud enough?

18    A    Well, we may want to go off the record so I can

19         -- I need to ask my attorney a question.

20    Q    I don't think we can do that.  And Jimmy follows

21         the rule pretty good.  I'll allow it on this one.

22    A    Oh.

23    Q    Off the --

24    A    I don't have a problem saying this.

25              MR. CHANG:  Yeah, go ahead.

```
1    A       I have hearing issues, where when there's
2            background noise in anything like this, I have
3            difficulty hearing all that.
4                    MR. CHANG:  You can always sit a little
5            bit closer for this one.  I think it gets --
6                    THE WITNESS:  Well --
7                    MR. CHANG:  -- a little bit clearer when
8            they --
9                    THE WITNESS:  Getting closer isn't
10           necessary -- it's the background noise.  And I
11           sincerely apologize for that, but that's reality.
12   Q       Give me a minute to opine -- please give me a
13           minute to opine about the materiality of the
14           point that I wanted to make --
15   A       Okay.
16   Q       -- in light of that.  Okay?
17                   MR. CHANG:  Are we on the record?
18                   THE COURT REPORTER:  Yeah.  We didn't go
19           off.
20                   MR. CHANG:  No, I didn't want to go off.
21           I was just curious.  Do you know if -- does the
22           quality get better if we play it a little longer?
23           I remember -- I vaguely remember it getting a
24           little bit better, but --
25                   MR. DAVIS:  I've also got a Bluetooth
```

```
1              speaker I can run it through, but I just -- I
2              think that --
3    A         And I sincerely apologize, Garrett, because I --
4              when there's background noise, I really have a
5              hard time making out the words.  And so I --
6              yeah.
7    Q         I think this is actually -- we're going to just
8              pull back for some reason.  There's -- when we're
9              at seven hours and I feel like we need to come
10             back.
11   A         And I apologize.  I --
12   Q         All right.  I'm going to retool.  Okay.  All
13             right.
14                  MR. DAVIS:  We're still on?
15                  THE COURT REPORTER:  Yes, sir.
16   Q         Okay.  Okay.  What is your understanding of
17             policies at Three Points that would require an
18             employee to repair or to replace company
19             property?
20   A         Well, there's broad policies there.  It's
21             understood in the policies that employees are not
22             to use or take, eat, anything like that, any kind
23             of property that they haven't been authorized
24             directly to use or eat.
25   Q         Are those policies at your -- is it all right if
```

Thane Palmer

```
 1          I call it your comp -- are those policies

 2          consistent between the two Three Points

 3          locations?

 4                  MR. CHANG:  Objection.  Policies at

 5          TPC --

 6                  MR. DAVIS:  Okay.  I'm not --

 7                  MR. CHANG:  -- is not a topic of

 8          examination.

 9                  MR. DAVIS:  But one second.

10                  MR. CHANG:  But if -- to your first

11          point, if it's clear that when you say your

12          company, you're talking about TPCNC, I'm sure

13          that's not objectionable.

14                  MR. DAVIS:  Yeah.

15                  MR. CHANG:  Yeah.

16     Q    Okay.  What are some -- can you give me an

17          example of when an employee has to come out of

18          pocket to replace company property for -- based

19          on one of those policy violations?

20     A    Yes.  If an employee took a -- one of the radios

21          home, and lost it at home, they -- we would

22          expect them to replace it.

23     Q    If an employee whose regular job duties did not

24          include the preparation of meals for the

25          students, prepared an item of food that Mr.
```

Thane Palmer

```
 1              Butcher said was not authorized, do you believe
 2              it's fair or unfair to make a youth mentor go to
 3              Food Lion and buy food for the company?
 4                   MR. CHANG:  Objection to form, but go
 5              ahead and answer if you can.
 6     A        Well, and I -- you know, it -- this is kind of --
 7              part of this is part of my frustration with a lot
 8              of your questions, Garrett.  Respectfully,
 9              they're so broad that there are so many questions
10              that you ask in one question that makes it
11              difficult to --
12     Q        Are you aware that -- let me hand you Exhibit 45.
13              (PLAINTIFF'S DEPOSITION EXHIBIT NO. 45
14                   MARKED FOR IDENTIFICATION)
15     A        I -- I'll tell you what I'm aware of related to
16              this incident.
17     Q        The breakfast incident.  Can we call it the
18              breakfast incident?
19     A        We can call it the breakfast incident.
20     Q        Okay.
21     A        "T," because -- I'll call her T because that's
22              what I knew her by, and that's what, you know,
23              she went by there with everybody.  T and another
24              staff, it might have been two or three -- I don't
25              know exactly -- wanted to make their own
```

1    breakfast from the food that -- it was company

2    food.  And without authorization, they took food

3    that was not authorized for them to have, and

4    made themself a breakfast and ate that breakfast.

5    And actually created a bigger problem with

6    students because the meals that we provide for

7    the students are the same meals that, out of the

8    goodness of our heart, we provide for the youth

9    mentors who are responsible for direct

10   supervision.

11           The food we provide, it's very

12   specifically expressed to the staff that we

13   provide food that the mentors that are assigned

14   to a group can eat for breakfast, lunch, and

15   dinner.  And that they -- the food they can have

16   is the food that the company, the same -- what

17   the company provides for the students.

18           Those staff made food that was different

19   than what was provided to the students.  They

20   made that known to the students.  The students

21   know what the rules are.  And the students

22   actually were very upset that the staff were

23   sitting there eating what the students viewed as

24   better food, and it caused a problem with the

25   students.

1    Q    So is it your testimony that -- the 30(b)(6)
2         testimony of Three Points Center North Carolina
3         is that the breakfast incident -- is that Tyliya
4         and the other staff member prepared the food that
5         was for the students, and that's what they ate?
6    A    No.
7    Q    And then --
8    A    That --
9    Q    -- they made their own different breakfast?
10   A    No.  That -- that's --
11   Q    Well, your answer was long.  That's why -- all
12        right.
13   A    Well --
14   Q    Okay.
15   A    And -- but that's --
16   Q    I'm going to write --
17   A    -- that's part of the problem because, like I
18        said, you ask these really broad questions.
19   Q    I'm showing you Exhibit 45 and asking you to --
20   A    Yes.
21   Q    -- react to that.
22   A    Yes.
23   Q    What happened --
24             MR. CHANG:  Objection.  Thane, finish
25        your answer.

1    A       And so you -- your question was very broad.  And

2            so to really answer the question, I have to give

3            a lot of detail.

4                    So our cook at the time would have -- who

5            was not there on the weekends typically, would

6            have basic meals prepared on the weekends for

7            breakfast.  That was usually a continental-style

8            breakfast that would be cold cereal.  Oftentimes,

9            would involve hard-boiled eggs.  The things that

10           the staff could, for the most part, pull out of

11           the fridge and put out for the students.

12                   T and the other staff in that situation

13           didn't want that breakfast for whatever reason,

14           and they took it upon themself to cook other

15           items that had not already been set aside

16           specific for the student and staff breakfast.

17   Q       Okay.  Understood.  So my understanding based on

18           that story is that on the weekends --

19   A       Well --

20   Q       -- on the week --

21   A       But --

22   Q       I need to ask the question.

23   A       Okay.  But don't --

24   Q       I get to ask the question.

25   A       Okay, but don't --

1    Q        I get to ask.

2    A        You mischaracterize some of --

3    Q        I haven't even characterized anything yet.

4    A        You called what I said a story.  What I said was

5             the truth.

6    Q        Oh, okay.  Okay.  Gosh.  All right.  I -- okay.

7             I understand that.  Your testimony.

8    A        Thank you.

9    Q        My apologies.  All right.

10   A        And I --

11   Q        Your -- I'm fine with that.

12   A        Okay.  I understand.

13   Q        I understand how --

14   A        I --

15   Q        -- and I'm just -- I'm working and --

16   A        But I've never once raised my voice at you today

17            and you've done it a couple of times, and I don't

18            quite understand that.  So --

19   Q        I know you don't understand it, but it's because

20            I want to ask the question, and that's why.

21   A        Yeah.  But I --

22   Q        Well, I'm going down.

23   A        -- haven't raised my voice at you today, so --

24   Q        Okay.  Based on your testimony, my understanding

25            is that on the weekend, it's just eggs, nothing

```
 1              fancy.  Is that a fair characterization of your
 2              testimony about --
 3      A       No.
 4      Q       -- the nutrition?
 5      A       No.
 6      Q       Okay.
 7      A       That's not a fair characterization.
 8      Q       When are sausage and waffles made?  During the
 9              week?
10      A       That very well could be a meal.  That would be
11              prepared when the cook is there working.  That
12              would be a meal that we would prepare on another
13              day.
14      Q       Okay.
15      A       But I want to -- just to characterize, remember,
16              I said a continental-style type breakfast.  That
17              would oftentimes be cold cereal.  That would be
18              cereal and milk.  Oftentimes it would be
19              hard-boiled eggs and other items that the mentor
20              staff could put out for the kids.  And so to say
21              just eggs, that is not accurate.
22      Q       Okay.
23      A       That they would also be given juice.
24      Q       All right.  As of January 31st, how long had the
25              students been at the facility?
```

1      A      January 31st?

2      Q      31st, 2022.

3      A      The first students arrived on January 4th of

4             2022, so however many days that that is, that

5             would -- but I don't know the exact days.

6      Q      Okay. The -- do you see at the top where it says

7             -- where Mr. Butcher says "Buck approved eggs

8             over the weekend, but a lot more stock was used"?

9      A      Yeah.

10     Q      When he wrote "Buck approved eggs," is there like

11            a menu, kind of like a school cafeteria menu, or

12            is it just whatever Buck says?

13     A      What happened for the weekends, Buck would write

14            down the meals. We have a whiteboard that was on

15            -- we have a commercial fridge. Buck would write

16            down the meals that he had prepared for the

17            different weekend meals.

18                 And so he would have Saturday breakfast

19            or Sunday breakfast and he would list cold

20            cereal, eggs, hard-boiled eggs, and he would --

21            you know, juice. He would have it listed, so

22            that it would be specified, so when the staff --

23            and it usually would have been the supervisor --

24            would have went into the kitchen, saw what was on

25            the list, and put that food out for the students.

1    Q    Okay.

2    A    So when Butch said, "Buck approved eggs," that

3         would be very consistent, because oftentimes as

4         part of the continental breakfast, it would use

5         -- it would be hard-boiled eggs that were already

6         cooked that could be put out for the students and

7         the staff, the mentor staff that were supervising

8         that group.

9    Q    And so the eggs were -- the eggs that were

10        approved were hard-boiled eggs and not like the

11        powdered eggs from, like, cafeterias.  Those --

12        was that what the eggs that would have been

13        approved were?

14   A    Well, we don't even serve powdered eggs, first of

15        all.  And -- but for that meal, I couldn't say

16        100 percent.  I would say generally speaking,

17        because it didn't require any cooking by anybody,

18        that would generally be hard-boiled eggs that

19        were part of the continental-style-type

20        breakfast.

21   Q    Why is -- why do you not have a cook that works

22        on the weekend?

23   A    The reason for that is, at that time, we had

24        eight students, and we spend already -- probably

25        70 percent of our gross income goes to our labor

1           cost.  And so we have to do things where we can

2           save labor where we can, to make sure that we can

3           have the money to pay for having sufficient and

4           more than sufficient staff who are responsible

5           for direct supervision of the students.

6      Q    How does making somebody who gets paid 12 dollars

7           and 50 cents an hour pay half -- you know, a not

8           insignificant percentage of their day's wages,

9           how does that create the type of culture that you

10          alluded to when we were talking about the Cross

11          Creek Manor lessons?

12              MR. CHANG:  Objection to form.  He has

13          never said that anyone made anybody pay anything.

14     Q    Do you see the part where -- let's look -- the

15          top part of Butch's message where he writes, "And

16          who is going to replace them?"  Do you believe

17          that Mr. Butcher is suggesting that they need to

18          go buy them when he says replace them, or that --

19          some other outcome?

20     A    What I would say, knowing Butch, that he's not

21          saying, "Go out and do that."  He's saying, you

22          know, send -- telling them, "You guys took food

23          that you were not authorized to take."  It's no

24          different than stealing.  No different than if

25          they took a radio and sold it to their friend.

1          That that was Three Points Center North Carolina
2          property that they took without authorization and
3          used it to where, after they used it, it was
4          gone.  It was in their stomach.  It wasn't
5          available for me on a later date to use to feed
6          my students.  So that -- their act cost me money.
7     Q    So is it your testimony that T's and the other
8          employees' act of making sausage and waffles was
9          an act of employee theft?
10    A    No.  I said it could have been considered that.
11    Q    What was it --
12    A    So -- so they --
13    Q    What was it considered?
14    A    It was considered kind of more of an irritant
15         that staff wouldn't understand the obvious, that
16         they shouldn't take something that's not theirs.
17    Q    Okay.
18    A    Which I think is -- is a respectful way to treat
19         anybody.  Nobody was -- no -- I mean, to verify
20         what I'm saying, nobody was written up for this.
21         Nobody asked them to or required that they
22         replace food in any way.  Butch was still trying
23         to make it clear to them, look, everybody, we
24         have the meals.  We -- you know, there's no law
25         that requires that I feed employees.

1          I care about my employees in such a way

2          that I want to feed them.  And to -- so that I

3          can align that with the -- so things don't cost

4          me too much, and so it doesn't cause problems

5          with the students that they're eating with.  The

6          food we provide to our good staff, because I care

7          about them, is the meals that we provide the

8          students, which are very, very good, healthy

9          meals.

10    Q    So the -- is it your testimony that the policy

11         that Three Points North Carolina has adopted that

12         permits youth staff to share in the meals with

13         students is -- you said it wasn't legally

14         required.  Fair?  Correct?

15    A    There's nothing that -- there's nothing, no

16         moral, ethical law or rule, legal rule that

17         requires me to feed my staff.

18    Q    How long are their shifts?  The youth mentor

19         shifts at the facility?

