IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 1:23-CV-00527

TYLIYA J. NELSON,                )
                                 )   30(b)(6) DEPOSITION OF
              Plaintiff,         )
                                 )     THREE POINTS CENTER
         v.                      )
                                 )     NORTH CAROLINA, LLC,
THREE POINTS CENTER, LLC;        )
THREE POINTS CENTER NORTH        )      THROUGH ITS AGENT,
CAROLINA, LLC; THREE POINTS      )
PROPERTIES, LLC; THREE POINTS    )        H E I D I
PROPERTIES NORTH CAROLINA, LLC;  )
THREE POINTS ACADEMY, INC., AND  )       P A L M E R
THANE PALMER,                    )
                                 )
              Defendants.        )
---------------------------------

A P P E A R A N C E S:

For the Plaintiff:      Mr. Garrett L. Davis
                        The Law Office of Garrett Davis
                        555 S. Mangum Street, Suite 100
                        Durham, North Carolina 27701

For the Defendants:     Mr. Jimmy C. Chang
                        Brooks, Pierce, McLendon,
                          Humphrey & Leonard, L.L.P.
                        Post Office Box 26000
                        Greensboro, North Carolina 27420

In Attendance:          Mr. Thane Palmer

In Greensboro, N.C.     Reported by:
April 18, 2024          Peter J. Wylie

2

E X A M I N A T I O N   I N D E X

| Examination | By Whom | Page No. |
|---|---|---|
| Direct | Mr. Davis | 6 |
| Cross | Mr. Chang | 101 |

E X H I B I T   I N D E X

| Exhibit No. | Description | Page Marked |
|---|---|---|
| Plaintiff's 52 | 12-6-2021 E-mail | 11 |
| Plaintiff's 53 | 2-22-2022 Attendance Review/ Corrective Action | 29 |
| Plaintiff's 54 | Text Message | 44 |
| Plaintiff's 55 | Employee Voucher Report | 57 |
| Plaintiff's 56 | 1-28-2022 Attendance Review/ Corrective Action | 72 |
| Plaintiff's 57 | Text Messages | 88 |

4

S T I P U L A T I O N S

It is hereby stipulated and agreed between the parties to this action, through their respective counsel of record:

(1)   That the 30(b)(6) deposition of THREE POINTS CENTER NORTH CAROLINA, LLC, through its agent, HEIDI PALMER may be taken on April 18, 2024, beginning at 4:14 P.M. at MARRIOT, located at 304 N. Greene Street, Greensboro, North Carolina 27401, before Peter J. Wylie, a Notary Public.

(2)   That the deposition shall be taken and used as permitted by the applicable Federal Rules of Civil Procedure.

(3)   That any objections of any party hereto as to notice of the taking of said deposition or as to the time or place thereof, or as to the competency of the person before whom the same shall be taken, are deemed to have been met.

(4)   Objections to questions and motions to strike answers need not be made during the taking of this deposition, but may be made for the first time during the progress of the trial of this case, or at any pretrial hearing held before any judge of competent jurisdiction for the purpose of ruling thereon, or at any other hearing of said case at which said deposition might be used, except that an objection as to the form of a question must be made at the time such question is asked, or objection is waived as to the form of the question.

1          (5)   That the witness waives the right to read and
2     sign the deposition prior to filing.
3          (6)   That the sealed original transcript of this
4     deposition shall be mailed first-class postage or hand-
5     delivered.
6          (7)   That the witness was identified by a government-
7     issued photo ID.
8                         *  *  *  *  *
9     Whereupon,
10                       HEIDI PALMER,
11                       having been first duly sworn,
12                       was examined and testified
13                       as follows:
14
15
16
17
18
19
20
21
22
23
24
25

6

DIRECT EXAMINATION BY MR. DAVIS:

1

2   Q   Good afternoon, Ms. Palmer.  Have you ever had your
3       deposition taken before?

4   A   A few times.

5   Q   Within the past ten years, how many times?

6   A   Once, probably, in the past ten years.

7   Q   What was that for?

8   A   An accident.

9   Q   An accident.  Okay.  Personal.  Have you ever had a
10      deposition -- your deposition taken where you were
11      a defendant or a defendant's agent, like we are
12      here, in a case?

13  A   No.

14  Q   Okay.  Let's start with an easy one.  What is the
15      -- your official title, job position at the Three
16      Points Center Siler City facility?

17  A   The Three Points Center North Carolina.  I have
18      several, actually, right now.  I am group living
19      director currently, I oversee human resource for
20      North Carolina, and I am quality assurance.

21  Q   Okay.  Knowing -- I know full well about you being
22      designated for Three Points Center North Carolina.

23  A   North Carolina.

24  Q   I do want to ask about your prior experience, but
25      just to understand your experience.

7

1    When was the Three Points Center Utah
2    facility started?
3  A  2014, I believe.
4  Q  In -- when it started, did you have -- were -- did
5    you have an official role with that company Day 1?
6  A  Not an official.
7  Q  Not an official.  Were you employed by another
8    organization or business at that time?
9  A  Yes.
10 Q  Who were you employed by?
11 A  City of St. George --
12 Q  City of St. George.
13 A  -- Police Department.
14 Q  What was your job title there?
15 A  At that time?
16 Q  Uh-huh.
17 A  I was a sergeant with the St. George City Police
18    Department.
19 Q  Sergeant.  Where is sergeant in terms of the --
20    that department's organizational chart?
21 A  For police officers?
22 Q  Uh-huh.
23 A  That's -- you go officer, then you go sergeant.
24 Q  That's it?  But were you the chief?  Is there a
25    chief of police, too?

```
 1        A    That would be the top.
 2        Q    That's the top.  Okay.  So you were not the chief
 3             of -- you were --
 4        A    Heavens no.
 5        Q    Okay.  All right.  How long were you -- did you
 6             work in law enforcement before, I guess,
 7             transitioning to Three Points?
 8        A    A little over twenty years.
 9        Q    Twenty years.  What was your first employment role
10             at the Three Points Center Utah facility?
11        A    Training.
12        Q    Training?
13        A    Uh-huh.
14        Q    Training.  Training.
15        A    And then I would work weekends as a mentor, if you
16             would.
17        Q    Okay.  All right.  What was your -- training.  Were
18             you HR director?
19        A    No.
20        Q    Okay.  Were you ever -- did you ever have a job at
21             the Three Points Center Utah facility that would
22             generally be considered something like HR director?
23        A    No.
24        Q    Okay.  What is -- I've seen quality assurance.
25             What does that mean?
```

1    A    I don't know the definition of it.  That would have
2         been a Norm name that he gave it.  What -- so what
3         I did?
4    Q    Yeah.  That -- uh-huh.  That's --
5    A    Okay.  I would --
6    Q    Thank you.
7    A    In Utah when I had that position, I would work with
8         the State if the State came in.  We have a lot --
9         had a lot of reports that we would have to send to
10        the State, a lot of reports that were written by
11        our -- by the staff that would be monitored and
12        made sure that they were accurate, make sure -- you
13        know, because we would do UIRs.
14             State of Utah has very different guidelines.
15        North Carolina is very different.  So when I was
16        over the quality assurance in Utah, state
17        guidelines on reporting incidences and things like
18        that were pretty much what I oversaw.  Making sure
19        those things got reported accurately, making sure
20        that the staff were themselves reporting
21        accurately, you know, so --
22   Q    Is there a quality assurance position at the Three
23        Points Center North Carolina facility?
24   A    I just told you that when you asked me what I did
25        for North Carolina.

```
 1        Q    You -- okay.  But it's --
 2        A    It's one of --
 3        Q    But -- all right.  I agree.  But it fulfills the
 4             same role, but there are different regulatory
 5             requirements?
 6        A    Yes.
 7        Q    Okay.  So as the Three Points Center quality
 8             assurance -- well, what is different between
 9             quality assurance and your human resources
10             responsibility?
11        A    They're vastly different.
12        Q    How much -- what percentage of your day do you
13             spend doing quality assurance work versus some
14             human resources generalist type work?
15        A    Currently right now, because I have Brittany, who
16             oversees the majority of the human resource pieces
17             of it, they overlap very seldom.  With group living
18             director, I would overlap that with human resources
19             not with responsibilities, but with involvement
20             because of hiring and that kind of thing.
21        Q    Okay.  And you said -- so Brittany is handling more
22             of the HR now?
23        A    Yeah.
24        Q    What is her name again?  The woman --
25        A    Brittany Ortiz.
```

1    Q    Brittany Ortiz.  When Ms. Nelson was hired -- was

2          employed at this -- at the Siler City facility

3          between -- do you know the time period of her

4          employment?  It's better for me to ask questions.

5    A    I do.

6    Q    Can you tell it for the record?

7    A    I believe she hired on the last part of November --

8          and I always get these dates -- of '21.  Like the

9          29th of November.  And then she was let go, I

10         believe, April 6th of '22.

11            MR. DAVIS:  Okay.  Thank you.  I want to get

12         this organized even though I am hustling.

13            Mr. Reporter, what number are we on right

14         now?

15            THE COURT REPORTER:  52.

16            MR. DAVIS:  52.  All right.  We may -- we

17         may not go through all these right now, but I just

18         want to get it out.  52.  These will be Jimmy's.

19       (PLAINTIFF'S DEPOSITION EXHIBIT NO. 52

20            MARKED FOR IDENTIFICATION)

21    Q    Okay.  I'm handing you Exhibit 52.  Ms. Palmer, as

22          I prepared for this, I refer to these as onboarding

23          docs.  So certainly have to ask -- you can ask

24          questions.  You can clarify if they're not

25          onboarding documents.

1        The first page is an e-mail.  It says, "New
2        hire date:  12-6-21."  And it's from
3        RMI_center@RMIincnc.com to
4        Slovell@threepointscenter.com.  I believe you
5        testified that previously, though, that Ms. Nelson
6        was hired -- began on -- oh, here we go.  It's
7        actually on here.  On 11-29-2021.
8   A    Uh-huh.  And this says, "New hire data," not new
9        hire date.
10  Q    Oh, okay.  Thank you.  The beginning text of the
11       e-mails says, "Your new hire request for Tyliya
12       Nelson was successfully submitted."  What is a new
13       hire request?
14  A    What we would send to -- this is coming from RMI.
15       That's the human resource entity that we used for
16       payroll, for all of that.  You know, let's see.  It
17       would be payroll, for medical insurance, for all of
18       that.  This was the company that we used at that
19       time.  So this is an e-mail from them stating,
20       "Your new hire request for Tyliya Nelson was
21       submitted successfully."
22  Q    Okay.  So that request -- who submitted that
23       request to RMI?
24  A    I believe that would have been -- because it was --
25       we were newly opening, we were using -- I had not

1          gotten the -- my laptop and everything set up in

2          that capacity as of yet, and so we were using the

3          resource of Utah's at that time to submit for North

4          Carolina.  Very separate entities, but that --

5          because they were already established and we were

6          still in the process of getting established with

7          RMI North -- for North Carolina, we used that

8          resource.

9     Q    Okay.  And does Three Points Center North Carolina

10         still use RMI?

11    A    No.

12    Q    Why not?

13    A    Well, I guess you would have to ask the -- you

14         know, Norm and Thane the reasons behind why not and

15         that they chose to go to a -- with a different

16         company.

17    Q    A different -- we may introduce it later.  Is it --

18         to the best of your recollection, did RMI have a

19         role in the drafting of any of the handbook

20         documents that were produced?

21    A    They did the handbook.

22    Q    They did the handbook?

23    A    The initial handbook, they did it.

24    Q    Okay.  Has isolved done another handbook that

25         supersedes the RMI handbook?

```
 1     A     When we went to isolved, I was the one who helped
 2           create the new handbook with isolved.  But the RMI
 3           one was -- established with RMI had no involvement
 4           of mine at all.
 5     Q     So the RMI-established handbook that was presented
 6           to Tyliya Nelson at some point around her hire
 7           date, that was -- that's the same handbook that was
 8           used for new hires in Utah, correct?
 9     A     You would have to ask probably more specifically
10           RMI that because I was not party to that piece.
11     Q     Okay.  And --
12     A     That would have to come from RMI.
13     Q     And based on the -- and I'm putting, quote,
14           onboarding docs -- so I'm saying that's my term.
15           You're not even on these new hire e-mails, if you
16           turn back to the first page, are you?
17     A     No.
18     Q     Okay.  Who is Slovell@Threepointscenter?
19     A     S. Lovell.  And that would have been Selwyn Lovell.
20     Q     Okay.  Where -- does she work from an office or
21           does she work from home?
22     A     He would have worked from an office.
23     Q     Where would that office be located?
24     A     I believe I explained that a minute ago, but that
25           would have been Utah.
```

1    Q    Okay.  Understood.  And then the other ones are

2         Schuyler.

3              All right.  If you can, turn to the one that

4         looks like the I-9.  You have, like, the

5         immigration type form.  Turn to the second page.

6         You see that box where it says, "Today's date"?

7         What is the date on the -- on the box?

8    A    Well, I've got to find it first.

9    Q    It's below -- it's kind of like halfway down.

10   A    That would be -- so above it, employee's first day

11        of employment is 11-29.  And then today's date

12        looks like -- signature of employer or authorized

13        representative would have been -- that would have

14        been 12-6.  That's 12-6.

15   Q    Okay.  And do you see the box above it where it

16        says, "Additional information"?

17   A    Where?  Where are you at?

18   Q    It's a block.  It's got a little bit of a text in

19        it.  See where it says, "Additional information"?