20    A    They are 12 hours.

21    Q    Sometimes can't they go longer?

22    A    Sometimes, yeah.

23    Q    Are you say -- are you suggesting that in the

24         event that a shift goes longer that you have no

25         moral or ethical responsibility to feed the

1           employees that are looking after the students --

2    A     No.

3    Q     -- that your income comes from?

4    A     I feel --

5           MR. CHANG:  Objection to form.  Go ahead.

6    A     I feel a very clear moral obligation to treat my

7           staff respectfully, and to show them I care about

8           them.  That's why I feed the mentor staff three

9           meals a day.  If I just wanted to be a jerk about

10          it, I could tell them to bring their own food in,

11          and put it in the fridge that I actually provide

12          for them and they could eat their own food.

13          Because I care about my employees, I feed them.

14          Staff that have direct responsibility over

15          supervising kids, I feed them really good food.

16          And staff, if they don't like a meal for

17          whatever reason, they know ahead of time that

18          they can bring in their food and put it in the

19          fridge in the space that I provide, and be able

20          to access that food so that there is no reason,

21          based on the food that I provide them and the

22          facilities I provide them, for them to go hungry

23          in any way.

24          I actually provide staff snacks

25          throughout the day, too.  The same that I provide

1           the students.

2    Q      At Cross Creek Manor were the youth mentors also

3           allowed to eat the food for the students?

4    A      I don't remember.  That's been years ago.

5    Q      What about Liahona Academy?

6    A      I don't remember.

7    Q      Okay.  At Three Points Center North Carolina, how

8           many employees have you terminated since the

9           facility opened?

10   A      Yeah.  I'd have to take a minute to think about

11          this.  I haven't directly terminated any

12          employee.  The employees that I would -- well,

13          no, actually, I need to take that back.  Sarah,

14          our first academic director -- I don't remember

15          her last name.  I'm sorry -- we did have to --

16          and she answered directly to me.

17                 I did have to make a decision to

18          terminate her employment because she had a

19          history of not showing up to work.  And along

20          with not showing up at the last minute, was

21          oftentimes late.  And so I ended up having to

22          terminate her employment.

23   Q      Okay.  She's the academic director.  I would

24          assume that she was not an hourly employee.  Was

25          she hourly or salary?

1    A    No, she was not an hourly employee, but there

2          were specified hours that I needed her to work

3          because we have our academic schedule.  And so

4          she, being the one that supervised that, had --

5          needed to be there during the academic hours of

6          9:00 to 5:00.

7    Q    Okay.  Did -- my understanding is that at some

8          point as the Siler City facility became

9          operational, a fingerprint time clock was

10         installed in one of the buildings.

11    A    Yes.

12    Q    Did the academic director have to clock in?

13    A    Yeah.  What we have, even our salaried employees,

14         like -- which could be teachers, for example,

15         academic director, therapists, we have everybody

16         clock in.

17    Q    Okay.  Besides Sarah, any -- can you think of any

18         other terminations that you have made the

19         decision to terminate?

20    A    Not that I directly would have made the decision.

21    Q    For Sarah's termination, did you terminate her,

22         or did you ask another employee to terminate her?

23    A    I did it.  I had -- I don't remember who else

24         would -- was in the room, but our policy, when

25         you have those conversations, you have somebody

 1            else there.  I don't remember who that was.

 2      Q    Okay.

 3      A    And I let her know that because she was

 4           consistently -- would call at the last minute

 5           saying she couldn't make it for whatever reason,

 6           and oftentimes would be late to where I was

 7           looking around for people because she -- along

 8           with being the academic director, she -- at those

 9           times, early on, she would have had to teach some

10           classes.  And she oftentimes was not there.

11      Q    Okay.  So, I mean, when you say that she was not

12           there, it wasn't -- not there the whole -- it was

13           no-shows, not late.  It was a pattern of

14           no-shows.

15                MR. CHANG:  Objection to form.

16      A    It would be a pattern of lates and a pattern of

17           no-shows, both.

18      Q    For employees that have been terminated from

19           Three Points, even if you -- that's the only one

20           you terminated, Sarah.

21      A    Uh-huh.

22      Q    After they are terminated, do your subordinates

23           make you aware of a termination?

24                MR. CHANG:  Objection to form.  Three

25           Points Center North Carolina?

1    Q    Uh-huh.

2    A    Oftentimes that would be the case, but not in

3         every case.  Yeah.

4    Q    Okay.  So there's the time before Mr. Butcher

5         left the employ of Three Points Center North

6         Carolina facility -- actually, let's do -- let's

7         do this one.  Okay.  This is 46, and it was

8         Butcher 33.

9         (PLAINTIFF'S DEPOSITION EXHIBIT NO. 46

10             MARKED FOR IDENTIFICATION)

11   Q    I'll represent that this document was produced in

12        response to request for production number 3, I

13        believe, which asked for a list of all employees

14        terminated.  What your attorneys provided, I

15        believe, is just the list of terminated youth

16        mentors.  Okay?  So Sarah's name is not on here.

17        That's why.  So even though she was terminated

18        from Three Points at some point --and maybe she

19        was terminated after April -- after Tyliya was,

20        but I believe that's what this list is.

21   A    Yeah.

22   Q    Okay.

23   A    And there also could be a good reason why she's

24        not on there.  Because I may -- well, I actually

25        know I had the conversation with her of the fact

1                    that she would have the -- you know, we --
2                    because of the problems that I had been talking
3                    with her about since she was employed with us, we
4                    were going to have to go in a different
5                    direction, but I would give her the opportunity
6                    to -- you know, to resign or be terminated.  And
7                    so if there's a reason for her not being on here,
8                    she likely would have chosen to resign her
9                    position.  So that wouldn't be on here.
10       Q    And I don't want to mischaracterize this, even
11                   though this is a list and --
12       A    Yeah.
13       Q    -- the exact reasons of all these terminations --
14       A    Right.
15       Q    -- some of them may appear that people did quit,
16                   also --
17       A    Yeah.
18       Q    -- versus a --
19       A    Yeah.
20       Q    Ms. Nelson's April 6th termination was an
21                   involuntary termination.  Is that a fair
22                   statement?
23       A    No.  I don't think that's a fair statement,
24                   because I didn't sit on her to -- you know, to
25                   make her quit.  I gave her the options.  You

1           know, Sarah, we've had these numerous times --

2      Q    I'm sorry.  You're -- I said Ms. Nelson, and I'm

3           going to go ahead because -- it's all right.

4      A    Because we were talking about Sarah.

5      Q    I know we were.  Yes.

6      A    Yeah.

7      Q    He said sit on it and I was like I know --

8           because I know you -- that Mr. Butcher previously

9           -- I said Ms. Nelson.

10     A    Oh.

11     Q    And I meant -- I'm going to start saying

12          Plaintiff.  That'll be easier because I know you

13          have a lot of names.

14     A    Okay.

15     Q    Plaintiff's name is on this list.  I'll just draw

16          your attention to it, and then we can move on to

17          the questions I had.  Starting from the bottom

18          where it says Darrius Petty, if you go up to

19          Tyliya Nelson.

20     A    Yes.

21     Q    Right.  And then the reason that -- whoever

22          filled this form out, which is part of your

23          wife's designation, I'm just noting that it says,

24          "excessive tardiness."

25     A    Yeah.

Thane Palmer

1    Q    Which is similar to your critique of Sarah, the
2         academic director.  Well, when -- it's my
3         understanding that the youth mentor job does have
4         some turnover based on Dr. Thibault's deposition.
5         Is that a fair statement?
6    A    Yeah.  We -- that is an entry-level position with
7         our company.  And if you look across the industry
8         and any different, you know, companies, or you
9         know, any type of company, entry-level positions
10        typically have a higher turnover percentage than
11        other positions for a lot of obvious reasons,
12        which I can go into.
13   Q    I'll ask -- but specific to your business in
14        Siler City --
15   A    Yeah.
16   Q    -- what are the reasons for high turnover in this
17        -- in the job of youth mentor?
18   A    Well, I can't speak to specific employees.  I can
19        give you some general reasons.
20   Q    Uh-huh.  General reasons, please.
21   A    Some -- for some people, it's their very first
22        job and they don't understand that in the
23        workplace there's expectations.  For example,
24        coming to work on time, at your scheduled time.
25        You know, coming to work when you're scheduled to

1          come to work.  Not taking things from the company

2          that are not yours.  There's expectations that

3          many of them, I think, don't quite understand.

4               And so the -- when they are expected to

5          work, you know, three days one week, four days

6          the next, that cuts into their -- you know, their

7          own time or whatever.  And so they -- they're not

8          counting for that, and so they quit.  Some people

9          work for a little bit and realize that this type

10         of work isn't what they really want to do.  And

11         so, you know, they're like, "You know, this isn't

12         my thing, so I'm going to go find something that

13         is my thing."

14              Some might find that the difficulties of

15         working with our specific population don't work

16         for them, and so they would move on to a

17         different position.  Many of them would have life

18         changes where their, you know, spouse may be

19         given another job or something like that and the

20         family had to move, which would mean that they

21         would have to leave.  There might be people who

22         their car breaks down; you know, that they have

23         some individual life circumstances where they're

24         not able to get to work and would, you know, quit

25         or terminate their employment with us.

1    Q    So January 1st, 2022, the girls had moved into

2         the Three Points Siler City facility.

3    A    No.

4              MR. CHANG:  Objection to form.

5              MR. DAVIS:  Okay.

6              MR. CHANG:  You said 2002.

7    Q    2022.

8    A    January 1st, 2022, students had not moved in.

9    Q    They had not moved in.  Ballpark, when did they

10        move in?

11   A    The first students arrived on January 4th of

12        2022.

13   Q    Okay.  January 4th.  So between January 4th and

14        now, almost two years later, how many youth

15        mentors that were there at that time, to your

16        knowledge, are still working for -- at the Three

17        Points Center North Carolina facility?

18             MR. CHANG:  I'm just going to object that

19        if this is a topic of examination, it's not for

20        Thane, but Thane if -- or Mr. Palmer.  But Mr.

21        Palmer if you -- based on your understanding, if

22        you know, you can answer.

23   A    So just so -- to make sure I understand the

24        question, it's how many employees worked for us

25        in January of 2022 that still work for us?

1    Q     Let me -- you know, it's a tough job, but

2           somebody likes it and they can work their way up,

3           like a company man or a company woman.

4    A     Yeah.

5    Q     That's what I'm asking for.

6    A     All right.  And I couldn't give you an exact

7           number.  I can think of three employees off the

8           top of my head that --

9    Q     Okay.

10    A     -- worked for us in January of 2022 that still

11           work for us.

12    Q     In the hourly youth mentor role?

13    A     Well, some of them have moved to different

14           positions.

15    Q     Moved up?  Is that -- that's what I'm -- I mean

16           --

17    A     Or lateral.

18    Q     Or lateral.  What would be a lateral position to

19           the youth mentor role?

20    A     One of those employees would be one named Alison

21           and she started out as a youth mentor.  And now

22           she's moved to doing what's called a

23           neuro-feedback tech and she works in the nursing

24           station.

25    Q     Okay.  And I'm not going to ask specifics about

1           Ms. Nelson's termination because Ms. Palmer's
2           been designated, but just to pin down dates for
3           us.  Can you see what the -- do you see what the
4           date is for the termination date for Tyliya
5           Nelson?
6      A    Which one?  Where's the date?  Is it this one?
7      Q    There you go.  Uh-huh.
8      A    April 6th, 2022.
9      Q    Did Mr. Butcher communicate with you prior to Ms.
10          Nelson's termination, about the termination?
11     A    Not specific about the termination, but over the
12          months that T was working for us, he had
13          expressed his concerns to me about her being late
14          and some days not showing up.  And so I was aware
15          of the concerns that we had with T since her
16          employment with us.
17     Q    How much interaction did you have with Ms. Nelson
18          during the four-plus months that she was with --
19          that she worked for you?
20     A    I would -- when she was supervising a group of
21          students, I oftentimes would have to interact
22          with the students, and so I would have
23          interaction with T or other staff during those
24          times.  I would have -- you know, I would have
25          other just brief, more kind of friendly, you

1           know, private conversations with T.  I didn't --

2           oh, I would also do -- did a lot of training with

3           T.  I spent a lot of time with T and other

4           employees doing a lot of training from, you know,

5           her first day of employment to -- up until when

6           she was terminated.

7      Q    Acknowledging the first thing you said was that

8           Mr. Butcher expressed concerns about being late,

9           that part, but the interpersonal interactions

10          with Ms. Nelson, what -- what's your opinion --

11     A    Well --

12     Q    -- of her as a person and employee?

13     A    Yeah.  Yeah.  I'm actually glad you asked because

14          --

15               MR. CHANG:  Objection to form.  Also,

16          just to put a break so that you can let Mr. Davis

17          finish his answer -- or his question.  I thought

18          you were going to start answering.

19     A    Oh, I'm sorry.  Yeah.  Go ahead.

20     Q    In term -- you -- and I -- this is --

21               MR. CHANG:  And I apologize.  If you

22          heard his question, please answer it.

23     Q    And it's all right.  But I mean, the reason I'm

24          asking a follow-up instead of taking the break

25          and moving on to the next thing is that you said

1    that you did spend time with her, training.  So

2    you had some one-on-one C & T with the girls.

3  A    Yeah.  Yeah.

4  Q    How did you feel about her with the girls --

5    students?

6  A    Well, I -- I can't say I had good or bad

7    feelings.  You know, positive or negative about

8    it, because I didn't have enough time of -- you

9    know, like I wasn't sitting there observing her

10    all day with a group.  But since I've listened to

11    her recording that you provided, my opinion of

12    her work actually has shifted.

13        On that recording, she directly calls a

14    student a bitch, which would be very directly

15    against company policy.  And in a conversation

16    with a student, she says that she would want to

17    kick my ass.  And so calling a student a bitch, I

18    find to be offensive and that's not something

19    that would happen.