20   A    Uh-huh.

21   Q    It says, "Employee took a while to complete the

22        process" --

23   A    Okay.

24   Q    -- correct?

25              If you turn back to the first page, though,

```
 1              it doesn't look like that this paperwork was even

 2              generated until that same day when RMI Center sent

 3              S. Lovell this form.

 4                   MR. CHANG:  Objection to form.  Go ahead if

 5              you understand.

 6    A    Well, you'll have to ask RMI.  This is RMI's stuff,

 7         not mine.

 8    Q    Well, no.  I'm talking about this form right here.

 9         It's filled out by Selwyn Lovell, correct?

10    A    I don't know who filled that out.

11    Q    Well, it says "Selwyn Lovell" on it.

12    A    It just says, "Signature of employer or authorized

13         representative."  It doesn't say that he filled it

14         out.

15    Q    Does it not say this document was electronically

16         signed by Selwyn Lovell?

17    A    Well, I would need to read the whole document to --

18    Q    Take --

19    A    -- confirm who did it.

20    Q    Well, this is --

21    A    I don't know.

22    Q    This is the whole document.

23    A    Well, that's what I said.  I haven't read it,

24         though.

25    Q    Okay.  Take your time.
```

1    A    I don't want to answer and -- so it's just -- his
2         bottom part state -- basically in reading this, he
3         is just attesting that the documents that were
4         produced -- that were presented by Tyliya Nelson
5         appear to be genuine and relate to the employee
6         named.  So that's what he is signing to.  I was not
7         present.  Or, you know, that wasn't my duty at that
8         time in this process, so --
9    Q    Okay.  If you turn to the -- turn to the first page
10        of the I-9 form.
11   A    The --
12   Q    The --
13   A    Okay.
14   Q    Yeah.  It says, "Signature of employee:  Tyliya
15        Nelson."  It says this document was electronically
16        signed by Tyliya Nelson.
17   A    Okay.
18   Q    And what is the date?
19   A    12-6-21.
20   Q    And my question is, Ms. Palmer, is it really fair
21        to say that Ms. Nelson took a while to complete
22        this process when she was provided this form on the
23        same day?
24   A    You -- okay.  You're asking me to answer for
25        somebody else.  I don't know that.

```
 1                    MR. CHANG:  Hold on.  Objection.
 2          Q    No.  I'm asking you if --
 3                    MR. CHANG:  Objection to form that she was
 4               provided with whatever you're talking about on
 5               (inaudible) --
 6                    MR. DAVIS:  We're just laying foundation
 7               right here.  If you --
 8                    MR. CHANG:  Okay.  Then do it.
 9                    MR. DAVIS:  Well, that's what I mean.  The
10               -- she is -- this is part of her --
11                    MR. CHANG:  Go ahead.
12          Q    Turn a few pages over.  There is an e-mail that
13               begins -- the subject is "Congratulations.  You've
14               been hired by Three Points Center."  Okay.  Now,
15               that is from RMI?
16          A    Correct.
17          Q    Okay.  Without reading this, is it fair to say that
18               this I-9 -- based on your experience in HR and
19               onboarding employees, that this immigration
20               services form was provided to Tyliya after she
21               received this e-mail from RMI telling her that she
22               was hired by Three Points Center?
23                    MR. CHANG:  Objection to form, but go ahead.
24          A    I don't know what you're asking me, so --
25          Q    I'm asking what --
```

1    A    I can tell you that -- however, it was sent 12-6 at

2         ten-forty-nine A.M.  So what is your question?

3    Q    I guess my question is if Tyliya Nelson was

4         provided the U.S. Department of Homeland Security

5         I-9 form on 12-6, is it fair to say that she took a

6         while to complete the process when she filled out

7         the form the same day?

8    A    I don't know that answer.  I don't know when things

9         were sent to her.  I don't know when --

10   Q    That's why I said "if."

11   A    I don't know.  I can't answer that, 'cause I have

12        no -- again, I didn't -- I didn't do or send any of

13        this stuff, so you're asking me to make an

14        assumption.  I don't know.

15             I can tell you that in the notes that -- I'm

16        going to assume, 'cause this is Selwyn Lovell who

17        filled this out, that he probably put this

18        information in here to explain that the employee

19        took a while to complete the process.  So I guess

20        by that statement, you could make an assumption to

21        -- that it took her a while.  It says here the

22        employee's first day of employment was 11-29, so --

23   Q    And what I'm saying is if this I-9 form was not

24        provided to Tyliya Nelson until December 6th, 2021

25        --

```
1    A    I don't -- well, you don't -- you have no way of

2         saying that it was and I have no way of saying that

3         it was.

4    Q    Ms. Palmer, that's why I'm saying "if."  And we can

5         figure it out later in this process.

6    A    That might be the best way to do it.

7    Q    Okay.  And that's why I'm saying "if," because this

8         testimony -- you understand this is a valuable

9         time-limited thing going on right now, correct?

10   A    Absolutely.

11   Q    So that's -- if this document was provided to

12        Tyliya Nelson with -- at the same time as her

13        "Congratulations, you have been hired by Three

14        Points Center" e-mail, would it be -- do you

15        believe it would be fair to say that she took a

16        while to complete the process when she completed it

17        the same day she got the form?

18   A    I cannot say that --

19              MR. CHANG:  Objection to form.

20   A    -- because you're asking for --

21   Q    I understand.

22   A    -- an assumption, and I'm not going to make an

23        assumption.

24   Q    You're not.  All right.  Do you -- can you turn

25        over to the second page?
```

1     A    Okay.  Second page of -- second page is the

2           employee (inaudible) --

3     Q    Yeah.  Not the second page.  It's -- so we've got

4           the e-mail where it says "Congratulations, you've

5           been hired by" --

6     A    Okay.

7     Q    All right.  Now look at the next -- turn to the

8           next page.

9     A    Okay.

10    Q    What is the -- what does it say at the top?  What

11          --

12    A    It's -- what --

13    Q    Employee onboarding completed?

14    A    Correct.

15    Q    What is the date for this e-mail from RMI to

16          Slovell@threepointscenter?

17    A    You can read it as well as I.  12-6-21.

18    Q    Okay.  So -- and then the -- I'll read it just to

19          kind of share the load.  It says, "The following

20          employee has completed the RMI Center onboarding

21          process.  Employee name:  Tyliya Nelson.  Employer

22          name:  Three Points Center.  Employee company ID."

23          I'm not going to read that out.  But the date,

24          12-6-2021 at two-twenty-seven P.M.

25             Turn back one page.  What was the date that

1       Ms. Nelson received the e-mail instructing her to

2       fill out these onboarding documents?

3   A   Again, like I've said before -- I pointed it out.

4       It says 12-6-21, ten-forty-nine A.M.

5   Q   How many -- ballpark, how many hours are in between

6       ten-fifty and -- let's say how many hours are

7       between eleven and three-thirty?

8   A   Eleven, twelve, one, two -- eleven, twelve, one,

9       two, three.  What is that?  Four, four and a half?

10  Q   I'll represent that that's four and a half hours.

11          There is also a note on this -- the employee

12      onboarding completed e-mail that instructs S.

13      Lovell to "Please log in to your supervisor's

14      service center to verify the employee's ID in

15      Section 2 of the Form I-9."  Now that you see this

16      e-mail, do you feel more comfortable, I guess,

17      inferring or assuming that the I-9 form we've been

18      looking at was, in fact, provided to Ms. Nelson

19      with all these onboarding documents?

20          MR. CHANG:  Objection to form.  It just

21      says, "Onboarding documents."

22          MR. DAVIS:  No.  Jimmy --

23          MR. CHANG:  It doesn't say the RMI was --

24      the I-9 form --

25          MR. DAVIS:  It doesn't say it.  I'm asking

1           if --
2       A   I'm not going to make an assumption.  It wouldn't
3           be -- it wouldn't be accurate for me to make an
4           assumption.
5       Q   Is the -- on this three-twenty-seven P.M. e-mail,
6           is the phrase "Form I-9" on the e-mail?
7       A   On what one?
8       Q   On the three-twenty-seven.  Is --
9       A   Okay.
10      Q   Do you see the phrase "Form I-9" in the text of
11          this e-mail to S. Lovell?
12      A   I see it says -- yes.  There is a --
13      Q   So I know you don't want to make an assumption, and
14          we'll move on.  But if the first time Tyliya even
15          knew there was an I-9 form she needed to fill out
16          was after ten-forty-nine A.M. and she filled it out
17          in the four and a half rough hours during that
18          timeframe, is it really a fair thing to say that
19          she took a while to complete the process?
20      A   Here is what I can tell you.  I see where you're
21          going.  I can't -- I cannot answer -- I can't
22          answer on an assumption or on an if.  If you would
23          like me --
24      Q   When you --
25      A   -- to answer an absolute --

1    Q    When you say, "I see where you're going" --

2    A    What I can tell --

3    Q    -- I wouldn't ask that question.

4    A    What I can tell you --

5    Q    Uh-huh.  Go ahead.

6    A    What I can tell you is when they get hired -- okay?

7         When they get hired how it would -- and this wasn't

8         done by me, because it was Mr. Butcher who hired

9         her.  Okay?  That information and stuff would be

10        sent then because we were not set up with a

11        computer yet with -- for RMI.  We had not

12        established that yet.  So it would have been sent

13        to Selwyn, and Selwyn would then have sent

14        information to T.  I was not a part of that, so I

15        don't know, and it would be -- it would be unfair

16        and it would be wrong for me to make an assumption

17        based off of what somebody else did.  I can't

18        answer that.

19             I do know that part of onboarding becomes

20        problematic when people we hire don't fill out the

21        paperwork in an appropriate time.  And that's a

22        common thing that we had in getting them to do

23        that.  We have that problem sometimes today in

24        North Carolina where they're told -- when they get

25        hired, they get sent the information right away,

1          and they don't fill out the onboarding stuff and it

2          takes constant reminders.

3                    So, you know, if you want to play the

4          hypothetical could that have happened, absolutely

5          it could have happened.  Do I know if it happened

6          or not?  I don't because I wasn't part of this

7          process.

8      Q   Understood.  Getting rid of the I-9, besides the

9          I-9 forms -- besides the I-9 form, at ten-forty-

10         nine A.M., Ms. Nelson got an e-mail instructing her

11         to enroll and to fill out forms, correct?

12     A   Okay.

13     Q   And it looks like the employee onboarding was

14         completed within four, four and a half hours --

15     A   Yeah.

16     Q   -- correct?

17                   Based on what you've previously testified

18         about some employees taking a long time, do you

19         think that this is a short -- this is her -- do you

20         think that this is a good amount of time for an

21         employee to fill out all their forms?  Four hours?

22     A   I have no idea.

23                   MR. CHANG:  I'm going to --

24     Q   You don't have an opinion?

25                   MR. CHANG:  I'm going to object to form,

```
1              because it's assuming that this was the only way
2              she got the onboarding documents.  I think this is
3              where we're having a real big disconnect and we're
4              going around in circles.
5    Q    No.  I mean -- last one.  If an employee got the
6              prompt to fill out the forms for onboarding and
7              filled them out within the same business day, on a
8              scale of one to ten, ten being gold star, one being
9              this is not going to be a good employee, where
10             would you rate that level of punctuality and
11             responsiveness?
12                  MR. CHANG:  I'm going to object to form.
13             Ms. Palmer, please go ahead and answer it so we can
14             move on.
15   A    If they were to do it right away -- is what you're
16             saying -- where would I rank them?
17   Q    Within four and a half hours.  Yeah.
18   A    Well --
19   Q    Where does that fit in the --
20   A    -- it depends, because this -- it depends on how
21             much time they take with the onboarding, 'cause
22             there is a lot of things that could -- you know,
23             that they -- it would just -- that's such a broad
24             -- it's a broad question.  So sure, it would be
25             great that they got it done really fast.  But does
```

```
 1              that mean that they, one, read over everything,
 2              too?  You know, so I don't -- I don't know how to
 3              answer that.  I'm not trying to be --
 4    Q    Well, that's --
 5    A    -- obstinate or difficult.  I just don't know how
 6              to answer that question, 'cause there are so many
 7              variables for each individual.
 8    Q    Last one.  When you said you knew where I was going
 9              with it -- when you said you knew where you're
10              [sic] going, if you could finish --
11    A    Well, that's why --
12    Q    If you could have --
13    A    So I explained this.
14    Q    -- finished that sentence --
15    A    I did.
16    Q    -- where was I going with it?
17    A    I did.  I finished it --
18    Q    Okay.  All right.
19    A    -- by telling you about the onboarding thing.
20    Q    Got it.  Okay.  All right.
21    A    Yeah.  Sorry.  Yeah.
22    Q    You're fine.  Let's see.  Onboarding.  And as of
23              December 6th, 2021, there weren't any student at
24              the facility, correct?
25    A    Correct.  Correct.
```

1    Q    What -- and you've been designated as the designee

2         for just generally Ms. Nelson's job performance.

3         What was she doing around this time since there

4         weren't any students there?

5    A    We had -- well, I can give you a broad view.  I

6         don't know for -- you know, with her directly.  I

7         can give you a broad view of what we had the hired

8         employees, you know, assisting with.  There was

9         training going on.