20        And, you know, T may have been upset at

21    me and, you know, said to herself or even another

22    staff, you know, "Man, sometimes I'd like to kick

23    Thane's ass."  You know, I would have zero issue

24    with that.  But making that statement in the

25    presence of students would be blatantly

1          unacceptable.  And if I knew about those things

2          when they happened, she would have been directly

3          terminated for those things.

4     Q   So your testimony is -- are you referring to the

5          April 5th audio recording?

6     A   I'm referring to the April 5th audio when she

7          recorded part of a -- a small part of a group

8          therapy session, and then continued that

9          recording with a conversation with a student in

10         which during that conversation you can hear T

11         refer to another student as a bitch.  And you can

12         hear T talking with the student that threatened

13         to kick my ass during the group therapy session,

14         T engaging in that conversation with that

15         student, and telling that student, "Yeah, I'd

16         like to kick Thane's ass."

17              So my view of T's work dramatically

18         shifted from not having enough information to

19         having clear information that I -- if I would

20         have had it at the time, she would have been

21         terminated for one of those acts.

22    Q   But that audio recording where T expressed those

23         feelings that changed your view of her, that

24         audio recording did occur after you said the N

25         word during that meeting.  Correct?

```
 1                    MR. CHANG:  Objection to form.
 2      A     In -- well, in what you referred to as that
 3            meeting, that was a group therapy session that I
 4            was having with all of the students in which I
 5            was informing the students -- and this is going
 6            to require a lot of background, so I -- I'm glad
 7            you brought it up.
 8      Q     This is what I was planning on.  I'm going to
 9            hand -- I'm going to --
10                    MR. CHANG:  Well, I think you should let
11            him finish.
12      Q     I know.  But I want to hand -- the meeting notes.
13            How much background because I was -- sorry.
14      A     Well, there -- there's a lot that went into my
15            decision to call the meeting in the first place.
16            There's a lot that goes into the reasons why I
17            was very direct during the meeting.  And there's
18            a lot that goes into things that went on after
19            that meeting that are related to that meeting
20            that I think need to be on the record.
21      Q     Would you mind if we put all that on the record
22            in like two minutes?  And I'm going to hand over
23            --
24      A     I -- I'm just being straight with you.
25      Q     No, I know.
```

```
1      A      It's --

2      Q      And I wasn't trying to interrupt.  It's more just

3             like a --

4      A      To fully explain that meeting, that -- you know,

5             T made an unauthorized -- according to company

6             policy, an unauthorized recording of students.

7             That, I think, is a big part of T's -- what T

8             thinks is her case, and I would like to give a

9             full detailed explanation to that.

10                  MR. DAVIS:  And I will be back shortly.

11                  MR. CHANG:  Oh, we're off the record?

12                  MR. DAVIS:  Yeah, just for a minute.

13                  (FOUR-MINUTE RECESS)

14                  (1:54 P.M. - 1:58 P.M.)

15     Q      (By Mr. Davis.)  Hello again, Mr. Palmer.  I

16            handed you 47, but I'd like -- can you find this

17            one?  The one that's in the coils?  Is that the

18            complaint?  So maybe put 47 next to the first --

19            keep that out, and then just turn --

20                  MR. DAVIS:  Jimmy, can you get him turned

21            to the complaint, the first page?

22                  MR. CHANG:  Yes, sir.

23                  MR. DAVIS:  It's that way.

24                  MR. CHANG:  Gotcha.  Yeah.

25                  MR. DAVIS:  Just the first page.
```

1                MR. CHANG:  Oh my God.

2                MR. DAVIS:  Oh, you can -- for his, you

3        can tear the 30(b)(6) out.  That way you have the

4        complaint right in the front.

5                MR. CHANG:  We're going to tab -- you've

6        got to fold this --

7                MR. DAVIS:  There you go.

8                MR. CHANG:  -- Mr. Palmer.

9    Q     Okay.  So, Mr. Palmer, I've handed you Exhibit 37

10        (sic), which I'll just -- that's the group note

11        from April 5th, 2022, 3:31.

12                THE COURT REPORTER:  Is that 47, Garrett?

13                MR. DAVIS:  Oh, yeah.  Uh-huh.

14                THE COURT REPORTER:  You said 37.  I was

15        --

16                MR. DAVIS:  Oh, 47, yes.

17                THE COURT REPORTER:  Okay.

18       (PLAINTIFF'S DEPOSITION EXHIBIT NO. 47

19         MARKED FOR IDENTIFICATION)

20    Q     And I've also asked you to refer to the

21        complaint, which we're not going to enter as an

22        exhibit, but it contains -- let me give a legal

23        description of what a complaint is.  It is the

24        plaintiff's allegations of what happened that you

25        indicated before the break that you want to be

1              able to provide your explanation of.  Fair?

2     A      Yes.

3     Q      Correct?  So I'm going to just go to the last

4              sentence on page one of the complaint where --

5              which I wrote for -- on behalf of Plaintiff.  It

6              says on April 5th, 2022, he -- so that he is

7              referring to you, Defendant Thane Palmer -- said

8              that word during a staff meeting, understanding

9              the staff meeting/group therapy session, tabling

10            that.  Okay?

11    A      Well, because it wasn't a staff meeting.  That

12            needs to be --

13    Q      But --

14    A      That needs to be stated clearly.  It was a group

15            therapy session.

16    Q      Well, again, what is your position on what that

17            meeting was?

18    A      It was a group therapy session.

19    Q      Okay.  And at that group therapy session, who --

20            using the map, where was -- actually, can you

21            find the map, too?

22    A      Sure.

23    Q      Can you put an indication, whatever you want to

24            do, indicate where the session was.

25    A      Yeah.  The group therapy session was in the

| | | |
|---|---|---|
| 1 | | upstairs of a dorm building that there is a large |
| 2 | | room that is right here in that building.  You go |
| 3 | | up the stairs and there's a large room there that |
| 4 | | we would use for group therapy, regularly. |
| 5 | Q | Okay. |
| 6 | A | Still do. |
| 7 | Q | All right.  And at this time, how many -- was it |
| 8 | | for the entire student population? |
| 9 | A | I requested and -- well, I didn't need to say it, |
| 10 | | but I requested that all students be there.  At |
| 11 | | that time we had eight students.  I do believe |
| 12 | | there was one student out of those eight that was |
| 13 | | on a doctor run or something like that, and |
| 14 | | didn't come until the end of the meeting.  So |
| 15 | | there was about seven or eight students there. |
| 16 | Q | So at this time there were only eight students? |
| 17 | A | Yes. |
| 18 | Q | And now, about how many students are there at the |
| 19 | | facility? |
| 20 | A | Twenty-six. |
| 21 | Q | Twenty-six.  When -- let's use Exhibit 47. |
| 22 | A | Okay. |
| 23 | Q | Okay.  This is a group -- this is a document |
| 24 | | titled "Group Note."  And the provider is Laurine |
| 25 | | White, and I think that is Laurine LeBlanc-White. |

1          But --

2     A    Yes.

3     Q    What is her educational -- if you remember -- her

4          credential, or therapy credential?

5     A    She had a master's degree and was a licensed

6          therapist in the state of North Carolina.

7     Q    Does this group note printout from April 5th --

8          does it come from the web software called

9          BestNotes that you use?

10    A    This would have been printed off from BestNotes.

11    Q    Okay.

12    A    And so a therapist, when they -- when a group

13         therapy session has been conducted, they are

14         required to write a -- what's called a progress

15         note in this -- for group therapy, this would be

16         a group therapy progress note that the therapist

17         is responsible to make sure is written for every

18         session that they are part of.

19    Q    All right.  So since this is -- this is in -- is

20         it fair to say that based on your understanding

21         of the complaint and what this case -- the

22         allegations in this lawsuit, that April 5th was

23         one of the main dates?

24              MR. CHANG:  Objection to form.  Go ahead

25         if you understand.

1    A    Yes.

2    Q    And that's just more of my preface.  We're going

3         to go through this methodically, Mr. Palmer.

4    A    Okay.

5    Q    Okay?

6    A    Yeah.

7    Q    That's why I'm just -- all right.  So it says the

8         date for the group note is April 5th, 2022, 3:31.

9         What -- but I see the stop time of the group is

10        3:40.  Where would Ms. -- where would Ms. White

11        have been able to enter this information into

12        BestNotes on -- at the facility?

13   A    On any -- any computer, device.  It would have to

14        be something that is a Windows device.

15   Q    Were there -- how many -- were there public term

16        -- not public, but for employees, terminal-type

17        computers that were just out, or is it just kind

18        of, like, shared laptops, just like sitting

19        around the office area?

20   A    Well, that's another one of those general

21        questions, Garrett.

22   Q    I'm sorry.

23   A    But I'll do my best to answer.

24   Q    How about let me -- I'm going to get specific.

25   A    Yeah.

1   Q      In -- in the dorm, was there a terminal?

2   A      No.

3   Q      Okay.  All right.

4   A      I wouldn't say there was a terminal.

5   Q      Okay.

6   A      But Dr. Laurine LeBlanc would have a

7          company-provided computer in her office where she

8          would -- that's where she would do most of her

9          notes.

10  Q      She had an office?

11  A      Yeah.

12  Q      How many therapists were at -- employed by -- or

13         how many therapists were working at the Three

14         Points Center North Carolina facility on this

15         day?

16  A      Two therapists.

17  Q      Okay.  Dr. White and who else?

18  A      Doc -- or not doctor.

19  Q      Oh, sorry.

20  A      Karen Storm.

21  Q      Karen Storm.  White and Storm.  Do you --

22  A      And I -- I'm glad you -- this helps me clarify

23         something.  I actually gave you incorrect

24         information about Dr. White.  She has a Ph.D.

25         She also has a master's degree in a

1          therapy-related field.  And so she had a Ph.D. in

2          a related field.  But most important for, you

3          know, me as the program director, she's a

4          licensed therapist in the State of North Carolina

5          and has the, you know, legal and recognized

6          qualifications to perform therapy.

7    Q     Okay.  Was she leading the April 5th group, as

8          you referred to, therapy session?

9    A     No.

10   Q     Okay.  Did you -- do you enter -- who was leading

11         it?

12   A     I was.

13   Q     Okay.  When you -- well, let's -- for group

14         therapy sessions, are you always the leader or --

15   A     No.

16   Q     So then -- all right.  So it's -- but it has to

17         be a therapist.

18   A     It has to be a therapist.

19   Q     Okay.  What was the reason that you led this

20         group session?

21   A     Yeah.  At this time that we're referring to, I

22         was both the program director and the clinical

23         director.  And for a week or so previous to this

24         date, we had students that were having verbal

25         arguments and situations that even started to get

1          physical between students.  Where the students

2          were arguing on -- about using the N word.  The

3          black students were saying that they could use

4          the N word.  I'm assuming you know what the N

5          word I'm referring to is, or --

6     Q    Yes.

7     A    I don't like to say the word, so -- the black

8          students were trying to tell me and other

9          students and the therapists that they should be

10         able to use the N word amongst them, but no one

11         else can use it.  And that would cause conflicts

12         because I would have other students that would

13         say, "I spent time in the hood," and that --

14         that's their language and not mine -- and because

15         of that, "I would have," in their words, "The

16         street cred to use the N word."

17              And that was causing very aggressive

18         verbal arguments and threats of physical violence

19         to each other to the degree that I knew as the

20         program director and the clinical director that I

21         needed to make that -- make sure that that

22         situation was addressed.  Hence, why Dr. White

23         wrote that the group discussed issues that they

24         felt they had in the facility.  It was being very

25         disruptive in the facility, and I knew that I

1                   needed to get everybody together in a group

2                   therapy setting and not only make the policy for

3                   students very clear, but also work with the

4                   students to get the severe arguing and the

5                   threats of violence figured out.

6     Q     So is it your testimony that the reason that you

7                   convened this particular -- you convened and led

8                   this particular session is because the black

9                   students of the eight total students were saying

10                  -- were using the N word out loud?

11                MR. CHANG:  Objection to form.  That is

12                  absolutely not what he said.  He said a lot.

13     Q     He said -- but -- did you overhear a student say

14                   the N word?

15     A     I have overheard students say that to each other.

16                   I've overheard them calling staff members that

17                   name.

18     Q     Which -- and I know the identification of

19                   students, you know, is a -- is its own thing.

20                   But when did this racial tension begin to emerge

21                   at Three -- at the facility?

22                MR. CHANG:  Objection to form.

23     A     I couldn't say a specific time.  That's an issue

24                   that comes up, you know, periodically, at

25                   different times.  At this particular time around,

1            you know, first part of April, it had -- that
2            particular problem had really become significant
3            to a degree that I had to do something different
4            than what I typically would have done of, you
5            know, having a therapist address the problem; me
6            talking to a specific student privately or
7            something.  It became such a widespread problem
8            in the facility amongst the students that I
9            needed to get to -- directly to the bottom of the
10           problem.
11     Q     And we'll get -- do you see how there's
12           redactions on this page?
13     A     Uh-huh.
14     Q     Where -- what I mean by that is there's text that
15           was written by Ms. White -- now, Dr. White --
16           that has a black bar across it.
17     A     Yeah.
18     Q     Why --
19                MR. DAVIS:  And Jimmy, they got cut off
20           at the bottom.  The attorney's-eyes only.
21     Q     I'll represent that your attorneys have also
22           designated this as attorney's-eyes only, which
23           means I have not shared this with anyone else.
24           Why am I not allowed to see what the diagnosis
25           was from this event?