10   Q    Yeah.

11   A    So Mr. Butcher was doing a lot of training with our

12        -- with the mentors that were hired.  There were

13        some just things -- putting things together to get

14        rooms prepped.  All of this was told to the new

15        hires, especially if it was a mentor, that we were

16        still in preparation of, you know, getting kids,

17        which allowed them the time for training.  It also

18        allowed opportunity for them to have interactions

19        and communications about how, you know, a dorm

20        would be ran.

21             And so they put bunkbeds together.  I think

22        a few times they went out -- because the mentors

23        were involved in the equine piece of it.  They

24        would go out and help collectively with any of the

25        equine things if there was stuff out there that

1         they needed assistance with.  So they were doing a
2         myriad of things.
3                 MR. DAVIS:  Okay.  My apologies.  I thought
4         I cut it off.
5                 And we're not going off the record, but I'm
6         having to assemble an exhibit, which is fine, more
7         or less, right now.  Okay.  All right.  Okay.
8         We're good.  Put these in.  All right.  Let's --
9         54.
10                THE COURT REPORTER:  53.
11                MR. DAVIS:  53.
12          (PLAINTIFF'S DEPOSITION EXHIBIT NO. 53
13                MARKED FOR IDENTIFICATION)
14                MR. DAVIS:  Okay.  Jimmy, if you have your
15        computer, these are Dr. Thibault's Exhibits 11, 12,
16        13.
17                MR. CHANG:  I don't have access to anything
18        right now except for my hard drive.  I don't --
19                MR. DAVIS:  All right.
20                MR. CHANG:  I'll just look over it with her.
21                MR. DAVIS:  All right.  Just got to get that
22        one out there.
23   Q    All right.  Ms. Palmer, what is Three Points Center
24        -- when Tyliya was terminated on April 6th, what
25        was the reason provided to her?

1    A    I believe that it was due to her attendance.

2          Significant attendance issues.

3    Q    By "significant attendance issues," what other --

4          do you remember the -- it may be in the stack.

5          Let's see here.  Here we go.  We get to feed that

6          one back in.  That one.  It looks like that one for

7          reference.

8               When you say "significant attendance

9          issues," can you please describe what you mean by

10         that?

11    A    As it was -- as it was told to me, as well as then

12          verified and confirmed, Ms. Nelson had a struggle

13          with getting to work on time, at least fifteen, you

14          know, times of not getting to her job in the

15          timeframe that she is expected to.  I know -- I do

16          believe she had a few no-shows, you know, so --

17    Q    Did you make the decision to fire Tyliya?

18    A    I did not.

19    Q    Who did make the decision to fire Tyliya?

20    A    I do believe that it went from her direct

21          supervisor, Dan at the time, and then typically

22          what is -- what is done then, Dan would then notify

23          his supervisor, which was Craig Butcher.  They

24          would then make that decision and then move

25          forward, and then ultimately I would be informed of

1          that, depending on the circumstances, as a

2          representative of human resource department, so --

3     Q    Okay.  So Topic No. 4 of this deposition is

4          Plaintiff's termination.  It says, "Defendant

5          designates Heidi Palmer."  And I'll ask you again,

6          but the reason I'm asking -- I believe you said, "I

7          believe it would have gone through this and that

8          and the other."

9     A    Sorry.  I know it -- I know it, too.

10    Q    So that's --

11    A    All right.

12    Q    Tell me how --

13    A    I will be more --

14    Q    Tell me how Tyliya -- the circumstances on April

15         6th that led to her termination.

16    A    Yes.  In all that I've been a part of, as well as

17         I've read and reviewed and that, she was terminated

18         due to her attendance issues.

19    Q    Who made the decision to terminate Tyliya Nelson

20         because of -- I'm going to say what Three Points

21         Center North Carolina contends --

22    A    I will more affirmatively --

23    Q    -- are attendance issues?

24    A    -- say it went from Dan, her direct supervisor, it

25         then went to Butch where with -- he conferred with

```
1              Butch and that determination was made.  And then
2              they went ahead and terminated her, and then I was
3              brought into the loop.  I probably would have been
4              more brought into the loop the next -- the
5              following day.  But I was brought into the loop
6              because of a -- the situation of T. refusing to
7              leave the property when she was asked to.
8         Q    At the -- as of April 6th, 2022, what was -- what
9              were your job titles or job roles at the facility?
10        A    I was the exact as to what I explained to you,
11             other than the group living director piece.  So I
12             was -- I was over human resource and quality
13             assurance.
14        Q    Okay.  For the terminations that are on -- would
15             have been your son -- Mr. Butcher's Exhibit 33 --
16             okay.  Did you have any direct role in making a
17             decision to terminate those -- any of those
18             employees that were terminated?
19        A    Oh, I'm sure I did.  Yes.
20        Q    You're sure you did?
21        A    Yeah.  Well, I would have to go through the names.
22        Q    Please do.  Which ones did you --
23        A    Let's see.  That I could tell you, you know, just
24             out of -- out of immediate recollection, I was --
25        Q    Let me get to it so I can read through it.  All
```

1       right.  I'll help.  Ashley Green.  It says, "Poor
2       job fit.  Not a" --
3    A  Yeah.  No.  Yeah.  I can read them.  I'm just
4       trying to see if ones immediately stand out to me
5       that I would know that I was directly involved
6       with.  Darrius.  Correct.  I would have been --
7    Q  Which Darrius?
8    A  Darrius -- I believe there's only one.  Oh, no.
9       Yeah.  They're both Darrius Petty.
10   Q  So which -- there's two entries for Darrius Petty.
11      Are you looking at the first one?
12   A  It would have been the one where he -- I believe he
13      didn't show up.  So it would have been the last one
14      that I can tell you absolute on.
15          And Kameron Ellis and Dymond Baldwin.  I
16      mean, these are just right out of the top.  I may
17      have had interactions with all of them, just not --
18      just not -- some of these were more probably
19      no-shows.  You know, they just didn't show up.
20          Let's see.  I'm trying to remember names.
21      Then I would have to -- I would have to look to --
22   Q  When you say you would have to look --
23   A  Well --
24   Q  -- I mean, what would --
25   A  -- I would have --

1      Q      -- you have to look at?

2      A      The names.

3      Q      You mean something different than what --

4      A      No.  Just I would have to look to see, you know,

5             just -- I can't -- I can't recall whether or not

6             one of them -- unless it's stated that, like -- I

7             believe like some of these -- Shaquana may not have

8             -- just not shown up.  And so some of them could

9             have been without -- you know, that they were let

10            go or they didn't show up and so they -- I was just

11            notified that they didn't show.

12     Q      Let's do one.  Dymond Baldwin.  It says, "Excessive

13            tardiness."

14     A      Yes.

15     Q      The question is why did you take a role in that

16            termination and not take a role in Tyliya's

17            termination --

18     A      Well, I --

19     Q      -- for the same reason?

20     A      -- didn't say that I didn't.  That I -- so I didn't

21            -- you added words in there.  There was --

22     Q      Let me -- let me ask the question that I think that

23            -- where I'm trying -- the foundation is that --

24            which of these employees on here that were

25            terminated did you authorize or recommend the

1             termination of?

2    A       Now you're asking me to try and remember

3             conversations I've had --

4    Q       How about this?  I think this would be -- instead

5             of looking at the list, have -- in between 2022

6             when the -- let's say January of 2022 and today at

7             the Three Points Center North Carolina facility,

8             what employees have you recommended the termination

9             of or -- let's do that.  Recommended the

10            termination of.  Let's stick with one.

11   A       You want me to answer all the ones that I've had

12            involvement with?

13   Q       Let's start with how --

14                   MR. CHANG:  I recommend --

15   Q       -- many have you had direct involvement?

16   A       I don't how to answer that.  I don't -- I can't

17            give you a number.  Five, maybe ten.  I don't know.

18            Twelve.

19   Q       Twelve?

20   A       You're asking me to -- I don't -- I don't know how

21            to answer that because --

22                   MR. CHANG:  I think Mr. Davis's first

23            question was number of employees that you

24            recommended to be terminated.

25   Q       And Ms. Palmer, I'm fine with ballpark.

1     A    Okay.  So directly recommended --

2             MR. CHANG:  Asking (inaudible) --

3     Q    Yes.

4     A    Yeah.  Do you mean directly recommended?

5     Q    I mean in your role as the HR director, somebody

6           came to you who -- or you observed it personally

7           and you're like, "This person needs to go."  That's

8           what I --

9     A    Right.

10    Q    That's what I want to know.

11    A    So, again, that would be -- trying to remember how

12          many we've had come through.  Maybe where I have

13          directly said -- I'm just going to have to throw a

14          ballpark out there.  Ten, maybe, twelve.

15    Q    And that's fine, 'cause ball -- these documents --

16          the case could potentially have more potentially.

17          But yeah.  There's a lot of -- and I know --

18          I know there is turnover.  And I look at this list

19          --

20    A    Right.

21    Q    -- and I can't tell you how many numbers are on

22          there, Ms. Palmer.  Okay?  I mean, I'm not --

23          trying to create a safe space, but I want to keep

24          the conversation going.

25    A    Right.

1    Q    So why -- when you were involved in one of them,

2         what was the practical reason that you were

3         involved in those terminations?

4    A    So some could be just confirming that they had, you

5         know, the appropriate documentation.  Some could be

6         that I was directly involved.  You -- and you said

7         between '22 and '23, correct, when you asked me --

8    Q    I mean, well, just from --

9    A    -- to kind of give that, right?  So --

10   Q    Yeah.

11   A    -- I'm trying to remember exactly when Butch left,

12        because '22 -- I mean '23 and '24 all kind of

13        blended into each other so that I became group

14        living director.

15             So that changes -- so, again, I wasn't

16        trying to be difficult, but you gave a broad

17        spectrum for me to try and answer honestly in.  And

18        so Craig Butcher left, if I'm correct, somewhere in

19        between August of '23, so then -- August of twenty

20        -- hold on.  He was there a year.  Not -- maybe not

21        quite a year, so it would've been '22.  So it would

22        have been '22.  So '22 to '23 would have had me

23        more involved, so that I would have taken a much

24        more active role.  You see what I'm saying?  I

25        would have to look to see timeframes of staff, you

1           know, hires so that I could --

2      Q    Well, let me ask --

3      A    -- answer that more accurately.

4      Q    You want specifics?  I can -- let's look at

5           Tyliya's -- turn a few pages to Ms. Nelson's

6           termination notice.  And it'll --

7      A    Of what document?  I'm sorry.

8      Q    Of --

9      A    Of this one?

10     Q    Yeah.

11     A    Okay.

12     Q    And it'll have Exhibit -- Thibault Exhibit 14 on

13          it.  Do you see it?

14     A    Okay.

15     Q    You know, using this as a visual cue, do you see

16          where it says, "Supervisor's signature"?  And I

17          believe -- I believe Dan -- that looks like Dan --

18     A    Yes.

19     Q    -- from what I've seen.

20               Have you signed any of these forms between

21          January 2022 and roughly the present?

22     A    Well, this is an attendance review/corrective

23          action form, and we don't use those now.  So I

24          don't believe I have signed any of these types of

25          forms while they were being -- you know, when they

1          were being administered.  It would have been

2          probably Butch -- Craig Butcher who would have done

3          that.

4     Q    Okay.  Do you see where it says, "Corrective

5          action" and employee Tyliya Nelson's employment is

6          being terminated?  Acknowledging that, you know,

7          there is forms that could be used for different

8          purposes -- but is terminating an employee really a

9          corrective action?

10    A    Well, it is if that's following up some additional

11         corrective action pieces.  So if you see before on

12         two -- February '22, it says here that she has

13         received a written warning.  The next occurrence

14         will result in a final written warning, and any

15         occurrence after will result in termination.

16              Okay.  So if -- you know, 3-15, if we were

17         -- she should have been -- received her final

18         written warning, and then -- and then 3-28, she

19         should have been terminated.  However, they -- you

20         know, from talking with both Butch and Dan, you

21         know, they were willing to try and work with T. and

22         see if she could fix this ongoing issue.

23              So if we're going to go, you know, off of

24         that, based off of the February write-up, the

25         corrective action stated that she -- this was a

1              written warning, the next one would be a final

2              written warning.  That should have taken place

3              3-15 -- that final written.  3-28, she would've

4              been terminated.

5         Q    So you think -- so is it your testimony that how

6              this should have happened -- how Tyliya's

7              termination should have happened would have been on

8              March 15th, 2022 where it shows twelve minutes

9              late?  She should have gotten a second written

10             warning based on the February one?

11        A    Uh-huh.

12        Q    Which is -- did she get a raise after she received

13             this warning?

14        A    Everybody -- I don't know if it was after this.  I

15             do know that everybody received a raise.

16        Q    Everybody?

17        A    Everybody collectively at that time on their ninety

18             -- everybody received a raise.  It wasn't based off

19             of anything.

20        Q    Now, at ninety days, I also saw -- at ninety days,

21             are employees supposed to start accruing PTO at

22             ninety days?

23        A    They, if I remember -- and this is RMI, so I have

24             to go back.  I believe they start accruing it.

25             They cannot use it 'til after the ninety days.

1   Q   Okay.  So Tyliya did work ninety days, so she would

2       have -- she should have accrued PTO?

3   A   Correct.

4   Q   Okay.  All right.

5   A   Correct.

6   Q   Now, so the first corrective action says employee

7       received the written warning.  Next occurrence will

8       result in a final written warning.  Can you look at

9       the -- on the first one, can you look at the number

10      of minutes late that Ms. Nelson was -- call it

11      docked for or documented for?