1          MR. CHANG:  Objection to form.  Go ahead
2      and try to answer.  But I also note that there's
3      actually two group notes that are one exhibit.
4   A   Which one?  What the other one we're looking at?
5   Q   Yeah.  Well, that's good, Jimmy.  There is one
6      from -- there is one that is from Dr. White, and
7      then there is another one entered.  It looks like
8      it's commonly -- I want to know who actually did
9      it, but it says K. Storm, T. Palmer, and L.
10     LeBlanc.  You know, right now, I'm looking at the
11     one that's just Dr. White.
12  A   So Karen Storm would have written the second note
13     for the same session because both Dr. White and
14     Karen had students on their specific caseload
15     that were in that same group at the time.  And so
16     both of them would have written a group therapy
17     note.
18          Dr. LeBlanc's -- Dr. White's note is, I
19     would say, very minimal in her description of the
20     session.  Karen's note was more -- was more
21     descriptive, and she did something correctly
22     where she did it in a way that would -- added me
23     on to the note where I would have been able to
24     also sign it because I was there.
25          THE COURT REPORTER:  Garrett, do you want

1          me to add 48?  Jimmy separated them.

2                    MR. DAVIS:  That's fine.  Uh-huh.  Yeah.

3                    THE COURT REPORTER:  Can you just say

4          what that is on the record?

5    Q    Exhibit 48 is the second group therapy note that

6          Mr. Palmer testified was written by Karen Storm.

7          It's five pages long.  All right.

8          (PLAINTIFF'S DEPOSITION EXHIBIT NO. 48

9             MARKED FOR IDENTIFICATION)

10                   MR. DAVIS:  And that -- I'm glad we did

11         that.  Thank you, Jimmy.

12   Q    All right.  So let's look at Exhibit 40 -- the

13         front pages of Exhibit 47 and 48, Mr. Palmer, if

14         you don't mind.

15   A    Yes.

16   Q    One thing I noticed a difference is Karen's note

17         said the -- that the session lasted 180 minutes,

18         and Ms. White wrote 90 minutes.  How long was the

19         session?

20   A    I don't remember exactly.  It -- that group --

21         that particular group therapy session was longer

22         than a typical group therapy session.  I do know

23         that for sure.  A typical group therapy session

24         would be what they call a therapy hour, which

25         would be 50 minutes.  That's the standard amount

1          of time in the profession that a group -- you

2          know, a therapy session would last.  They call it

3          a therapy hour, which is 45 to 50 minutes.

4                  And so that particular session did go a

5          long time because it was very intense.  There was

6          a lot of issues that we had to address that took

7          a long time to get to the point that I felt like

8          we could end.

9     Q    Okay.  Back to the -- trying to ask you the right

10         question for the specific behavior -- yeah.  What

11         specific behavior did you observe from the

12         students that led you to convene the April 5th

13         group?

14    A    Students -- there was numerous verbal arguments

15         between students about this issue, and threats of

16         violence to each other.  And there were instances

17         where the staff even had to physically get in

18         between students to make sure that there was no

19         -- any actual physical altercations.

20    Q    Okay.  It's my understanding that even youth

21         mentors are -- a part of their duties is to

22         document, you know, incidents of -- significant

23         incidents that are not therapeutic, in BestNotes.

24         Is that correct?

25    A    There are specific incidents that youth mentors

1          are required to document.  Yes.

2     Q    The incidents which led you to convene this group

3          session are -- is there any documentation of

4          those, let's say, predicate incidents before you

5          convened the group?

6     A    Not that I'm aware of, and those things

7          necessarily would not have reached the threshold

8          where -- because the threshold would be, like,

9          actual physical violence.  That would be what we

10         would call an unusual incident report.  That

11         would have been a required documentation.  But it

12         -- an argument between students, you know, for us

13         happens on a regular basis.  If staff had to

14         document that, all they would be doing is

15         documenting.

16    Q    Understood.  And so was it reported to you, or

17         did you observe some of these preceding incidents

18         before the April 5th session?

19    A    It was reported to me by staff and supervisors.

20         I also observed it.  I also had students come to

21         me privately either telling me that they would

22         appreciate it if nobody would, you know, use the

23         N word around them, and students that talked to

24         me privately, convincing me that the black

25         students should be able to use that word among

1          themselves.

2     Q    And so is it -- with those kind of comments from

3          your student population, you made the decision to

4          convene this group.  Was this -- was two o'clock

5          a regularly scheduled group time?

6     A    Two --

7               MR. CHANG:  Objection to form.  That

8          first statement you said, he actually gave

9          several reasons why he convened, and you only

10         said one.

11              MR. DAVIS:  Okay.

12              MR. CHANG:  But go ahead.

13    A    Two o'clock on weekdays is the usual scheduled

14         time for group therapy.

15    Q    Let's -- we'll come back.  For a group therapy

16         where you're not leading it, let's -- imagine

17         Karen's leading one and it doesn't have these

18         background facts.  Are the youth mentors and

19         supervisors present during the group therapy?

20    A    The youth mentors that are assigned to a specific

21         group would oftentimes be present there.  They're

22         -- at least one of the mentors because we'll have

23         two youth mentors with a group at all times.  At

24         least one of those is required to be there.

25         Oftentimes they'll switch where, you know, one

1               can go get a drink or something like that --

2       Q       Okay.

3       A       -- during that time.  But oftentimes, you know,

4               the youth mentors -- both youth mentors assigned

5               to a group would be present.

6       Q       All right.  Now, for the group -- April 5th

7               group, how many people -- how many employees --

8               well, were all the youth mentors present for

9               this?

10      A       I couldn't say that a hundred percent.  I do know

11              from the information I've gotten since then that

12              T was returning from taking a student to a

13              doctor, so I know there was at least one student

14              that was in the program that was not in

15              attendance.

16      Q       At the -- at least at the beginning.

17      A       At the beginning --

18      Q       Okay.

19      A       -- of that session.  Yes.

20      Q       One more, I guess, kind of like -- since it's

21              regularly scheduled, did your employees know what

22              the main topic of the April 5th group was going

23              to be?

24      A       I couldn't speak directly to each employee.  I do

25              know that I made it clear to the therapist

 1              because myself and the therapist had previous

 2              discussions about this problem and the need to

 3              address it.  The supervisors, you know, had

 4              spoken with me about the need to have it

 5              addressed.  And so I -- it very well could have

 6              been that the youth mentors knew very well what

 7              we were getting together for.

 8       Q     Right.  And I'm getting a little bit more -- what

 9              I should have asked, because you don't know, is,

10              like, did you send out some sort of written

11              communication and --

12       A     No.

13       Q     -- I don't think the answer -- but now, just to

14              kind of -- to picture the clinical setting that

15              exists there, is that you're around, there's

16              therapists around.  And you communicate like

17              you're on a -- like a floor, like a -- I don't --

18              at a mental health facility.  You -- verbally.

19                    MR. CHANG:  Objection to form.  Go ahead

20              if you understand.

21       A     There would be a lot of communication like that,

22              yes.

23       Q     Did you communicate with any of the therapists

24              for clinical reasons using your personal cell

25              phone?

1    A    Yes.

2    Q    Okay.  So to just -- kind of just picture --

3         going back to two o'clock.  Do you believe that

4         Karen's estimate of 180 minutes was about how

5         long it lasted, the group?

6    A    Oh, I wouldn't be able to say for sure.  I do

7         know in a general sense that Dr. -- I had to

8         correct Dr. White numerous times on either not

9         keeping correct -- you know, effective clinical

10        records, or not even completing clinical records.

11        And on average -- I mean records on average,

12        Karen Storm was much more effective at completing

13        notes on time and completing accurate notes.

14             But as far as the specific time, the

15        amount of time that we had that session, I

16        couldn't speak any -- a hundred percent on that.

17   Q    More than an hour for sure.

18   A    For sure more than an hour.  Yeah.

19   Q    When did you say the N word?

20   A    I don't recall.  It was a very, very intense

21        situation with kids, with a lot of moving parts.

22        I don't remember when I said the word.

23   Q    And I've done this a few times but it's always

24        you -- you know, when -- understand you don't

25        remember the time.  How would you -- when you

1        start group therapy, which you contend this is,

2        is there like a standard way to do -- like best

3        practices?  Like that's what I'm -- I want to

4        take you back to this so we can figure out kind

5        of the sequence of things.  How do you start it?

6    A   Well, that's another one of the broad questions,

7        but I'll go into it.  There's a lot of different

8        things that you would do to start a group therapy

9        that you could consider best practices.  One of

10       those may be you come in with a fairly

11       open-ended question to students.  "What would you

12       like to work on today?"  You go around the room.

13       Students would bring up different ideas that they

14       have.  They might bring up a problem in their

15       group.  You know, different things.

16             And then from there the therapist would

17       make decisions on where the focus would go.  You

18       then make determinations on what they would call

19       the content issue of focus, and then how are you

20       going to use the content issues to get to a --

21       what they would call a process issue.

22             You also might start a group therapy

23       session where you would say, "Today everybody,

24       because this is going on, this is the issue that

25       we're going to talk about."  And me or another

1             therapist would take a very directive approach to

2             specifically state where -- what the topic of the

3             day was going to be.

4                  And so there's a lot of different ways

5             that would fit within best practices to -- for a

6             therapist to begin a therapy session.

7    Q     With acknowledgement to you, Mr. Palmer, that

8             this was a more -- on the more intense side of

9             things, and you can't remember the -- when you

10            said the N word.  Knowing the reasons you -- but

11            you testified that you remembered the reasons

12            that you convened it.

13   A     Yeah.

14   Q     So my question is, now, how would you start the

15            session with the same type of underlying issues?

16            Like what would you -- if the girls were here and

17            the employees were here, how would you start it?

18   A     Well, if -- are you asking me -- do you --

19   Q     I'll -- remember, you told me -- you testified

20            that the students came to you and said we don't

21            like people saying the N word, but the black

22            students should be allowed to say it, and you

23            convened this session to kind of --

24   A     Yeah.

25             MR. CHANG:  Objection to form again --

1          MR. DAVIS:  Right.

2          MR. CHANG:  -- because he's stated a lot

3     of reasons why this meeting was called.

4          MR. DAVIS:  I know.  But it's on the --

5     it's on there.  He said it and it's always there

6     and you'll be able to find it again.

7     A    So --

8     Q    I'm asking with that background, if it was

9          just -- go back to the dorm.  How would you start

10         it?  Would you immediately say the N word, or

11         would you do something else first?

12    A    So let me state what I think is your question.

13         "Thane, how did you start that group therapy

14         session?"  Is that your question?

15    Q    Yeah.

16    A    Okay.  I started that group -- that day, that

17         group therapy session in a very directive way,

18         and told the students that we were going to --

19         going to specifically discuss the expectations

20         related to the use of the N word on the campus of

21         Three Points Center North Carolina.

22    Q    Okay.  The use of the N word by the students?

23    A    Staff and students.

24    Q    Were there reports that you were aware of at the

25         time that staff were using racial slurs?

1    A    I have heard in passing, student -- staff
2         referring to each other with that verbiage.  Yes.
3    Q    Okay.  And so when you say staff referring to
4         each other, do you mean black staff calling each
5         other the N word --
6    A    Yes.
7    Q    -- or do you mean -- okay.
8    A    Yes.
9    Q    And with the students using the word, were there
10        --
11   A    And I heard students calling staff the N word,
12        also.
13   Q    The students that called staff the N word, were
14        those students white or black?
15   A    Those students that I'm remembering off my head
16        would have been black students.
17   Q    Okay.  So --
18   A    But -- but let me clarify that.  With our
19        population that we work with, our students,
20        the -- which is the adopted adolescent
21        population, they have extreme, what they call,
22        developmental trauma.  So they have a lot of
23        developmental delays such that when they go into
24        what they call a fight-or-flight state, all of
25        our students would say outrageous, disrespectful

1          things, including a white student calling a staff

2          the N word, whether it's a white staff or a black

3          staff or Hispanic staff; that they would threaten

4          to -- you know, threaten to kill people, threaten

5          to blow up the world, threaten -- you know,

6          threaten things.

7     Q    So it's possible that there was some -- well,

8          there were only eight students at the time,

9          correct?

10    A    Well, when I talked about eight students before,

11         we were talking about January.  We had a few --

12         and I don't remember the exact number.  By April,

13         by that time, we had a few more students than

14         eight.

15    Q    Okay.  And how you -- well, I believe your

16         testimony, how you started the session was -- it

17         speaks for itself, but was -- to set expectations

18         about the use of the N word at Three Points Siler

19         City.

20    A    And I stated very clearly in the beginning to the

21         students, and the staff were there to hear it,

22         also, the -- that the policy at Three Points

23         Center North Carolina is the N word will not be

24         used on this campus.  When I made that directive,

25         there were some of the students who very

Thane Palmer

1          aggressively pushed back on my expectation, and
2          there was a lot of yelling.  There was even one
3          student that threatened to physically harm me if
4          I didn't allow it.
5              I also had in -- amongst the students,
6          that there would be students that would have had
7          what they would call high-functioning autism that
8          do not -- they don't understand, you know,
9          language like most people.  And as that
10         conversation progressed, I knew I was going to
11         have to state very clearly what the expectation
12         was that we are not going to use the N word.  And
13         I said the N word to make it very clear to
14         everybody so the students with developmental
15         delays and so forth -- so everybody would
16         understand very clearly what the policy was.
17    Q    But the policy you were announcing was a policy
18         for the students?  Correct?  And the employees?
19    A    It was for everybody.
20    Q    Everybody.  So it's your testimony that this was
21         a group therapy?
22    A    It was a group therapy session.
23    Q    But in -- based on what I'm hearing, Mr. Palmer,
24         in the context of this "group therapy session,"
25         that I'm putting in quotes, you also announced a

Pace Reporting Service, Inc.  919-859-0000     www.pacereporting.com

1          policy, which perhaps you should -- maybe

2          shouldn't have to, but you did to make it clear.

3     A    Yeah.  Well, it was not a new policy.

4     Q    Right.

5     A    It wasn't new to the students, and it wasn't new

6          to the staff.  And so it -- it would be more

7          accurate to say that it was a clarification of

8          the existing policy that actually goes -- you

9          know, goes back to --

10    Q    Which one are you looking for?

11    A    -- to this exhibit of that there is no

12         discrimination related to race, color, religion,

13         sex, national origin.  And our policy of not

14         using the N word is related to our general policy

15         that we are going to be respectful of everybody,

16         of any racial background, any religious

17         background, age.