12  A   Yeah.

13  Q   What are the minutes?

14  A   Eighteen.

15  Q   Okay.  What is the 2-20-2022?  How many minutes?

16  A   Eighteen.

17  Q   Okay.  And the other one is not tardiness, but it

18      says Ms. Nelson left twenty-one minutes -- with no

19      approval --

20  A   Correct.

21  Q   -- from supervisor.

22          All right.  Now, if you turn to the

23      termination notice, that should have been preceded

24      by a final written warning?

25          MR. CHANG:  Objection to form.

42

1    Q    The -- after March 15th, 2022, six minutes?  Six
2         minutes?
3    A    Uh-huh.  Yeah.
4    Q    Have you ever terminated anybody else for being six
5         minutes late?
6              MR. CHANG:  Objection to form.  That's not
7         why she was terminated.
8    Q    I believe you testified that Ms. Nelson should have
9         been terminated on March 28th, 2022 after -- so
10        let's just use --
11   A    No.  I didn't say two --
12   Q    You said that she should have gotten a written
13        warning on March 15th, 2022, right?
14   A    If they -- right.  If they were -- if they were
15        following what was written in February of 2022.  I
16        didn't write these.  You know, their -- the
17        supervisor wrote this.  So it appears to be that
18        they were still trying to help coach Ms. Nelson
19        into just abiding by this.
20             So yes.  So 3-15, she was twelve minutes
21        late; 3-28, she was six minutes late.  I also know
22        that I provided a time clock, you know, that shows
23        they didn't document all of them.  But 3-28, six
24        minutes late.  So yes, she should have been
25        terminated for six minutes late at that point.

1    Q    Who is -- when you said they didn't document all of
2         them, who is -- who is "they" you're referring to?
3    A    Well, I'm talking about the supervisors.  If you go
4         off of the time clock, she was -- like I said,
5         there is probably fifteen-plus times that she was
6         -- she clocked in late.  And let's --
7    Q    But are they -- are those times that you're
8         referring to -- are those on this form that was
9         produced either by Dan and/or Mr. Butcher?
10   A    No.
11   Q    Okay.  Should those times have been put on this
12        form if they were, in fact, occurrences?
13   A    They could have been.
14   Q    I said should they have, from your -- as the HR rep
15        for this -- for Three Points Center North Carolina?
16        Would that --
17   A    In training a new supervisor, yes, in how to do
18        these, 'cause that would be what Dan was in -- was
19        still in training and trying to understand, you
20        know, his responsibilities in providing these
21        corrective actions.
22   Q    So --
23   A    Yes.
24   Q    So did Dan make the decision to terminate Ms.
25        Nelson or did Craig make the decision to terminate

1               Ms. Nelson?

2       A   I believe it -- like I said, it was Dan who took it

3               to Butch.  They collectively made the determination

4               to terminate at that point.

5       Q   On March 15th, 2022, it says twelve minutes late,

6               and I believe your testimony was she should have

7               gotten a written warning at that time.

8       A   If I was her supervisor, she would have received a

9               written warning.  Yes.

10      Q   But I'm going to do --

11              MR. DAVIS:  Are we at 54?

12              THE COURT REPORTER:  Yes, sir.

13          (PLAINTIFF'S DEPOSITION EXHIBIT NO. 54

14              MARKED FOR IDENTIFICATION)

15      Q   I'm going to show you a text message.  And I'll

16              represent that we may have to look at 54 'cause

17              these are (unintelligible).  Do you -- do you see

18              where -- so this is a text message from Dan.

19              MR. DAVIS:  Oh, these were produced by --

20              Well, Jimmy, let me find it, 'cause these are

21              y'all's.  The Bates got cut off.  Give me one

22              second.  I got it.  I can find them here faster

23              probably.  Okay.  Here we go.

24      Q   All right.  So, Ms. Palmer, that exhibit that has

25              been -- the Bates has been truncated, it's Three

1           Points 636 and -- from your production.  And it is

2      a text message exchange between Daniel and Mr.

3      Craig Butcher.  Daniel reports to Mr. Butcher, "T.

4      was late because she picked up Darrius.  And

5      Candace overslept."  Craig responded, "How late?"

6      And he says, "Which one?"  And then he says, "T.

7      was seven minutes, I think.  Candace was about

8      twenty-five to thirty."

9           Does the fact that Dan and/or Craig knew

10     that the reason that Ms. Nelson clocked in late

11     that day was to pick up another employee to bring

12     them to your place of business -- does that explain

13     why she probably wasn't given a written warning

14     that day?

15           MR. CHANG:  Objection to form.  The March 15

16     --

17           MR. DAVIS:  Jimmy, I've looked.  If --

18           MR. CHANG:  Hey, I'm stating my objection.

19           MR. DAVIS:  Okay.

20           MR. CHANG:  And you're reading text messages

21     that are above the March 15, 2022 date.  Does March

22     15 mean --

23           MR. DAVIS:  Jimmy, this is -- now, this is

24     why I need the time records, because -- and we can

25     go through it.  But I've got time Tyliya did not

```
1                work -- Tyliya wasn't scheduled to work.  I can

2                find it.  Here it is.  I'll just grab

3                (unintelligible).

4        Q      So I'll just -- I'll represent instead of putting

5                something else in, these are from -- remember

6                these, the production?  Tyliya did not work -- she

7                worked on three -- so this -- I'm reading from

8                Three Points 607.  It has Tyliya clocking in on

9                March 14th at six-fifty-nine.  So if she clocked in

10               on March 14th at six-fifty-nine, is it fair to say

11               that this text message is not from March 14th?

12                       MR. CHANG:  Can you show the witness the

13               document that you're --

14                       MR. DAVIS:  Yeah.

15                       MR. CHANG:  -- getting your facts from?

16       Q      Do you understand my question, Ms. Palmer, and the

17               evidence I've presented to you?

18       A      I think I do.  Let me -- can I just make sure?  I'd

19               like to ask you something if -- so what you're --

20               what you're stating is above line of the 3-15 is

21               also 3-15?

22       Q      It is.

23       A      Okay.  That's why I'm asking you.

24       Q      Yeah.

25       A      So, to me, based off of, you know, what you're --
```

```
 1              if that is correct -- if what you are telling me is
 2              correct, which I have no way of verifying other
 3              than to take your word for it, no, that doesn't
 4              tell me that that text message happened on that
 5              date.
 6     Q        Well, here's -- okay.
 7     A        What that tells me -- hold on.
 8     Q        You finish.
 9     A        Let me finish.  What that tells me is that -- and
10              I'm going to get this back and forth, so I've got
11              to remember who is who.  Whomever responded T. was
12              seven minutes.  In actuality, she was twelve
13              minutes late by the clock-in time.
14     Q        Understood.
15     A        So this -- to me, it appears that, you know, they
16              weren't a hundred percent sure, but they think they
17              -- that T. was seven minutes late, so -- but in
18              actuality, it was twelve minutes.  But, again, not
19              knowing, just trusting that that was a March 15th,
20              you know, date above it, which I have no way of
21              knowing, then it would be -- yeah.  That would be
22              T. was seven minutes when actual -- that would be a
23              guess because he put "I think."
24     Q        Yeah.
25     A        She was twelve minutes late.
```

1    Q    Understood.

2    A    Okay.

3    Q    And the point I'm making with this is on March

4         14th, when did Tyliya clock in?

5    A    Well -- but, again --

6    Q    What --

7    A    -- that doesn't -- that's irrelevant because you're

8         trying to assume --

9    Q    I'm asking --

10   A    -- it may have been --

11   Q    I know -- you're arguing with me now.

12   A    Yes.  Sorry.  Sorry.

13   Q    When did Tyliya --

14   A    Yes.

15   Q    -- clock in on the 14th?

16   A    Six-fifty-nine.  Correct.

17   Q    Is six-fifty-nine late or early?

18   A    That would be on time.

19   Q    Okay.  So on March -- if -- on March 14th, would

20        Dan have had any reason to report to his boss that

21        T. was -- T. was late?

22   A    On March 14th?

23   Q    Yes.  Based on that clock-in time.

24   A    No.

25   Q    Okay.  That -- so even though you can't see it,

1          you'll have to have some assumption, that data --
2          who produced this?
3     A    RMI.
4     Q    RMI produced this?
5     A    Uh-huh.
6     Q    So did RMI produce this from the clock-in -- the
7          clock-in machine?
8     A    I doubt that.  No.
9     Q    Where does the data come from?
10    A    That would be from RMI.
11    Q    Okay.  I might have to -- when I say "time
12         machine," at Three Points Center --
13             MR. DAVIS:  How much time are we at for
14         record time?
15             THE COURT REPORTER:  An hour and five
16         minutes.
17             MR. DAVIS:  We're at an hour and five or --
18             THE COURT REPORTER:  You've got an hour and
19         five.
20             MR. DAVIS:  Oh, I have an hour and five.
21         All right.  Good.
22    Q    Did you play sports?
23    A    I did.
24    Q    I'm getting ready to hustle.  Okay?
25    A    You hustle.

1    Q    All right.  Where is that?  I'm looking for our

2         map.  All right.  So this map.  Where are the time

3         machine clock-ins that people have to use their

4         fingerprint?

5    A    At what time?  'Cause they changed.

6    Q    As of March 14th and 15th.

7    A    I cannot -- it was Mr. Butcher who moved them.  So

8         I can tell you two -- I can give that two answers.

9         Okay?  Because I don't know the exact time when he

10        moved them, nor do I recall it being said during

11        his deposition.  And so I just know that they were

12        moved.  So if this is the admin -- I've got to get

13        -- sorry.  I've got to get oriented on this.  So it

14        goes like that.

15   Q    Yeah.  But this -- okay.

16   A    Okay.  And so initially, the clock-in -- and that's

17        the admin school building, so there is a library

18        right here.  And we had it initially right here,

19        'cause that's where the staff park right here.  So

20        they would go right into here and clock in.  Okay?

21        Then it was -- then it was moved.  It was moved

22        down -- when everything was completed and we were

23        able to get that down here, it was moved down to

24        the staff's office and the staff parked here.  And

25        so they would just go right in, first thing they

1        would do is clock in, and then -- so it would just

2        take them seconds to get there.

3    Q    All right.  And so was Tyliya allowed to park

4        there?

5    A    Uh-huh.  That's where we preferred the mentors to

6        park once that was moved.

7    Q    The -- I asked -- I asked where this -- where this

8        data came from, and you answered RMI.  Does that

9        mean that you asked RMI to produce this document?

10   A    I asked RMI to give me the times of the employees,

11       and that's what they sent me.

12   Q    That's what they -- that's what they did?

13   A    Correct.  Correct.

14   Q    When we started the conversation about the time

15       machine, remember you said Mr. Butcher moved them?

16   A    Uh-huh.

17   Q    Okay.  'Cause I have no visual concept --

18   A    Right.

19   Q    -- of what these things look like.  What are they?

20       What do they look like?

21   A    That's a -- if I can -- I've got to -- it's about

22       like this big, a box --

23            MR. CHANG:  All right.

24   A    -- I think.

25            MR. CHANG:  Ms. Palmer, please use words.

1    A    I'm sorry.  A box.

2    Q    (Unintelligible.)

3    A    Yeah.  Sorry.  A box about the -- maybe a little

4         smaller than this notebook.  So yeah.

5    Q    Okay.  And I'm going to interrupt you.

6    A    Maybe half that.  Half this size.  So whatever --

7         I'm horrible with trying to figure out -- six by --

8         I don't know.

9    Q    It's a box?

10   A    Yeah.

11   Q    It's a box.  And does it have some sort of -- what

12        is -- is there a screen on it for fingerprints?  Is

13        it like a whole handprint?  Like, what is it?

14   A    No.  It's a thumbprint.

15   Q    It's a thumbprint.  Like your phone, then?

16   A    Yeah.

17   Q    All right.  And what does it connect to?  Is there

18        another computer nearby or is it standalone?