18              And the reason for that is -- one of the

19         reasons, not all of them -- but one of the

20         reasons for that is our clientele comes from many

21         different religious backgrounds, many different

22         racial backgrounds.  And our policy is that we

23         are respectful to other people, other people's

24         backgrounds, and religious, political, racial

25         backgrounds, ethnic backgrounds.

1    Q    Hypothetical question.  Let's assume the student

2         population changed.  You've got new students in.

3         New employees in.  And the same facts that

4         happened which led you to have the April 5th

5         group and say what you did occurred.  Would you

6         change your approach today and not say the N word

7         out loud in front of employees?

8              MR. CHANG:  Objection to form.  Go ahead

9         and answer if you know.

10   A    That -- I mean, I actually wouldn't be able to

11        say, because in any kind of group therapy

12        session, especially with our population, there is

13        a lot of moving parts specific to individual

14        students, specific to dynamics between students

15        in a group, dynamics between the students and the

16        therapist, dynamics between the therapist and the

17        staff -- that you have to make instant decisions

18        on in the moment.  So I couldn't say.

19   Q    Fair.  Do you believe it's possible that there

20        could be a conflict between what you believe is

21        in your best judgment from a clinical

22        perspective, and what might be best to contribute

23        to, you know, workplace culture for the

24        employees?

25             MR. CHANG:  Objection to form.

1    A      And I -- I'm not sure I exactly understand the

2           question, but I'll actually elaborate on this.

3    Q      I -- let me -- my understanding based on our --

4           your testimony about the group is that the

5           predominant reason that you said the full N word

6           out loud was because of the students.  Correct?

7    A      I wanted to make our policy -- expectation,

8           that'd be more accurate when it relates to the

9           students -- the expectation at Three Points

10          Center North Carolina is that we were not going

11          to use that word.  And me, understanding very

12          clearly the clientele that was in that room, kids

13          with extreme developmental delays, kids with

14          high-functioning autism, that in that particular

15          instance with how the conversation -- how the

16          conversations were going before we even had the

17          group and how the conversation was going on

18          during the group, that I needed to be very, very

19          clear.

20                  And I would also say, I personally am

21          very, very uncomfortable using that word to the

22          degree that even after that session, I met

23          individually with Dr. White and Karen Storm and I

24          specifically apologized to them that I had to use

25          that word in the context of that group therapy

1           session.  And both of them understood why I did

2           it.

3                   In fact -- and I actually was very

4           thankful to hear from -- in the recording, that

5           at the end of the April 5th recording when it's

6           Dr. LeBlanc and T, I actually was very thankful

7           to hear that Dr. LeBlanc actually clearly

8           understood what I was trying to accomplish in

9           that group, because she was explaining to T that

10          the need to make it clear to everybody that

11          nobody -- and Dr. LeBlanc is black, and she

12          understood clearly as -- and I know that by what

13          she was explaining to T -- that it had to be

14          explained to the students that nobody, even black

15          students, were not to use that word.  And I

16          actually was pretty thankful that Dr. LeBlanc,

17          you know, understood that from that meeting.

18                  And I don't remember the exact days but I

19          do know in the days after that, that I went --

20          went directly to staff members and made direct

21          apologies to them that they had to hear that word

22          come out of my mouth.  And I reiterated that

23          that's not a word that we're going to use, and

24          that they are -- were to be expected that we

25          don't use that word.

```
 1    Q     Before the April 5th session, had you ever said

 2          the full -- and that's how I'm going to say it --

 3          the full N word, N-I-G-G-E-R, out loud in public?

 4    A     No.

 5    Q     That was the first time you've ever said the N

 6          word out loud in public?

 7    A     Yes.

 8                MR. CHANG:  Objection to form just to the

 9          fact that's not -- it wasn't public.

10    Q     Well, I mean, public in terms of -- it was the

11          first time you said it out loud in front of your

12          workforce.

13    A     Yes.  And only time.

14    Q     And only time.  So it's fair to say this is the

15          first time that you ever said that word out loud,

16          that the events leading up to it from your

17          clinical perspective were something like you've

18          never seen before?

19                MR. CHANG:  Objection to form.

20    Q     Is it --

21    A     Do you want me to go into things I've seen

22          before?

23    Q     No.  No.  I don't actually --

24    A     I --

25    Q     I don't -- I terms of --
```

Case 1:23-cv-00527-WO-JGM    Document 39-3    Filed 07/23/24    Page 157 of 209

```
1    A      I've --

2    Q      -- Three Points Center North Carolina, the -- and

3           I want to say tension.  And Dr. Thibault

4           corrected, we don't like this word, we don't like

5           that.  But my assessment as a non-therapist is

6           that there was so much tension between these

7           girls related to -- and we'll go to Karen's note,

8           I think, next -- that it led you to have this

9           extremely long session, and then you said a word

10          that you testify that you've never said before

11          out loud.

12                  MR. CHANG:  Objection to form.

13   A      I testified very directly, I have not used that

14          word before at Three Points Center North

15          Carolina, and I have not used it since.

16   Q      I'm going to turn to 48, Exhibit 48.  That's

17          Karen's group note.  She's got more text.  And so

18          the group data, "Groups one and two joined

19          together again today."  The one and two -- were

20          there only two -- there were two groups of girls

21          at the time as --

22   A      Yes.

23   Q      Okay.  There wasn't a group three?

24   A      No.

25   Q      Were those groups racially mixed in terms of
```

1           their composition?

2       A   Yes.

3       Q   Okay.  It says, "Joined together with the

4           intention to allow all group members the

5           opportunity to address their concerns raised

6           yesterday with administration."  That kind of

7           connects the dots a little bit.  So it looks like

8           April 4th was when the -- are you administration?

9           Would you be considered administration?

10      A   I'm the program director.

11      Q   Okay.  And this -- all right.

12      A   And that would refer to the students that came to

13          me in the days previous to April 5th to -- and it

14          went two directions.  Black students talked to me

15          to try to tell me that it should be okay for them

16          to use the N word between themselves.  Other

17          students would come to me -- and there's a

18          particular student that is -- she was adopted

19          from Colombia.  She came to me privately and was

20          convincing me of all the reasons why she, in her

21          words, had the street cred and had spent enough

22          time in the hood that she should be allowed to

23          use that word along with the black students.

24              And it happened that she was one of the

25          students that staff had to step in the middle of

```
 1              with -- you know, with black students because
 2              they were -- there was almost a physical
 3              altercation between her and a black student where
 4              the student who was adopted from Colombia was
 5              trying to tell the black student that she could
 6              use the N word because she spent time in the hood
 7              and had the street cred to use the N word and --
 8         Q    Understood.
 9         A    And so --
10         Q    All right.  Okay.
11         A    And just for the record, too.  I think, you know,
12              Karen says, which I appreciate, "Expectations and
13              rules for self-expression on campus were
14              explained and discussed."  And that -- I
15              appreciate her saying that very explicitly
16              because that is what I was doing.
17         Q    Okay.  So the detail that you've just provided
18              me, obviously, that would take up more text, and
19              then people would be writing notes all the time.
20              But why did Karen's note not even talk about --
21              it's still very vague.  I mean, it's very
22              general.  Why does it not talk about the N word
23              in -- why does it not have the N word in it?
24                   MR. CHANG:  Objection to form to your
25              characterization of the notes.  Go ahead.
```

Thane Palmer

1    A      Well, I -- you're -- that's another very general

2           question, but I'll feel free to answer it.  When

3           a therapist is writing progress notes for

4           individual, family, or group therapy, generally

5           speaking, you would write things in a general

6           sense.  I often do it personally where I'll say

7           in the note we -- "I discussed with a student a

8           personal issue."  And I won't go into the

9           specifics oftentimes to -- as a way to maintain

10          confidentiality.  Because you don't -- when you

11          use insurance companies, you don't know who's --

12          who might read a note.

13                 And so I would specifically write my note

14          in my efforts to protect confidentiality.  Where

15          I wouldn't write something in a note that would

16          be embarrassing to a student.  For example, you

17          know, that there was a student in this meeting

18          that did physically threaten me, and move -- you

19          know, made what you could call furtive motions

20          toward me to physically attack me.  And I told

21          that student that she needed to back off and she

22          needed to get herself calmed down and have a --

23          you know, have a discussion.

24                 That particular student became, you know,

25          so agitated and extremely mad at me that she

Pace Reporting Service, Inc.  919-859-0000       www.pacereporting.com

Case 1:23-cv-00527-WO-JGM    Document 39-3    Filed 07/23/24    Page 161 of 209

1          blurted out to me -- her knowing that my wife,

2          Heidi, was a retired police officer, she blurted

3          out to me, "How many black people did your wife

4          kill when she was a police officer?"  The answer

5          to that is zero.

6                    The other answer to that is that Heidi

7          was a very good, respectful police officer and

8          that was an allegation that came out of left

9          field that I, as a therapist, had to deal with a

10         very personal attack and keep my wits about me

11         and maintain a group in spite of being very

12         personally attacked by a student.

13    Q    So -- thank you for that.  So it's fair to say

14         that in behavioral health and mental health, that

15         sometimes documentation that may be relevant to a

16         diagnosis may not include very specific details

17         as standard practice?

18    A    That would be standard practice.

19    Q    Okay.

20    A    Yes.

21    Q    Let's see.  We're about -- I'm thinking almost to

22         a switch, but I need to take a -- I mean, we

23         don't have to go off the record, but I'm just

24         going to -- uncomfortable silence maybe for a

25         minute.

1          MR. DAVIS:  And what are we at, record

2      time, Pete?

3          THE COURT REPORTER:  That was 49 there on

4      top of 181, so --

5          MR. DAVIS:  So we've got four hours.

6      That's about --

7          THE COURT REPORTER:  Two-hundred and

8      thirty.

9          MR. DAVIS:  Okay.

10         THE COURT REPORTER:  So, ten minutes

11     short of four hours.

12         MR. DAVIS:  All right.  I'm doing all

13     right.

14  Q     (By Mr. Davis.)  Okay.  Back to the -- I want to

15     -- I'm going to call it something.  Of course,

16     you can correct me.  Your clinical justification

17     for saying the full N word out loud is that your

18     population, the student population, some of them

19     might not be able to hear what your expectations

20     are if you didn't say the full N word out loud.

21     Fair?

22         MR. CHANG:  Objection to form.

23  A     There would be students when -- if I said we

24     can't say the N word, they could be thinking that

25     we're not going to say the word "no."

1    Q    Okay.

2    A    So there -- with our students who -- especially

3         the ones that would have, you know,

4         high-functioning autism type issues, and they --

5         those issues look very similar to the issues that

6         come from the developmental trauma issues that

7         our students have.  They tend to be delayed in

8         their cognitive development and their thinking is

9         very, very concrete.  And so similar to a

10        four- or a five-year-old.

11             And so you do need to be very direct in

12        your language.  You've got be careful in using

13        sarcasm or using words that have double meanings.

14        You have to speak very, very clearly to them so

15        that they understand.

16   Q    Of the students at that time -- it's rough

17        percentages here -- what percentage of them were

18        functioning at the same level as a four- or

19        five-year-old?

20   A    Well, that's one of those really general

21        questions because our students in some ways could

22        function and appear as, you know, a very well

23        adapted 14- or 15-year-old.  And then 15 minutes

24        later, would revert into behavior that

25        developmentally you would view as three- or four-

1          year-old behavior.  And so that could happen.

2                  You know, just, for example, you know,

3          the student that made those kind of personal

4          attacks toward me.  The far majority of the time,

5          she was a well-adjusted, wonderful young woman,

6          yet she was not getting what she wanted, and that

7          triggered her to go into a very angry state to

8          where she was like in a tantrum-type state.  And

9          so you have, you know, three- or four-year-old

10         tantrum-type behavior.

11                 The words that come out of their mouth

12         are going to be different oftentimes because

13         they'll -- you know, a kid that's 14 or 15, you

14         know, has had more experience in the world than a

15         three- or four-year-old.  But the behavior is

16         very three-, or four-, or five-year-old-ish.  The

17         words might be different.

18                 So, to answer your question, all of the

19         students in that room at any given time could

20         revert into, you know, three- to six-year-old

21         type behavior if we're looking at it from a

22         developmental point of view, not a chronological

23         point of view.  Which is a very common trait of

24         the adopted population that have suffered severe

25         developmental trauma issues.  Severe pre-birth,

```
 1              what they call pre-birth and post-birth

 2              developmental trauma.

 3    Q         During Dr. Thibault's deposition, he said

 4              something that stuck with me that I was reminded

 5              of.  He said we're not seeking compliance from

 6              our students.  So, first question is, are you and

 7              Dr. Thibault generally on the same page with

 8              regards to discipline, student discipline at your

 9              respective facilities?

10                   MR. CHANG:  Objection to form.  But go

11              ahead if you understand the question.

12    A         We -- the term discipline does not exist in our

13              model.

14    Q         Okay.

15    A         And --

16    Q         I -- okay.  I'm there -- safety is the goal.

17              Fair?  For the students.  The paramount goal?

18                   MR. CHANG:  Objection to form.

19    A         That -- once again, that's very broad, but I'll

20              answer.  One of the very important goals in our

21              model is physical and emotional safety.  And that

22              speaks directly to the severe pre- and post-birth

23              developmental trauma that our kids have.  And so

24              one of the first goals of treatment is we have to

25              help a student feel emotionally and physically
```

1    safe because that speaks to the core task that

2    has to occur when you're dealing with

3    developmental trauma issues, because you're

4    working to address a problem at a brain level.

5          And we're trying to increase connection

6    between the mid brain and the prefrontal cortex.

7    And in order for brain connections to strengthen,

8    the brain has to be in a state of safety.  And so

9    that's -- that safety is a critical element.  You

10   know, the physical and emotional safety are

11   critical elements in our model.