19   A    No.  It's standalone.

20   Q    Who bought -- who bought it for the company?

21   A    We purchased -- so it's RMI's, but we purchased it

22        -- or rented it, I guess.  I wasn't part of some of

23        this portion.  I went with isolved, so I know that

24        one really well.  And so that would have been sent

25        from RMI to us to use because it was their

53

```
 1              equipment.
 2       Q      Okay.  So that's -- so RMI -- because of their role
 3              for payroll, they --
 4       A      That was what they --
 5       Q      -- provided, like, a comprehensive solution for
 6              clocking in, and that's the time machine that Mr.
 7              Butcher refers to?
 8       A      Correct.  Correct.
 9       Q      The time machine that he moved.
10       A      Correct.
11       Q      And when you said you could move it, it's portable?
12       A      Yeah.  It's just a box that he could move and then
13              -- and then set it back up.
14       Q      Okay.  And so when Dan and/or Butch or any other
15              employee that needs to, you know, write up a
16              subordinate for being tardy, how do they get -- how
17              do they review that information?  Like, where is
18              that information stored?
19       A      All right.  They would have had a limited amount of
20              access to RMI time -- 'cause they have to approve
21              the times, you know, of each person that they
22              supervise.  And so RMI has an app that we would --
23              they would each get their individualized login, and
24              then whatever role they played would be what they
25              would be allowed to -- you know, to view or to
```

54

```
 1              approve.
 2         Q    Okay.  So if you wanted to look -- well, I'm not
 3              going to make -- pass the phone over.  But if you
 4              wanted to see when today's youth mentors got to --
 5              or when they clocked in, it wouldn't be RMI's, but
 6              does isolved have a -- did you get new technology
 7              --
 8         A    Yes.
 9         Q    -- when isolved came?
10         A    Yes.
11         Q    All right.  And you can look at it on your phone?
12              Is it that type of app or is it --
13         A    We could.  Yeah.  Yeah, we could.
14         Q    All right.
15         A    But there is limited things that you can do with
16              it.  So to -- I mean, there's just limited things
17              that you can do with it on the phone.  I don't -- I
18              don't have it on my phone.  I have it on my --
19         Q    On your computer?
20         A    -- on my computer.
21         Q    So you -- right now, if you -- when did isolved --
22         A    I want to say it was the end of '22 that we were
23              doing the transfer over.  First of '23, we went to
24              isolved.
25         Q    Okay.  So you don't have it on your phone.  But if
```

1         you did log in to a computer right now, would it be
2         really easy just to look at everything?  Like is it
3         difficult?
4    A    With isolved?
5    Q    Yeah.
6    A    Oh, yeah.  Uh-huh.
7    Q    It's real easy?  Can you, like, export reports, or
8         can you just, like, log in and just look at stuff?
9    A    I could.  Again, limited access.  Depending on the
10        access I have, I would have a limited ability to --
11        you know, to do some of the functions, 'cause it's
12        --
13   Q    And if I -- why would you have limited -- I mean,
14        you're, like, senior management, correct, at Three
15        Points Center --
16   A    Yes.
17   Q    -- at Three Points Center North Carolina?
18   A    Three Points Center North Carolina.  However, I'm
19        also pretty strict about, you know, what I want to
20        be able to have access to and what I don't.  I like
21        to stay very within the --
22   Q    Right.
23   A    -- that box, so --
24   Q    But is there somebody that -- in this room that
25        would have full --

1    A    No.  I would have had -- no.  I would have had the
2         highest amount of --
3    Q    No.  I'm kidding.  I just wanted --
4    A    -- accessibility.
5    Q    So you would have had -- so at the time Tyliya was
6         terminated, you would have had the highest amount
7         of accessibility?
8    A    Correct.  Correct.
9    Q    Now that you're not an RMI customer, do you still
10        have access to the original data?
11   A    No, I do not.
12   Q    But based on exhibit -- Craig Butcher Exhibit 30,
13        they do?
14   A    Right.  RMI -- yes -- provided that for me at my
15        request.
16   Q    At your -- for all -- for all employees that RMI
17        was the umbrella employer -- what should we call --
18        let's just call them RMI.
19   A    RMI.
20   Q    Did RMI also provide the same functions for the
21        Three Points Center Utah facility?
22            MR. CHANG:  Objection.  Not a topic of
23        examination.  But go ahead and answer.
24   A    I would assume so.  Yes.
25   Q    Is it -- where is -- where is RMI located?

1      A      I believe it's out of Salt Lake.

2      Q      Okay.  And is that in Utah?

3      A      It is.

4              MR. DAVIS:  All right.  Give me one second.

5      There we go.  I think that'll be -- that's probably

6      the best (inaudible).  Where are we at?  56?

7              THE COURT REPORTER:  55.

8              MR. DAVIS:  55.  Okay.

9              THE COURT REPORTER:  Yeah.

10        (PLAINTIFF'S DEPOSITION EXHIBIT NO. 55

11             MARKED FOR IDENTIFICATION)

12             MR. DAVIS:  All right.  Knowing that I'm

13     going to have to have a word with my FedEx print

14     vendor for these truncations, I'm also -- Jimmy,

15     this is RMI subpoena production.  I have not

16     produced this in full form.  Do you see the --

17             MR. CHANG:  Sorry.  To be clear, Mr. Davis,

18     you just haven't prepared it in full form today?

19             MR. DAVIS:  I have not prepared a full form,

20     but we can pull it up and look at it.

21             MR. CHANG:  No.  Just 'cause you said

22     "produced" and I was like --

23             MR. DAVIS:  Yes.

24             MR. CHANG:  -- did you just not produce it?

25             MR. DAVIS:  This is a prepared -- yeah.

1          'Cause I've already submitted this over to you when

2          we got it in December.

3                    MR. CHANG:  Yeah.

4                    THE COURT REPORTER:  You're in low power

5          mode, by the way, if you need to pull something up.

6                    MR. DAVIS:  Well, shoot.  I need to do a

7          quick -- do it right.  Excuse me.  All right.

8          We're not going to worry about it.

9     Q    Ms. Palmer, what I've handed you are -- most of the

10         pages come from a document that RMI produced in

11         response to a subpoena early in the discovery in

12         the case.  And the reason I've included more pages

13         from one -- or there were two documents actually

14         produced.  One was for employee records, okay,

15         related to Three Points Center -- I don't have the

16         subpoena in front of me -- for two different

17         timeframes.  Do you see the top header of this --

18         of the Exhibit 55?

19    A    Uh-huh.

20    Q    It says, "Three Points Center employee voucher

21         report from 1-01-2022 to 4-30-2022."  Okay.  The

22         other one that I've included in here, which is on

23         this back page -- the same type of information was

24         produced for 2020, also, but I didn't include all

25         that.  Okay?  And if I can connect the dots -- I

1           just want to let Jimmy know that's where that one

2           is from.

3                    All right.  So there were sixty-three pages

4           from the 2022 RMI production.  And the reason I've

5           picked Page 23 to start it visually, do you see

6           that Daniel, I guess -- do you know how to

7           pronounce his last name?

8      A    Gschwind.

9      Q    Gschwind.  He is on here.  Do -- right?  And that

10          was -- is that the employee that signed Tyliya's

11          termination notice?

12     A    Correct.

13     Q    Okay.  And is it your position that he was an

14          employee of Three Points Center North Carolina,

15          LLC?

16     A    Correct.

17     Q    Okay.  If you turn to the last -- the last page of

18          the 2022 production -- go one -- go back one more.

19     A    One more.

20     Q    Acknowledging that this is an RMI -- it's its own

21          voucher report, do you see where it says, "Total

22          number of employees:  Two hundred and twenty-

23          seven"?

24     A    Uh-huh.

25     Q    As of January -- or no.  Excuse me.

1              As of April 2022, did Three Points Center

2       North Carolina have two hundred and twenty-seven

3       employees?

4    A  Three Points Center North Carolina did not have two

5       hundred and twenty-seven employees.

6    Q  So even though I haven't produced all sixty-three

7       pages of this RMI voucher report, is it fair to say

8       that this voucher report -- that they provided

9       payroll -- you know, high-level payroll information

10      for all employees for -- not all; excuse me -- for

11      employees of what you contend are Three Points

12      Center Utah and Three Points Center North Carolina?

13   A  You'll have to say the first part.  I got lost in

14      (inaudible) --

15   Q  How about this?  I apologize.

16   A  -- changes.  Sorry.

17   Q  I'll keep it more simple.  I'm going to rephrase

18      it.  If there weren't two hundred and twenty-seven

19      employees of Three Points Center North Carolina,

20      where did the other employees listed on this

21      employee voucher center [sic] work?

22   A  Well, I would have to make the assumption just

23      based off of your question at Three Points Center

24      Utah.

25   Q  Who -- currently, isolved does the same type of

1          role that RMI did at this time, correct?

2     A    When you say "role," you mean do they --

3     Q    The payroll.

4     A    -- provide -- yes.  Yes.  They do payroll.  Yes.

5          Sorry.  I just didn't want to misunderstand what

6          you meant by "role," so --

7     Q    All right.  I don't have any specific ones on here.

8          There is going to be some bouncing around just to

9          do housekeeping.

10              I thought about benefits.  What employees at

11         Three Points Center North Carolina -- full-time

12         employees are entitled to employee benefits?

13    A    Full-time employees.

14    Q    Okay.  A youth mentor -- after ninety days, they

15         begin accruing PTO, correct?

16    A    Well, they begin to accrue it right at the start.

17         They just can't use it until the ninety days.

18    Q    What other benefits besides PTO do the youth

19         mentors and supervisors get after ninety days?

20    A    They have the option for -- 'cause they can opt out

21         and not -- and not use the benefits.

22    Q    But what are the benefits?

23    A    So they have the -- they would be -- have been

24         offered health insurance, I believe a 401(k).  I

25         might be saying it wrong.  And they would have life

1             insurance, you know, that type of -- those type of

2             benefits, so -- which would include vision.  So

3             basically what's on this.

4        Q    Would there even -- did RMI handle the benefits

5             aspect of --

6        A    They did.

7        Q    They did.  Would there be a document -- I guess I

8             won't say similar -- but if you sent a request to

9             RMI or looked through your own records where you

10            could determine the value of -- or the employer

11            contributions to the employee benefit plans that

12            you just discussed?

13       A    You're asking me if I could request it from RMI?

14       Q    Right.

15       A    I don't know how to answer.  I'm not RMI.  I would

16            -- I would think that they would be able to provide

17            that for me.

18       Q    Okay.  All right.  Let's see.  I think you can --

19       A    Yeah.  Yeah.

20       Q    -- put that one away for a little bit.

21                 All right.  Let's get these back out.  Okay.

22            All right.  So we're back to your Exhibit 53, which

23            is Thibault 11 through 14.  Do you remember when I

24            was asking questions about, you know, Ms. Nelson

25            potentially being late because she picked up, you

1          know, Darrius that day on March 15th?

2     A    Okay.

3     Q    If Ms. Nelson was late because she picked up

4          another employee, is that an -- is that an

5          excusable tardiness or inexcusable?

6     A    I don't -- maybe I need to understand what you mean

7          by an excusable tardiness or -- I don't know what

8          you mean by that.

9     Q    Remember -- you've been here -- you've seen a few

10         depositions now in this case.

11    A    I believe all of them except for Norm's.

12    Q    Right.  And the discussions about ratios and the

13         reasons that ratios are required in Utah -- but

14         that my understanding is that Three Points Center

15         North Carolina voluntarily tries to keep those

16         ratios -- the mentor-to-student ratios.  Do you

17         know what I'm talking about?

18    A    We have a policy that they have to maintain that

19         ratio.  Correct.

20    Q    And so my question is if -- you know, you being

21         able to observe these, you know, employee facts,

22         you know, retrospectively, if there is an employee

23         on the road and they're on the way to Three Points

24         Center, and they get a call from one of their

25         coworkers that's got a same shift the same day, and

1          that coworker says, "My car -- my car is not

2          starting, can you come by and get me," would you

3          rather the employee whose car is working stop by

4          and pick up that employee or would you rather them

5          say, "No way, I've got to get there on time"?

6     A    Well, that's kind of a broad question, and there is

7          a lot of variables that could take place.  I can

8          answer it in a -- in a kind of roundabout way.  If

9          we're talking about what is considered late -- and

10         we can be very -- I can be very definite on that

11         for you.  We give -- we give our staff a five-

12         minute window where we won't take disciplinary, if

13         you will, action.

14              But if they are six minutes late, okay -- so

15         not five minutes -- they kind of get a little bit

16         of a grace there, five minutes.  But then if

17         they're six minutes late and then on, you know --

18         'cause we have to remember five minutes is still

19         late.  We're just giving them that five minutes.

20         We're giving them -- before we take any type of

21         disciplinary, you know, action.  But they're still

22         late.

23              After that five minutes, we've got to start

24         that somewhere, right?  So six minutes, now

25         disciplinary actions will be taken because they're

```
1              still -- they're late.  So we do try to work with
2              the staff where they get that five minutes where we
3              don't take disciplinary action, but after that five
4              minutes, it's got -- it's got to start somewhere.
5              Our kids have to have twenty-four-hour supervision.
6              That is just number one.  So at six minutes,
7              they're late.  They're still late at five minutes,
8              but we won't take disciplinary action.  Six
9              minutes, they're late.  That's disciplinary action.
10      Q      Ms. Palmer, and what I asked was given -- as the
11             employer who has to consider these operational
12             criteria, twenty-four-hour supervision, four -- one
13             mentor per four students?  Is that the ratio?  One-
14             to-four?
15      A      We -- that would be a -- yeah.  It's two staff.
16      Q      Given the -- given these two possibilities with the
17             on the way to work do you stop and pick up the
18             other youth mentor or do you say got to get there
19             on time, but then the ratios won't work -- do you
20             understand the example?
21      A      I understand the example.
22      Q      What I'm saying is you as -- having been in this
23             business for a while, in that specific situation,
24             would Tyliya stopping to pick up Darrius or any
25             other employee doing this -- would that have been
```

```
1              considered a good team player or not being a good

2              team player?

3    A    Well, if we're talking about a team player, that

4              doesn't have anything to do with whether or not she

5              was late or not.  And, you know, that's great.

6              However, being -- if you're asking me if I had --

7              if I was Tyliya, like you asked, and I received a

8              notice that said my next one could be -- 'cause

9              this was in February, this was in March.  I would

10             be going, "Look, guys, you need to call your

11             supervisor and let them know the issue.  I'm going

12             to get to work and then we can decide from there."

13                  A good team player, you bet.  You bet.  That

14             would be awesome.  That doesn't negate the late

15             pieces of it, so --

16   Q    I guess my -- understood.  You know, it's -- you

17             know, sometimes your self-interest has to prevail,

18             correct?

19   A    Right.  Right.  Absolutely.

20   Q    But she wasn't written up by Dan on March 15th,

21             2022.  Do you think it's possible that Dan could

22             have made a judgment call -- or let me just say

23             does -- do supervisors and Butch have the ability

24             to say this is an excusable lateness, based on

25             circumstances like we've just been discussing?
```

1    A    Again, I guess I'm trying to understand what you

2         mean by an excusable -- they're still late.  Okay?