12  Q    Tying this up.  One -- during Dr. Thibault's

13       deposition, we had a conversation where the word

14       discipline was used, but I acknowledge you're

15       saying that's not in your model.  But we used the

16       word discipline.  And he gave me one example that

17       stuck with me with regards to runaways.

18             I said, "What do you do?"  He said, "We

19       don't try to get them to comply.  We take the

20       shoes."  Do you understand?  That is, take --

21       taking the shoes is something that has to be done

22       because these students have to be -- you have to

23       be literal with these -- do you know what --

24  A    Well, they're --

25  Q    I'm sorry.

1                    MR. CHANG:  Objection to form.

2        Q      I'm sorry.  But --

3        A      That would be done from --

4        Q      Can you tell me about taking the shoes and why

5               you do it?  That'll help.

6        A      Sure.  Oh, yeah.  Sure.  That would be -- and

7               this goes back to the safety issue.  And it also

8               goes back to why I say that we don't use the term

9               discipline.  Discipline refers to what, in the

10              profession, would be termed more a behavior

11              modification type program.  Where you use the

12              terms positive and negative reinforcement,

13              positive and negative punishments, to either

14              decrease negative behavior or increase positive

15              behavior.  And those are -- and those would be

16              the terms used in a discipline system.

17                     Our model goes -- is diametrically

18              opposed to what they would term the behavior

19              modification models, because we are working to

20              get at the deeper etiology of the problems.  Our

21              goal is not behavior compliance.  Our goal is, as

22              I've said, physical and emotional safety.  And

23              from there you can work on the goals of emotional

24              regulation.

25                     And so we don't use discipline in the

```
1              classic sense of that as far as the

2              positive/negative reinforcements,

3              positive/negative punishments.  We use

4              relationship as we need to correct behavior,

5              because our goal is to dampen -- what they would

6              call dampen the limbic system.  So the limbic

7              system where that flight-or-fight response is not

8              so active, to where kids are able to move into

9              their executive functioning.  I --

10    Q        No.  Thank you for that.  I was just --

11    A        Yeah.

12    Q        Sorry.  It took me a while to ask a question.

13             Now, if one of the students that you told not to

14             say the N word by saying the N word in full out

15             loud, if you heard him say it the next week,

16             what's the -- what's the action?  What's the

17             corrective action you would take to discourage

18             that behavior?

19    A        The staff would ask them to not say it again,

20             depending on -- and that's another one of those

21             broad questions and so --

22    Q        Would they have -- would they have to, in order

23             -- if the staff was to tell them not to say it

24             again, would you want your staff to say

25             N-I-G-G-E-R out loud each time one of the
```

1          students --

2     A    No.

3     Q    -- violated the expectations?

4     A    No.

5     Q    Why not?

6     A    For the obvious reasons that that word, very

7          understandably for a lot of reasons, it is

8          offensive.  And it's for -- and the exact reasons

9          why I took the time to explain to everybody in a

10         very direct way why we're not using that word.

11         And there -- there's a lot of interventions that

12         a therapist would do that would not be

13         appropriate for a youth mentor to do, because

14         they do not have that level of training to make

15         those kind of decisions.

16    Q    And would those therapists take -- do those

17         interventions apply in a non-group setting with a

18         student who still keeps saying the N word?

19    A    There -- the occasions to use the actual N word

20         would be incredibly rare.  And that's why I

21         personally have not used -- I hadn't used that

22         word before that time, and I haven't used it

23         since, because it is incredibly rare.

24    Q    All right.  We are going to switch gears.  I'm

25         just saying that.  Go back to this topic.

1          MR. DAVIS:  Jimmy, I guess it's probably

2     under 7, "The factual basis for Defendant's

3     contention that Defendants are not an 'integrated

4     enterprise' or 'a single employer.'

5          THE WITNESS:  Could I -- I need to take a

6     bathroom break if I could.

7          MR. DAVIS:  All right.

8          THE COURT REPORTER:  We're off at three

9     o'clock.

10         (FIVE-MINUTE RECESS)

11         THE COURT REPORTER:  We're on the record

12     at 3:05.

13    Q    Okay.  All right.  Let's see here.  Okay.  This

14         is 49.  It is not something we're going to go all

15         the way through, gentlemen.  But it is also Dr.

16         Thibault's Exhibit 16.

17    (PLAINTIFF'S DEPOSITION EXHIBIT NO. 49

18         MARKED FOR IDENTIFICATION)

19    Q    The first page of Exhibit 49, Mr. Palmer.  The

20         first page of this document says, "Lease

21         Agreement" and I'm just going to read it out for

22         the transcript.

23         "This Lease Agreement (the 'Lease') is

24         made effective as of the 15th Day of August,

25         2021, by and between Three Points Center North

1          Carolina, LLC, a Colorado limited liability

2          company (the 'Tenant'), and Three Points

3          Properties North Carolina, LLC, a Colorado

4          limited liability company (the 'Landlord')."

5               If you want to take a few minutes to look

6          through it, but I'll represent that this is the

7          recorded lease that is for the Three Points Siler

8          City facility.

9               MR. CHANG:  He's probably going to look

10         through it.

11    Q    You can -- and it's got 14 pages.  And I'll

12         represent that the last page appears to have your

13         signature on it.  So if I can draw your attention

14         to that.  I'm not going to ask too many questions

15         about this.

16    A    Yeah.  I'm getting there.  I just --

17    Q    Okay.

18    A    I just want to make sure -- yeah.  Okay.

19    Q    Okay.  Well, are you on the signature page, page

20         14?

21    A    That is my signature.

22    Q    Okay.  And did you -- you signed for Three Points

23         Properties North Carolina, LLC, correct?

24    A    Yes.

25    Q    And who signed for the tenant, Three Points

1              Center North Carolina, LLC?

2      A      That would be Norm Thibault.

3      Q      So the entity that Dr. Thibault signed for, that

4              is the entity which you are here as the corporate

5              -- one of the two corporate designees today,

6              correct?

7      A      Yes.

8      Q      Why did you sign for the Properties, LLC?

9      A      I am one of the members for Three Points

10             Properties North Carolina, and in that role can

11             sign this document.

12     Q      Do you remember earlier in the deposition with

13             the questions about the distinctness between

14             Three Points Center, LLC Utah and Three Points

15             Center North Carolina, LLC?  You remember those

16             questions?

17     A      Yep.

18     Q      One -- I believe one of the -- one of the items

19             of separateness that you identified was separate

20             bank accounts.  Do you remember that?

21     A      Yes.  We have separate bank accounts and separate

22             accounting.  Yes.

23     Q      Does Three Points Properties North Carolina, LLC,

24             have a bank account?

25                     MR. CHANG:  Objection to form because

1          they are not the witness.  But you can ask that
2          in a way that's from the Three Points Center
3          North Carolina perspective.  But go ahead and
4          answer if you know.
5     Q    Hold on.  Let -- I mean, I -- you are the
6          president of Three Points Center North Carolina,
7          LLC, correct?  I'm sorry, but we have to do this.
8     A    Yes.
9     Q    Okay.
10    A    Yeah.
11    Q    Does that entity pay rent to Three Points
12         Properties North Carolina, LLC?
13    A    Yes.
14    Q    How much rent do they pay?
15    A    I don't know the exact number off the top of my
16         head.
17    Q    Who does -- who makes those payments, or who's --
18         who is the employee or member of Three Points
19         North Carolina, LLC, that handles that payment?
20    A    That would either be Colby Dalley, our CFO, or --
21    Q    Okay.
22    A    -- LeAnne Hukill, who operates as a bookkeeper.
23    Q    Okay.  Do you own your own house?
24    A    No.
25    Q    No?

1    A    No.

2    Q    Have you ever owned your own dwelling, property?

3    A    Yes.

4    Q    Was it in Utah?

5    A    Utah and Washington State.

6    Q    Utah and Washington State.  What is the reason

7         that Three Points Center North Carolina, LLC,

8         doesn't own the land where the Siler City

9         facility is located?

10   A    I'm sorry.  Restate the question.

11   Q    Three Points Center North Carolina, LLC, is a

12        business that you run with others, correct?

13   A    Three --

14   Q    Points Center North Carolina.

15   A    Three Points Center North Carolina.

16   Q    Uh-huh.

17   A    Yes.

18   Q    Why doesn't that legal entity own the property

19        that it does business on?

20             MR. CHANG:  Objection to form, but go

21        ahead and answer if you understand.

22   A    From what I understand, Three Points Properties

23        North Carolina does own that property.

24   Q    No.  I'm -- do you see how -- see where it says

25        tenant, Three Points Center North Carolina, LLC?

1    A    Uh-huh.

2    Q    What is your understanding of what a tenant is?

3         Does a tenant own property or do they lease

4         property?

5    A    Three Points Center North Carolina leases the

6         property from Three Points Properties North

7         Carolina.

8    Q    And all -- all I'm asking is why would a

9         business, like the one you run, which receives

10        tuition payments, create another entity just to

11        pass through tuition payments?

12             MR. CHANG:  Objection to form.  That does

13        not say TPCNC created another entity.

14   A    And that would probably be more of a -- you know,

15        an attorney question.

16   Q    Okay.

17   A    That I don't -- you know, I don't know the answer

18        to.

19   Q    Understood.  All right.

20   A    I mean, I -- you know, I deal with this stuff.  I

21        also -- because my expertise is in helping the

22        adolescent population, I rely on experts in the

23        different professions to do those things.

24   Q    But the reason you signed it is because you are a

25        member of both of these -- of that LLC, also?

1    A      Yes.

2    Q      Okay.  Here we go.  Let's use this one because I

3            can just look at it.  All right.  Exhibit 50.

4         (PLAINTIFF'S DEPOSITION EXHIBIT NO. 50

5              MARKED FOR IDENTIFICATION)

6    A      Are we done with this for right now?

7    Q      Yes.  Just a quick question on this one.  You

8            know, it's a page from the handbook, but I'm not

9            going to ask a specific handbook question.  Do

10          you see how that is a letter from Glenn Thibault,

11          or it's signed by Glenn Thibault?

12              MR. CHANG:  Mr. Davis, will you just

13          identify --

14              MR. DAVIS:  Oh, yeah.  And --

15              MR. CHANG:  -- what page within the

16          employee handbook then?

17              MR. DAVIS:  Give me one second because

18          that got chopped off.

19              MR. CHANG:  And it would be helpful --

20          you could just say in the beginning, in the

21          middle, or at the end.

22              MR. DAVIS:  Yeah.  Okay.  Because I

23          thought some -- my other copy wasn't here.  And

24          I'll get to an e-version of it in a second.

25    Q      (By Mr. Davis.)  All right.  Here we go.  Okay.

1          So what I just handed you is actually Three

2          Points Bates stamped 64, and it is Thibault

3          Exhibit 27, your Exhibit 50.  At the first line,

4          it says, "Welcome to Three Points Center, LLC,"

5          and it is signed by Glenn Thibault, who says he

6          is the CEO of Three Points Center, LLC.  I

7          thought Dr. Thibault was the C-bow -- was -- I

8          thought Dr. Thibault -- strike C-bow.

9              I thought Dr. Thibault was the CEO of

10         these facilities?

11             MR. CHANG:  Mr. Davis, still my

12         objection.  I asked if you could identify for the

13         witness where this document occurs.  And I know

14         you don't have to agree with the characterization

15         of what a document is, but if it's --

16             MR. DAVIS:  Where it is in the hand --

17             MR. CHANG:  -- what -- you know, what

18         page it is within the -- or just say middle.

19             MR. DAVIS:  Oh, it says 1 on it, Jimmy,

20         at the -- it's just you can't see it on the

21         print.  It's the first page of whatever document

22         this came from.

23             MR. CHANG:  Okay.

24             MR. DAVIS:  It says 1.

25    A    It's still not clear which handbook this comes

1        from that was used with Three Points Center Utah,

2        or Three Points Center North Carolina.

3              MR. CHANG:  I'm going to object to this

4        topic of examination just because we designated

5        Heidi for the -- or, sorry, Ms. Palmer for the

6        handbook.

7              MR. DAVIS:  Okay.

8              MR. CHANG:  And she also helped produce

9        the documents.  And now that we've taken one page

10        out of the handbook to Mr. Palmer, I think he's

11        going to get -- he's going to have no idea what

12        we're talking about.

13              MR. DAVIS:  It's -- well, let me just --

14   Q    (By Mr. Davis.)  There is a document that was

15        produced in discovery in this case which -- where

16        Glenn Thibault holds him -- says that he is the

17        CEO of a Three Points entity.

18   A    Uh-huh.

19   Q    Why would he say that?

20   A    When --

21   Q    Why would he write that?

22   A    When we first opened up the first Three Points

23        Center, Glenn Thibault, Norm's older brother,

24        operated as the president/CEO of the company, and

25        the CFO.  And he handled the business side of

1          things, and Norm and I handled the program side

2          of it to build the program.  So there were in the

3          beginning, the first few years, and I don't

4          remember the exact dates -- the first few years

5          when we opened up the first facility and

6          business, Glenn did operate in those roles.

7     Q    Okay.  All right.  Dr. Thibault testified that

8          you have the final say-so -- you have the final

9          say at the Three Points Center North Carolina

10         facility.  And that's page ten of his deposition.

11         Quick question.  When he says final say -- I

12         believe we already asked that because the -- with

13         the money.  What do you think he means by final

14         say?

15              MR. CHANG:  Objection to form.  His

16         testimony is -- what about -- could we just read

17         it?

18              MR. DAVIS:  I'm going to read it.  It

19         says -- oh, here we go.  "What do you mean by" --

20         oh, here we go.  My apologies.  You're right,

21         Jimmy.

22    Q    I asked -- okay.  Actually, we'll do it like

23         this.  This will be better.  I can get it.  Gosh.

24         All right.  Ten.  All right.  Do you see at the

25         top of page ten?  God, why is it so tiny?

1          MR. CHANG:  Mr. Davis, you can just read

2     it.