3         They're late.  That's not an arguable -- I mean,

4         it's a fact.  If they're six minutes -- for

5         disciplinary actions to be taken -- okay.

6              What they were trying to do in working with

7         T. and -- you know, which, again, trying to be a

8         workable -- we need employees.  We need employees

9         at work.  It affects, you know, the team, if you

10        will.

11             So excusable -- did they call in and provide

12        an excuse as to why they were late?  Yes.  Thank

13        you.  Doesn't take away the fact that they're still

14        late.

15   Q    But I'm saying is picking up a fellow coworker to

16        try to bring them to a place of employment where

17        turnover is high -- is that something that is

18        applauded or not applauded?

19   A    Well, I said that would be -- you know, that's

20        great teamwork.

21   Q    That's great teamwork?

22   A    I did say that.  Right.

23   Q    So what I'm saying is that if now -- and I know

24        with the hypotheticals, you don't like them.  But

25        imagine that this -- that the warning -- there had

1          been a second warning intervening between the

2          February one and here.  Okay?  Maybe there was one

3          other warning maybe on like March 1st or something.

4          Okay?  And then Tyliya picks Darrius up and is late

5          because she picks Darrius up.  Would you have fired

6          Tyliya that day?

7     A    Well, off of a hypothetical, that's a -- you know,

8          that's a -- there are still other variables that

9          you have to take into consideration.  Did she

10         communicate with her supervisor?  What was that

11         communication?  What was the communication of these

12         individuals as to why -- you know, their

13         circumstances?  I would have to take all of that --

14         did they communicate with the supervisor?  And so a

15         lot of that would take -- come into play.

16              And then what are the circumstances of the

17         staff that are on duty waiting for them to show up

18         so that they could be relieved?  You know, so I

19         would have to take a lot of things into

20         consideration.  And, again, that doesn't mean that

21         I wouldn't applaud them for being a great team

22         player and thanks for taking care of your guys in

23         that capacity.  Again, not trying to be a punitive

24         program and saying, you know, that's not good

25         teamwork.  At the same time, that's pretty just

1          irresponsible of the other two to put that burden

2          on T.

3     Q    But she took it on, correct?

4     A    Well, I can't -- I can't make T.'s decisions.  Now,

5          what I -- but what I -- you know, you have to --

6          again, that goes to the -- to do a hypothetical,

7          there are so many pieces that you don't add --

8     Q    I'll add one.

9     A    -- and so --

10    Q    One you mentioned was if T. was picking up Darrius

11         and communicated with Dan proactively before

12         arriving.  Is that -- you know, tell your

13         supervisor, "Hey, I'm running late."  Is that what

14         you're talking about communicating?

15    A    No.

16    Q    Or what?

17    A    No.  I'm saying communicating with them and saying,

18         "Look, I just got called by this person to pick

19         them up."  As a supervisor, most likely my response

20         would be, on a hypothetical, "I need you here.

21         They'll -- we'll have to manage that otherwise,

22         because I've got staff waiting to be relieved."

23    Q    Right.  But having two staff seven minutes late is

24         better than having one staff on time and nobody

25         show up, right?  Right, Ms. Palmer?

1    A    Well, again --

2    Q    What would happen if Tyliya didn't pick up a youth

3         mentor and then it was just her?  What would -- how

4         would the -- how would the -- everything got filled

5         in?  Like, what would happen in that situation?

6    A    I don't know, 'cause I don't know what the

7         circumstances there were and who was covering who.

8         But it appears here that she didn't get Candace,

9         'cause Candace was twenty-five to thirty minutes

10        late.  So she didn't pick up Candace, if I'm

11        reading that correctly.

12             So yes.  Was that awesome of T. to do that?

13        Absolutely.  That's fantastic.  It does not go

14        without creating some sort of an issue at work.  So

15        yeah.  That's a great buddy, friend.  Pretty crappy

16        of the other buddy, friends to put her in that

17        position to have to come get them, but --

18   Q    Why is it -- why is it crappy of somebody --

19   A    Well, because they're making her late now, too.

20   Q    Right.  But, I mean, aren't these -- aren't these

21        youth mentors --

22   A    They know the same -- they have the same --

23   Q    Aren't --

24   A    -- expectation as T. does.

25   Q    Right.  But aren't these their -- most youth

1    mentors, these are their first jobs, aren't they?

2 A  I don't know that.  I don't know.

3 Q  You don't -- you don't know what -- what is the

4    typical age demographic of youth mentors?

5 A  We have, I'm going to say, eighteen to -- let me

6    see.  We have a fifty -- it's really wide.

7 Q  Is it mostly people with high school degrees

8    shortly after they've graduated high school?

9 A  There's quite a few that are in that position.

10    Yeah.

11 Q  And is it mostly young adults?  I mean young adults

12    being eighteen to twenty-one, twenty-two.

13 A  I'm trying to think of our -- a majority of them

14    would range between eighteen and twenty-five-ish.

15 Q  Okay.  And so I think we've -- you know, having

16    that scenario in front of you, you know, I believe

17    it's fair to say that you applauded that as team --

18    a good team effort by Tyliya, fair?  Picking up

19    Darrius that day.

20 A  I would -- I would tell you that -- you know, that

21    was great of T. to do that.  It does not excuse nor

22    negate the late aspect of that.

23 Q  It -- okay.  So turning to Thibault Exhibit 14, go

24    a few pages in on that one.

25 A  Where are we at?

1      Q     It'll be a few towards the end.

2      A     The last one?

3      Q     Yeah.  There we go.

4      A     Okay.  Uh-huh.

5      Q     So based on this testimony, T. did a -- 3-15-2022,

6            that twelve minutes was used to justify Ms.

7            Nelson's termination?

8      A     It would state that she was late.

9      Q     Okay.  So based on your testimony, Three Points

10           Center is using the March 15th late -- the late

11           arrival which appears to have been caused by

12           picking up another employee against Ms. Nelson?

13                 MS. CHANG:  Objection to form.  I think Ms.

14           Heidi said there was about -- at least fifteen

15           lates.

16     Q     Are there fifteen lates on this form?

17     A     There's one, two, three, four, five, six lates on

18           this form.

19                 MR. DAVIS:  56.

20            (PLAINTIFF'S DEPOSITION EXHIBIT NO. 56

21                 MARKED FOR IDENTIFICATION)

22                 THE WITNESS:  Are we done with these ones,

23           just so I don't --

24                 MR. DAVIS:  You can just keep them --

25                 THE WITNESS:  Okay.

1     MR. DAVIS:  -- out.

2  Q    All right.  There's 56.  Let me -- all right.

3        That's 20.  Oh, good.  I got one, too.  We're on

4        the same page.  That's great.  Now let me find it.

5        Okay.  One, two.  Actually, that's mine.  What am I

6        doing?  Jimmy.  Here you go, Ms. Palmer.

7             Okay.  I've handed you Exhibit 56, which is

8        the same type of internal form that Tyliya's

9        warning and termination notice were written on.

10            MR. CHANG:  Objection to form, but go on.

11 Q    What is the employee -- what does the top line of

12       this document say?

13 A    The name of it?

14 Q    Uh-huh.

15 A    It's "Attendance review/Correction action."

16 Q    What is the employee's name?

17 A    Dymond Baldwin.

18 Q    What is the date of this corrective action?

19 A    1-28-22.

20 Q    Okay.  Was Dymond terminated for excessive

21       lateness?

22 A    We had that paper, if I can reference that doc

23       again.  Excessive tardiness.  Yes.

24 Q    Why aren't there any time -- like, why are there no

25       minutes on it?  Like, how late was Dymond?

1    A    I didn't write the corrective action plan.  And I

2         would have to reference -- it looks like Craig

3         Butcher wrote this one.

4    Q    So as the -- as the -- and if I call you HR -- it's

5         hard for me not to call you HR director.  But as

6         the head of HR at Three Points Center North

7         Carolina, taking out the fact that Mr. Butcher is

8         your son-in-law, if you saw a corrective action

9         form like this written by another employee, would

10        you -- for documenting lateness, would you instruct

11        them to put the number of minutes on the corrective

12        action form?

13   A    This one says, "In excess of five minutes," so I

14        could make the assumption quite quickly that that

15        would have been anything outside of that five

16        minutes.

17   Q    Okay.  And so in terms of the underlying data for

18        the -- for Dymond's time records for -- and that's

19        why I've -- if you to go to the second page, it's

20        just an excerpt from the RMI subpoena.  We can't

21        see when Dymond clocked in and clocked out, based

22        on this document, can we?

23   A    Not that I can see.

24   Q    But does -- and maybe Dymond's --

25   A    I only have a small --

1      Q      Hold on.  Give me one -- I might -- I might be --
2             what is Dymond's last name?
3      A      It says Baldwin.
4      Q      I know what it is.  That's why -- it's not in here
5             because we didn't ask for it.
6                    Okay.  But RMI would have a version of this
7             for Dymond that shows when Dymond got to work?
8      A      I would think so.  Absolutely.
9      Q      Okay.  Great.  So we could see how late is late
10            based on Dymond's --
11     A      Well, yeah.  If you wanted to go by the minute, you
12            bet.  But in here -- in the write-up that he -- you
13            know, he provided her, he describes in excess of
14            five minutes.  So you could assume that each one of
15            these dates that he put down here --
16     Q      Yeah.
17     A      -- would be that -- it would be over -- anything
18            over five minutes.  So those dates I would make
19            that connection.  Would have been -- you know, she
20            was over five minutes late.
21     Q      Right.  Do you remember the -- remember the text
22            message where Dan was -- I think might be -- what
23            is your exhibit?  What exhibit is that?
24     A      The one that Dan says T. was seven minutes late?
25     Q      How late was Candace?

1    A    Well, again --

2    Q    How late -- or how late is Dan saying Candace was?

3    A    Right.

4    Q    Yeah.

5    A    Candance was about twenty-five to thirty minutes

6         late.

7    Q    That's per --

8    A    Well, he says twenty-five to thirty.  I'm going to

9         assume it meant minutes, but it doesn't state

10        minutes.  But I'll assume minutes.

11   Q    It's not hours, is it?

12   A    Well, I hope not.

13   Q    That would be --

14   A    That would be a no-show.

15   Q    Now we're on the same page.  That would be a no --

16        all right.

17             Thirty minutes late?

18   A    Right.

19   Q    That is -- that is late, isn't it, Ms. Palmer?

20   A    Yeah.  Well --

21   Q    That's -- did Candace get fired after that?  Do you

22        know?

23   A    I don't know.

24   Q    Let's see.

25   A    I don't know.

1      Q      Okay.  What was -- wait a second.  Candace,

2             Candace, Candace.  What is Candace's last -- do you

3             know what Candace's last name is?

4      A      I have no idea.

5      Q      Yeah.  All right.  So Candace -- Candace did leave

6             the employ of Three Points, but they did not -- she

7             did not -- I assume it's a she.  She did not leave

8             on March 15th.  And I'm looking at it.  Let me

9             point it out to you.

10     A      Let me see.

11     Q      Let's see.  I'll highlight this one.  It is

12            Candace.  Okay.  So based on Candace's, I guess,

13            record in Butcher Exhibit 33, your Exhibit 46,

14            Three Points 581, what was the reason provided for

15            Candace leaving the employ of --

16     A      If we --

17     Q      -- Three Points Center?

18     A      Yeah.  We have to assume that -- I don't know what

19            Candace this one is referencing.  So it -- I don't

20            know if we've --

21     Q      Is it --

22     A      -- had other Candaces.  I can't remember.  It's --

23            but if this was -- I'll make that assumption.

24     Q      Okay.

25     A      If that is the same Candace as this Candace, okay,

1              it would have been unhappy with job.
2       Q     So Candace was not terminated for being thirty
3              minutes late to a shift.  Fair to say?
4       A     Yeah, based off of that.
5       Q     To your knowledge, was -- I understand that you
6              contend that there was -- Tyliya had a no-show on
7              March 30th, correct?
8       A     Yes.  Yeah.  I can't tell you yes for sure on the
9              date --
10      Q     Yeah.
11      A     -- but there was a no-show.  Yes.
12      Q     But what is Tyliya's termination reason on there?
13      A     Tyliya?  Excessive tardiness.
14      Q     Tardy.  Was -- on any of the documented -- in those
15             exhibits, the two Tyliya write-ups, was she ever
16             thirty minutes late?
17      A     No.  She didn't show up.  So she was way more than
18             thirty minutes --
19      Q     Ms. Palmer, I understand.  That is --
20      A     Okay.  So I answered your question.
21      Q     I understand that.  But late -- but, I mean, it's
22             tardiness where she --
23      A     Well, I don't have -- I have the dates that are
24             provided to me.  I can't go off of recollection,
25             straight, you know, recall.  You --

1    Q    Are you saying that those -- there is --

2          potentially that those dates -- that those times

3          are potentially inaccurate?

4    A    No, no, no, no, no.

5          MR. CHANG:  You're asking her to remember

6          and you're not putting the time cards in front of

7          her.

8    A    Right.  I said off of this, I can tell you that

9          these state these times, so I can tell you that

10         that's -- you know, that's accurate.  These state

11         these times.  But to go off of memory on anything

12         else -- because you're asking me if she was over

13         thirty -- I don't know that for sure.