3  Q     Yeah.  I'll read it.  Okay.  Page ten.  Dr.

4     Thibault's answer.  He says, "I am the CEO of

5     Three Points Center, LLC, in Utah."  And I asked

6     him, "Okay, Three Points Center, LLC, is one of

7     the entities named in this lawsuit.  So is Three

8     Points Center North Carolina, LLC."  He says,

9     "Uh-huh."  I said, "Who is the CEO of Three

10    Points Center North Carolina?"  He says, "In

11    name, I am."  I asked, "What do you mean by 'in

12    name,'" and then he said, "Thane Palmer is the

13    president, and he has the final say in that

14    facility."

15          And we may have gone over it again, but

16    what do you -- what is your understanding of you

17    having the final say at Three Points Center North

18    Carolina?

19  A    I can make all decisions that are related to the

20    operation of the facility and program with Three

21    Points Center North Carolina.

22  Q    Okay.  You testified earlier that you oversee the

23    horse -- the equine therapy program.  Correct?

24  A    That is correct.

25  Q    My understanding of the program is that horses

1              that are at Three Points Center Siler City --

2              this understanding is from Dr. Thibault's

3              deposition.  My understanding is that horses that

4              are at the Siler City location, originally --

5              their original source is the Bureau of Land

6              Management land.  Is that correct?

7                   MR. CHANG:  Objection to form.

8    A         That -- that's not completely correct.  And the

9              reason it's not correct is since Dr. Thibault

10             testified, we received a group of horses through

11             the National Forest Service, which is in a

12             different department from the Bureau of Land

13             Management in the federal government.

14   Q         Okay.  How many horses are at the facility -- at

15             the Siler City facility right now?

16   A         Right now we have, I would say rough -- about 25,

17             25 to 27.

18   Q         And how many students are at the facility now?

19   A         Twenty-six.

20   Q         Does each student have their own assigned horse?

21   A         No.  We have horses that at any given time are

22             not assigned to students.  For example, right now

23             we have two mares that have recently had a foal

24             that are not being used.  We have three mares

25             that are going to foal that are not being used.

1           We have a couple of horses that after using them

2           we've deemed that they're not safe for the

3           students, so we have them out in a pasture.  We

4           have other horses there that are -- the two

5           equine staff we have, that they use for their

6           personal horses.  And then we have horses -- a

7           group of about ten horses that have not been

8           assigned to students.

9                And so generally speaking, at any given

10          time, the -- for the students that we're using in

11          what we call the Mustang Program, that they'll be

12          two students assigned to a horse that are

13          specifically in the Mustang Program, but we'll

14          have, you know, other horses in those other

15          categories.

16     Q    Are the -- knowing that there could be some

17          distinctions between the 27 horses, do -- does

18          Three Points Center North Carolina own the

19          horses, like somebody would own a vehicle, or are

20          they still owned by the government agency?

21     A    As of right now, the Bureau of Land Management --

22          well, it's another one of these broad questions.

23     Q    I know.  It's actually not.

24     A    So.

25     Q    I just asked if you own them.

1    A    No.

2    Q    I know the --

3    A    I --

4    Q    I did my homework to not waste time here.

5    A    Well, but there -- there's a lot related to that program that -- and I don't mean it disrespectful, because there's no reason for you to understand it.  But recently, in the last year, there was a significant shift with the Bureau of Land Management and a non-profit organization that they used in the adopt -- mustang-adoption process called the Mustang Heritage Foundation.

The Mustang Heritage Foundation and the BLM recently terminated their relationship as far as the Bureau of Land Management using the Mustang Heritage Foundation to get horses adopted out.  And that required us last fall to return all the horses to the Bureau of Land Management that my employees hadn't adopted, or that were not adopted out by outside people.

And so the horses that we have on the property right now are actually a combination of these horses that we got from the National Forest Service, and horses that have been adopted by my

1           equine staff.

2      Q    Okay.  And so when you said -- I believe it was

3           due to this schism between --

4      A    Yeah.

5      Q    -- the Bureau of Land Management and the Mustang

6           Heritage Foundation, which was -- my

7           understanding is that's the whole -- that's the

8           reason that Three Points Center was able to

9           develop its equine program to where it was.  That

10          BLM horses, which are tagged -- you know, tagged

11          on their neck, had to be returned to BLM.

12          Correct?

13               MR. CHANG:  Objection to form.  Answer if

14          you understand.

15     Q    I just -- when you said us, do you mean Three

16          Points Center North Carolina had to return

17          horses, or Three Points Center Utah?

18     A    I'm -- my whole conversation was about Three

19          Points Center North Carolina.

20     Q    Understood.  At this -- when there were, let's

21          call them, BLM-sourced horses at the Siler City

22          facility before the schism, did they -- were they

23          owned by a Three Points entity, or were they just

24          kind of being held before they are adopted?

25     A    Those horses were not owned by a Three Points

1           Center entity.  They are -- and I don't know the
2           exact legal terms.
3     Q     Okay.
4     A     But they were owned by the Bureau of Land
5           Management, and we were part of the adoption
6           process that the Bureau of Land Management would
7           oversee to help wild mustangs be safely adopted
8           into new homes.
9     Q     Okay.  Now, however, there are no BLM-sourced
10          horses at the Siler City facility, correct?
11    A     No.
12    Q     The horses that are now --
13    A     Well, no.  That's not accurate.  We -- I have
14          horses that were adopted from the BLM by my
15          equine staff that we have on our property.
16    Q     Very fair.  Ones -- now they are -- if they
17          hadn't been adopted from BLM, the other horses
18          are not from the BLM?
19    A     They -- those horses would be that group of
20          horses that we received from the National Forest
21          Service.
22    Q     Do those horses have papers that indicate who the
23          horses are owned by now?
24    A     Those -- those horses we have -- we would have
25          the papers from them that we -- that the -- and

1           I'll -- I actually need to find out from Reggie

2           if the Bureau of Land -- or the National Forest

3           Service technically has those titles, or if Three

4           Points Center North Carolina does.  I would need

5           to get that clarified from Reggie.

6     Q     At the time -- now, going back, pre-schism -- my

7           understanding is that Three Points Center Utah

8           and North Carolina -- so I'm going to ask both,

9           but -- had a relationship with the Mustang

10          Heritage Foundation in order to get the horses,

11          correct?

12    A     Yeah.

13                MR. CHANG:  Objection to form.  You can

14          testify as to Three Points Center North Carolina.

15    A     Yeah.  We -- Three Points North Carolina and the

16          person that would work under me, Reggie --

17          Reggie, who is employed by Three Points Center

18          North Carolina, would be my person that would

19          interact with the different BLM employees, and

20          originally, Mustang Heritage Foundation people in

21          the adoption process.

22    Q     Okay.  So when I said they're -- excuse me.  When

23          Three Points Center North Carolina -- when the

24          Three Points Center Siler City facility opened

25          up, did you or your -- or Reggie have to execute

```
1              some sort of new memorandum of understanding with
2              the Mustang Heritage Foundation?
3    A         Yes.  Reggie had to be -- become what they call
4              an approved TIP trainer.
5    Q         Okay.
6    A         TIP is an acronym that I don't remember what it
7              stands for.
8    Q         Trainer Incentive Program.  All right.
9    A         Reggie had to fill out the paperwork to get his
10             own certification from -- and that TIP-trainer
11             certification happened through the Mustang
12             Heritage Foundation.  Reggie had to acquire his
13             for our campus at -- in North Carolina.
14   Q         Okay.  All right.  Let's just do this one just to
15             get it in and finish it off.  I think we're about
16             -- we're getting there.  We don't need that.
17             Your testimony is clear enough.  This is going to
18             take time.
19                  MR. DAVIS:  All right.  I think that's it
20             for Mr. Palmer.  Take maybe five so I can get
21             ready for the next one.
22                  THE COURT REPORTER:  Do you have
23             questions, Jimmy?
24                  MR. DAVIS:  Oh, yeah.  Sorry.
25                  MR. CHANG:  Yeah.  I need a minute
```

1          though.  Can I go off the record?

2                    MR. DAVIS:  Uh-huh.

3                    THE COURT REPORTER:  Yeah, sure.  We're

4          off at 3:34.

5                    (SEVEN-MINUTE RECESS)

6                    THE COURT REPORTER:  We're on the record

7          at 3:41.

8     CROSS-EXAMINATION BY MR. CHANG:

9          Q     Mr. Palmer, does TPC North Carolina share a

10               website with TPC Utah?

11         A     No.

12         Q     Does TPC North Carolina even have a website?

13         A     No.

14         Q     Is North Carolina mentioned on TPC Utah's

15               website?

16         A     No.

17         Q     Does TPC North Carolina have its own phone

18               number?

19         A     Yes.

20         Q     Okay.  Would you have terminated Ms. Nelson just

21               based on her act of secretly recording a

22               conversation with a student?

23         A     Definitely.

24         Q     Did you testify earlier that you had terminated

25               an employee by the first name Sarah?

1      A      Yes.

2      Q      What was her race?

3      A      White.  Caucasian.

4      Q      Okay.  Mr. Palmer, did you review the complaint,

5             which can also be called T's allegations, at my

6             offices?

7      A      Yes.

8      Q      Okay.  And did you review the answer, which can

9             also be called the denials or defenses, in my

10            offices?

11     A      Yes.

12                    MR. CHANG:  Okay.  That's all the

13            questions I have.

14                    THE COURT REPORTER:  Do you have others?

15                    MR. DAVIS:  Just one on the website only.

16                    THE COURT REPORTER:  Okay.

17     REDIRECT EXAMINATION BY MR. DAVIS:

18     Q      Your -- Mr. Palmer, your counsel asked you

19            whether or not Three Points Center North Carolina

20            shared a website with Three Points Center Utah.

21            You remember that question?  What website was he

22            referring to?

23     A      Threepointscenter.com.

24     Q      And I believe it was maybe -- can you turn to

25            your first exhibit?

1    A      Is it that one?

2    Q      Yeah.  Is there a logo on there, on the website?

3    A      Yes.

4    Q      Is that logo the same logo that's on your shirt

5           today?

6    A      Yes.

7    Q      And are you here as the corporate designee for

8           Three Points Center North Carolina, LLC?

9    A      Yes.

10    Q      Why -- are there plans to have a separate website

11           for the Three Points Center North Carolina

12           facility?

13    A      Yes.

14    Q      What will that website look like?

15    A      I don't know.  We -- it hasn't been developed

16           yet.

17    Q      Well, you said there were plans.  So, I mean,

18           whose plans are they?

19    A      We have plans to have a Three Points Center North

20           Carolina website.  I don't know what that website

21           looks like because we are putting our money

22           towards staffing and things like that that are

23           more important.

24    Q      When you say, "We," I understand that, you know,

25           your company -- you can refer to it in the "We."

1    A    Yeah.

2    Q    But in terms of the people that will decide that

3         it's time to move forward with a Three Points

4         Center North Carolina website, who are those

5         people?

6    A    That would be myself and Dr. Norm Thibault.

7    Q    What will be the benefit?  Even though there's

8         plans for it, what is the intended benefit of

9         having a separate Three Points Center website for

10        North Carolina's facility?

11             MR. CHANG:  Objection to form.

12   A    The benefit of that would be, I think, kind of

13        the obvious reasons that any business these days

14        would have a website, to show that they are in

15        business, and to explain and describe their

16        business and the services that they offer.

17   Q    Your counsel asked you if you would have

18        terminated Tyliya Nelson based on -- hang on -- I

19        mean, an audio tape that we haven't listened to

20        today, correct?

21   A    Yes.

22             MR. CHANG:  Objection.  That was not my

23        question, but go ahead.

24   Q    Did he refer -- during his question about would

25        -- the question where he said would you have

1        terminated Ms. Nelson if you knew that she made

2        the April 5th audio recording --

3                MR. CHANG:  That was not my question,

4        again.

5                MR. DAVIS:  Well, can we read it back?

6        What was it, Jimmy?  I --

7    Q   What was your testimony about the -- during his

8        cross, what was your testimony --

9                MR. CHANG:  I said, "Would you have

10        terminated Ms. Nelson just for the very act of

11        recording a secret conversation with a student?"

12   Q   Okay.  Did -- has that --

13                MR. CHANG:  "For secretly recording a

14        conversation."  Sorry.

15   Q   How do you know that it was a secret recording of

16        that specific conversation?

17   A   Well, a couple of reasons.  It would be expressly

18        noted in trainings and so forth that any staff --

19        that no staff are allowed to record anything from

20        students.

21                And when we're talking about the group

22        therapy element of that, just so you're aware --

23        are aware of the importance of this, our

24        therapist offices have a video camera and those

25        specific cameras expressly do not have audio.

1          All of our other cameras around the whole

2          facility have audio and video.  The therapist

3          offices, even the therapist offices, do not have

4          audio.

5               Recording students is -- it is very

6          common knowledge amongst all the staff and

7          therapists that you do not record students.

8     Q    Okay.

9     A    So it --

10    Q    When --

11    A    -- would've had to have been done without

12         anybody's knowledge because somebody would have

13         said something to her about not doing that.

14    Q    Okay.  So when Mr. Chang asked you about secretly

15         recording -- remember when you constantly asked

16         me what I meant by certain things -- you knew

17         what he was -- what he meant by "secret."  That's

18         why you didn't ask him, "What do you mean by

19         secret?"

20    A    Well, that's another one of those interesting

21         questions because when my counsel is asking me a

22         question, I know -- I can very clearly make

23         different assumptions about his questions

24         compared to your questions.

25    Q    Okay.

1    A       Mr. Chang is representing me.  And so I know from

2            that point of view, his -- the questions he asks

3            me are going to be in my interest.  When you ask

4            me a question, I have no bad feelings about it.

5            You -- you're representing the Plaintiff.  And so

6            your purpose in asking me questions is different

7            than Mr. Chang, answering questions.

8                    And so by the nature of that difference,

9            I would have a different approach to his

10           questions compared to your questions.