14         I have -- I need to see her time card to be

15         able to -- I can tell you she didn't show up, so

16         she was therefore over thirty minutes late.  So,

17         again, not trying to be, you know, difficult, but

18         you asked me a question that I have been -- I can't

19         -- two year -- two and a half years ago.

20         MR. DAVIS:  Right.  What is our record time?

21         How much have been going?

22         THE COURT REPORTER:  You have twenty-four

23         minutes.

24    Q    You mentioned -- turn to the final page of that --

25    A    Yes.

1      Q    -- the one -- the termination notice.

2      A    Yes.

3      Q    You mentioned the no-show.  Do you remember earlier

4            when you said that Tyliya probably should have

5            gotten a write-up on March 15th?

6      A    If I was her supervisor, I would have.  Yes.

7      Q    Even though there was a reason for it.  I

8            understand.

9                 Why -- for a no-show -- I mean, that seems

10          like a big deal.  Why didn't she get a write-up for

11          being a no-show?

12     A    Well, again, you would have to ask Dan that.  I

13          have not asked Dan that specific question.

14     Q    Ms. Palmer, there is -- there is a -- this is a

15          30(b)(6) deposition where the second --

16     A    I don't --

17     Q    -- topic is Plaintiff's work performance.  It

18          designates Heidi Palmer.  No. 4, Plaintiff's

19          termination.  Another one is the factual basis of

20          probably the affirmative defenses, which -- oh,

21          here we go.  No. 5, "The factual basis for any

22          allegations or defenses raised in Defendant's

23          answer to affirmative defenses."  Are you aware

24          that your attorneys have asserted or will be

25          asserting a defense that there was a legitimate,

1          non-discriminatory reason for terminating Ms.

2          Nelson?

3     A    What page --

4               MR. CHANG:  Okay.  But what was your

5          question --

6               THE WITNESS:  Yeah.

7               MR. DAVIS:  My --

8               MR. CHANG:  -- that prompted that?

9               MR. DAVIS:  My question to -- actually, I

10         apologize --

11              MR. CHANG:  What was the question?

12              MR. DAVIS:  -- because she asked me a

13         question and I got confused.

14              MR. CHANG:  And then you just busted out the

15         --

16              MR. DAVIS:  I did, because --

17              MR. CHANG:  -- topics?

18              MR. DAVIS:  -- she's not --

19              THE WITNESS:  I don't think --

20              MR. DAVIS:  No.  I'm sorry.

21              THE WITNESS:  I didn't ask -- I didn't ask

22         you a question.

23    Q    You said I have to ask Dan, and what I'm saying is

24         Dan is not here.  You have been -- you have been

25         designated.

1          MR. CHANG:  But what was the question where
2          she said -- she had said that in response?  What --
3    Q    She's -- I asked -- I asked why would -- as an
4          employee who is -- from your testimony, is
5          basically on the edge of getting terminated -- you
6          testified that she should have been written up on
7          March 15th, and now there is a no-show, which
8          there's -- I'll acknowledge there is a potential
9          factual dispute there that we don't have get
10         through all today.  She wasn't written up on March
11         30th.  Why not?
12   A    You're asking me to give -- okay.  So she is being
13         supervised.
14   Q    By who?
15   A    By Dan, who has not been deposed at all.  And I did
16         try and do my due diligence.  I was there for
17         Butch's.  I do not in any of the -- of the
18         documents with Butch -- I do not recall just
19         offhand him giving a definition as to why there
20         wasn't a write-up.  I don't -- I can't answer for
21         Dan, honestly, and so --
22   Q    Can you answer for Three Points Center the
23         following question?  Should there have been a
24         write-up if Three Points Center was consistently
25         enforcing their policies around this time?

```
 1              MR. CHANG:  Objection to form.  I don't
 2         think you established when Dan checked the time
 3         cards.
 4              MR. DAVIS:  Don't --
 5              MR. CHANG:  We're just going around in
 6         circles.
 7              MR. DAVIS:  Jimmy, I'm talking about the --
 8         excuse me.
 9    Q    There is no need for a time card for a no-show,
10         correct, Ms. Palmer?  A no-show is a no-show.
11    A    Well, it would show that they didn't show up to
12         work.
13    Q    Right.  But if Ms. Nelson didn't show up to work,
14         and Dan is her supervisor, does he have to check
15         the time card to know that she is not there?
16    A    That's kind of a rhetorical -- no, he wouldn't,
17         because she didn't show up for work.
18    Q    Right.  And if she didn't show up for work -- well,
19         if Dan wasn't there, Craig -- Mr. Butcher could
20         also be her -- he would be the default supervisor?
21    A    He could have been.  Yes.
22    Q    But just to -- I don't have to do -- 'cause we
23         don't know if Dan was -- actually, I don't know
24         right now if he was there on the 30th, actually.
25         Hold on.  Let's see if Dan was there.  What is his
```

1          last name again?

2     A    It starts with a G.  Gschwind.  Gschwind.

3     Q    All right.  So I'm looking at Craig Butcher Exhibit

4          30.

5               MR. CHANG:  Okay.  And I'm just going to

6          state for the record that we were talking a lot

7          about time cards, and that is not being offered to

8          the witness as an exhibit in this lawsuit -- or in

9          this deposition.  You had the copy of it.  Counsel

10         has the only copy of --

11              MR. DAVIS:  No, I don't.  Here it is.

12              MR. CHANG:  That's why I was getting

13         confused why you --

14              MR. DAVIS:  I'm sorry.

15              MR. CHANG:  -- kept asking --

16              MR. DAVIS:  That's why --

17              MR. CHANG:  -- and accusing her of --

18              MR. DAVIS:  No.  No.  All right.  Well,

19         let's see --

20              MR. CHANG:  Well, I'm going to put on the

21         record accusing her of not being able to memorize

22         time cards when --

23              MR. DAVIS:  No.  That's not what I was

24         talking about.  I was talking about the other

25         documentation sheets.

1    Q    All right.  Let's find Dan.  All right.  Okay.
2         Based on the RMI-produced time records, Three
3         Points 592, Dan was not at work on March 30th.
4    A    Okay.
5    Q    Okay.  Are you there?
6    A    Yeah.
7    Q    It's Three --
8    A    Yeah.  Yeah.
9    Q    Okay.  All right.  So if Dan wasn't there, who was
10        Tyliya's direct report?
11   A    Well, I don't know what -- again, I'm not trying to
12        be argumentative.  I don't know what shift that
13        was.  I cannot recall --
14   Q    What shift did Tyliya work, typically?
15   A    If I remember -- and I'm just going off of the
16        information that I have.  I got to remember here.
17        Hold on.  I believe it would have been Hannah who
18        would have been supervising at that time.  So
19        Hannah would have been her supervisor.  And so it
20        would have been Hannah who would have been the
21        supervisor for that day.
22   Q    Okay.  For the day shift?
23   A    Well, for that -- for that timeframe.  I don't -- I
24        would have to go back and look to confirm if that
25        was a -- it would have been a day shift, typically.

```
 1              Yes.
 2      Q      Typically?
 3      A      Typically.
 4      Q      All right.  Okay.  And because -- the first page of
 5              what I've just handed you, it does show Tyliya's
 6              shifts.  Can you just look at that?
 7      A      Yeah.  Yeah.
 8      Q      She's a day --
 9      A      Typically, she would -- yes.  Yes.
10      Q      All right.
11      A      She was a day shift.
12      Q      So if Dan wasn't there on March 30th, the day of
13              the --
14      A      Right.
15      Q      -- alleged no-show --
16      A      It would have been Hannah --
17      Q      -- it would have been Hannah?  Okay.
18      A      -- that would have supervised.
19      Q      And what is Hannah's last name?
20      A      Locke.  Locke.  Locke.
21              MR. DAVIS:  I'm not finding Hannah Locke.
22              Well, if it's not there, it's not there.  Maybe we
23              didn't ask.  I don't know if that was one of them.
24              But just for us, Jimmy, if you look at it, Hannah
25              Locke's time cards have not been -- not time cards
```

1          -- RMI time logs have not been produced.  I'm not

2          saying they were requested.  They're just not here.

3          All right.

4               MR. CHANG:  Are you --

5               MR. DAVIS:  I can't find Hannah.

6               THE WITNESS:  Yeah.  Well, I'm pretty

7          confident.

8               MR. CHANG:  I'm sorry, Mr. Davis.  The first

9          name (inaudible) --

10               MR. DAVIS:  Yeah.

11               MS. CHANG:  And Ms. Palmer, she doesn't go

12          by a different legal name, perhaps?

13               THE WITNESS:  If I -- if by -- no.  She --

14          it would -- that's what my --

15               MR. DAVIS:  Let me see if I -- we -- I'm

16          keeping an eye on the time.  But it's like -- I

17          know we're working, Jimmy, and that's the whole --

18          like, we've got the time.  Let me see did I ask for

19          Hannah, and then I can move on.  I may not have

20          asked for it the first time around.  I think what

21          happened -- I'll say this and we'll move on.  I

22          think I thought Hannah was Haley when I -- when I

23          did the employees.  You know, there's a lot of

24          names.  All right.  So --

25               MR. CHANG:  All right.  Well, I want to be

```
 1              helpful.  It's on -- Hannah Locke is on -- some of

 2              her time, I guess, is on 739.

 3                       MR. DAVIS:  Does it have March 30th, though?

 4                       MR. CHANG:  Oh, no.

 5                       MR. DAVIS:  That's -- Jimmy, that's why --

 6                       MR. CHANG:  I have not --

 7                       MR. DAVIS:  That's why I want to talk

 8              tomorrow about -- never mind.

 9         Q    All right.  Let's move on.  All right.  Ms. Palmer,

10              do you remember exchanging text messages with

11              Tyliya about the no-show where she was pleading for

12              her job back after she was terminated?

13                       MR. CHANG:  Objection to form.

14         Q    Do you remember during -- well, actually, I'm going

15              to -- let me get these out.  Okay.  All right.

16              Here is a fresh exhibit.

17                       MR. DAVIS:  Where -- what number are we at?

18                       THE COURT REPORTER:  57.

19                       MR. DAVIS:  57.

20               (PLAINTIFF'S DEPOSITION EXHIBIT NO. 57

21                       MARKED FOR IDENTIFICATION)

22         Q    We got fifteen minutes.  Okay.  I'm going to hand

23              you 57.  All right.  Okay.  If you can thumb

24              through --

25                       MR. DAVIS:  Well, I'll start --  'cause
```

1              these actually haven't been introduced yet, Jimmy.

2      Q      The -- they're truncated.  But, Ms. Palmer, I'll

3              represent that these are text messages that were

4              produced in discovery -- which your counsel and I

5              can identify the Bates numbers later -- that you --

6              that, based on my review, are exchanges with you

7              and Ms. Nelson the day of her termination and

8              afterwards.  Okay.  I'm going to turn and then when

9              I see the message that I'm looking for -- okay.

10             Here we go.  If you don't mind me, I'll -- there we

11             go.  Do you see where it says, "Last Wednesday?"

12             Is that you -- I assume that's you texting Ms.

13             Nelson there?

14     A      Correct.

15     Q      Okay.  You wrote, "Last Wednesday you were told to

16             get coverage for the shift you wanted to be gone."

17             So if this was sent on April --

18                 MR. CHANG:  Objection to form.  The rest of

19             the sentence is "for at the last minute."  Go

20             ahead.

21     Q      Okay.  Are you referring the -- to -- the Wednesday

22             that you're referring to, do you believe that that

23             was -- is March 30th?  The shift you were told to

24             get coverage?

25     A      It --

1      MR. DAVIS:  I'm going to look it up, Jimmy,

2           just to confirm.

3                MR. CHANG:  Yeah.

4  Q    Yeah.  March 30th, 2022 is a Wednesday.

5  A    So yeah.  'Cause the -- because the -- Marcus --

6           yes.  It would have been the 30th.

7  Q    Okay.  So is it your testimony that no one -- that

8           Marcus did not -- that Tyliya did not secure

9           Marcus's coverage for that day?

10 A    Correct.

11 Q    Okay.  What is Marcus's last name?

12 A    Maness.

13 Q    Okay.  Remember this one that -- now Jimmy and I

14          have an understanding that I've given you all the

15          copies.

16 A    Uh-huh.  Yeah.

17 Q    All right.  Okay.  Turn to Three Points 596.  What

18          is the name of the employee in this time record

19          report?

20 A    Marcus Maness.

21 Q    Is that the employee that you just testified did

22          not show up on March 30th?

23 A    No.  It was T. who didn't show up on March 30th.

24 Q    But it was because -- but you said --

25 A    Sorry.

```
 1     Q     -- you wanted to get coverage and -- but if -- but
 2           if some -- but if Marcus came -- well, turn to the
 3           second page of the text message.  Did Marcus come
 4           to work on the 30th?
 5     A     Okay.  Sorry.  Let me make sure I understand what
 6           you're asking.  So on March 30th -- okay.  Ask your
 7           question again.  You lost me.  Sorry.
 8     Q     You wrote -- Tyliya was written up for a no-show to
 9           justify her termination on the 30th --
10                 MR. CHANG:  Objection --
11     Q     -- correct?
12                 MR. CHANG:  -- to form.
13     Q     The -- here.  Is it a no-show for an employee who
14           gets another employee to cover their shift if the
15           employee that they ask to cover the shift comes in?
16                 MR. CHANG:  Objection to form.
17     A     Is it --
18     Q     Did --
19     A     So if she had gotten an employee to cover her
20           shift, that would not have been considered a
21           no-show.
22     Q     Who did Tyliya tell you that she was -- based on
23           your text messages after she was terminated, who
24           did Tyliya tell you that was -- agreed to come in
25           for her shift --
```

Case 1:23-cv-00527-WO-JGM    Document 39-4    Filed 07/23/24    Page 91 of 104

1      A      And I want to --

2      Q      -- the next day?

3      A      It was -- right.  It was --

4      Q      What is that?

5      A      -- Marcus, 'cause she had sent me this.

6      Q      Now look at Marcus's -- this one.  Did Marcus --

7             was Marcus paid for work by Three Points Center

8             North Carolina on -- for time worked on March 30th,

9             2022?