11   Q       Hypothetically, if an employee unintentionally

12           recorded a part of a conversation and that came

13           to your knowledge, would you fire that employee?

14                   MR. CHANG:  Objection to form.  Is it

15           still -- are you still talking about --

16                   THE WITNESS:  Well --

17                   MR. DAVIS:  Hey.  Jimmy, uh-uh, uh-uh.

18                   MR. CHANG:  -- recording a student?

19                   MR. DAVIS:  This is -- stop that, Jimmy.

20           He's thinking and you're thinking.

21   A       I'll --

22   Q       Answer please.

23   A       I'll --

24                   MR. CHANG:  Objection to form.

25   A       Okay.  Yeah.  I'll answer the question.

1    Q      You don't -- unintentionally.

2    A      Yeah.  That's a good question.  And so if a

3             staffer did it unintentionally and that came to

4             my knowledge, I would have very specific

5             conversations with them, about what their intent

6             was, why did they do that.  Most importantly,

7             what did they do with that recording.

8                    And so there would be a lot of different

9             factors in your hypothetical that I wouldn't be

10           able to give in a specific answer.

11    Q      What if the reason that the student was recorded

12           unintentionally is because the employee was

13           trying to capture evidence that there was another

14           employee that was using racial slurs on campus?

15             MR. CHANG:  Objection.  You said why --

16           if their purpose in doing it was unintentionally.

17           How can you have a purpose to unintentionally do

18           something?

19    Q      The -- that's fair.  The fact that a recording

20           could have been initiated for one purpose

21           intentionally that recorded a student.  That was

22           not the purpose.

23    A      Well --

24    Q      Do you understand the question?

25    A      I don't agree with the premise of the question.

1      Q      Do you understand the question?

2      A      I -- well, I don't -- I think I do.  From my

3             understanding of the question, I don't agree with

4             the premise that you're suggesting.

5      Q      Let me instead put the two together.

6      A      Because you're -- the premise that you're

7             suggesting is that there would be a need for

8             somebody to do that, and there is not a need for

9             anybody to do that because the policy of Three

10            Points Center is to keep students and employees

11            safe.  And so your question implies that there

12            could possibly be a need for that, and that need

13            has not existed on Three Points Center campus.

14            So I don't agree with the premise.

15     Q      So is it your testimony that you -- that you as

16            the president determine when an employee should

17            be able to record a hostile work environment?

18                  MR. CHANG:  Oh, objection to form.

19     A      Once again, I fully disagree with the premise

20            that underlies your question because we do not

21            have and have not had a hostile work environment

22            at Three Points Center North Carolina.

23     Q      Okay.  That's fair.  Well, let's have a

24            hypothetical that's not a -- not your business.

25            Let's see.  A factory that makes machine parts.

1          Okay?  Do you think that an employee should be

2          able to record a manager or supervisor using a

3          racial slur for the purpose of reporting that

4          conduct?

5    A     Well, you're -- and I am not trying to be

6          obstinate with you, Garrett.  Your hypothetical

7          does not capture some of the critical parts of

8          the recording that the Plaintiff did.  There --

9          we work in a therapeutic environment.  There are

10         very specific guidelines related to working in a

11         therapeutic environment related to juveniles.

12              Your factory example, I'm assuming unless

13         they're engaging in child labor, doesn't involve

14         that kind of environment.  And so the -- it's

15         trying to compare apples and oranges, and it's --

16   Q     So is it fair to say that the nature of your

17         testimony is due to the fact that Three Points

18         serves juveniles that there is a zero-tolerance

19         recording policy if the recording is done for the

20         purpose of engaging in protected activity?

21              MR. CHANG:  Objection to form.  You have

22         got to stop recharacterizing the client's

23         testimony.

24   Q     With the factory example --

25              MR. CHANG:  There is no good reason why

1              opposing counsel is trying to re-summarize --

2                    MR. DAVIS:  I'm --

3                    MR. CHANG:  -- opposing client's

4              testimony.

5        Q     But with the -- Mr. Palmer, you keep -- I believe

6              that you keep pointing out the fact that your

7              business is special, therefore no recordings

8              whatsoever.  That's what I believe your testimony

9              is.  Is that your testimony?

10       A     No.

11       Q     What is your testimony about the recording?

12       A     My testimony is what I've stated, Garrett.  That

13             it is Three Points Center policy, very clear

14             policy, that staff do not record students.

15                   And in -- if we want to talk about

16             specifics, if we're talking about a group therapy

17             session that happened on April 5th of 2022, there

18             were many adults present in that meeting that can

19             clearly testify, and I'm sure are willing to

20             testify, that there was not anything related to a

21             hostile work environment.  And what was being

22             conducted in that meeting was actually to prevent

23             a possible hostile work environment for staff or

24             a hostile environment for the students in the

25             program.

 1    Q     Mr. Palmer, I understand that.  And we spent

 2          plenty of time -- what --

 3    A     Don't try to twist my words then.

 4    Q     I'm not.  And I'm not.

 5    A     And don't try to --

 6    Q     What I'm --

 7    A     -- don't try to make me say something that --

 8    Q     I'm trying to ask a question.  I'm not trying to

 9          make you say something.

10    A     Well --

11                MR. CHANG:  Objection to form.

12    Q     Back -- you're saying what people will testify

13          to, so you're trying to make other people say

14          stuff right now.  I'm just going to point that

15          out.

16                MR. CHANG:  Objection to form.

17                MR. DAVIS:  He said that.

18                MR. CHANG:  No, he didn't.

19                MR. DAVIS:  He said other people will

20          testify it's not a hostile workplace.  I'm not --

21                MR. CHANG:  No.  And you accused him of

22          saying you were going to -- he was going to force

23          other people to say --

24                MR. DAVIS:  I am not saying that.

25                MR. CHANG:  Objection.  He's testifying.

1               But go ahead.  Ask your question.  Stop

2               testifying.

3     Q     Mr. Palmer, the N word was said at that meeting,

4               correct?

5     A     I said the N word in that meeting, and I've

6               explained very clearly in different ways why that

7               word was said.  That word was said in ways that

8               have nothing to do with it being okay --

9     Q     All right.

10    A     -- to refer to other people with that word.

11    Q     I'm going to -- Exhibit 51 -- this is also Ms.

12              Nelson's Deposition 54.

13          (PLAINTIFF'S DEPOSITION EXHIBIT NO. 51

14             MARKED FOR IDENTIFICATION)

15    Q     Can -- that is the April 6th message from Shareka

16              to Ms. Nelson.  Ms. Nelson writes at the top,

17              "How is group going?"  Shareka responds, "Crazy.

18              Thane said N-I-G-G-A."  At that point in time,

19              did Ms. Nelson have any idea about what we spent

20              probably over an hour discussing with your

21              clinical reason for saying the N word?

22    A     I can't speak to what she knew.

23    Q     Why --

24    A     I --

25    Q     Are you telling me that she -- just based on that

```
1                   --
2      A      Okay.
3      Q      -- based on that, did she --
4      A      Okay, Garrett --
5      Q      -- know that there was --
6      A      -- if --
7      Q      -- a clinical reason for it?
8      A      If you are going to raise your voice at me, I
9             will not answer you.  So --
10     Q      Did she --
11     A      -- do you want to ask me questions respectfully,
12            like I've been with you?
13     Q      At that point in time, did Ms. Nelson -- or did
14            who -- if someone received that communication,
15            would they have had any idea that Ms. -- that Mr.
16            -- that you said that word for the clinical
17            reason that -- that's on the record that you
18            explained today?
19     A      And --
20     Q      Based on that text message.
21                 MR. CHANG:  Objection to form.
22     A      And my answer is the same.  I don't know what she
23            knew, because it is very possible that she could
24            have had other communication with other people
25            besides this.  Because this is, you know, Ms.
```

1          Nelson is supplying information that she thinks

2          supports her case.  So Ms. Nelson could have

3          information from other people where she may have

4          had that knowledge.  I cannot speak to what she

5          knew related to this text.

6     Q    I'm going to try to finish it up.  If someone

7          knew the N word was said at a business, would

8          they have reasonable grounds to believe that it's

9          possible that it was uttered for a racially

10         insensitive reason?

11              MR. CHANG:  Objection to form.

12    Q    If that person didn't know what we spent over an

13         hour discussing today, and they just knew that

14         you said the N word, would they be -- would it be

15         unreasonable for them to think it's possible

16         there could have been a racially improper reason

17         or insensitive reason for the word being said?

18    A    Well --

19              MR. CHANG:  Objection to form.  This is a

20         30(b)C -- 30(b)(6) deposition, not --

21              MR. DAVIS:  Jimmy --

22              MR. CHANG:  -- any hypothetical that is

23         --

24              MR. DAVIS:  -- it is not.  He has spent

25         so much time talking -- sorry.  He has spent so

1          much time talking about context.  We've got all

2          of it there.

3                    MR. CHANG:  Okay.  If you understand the

4          hypothetical, then go for it, Mr. Palmer.

5    A     In -- if we look at this situation in totality,

6          the -- Ms. Nelson had been with us for three or

7          four months.  Whatever it was at that point.  Ms.

8          Nelson would have seen me numerous times in

9          interaction with students, in interaction with

10         staff.

11                   And she would have seen how I interact

12         with staff, how I interact with students.  And

13         based on her relationship with the program and

14         watching me operate, she would have no reason to

15         assume that that was said in a way that would

16         create a hostile work environment.

17   Q     And -- you know, I know -- just testified to what

18         Ms. Nelson would know.

19   A     What I said --

20   Q     Is it okay --

21   A     -- she --

22   Q     Okay.  Even --

23   A     -- she would not have witnessed anything to have

24         reason to believe that there was potentially a

25         hostile work environment at Three Points

1          Center --

2     Q    Do you still believe that it would be a --

3     A    -- North Carolina.

4     Q    Do you still believe that it would be -- so is it

5          unreasonable for a teenage black woman, even if

6          she didn't have any reason to believe there's a

7          hostile work environment, to still be -- feel

8          uncomfortable based on the fact that you said the

9          N word that day?

10    A    I --

11              MR. CHANG:  Objection to form.

12    A    Well, I could see a -- anybody that was trying to

13         lay the foundation for a lawsuit would very

14         actively come to that conclusion.

15    Q    And is -- based on your testimony there, is it

16         your suggestion that Ms. Nelson was trying to lay

17         a foundation for a lawsuit?

18    A    No.  What I'm suggesting is there is a lot of

19         reasons other than what you're suggesting for Ms.

20         Nelson to come to those conclusions, and to

21         assert those conclusions.  And it's not a far

22         reach for me to think of the possibility that

23         that's what was going on.

24              There -- the assertions -- you're trying

25         to make a specific assumption that Ms. Nelson

Thane Palmer

206

```
 1              would do that because there possibly was a

 2              hostile work environment.  There is not, and has

 3              not been, a hostile work environment at Three

 4              Points Center.  And I will testify about that all

 5              day long.  I know the kind of company I operate.

 6              And so your assertions in your questions are

 7              simply not accurate.  And I -- you won't --

 8        Q     What I'm -- if an -- if the president of a

 9              company -- not your company -- said the N word at

10              a meeting where staff were present, would the

11              employee of that company have some basis to

12              believe that there's potentially a hostile

13              workplace environment emerging?

14        A     One -- once again, Jimmy -- or Jimmy -- sorry.

15        Q     It's all right.

16        A     Garrett.  I'm sorry.

17                   MR. CHANG:  That's fine.

18        A     Once again, Garrett, the whole hypothetical

19              thing, as both you and I have found out today,

20              they -- that they don't work very well because

21              they are so general it does not apply.  In most

22              work situations --

23        Q     I can fix it.  McDonald's.  Remember your --

24              let's -- you started with a hypothetical from

25              McDonald's.  Let's do a McDonald's.  New employee
```

Pace Reporting Service, Inc.  919-859-0000      www.pacereporting.com

Case 1:23-cv-00527-WO-JGM    Document 39-3    Filed 07/23/24    Page 206 of 209

1    shows up at McDonald's.  A fry cook.  They hear

2    the manager say N-I-G-G-E-R out loud.  Okay?

3    Would that employee just based on that

4    information at that time have reasonable grounds

5    to believe that, well, potentially there's a

6    hostile workplace environment here?

7  A  Would -- was that in a group therapy session

8    where that manager was -- or therapist was trying

9    to instruct people and be very specific to people

10   that have limited comprehension and limited

11   cognitive abilities?  And so that's once again

12   the problem with the hypotheticals, that the

13   hypotheticals do not capture the complex

14   situation that I was dealing with in that -- on

15   that day.

16 Q  Mr. Palmer, I understand.  But what I started

17   asking before we went here --

18 A  My --

19 Q  -- was does Shareka's text message capture that

20   complexity that you just described in that text

21   message to Ms. Nelson?

22 A  No.

23          MR. DAVIS:  Thank you.

24          THE COURT REPORTER:  Any more, Jimmy?

25          MR. CHANG:  Nope.

208

1          THE COURT REPORTER:  Okay.  We're off at

2     4:05.

3  (Whereupon, the deposition was concluded at 4:05 P.M.)

STATE OF NORTH CAROLINA

COUNTY OF CHATHAM

    I, Peter J. Wylie, a Notary Public in and for the State of North Carolina, duly commissioned and authorized to administer oaths and to take and certify depositions, do hereby certify that on April 18, 2024, MR. THANE PALMER, being by me duly sworn to tell the truth, thereupon testified as above set forth as found in the preceding 208 pages, his examination being reported by me verbatim and then reduced to typewritten form under my direct supervision; that the foregoing is a true and correct transcript of said proceedings to the best of my ability and understanding; that I am not related to any of the parties to this action; that I am not interested in the outcome of this case; that I am not of counsel nor in the employ of any of the parties to this action, and that signature of the witness was not waived.

    IN WITNESS WHEREOF, I have hereto set my hand, this the 25th day of April, 2024.

_____

Notary Public

Certificate No. 202221000213