10     A      He was two and a half hours later, so I don't know

11            if that was because Hannah called him or if that

12            was how that -- 'cause he was late.  He was two and

13            a half hours late.  So based off of his text

14            message here, he didn't secure that.

15     Q      But if -- I guess what I'm saying, if Tyliya

16            reached an agreement with Marcus or another

17            employee the day before her shift where the

18            employee agreed to cover the shift --

19     A      Right.

20     Q       -- okay, and then that other employee is -- I

21            mean, I understand he came in at nine-thirty.  But

22            that's not Tyliya's fault, is it?

23     A      Had she -- correct.  Had she secured that --

24     Q      How can she secure the arrival of somebody who is

25            not in her control?

1      A      Well --

2             MR. CHANG:  Objection to form.

3      Q      How can she -- I mean, if -- I don't know why

4             Marcus showed -- I don't know why he clocked in at

5             nine-thirty, but he obviously came to work that

6             day, didn't he?

7      A      I'm going to -- just based off of what she provided

8             herself -- me.  And that would have been the first

9             time I saw this -- was what she sent me at that

10            time.

11     Q      Right.

12     A      Okay.  So what she provided me shows that he had

13            not agreed to it, but that Hannah was the one who

14            was trying to get the coverage.  So I don't know if

15            that was because Hannah called him up and said,

16            "Hey, you know, would you be able to come in and

17            cover T.'s shift?"  So that would have been --

18            'cause I put in here she shouldn't be the one

19            finding you coverage for that day, 'cause it was

20            agreed upon that if she found the coverage, you

21            know, that she could take that time per her

22            supervisor, and that had not been -- in my

23            understanding at the time, that was not secured.

24            Even based off of what she sent me, that

25            that was not definitive.  He said, "I don't know."

```
1              And, you know, "Will you work with me" -- "work for
2              me," and he puts in here, you know, "I don't know."
3              So I don't know if him showing up here was because
4              -- you know, had he -- had that been secured,
5              Marcus would have been the one late, but I don't
6              know who made contact with Marcus in the end.
7         Q    So when you say "secured," if you're evaluating
8              this decision looking back in time, is Tyliya's
9              actions here, you know -- let's see -- not aligned
10             with your company's expectations because you
11             disagree with the firmness of the agreement that
12             Marcus had with her that day?  Like, what do you
13             mean by "secured"?
14        A    Well, so --
15        Q    You mean (unintelligible) 'cause I'll -- do you
16             mean by "secured" they actually show up?
17        A    No.
18        Q    Or let's just say --
19        A    No.  Had that been --
20        Q    -- he didn't show up and she showed you a text
21             message that was like Marcus signed a contract and
22             said, "I will be there."
23        A    So how we have it now -- this might help you
24             understand what I -- what I mean.  How I have it
25             for group living right now and -- right.  There is
```

1          a form that has to be filled out.  It has to be

2          filled out by the employee who is requesting to

3          swap a shift or to have coverage.  They fill out

4          the form, they find the coverage.  That person then

5          -- so the person who wants the -- who wants that

6          day off or they're swapping a shift or something,

7          okay, they'll -- the person who is seeking that out

8          will sign the form after they find the person who

9          is going to swap them or cover for them.  Both of

10         those entities -- so both of those employees sign

11         that form and get their supervisor to sign it so

12         that we know who to -- you know, this person is

13         supposed to show up, right?  And as -- that's how I

14         have it and have had it for now -- you know, since

15         I've been there.

16             As far as what was put in place and as far

17         as my understanding at the time, okay --

18    Q    But I --

19    A    -- as she is providing this for me --

20    Q    I thought you were there at this time.

21    A    Right.  That's what I'm saying.  So my

22         understanding and knowledge of this, even in

23         listening to Butch and that, was that it had not

24         been confirmed that Marcus was covering it.  And so

25         -- and that's -- hence the reason why the no-show,

1    no-call.

2        I don't know who contacted Marcus.  I don't

3    know if Butch would have known that.  Again, trying

4    to do my best to recall that -- you know, that

5    whole day.  I don't remember if that had been -- I

6    just don't -- I don't recall that being addressed

7    by Butch in it.

8        So I had this piece, and so that's what I

9    knew and still know kind of for surety on coverage.

10   I don't know -- and don't recall if Butch addressed

11   it -- if it was Hannah who reached out to him or

12   how it was that Marcus came in to work then at that

13   time.

14   Q    Did Hannah -- so assuming that Hannah was there --

15   the supervisor that day, did Hannah have the

16   ability to write up Tyliya for Marcus not being

17   there exactly at seven o'clock?

18   A    She could have.  Yes.

19   Q    She could have?

20   A    Uh-huh.

21   Q    She didn't?

22   A    Right.

23   Q    Did -- you mentioned it is now the way you have it

24   about the agreement and forms.

25   A    Right.  Right.

1    Q    Why did you -- why did you implement this new

2         procedure for this situation -- that Marcus March

3         30th situation?

4    A    I like accountability.  So they had it on -- they

5         had it on the phone in our -- in a Zoom piece.  I

6         don't like that.  I want -- I want people to take

7         ownership, you know, of each piece of that.  And so

8         if you and I were working and I needed you to cover

9         my shift, you know, I want you to take ownership of

10        that if you say, "Yes, I'll cover that" so that it

11        shows that I've done my due diligence that has been

12        expected of me to get that coverage.  So me as an

13        employee, I would be going, "Look, I want to secure

14        that you are doing this for me."  So that was the

15        only reason why I took an extra step in that.

16   Q    But with the amount of responsibility that the

17        management -- the administration of Three Points

18        Center has, isn't it unfair to pass the buck onto

19        hourly employees?  I mean, doesn't it stop with you

20        to ensure that shifts are covered?

21   A    I don't know what you're --

22             MR. CHANG:  Objection to form.

23   A    I don't know what you're asking.

24   Q    I guess, I mean, if the ratios are very important

25        -- are the ratios that get implicated by no-shows

1          very important to maintaining the safety of the

2          students?

3     A    The ratios are vital to our -- running our

4          facility.

5     Q    So in terms of accountability, if those ratios

6          aren't there -- or if the employees -- if the

7          employees aren't there, the ratios are not the

8          correct ratios, why are you just letting employees

9          just have these, like, flimsy agreements on text

10         messages at this time?

11              MR. CHANG:  Objection to form.  There is no

12         agreement.  That's the problem.  There --

13    Q    I know.  Well, why is there -- why was there not a

14         -- why was there not a policy at this time?

15    A    There is now.

16    Q    Well, what is the policy?  There is now.  There

17         wasn't -- so if in the handbook which --

18              MR. DAVIS:  What is our record time?  We're

19         not going to get -- we can -- we've already seen

20         them.

21              THE COURT REPORTER:  Two minutes and a half.

22    Q    Yeah.  If there is a policy in the handbook that

23         was presented to Ms. Nelson at some point, would

24         that policy have allowed what Ms. Nelson and Marcus

25         were attempting to do via their Snapchats?

1          MR. CHANG:  Objection to form.
2     Q    Has there been an update to the policy and
3          procedures manual that was produced in discovery in
4          this action introduced during Tyliya's deposition?
5     A    Not to the policy and procedure, but to the mentor
6          expectations.
7     Q    To the --
8     A    Mentors expectations on how to -- how to do this.
9     Q    But is there a form or --
10    A    Yes.  There is a form.
11    Q    Okay.  All right.
12    A    Yes.  That's what I told you.  I have a form.
13    Q    And when was that form created?
14    A    I created that form.  So, like I said, it would
15         have been the end of '23 sometime shortly after
16         Butch left.
17    Q    After Butch left?
18    A    Yeah.  Because Butch was in charge of group living
19         at that time, so, you know, he managed those
20         pieces.
21    Q    So when you're judging Ms. Nelson's conduct at that
22         time, that's not really relevant because you
23         testified that you didn't terminate her --
24         MR. CHANG:  Objection to form.
25    Q    -- right?

1          MR. CHANG:  Objection.

2     A    When I'm judging?  I don't know what you mean by

3          that.  Are you making a statement or are you asking

4          a question?

5     Q    Did Butch write Ms. Nelson up for the Marcus March

6          30th incident?

7     A    Not that I'm aware of.

8     Q    Okay.  Why didn't he write her up?

9     A    You would have to ask Butch that.  He has never

10         offered that, so I couldn't even tell you what he

11         -- what he would have said.

12    Q    Is it possible he didn't write her up because

13         Marcus showed up and it really wasn't that big of a

14         deal?

15         MR. CHANG:  Objection to form.

16    A    Again, I don't know how to -- are you asking me or

17         are you making a statement?

18    Q    I'm asking is it possible that your son-in-law did

19         not write up Ms. Nelson on March 30th because what

20         happened that day was not that big of a deal and he

21         did not consider it to be a violation of his

22         expectations?

23    A    Well, I guess anything is possible.

24         MR. CHANG:  What time are we at?

25         THE COURT REPORTER:  Ten seconds.

1          MR. DAVIS:  Thank you.

2          THE COURT REPORTER:  I have to ask a

3     question.  The same transcript orders as the

4     previous deposition?

5          MR. CHANG:  I need --

6          MR. DAVIS:  Don't forget about --

7          THE COURT REPORTER:  Oh, yes.

8          MR. DAVIS:  Don't forget my counterpart.

9          THE COURT REPORTER:  Jimmy, I'm sorry.

10         MR. CHANG:  Let's go talk outside.

11         THE WITNESS:  You bet.

12         THE COURT REPORTER:  Want to go off the

13    record for a second?

14         MR. CHANG:  Yes, sir.

15            (FOUR-MINUTE RECESS)

16            (6:14 P.M. - 6:18 P.M.)

17    CROSS-EXAMINATION BY MR. CHANG:

18    Q     Okay.  Ms. Palmer, earlier I believe you were

19          answering some hypotheticals.  You said

20          hypothetically you would have, I believe, given Ms.

21          Nelson another write-up.  Is that something you had

22          said earlier --

23    A     Yes.

24    Q     -- if it were you?

25                Okay.  But at the time, did the policy and

1          employee handbook require that?

2     A    No.

3               MR. CHANG:  That's all the questions I have.

4               THE COURT REPORTER:  As I mentioned before,

5          Garrett, same transcript order for both depositions

6          today as we've had in the other depositions?

7               MR. DAVIS:  What's that -- how much does it

8          cost extra to do the condensed?

9               THE COURT REPORTER:  That's not my --

10              MR. DAVIS:  That's not your thing?

11              THE COURT REPORTER:  No.

12              MR. DAVIS:  I think just the same.

13              THE COURT REPORTER:  Same?

14              MR. DAVIS:  Yeah.  I don't want to think

15         anymore.

16              THE COURT REPORTER:  The same for you?

17              MR. CHANG:  The condensed and then the

18         certified.  I don't need a hard copy.

19              THE COURT REPORTER:  Okay.

20              MR. CHANG:  Yeah.  So all electronically.

21              THE COURT REPORTER:  Okay.  PDF for you?

22              MR. CHANG:  Oh, no.  PDF, not the --

23              THE COURT REPORTER:  E-Tran?

24              MR. CHANG:  No.  E-Trans is the one that's,

25         like, hyperlinked and, like, glossary and

1         everything?

2                 MR. DAVIS:  That seems -- I never --

3                 THE COURT REPORTER:  I'll just look at the

4         ones you've done previously and do the same thing.

5         Is that okay?

6                 MR. CHANG:  Yeah.

7                 THE COURT REPORTER:  Or is it PDF?

8                 MR. CHANG:  PDF.

9                 THE COURT REPORTER:  PDF.

10                MR. CHANG:  PDF certified, PDF condensed.

11                THE COURT REPORTER:  Okay.

12                MR. CHANG:  Yeah.

13                THE COURT REPORTER:  We're off the record at

14        six-twenty.

15        (Whereupon, the deposition was concluded at 6:20 P.M.)

16

17

18

19

20

21

22

23

24

25

STATE OF NORTH CAROLINA

COUNTY OF CHATHAM

    I, Peter J. Wylie, a Notary Public in and for the State of North Carolina, duly commissioned and authorized to administer oaths and to take and certify depositions, do hereby certify that on April 18, 2024, MS. HEIDI PALMER, being by me duly sworn to tell the truth, thereupon testified as above set forth as found in the preceding 103 pages, his examination being reported by me verbatim and then reduced to typewritten form under my direct supervision; that the foregoing is a true and correct transcript of said proceedings to the best of my ability and understanding; that I am not related to any of the parties to this action; that I am not interested in the outcome of this case; that I am not of counsel nor in the employ of any of the parties to this action, and that signature of the witness was waived.

    IN WITNESS WHEREOF, I have hereto set my hand, this the 24th day of April, 2024.

_____

Notary Public

Certificate No. 202221000213